WEST/CRS

Nos. 2012-5035, -5036, -5043 (consolidated)

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

JUN - 5 2012

JAN HORBALY
CLERK

SHELDON PETERS WOLFCHILD, ERNIE PETERS LONGWALKER,
SCOTT ADOLPHSON, MORRIS J. PENDLETON,
BARBARA FEEZOR BUTTES, WINIFRED ST. PIERRE FEEZOR,
AUTUMN WEAVER, ARIES BLUESTONE WEAVER,
ELIJAH BLUESTONE WEAVER, RUBY MINKEL, LAVONNE A. SWENSON,
WILLIS SWENSON, AARON SWENSON, BEVERLY M. SCOTT,
LILLIAN WILSON, MONIQUE WILSON, SANDRA COLUMBUS GESHICK,
CHERYL K. LORUSSO, JENNIFER K. LORUSSO,
CASSANDRA SHEVCHUK, JASON SHEVCHUK,
JAMES PAUL WILSON, EVA GRACE WILSON,
BENITA M. JOHNSON, and KEVIN LORUSSO,

Plaintiffs-Cross Appellants,

and

ANITA D. WHIPPLE et al., Descendants of Lucy Trudell,
BONNIE RAE LOWE, et al., Desecendants of Joseph Graham, et al.,
LENOR ANN SCHEFFLER BLAESER et al., Descendants of John Moose,
and MARY BETH LAFFERTY, et al.,

Plaintiffs,

(caption continued on following page)

Appeals from the United States Court of Federal Claims in
Consolidated Case Nos. 03-CV-2684 and 01-CV-0568, Judge Charles F. Lettow

## CORRECTED OPENING BRIEF
## FOR THE UNITED STATES AS APPELLANT

JOHN L. SMELTZER
AARON AVILA
JODY SCHWARZ
 *Attorneys, U.S. Dept. of Justice*
*Environment & Natural*
 *Resources Division*
*(202) 305-0343*
john.smeltzer@usdoj.gov

IGNACIA S. MORENO
*Assistant Attorney General*
*Environment & Natural*
 *Resources Division*
*U.S. Department of Justice*
*Post Office Box 7415*
*Washington, D.C 20044*

and

COURSOLLE DESCENDANTS and ROCQUE AND TAYLOR ESCENDANTS,

Plaintiffs,

and

DEBORAH L. SAUL, LAURA VASSAR, et al., LYDIA FERRIS et al.,
DANIEL M TRUDELL, et al., and ROBERT LEE TAYLOR, et al.,
and DAWN HENRY,

Plaintiffs,

and

RAYMOND CERMAK, SR., (acting individually and
under a power of attorney for Stanley F. Cermak, Sr.),
MICHAEL STEPHENS, et al., JESSE CERMAK, et al., DENISE HENDERSON,
DELORES KLINGBERG, SALLY ELLA ALKIRE,
PIERRE ARNOLD, JR., GETRUDE GODOY et al.,

Plaintiffs,

and

JOHN DOES 1-30, WINONA C. THOMAS ENYARD, and
ELIZABETH T. WALKER,

Plaintiff,

and,

FRANCIE GARREAU, et al.,

Plaintiff,

and

FRANCIS ELAINE FELIX,

Plaintiff,

and

JOHN DOES 1-433,

Plaintiff,

and

KE ZEPHIER, et al.,

Plaintiff,

and

LOWER SIOUX INDIAN COMMUNITY,

Plaintiff,

PHILIP W. MORGAN,

Plaintiff,

and

REBECCA ELIZABETH FELIX,

Plaintiff,

and

VERA A. ROONEY, et al.,

Plaintiff,

and

DANNY LEE MOZAK,

Plaintiff-Cross Appellant,

and

DAWN BURLEY, et al.,

Plaintiff-Cross Appellant,

and

HARLEY ZEPHIER, SR.,

Plaintiff-Cross Appellant,

and

JULIA DUMARCE, et al.,

Plaintiff-Cross Appellant,

and

RAYMOND COURNOYER, SR., et al., JERRY ROBINETTE, et al.,
SANDRA KIMBELL, et al., CHARLENE WANNA, et al.,
and LESLIE LEE FRENCH, et al.,

Plaintiff-Cross Appellants,

and

KRISTINE ABRAHAMSON,

Plaintiff-Cross-Appellant,

v.

UNITED STATES,

Defendant-Appellant.

———————————

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................v

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUES............................................................................6

STATEMENT OF THE CASE...............................................................................7

    A.    Nature of the Case ...............................................................................7

    B.    Course of Proceedings and Decisions Below.......................................7

        1.    Initial Complaint and Ruling on Trust Obligation
            (*Wolfchild I*) ..............................................................................7

        2.    Joinder of Additional Plaintiffs by Amendment
            and Intervention (*Wolfchild II, III,* and *IV*)............................. 11

        3.    Interlocutory Appeal (*Wolfchild V* and *VI*)............................. 13

        4.    Motions to Amend and Partial Summary Judgment
            on Use-Restriction Claim (*Wolfchild VII*) .............................. 13

        5.    Judgment on Merits Claims and Ruling on
            Applicability of Tribal Judgment Act (*Wolfchild*
            *VIII* and *IX*)........................................................................... 16

STATEMENT OF THE FACTS............................................................................ 19

    A.    Sioux Rebellion ................................................................................ 19

    B.    Initial Aid for Loyal Sioux ............................................................... 20

    C.    1888-1890 Acts ............................................................................... 22

D.    Land Purchases and Assignments under the 1888-1890 Acts ........................................................................ 23

E.    Development of Tribal Communities ............................... 24

F.    Disbursement of Pre-1980 Land Revenues ...................... 26

SUMMARY OF ARGUMENT ........................................................... 28

A.    Viability of Use-Restriction Claims ................................. 28

B.    Timeliness of Use-Restriction Claims .............................. 29

C.    Applicability of Tribal Judgment Act .............................. 30

STANDARD OF REVIEW ............................................................... 31

ARGUMENT ................................................................................. 32

I.    The Use-Restriction Claims Are Not Viable ........................... 32

A.    The Tucker Act and Indian Tucker Act Require a Separate Source of Law Establishing a Money-Mandating Duty ............................................................. 32

B.    The 1888-1890 Acts Did Not Mandate Payments to the Descendants of the 1886 Mdewakantons ........................... 37

1.    Authority to Support Descendants Is Not a Money Mandate ............................................................. 37

2.    The Equal Value Proviso Does Not Pertain to Money Payments, Land Revenues, or the Descendants ........................................................ 39

3.    There Was no Actionable Breach (If Any) of the 1888-1890 Acts ................................................... 45

II.   The Use-Restriction Claims Are Barred By The Statute Of
      Limitations .................................................................................. 46

      A.    The Claims Are Time-Barred Under 28 U.S.C. § 2501 ..................... 46

      B.    ITAS Does Not Apply ............................................................. 47

            1.    ITAS Only Applies Where There Is a Trust Duty ................... 48

            2.    ITAS Only Applies Where an Accounting Is
                  Reasonably Required to Demonstrate a Breach ..................... 51

III.  The 1995 Reports Elimination Act Did Not Repeal Any Part of
      The Tribal Judgment Act .............................................................. 54

      A.    The Tribal Judgment Act Governs All Judgments under
            the Indian Tucker Act ............................................................. 55

      B.    Congress did Not Repeal Any Part of the Tribal
            Judgment Act ....................................................................... 56

CONCLUSION ....................................................................................... 61

STATUTORY ADDENDUM: 1888-1890 ACTS ...................................................... I

      Act of June 29, 1888, ch. 503, 25 Stat. 217, 228-29 ......................... I

      Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992-93 ......................... I

      Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349 ........................... II

ADDENDUM (Judgments & Opinions on Appeal) ............................................... A1

      Published Opinion (Dec. 21, 2010) (96 Fed. Cl. 302)
      ("*Wolfchild VII*") ................................................................... A1

      Published Opinion (Aug. 5, 2011) (101 Fed. Cl. 54) ("*Wolfchild
      VIII*") ............................................................................. A52

Judgment (Aug. 5, 2011) ...........................................................................A90

Corrected Judgment  (Aug. 22, 2011) .......................................................A91

Order Denying Motion for Reconsideration (Oct. 25, 2011) 101
Fed. Cl. 92) ("*Wolfchild IX*")...................................................................A92

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Agwiak v. United States*, 347 F.3d 1375 (Fed. Cir. 2003) ....................................... 34

*American Indians Residing on Maricopa-Ak Chin Reservation v. United States*, 667 F.2d 980 (Ct. Cl. 1981)................................... 49

*Barnick v. United States*, 591 F.3d 1372 (Fed. Cir. 2010)..................................... 36

*Bell v. United States*, 366 U.S. 393 (1961) ............................................... 35

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)................................. 35, 41

*Cermak v. Babbitt*, 234 F.3d 1356 (Fed. Cir. 2000) ............................... 12

*Creative Compounds, LLC v. Starmark Laboratories*, 651 F.3d 1303 (Fed. Cir. 2011) ......................................... 31

*Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999) ............................ 48

*Doe v. United States*, 100 F.3d 1576 (Fed.Cir.1996)........................... 34, 36

*Ferreiro v. United States*, 501 F.3d 1349 (Fed. Cir. 2007) ................................. 31

*Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005)................................. 33, 34

*Gillig v. Nike, Inc.*, 602 F.3d 1354 (Fed. Cir. 2010)................................. 31

*Golz v. Shinseki*, 590 F.3d 1317 (Fed. Cir. 2010)....................................... 59

*Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573 (Fed.Cir.1988)................................................. 46

*In re Staats*, 671 F.3d 1350 (Fed. Cir. 2012)........................................... 31

*iLOR, LLC v. Google, Inc.*, 550 F.3d 1067 (Fed. Cir. 2008)................................4

*Loudner v. United States*, 108 F.3d 896 (8th Cir. 1997)..........................49

*Moose v. United States*, 674 F.3d 1277 (9th Cir. 1982) .........................49

*National Ass'n of Counties v. Baker*, 842 F.2d 369
    (D.C. Cir. 1988) ..............................................36

*Nielson v. Shinseki*, 607 F.3d 802 (Fed. Cir. 2010) ..............................60

*Office of Personnel Management v. Richmond*,
    496 U.S. 414 (1990)..........................................39, 45

*Perri v. United States*, 340 F.3d 1337 (Fed.Cir.2003).......................33, 36

*Price v. Panetta*, 674 F.3d 1335 (Fed. Cir. 2012)............................34, 35

*Samish Indian Nation v. United States*, 657 F.3d 1330 (Fed. Cir.
    2011) ("*Samish V*") .......................................35, 36

*San Carlos Apache Tribe v. United States*, 639 F.3d 1350 (Fed.
    Cir. 2011) ..................................................46

*Shoshone Indian Tribe v. United States*, 364 F.3d 1339 (Fed.
    Cir. 2004) ...............................................48, 51-53

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ................................59

*Turtle Mountain Band of Chippewa Indians v. United States*,
    490 F.2d 935 (Ct. Cl. 1974) ..................................57

*TVA v. Hill*, 437 U.S. 153 (1978)..........................................59

*Tyson v. United States*, 32 F.Supp. 135 (Ct. Cl. 1940) .......................34

*United States v. Mitchell*, 445 U.S. 535 (1980) ("*Mitchell I*") ...............33

*United States v. Mitchell*, 463 U.S 206 (1983) ("*Mitchell II*")...........33, 41

*United States v. Navajo Nation*, 556 U.S. 287 (2009)
  ("*Navajo III*") ........................................................... 32, 33, 40

*United States v. Testan*, 424 U.S. 392 (1976) ........................................ 35

*Wolfchild v. United States*, 62 Fed. Cl. 521 (2004)
  ("*Wolfchild I*") ....................................... 10, 11, 13, 17, 19, 21, 24, 56

*Wolfchild v. United States*, 68 Fed. Cl. 779 (2005)
  ("*Wolfchild II*") ............................................................... 11

*Wolfchild v. United States*, 72 Fed. Cl. 511 (2006)
  ("*Wolfchild III*") .............................................................. 12

*Wolfchild v. United States*, 77 Fed. Cl. 22 (2007)
  ("*Wolfchild IV*") ........................................................ 12, 13, 17

*Wolfchild v. United States*, 78 Fed. Cl. 472 (2007)
  ("*Wolfchild V*") .............................................................. 13

*Wolfchild v. United States*, 559 F.3d 1228 (Fed. Cir. 2009)
  ("*Wolfchild VI*") ........................................ 2, 7, 8, 13, 19-21,
                                                              23-25, 29, 38, 42, 44, 48-49

*Wolfchild v. United States*, 96 Fed. Cl. 302 (2010)
  ("*Wolfchild VII*") ................................................ 2-4, 7, 13-14, 19, 21,
                                                              24-28, 37-42, 44, 47, 49-51, 53

*Wolfchild v. United States*, 101 Fed. Cl. 54 (2011)
  ("*Wolfchild VIII*") ............................................... 2-5, 9, 14, 16, 56-59

*Wolfchild v. United States*, 101 Fed. Cl. 92 (2011)
  ("*Wolfchild IX*") ........................................................ 3, 18, 60

*Xianli Zhang v. United States*,
  640 F.3d 1358 (Fed. Cir. 2011) ........................................................ 59

## STATUTES

Act of Feb. 16, 1863, § 9, 12 Stat. 652 ............................................................ 19

Act of Mar. 3, 1863, §§ 3-4, 12 Stat. 819 ........................................................ 20

Act of July 4, 1884, Ch. 180, 23 Stat. 76 ......................................................... 21

Act of Mar. 3, 1885, Ch. 341, 23 Stat. 362 ................................................. 21, 41

Act of Mar. 15, 1886, Ch. 333, 24 Stat. 29 ...................................................... 21

Act of June 29, 1888, Ch. 503, 25 Stat. 217 ................................................ 22, 41

Act of Mar. 2, 1889, Ch. 412, 25 Stat 980 ............................... 22, 38, 40, 41, 42

Act of Aug. 19, 1890, Ch. 807, 26 Stat. 336 ............................... 23, 40, 41, 42


Pub. L. No. 96-557, § 1, 94 Stat. 3262 (1980) ......................................... 25, 26, 38

Pub. L. No. 78-335, ch. 243, 58 Stat. 274 (1944) ............................................. 26


Federal Reports Elimination and Sunset Act ("Reports Elimination Act")

    31 U.S.C. § 1113, note ................................................................. 57

    Pub. L. No. 104-66 § 3003(a), 109 Stat. 707, 734

      (Dec. 21, 1995) ...........................................................17-18, 57-59

    Pub. L. No. 106-113, Div. B, § 1000(a)(5) [Title II, § 236]

      113 Stat. 1536, 1501 A-302 (Nov. 29, 1999) ............................. 57

    Pub. L. No. 110-314, Title I, § 203(b) 122 Stat. 3040 (Aug. 14, 2008) ........... 57


"Indian Tribal Accounting Statute"

    Pub. L. No. 108-108, 117 Stat. 1241, 1263 (Nov. 10, 2003) ........................... 47

    Pub. L. No. 109-54, 119 Stat. 499, 519 (Aug. 2, 2005) .................................. 47


Indian Non-Intercourse Act,

    25 U.S.C. § 177 ................................................................................ 14


Indian Reorganization Act

    25 U.S.C. §§ 461-79 ........................................................................ 24

Tribal Judgment Fund Use or Distribution Act ("Tribal Judgment Act")

Pub. L. No. 93-134, § 2, 87 Stat. 466 (Oct. 19, 1973)..................... 58
Pub. L. No. 97-458 § 1, 96 Stat. 2512 (Jan. 12, 1983) ................... 58
25 U.S.C. §§ 1401-1407 ......................................... 5, 6, 9, 17, 55
25 U.S.C. § 1401 ................................................................ 55
25 U.S.C. § 1402(a) (3).......................... 30, 55, 57, 58, 59, 60
25 U.S.C. § 1403(a), (2)...................................................... 55
25 U.S.C. § 1405(a) ........................................................... 55

28 U.S.C. § 1291 ................................................................. 4
28 U.S.C. § 1292(b) ............................................................. 7

28 U.S.C. § 1491 .................................................... 2, 28, 32
28 U.S.C. § 1505 ........................................ 2, 9, 16, 28, 32, 55
28 U.S.C. § 2501 ........................................... 10, 15, 46, 47
28 U.S.C. § 2517(a)............................................................ 56

31 U.S.C. § 1304(a)....................................................... 55, 56
31 U.S.C. § 3302(b) ........................................................... 45

## RULES & REGULATIONS

Fed. R. App. P. 4(a)(1)(B)(i).................................................. 4
Fed. R. App. P. 4(a)(4) ......................................................... 4

RCFC 14(b) ..................................................................... 11
RCFC 23......................................................................... 11
RCFC 54(b) ...................................................................... 4
RCFC 58(e) ....................................................................... 5
RCFC 59........................................................................... 5

25 C.F.R. § 115.001 .......................................................... 50
25 C.F.R. § 115.002 .......................................................... 50

## STATEMENT OF RELATED CASES

An appeal from the present civil action (Court of Federal Claims No. 1:03-cv-2684) was previously before this Court. *Wolfchild et al. v. United States*, Fed. Cir. No. 2008-5018. The panel consisted of Judges Rader, Bryson, and Prost. The Court issued its decision on March 10, 2009. *Wolfchild v. United States*, 559 F.3d 1228 (Fed. Cir. 2009) ("*Wolfchild VI*") (A225-257). There is one case in the Court of Federal Claims ("CFC") that will be directly affected by this Court's ruling in the pending appeal. On April 27, 2007, after granting a motion to intervene in the present case filed by Kermit A. Belgarde *pro se*, the CFC ordered the cause severed due to the "somewhat divergent nature" of Mr. Belgarde's claims and "case-management considerations." A562 (Dkt. 456). Mr. Belgarde's cause (CFC No. 1:07-cv-00265-CFL) has been stayed pending resolution of the present appeal. There are no other cases, known to counsel, pending in this Court or any other court of appeals that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

Plaintiffs and Intervenor-Plaintiffs (collectively, the "Claimants") are a collection of individuals who claim to be descendants of the "1886 Mdewakantons," a group of Indians who received material support under a series of appropriations enacted in 1888-1890 (the "1888-1890 Acts"). Claimants invoked the jurisdiction of the Court of Federal Claims ("CFC") under the Tucker Act (28 U.S.C. § 1491) and Indian Tucker Act (28 U.S.C. § 1505) to allege, *inter alia*, that the United States breached fiduciary obligations in relation to an alleged trust created under the 1880-1890 Acts. In an interlocutory appeal, this Court held that the 1888-1890 Acts did not create a trust. *Wolfchild VI*, 559 F.3d at 1255 (A252). On remand, Claimants moved to amend their complaints to add new claims, including claims that the United States violated statutory "use restrictions" in the 1888-1890 Acts when distributing revenues from lands purchased under the 1888-1890 Acts.

In a series of published decisions, the CFC granted leave to add the use-restriction claims and granted summary judgment for Claimants on those claims. *Wolfchild v. United States*, 96 Fed. Cl. 302, 351-352 (2010) ("*Wolfchild VII*") (A1-51) (partial summary judgment on liability); *Wolfchild v. United States*, 101 Fed. Cl. 54, 91 (2011) ("*Wolfchild VIII*") (A52-90) (summary judgment on stipulated damage amount). In the same decisions, the CFC dismissed or denied amendment

2

as to all other claims. *Wolfchild VIII*, 101 Fed. Cl. at 76, 91-92 (A74, 87-88); *see also Wolfchild VII*, 96 Fed. Cl. at 351 (A50).  While expressly retaining jurisdiction to review a judgment distribution plan to be prepared by the Department of the Interior under the Indian Tribal Judgment Fund Use or Distribution Act ("Tribal Judgment Act"), the CFC found "no just reason for delay" in entering judgment on the use-restriction claims and directed the Clerk, pursuant to RCFC 54(b) "to enter final judgment against the United States on the use-restriction claims in the amount of $673,944 . . ."  *Wolfchild VIII*, 101 Fed. Cl. at 91-92 (A89-90).  The Clerk entered such judgment on August 22, 2011.  A92 (corrected judgment); *see also* A91 (judgment with incorrect amount).

The United States moved for reconsideration of the Tribal Judgment Act ruling and for entry of final judgment on all claims, noting that the CFC had rejected all other asserted bases for relief.  A620 (Dkt. 1100).  In a published opinion issued on October 25, 2011, the CFC denied reconsideration and denied entry of final judgment as to all claims, citing remaining issues "regarding the government's liability for attorneys' fees" and other costs.  *Wolfchild*, 101 Fed. Cl. 92, 97 (2011) ("*Wolfchild IX*") (A93-100).

3

The United States timely filed a notice of appeal on December 27, 2011 (designated No. 2012-5035).[1] A502; Fed. R. App. P. 4(a)(1)(B)(i), (4)(a)(iv). This Court has jurisdiction over the certified final judgment on the use-restriction claims under 28 U.S.C. § 1291. Although a "bare recitation" of the "no just reason for delay" standard under RCFC 54(b) is insufficient, by itself, to render an incomplete judgment "final" for appeal purposes, this Court will find appellate jurisdiction when there is a Rule 54(b) certification and it is "apparent from the record . . . that there is a sound reason to justify departure from the general rule that all issues decided by the district court should be resolved in a single appeal of a final judgment." *iLOR, LLC v. Google, Inc.*, 550 F.3d 1067, 1072 (Fed. Cir. 2008).

Here, although the CFC nominally withheld final judgment in the case as a whole, the CFC has finally resolved all merits claims. *See Wolfchild VIII*, 101 Fed. Cl. at 76, 91-92 (A74, 89-90); *Wolfchild VII*, 96 Fed. Cl. at 351 (A50). The only questions remaining before the CFC concern: (1) the eligibility of individual plaintiffs to share in the judgment, which the CFC rendered under the Indian

---

[1] Two cross-appeals were filed. A504 (appeal by Intervenor-Plaintiffs Julia DuMarce *et al.*) (designated No. 2012-5036) ; A508 (appeal by Plaintiffs Sheldon Peters Wolfchild *et al.*) (designated No. 2012-5043).

Tucker Act on behalf of an Indian group,[2] *see Wolfchild VIII*, 101 Fed. Cl. at 76-91 (A74-89), and (2) claims by the Plaintiffs and Intervenor-Plaintiffs for attorneys' fees and costs expended to prove eligibility. *See Wolfchild VIII*, 101 Fed. Cl. at 97 (A98). These are post-judgment issues that ordinarily would not delay the entry of final judgment. *See* RCFC 58(e) ("entry of judgment may not be delayed, nor the time for appeal extended, in order to tax costs or award fees" unless a "timely motion for attorneys fees" is filed before the filing of a notice of appeal and the CFC "order[s] that the motion have the same effect under Federal Rule of Appellate Procedure 4(a)(4) as a timely motion under RCFC 59.")   Accordingly, there is no just reason to delay appeal from the CFC's certified final judgment.

---

[2] The CFC determined that the descendants of the 1886 Mdewakantons are entitled to the judgment amount as an identifiable group of Indians and that the Indian Tribal Judgment Funds Use or Distribution Act (25 U.S.C. §§ 1401-7) governs the distribution of the group judgment. *See Wolfchild VIII*, 101 Fed. Cl. at 76-92 (A74-90).

## STATEMENT OF THE ISSUES

1.  Whether the CFC erred in holding, for purposes of jurisdiction under the Tucker Act or Indian Tucker Act, that Acts of 1888-1890, which appropriated funds for the support of the "1886 Mdewakantons," established an implied "money-mandating duty" requiring the Department of the Interior to pay monies derived from lands purchased under the Acts to descendants of the 1886 Mdewakantons;

2.  Whether the CFC erred in holding that the descendants' claims to the above monies (which otherwise accrued in 1981 and 1982) are not time-barred due to the so-called "Indian Trust Accounting Statute" ("ITAS"), which suspended the statute of limitations only for certain claims "concerning losses to or mismanagement of trust funds" until there is an "accounting" of trust assets; and

3.  Assuming that the CFC correctly entered judgment under the Indian Tucker Act in favor of the descendants of the 1886 Mdewakanton as a group, whether the CFC erred in holding that the Tribal Judgment Funds Use or Distribution Act (25 U.S.C. §§ 1401-1407) was repealed in part by the 1995 Reports Elimination Act and therefore no longer provides the exclusive mechanism for determining the distribution of judgments to Indian tribes or groups.

6

## STATEMENT OF THE CASE

### A.    Nature of the Case

This is the second appeal in a long-running case involving claims by alleged descendants of the "1886 Mdewakantons"[3] to revenues from lands (the "1886 lands") that the Department of the Interior purchased for the 1886 Mdewakantons under appropriations acts of 1888, 1889, and 1890 (the "1888-1890 Acts").   In their initial complaints, the Claimants sought damages for breach of trust.  In an interlocutory appeal under 28 U.S.C. § 1292(b), this Court held: (1) that the 1888-1890 Acts did not create a trust in land or monies for the 1886 Mdewakantons or their descendants, and (2) that any trust was terminated by a 1980 Act declaring the subject lands to be held in trust for three organized Indian Communities. *Wolfchild VI*, 559 F.3d at 1237-1260 (A234-257).

On remand, the Claimants sought leave to amend their complaints to bring new claims, *inter alia*, on an issue this Court acknowledged in a footnote but did not resolve in *Wolfchild VI*.  After 1950 and before the 1980 Act, the Department

---

[3]The term "1886 Mdewakantons" refers to "the Mdewakantons who were statutorily eligible for benefits under the [1888-1890] Acts." *Wolfchild VI*, 559 F.3d at 1234 (A231).  The CFC described the same group as the "loyal Mdewakantons." *See, e.g., Wolfchild VII*, 96 Fed. Cl. at 311 (A10); *see also* pp. 19-23, *infra* (history of the 1888-1890 Acts).

of the Interior ("DOI") derived approximately $60,000 in real property revenues by allowing non- Indians to lease or use tracts that were part of the lands purchased under the 1888-1890 Acts. In 1981 and 1982, DOI distributed these funds to the organized Communities. In *Wolfchild VI*, this Court noted the parties' dispute over the "lawful[ness]" of this distribution, but determined that the issue did "not affect analysis of the two certified questions." *Id.* at 1259, n. 14 (A257). Accordingly, this Court left the issue "to be addressed, to the extent necessary, in further proceedings before the [CFC]." *Id.*

Relying on this footnote, the Claimants moved to add claims that the disbursement of the land revenues was in violation of statutory "use restrictions" in the 1888-1890 Acts, notwithstanding the absence of any trust obligation to the descendants. The CFC permitted the amendments and granted summary judgment on the use-restriction claims in the amount of $673,944; *i.e.*, the stipulated value of the subject land revenues as of January 2011. In so doing, the CFC determined: (1) that the 1888-1890 Acts created a "money-mandating duty" in favor of the descendants of the 1886 Mdewakantons, despite the absence of any statutory terms addressing the revenues or descendants; and (2) that the Claimants' efforts to recover the land revenues (which were distributed in 1981 and 1982) were not barred by the statute of limitations, given the so-called "Indian Trust Accounting Statute" or "ITAS," a tolling provision that prevents the statute of limitations from

8

beginning to run against certain claims for the mismanagement of "trust funds" until there is an "accounting." As explained *infra* (pp. 32-54), both rulings are in error and at odds with this Court's holding in *Wolfchild VI*.

Assuming, *arguendo*, that the CFC's judgment on the use-restriction claims are affirmed, the CFC's ruling on the Indian Tribal Judgment Use or Distribution Act (25 U.S.C. §§ 1401-1407) ("Tribal Judgment Act") also requires review. The CFC invoked its jurisdiction under the Indian Tucker Act (28 U.S.C. § 1505) to render judgment in favor of an "identifiable group of Indians," *viz.*, the descendants of the 1886 Mdewakanton. Given the nature of the judgment, the CFC determined that the Tribal Judgment Act governs its distribution, including the determination as to whether the named plaintiffs are descendants of the 1886 Mdewakantons and thus eligible to share in the damage award. *Wolfchild VIII*, 101 Fed. Cl. at 78-91 (A76-89). The Tribal Judgment Act directs DOI to prepare a use or distribution plan exclusively for Congressional review. Nonetheless, the CFC directed DOI to prepare a distribution plan subject to the court's review – instead of Congress – on the theory that the Federal Reports Elimination and Sunset Act of 1995 repealed the Congressional-review provision of the Tribal Judgment Act. *Id.* For reasons explained *infra* (pp. 54-60), there is no basis for implying such repeal.

9

**B.    Course of Proceedings and Disposition Below**

*1.    Initial Complaint and Ruling on Trust Obligation (Wolfchild I)*

Plaintiff Sheldon Peters Wolfchild and others initiated this action in

November 2003 "on behalf of themselves and all other descendants of persons

listed on [a] May 20, 1886 U.S. Mdewakanton census." *Wolfchild v. United States*,

62 Fed. Cl. 521, 533-34 (2004) ("*Wolfchild I*") (A101-136).  The Plaintiffs alleged

two causes of action: (1) that, beginning in 1980 and thereafter, the United States

breached a fiduciary obligation to the 1886 Mdewakantons and their heirs with

respect to real property and other assets derived from the Acts of 1888-1890; and

(2) that the 1888-1890 Acts were part of the consideration of an implied contract

with the 1886 Mdewakantons (alleged promise to provide material support in

exchange for the severing of tribal relations), which the United States also

breached. *Id.* at 533-34, 546 (A113-14, 126).

The United States moved to dismiss arguing, *inter alia*, (1) that the Plaintiffs

failed to state a claim under the Tucker Act or Indian Tucker Act; and (2) that the

stated claims were barred by the six-year statute of limitations (28 U.S.C. § 2501).

*Id.* at 534 (A114).  In a published opinion issued in October 2004, the CFC held

that the Plaintiffs had stated a viable claim for breach of trust and that such claim

was not barred by the statute of limitations because, among other things, the so-

called Indian Trust Accounting Statute ("ITAS") – a tolling provision that has been

10

included in Department of Interior appropriations acts since 1990 – "resuscitated" and preserved the claim. *Id.* at 540-548 (A120-128); *see also Wolfchild v. United States*, 68 Fed. Cl. 779, 784-795 (2005) ("*Wolfchild II*) (A137-163). As for the alleged breach of contract, the CFC dismissed the claim as time-barred, holding that any contract was repudiated in the early 1980s and that the ITAS did not apply to contract claims. *Wolfchild I*, 62 Fed. Cl. at 546-549 (A126-129).

2.    *Joinder of Additional Plaintiffs by Amendment and Intervention (Wolfchild II, III, and IV)*

After holding that descendants of the 1886 Mdewakantons had a viable breach-of-trust claim, the CFC directed the Plaintiffs to file a motion for class certification under RCFC 23 or to propose a plan, per RCFC 14(b), to notify other descendants of the 1886 Mdewakantons, for purposes of allowing their joinder as interested parties. *Wolfchild I*, 62 Fed. Cl. at 555-56 (A135-36). The Wolfchild Plaintiffs elected to pursue notification-and-joinder proceedings. In a 2005 decision, the CFC approved a form of notice, directed the Secretary of the Interior to disclose the names of all known descendants of the 1886 Mdewakanton, and authorized notification at the Plaintiffs' expense. *Wolfchild II*, 68 Fed. Cl. at 801-05 (A159-163). In two subsequent opinions, the CFC granted motions by the Wolfchild Plaintiffs to amend their complaint to add thousands of additional plaintiffs, and granted motions by thousands of others (in several groupings) to

11

intervene as plaintiffs. *Wolfchild v. United States*, 72 Fed. Cl. 511 (2006)

("*Wolfchild III*") (A164-194); *Wolfchild v. United States*, 77 Fed. Cl. 22 (2007)

("*Wolfchild IV*") (A195-210). As a result, the number of plaintiffs grew to over

20,000, consisting of 7,588 plaintiffs under the Wolfchild complaint (as amended)

and 13,286 intervenor-plaintiffs under complaints in intervention by 40 different

groups.[4] *Wolfchild IV*, 77 Fed. Cl. at 34-35 (A207-8). All Claimants allege to be

descendants of Indians eligible to receive benefits under the 1888-1890 Acts.

Plaintiffs and "Group A" Intervenor-Plaintiffs claim an ancestor among the 264

individuals identified on censuses of 1886 and 1889. *See* p. 21, *infra.* "Group B"

Intervenor-Plaintiffs claim entitlement *via* some other source. *Wolfchild IV*, 77

---

[4] In *Wolfchild III*, the CFC also ordered proceedings in *Cermak v. United States* (No. 01-568L), consolidated with *Wolfchild* (No. 03-2684L). Stanley F. Cermak and Raymond Cermak, Sr. (the "Cermaks") initiated their action in the District of Minnesota in 1998, alleging a taking and breach of legal duty with respect to a tract of land that was purchased under the 1888-1890 Acts and assigned to John Cermak, ancestor to the Cermaks. *Wolfchild III*, 72 Fed. Cl. at 521-522 (A174-75). In a series of orders, including orders on appeal by this Court and the Eight Circuit, the case was transferred to the CFC in 2001, A624 (Dkt. 1), transferred back to the District of Minnesota in 2002, A625 (Dkt. 24), and retransferred to the CFC in 2006. A626 (Dkt. 26); see also *Wolfchild III*, 72 Fed. Cl. 522-23 (A175-76) (citing, *inter alia, Cermak v. Babbitt*, 234 F.3d 1356 (Fed. Cir. 2000)). In *Wolfchild III*, the CFC determined that the Cermaks' original claims had been properly dismissed but that a reformulated claim for trust mismanagement – akin to the claims in Wolfchild – could proceed. *Id.* at 521-26 (A174-79). Given the similarity of claims and motions by the Cermaks to intervene in *Wolfchild*, the CFC directed consolidation. *Id.* at 526-527 (A179-80).

Fed. Cl. at 34-35 (A207-8); *Wolfchild v. United States*, 78 Fed. Cl. 472, 476 (2007) ("*Wolfchild V*") (A211-224).

### 3. Interlocutory Appeal (*Wolfchild V* and *VI*)

In 2007, the CFC granted the United States' motion to certify, for interlocutory appeal, two issues first addressed in *Wolfchild I*, namely: (1) whether the 1888-1890 Acts created a trust in favor of the 1886 Mdewakantons and their descendants; and (2) whether the 1980 Act terminated any such trust. *Wolfchild V*, 78 Fed. Cl. at 485 (A224). As noted *supra*, this Court granted interlocutory appeal and reversed, holding that the 1888-1890 Acts did not establish a trust obligation with respect to the 1886 lands and that the 1980 Act terminated any such trust that might have been created. *Wolfchild VI*, 559 F.3d at 1255, 1260 (A252, 257). However, in so doing, this Court declined to reach a dispute over pre-1980 revenues derived from the 1886 lands. *Id.* at 1259-60, n. 14 (A256-57).

### 4. Motions to Amend and Partial Summary Judgment on Use-Restriction Claim (*Wolfchild VII*)

On remand, the Claimants (Plaintiffs and Intervenor-Plaintiffs) sought leave to amend their complaints to add claims: (1) that the United States violated "use restrictions" within the 1888-1890 Acts when disbursing the pre-1980 land revenues, notwithstanding the absence of a statutory trust, *see Wolfchild VII*, 96 Fed. Cl. at 311, 326 (A10, 25); A383-405, A466-488; (2) that the United States

13

violated the Indian Non-Intercourse Act (25 U.S.C. § 177) in its historical dealings with the 1886 Mdewakantons; *see Wolfchild VIII*, 101 Fed. Cl. at 65 (A63); A493-499; and (3) that the United States breached an alleged obligation to provide lands under Acts of 1863. *See Wolfchild VIII*, 101 Fed. Cl. at 69-70 (A67-68); A407-409; A450-455; A489-493; *see also* pp. 19-20, *infra* (describing 1863 Acts). One intervenor group (the "Robertson-Vadnais Group") also sought to add a takings claim based on the alleged failure to provide land. *Wolfchild VIII*, 101 Fed. Cl. at 73 (A71); A410-422. The United States opposed the motions, observing that the claims were not viable and/or barred by the statute of limitations.

In *Wolfchild VII* (decided December 21, 2010), the CFC granted Claimants' motion to add the use-restriction claims and granted partial summary judgment on those claims. *Id.* at 327-352 (A26-51). The CFC reasoned that revenues derived on the 1886 lands before 1980 – excluding certain credits that Congress provided in exchange for converting Wabasha County lands to a wildlife refuge[5] – were subject to the same statutory use restrictions that governed the 1888-1890 appropriations, including the requirement that the appropriations be used for the "support" of the 1886 Mdewakantons or their families. *Id.* at 336-350 (A35-49); *see also* pp. 22-23, *infra* (describing statutes). The CFC further determined that

---

[5] *See* n. 8, *infra*.

statutory terms directing the Secretary to spend the 1888-1890 appropriations, to the extent practicable, equally among the 1886 Mdewakantons created a present-day money-mandating duty compelling the Secretary to distribute land revenues equally among all descendants of the 1886 Mdewakantons. *Id.* at 337, 345-348 (A36, 44-47). Because DOI had disbursed the land revenues to the three Indian Communities and not to the descendants of the 1886 Mdewakantons individually or as a group (*see* pp. 26-28, *infra*), the CFC reasoned that the disbursements were unlawful and that the descendants were entitled to damages in the amount of the unlawfully disbursed funds. *Id.* at 351 (A50).

As to the statute of limitations (28 U.S.C. § 2501), the CFC held that the use-restriction claims were not barred – even though the land revenues had been disbursed in 1981 and 1982 – because, prior to disbursement, the Secretary had held the land revenues in trust accounts. *Id.* at 332-334 (A31-33). The CFC reasoned that the disbursement of trust accounts to the "wrong beneficiaries" constituted the "mismanagement of trust funds" for purposes of the Indian Trust Accounting Statute, a tolling provision first enacted in 1990, which states that the limitations period shall not commence to run on specified claims of trust management, until the Secretary provides an accounting of the trust assets. *Id.* at 335 (A34).

15

5.    *Judgment on Merits Claims and Ruling on Applicability of Tribal Judgment Act (Wolfchild VIII and IX).*

The parties subsequently stipulated that the value of the alleged wrongfully distributed land revenues, as of January 2011, was $673,944. *Wolfchild VIII*, 101 Fed. Cl. at 63 (A61). This left to be resolved: (a) the issue of Claimant eligibility, *i.e.*, the determination whether each individually-named Plaintiff and Intervenor Plaintiff was a descendant of an 1886 Mdewakanton and thus eligible to share in the CFC's judgment on the use-restriction claim, and (b) the Claimants' motions to add additional claims.

In *Wolfchild VIII*, the CFC denied the remaining motions to amend, holding: (1) that the Claimants were not a tribe and thus lacked standing to bring a cause of action under the Indian Non-Intercourse Act; (2) that the 1863 Acts did not create a fiduciary obligation or other money-mandating duty in favor of the 1886 Mdewakantons and their descendants; and (3) that the takings claim (by the Robertson-Vandais group) was time-barred. 101 Fed. Cl. at 76 (A74).

In the same opinion, the CFC also determined that it need not reach the issue of Claimant eligibility. The CFC had already determined that the descendants of the 1886 Mdewakanton were an "identifiable group of American Indians" within the meaning of the Indian Tucker Act and that the Plaintiffs had brought their claims "specifically and solely as members of [this] group." *Id.* at 79 (A77)

16

(quoting *Wolfchild I*, 62 Fed. Cl. at 540). After the CFC granted partial summary judgment to this group on the use-restriction claims, the United States asserted that the use and distribution of the judgment amount would be governed by the Tribal Judgment Act (25 U.S.C. §§ 1401-1407). That Act provides that the "use or distribution of funds appropriated in satisfaction of a judgment . . . in favor of any Indian tribe, band, group, pueblo, or community" is to be made pursuant to a distribution plan developed by the Secretary of the Interior, 25 U.S.C. §§ 1401, 1403, which must first be submitted to Congress for review and potential disapproval. *Id.*, § 1402(a). The CFC agreed that the Tribal Judgment Act applied and that the "court ha[d] no direct role in specifying the individual persons entitled to share in a judgment in favor of the [1886] Mdewakantons as an identifiable group of Indians." *Wolfchild VIII*, 101 Fed. Cl. at 91 (A89). Accordingly, the court ordered the entry of final judgment on the use-restriction claims. [6] *Id.*

The CFC determined, however, that the United States had raised the applicability of the Tribal Judgment Act belatedly, after requiring proof from the Claimants on eligibility issues. *Id.* at 87-89 (A85-87). The CFC further held that

---

[6] Although the form of judgment was entered in favor of the "plaintiffs and plaintiff-intervenors," A90-91, the CFC described the judgment as being "in favor of the descendants of the [1886] Mdewakantons as an identifiable group of Indians." *Wolfchild VIII*, 101 Fed. Cl. at 91 (A89); *see also Wolfchild IV*, 77 Fed. Cl. at 24, n. 1 (A197) (describing "collective action" under the Indian Tucker Act).

17

the Federal Reports Elimination and Sunset Act of 1995, Pub. L. No 104-66,

§ 3003(a), 109 Stat. 707 ("Reports Elimination Act"), repealed the Congressional

reporting provisions of the Tribal Judgment Act. *Id.* at 90 (A88). Given the

presumed unavailability of Congressional review, the CFC directed the Secretary

to prepare a distribution plan under Tribal Judgment Act subject to the court's

review. *Id.* at 91-92 (A89-90). And the CFC directed the Secretary to "provide

reimbursement" to Claimants for their costs in preparing and submitting

genealogies to demonstrate their eligibility. *Id.* at 92 (A90).

The United States moved for reconsideration of the Tribal Judgment Act

decision, noting that the Reports Elimination Act only repealed specified

provisions requiring "annual, semiannual, or regular periodic" reports. *See*

*Wolfchild IX*, 101 Fed. Cl. at 96 (A97). The CFC declined reconsideration,

holding that because the Tribal Judgment Act required "timely" submission of

distribution plans, the reporting requirement was not "*ad hoc*" and qualified as

"regular periodic." *Id.*

## STATEMENT OF THE FACTS

The prior published opinions of the CFC and this Court exhaustively set out the facts in this case, which are not in dispute. *See Wolfchild VI*, 559 F.3d at 1232-36 (A229-233); *Wolfchild VII*, 96 Fed. Cl. at 311-324 (A10-23); *Wolfchild I*, 62 Fed. Cl. at 526-535 (A106-115). The following is a summary of pertinent facts from the published opinions.

### A.    Sioux Rebellion

In a series of treaties in the mid 1800s, the Minnesota Sioux – comprised of the Mdewakanton, Wahpakoota, Sisseton, and Wahpeton Bands – ceded their aboriginal territory to the United States in exchange for a reservation in south central Minnesota and financial promises. *Wolfchild VII*, 96 Fed. Cl. at 312-313 (A11-12). In 1862, incited by perceived treaty violations, the Sioux rebelled, killing over 500 settlers. *Id.* at 313 (A12). In 1863, after the uprising was quelled, Congress annulled the treaties and directed the removal of the Sioux to western territories. *Id.*

In so doing, Congress recognized that some individual Sioux had remained loyal to the United States and had come to the aid of Settlers. *See* Act of Feb. 16, 1863, § 9, 12 Stat. 652, 654. Accordingly, Congress authorized the Secretary of the Interior to set apart, for any individual Sioux who "exerted himself in rescuing the whites . . . ," up to 80 acres from the "public lands" to be held for said Indian

19

and his heirs "forever." Act of Feb. 16, 1863, § 9, 12 Stat. 652, 654. Shortly thereafter, as part of legislation providing for the disposition of the former reservation lands (*via* survey and settlement), Congress provided "[t]hat it shall be lawful for the Secretary to locate any meritorious individual [Sioux] who exerted himself to the lives of whites . . . upon said lands . . ." Act of Mar. 3, 1863, §§ 3-4, 12 Stat. 819. However, area settlers who were opposed to any continued presence of the Sioux effectively blocked the Secretary from exercising this authority. *Wolfchild VI*, 559 F.3d at 1232 (A229). Consequently, individual Sioux who had severed tribal relations and remained in Minnesota were left homeless and destitute. *Id.*

### B.     Initial Aid for Loyal Sioux

In 1865, citing the dire condition of the Indians who "did aid in saving many white men, women and children from being massacred," Congress appropriated $7,500 to be used for an "examination" of "all the facts pertaining to [their] action" during the rebellion and to "make provisions for their welfare." Act of Feb. 9, 1865, Ch. 29. Congress provided no further support, however, for nearly two decades. *See Wolfchild VI*, 559 F.3d at 1233 (A230). During this period, many of the loyal Sioux left the State. *Id.*

In 1884, as part of omnibus acts appropriating funds to numerous Indian tribes and entities, Congress began a series of appropriations for the "support" of

the "full-blood Indians" who had remained in or had returned to Minnesota and "belong[ed] to the Medewakanton [sic] band." *See* Act of May 15, 1886, Ch. 333, 24 Stat. 29, 39-40; *see also* Act of Mar. 3, 1885, Ch. 341, 23 Stat. 362, 375; Act of July 4, 1884, Ch. 180, 23 Stat. 76, 87.  Congress first appropriated $10,000 "for the purchase of stock" and "other necessary articles."  Act of July 4, 1884, Ch. 180, 23 Stat. 76, 87.  In 1885, Congress enacted legislation stating that the 1884 funds could be expended on "agricultural implements, lands, or cash." Act of Mar. 3, 1885, Ch. 341, 23 Stat. 362, 375.  In 1886, Congress appropriated an additional $10,000 for the purchase of "agricultural implements, cattle, [or] lands."  Act of May 15, 1886, Ch. 333, 24 Stat. 29, 39-40.  With such funds, DOI purchased several parcels of land, which DOI granted to individual Mdewakantons in fee. *Wolfchild VI*, 559 F.3d at 1233 (A230).

Also in 1886, DOI conducted a census of full-blood Mdewakantons then residing in Minnesota. *Wolfchild VII*, 96 Fed. Cl. at 316 (A15).  DOI conducted a supplemental census in 1889. *Id.*  Through these censuses, DOI identified a total of 264 individuals. *Wolfchild VI*, 559 F.3d at 1243 (A240).  DOI used these censuses to distribute benefits under the 1888-1890 Acts. *Wolfchild VI*, 559 F.3d at 1234, 1243 (A231, 240); *see also Wolfchild I*, 62 Fed. Cl. at 528 (A108).

## C.    1888-1890 Acts[7]

In 1888, Congress enacted the first of the three appropriations acts at issue in the present case. Similar to the earlier appropriations acts (*supra*), the 1888 Act appropriated funds for the "support" of the "full-blood Indians" who "belong[ed] to the Medawakanton [*sic*] band of Sioux Indians," but who had "severed their tribal relations." Act of June 29, 1888, Ch. 503, 25 Stat. 217, 228-29. The 1888 Act further defined the list of eligible beneficiaries as those former Mdewakantons who had "resided in [Minnesota] since the twentieth day of May, A.D. eighteen hundred and eighty-six." *Id.* The Act appropriated $20,000 and directed the Secretary to expend these funds "as in his judgment he may deem best" for "agricultural implements, cattle, horses, and lands." *Id.*

In 1889, Congress appropriated an additional $12,000 for the "support" of a slightly enlarged class of former "full-blood" Mdewakantons; *viz.*, those who had resided in Minnesota since May 20, 1886, or "who were then engaged in removing to said state and have since resided therein." Act of Mar. 2, 1889, Ch. 412, 25 Stat. 980, 992. The 1889 Act directed the Secretary to expend these funds and remaining appropriations from the 1888 Act upon "these Indians or family thereof," and further directed, "as far as practicable," that all eligible Indians

---

[7] The relevant text of these Acts is set out in the statutory addendum to this brief.

should receive, "an equal amount in value of [the appropriated funds]," that "lands shall be purchased in such locality as each Indian desires," and that "none of said Indians will be required to remove from where he now resides . . . against his will." Act of Mar. 2, 1889, Ch. 412, 25 Stat 992-993.

In 1890, Congress appropriated an additional $8,000 to be expended under the same terms and provisos as included in the 1889 Act, with two new variations: the 1990 Act expanded the class of eligible beneficiaries to "full and mixed blood" Mdewakantons and provided that $2,000 of the appropriated funds "shall be expended for the Prairie Island settlement of Indians in Goodhue County." Act of Aug. 19, 1890, Ch. 807, 26 Stat. 336, 349.

### D.    Land Purchases and Assignments under the 1888-1890 Acts

As noted (*supra*), when purchasing lands under the 1884-1886 Acts, DOI granted title to individual Mdewakantons in fee. Those grants proved unsuccessful, as most recipients promptly sold, abandoned, or encumbered the properties. *Wolfchild VI*, 559 F.3d at 1233 (A230). Accordingly, DOI changed its practice when purchasing lands for the 1886 Mdewakantons under the 1888-1890 Acts. Specifically, DOI retained title (in the name of the United States) and assigned non-inheritable rights of possession to eligible Mdewakanton *via* "Indian Land Certificates." *Wolfchild VI*, 559 F.3d at 1234, 1244-45 (A231, 241-42). The certificates granted the rights of "exclusive use and benefit" so long as the named

"allottee or his or her heirs occupy and use" the land. *Id.* at 1245. However, DOI retained and exercised authority to reassign the land to any other 1886 Mdewakanton or lineal descendant whenever the conditions of an assignment were no longer met. *Id.* Among other things, when an assignee died, DOI did not divide tracts among all heirs, but reassigned the "vacant" tract to the Mdewakanton "most equitably entitled to have . . . temporary use and occupancy." *Id.* at 1247 (A244) (quoting DOI memorandum).

DOI acquired tracts of lands under the 1888-1890 Acts (the "1886 lands") in four areas: (1) 260 acres in Scott County ("Shakopee" lands); (2) 575 acres in Redwood County ("Lower Sioux" lands); (3) 120 acres in Goodhue County ("Prairie Island" lands); and (4) 110 acres in Wabasha County. *Wolfchild VII*, 86 Fed. Cl. at 318-319 (A17-18). Three separate Indian communities developed around the lands purchased in Scott, Redwood, and Goodhue Counties. *Wolfchild VI*, 559 F.3d at 1234-35 (A231-32). DOI subsequently took additional lands into trust for these Communities. *Wolfchild VI*, 559 F.3d at 1235 (A232); *Wolfchild I*, 62 Fed. Cl. 530 (A110). The 1886 lands in Wabasha County were transferred to conservation use in 1944. *Wolfchild VII*, 96 Fed. Cl. at 319-320 (A18-19).

### E.    Development of Tribal Communities

In 1934, Congress enacted the Indian Reorganization Act, which permitted Indian groups "residing on the same reservation" to organize for their common

24

welfare and to receive official recognition from the United States. *See generally*
25 U.S.C. §§ 461-79 (Reorganization Act as amended). Pursuant to this Act, the
three Indian communities that developed around the 1886 lands (as expanded by
trust purchases) organized as three separate tribal entities: (1) the Shakopee
Mdewakanton Sioux Community, (2) the Lower Sioux Indian Community; and
(3) the Prairie Island Indian Community. *Wolfchild VI*, 559 F.3d at 1235 (A232);
*Wolfchild VII*, 96 Fed. Cl. at 319 (A18).

Pursuant to federal law, all three Communities established their own tribal
governments and rules of membership and enrolled members who are not lineal
descendants of the 1886 Mdewakanton. *Id.* This left each of the Communities
with two classes of members: those who were lineal descendants of the 1886
Mdewakanton and could claim rights to the 1886 lands (as administered by DOI)
and those who could not. *Wolfchild VII*, 96 Fed. Cl. at 319, 322-23 (A18, 21-22).
Further, there are many lineal descendants of the 1886 Mdewakantons who never
resided on the 1886 lands or enrolled in any of the Communities. *Id.* Because
DOI held the 1886 lands for the potentially use of these lineal descendants (as a
class) and not as trust lands for the three Communities, the Communities lacked
corporate interests in the 1886 lands. *Id.* at 319, 323 (A18, 21). This created a
significant obstacle to land-use planning and community development. *Id.*

In 1980, to resolve these problems, Congress enacted legislation declaring that all "right, title, and interest of the United States" in the 1886 lands in Scott, Redwood, and Goodhue Counties would "[t]hereafter be held by the United States . . . in trust . . ." for the Shakopee, Lower Sioux, and Prairies Island Communities respectively. Act of Dec. 19, 1980, Pub. L. No. 96-557, § 1, 94 Stat. 3262 ("1980 Act"). The Act required the Secretary of the Interior to publish notice of the "lands transferred" by virtue of the Act, *id.*, § 2, and contained a savings clause stating that "[n]othing in this Act shall (1) alter, or require the alteration, of any rights under any contract, lease, or assignment entered into or issued prior to enactment of this Act, or (2) restrict the authorities of the Secretary of the Interior under or with respect to any such contract, lease, or assignment." *Id.*, § 3.

## F.    Disbursement of Pre-1980 Land Revenues

Before the 1980 Act, DOI derived funds from the 1886 lands in two ways. First, in 1944, Congress enacted legislation to transfer the Wabasha County tract (110 acres) – which was then no longer in use by Indians – to a wildlife refuge. *Wolfchild VII*, 96 Fed. Cl. at 319-320 (A18-19) (citing Pub. L. No. 78-335, ch. 243, 58 Stat. 274 (1944)). To "carry out" the transfer, Congress declared that the sum of $1,261.20 would be "made available . . . to the credit of the Mdewakanton and Wahpakoota Bands of Sioux Indians," "subject to disbursement under the [Secretary's] direction for the benefit of [those] bands," with the further instruction

26

that the Secretary could "set apart and disburse" a "proportionate share" to "groups of such Indians organized as tribes" under the Reorganization Act "based on the number of Indians so organized."[8]  *Id.*  (A19).

Second, sometime after 1950, DOI developed a policy of leasing or licensing 1886 lands for fair market value, where there were no eligible 1886 Mdewakantons available for (and interested in) assignment. *Wolfchild VII*, 96 Fed. Cl. at 320-21 (A19-20).  In some cases, DOI directed license proceeds to be paid directly to a third-party Indian organization (e.g., an Indian School). *Id.* at 320 (A19).  In other cases, DOI collected license fees and rents and deposited them into U.S. Treasury accounts. *Id.*

In 1975, DOI prepared a report of all funds that had been derived from the 1886 lands and held in Treasury accounts. *Id.* at 321 (A20); A266-272.  The 1975 report identified a total of $61,725.22 – inclusive of the Wabasha transfer fund (*supra*) – in three "Proceeds of Labor" Treasury accounts and four "Individual Indian Money" accounts. *Id.*  Thereafter, DOI officials met with tribal leaders to develop a plan for disbursing the proceeds among the three Communities.

---

[8] Because the 1944 Act specified disbursement to the Mdewakanton and Wahpakoota bands and authorized the Secretary to disburse the funds to organized groups, the CFC held that the Act "terminated" any duty to the 1886 Mdewakantons and their descendants, *per se. Wolfchild VII*, 96 Fed. Cl. at 346 (A45).

*Wolfchild VII*, 96 Fed. Cl. at 321 (A20).  In 1981 and 1982, following enactment of

the 1980 Act (pp. 25-26, *supra*), DOI disbursed the funds (which had grown to

over $130,000) to the Communities in accordance with an agreed disbursement

plan.  *Id.*; *see also* A299-307 (tribal agreement).  The CFC ultimately determined

that these disbursements were unlawful on the theory that the 1888-1890 Acts

mandated the payment of the funds to the 1886 Mdewakantons.  *Wolfchild VII*, 96

Fed. Cl. at 351 (A50).

## SUMMARY OF ARGUMENT

### A.    Viability of Use-Restriction Claims

The CFC lacked jurisdiction over and erred in granting judgment upon the

use-restriction claims, which are not viable claims under the Tucker Act (28 U.S.C.

§ 1491) or Indian Tucker Act (28 U.S.C. § 1505).   To state a claim under either

Act, a plaintiff must demonstrate: (1) a specific legal duty on the part of a federal

official, and (2) that the statute or other source of law imposing such duty is

"money-mandating," *i.e.*, fairly can be construed as mandating money damages for

a breach of the relevant duty.   Here, the Claimants failed to show that the 1888-

1890 Acts imposed a specific duty with respect to revenues derived from 1886

lands or that any duties imposed under those acts are money mandating.

The only "use restrictions" in the 1888-1890 Acts are restrictions on and

directives for the expenditure of the originally-appropriated funds.   While statutes

28

that mandate cash payments to individuals – *e.g.*, as compensation for past injuries or labors – have been found to be money-mandating, the 1888-1890 Acts did not mandate or even authorize cash payments from the appropriations. Instead they directed DOI to make expenditures for the 1886 Mdewakantons on items to be selected at DOI's discretion. The CFC cited no precedent for inferring a cause of action for damages from the breach of such a duty.

Moreover, the specific "use restrictions" imposed on the 1888-1890 appropriations cannot reasonably be applied to the later-derived land revenues. Rather, because the 1888-1890 Acts are utterly silent on the question of land revenues and their use, the 1888-1890 Acts either left DOI complete discretion to disburse land revenues in accordance with the general purposes of the Acts or with no discretion to disburse the funds whatsoever. Neither interpretation provides the Claimants with a viable Tucker Act or Indian Tucker Act claim.

**B.    Timeliness of Use-Restriction Claims**

The use-restriction claims were also untimely, since they were not brought within six years of the alleged wrongful disbursement of the land revenues. The so-called Indian Trust Accounting Statute or "ITAS" does not control the limitations period in this case because that statute applies only to "claims concerning losses to or mismanagement of trust funds." Although DOI deposited and maintained the land revenues in U.S. Treasury accounts denominated "trust"

accounts, that action does not make the revenues "trust funds." As this Court held in *Wolfchild VI*, DOI was under no obligation to hold the land revenues in trust for the descendants of the 1886 Mdewakantons. Absent a legal duty to manage the revenues as a trust asset, the revenues cannot be deemed a true trust fund. In addition, this is not a case involving mere mismanagement of or losses to an extant trust, where an accounting was (and remains) reasonably required to provide notice of a breach and possible suit. Rather, the Claimants alleged an unlawful liquidation of trust funds and complete disbursement of trust assets to the wrong beneficiaries. The existence of this alleged breach was evident at the point the trusts funds were thus liquidated. According, ITAS has no bearing on the use-restriction claims and did not rescue those claims from the statute-of-limitations time bar.

### C.    Applicability of Tribal Judgment Act

Because the use restrictions claims are not viable and are time-barred, there is no basis for a judgment against the United States. If this Court finds a basis for the CFC's judgment, however, this Court should review and reverse the CFC's decision to retain jurisdiction over the distribution of the judgment. The CFC entered judgment under the Indian Tucker Act in favor of the descendants of the 1886 Mdewakantons, as an "identifiable group of American Indians." Given the nature of the judgment, the CFC correctly determined that the Tribal Judgment Act

applies to determine a proper distribution. The CFC refused to defer to the Congressional-review procedures under that Act, however, on the theory that the 1995 Reports Elimination Act repealed 25 U.S.C. § 1402(a), the provision that requires DOI to submit use or distribution plans to Congress. In so holding, the CFC ignored the plain terms of the Reports Elimination Act, which limit its application to certain "annual, semiannual, or other regular periodic reports." Section 1402(a) does not require "regular periodic" reports, but instead mandates *ad hoc* submittals whenever the CFC issues a tribal judgment. There is no basis for inferring Congressional intent to repeal this provision and thus no grounds for the CFC's designating itself as substitute reviewer in Congress's place.

## STANDARD OF REVIEW

This Court reviews *de novo* a grant of summary judgment or denial of a motion to dismiss for lack of subject-matter jurisdiction. *Creative Compounds, LLC v. Starmark Laboratories*, 651 F.3d 1303, 1309 (Fed. Cir. 2011). This Court also reviews, *de novo*, all questions of statutory construction, *In re Staats*, 671 F.3d 1350, 1353 (Fed. Cir. 2012), including whether a statute is "money-mandating" for purposes of Tucker-Act jurisdiction, *Ferreiro v. United States*, 501 F.3d 1349, 1352 (Fed. Cir. 2007), and whether a statute of limitations applies to bar a claim. *Gillig v. Nike, Inc.*, 602 F.3d 1354, 1358 (Fed. Cir. 2010).

## ARGUMENT

## I.    THE USE-RESTRICTION CLAIMS ARE NOT VIABLE

### A.    The Tucker Act and Indian Tucker Act Require a Separate Source of Law Establishing a Money-Mandating Duty

The Tucker Act gives the CFC jurisdiction over certain "claim[s] against the United States founded either upon the Constitution, . . . any Act of Congress, . . . any regulation of an executive department, or . . . any express of implied contract . . ." 28 U.S.C. § 1491. The Indian Tucker Act similarly gives the CFC jurisdiction over certain "claim[s] against the United States . . . in favor of any tribe, band, or other identifiable group of American Indians," whenever the claim "aris[es] under the Constitution, laws or treaties of the United States, or Executive orders of the President" or "would be cognizable in the [CFC] if the claimant were not an Indian tribe, band or group." 28 U.S.C. § 1505. "Neither . . . Act . . . creates substantive rights; they are simply jurisdictional provisions that operate to waive sovereign immunity for claims premised on other sources of law." *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) ("*Navajo II*").

To establish a cognizable claim on a separate substantive source of law, a plaintiff need not show that such source *expressly* provides a remedy in damages for an alleged breach. *Id.* However, a plaintiff must show: (1) that the relevant "substantive source of law . . . establishes specific fiduciary or other duties" on the

32

Government, and (2) that such source of law "can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of [such] duties." *Id.*

The courts have found statutory duties to be "money mandating" in two contexts. First, courts have found viable damage claims where a statute or network of statutes creates a specific trust obligation on the part of the Government. *United States v. Mitchell*, 463 U.S 206, 225-26 (1983) ("*Mitchell II*"). A "bare" trust relationship is not sufficient. *Navajo III*, 556 U.S. at 299-302; *United States v. Mitchell*, 445 U.S. 535, 540-545 (1980) ("*Mitchell I*"). But where there is detailed language establishing a specific duty (*e.g.*, duty to manage certain assets for the benefit of a tribe), the courts will infer a cause of action for damages incurred as the result of an alleged breach of trust, based on the language establishing the trust obligation and common-law trust principles. *Navajo III*, 556 U.S. at 301-302; *Mitchell II*, 463 U.S.at 225-26.

Second, this Court has found viable Tucker-Act claims under statutes that create an entitlement to monetary compensation, either by leaving the Government with "no discretion" over the payment of funds, *Fisher v. United States*, 402 F.3d 1167, 1174-75 (Fed. Cir. 2005), or by mandating payment to specified persons under "clear standards," in "precise amounts," and/or on satisfaction of certain conditions. *See Perri v. United States*, 340 F.3d 1337, 1342–43 (Fed.Cir.2003)

33

(citing *Doe v. United States*, 100 F.3d 1576, 1579-80, 1582-83 (Fed.Cir.1996)).

For example, this Court has found Tucker Act jurisdiction over claims founded

upon:

- a statute providing an "undisputed right to the payment of a bonus in an
  amount certain" upon a showing that a plaintiff was employed on a specified
  date, *Price v. Panetta*, 674 F.3d 1335, 1340 (Fed. Cir. 2012);

- a statute giving the Secretary of Defense "no discretion [but] to pay out
  retirement funds" to persons with qualifying disabilities once a disability is
  found to be qualifying under specific standards, *Fisher v. United States*, 402
  F.3d 1167, 1174-75 (Fed. Cir. 2005);

- a statute providing an "entitle[ment]" to remote duty allowance to persons
  employed at specified remote duty sites, *Agwiak v. United States*, 347 F.3d
  1375, 1380 (Fed. Cir. 2003); and

- a statute compelling the Secretary of the Treasury to pay a percentage of the
  funds recovered in a customs enforcement case to an informant who made
  the recovery possible. *Doe*, 100 F.3d at 1582-83 (Fed. Cir. 1996).[9]

---

[9] Although the statute in *Doe* stated that the Secretary of Treasury "*may* award" a
customs informant compensation, an earlier (pre-1986) version of the statute had
long been construed as "confer[ring] upon the informer an absolute right to
demand the payment of the [specified] award" when the "conditions precedent"
were met, *id.* at 1579-80 (quoting *Tyson v. United States*, 32 F.Supp. 135, 136 (Ct.

The common element of these statutes is language that fairly can be read as mandating a monetary payment to specified persons or entities as compensation for "past injuries or labors." *See Bowen v. Massachusetts*, 487 U.S. 879, 905-6 n. 42 (1988) (citing *United States v. Testan*, 424 U.S. 392, 405 (1976) (referencing "Back Pay Act"); *Bell v. United States*, 366 U.S. 393, 398 (1961) (statute providing compensation to former prisoners of war)).

In contrast, any statute that gives a government official "substantial discretion to decide whether to expend government funds in a particular way" does not create a statutory entitlement to funds or any basis from which a cause of action for money damages can be inferred. *Price*, 674 F.3d at 1339. For example, In *Samish Indian Nation v. United States,* 657 F.3d 1330 (Fed. Cir. 2011) ("*Samish V*"), this Court found no Indian Tucker Act jurisdiction over the Samish Indian Nation's claim to proceeds under annual appropriations acts that supported tribal programs per the tribal priority allocation ("TPA") system established by the Bureau of Indian Affairs. 657 F.3d at 1336. This Court noted that the appropriations acts did "not provide a clear standard for paying money to

---

Cl. 1940)), and this Court found no evidence that Congress intended to reverse this longstanding interpretation. *Id.* at 1581-84.

recognized tribes," did not "state the amounts to be paid to any tribe," and did not "compel payment on satisfaction of conditions." [10] *Id.*

Similarly, this Court found no Tucker Act jurisdiction over claims founded on:

- a statute authorizing the Secretary of the Air Force to provide "incapacitation pay" whenever the Secretary finds it to be "in the interests of fairness and equity to do so," *Barnick v. United States*, 591 F.3d 1372, 1378 (Fed. Cir. 2010); and

- a statute permitting (but not mandating) awards to persons who provide "information or assistance directly relating to violations of . . . criminal drug laws" and other statutes. *Perri v. United States*, 340 F.3d 1337, 1341-43 (Fed. Cir. 2003) (distinguishing *Doe, supra*).

The common element of these statutes is that they left government officials with substantial discretion to determine to whom to make authorized payments and in what amount, precluding any assertion of entitlement.

---

[10] In *Samish V*, this Court did find an Indian Tucker Act cause of action based on language of the federal "Revenue Sharing Act" directing the Secretary of the Treasury to pay specified monetary "entitlements" to tribes, States, and local governments *via* formula based on population. 657 F.3d at 1332-33, 1335, 1338-39; *but see National Ass'n of Counties v. Baker*, 842 F.2d 369, 375 (D.C. Cir. 1988) (declining to imply a "substantive right to recover damages" from statutory language creating substantive rights to money "standing alone").

**B.    The 1888-1890 Acts Did Not Mandate Payments to the Descendants of the 1886 Mdewakantons**

As explained *supra* (pp 22-23), the 1888-1890 Acts appropriated funds to be expended by the Secretary of the Interior for the purchase of lands and goods for the support of 1886 Mdewakantons.  In contrast, the present case involves claims by a different class of persons (alleged *descendants* of the 1886 Mdewakantons) to a different set of funds (revenues derived from lands purchased under the 1888-1890 Acts).  The CFC determined that the 1888-1890 Acts governed disbursement of the land revenues because the revenues were traceable to the appropriations, *Wolfchild VII*, 96 Fed. Cl. at 336-37, and that "use restrictions" within the 1888-1890 Acts reasonably can and should be read as mandating the payment of the land revenues to the descendants of the 1886 Mdewakantons. *Id.* at 337-348.  While DOI reasonably interpreted the 1888-1890 Acts as authorizing use of 1886 lands for the support of descendants of the 1886 Mdewakantons, those Acts cannot be construed as mandating the payment of land revenues to descendants.

*1.    Authority to Support Descendants Is Not a Money Mandate*

The CFC held that DOI was "statutorily required" to handle revenues from 1886 lands in accordance with "mandates" within the 1888-1890 Acts, given the "fundamental precept" that every agency action must be "anchored" in some statute and DOI's longstanding practice of managing the 1886 lands to meet the

37

purposes of the 1888-1890 Acts. *Wolfchild VII*, 96 Fed. Cl. at 336-37. There is no denying that DOI looked to the 1888-1890 Acts when managing 1886 lands. As this Court explained in *Wolfchild VI*, while the 1888-1890 Acts did not direct DOI to take lands into trust or require DOI to retain title to lands purchased for the 1886 Mdewakantons, DOI's decision to retain title (in the name of the United States) left DOI with continuing responsibility over the 1886 lands, if not to particular persons, including the duty to determine rights of use and occupancy upon the death of the individual Indians for whom the lands were purchased. *See* 559 F.3d at 1246. Because the 1889 and 1890 Acts permitted DOI to consider the individual needs of any "families" of the 1886 Mdewakantons, Act of Mar. 2, 1889, ch. 412, 25 Stat. at 992; Act of Aug. 19, 1890, ch. 807, 26 Stat at 349, DOI adopted a policy of reassigning available tracts, as the Department deemed best, to family members of 1886 Mdewakantons, broadly defined as including descendants. *Wolfchild VI*, 559 F.3d at 1246-49. Similarly, when no 1886 Mdewakanton or descendant was available to receive such assignment, DOI determined that it could lease or license vacant tracts at fair market value and hold the revenue for the benefit of the area Indian communities. *Id.* at 1248; *see also Wolfchild VII*, 96 Fed. Cl. at 320-321.

DOI's policy of managing the 1886 lands to "approximate Congress's purpose in the [1888-1890] Acts," *WolfchildVI*, 559 F.3d at 1249, supports the view that DOI also had *authority* to disburse land revenues to serve the purposes of

the Acts, *i.e.*, to make expenditures, as the Department deemed best, to "support" one or more of the 1886 Mdewakantons or their "families," inclusive of descendants. It does not follow, however, that the 1888-1890 Acts *mandated* the disbursements of land revenues at any particular time, to any particular descendent, or in any particular amount. To be sure, any statute that authorizes expenditures for a specified purpose necessarily restricts expenditures to that purpose, as agencies cannot disburse federal funds without statutory authority. *See generally Office of Personnel Management v. Richmond*, 496 U.S. 414, 424 (1990) ("the payment of money from the Treasury must be authorized by a statute"). But DOI's implied authority to generate and expend land revenues for the "support" of families of the 1886 Mdewakantons was not a mandate requiring any expenditures, much less a mandate to make monetary payments to any and all identifiable descendants.

> 2.  *The Equal Value Proviso Does Not Pertain to Money Payments, Land Revenues, or the Descendants*

The CFC inferred a money-mandating duty to descendants of the 1886 Mdewakantons not from statutory purpose alone, but principally from the clause in the 1889 and 1890 Acts (hereinafter, the "equal-value proviso") that stated:

> all of said [appropriated] money which is to be expended for lands, cattle, horses, implements seeds, food or clothing shall be so expended that each of the Indians in this paragraph mentioned shall

receive, as nearly as practicable, an equal amount in value of this appropriation.

*See* Act of Aug. 19, 1890, ch. 807, 26 Stat. at 349; Act of Mar 2, 1889, ch. 412, 25 Stat. at 992. This proviso required DOI, as practicable, to expend the subject appropriations on at least one item (land or goods) for every eligible Indian and to provide each Indian with sets of items of roughly equal value. *Id.* The CFC determined that this language likewise provided a "clear standard" for disbursing the land revenues and thus created a money-money mandating duty with respect to the revenues. *Wolfchild VII*, 96 Fed. Cl. at 337, 342-43, 347. This interpretation cannot survive scrutiny.

To begin with, although the above quoted language used the obligatory "shall," it did so in relation to the expenditure of funds for the purchase of specified items. *Id.* As explained *supra*, to establish Tucker Act or Indian Tucker Act jurisdiction, a plaintiff must allege more than the breach of a mandatory duty. *Navajo III*, 556 U.S. at 290. The plaintiff must also show that the duty is money-mandating; *i.e.*, that a cause of action for damages fairly can be inferred in relation to the breach.[11] *Id.* The CFC cited the authority (discussed, *supra*) for inferring a

---

[11]When the relevant statutes establish a specific trust obligation and "define the contours of the United States' fiduciary duties," it "naturally follows that the Government should be liable in damages for the breach of its fiduciary duties."

cause of action for wrongful nonpayment where Congress has mandated direct monetary payments to individuals or entities, e.g., to "compensate a particular class of persons for past injuries or labors." *Wolfchild VII*, 96 Fed. Cl. at 342 (quoting *Bowen*, 487 U.S. at 905-6 n. 42. The CFC cited no authority for inferring a money-mandating duty from language that merely restricts the expenditure of appropriations. Indeed, unlike an earlier 1885 statute that allowed appropriations for the Mdewakantons to be disbursed in the form of "cash," the 1888-1890 Acts did not even authorize monetary payments.[12]

Moreover, even if a money-mandating duty fairly can be inferred from the statutory obligation to spend appropriations in roughly equal parts for the 1886 Mdewakantons, this obligation cannot be construed as applying to descendants of the 1886 Mdewakantons and the later-derived land revenues. This is so for three reasons. First, as noted *supra*, the 1889 and 1890 Acts merely permitted the Secretary to expend the original subject appropriations "as in his judgment he may

---

*Mitchell II*, 463 U.S. at 224, 226. Here, there is no trust, so the intent to provide a monetary remedy for the breach of a statutory duty must be otherwise inferred.

[12]*Compare* Act of Mar. 3, 1885, ch. 341, 23 Stat. 362, 365 (authorizing disbursements for "agricultural implements, lands, or *cash*") with Act of June 29, 1888, ch. 503, 25 Stat. at 230, Act of Mar. 2, 1889, 25 Stat. at 992 *and* Act of Aug.18, 1890, 26 Stat. at 349 (variously authorizing expenditures for "lands", "agricultural implements", "buildings", "seeds", "cattle", "horses", "food", or "clothing").

think best" on lands or goods "as may be deemed best in the case of each [eligible] Indian *or family thereof.*" Act of Mar. 2, 1889, ch. 412, 25 Stat. at 992 (emphasis added); *see also* Act of Aug. 19, 1890, ch. 807, 26 Stat. 336 (nearly identical language). This language did not compel the Secretary to make purchases for living family members of the 1886 Mdewakantons (who did not themselves meet the statutory criteria) or to make provisions for future generations. *Id.* The equal-value proviso (*supra*) did not mention family members or descendants. *Id.*

Second, by its terms, a requirement to distribute moneys equally among a specified class can only operate as a point-in-time mandate; *i.e.*, when there is a fixed sum to be distributed to a fixed or determinable number of persons.[13] DOI generated the subject land revenues over an extended and potentially unbounded period of time, during which time the number of descendants was continually in flux (due to births and deaths). If DOI was statutorily required to disburse an unknowable sum of land revenues equally to an ever-changing cast of individual descendants, when did such mandate attach? Whenever DOI first received any revenues and then only as those descendants alive at the time of each receipt? Or

---

[13] The CFC's observation that the appropriations endured until expended, *Wolfchild VII*, 96 Fed. Cl. at 343) does not alter the fact that the "equal value" proviso applied to fixed sums and a fixed class of beneficiaries.

at some unspecified periodic interval?[14] The virtual impossibility of administering

such a requirement precludes any inference that Congress intended (much less

mandated) such result.

Third, there is no reason to believe that Congress would have intended future

land revenues to be expended equally on any and all future descendants of the

1886 Mdewakantons. Congress's desire to provide roughly equal support to each

of the 1886 Mdewakantons reflected the common circumstance of these Indians,

all of whom had lost their tribal lands and affiliation as a result of a rebellion in

which they (presumably) did not participate, except to aid white settlers. In

contrast, the present Claimants have nothing in common except an alleged lineal

ancestor among one or more Indians alleged to have been eligible to receive

benefits under the 1888-1890 Acts. They are not all descendants to the same

degree, they do not all belong to the same (if any) tribal community, and they do

not share a common economic need. Moreover, per this Court's ruling in

*Wolfchild VI*, Congress did not intend the 1888-1890 Acts to create a trust on

behalf of the 1886 Mdewakanton and their descendants. *See* 559 F.3d at 1255. In

short, there is no textual basis for inferring a statutory duty to equally distribute the

---

[14] If the alleged statutory requirement attached only if and when DOI exercised discretion to disburse the revenues, there was no money-mandating duty, as DOI was free to hold the revenues in perpetuity (or until Congress directed a specific use).

unanticipated funds (the land revenues) to persons (the descendants) who were not intended direct beneficiaries of the appropriations.

The CFC's effort to find support for such duty in the supposed purpose of the 1888-1890 Acts is also misplaced. *See Wolfchild VII*, 96 Fed. Cl. at 340-342. The CFC reasoned that because Congress acted to support the 1886 Mdewakanton, Congress must have intended the appropriations to serve as "substitutes" for benefits earlier provided in treaties with the Sioux bands. *Id.* This cannot be squared with Congress's express decision to appropriate the funds for the support of individual *former* Mdewakantons who had not reorganized and were not required to organize as a group as a condition precedent to receiving support. Nor can it be squared with the absence of any statutory duty to generate future revenues for, or to hold the lands or any portion of the appropriations in trust for, future generations of the 1886 Mdewakantons individually or as a group. *See Wolfchild VI*, 559 F.3d at 1255.

Finally, the CFC errs in suggesting, *Wolfchild VII*, 96 Fed. Cl. at 347, that the equal-value proviso must be interpreted as applying to the land revenues to avoid rendering the proviso "superfluous." The proviso applied to the original appropriations. All 264 of the 1886 Mdewakantons presumably received their fair share from the expenditures, in accordance with the equal value proviso, around the time the statutes were enacted. No principle of statutory construction required

44

revivifying the proviso and applying it in a context to which it did not expressly apply and reasonably could not be applied.

### 3.    There Was no Actionable Breach (If Any) of the 1888-1890 Acts

Because the equal value proviso did not apply to disbursement of the land revenues, the only potentially applicable restriction per the 1888-1890 Acts was an arguable duty to expend the revenues to "support" one or more family members (descendants) of the 1886 Mdewekantons, as the Secretary deemed best. DOI's disbursement of the land revenues to the tribal Communities that were organized on and around the 1886 lands and by descendants of the 1886 Mdewakantons was in accord with this purpose and in accord with the terms and purpose of the 1980 Act (which declared the 1886 lands held in trust for the Communities). However, whether the disbursements were authorized under any or all of these statutes is not at issue. The statutes either gave DOI complete discretion to determine how to disburse the land revenues to meet the statutory purposes or no discretion to disburse the revenues.[15] Under either construction, the Claimants lack a viable Tucker Act or Indian Tucker Act claim. The Claimants' "use restriction" claims were predicated on the assertion that each and every person who is a *bona fide*

---

[15] "Miscellaneous receipts" (funds received without a statutorily prescribed use) must be deposited in the Treasury, 31 U.S.C. § 3302(b), for expenditure only as appropriated by Congress. *Office of Personnel Management*, 496 U.S. at 424.

descendant of an 1886 Mdewakanton is (or was) statutorily *entitled* to a share of the land revenues. For reasons already stated, that interpretation of the 1888-1890 Acts cannot be sustained.

## II.    THE USE-RESTRICTION CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

### A.    The Claims Are Time-Barred Under 28 U.S.C. § 2501

The CFC's judgment on the use-restriction claims also must be reversed under the statute of limitations. A cause of action under the Tucker Act or Indian Tucker Act is time-barred unless filed within six years of the date the cause of action accrued. 28 U.S.C. § 2501; *San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1350 (Fed. Cir. 2011). A cause of action accrues "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *San Carlos Apache*, 639 F.3d at 1350 (quoting *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988)).

Here, the Claimants' use-restriction claims arguably accrued on each occasion that DOI received revenues from leases or licenses on the 1886 lands and failed to disburse the revenues to descendants of the 1886 Mdewakantons as allegedly required by the 1888-1890 Acts. *See* pp. 42-43, *supra.* At the latest, the claims accrued in 1981 and 1982 when DOI disbursed the revenues to the

Communities (pp.26-28, *supra*), thereby precluding disbursement to descendants

of the 1886 Mdewakantons individually and providing notice to individual

claimants that such disbursement would not occur. If the claims accrued in 1981

and 1982, the six-year statute of limitations ran in 1987 and 1988. 28 U.S.C. §

2501.

## B.   ITAS Does Not Apply

As explained *supra*, despite the running of the statute of limitations, the CFC

determined that the statutorily-barred claims were "resuscitated" in 1990, when

Congress began enacting, as part of the annual appropriation to DOI, a tolling

provision sometimes referred to as the "Indian Trust Accounting Statute" or

"ITAS." *See Wolfchild VII*, 96 Fed. Cl. at 331-35. The 2003 enactment stated

that:

> [N]otwithstanding any other provision of law, the statute of
> limitations shall not commence to run on any claim, including any
> claim in litigation pending on the date of the enactment of this Act,
> concerning losses to or mismanagement of trust funds, until the
> affected tribe or individual Indian has been furnished with an
> accounting of such funds from which the beneficiary can determine
> whether there has been a loss.

Pub. L. No. 108-108, 117 Stat. 1241, 1263 (Nov. 10, 2003); *see also* Pub. L. No.

109-54, 119 Stat. 499, 519 (Aug. 2, 2005) (same). Contrary to the CFC's

determination, this statute does not apply.

"Statutes that toll the statute of limitations, resurrect an untimely claim, defer the accrual of a cause of action, or otherwise affect the time during which a claimant may sue the Government . . . are considered a waiver of sovereign immunity" and "must be construed strictly" in favor of the sovereign. *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1346 (Fed. Cir. 2004) (internal citations omitted). This means a waiver will be found only where "unequivocally expressed." *Id.* (quoting *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999). In ITAS, Congress expressly consented to suit only as to claims concerning "trust funds," and only where such claims allege "loss or mismanagement" for which an "accounting" is reasonably required to establish breach of a fiduciary duty.

1.    *ITAS Only Applies Where There Is a Trust Duty*

Properly construed, the Claimants' use restriction claims do not involve "trust funds." Under common usage, a "trust fund" is a fund that must be managed in accordance with trust principles. The first certified question in *Wolfchild VI* was whether the 1888-1890 Acts created a trust for the benefit of the 1886 Mdewakantons "which . . . included land, improvements to land, and *monies* as the corpus." 559 F.3d at 1237 (emphasis added). This Court answered "no." *Id.* at 1255. Although this Court's decision focused principally on the 1886 lands as opposed to the monies derived from the lands, this Court's decision expressly and

48

logically embraced both, foreclosing any claim that the 1888-1890 Acts imposed trust duties as to the monies. *Id.* at 1237-55.

Nor did the CFC determine that DOI had a trust obligation in relation to the land revenues arising from a different statute. In a footnote, the CFC cited various authorities for the proposition that when the Government holds any Indian money, the funds are presumed to be held in trust. *Wolfchild VII*, 96 Fed. Cl. at 332, n. 41 (citing *Loudner v. United States*, 108 F.3d 896, 900 (8th Cir. 1997); *Moose v. United States*, 674 F.3d 1277, 1281 (9th Cir. 1982); *American Indians Residing on Maricopa-Ak Chin Reservation v. United States*, 667 F.2d 980, 1002 (Ct. Cl. 1981)). An interpretive presumption, however, can only be applied in relation to the statute or statutes giving the Government control over the subject funds. The only statutes the CFC has identified as governing the land revenues are the 1888-1890 Acts. And the presumption cited by the CFC applies equally to property. *See American Indians*, 667 F.2d at 1002 ("Where the Government takes on or has control and supervision over tribal money or *property*, the normal relationship is fiduciary unless Congress expressly has provided otherwise") (emphasis added). The CFC cannot presume a trust obligation arising from the 1888-1890 Acts after this Court, on certified appeal, interpreted the Acts to create no trust in lands or monies. *Wolfchild VI*, 559 F.3d at 1255.

49

Indeed, the CFC did not expressly find a trust obligation, notwithstanding its citation to the interpretive presumption. [16] Rather, the CFC determined that the land revenues were held "in trust" simply because DOI had deposited and maintained the subject land revenues – prior to disbursement – in various U.S. Treasury accounts denominated "trust" accounts. *Wolfchild VII*, 96 Fed. Cl. at 333-35. This is a *non sequitur*. Absent a statutory duty or delegated authority to create a binding trust, the mere deposit of funds into an Indian trust account by federal officials cannot create an Indian "trust fund."

This principle is reflected in DOI guidelines that govern trust duties owed to tribes and individual Indians under federal law. *See* 25 C.F.R. § 115.001 *et seq.* These regulations define the term "trust fund" to mean "money derived from the sale or use of trust lands, restricted fee lands, or trust resources and any other money that the Secretary *must* accept into trust." 25 C.F.R. § 115.002 (emphasis added). The CFC cited this definition and correctly observed that the "derived from" clause did not apply to the subject land revenues, because the 1886 lands (prior to the operation of the 1980 Act) were not "trust lands" or "restricted fee

---

[16] The CFC's judgment on the use restriction claims is not predicated on the existence of any trust duty, *Wolfchild VII*, 96 Fed. Cl. at 336-347, and the CFC dismissed the Claimants' breach of trust claims in their entirety (not merely as to the lands). *Id.* at 352.

lands." *Wolfchild VII*, 96 Fed. Cl. at 333. Yet the CFC proceeded to hold, inexplicably, that the land revenues fell under the heading of "money that the Secretary *must* accept into trust." *Id.* at 333-34 (emphasis added). In so doing, the CFC never identified any source of law that compelled the Secretary to take the land revenues into trust or deposit them into trust accounts. *Id.* at 333-34. Nor in its merits ruling did the CFC treat the revenues as anything other than the equivalent of ordinary appropriations. *Id.* at 337 (finding that DOI was "statutorily required to handle" the land revenues in a manner that accorded with the 1888-1890 Appropriations Acts).

Thus, the CFC's ruling boils down to the proposition that, in ITAS, Congress extended the Tucker Act's waiver of sovereign immunity (by removing the otherwise applicable statute of limitations) for suits alleging the loss or mismanagement of any funds appropriated to Indians. That interpretation cannot stand, as such waiver was not "unequivocally expressed." *Shoshone*, 364 F.3d at 1346.

2.    *ITAS Only Applies Where an Accounting Is Reasonably Required to Demonstrate a Breach*

Even if any funds once held in a trust account are "trust funds" for ITAS purposes, ITAS does not apply to Claimants' use-restriction claims for the additional reason that an accounting was not reasonably required to provide notice

51

of the claims. As this Court explained in *Shoshone*, the "operative" clauses of ITAS include the instruction that ITAS applies "[n]otwithstanding any other provision law," and the directive that the statute of limitations "shall not commence to run" on subject claims until there is an accounting from which the existence of a loss can be determined. *Shoshone*, 364 F.3d at 1346. Together, these clauses eliminate the statute of limitations for subject claims as to which there has been no accounting. *Id.* at 1346-1348. This Court explained that in trust law, a claim for breach traditionally accrues upon "repudiation," which can be open and express or *via* actions inconsistent with a trust responsibility. *Id.* at 1348. In the latter case, a breach can occur without clear notice to beneficiaries, especially given the reliance beneficiaries are entitled to place in their trustees. *Id.* Accordingly, it is "common" for courts to require an "accounting" to provide the presumptive notice necessary to begin the relevant limitations period in breach-of-trust cases. *Id.* Congress codified this rule in ITAS in response to the "simple logic" that a beneficiary cannot be presumed aware of a relevant breach "unless and until an accounting has been rendered." *Id.* at 1347.

Such "simple logic," however, does not apply where (as here) the United States has openly repudiated an alleged trust, *e.g. via* the wholesale liquidation and distribution of an alleged trust fund to persons other than the alleged beneficiaries. In such cases, a formal "accounting" of trust assets is not required to provide

52

presumptive notice of a potential cause of action. Further, in ITAS, Congress did not suspend the statute of limitations, pending an accounting, on all "breach of trust" claims. Rather, Congress addressed claims "concerning losses to or mismanagement of trust funds." *Id.* at 1344. In context, the terms "loss" and "mismanagement" imply misconduct in relation to an ongoing trust, *i.e.*, where there is a dispute as to the whether federal officials' actions were consistent with an acknowledged and ongoing trust obligation. These terms do not readily encompass cases where the alleged trust has long since ceased to exist as a result of federal action completely repudiating the notion of any trust obligation.

In finding that Congress did intend to include such claims, the CFC stated that it was "difficult to imagine what type of claim would fall under 'losses to or mismanagement of trust funds' if the disbursement of the entire funds [of an alleged trust] to the wrong beneficiaries is not included." *Wolfchild VII*, 96 Fed. Cl. at 335. This betrays a fundamental misunderstanding of the issue. The terms "loss" and "mismanagement" plainly are a subset of claims within the broader category "breach of trust." And the terms "loss" and "mismanagement" plainly encompass claims like those not merely "imagined" but actually addressed by this Court in *Shoshone*, *i.e.*, alleged failures by federal officials to collect and manage revenues in relation to acknowledged trust assets that the Government continued to manage as trustee. *Shoshone*, 364 F.3d at 1348-1354. Thus, there is no difficulty

53

in identifying claims that fall within the terms of the ITAS waiver, as unequivocally expressed.

In contrast, ITAS does not unequivocally express Congress's intention to eliminate/suspend the statute of limitations as to claims concerning the alleged wholesale liquidation of trust funds, where the relevant trust accounts have long since ceased to exist and where the federal officials have long since denied any trust obligation. Because ITAS does not unequivocally apply to the use-restriction claims in this case, the CFC's reliance on ITAS was in error. *Id.* at 1346,

## III.   THE 1995 REPORTS ELIMINATION ACT DID NOT REPEAL ANY PART OF THE TRIBAL JUDGMENT ACT

Because the Claimants' use-restriction claims are not viable under the Tucker Act or Indian Tucker Act and are time-barred, and because the CFC correctly dismissed all remaining claims, there is no basis for judgment against the United States. If this Court finds a basis for the CFC's judgment, however, this Court should reverse that portion of the judgment pertaining to the Tribal Judgment Act. *See* pp. 16-18, *supra.* Contrary to the CFC's conclusion, the Tribal Judgment Act has not been repealed in any part and continues to govern any judgment to a group of Indians under the Indian Tucker Act.

## A.    The Tribal Judgment Act Governs All Judgments under the Indian Tucker Act

The Tribal Judgment Act (25 U.S.C. §§ 1401-1407) applies to determine the "use or distribution" of any funds appropriated in satisfaction of a judgment by the CFC "in favor of any Indian tribe, band, group, pueblo, or community." 25 U.S.C. § 1401. These terms parallel those of the Indian Tucker Act, which grants jurisdiction over claims "in favor or any tribe, band, or other identifiable group of American Indians." 28 U.S.C. § 1505. Under these statutes, if the CFC grants judgment on an Indian-Tucker-Act claim in favor of an "identifiable group of American Indians," *id.*, the Secretary must: (1) prepare a plan, with notice to and input from the impacted group, that "best serve[s] the interest" of all persons "entitled to receive funds" under the judgment, 25 U.S.C. § 1403(a), (2) submit the plan to Congress, *id.*, § 1402(a), and (3) take immediate action to implement the plan after a sixty-day review period, if Congress does not adopt a joint resolution disapproving the plan during such period. *Id.*, § 1405(a).

The Tribal Judgment Act specifies that the Secretary must submit the plan to Congress "within one year after appropriation of funds" to pay the judgment. *Id.*, § 1402(a). Congress has provided that "necessary amounts are appropriated to pay [specified] final judgments" upon certification by the Secretary of the Treasury. 31 U.S.C. § 1304(a). Such judgments include judgments rendered by the CFC against

the United States. *Id.* (referencing 28 U.S.C. § 2517(a). Accordingly, the one-year deadline under the Tribal Judgment Act runs from the time an Indian-Tucker-Act judgment is certified.

In the present case, although the Plaintiffs and Intervenor-Plaintiffs brought claims in their own names (as under the Tucker Act), the Plaintiffs purported to represent "all descendants" *see Wolfchild I*, 62 Fed. Cl. at 533-34, and all Claimants pursued causes of action (include the use-restriction claims) that asserted individual entitlement to damages solely due to each individual's membership within the "descendant" class. The CFC determined that the descendants of the 1886 Mdewakantons are an "identifiable group of American Indians" for purposes of the Indian Tucker Act, *Wolfchild VIII*, 101 Fed. Cl. at 79-80, and entered judgment in the amount presumed due to the entire group. *Id.* at 91-92. Given the nature of the judgment (and assuming its correctness), the CFC properly determined that the Tribal Judgment Act applies. *Id.* at 79-86.

**B.    Congress did Not Repeal Any Part of the Tribal Judgment Act**

The CFC erroneously concluded, however, that the Court could retain jurisdiction to review DOI's use or distribution plan. The CFC acknowledged that the Tribal Judgment Act provides an exclusive mechanism for determining distribution of a judgment in favor of an Indian group. *Wolfchild VIII*, 101 Fed. Cl. at 86 & n. 29; *see also Turtle Mountain Band of Chippewa Indians v. United*

*States*, 490 F.2d 935, 951 (Ct. Cl. 1974) (recognizing that distribution issues are

for Congress or authorized administrative bodies).  Nonetheless, the CFC

determined that the court could and should retain jurisdiction here, because

Congress "decimated" the Tribal Judgment Act in 1995 *via* enactment of the

Reports Elimination Act, which allegedly repealed the provision of the Tribal

Judgment Act (25 U.S.C. § 1402(a)) requiring the submittal of use or distribution

plans to Congress.  *Wolfchild VIII*, 101 Fed. Cl. at 90.

> In Section 3003(a), Congress declared, subject to specified exceptions, that
>
> each provision of law requiring the submittal to Congress . . . of *any annual, semiannual, or other regular periodic report* specified on the list described under subsection (c) shall cease to be effective, with respect to that requirement, May 15, 2000.

*See* 31 U.S.C. § 1113, note (citing Pub.L. 104-66, Title III, § 3003(a),109 Stat. 734

(Dec. 21, 1995), as amended by Pub.L. 106-113, Div. B, § 1000(a)(5) [Title II, §

236], 113 Stat. 1536, 1501A-302 (Nov. 29, 1999); Pub.L. 110-314, Title I, §

203(b), 122 Stat. 3040 (Aug. 14, 2008)) (emphasis added).  Subsection (c) refers to

"House Document No. 103-7," a "list prepared by the Clerk of the House of

Representatives." *Id.* That document is an over-200-page list of many hundreds of

"reports to which it is the duty of any officer or Department to make to Congress."

*See* House Document No. 103-7 (transmittal letter).[17]   The list includes, at page

---

[17] Available at http://clerk.house.gov/103/hd103007.pdf.

113, a reference to § 1402(a) of the Tribal Judgment Act (25 U.S.C. § 1402(a)), which the Clerk describes as requiring reports "180 days after appropriation of funds."[18]  Because § 1402(a) is listed in House Document 103-7, the CFC determined that it "ceased to be effective" in 2000, per the Reports Elimination Act § 3003(a). *Wolfchild VIII*, 101 Fed. Cl. at 90.

This interpretation is in error for three reasons.  First, § 3003(a) expressly applies only if *two* conditions are met: (1) the reporting requirement is listed in House Document 103-7, and (2) the requirement is "annual," "semiannual," or "regular" and "periodic" in nature. Pub.L. 104-66, Title III, § 3003(a), 109 Stat. 734.  House Document 103-7 includes numerous statutes that, like § 1402(a) of the Tribal Judgment Act, impose *ad hoc* reporting requirements; *i.e.*, requirements relating to events that do not occur on a "regular periodic" basis.  If § 3003(a) is construed to apply to all provisions listed in House Document 103-7 (not specifically excepted), the terms "annual," "semiannual," and "regular periodic" would be rendered superfluous.  "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Golz v.*

---

[18]This deadline is stated in the original Act.  Pub.L. 93-134, § 2, 87 Stat. 466 (Oct. 19, 1973).  In 1983, Congress changed the deadline to one year.  Pub.L. 97-458, § 1, 96 Stat. 2512 (Jan. 12, 1983).

*Shinseki*, 590 F.3d 1317, 1321 (Fed. Cir. 2010) (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).

Second, there is also a "cardinal rule . . . that repeals by implication are not favored." *TVA v. Hill*, 437 U.S. 153, 189 (1978) (internal quotations and citations omitted); *accord Xianli Zhang v. United States*, 640 F.3d 1358, 1368 (Fed. Cir. 2011). In § 3003(a) of the Reports Elimination Act, Congress acted to eliminate, *via* sunset provision, "regular periodic" reporting requirements, on the apparent understanding that requiring repeated reports to Congress, in perpetuity, for informational purposes imposes unnecessary paperwork burdens. But Congress expressed no clear intention to repeal *ad hoc* reporting requirements integral to the operation of statutory programs. In holding that Congress nevertheless did so "decimate" the Tribal Judgment Act, the CFC provided no explanation for why Congress would have intended such result. Instead, the CFC implied that Congress unwittingly "introduced . . . a defect." *Wolfchild VIII*, 101 Fed. Cl. at 90. There is no sound reason for implying an unwitting repeal not compelled by the plain terms of a statute.

Third, there is also no sound basis for the CFC's determination, in its ruling denying reconsideration, that the phrase "regular periodic" can be construed to include reports like those required under § 1402(a) of the Tribal Judgment Act. The CFC observed: (1) that § 1402(a) imposes a deadline, (2) that select other *ad*

*hoc* reporting requirements cited in House Document 103-7 are described as not having specific deadlines, and (3) that Congress exempted, from the operation of § 3003(a), at least one *ad hoc* reporting requirement with a deadline. *Wolfchild IX*, 101 Fed. Cl. at 96. From this, the CFC determined that the § 1402(a) reporting requirement can be and should be deemed "regular" and "periodic" for purposes of § 3003(a).

Those terms cannot be stretched so far. As a modifier for "reports," the phrase "other regular periodic" plainly refers to reports that must be "periodic[ally]" prepared on a "regular" interval, just like the "other" ("annual" or "semiannual" ) reports specified in § 3003(a). This is a straightforward application of the canon *ejusdem generis*, which means "of the same kind," and dictates that "where an enumeration of specific things is followed by a general word or phrase, the general word or phrase . . . refer[s] to things of the same kind as those specified." *Nielson v. Shinseki*, 607 F.3d 802, 807 (Fed. Cir. 2010).

In short, by its plain terms as construed under fundamental rules of statutory interpretation, the Reports Elimination Act did not repeal § 1402(a) of the Tribal Judgment Act. If permitted to stand, the CFC's interpretation would unnecessarily and improperly disrupt Congress's carefully crafted process for determining the distribution of tribal judgments and must be reversed.

60

## CONCLUSION

For the foregoing reasons, the judgment of the Court of Federal Claims should be reversed and the case remanded for the dismissal of all claims and entry of judgment in favor of the United States.

Respectfully submitted,

IGNACIA S. MORENO
*Assistant Attorney General*

JOHN L. SMELTZER
AARON AVILA
JODY SCHWARZ
*Attorneys, Department of Justice*
*Environment & Natural Resources Divisi*
*P.O. Box 7415*
*Washington, DC  20044*
*(202) 305-0343*
*john.smeltzer@usdoj.gov*

May 25, 2011
D.J. No. 90-2-20-11099

61

## STATUTORY ADDENDUM: 1888-1890 Acts

### Act of June 29, 1888, ch. 503, 25 Stat. 217, 228-29 ("1888 Act")

\* \* \*

For the support of the full-blood Indians in Minnesota, belonging to the Medawakanton [*sic*] band of Sioux Indians, who have resided in said State since the twentieth day of May, A.D. eighteen hundred and eighty-six, and severed their tribal relations, twenty thousand dollars, to be expended by the Secretary of the Interior in the purchase, in such manner as in his judgment he may deem best, of agricultural implements, cattle, horses and lands: *Provided*, That of this amount the Secretary if he may deem it for the best interests of said Indians, may cause to be erected for the use of the said Indians at the most suitable location, a school house, at a cost not exceeding one thousand dollars: *And provided also*, That he may appoint a suitable person to make the above-mentioned expenditures under his direction, the expense of the same to be paid out of this appropriation.

### Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992-93  ("1889 Act")

\* \* \*

For the support of the full-blood Indians in Minnesota heretofore belonging to the Medawakanton [*sic*] band of Sioux Indians, who have resided in said State since the twentieth day of May eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein, and have severed their tribal relations, twelve thousand dollars, to be expended by the Secretary of the Interior as follows: Ten thousand dollars in the purchase, as in his judgment he may think best, of such lands, agricultural implements, seeds, cattle, horses, food, or clothing as may be deemed best in the case of each of these Indians or family thereof; one thousand dollars, or so much thereof as may be necessary to defray the expenses of expending the money in this paragraph appropriated; and one thousand dollars for the completion and furnishing of the schoolhouse for said Indians authorized by the act of June twenty-ninth, eighteen hundred and eighty-eight: *Provided*, That if the amount in this paragraph appropriated, or any portion of the sum appropriated for the benefit of these same Indians by said act of June twenty-ninth, eighteen hundred and eighty-eight, shall not be expended within the fiscal year for which either sum was appropriated,

I

neither shall be covered into the Treasury, but shall, notwithstanding, be used and expended for the purposes for which the same amount was appropriated and for the benefit of the above-named Indians: *And provided also*, That the Secretary of the Interior may appoint a suitable person to make the above-mentioned expenditure under his direction; and all of said money which is to be expended for lands, cattle, horses, implements, seeds, food, or clothing shall be so expended that each of the Indians in this paragraph mentioned shall receive, as nearly as practicable an equal amount in value of this appropriation and that made by said act of June twenty-ninth, eighteen hundred and eighty-eight: *And provided further*, That as far as practicable lands for said Indians shall be purchased in such locality as each Indian desires, and none of said Indians shall be required to remove from where he now resides and to any locality against his will.

### Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349 ("1890 Act")

* * *

For the support of the full and mixed blood Indians in Minnesota heretofore belonging to the Medawakanton [*sic*] band of Sioux Indians, who have resided in said State since the twentieth day of May, eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein, and have severed their tribal relations, eight thousand dollars, to be expended by the Secretary of the Interior, as in his judgment he may think best, for such lands, agricultural implements, buildings, seeds, cattle, horses, good, or clothing as may be deemed best in the case of each of these Indians or families thereof: *Provided*, That two thousand dollars of the above eight thousand dollars shall be expended for the Prairie Island settlement of Indians in Goodhue County: *Provided further*, That the Secretary of the Interior may appoint a suitable person to make the above-mentioned expenditure under his direction whose compensation shall not exceed one thousand dollars; and all of said money which is to be expended for lands, cattle, horses, implements, seeds, food, or clothing shall be so expended that each of the Indians in this paragraph mentioned shall receive, as nearly as practicable, an equal amount in value of the appropriation: *And provided further*, That, as far as practicable, lands for said Indians shall be purchased in such locality as each Indian desires, and none of said Indians shall be required to remove from where he now resides and to any locality or land against his will.

utory claim pursuant to RCFC 12(b)(6) is granted.

### C. Defendant's Motion for Judgment Upon the Administrative Record[15]

In its motion for judgment upon the administrative record, defendant argues that substantial evidence supports the DFAS's decision to recoup plaintiff's SSB in the amount of $45,052.61. To the extent that the complaint can be construed to challenge the amount of the SSB, *see* Compl. ¶¶ 6, 9, 10–11 (alleging that (1) garnishments were made without "verification of sums possibly owed," (2) the DFAS failed to produce documentation and had no records "to support [its] claim," and (3) "a garnishment without facts to support the claim is illegal and unjust"), defendant is entitled to judgment upon the administrative record. DFAS records indicate that plaintiff received an SSB of $45,052.61 in 1993. AR 1, 5, 9, 11. As previously explained, plaintiff's DD Form 214 indicated an SSB in the amount of $43,296.17. AR 21; *supra* note 14. However, Mr. Heiney indicated that $43,296.17 would have been plaintiff's SSB if he did not have prior years of enlisted experience before becoming an officer. AR 23 (Heiney Decl. ¶ 3). Because plaintiff did have enlisted experience prior to becoming an officer, plaintiff's correct classification entitled him to an SSB in the amount of $45,052.61. *Id.* (Heiney Decl. ¶¶ 3–4). Plaintiff ultimately received an SSB in the amount of $45,052.61. *Id.* at 1, 5, 9, 11, 22. Furthermore, plaintiff himself indicated, in correspondence with the DFAS in April 2009, that his SSB was approximately $45,000. Compl. Ex. at 2. The DFAS's decision to recoup $45,052.61, therefore, is supported by both evidence in the administrative record and plaintiff's personal recollection of the amount of his SSB. Accordingly, the court, in the alternative, that defendant's motion for judgment upon the administrative record is granted.

### V. CONCLUSION

For the reasons set forth above, it is hereby ordered:

1. Plaintiff's application to proceed *in forma pauperis* is DENIED.

2. Plaintiff motion for immediate preliminary injunction is DENIED.

3. Defendant's motion to dismiss is GRANTED. The Clerk of Court is directed to DISMISS WITHOUT PREJUDICE those portions of the complaint over which the court lacks jurisdiction and to DISMISS WITH PREJUDICE those portions of the complaint over which the court possesses jurisdiction.

4. Alternatively, to the extent that the complaint can be construed to challenge the amount of plaintiff's SSB, defendant's motion for judgment upon the administrative record is GRANTED.

The Clerk of Court is directed to enter judgment accordingly. No costs.



---

Sheldon Peters WOLFCHILD, et al., Plaintiffs,

v.

UNITED STATES, Defendant.

Nos. 03–2684L, 01–568L.

United States Court of Federal Claims.

Dec. 21, 2010.

**Background:** Lineal descendants of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota sued United States for, inter alia, breach of fiduciary duty based upon government's management of property originally provided for benefit of loyal Mdewakanton. The United States Court of Federal Claims, Charles F. Lettow, J., 62 Fed.Cl. 521, ruled that government had breached its fiduciary duties, and subse-

---

15. Having dismissed the complaint pursuant to RCFC 12(b), the court need not reach defendant's motion for judgment upon the administrative record. Nevertheless, the court addresses the issues raised by defendant as an alternative holding.

quently, 68 Fed.Cl. 779, denied reconsideration and, 78 Fed.Cl. 472, certified questions for interlocutory appeal. Government filed interlocutory appeal. The Court of Appeals for the Federal Circuit, 260 Fed. Appx. 261, granted leave to appeal, and, 559 F.3d 1228, reversed and remanded. After plaintiffs moved to amend their complaints, government moved to dismiss and plaintiffs cross-moved for partial summary judgment.

Holdings: The Court of Federal Claims, Lettow, J., held that:

(1) amendment of complaint to add claims based upon Appropriation Acts' use restrictions was not precluded on grounds of futility;

(2) Indian Trust Accounting Statute (ITAS) applied to toll six-year statute of limitations for proposed claims based upon Appropriations Acts' use restrictions;

(3) Appropriations Acts created money-mandating duty providing basis for plaintiffs' claims under Indian Tucker Act;

(4) plaintiffs could base their claims on use restrictions contained in Appropriations Acts, even though Acts did not specify how broadly term "family" was to be interpreted;

(5) Act authorizing transfer of certain lands to wildlife refuge permitted disbursement of funds paid to three Indian communities in Minnesota;

(6) funds derived, prior to passage of 1980 Act, from lands purchased with monies appropriated under Appropriations Acts had to be distributed to lineal descendants of loyal Mdewakanton; and

(7) Indian communities, rather than lineal descendants of loyal Mdewakanton, were entitled to any income derived from lands purchased with appropriated funds following passage of 1980 Act.

Ordered accordingly.

**1. Statutes ⟐164**

Where the legislature supplements or amends an act so as to specify that a beneficiary of the subsequent act may not receive relief under both the prior and subsequent act, there is no conflict between the two statutes, and an implied repeal of the prior act cannot be inferred.

**2. Federal Courts ⟐1111**

Decision to grant or deny amendment of a complaint or answer is within the discretion of the trial court, but if the underlying facts or circumstances relied upon by plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. RCFC, Rule 15(a)(2), 28 U.S.C.A.

**3. Federal Courts ⟐1111**

Absent a reason, such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment, motion to amend pleading should be granted. RCFC, Rule 15(a)(2), 28 U.S.C.A.

**4. Federal Courts ⟐1071**

Jurisdiction must be established as a threshold matter before the Court of Federal Claims may proceed with the merits of action.

**5. Federal Courts ⟐1113**

Plaintiffs bear the burden of establishing that Court of Federal Claims has subject matter jurisdiction over their claim.

**6. Federal Courts ⟐1111**

In undertaking an analysis of subject matter jurisdiction, the court must accept as true the facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiffs.

**7. United States ⟐125(3)**

Jurisdiction over a claim against the United States requires a waiver of sovereign immunity combined with a cause of action falling within the terms of that waiver.

**8. United States ⬤125(5)**

Waiver of sovereign immunity of United States must be unequivocally expressed.

**9. Federal Courts ⬤1081**

Claims that would "otherwise be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group" encompassed by waiver of United States's sovereign immunity under Indian Tucker Act include those founded upon the Tucker Act. 28 U.S.C.A. §§ 1491(a)(1), 1505.

**10. Federal Courts ⬤1081**

Although it serves as a waiver of sovereign immunity by United States, the Indian Tucker Act does not itself create a substantive right enforceable against the government by a claim for money damages. 28 U.S.C.A. § 1505.

**11. Federal Courts ⬤1081**

As with the Tucker Act, plaintiff grounding its claim against United States on the Indian Tucker Act must demonstrate that some other source of law creates a money-mandating right or duty that falls within the ambit of the waiver of sovereign immunity; this other source of law need not explicitly provide that the right or duty it creates is enforceable through a suit for damages, but it triggers liability only if it can be fairly interpreted as mandating compensation by the federal government. 28 U.S.C.A. §§ 1491(a)(1), 1505.

**12. Federal Courts ⬤1072**

To establish Tucker Act jurisdiction, it is enough that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages; a fair inference will do. 28 U.S.C.A. § 1491(a)(1).

**13. Federal Courts ⬤1072**

If Court of Federal Claims determines that the source of law upon which plaintiffs rely to establish Tucker Act jurisdiction is not money-mandating, court must dismiss the claim for lack of subject matter jurisdiction. 28 U.S.C.A. § 1491(a)(1).

**14. Federal Courts ⬤1081**

For claims arising under the Tucker Act or the Indian Tucker Act, if the court concludes that the facts as pled do not fit within the scope of a statute that is money-mandating, the court shall dismiss the claim on the merits for failure to state a claim upon which relief can be granted. 28 U.S.C.A. §§ 1491(a)(1), 1505; RCFC, Rule 12(b)(6), 28 U.S.C.A.

**15. Federal Courts ⬤1111**

Where an amendment would be futile, a court should disallow plaintiff's motion to modify its complaint. RCFC, Rule 15(a)(2), 28 U.S.C.A.

**16. Federal Courts ⬤1111**

In assessing futility of a proposed amendment of a complaint, the court should apply the same standard of legal sufficiency as applies under rule governing motions to dismiss for failure to state claim upon which relief may be granted; thus, amendment to add claim is "futile" if amendment fails to state claim upon which relief can be granted. RCFC, Rules 12(b)(6), 15(a)(2), 28 U.S.C.A.

See publication Words and Phrases for other judicial constructions and definitions.

**17. Federal Courts ⬤949**

"Law of the case" doctrine provides that when a case has been once decided by a superior court and remanded to the lower court, whatever was before the superior court and disposed of by its decree is considered finally settled; the lower court is bound by the decree as the law of the case, and must carry it into execution, according to the mandate.

See publication Words and Phrases for other judicial constructions and definitions.

**18. Federal Courts ⬤949**

Law of the case doctrine did not apply to establish, for purposes of defendant's futility defense to plaintiffs' motion to amend complaint, that plaintiffs had viable claims predicated on statutory use restrictions in Appropriations Acts recognized by Court of Appeals on prior appeal where Court of Appeals, in its ruling on prior appeal, explicitly abstained from addressing merits of any

claims that plaintiffs would have under use restrictions. Act June 29, 1888, § 1, 25 Stat. 217; Act March 2, 1889, § 1, 25 Stat. 980; Act Aug. 19, 1890, § 1, 26 Stat. 336; RCFC, Rules 12(b)(6), 15(a)(2), 28 U.S.C.A.

**19. Federal Courts ⟜1111**

Lineal descendants of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota had legally viable claims against United States based upon their alleged rights, under statutory use restrictions, to funds that were derived from lands purchased with monies provided via Appropriations Acts to benefit loyal Mdewakanton and their descendants and alleged improper disbursement, by Department of the Interior, of such funds to three Indian communities in Minnesota, rather than eligible Mdewakanton, and therefore amendment of complaint to add such claims was not precluded on grounds of futility. Act June 29, 1888, § 1, 25 Stat. 217; Act March 2, 1889, § 1, 25 Stat. 980; Act Aug. 19, 1890, § 1, 26 Stat. 336; RCFC, Rules 12(b)(6), 15(a)(2), 28 U.S.C.A.

**20. Indians ⟜141(2), 152, 197**

Passage of 1980 Act, which provided that government would thereafter hold in trust, for three Indian communities located in Minnesota, lands which, pursuant to Appropriations Acts, were purchased with monies appropriated for the benefit of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota and their lineal descendants, did not affect claims of lineal descendants, based upon statutory use restrictions in Appropriations Acts, to funds derived from affected lands prior to passage of 1980 Act, which was silent as disposition of such funds, and instead applied only to lands themselves. Act June 29, 1888, § 1, 25 Stat. 217; Act March 2, 1889, § 1, 25 Stat. 980; Act Aug. 19, 1890, § 1, 26 Stat. 336, Act Dec. 19, 1980, § 1, 94 Stat. 3262.

**21. Statutes ⟜188**

When interpreting a statute, the court must look first to the statutory language.

**22. Statutes ⟜219(2)**

Where the text of statute does not address a particular issue, an agency's interpre-tation of the statute as contained in informal opinion letters or otherwise not embodied in regulations is entitled to respect on judicial review, but only to the extent that those interpretations have the power to persuade.

**23. Statutes ⟜219(6.1)**

*Skidmore* deference did not apply in determining whether lineal descendants of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota had viable claims against United States based upon their alleged rights, under statutory use restrictions, to funds that were derived from lands purchased with monies appropriated to benefit loyal Mdewakanton and their descendants and alleged improper disbursement, by Department of the Interior, of derived funds to three Indian communities located in Minnesota, rather than eligible Mdewakanton, where Department simply presumed that it could distribute funds to three communities on basis of subsequent Act providing for government to hold affected lands in trust for three communities, contrary to its earlier conclusions regarding funds' status and proper ownership, and pursuant to unreasonable construction of Act. Act June 29, 1888, § 1, 25 Stat. 217; Act March 2, 1889, § 1, 25 Stat. 980; Act Aug. 19, 1890, § 1, 26 Stat. 336, Act Dec. 19, 1980, § 1, 94 Stat. 3262; RCFC, Rules 12(b)(6), 15(a)(2), 28 U.S.C.A.

**24. Statutes ⟜219(1, 3)**

In applying limited *Skidmore* deference given to agency's interpretation of statute as contained in informal opinion letters or otherwise not embodied in regulations, court considers thoroughness evident in agency's consideration, validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

**25. Statutes ⟜219(1)**

In applying limited *Skidmore* deference given to agency's interpretation of statute as contained in informal opinion letters or otherwise not embodied in regulations, court considers the extent to which the agency's interpretation relies upon its specialized ex-

perience and broader investigations and information.

**26. Statutes ⟢211**

Although the title of a statute cannot limit the plain meaning of the text, statutory titles and section headings are tools available for the resolution of a doubt about the meaning of statute.

**27. Federal Courts ⟢1106**

Funds which were derived from lands purchased with monies provided via Appropriations Acts to benefit Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota and their lineal descendants, and which were placed by government into proceeds-of-labor and individual Indian money (IIM) accounts, were held "in trust," as required for Indian Trust Accounting Statute (ITAS) to apply to toll six-year statute of limitations for claims in which descendants asserted rights to funds based upon statutory use restrictions in Appropriations Acts and alleged improper disbursement of funds to three Indian communities located in Minnesota, rather than eligible Mdewakanton. 28 U.S.C.A. § 2501; 31 U.S.C.A. § 1321(a)(20); Department of the Interior and Related Agencies Appropriations Act, 2004, 25 U.S.C.A. § 4011 note; Act June 29, 1888, § 1, 25 Stat. 217; Act March 2, 1889, § 1, 25 Stat. 980; Act Aug. 19, 1890, § 1, 26 Stat. 336; 25 C.F.R. § 115.002.

**28. Federal Courts ⟢1104**

Since the six-year statute of limitations applicable to suits against United States in Court of Federal Claims circumscribes scope of government's waiver of sovereign immunity, it is jurisdictional in nature and must be construed strictly. 28 U.S.C.A. § 2501.

**29. Federal Courts ⟢1106**

Court addressing statute of limitations defense to action against United States in Court of Federal Claims may not consider whether a case warrants equitable tolling, or imply exceptions to the limitations period. 28 U.S.C.A. § 2501.

**30. Indians ⟢141(2)**

Where the government holds any Indian money, there is a strong presumption that those funds are held in trust, and this trust relationship extends not only to Indian tribes as governmental units, but to tribal members living collectively or individually, on or off the reservation.

**31. Federal Courts ⟢1106**

Claims in which lineal descendants of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota asserted rights, under statutory use restrictions imposed by Appropriations Acts, to funds which were derived from lands purchased with appropriated monies to benefit loyal Mdewakanton and their descendants, and which were held in trust by government until their allegedly improper disbursement, concerned "losses to or mismanagement of" trust funds, as required for Indian Trust Accounting Statute (ITAS) to apply to toll six-year statute of limitations otherwise governing claims. 28 U.S.C.A. § 2501; 31 U.S.C.A. § 1321(a)(20); Department of the Interior and Related Agencies Appropriations Act, 2004, 25 U.S.C.A. § 4011 note; Act June 29, 1888, § 1, 25 Stat. 217; Act March 2, 1889, § 1, 25 Stat. 980; Act Aug. 19, 1890, § 1, 26 Stat. 336; 25 C.F.R. § 115.002.

**32. Indians ⟢141(2), 197**

Secretary of the Interior acted under authority conferred by Appropriations Acts that provided for funds to be expended for the benefit of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota, and their lineal descendants, when Secretary leased lands purchased with appropriated funds to non-eligible individuals and obtained money as a result, and therefore Secretary was statutorily required to handle funds obtained in manner that accorded with congressional mandates contained in Appropriation Acts, including requirements that benefits be distributed to loyal Mdewakanton and their families and that such benefits be conferred in as equal an amount as practicable. Act June 29, 1888, § 1, 25 Stat. 217; Act March 2, 1889, § 1, 25 Stat. 980; Act Aug. 19, 1890, § 1, 26 Stat. 336.

**33. Administrative Law and Procedure ⟢305**

Every agency decision must be anchored in the language of one or more statutes the agency is charged to implement.

**34. United States ⟺85**

Under the Appropriations Clause of the United States Constitution, funds from the Treasury cannot be used for purposes other than those permitted by the appropriating statute. U.S.C.A. Const. Art. 1, § 9, cl. 7.

**35. United States ⟺105**

Appropriations Acts that provided for funds to be expended for the benefit of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota and their lineal descendants created money-mandating duty providing basis for descendants' claims under Indian Tucker Act to funds derived from lands purchased with appropriated monies; Acts consistently used word "shall," appropriated funds were considered by Congress as substitution for treaty benefits of which loyal Mdewakanton had been deprived, and Department of the Interior had consistently considered appropriated funds, lands, and funds derived from lands as being held only for benefit of eligible Mdewakanton, prior to its challenged decision to disburse disputed funds to three Minnesota Indian communities, rather than eligible Mdewakanton. 28 U.S.C.A. § 1505; Act June 29, 1888, § 1, 25 Stat. 217; Act March 2, 1889, § 1, 25 Stat. 980; Act Aug. 19, 1890, § 1, 26 Stat. 336.

**36. Federal Courts ⟺1081**

Where the statutory text leaves the government no discretion over payment of claimed funds, Congress has provided a money-mandating source for jurisdiction in Court of Federal Claims under Indian Tucker Act. 28 U.S.C.A. § 1505.

**37. Federal Courts ⟺1072**
  **Statutes ⟺227**

Use of the word "may" in a statute leads to the presumption that the government has discretion over the payment of funds and does not owe a money-mandating duty to plaintiff supporting Tucker Act jurisdiction, but presumption of governmental discretion in statute may be rebutted by the intent of Congress and other inferences that the court may rationally draw from the structure and purpose of the statute. 28 U.S.C.A. § 1491(a)(1).

**38. Federal Courts ⟺1072**

A statute is not wholly discretionary, and so can establish money-mandating duty supporting Tucker Act jurisdiction, even if it uses the word "may" when an analysis of congressional intent or the structure and purpose of the statute reveal one of the following: (1) the statute has clear standards for paying money to recipients, (2) the statute specifies precise amounts to be paid, or (3) the statute compels payment once certain conditions precedent are met. 28 U.S.C.A. § 1491(a)(1).

**39. Indians ⟺141(2), 197**

Terms "family" and "families" included in Appropriations Acts requiring appropriated funds to be expended for benefit of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota and their families encompassed lineal descendants of loyal Mdewakanton, such that lineal descendants could base their claims to funds derived from lands purchased with appropriated funds on use restrictions contained in Appropriations Acts, even though Acts did not specify how broadly term "family" was to be interpreted. 28 U.S.C.A. § 1505; Act June 29, 1888, § 1, 25 Stat. 217; Act March 2, 1889, § 1, 25 Stat. 980; Act Aug. 19, 1890, § 1, 26 Stat. 336.

**40. Indians ⟺109**

Statutes are to be construed liberally in favor of Indians, with ambiguous provisions interpreted to their benefit.

**41. Indians ⟺141(2), 197**

Passage of Act authorizing transfer of Indian lands to wildlife refuge, pursuant to which payment received was allocated to be paid for benefit of Mdewakanton and Wahpakoota Bands generally, terminated entitlement to funds derived from affected lands of lineal descendants of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota, which was based upon restrictions contained in Appropriations Acts pursuant to which lands were purchased for benefit of loyal Mdewakanton and their lineal descendants, and also permitted Secretary of the Interior to disburse funds paid to three Indian communities in

Minnesota. Act June 29, 1888, § 1, 25 Stat. 217; Act March 2, 1889, § 1, 25 Stat. 980; Act Aug. 19, 1890, § 1, 26 Stat. 336; 1944 Act, § 2, 58 Stat. 274.

**42. Indians ⚖141(2), 197**

Discretion granted to Secretary of the Interior pursuant to Appropriations Acts which provided for appropriated monies to be expended for the benefit of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota and their lineal descendants, pursuant to which Secretary was to use his judgment in administering benefits of Acts, did not modify or abrogate Acts' other restrictions, but rather permitted Secretary to determine precise manner of implementing Acts, and therefore Secretary did not have authority to override Acts' mandates to administer funds for benefit of loyal Mdewakanton and their lineal descendants and to distribute funds as equally as possible, and was required to distribute funds derived from lands purchased with appropriated funds to lineal descendants of loyal Mdewakanton. Act June 29, 1888, § 1, 25 Stat. 217; Act March 2, 1889, § 1, 25 Stat. 980; Act Aug. 19, 1890, § 1, 26 Stat. 336.

**43. Statutes ⚖206**

Statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.

**44. Federal Courts ⚖1072**

A statute can be money-mandating, so as to support jurisdiction of Court of Federal Claims under Tucker Act, without stating a precise amount to be paid. 28 U.S.C.A. § 1491.

**45. Indians ⚖141(2), 152, 197**

Passage of 1980 Act, which provided that government would thereafter hold in trust, for three Indian communities located in Minnesota, lands which, pursuant to earlier Appropriations Acts, had been purchased with appropriated monies for the benefit of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota and their lineal descendants, prevented further application of use restrictions imposed by Appropriations Acts to affected lands and funds derived from them, and therefore Indian communities, rather than lineal descendants of loyal Mdewakanton, were subsequently entitled to any income derived from lands. Act June 29, 1888, § 1, 25 Stat. 217; Act March 2, 1889, § 1, 25 Stat. 980; Act Aug. 19, 1890, § 1, 26 Stat. 336, Act Dec. 19, 1980, § 1, 94 Stat. 3262.

**46. Federal Courts ⚖1081**
   **Indians ⚖141(2), 197**

Congress was free to define as it deemed appropriate beneficiary class of Appropriations Acts that provided for funds to be expended for benefit of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota and their lineal descendants, and therefore issue of whether manner selected for ascertaining lineal descendants resulted in exclusion of some individuals who might otherwise have qualified was not properly before Court of Federal Claims in action addressing lineal descendants' entitlement to funds derived from lands purchased with appropriated monies. Act June 29, 1888, § 1, 25 Stat. 217; Act March 2, 1889, § 1, 25 Stat. 980; Act Aug. 19, 1890, § 1, 26 Stat. 336.

**47. Federal Courts ⚖1080, 1081**

Any money judgment issued by Court of Federal Claims in action addressing entitlement to funds derived from lands purchased with monies appropriated for use for benefit of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota and their lineal descendants would not be directly tied to tribal governing documents that descendants sought to set aside, and therefore court lacked jurisdiction to order such equitable relief. 28 U.S.C.A. §§ 1491(a)(2), 1505.

**48. Federal Courts ⚖1080**

While limited equitable relief sometimes is available in Tucker Act suits before Court of Federal Claims, that equitable relief must be an incident of and collateral to a money judgment. 28 U.S.C.A. § 1491(a)(2).

———

Erick G. Kaardal, Mohrman & Kaardal, PA, Minneapolis, MN, for Wolfchild plain-

tiffs. With him on the briefs were William F. Mohrman, Mohrman & Kaardal, P.A., Minneapolis, MN.

Jody H. Schwarz, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Ignacia S. Moreno, Assistant Attorney General, and Sam Costello and Daniel Steele, Trial Attorneys, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C. Of counsel was James Porter, Office of the Solicitor, Department of the Interior, Washington, D.C.

John Ernst Jacobson, Jacobson, Buffalo, Magnuson, Anderson & Hogen, P.C., St. Paul, MN, for intervening plaintiff Lower Sioux Indian Community.

Jack E. Pierce, Pierce Law Firm, PA, Minneapolis, MN, for the Cermak plaintiffs and for the Stephens, R. Cermak, J. Cermak, Henderson, Klingberg, Alkire, Arnold, and Godoy groups of intervening plaintiffs.

Kelly H. Stricherz, Vermillion, SD, for the Mozak group of intervening plaintiffs.

Garrett J. Horn, Horn Law Office, Yankton, SD, for the Saul, Trudell, Taylor, Ferris, Henry, and Vassar groups of intervening plaintiffs.

Creighton A. Thurman, Yankton, SD, for the Cournoyer, Robinette, Kimbell, French, and Wanna groups of intervening plaintiffs.

Elizabeth T. Walker, Walker Associates, Alexandria, VA, for the anonymous Walker group of intervening plaintiffs.

Robin L. Zephier, Abourezk & Zephier, PC, Rapid City, SD, for the Zephier group of intervening plaintiffs.

Larry Leventhal, St. Paul, MN, for the Burley group of intervening plaintiffs.

Wood R. Foster, Jr., Siegel, Brill, Greupner, Duffy & Foster, PA, Minneapolis, MN, for the Lafferty, Blaeser, Whipple, and Lowe groups of intervening plaintiffs.

Michael W. Ellwanger, Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, LLP, Sioux City, IA, for the Enyard and Kitto groups of intervening plaintiffs.

Bernard J. Rooney, Amherst, WI, for the Rooney group of intervening plaintiffs.

Scott A. Johnson, Johnson Law Group, Minnetonka, MN, for the Rocque group of intervening plaintiffs.

James L. Blair, Renaud, Cook, Drury, Mesaros, PA, Phoenix, AZ, for the anonymous Blair group of intervening plaintiffs. With him on the briefs was Barry P. Hogan, Renaud Cook Drury Mesaros, PA, Phoenix, AZ.

Gary J. Montana, Montana & Associates, Osseo, WI, for the Julia DuMarce group of intervening plaintiffs.

Nicole N. Emerson, Lynn, Jackson, Shultz & Lebrun, PC, Sioux Falls, SD, for the Garreau group of intervening plaintiffs.

Douglas Kettering, Kettering Law Office, Yankton, SD, for the Ke Zephier group of intervening plaintiffs.

Randy V. Thompson, Nolan, MacGregor, Thompson & Leighton, St. Paul, MN, for the Abrahamson group of intervening plaintiffs.

Frances Felix, pro se, Minneapolis, MN, for herself and members of her immediate family as intervening plaintiffs.

Royce Deryl Edwards, Jr., Joplin, MO, for the Vadnais group of intervening plaintiffs.

Rory King, Bantz, Gosch & Cremer, LLC, Aberdeen, SD, for the Marvel Jean DuMarce group and the Youngbear group.

Brian L. Radke, Radke Law Office, P.C., Sioux Falls, SD for the Schroder group of intervening plaintiffs.

## OPINION AND ORDER

LETTOW, Judge.

This case arises under the Indian Tucker Act, 28 U.S.C. § 1505, and comes before the court for proceedings on remand from the Court of Appeals for the Federal Circuit after that court's decision on an interlocutory appeal of questions certified by this court. See Wolfchild v. United States, 559 F.3d 1228 (Fed.Cir.2009) ("Wolfchild VI"), cert. denied, — U.S. —, 130 S.Ct. 2090, 176 L.Ed.2d 722, 755 (2010). The issues on

remand are complex, reflecting both the convoluted and lengthy history of the federal government's relationship with the group of Indians who are plaintiffs and the extensive prior proceedings in this litigation.

### INTRODUCTION

Plaintiffs are lineal descendants of Mdewakanton Sioux Indians who were loyal to the United States and assisted white settlers in Minnesota during the 1862 Sioux uprising ("the loyal Mdewakanton" or "1886 Mdewakanton"). *See Wolfchild v. United States*, 62 Fed.Cl. 521, 524 (2004) ("*Wolfchild I* "). Approximately 20,750 persons have joined in this litigation as plaintiffs.[1] On October 27, 2004, the court granted partial summary judgment for the plaintiffs, holding that a trust for the benefit of the loyal Mdewakanton and their lineal descendants was created in connection with and as a consequence of appropriations statutes enacted in 1888, 1889, and 1890 ("Appropriation Acts"), providing money to the Department of the Interior ("the Department") for the benefit of the loyal Mdewakanton and their families. *See Wolfchild I*, 62 Fed.Cl. at 555.[2]

The court concluded that the relationship created pursuant to the Appropriations Acts contained the three traditional elements of a trust: a trustee (the United States), specific beneficiaries (the 1886 Mdewakanton and their lineal descendants), and trust property acquired by the Department using the appropriated funds (the 1886 lands, improvements to those lands, and funds derived from those lands). *See Wolfchild I*, 62 Fed.Cl. at 541. The court found additional evidence that a trust was created by looking to the arrangements made by the Department for the use of the 1886 lands by the loyal Mde-

wakanton and their lineal descendants over the years following acquisition of those lands. *See id.* at 541–43. Ninety years of detailed management of the 1886 lands by the Department, including its assigning rights of use to particular loyal Mdewakanton, monitoring beneficiaries' use of the lands, and leasing non-assigned land to third parties, and the Department's own repeated characterization of the 1886 lands as being held "in trust" for the loyal Mdewakanton, further persuaded the court that a trust relationship was created as a consequence of the assignment system. *See id.*[3]

The court also held that the Act of December 19, 1980, Pub.L. No. 96–557, 94 Stat. 3262 ("1980 Act"), which provided that the government would thereafter hold the 1886 lands in trust for three Indian communities located in Minnesota ("the three communities")[4] did not alter or terminate the trust for the loyal Mdewakanton. *See Wolfchild I*, 62 Fed.Cl. at 543–44. Consequently, the court concluded that actions taken in December 1980 and thereafter, including the Department of Interior's disbursement of funds derived from the 1886 lands to the three communities, constituted a breach of that trust. *See id.* at 555.

Approximately two and one half years after the court's ruling in *Wolfchild I*, the government interposed a motion to certify the court's decisions in *Wolfchild I*, *Wolfchild II*, and *Wolfchild III* for interlocutory appeal under 28 U.S.C. § 1292(d). *See Wolfchild v. United States*, 78 Fed.Cl. 472 (2007) ("*Wolfchild V* "). The court granted the government's motion in part and certified the following two questions for interlocutory review by the Court of Appeals for the Federal Circuit:

---

1. The Wolfchild plaintiffs number about 7,500 persons, and 41 separate groups totaling about 13,250 people were granted leave to intervene as plaintiffs. *See Wolfchild v. United States*, 77 Fed. Cl. 22, 31–35 (2007) ("*Wolfchild IV* ").

2. The three Appropriation Acts are: the Act of June 29, 1888, ch. 503, 25 Stat. 217, 228–29, the Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992–93, and the Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349.

3. The government's motion for reconsideration of the trust holding was denied in *Wolfchild v.*

*United States*, 68 Fed.Cl. 779, 801 (2005) ("*Wolfchild II* "). The court addressed procedural issues in *Wolfchild v. United States*, 72 Fed.Cl. 511 (2006) ("*Wolfchild III* ") and also in *Wolfchild IV*.

4. The three Indian communities are the Lower Sioux Indian Community, the Shakopee Mdewakanton Sioux (Dakota) Community, and the Prairie Island Indian Community in Minnesota. *See* 94 Stat. 3262.

(1) Whether a trust was created in connection with and as a consequence of the 1888, 1889, and 1890 Appropriations Acts for the benefit of the loyal Mdewakanton and their lineal descendants, which trust included land, improvements to land, and monies as the corpus; and

(2) If the Appropriations Acts created such a trust, whether Congress terminated that trust with enactment of the 1980 Act.

The Court of Appeals granted interlocutory appeal of those two questions and in due course reversed this court's conclusion regarding both certified questions. *See Wolfchild VI*, 559 F.3d 1228, 1231. Although the Court of Appeals acknowledged that "Interior Department officials at times characterized the 1886 lands as being held in trust for the 1886 Mdewakantons and their descendants[,]" *id.* at 1241, it decided that "the key question regarding the rights at issue in this case is not whether the 1886 lands were held 'in trust' for the 1886 Mdewakanton descendants to whom they were assigned, but rather what rights were conferred in the assigned lands." *Id.* at 1248–49. The Court of Appeals held that the Appropriations Acts did not create a trust for the benefit of the loyal Mdewakanton nor did they vest any title, legal or otherwise, in that group. *Id.* at 1240–41, 1249. Rather, it determined that "the Appropriations Acts are best interpreted as merely appropriating funds *subject to a statutory use restriction.*" *Id.* at 1240 (emphasis added). Under that view of the Appropriations Acts, the Court of Appeals concluded that the 1886 lands "were being held by the Department of the Interior for use by the 1886 Mdewakantons and their descendants pending an ultimate legislative determination as to how the ownership interests in the lands should be allocated." *Id.* at 1255. Regarding the second certified question, the Court of Appeals found that the 1980 Act

furnished that "ultimate legislative determination" by creating a trust for the benefit of the three communities, thereby terminating any trust that would have been created by the Appropriations Acts. *Id.* at 1255, 1259–60. The Court of Appeals remanded the case to this court to address the issue of "whether it was lawful for the Interior Department, following the 1980 Act, to transfer to the three communities approximately $60,000 in funds that had been collected as proceeds from the sale, use, or leasing of certain of the 1886 lands, given that the 1980 Act was silent as to the disposition of those funds." *Id.* at 1259 n. 14.

In light of the decision of the Court of Appeals and its remand to this court, plaintiffs and intervening plaintiffs have filed motions to amend their complaints. The government filed a motion to dismiss, arguing that this court lacks subject matter jurisdiction and that the complaint fails to state a claim upon which relief may be granted. Plaintiffs responded with a cross-motion for partial summary judgment respecting their entitlement to the money previously held by Treasury and other monies derived from the 1886 lands.

For the reasons stated below, the government's motion to dismiss is denied, and plaintiffs' and intervening plaintiffs' motions to amend their complaints are granted. Plaintiffs' cross-motion for partial summary judgment is granted in part and denied in part.

## FACTS[5]

### *The Mdewakanton Sioux*

Prior to August 1851, the Minnesota Sioux lived along the Mississippi River, stretching from the Territory of Dakota to the Big Sioux River. *See Medawakanton and Wahpakoota Bands of Sioux Indians v. United States*, 57 Ct.Cl. 357, 359 (1922).[6] Originally,

---

5. Thousands of pages of historical documents have been filed in connection with the pending motions and the prior motions dating back to 2004 in this litigation. The court has drawn upon that historical record in developing the recitation of facts which follows. Unless otherwise noted, the facts set out are undisputed. No authenticity objection has been raised to any of the historical documents. The arguments of the parties focus on the inferences to be drawn from the resulting record.

6. Some prior documents and decisions refer to the Mdewakanton Sioux as "Medawakanton." The court does not revise or correct the spelling in those instances.

these Sioux were all Mdewakantons, but they later split into four bands, known as the Mdewakanton and the Wahpakoota (together comprising the "lower bands"), and the Sisseton and the Wahpeton (known as the "upper bands" or "Santee Sioux"). *Id.* On September 29, 1837, the Sioux entered a treaty with the United States by which they ceded "to the United States all their land, east of the Mississippi River, and all their islands in said river[,]" in consideration of the United States' investment of $300,000 for the benefit of the Sioux. Treaty of Sept. 29, 1837, arts. I–II, 7 Stat. 538 ("1837 Treaty").[7] Under the treaty, the United States was required to pay an annuity to the Sioux at a rate of not less than five percent interest, such annuity to be paid "forever." *Id.,* art. II, 7 Stat. at 538.

In 1851, the Mdewakanton and Wahpakoota bands entered another treaty with the United States under which they ceded "all their lands and all their right, title and claim to any lands whatever, in the Territory of Minnesota, or in the State of Iowa[,]" and bound themselves to "perpetual" peace and friendship with the United States. Treaty of Aug. 5, 1851, arts. I–II, 10 Stat. 954 ("1851 Treaty"). This treaty stated that the government would provide to the bands, among other compensation, a trust fund of $1,160,000, with interest set at five percent, to be paid annually for a period of fifty years. *See id,* art. IV, ¶ 2, 10 Stat. at 954. The Sisseton and Wahpeton Bands signed a similar treaty on July 23, 1851, ceding all of their lands in the Territory of Minnesota and the State of Iowa, and "all of the lands owned in common by the four bands by natural boundaries." *Medawakanton,* 57 Ct.Cl. at 360; Treaty of July 23, 1851, art. II, 10 Stat. 949. The Sisseton and Wahpeton Bands were to receive compensation comparable to that of the Mdewakanton and Wahpakoota bands,

with a trust of $1,360,000 and interest at 5% to be paid out annually for fifty years. *See* Treaty of July 23, 1851, art. IV, ¶ 2, 10 Stat. at 949.

Article 3 of both 1851 treaties provided for the creation of a reservation for the Minnesota Sioux to run along the Minnesota River. *See Medawakanton,* 57 Ct.Cl. at 361. Based upon that Article, the Sioux were removed to the reservation delineated in the treaty. *See id.* at 360. The Senate, however, struck out the third article in its ratification of each of the treaties and instead agreed to pay the Sioux for the reservation lands at a rate of 10 cents per acre, the total sum to be added to the trust funds created by the treaties. *See id.* The Senate also authorized the President to set aside another reservation outside the limits of the ceded land. *See id.* The appropriate compensation corresponding to the ten-cents-per-acre rate was thereafter added to the trust funds created by the treaties, but the President never established an alternative reservation for the Sioux. *See id.* at 362. The Sioux continued to live on the land originally intended to serve as their reservation under the 1851 treaties. *See id.*

In 1858, the United States entered into another treaty with the Sioux under which the Mdewakanton and Wahpakoota bands "agreed to cede that part of their reservation lying on the north side of the Minnesota River" in exchange for compensation, including money and goods, the exact amount of which would be determined by the Senate at a later time. *Medawakanton,* 57 Ct.Cl. at 365–66; Treaty of June 19, 1858, arts. I–III, 12 Stat. 1031 ("1858 Treaty").[8] The treaty created a new reservation for the Sioux consisting of the land then occupied by the bands along the Minnesota River in south-central Minnesota. *See* 1858 Treaty, art. I, 12 Stat. 1031.[9] By entering the treaty, the

---

7. Although the 1837 treaty purports to bind the entire Sioux Nation, it appears that the treaty was signed only by leaders of the Mdewakanton band. *See* 7 Stat. 538.

8. Specifically, by the 1858 treaty the Mdewakanton and Wahpakoota bands agreed to cede part of their reservation, should the Senate determine they indeed had valid title to that land. *See* Treaty of June 19, 1858, art. II, 12 Stat. at 1031. The title was apparently in dispute because at least some portion of the land to be ceded under

the 1858 treaty included that land originally granted to the Sioux by virtue of the 1851 treaty but removed in the Senate ratification process. Congress authorized the President to confirm the land to the Sioux in an 1854 Act, but it maintained that "the President ha[d] not directly confirmed said reserve to said Indians." *Id.*

9. The Sisseton and Wahpeton bands entered into a similar treaty in 1858 by which they also ceded their land north of the Minnesota River. *See* Treaty of June 19, 1858, 12 Stat. 1037.

Mdewakanton and Wahpakoota bands of the Sioux Indians pledged "to preserve friendly relations with the citizens [of the United States], and to commit no injuries or depredations on their persons or property." *Id.,* art. VI, 12 Stat. at 1031.

### The 1862 Sioux Uprising

In August of 1862, individuals from each of the four bands of the Minnesota Sioux revolted against the United States in response to the United States' failure to furnish the money and supplies promised in exchange for the Sioux lands under the aforementioned treaties. *See* Def.'s Mot. to Dismiss and Mem. in Support ("Def.'s Mot.") at 4.[10] In the course of that uprising, the Sioux killed more than 500 settlers and damaged substantial property, *Wolfchild I,* 62 Fed.Cl. at 526, thereby breaching the 1851 and 1858 treaties. After defeating the Sioux, the United States annulled its treaties with them, which had the effect of, among other things, voiding the annuities that had been granted and were then being paid to the Sioux as part of the terms of the 1837 and 1851 treaties and eliminating any possibility of compensation under the 1858 treaty. *See* Act of Feb. 16, 1863, ch. 37, 12 Stat. 652. A portion of the remaining unexpended annuities was appropriated for payment to those settlers who had suffered damages as a result of the uprising. *Id.,* § 2, 12 Stat. at 652–53. The United States also confiscated the Sioux lands in Minnesota, *Id.,* § 1, 12 Stat. at 652, and later directed that the Sioux be removed to tracts of land outside the limits of the then-existing states. *See* Act of Mar. 3, 1863, ch. 119, § 1, 12 Stat. 819.

Some of the Sioux, however, had been loyal to the United States during the uprising by either not participating in the revolt or affirmatively acting to save the settlers. *See Wolfchild I,* 62 Fed.Cl. at 526. Nonetheless, Congress acted with a broad brush, declaring the Sioux's treaties void and annuities and allocation of land forfeited and failing to except from that termination the loyal Mdewakanton band of Sioux, whose annuity was valued at approximately $1,000,000. *See id.* at 527. Those Sioux who observed their pledge under the 1851 and 1858 treaties to maintain peaceful relations with the citizens of the United States were rendered "poverty-stricken and homeless." *Wolfchild VI,* 559 F.3d at 1232. Many of the loyal Sioux had lost their homes and property but could not "return to their tribe ... or they would be slaughtered for the part they took in the outbreak." *Wolfchild I,* 62 Fed.Cl. at 526 (quoting CONG. GLOBE, 38TH CONG., 1ST SESS. 3516 (1864)).[11]

### Congress's Initial Efforts to Compensate the Loyal Mdewakanton

Notwithstanding the broad termination of the Sioux treaties, Congress did attempt to provide for the loyal Mdewakanton by including a specific provision for them in the Act of February 16, 1863. After confiscating the Sioux land, Congress authorized the Department to assign up to eighty acres of that land to each loyal Sioux:

> [T]he Secretary of the Interior is hereby authorized to set apart of the public lands, not otherwise appropriated, eighty acres in severalty to each individual of the before-

10. A statement made by the Episcopal Bishop of Minnesota and quoted by Senator Fessenden in the course of passing subsequent legislation in 1863 provides a more detailed explanation:

> Four years ago the Sioux sold the Government about eight hundred thousand acres of land, being a part of their reservation. The plea for this sale was the need of more funds to aid them in civilization.... Of $93,000 due to the Lower Sioux they have never received a cent. All has been absorbed in claims except $880.58, which is to their credit on the books in Washington. Of the portion belonging to the Upper Sioux, $88,351.62 was also taken for claims.

CONG. GLOBE. 37TH CONG. 3D SESS. 192 (1863). In short, "[b]y fraud somewhere, these Indians have

had money withheld from them which was justly their due." *Id.*

11. By an 1868 treaty with the Sioux, the United States resumed paying annuities and providing goods and land to the Sioux. *See* Treaty of Apr. 29, 1868, 15 Stat. 635. The loyal Mdewakanton, however, did not benefit under this treaty as they had severed all tribal relations, and were no longer considered "Sioux." *See* 21 CONG. REC. 7,585, 7,587 (1890) (statement of Sen. Dawes) ("The Sioux fund and the Sioux appropriation grow out of an arrangement made in 1868, not with these Sioux [the loyal Mdewakanton], but with the warlike Sioux, from whom this band separated themselves and whom the warlike Sioux never afterward recognized.").

named bands who exerted himself in rescuing the whites from the late massacre [by] said Indians. The land so set apart ... shall not be aliened or devised, except by the consent of the President of the United States, but shall be an inheritance to said Indians and their heirs forever.

Act of Feb. 16, 1863, § 9, 12 Stat. at 654. As the Court of Appeals noted, the provision that the land would be "an inheritance to said Indians and their heirs forever[,]" "clearly would have created an inheritable beneficial interest in the recipients of any land conveyed under the statute." *Wolfchild VI*, 559 F.3d at 1241.

Two weeks after enacting this statute Congress passed an additional act providing for the loyal Sioux. *See* Act of Mar. 3, 1863, ch. 119, 12 Stat. 819. The second Act of 1863 supplemented the first Act of 1863 in important respects. Under the second Act, the President was "authorized" and "directed" to set apart "outside of the limits of any state" eighty acres of "good agricultural lands" for the Sioux. *Id.*, § 1, 12 Stat. at 819.[12] This grant of land appeared to be an attempt to address the fact that the first Act of 1863 confiscated all Sioux land, leaving the Sioux with no direction as to where they might make a new home. *See* CONG. GLOBE, 37TH CONG., 3D SESS. 528 (1863) (statement of Sen. Harlan) ("It was supposed by the committee that this removal of the Indians could not take place immediately ... [and] that a place must first be looked up for the Indians."). The second Act of 1863 also stated:

[I]t shall be lawful for [the Secretary of Interior] to locate any [loyal Sioux] ... upon said [reservation] lands on which the improvements are situated, assigning the same to him to the extent of eighty acres, to be held by such tenure as is or may be provided by law: *And provided, further,* That no more than eighty acres shall be

awarded to any one Indian, under this or any other act.

Act of Mar. 3, 1863, § 4, 12 Stat. at 819.

The Court of Appeals concluded that the second Act of 1863 "superseded" the first Act of 1863, and "pointedly left open the nature of the interest that the assignees would have in the lands, stating that the lands would be 'held by such tenure as is or may be provided by law.'" *Wolfchild VI*, 559 F.3d at 1241–42. Because the Court of Appeals found that the second Act superseded the first Act of 1863, it concluded that "the failure of the 1863 Acts cannot be viewed as leading Congress to create permanent ownership interests in the 1886 lands along the same lines set forth in the first 1863 statute, because the second of the two 1863 Acts left the question of ownership open to later resolution." *Id.* at 1242.

The Federal Circuit's view of the relationship between the two Acts of 1863, however, misreads the second enactment. The original version of the bill that became the second Act of 1863 provided that the Secretary could assign one hundred and sixty acres to each loyal Sioux. *See* CONG. GLOBE, 37TH CONG., 3D SESS. 528 (1863). In the course of debating the bill, Senator Fessenden suggested that "the one hundred and sixty acres ought to be reduced to eighty, and there ought to be a reference to the former act to provide that but eighty shall be given under any act; otherwise it might be construed to give him eighty acres under that act and eighty under this." *Id.* The Senate concurred, and the provision that "no more than eighty acres shall be awarded to any one Indian, under this or any other act" was added. *Id.*

[1] This history demonstrates that Congress was not "superseding" the first Act of 1863 by the second Act of 1863; to the contrary, it passed the second act with the specific understanding that the first Act of 1863 remained valid. The amendment to the second act to include a reference to "any other act" shows that the two acts of 1863

---

12. The Act also provided that the land that previously served as the reservation for the Sioux would be sold to "actual bona fide settler[s]" or "sold at public auction[.]" Act of Mar. 3, 1863, § 3, 12 Stat. at 819, and that proceeds from the sale of the lands that previously served as the Sioux's reservations were to be "invested by the Secretary of the Interior for the benefit of said Indians in their new homes, in the establishing [of] them in agricultural pursuits." *Id.*, § 4, 12 Stat. at 819.

were intended to co-exist, with the Secretary of the Interior ("the Secretary") entitled to provide relief to the loyal Sioux under either act.[13] Where, as here, the legislature supplements or amends an act so as to specify that a beneficiary of the subsequent act may not receive relief under *both* the prior and subsequent act, there is certainly no conflict between the two statutes, and an implied repeal of the prior act cannot be inferred. *See National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662–63, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) ("We will not infer a statutory repeal unless the later statute expressly contradicts the original act or unless such a construction is absolutely necessary ... in order that the words of the later statute shall have any meaning at all." (citation and internal quotations omitted)); *Miccosukee Tribe of Indians of Fla. v. United States Army Corps of Eng'rs*, 619 F.3d 1289, 1299 (11th Cir.2010) ("Congress's intent to effect an implied repeal can be inferred when a later statute conflicts with or is repugnant to an earlier statute; or when a newer statute covers the whole subject of the earlier one, and clearly is intended as a substitute[,] ... [but] a conflict [between the two statutes] is a minimum requirement." (citations omitted); *Cathedral Candle Co. v. United States Int'l Trade Comm'n*, 400 F.3d 1352, 1365 (Fed.Cir.2005) ("The Supreme Court has frequently explained that repeals by implication are not favored, and it has instructed that 'where two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to be contrary, to regard each as effective.'") (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)).

The land-grant provisions of both 1863 Acts intended to benefit the loyal Sioux were not successfully implemented. *See Wolfchild I*, 62 Fed.Cl. at 526–27. The Secretary did not exercise the authority granted by either 1863 Act, and no lands were provided to the loyal Mdewakanton. *Wolfchild VI*, 559 F.3d at 1232.[14] Notably, however, neither act has been repealed.

Two years later, in 1865, Congress attempted once again to alleviate the continuing plight of the loyal Sioux by appropriating an additional $7,500 for their benefit. *See* Act of Feb. 9, 1865, ch. 29, 13 Stat. 427. In doing so, Congress acknowledged that the loyal Sioux, who "at the risk of their lives, aid[ed] in saving many white men, women, and children from being massacred," had as a result been forced to sever their relationships with the tribe and "were compelled to abandon their homes and property, and are now entirely destitute of means of support." *Id.*

Thereafter, additional efforts were made to address the failure to implement the 1863 Acts. Beginning in 1884, Congress began appropriating funds for the benefit of the Mdewakantons who had remained in Minnesota or had returned to the state. *See* Act of July 4, 1884, ch. 180, 23 Stat. 76, 87 (appropriating $10,000 for the purchase of stock and "other articles necessary for their civilization and education, and to enable them to become self-supporting"); Act of Mar. 3, 1885, ch. 341, 23 Stat. 362, 375 (amending the 1884 Act by allowing the Secretary to disburse funds to the full-blooded Mdewakanton "for agricultural implements, lands, or cash, as in his judgment may seem best for said Indians"); Act of May 15, 1886, ch. 333, 24 Stat. 29, 39–40 (appropriating $10,000 for the purchase of "such agricultural implements, cattle, lands, and in making improvements thereon, as in [the Secretary's] judgment may seem best for said Indians"). Pursuant to the 1884, 1885, and 1886 statutes, Interior Department officials purchased land for the Mdewakanton and distributed it to many of them in fee

---

13. This relationship between the two Acts of 1863 accords with the fact that the first Act of 1863 allowed the Secretary to set apart unspecified public lands not otherwise appropriated, Act of Feb. 16, 1863, § 9, 12 Stat. at 654, while the second Act of 1863 provided that the Secretary could assign to the loyal Sioux lands that had previously served as reservation lands for the Sioux. Act of Mar. 3, 1863, § 4, 12 Stat. 819.

14. The failure to purchase land for the loyal Sioux was apparently due to fervent opposition by whites to permitting any Sioux from resettling in the state. *See Wolfchild VI*, 559 F.3d at 1232–33.

simple. *See Wolfchild VI*, 559 F.3d at 1233. This method of providing land to the Mdewakanton failed to supply long-term relief to the group as most of the recipients sold the land, otherwise encumbered it, or abandoned it. *Id.* Consequently, "the Interior Department discontinued the practice of transferring land to the loyal Mdewakantons in fee." *Id.*

*The 1886 Census and the 1888, 1889, and 1890 Appropriations Acts*

In 1886, the Department of Interior set out to establish with a greater degree of certainty which Mdewakanton were loyal to the United States during the 1862 uprising. Because of the administrative difficulty of this task, Congress decided that presence in Minnesota as of May 20, 1886 would suffice to qualify an individual as a "loyal Mdewakanton." *Wolfchild I*, 62 Fed.Cl. at 527. To determine which Mdewakanton lived in Minnesota on May 20, 1886, U.S. Special Agent Walter McLeod took a census listing all of the full-blood Mdewakantons, which census was mailed to the Commissioner of Indian Affairs on September 2, 1886. *Id.* at 528.[15] At the behest of the Secretary, on January 2, 1889, a second supplemental census was taken by Robert B. Henton, Special Agent for the Bureau of Indian Affairs ("BIA"), of those Mdewakanton living in Minnesota since May 20, 1886. *Id.* The McLeod and Henton listings (together, "the 1886 census") were used to determine who would receive the benefits of the later Appropriations Acts. *Id.*

Motivated by the failure of the 1863 Acts to provide viable long-term relief, in 1888, 1889, and 1890, Congress passed three Appropriations Acts that included provisions for the benefit of the loyal Mdewakanton. *See Wolfchild VI*, 559 F.3d at 1241; *Wolfchild I*, 62 Fed.Cl. at 524.[16] These Acts served as the foundation of the plaintiffs' breach-of-trust claims asserted in this litigation, and led to the approximately $60,000 in land proceeds that are at issue on remand. That $60,000, identified in a report prepared in 1975, had grown to $131,483 by 1980, and, with additional interest since 1980, would be a few times greater than that larger amount by today, thirty years later.

In 1888, Congress appropriated $20,000 "to be expended by the Secretary of the Interior" in purchasing land, cattle, horses, and agricultural implements for those "full-blood" loyal Mdewakanton who had severed their tribal relations. Act of June 29, 1888, ch. 503, 25 Stat. 217, 228–29.[17] In 1889, Congress appropriated a further sum of $12,000 "to be expended by the Secretary of the Interior" for the "full-blood" loyal Mdewakanton. Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992–93.[18] The 1889 Act was substantial-

15. Although the census was not prepared as of May 20, 1886, "inclusion on the McLeod list has been deemed to create a rebuttable presumption that an individual met the requirements of the subsequent 1888, 1889, and 1890 Acts." *Wolfchild I*, 62 Fed.Cl. at 528.

16. Notably, over thirty years later, the funds provided under the Appropriations Acts were deducted from a judgment for the Mdewakanton and Wahpakoota Bands, which judgment was rendered to compensate them for the annuities that were terminated by the 1863 Acts. *See Wolfchild VI*, 559 F.3d at 1254 (citing *Medawakanton*, 57 Ct.Cl. 357).

17. The section of the statute pertaining to the loyal Mdewakanton provided as follows:

> For the support of the full-blood Indians in Minnesota, belonging to the Mdewakanton band of Sioux Indians, who have resided in said State since the twentieth day of May, A.D. eighteen hundred and eighty-six, and severed their tribal relations, twenty thousand dollars, to be expended by the Secretary of the Interior in the purchase, in such manner as in his judgment he may deem best, of agricultural implements, cattle, horses and lands: *Provided*, That of this amount the Secretary if he may deem it for the best interests of said Indians, may cause to be erected for the use of the said Indians at the most suitable location, a school house, at a cost not exceeding one thousand dollars: *And provided also*, That he may appoint a suitable person to make the above-mentioned expenditures under his direction, the expense of the same to be paid out of this appropriation.

25 Stat. at 228–29.

18. The relevant portion of the 1889 appropriation act reads as follows:

> For the support of the full-blood Indians in Minnesota heretofore belonging to the Mdewakanton band of Sioux Indians, who have resided in said State since the twentieth day of May eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein, and have sev-

ly similar to the 1888 Act but included three additional provisions not included in the 1888 Act. Unlike the 1888 Act, the 1889 Act required the Secretary to expend the appropriated funds in a manner such that each loyal Mdewakanton received as close to an equal amount as practicable. *Id.* Additionally, the 1889 Act mandated that any money appropriated in the 1889 Act not expended within the fiscal year would not be recovered by Treasury, but rather would be carried over to the following years and expended for the benefit of the loyal Mdewakanton. *Id.* at 992. The 1889 Act included both of these additional provisions applicable to the money appropriated under the 1888 Act as well. *Id.* at 992–93. The 1889 Act differed from the 1888 Act in a third way by granting the Secretary discretion based on what "may be deemed best in the case of each of these Indians *or family*

*thereof.*" *Id.* at 992 (emphasis added). The 1888 Act, on the other hand, made no explicit mention of the loyal Mdewakantons' families as beneficiaries of the appropriations. *See* 25 Stat. at 228–29.

In 1890, Congress provided an additional $8,000 "to be expended by the Secretary of the Interior" for the loyal Mdewakanton. Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349.[19] The 1890 Act was substantially similar to the 1889 Act, and included the requirement that the Secretary spend the money in a way that ensured each loyal Mdewakanton would receive as close to an equal amount as practicable. *Id.* There were, however, two unique aspects of the 1890 Act. First, the 1890 Act dictated that the amount was to support both "full and mixed blood" loyal Mdewakanton. *Id.* Additionally, the 1890 Act did not include the provision found in the

---

ered their tribal relations, twelve thousand dollars, to be expended by the Secretary of the Interior as follows: Ten thousand dollars in the purchase, as in his judgment he may think best, of such lands, agricultural implements, seeds, cattle, horses, food, or clothing as may be deemed best in the case of each of these Indians or family thereof; one thousand dollars, or so much thereof as may be necessary to defray the expenses of expending the money in this paragraph appropriated; and one thousand dollars for the completion and furnishing of the schoolhouse for said Indians authorized by the act of June twenty-ninth, eighteen hundred and eighty-eight: *Provided,* That if the amount in this paragraph appropriated, or any portion of the sum appropriated for the benefit of these same Indians by said act of June twenty-ninth, eighteen hundred and eighty-eight, shall not be expended within the fiscal year for which either sum was appropriated, neither shall it be covered into the Treasury, but shall, notwithstanding, be used and expended for the purposes for which the same amount was appropriated and for the benefit of the above-named Indians: *And provided also,* That the Secretary of the Interior may appoint a suitable person to make the above-mentioned expenditure under his direction; and all of said money which is to be expended for lands, cattle, horses, implements, seeds, food, or clothing shall be so expended that each of the Indians in this paragraph mentioned shall receive, as nearly as practicable an equal amount in value of this appropriation and that made by said act of June twenty-ninth, eighteen hundred and eighty-eight: *And provided further,* That as far as practicable lands for said Indians shall be purchased in such locality as each Indian desires, and none of said Indians shall

be required to remove from where he now resides and to any locality against his will. 25 Stat. at 992–93.

19. The full text of the 1890 appropriation provided as follows:

For the support of the full and mixed blood Indians in Minnesota heretofore belonging to the Mdewakanton band of Sioux Indians, who have resided in said State since the twentieth day of May, eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein, and have severed their tribal relations, eight thousand dollars, to be expended by the Secretary of the Interior, as in his judgment he may think best, for such lands, agricultural implements, buildings, seeds, cattle, horses, good, or clothing as may be deemed best in the case of each of these Indians or families thereof: *Provided,* That two thousand dollars of the above eight thousand dollars shall be expended for the Prairie Island settlement of Indians in Goodhue County: *Provided further,* That the Secretary of the Interior may appoint a suitable person to make the above-mentioned expenditure under his direction whose compensation shall not exceed one thousand dollars; and all of said money which is to be expended for lands, cattle, horses, implements, seeds, food, or clothing shall be so expended that each of the Indians in this paragraph mentioned shall receive, as nearly as practicable, an equal amount in value of the appropriation: *And provided further,* That, as far as practicable, lands for said Indians shall be purchased in such locality as each Indian desires, and none of said Indians shall be required to remove from where he now resides and to any locality or land against his will.

1889 Act specifying that any monies not expended in the fiscal year were to be carried over to the following years. *See id.*[26]

*Land Assignments under the Appropriations Acts*

Unlike the failed 1863 Acts, the funds provided by the three Appropriations Acts were used for the purchase of land, agricultural implements, livestock, and goods for the loyal Mdewakanton. *See Wolfchild I*, 62 Fed.Cl. at 528. The lands were purchased in three distinct areas of Minnesota, and by 1980 they consisted of: (1) approximately 260 acres in Scott County (the "Shakopee lands"), (2) approximately 575 acres in Redwood County (the "Lower Sioux" lands), and (3) approximately 120 acres in Goodhue County (the "Prairie Island" lands). *Id.* Collectively, these properties were known as the "1886 lands" to reflect the date by which the beneficiaries of the Appropriations Acts were defined. *Id.*

In 1904, the Secretary began conveying rights to use the purchased land to the loyal Mdewakanton. *See* Def.'s Mot. at 4. Rather than granting the land in fee simple—a practice that had failed to provide long-term relief under the 1884, 1885, and 1886 appropriations—the Department chose to make the land available to the loyal Mdewakanton while retaining title in the United States' name. *See Wolfchild I*, 62 Fed.Cl. at 528; *see also* Pls.' App. in Support of Cross–Mot. for Summ. Judgment ("Pls.' App.") at 61 (Letter from Acting Comm'r of Dep't of Interior to James McLaughlin, U.S. Indian Inspector) (Feb. 20, 1899) ("As you are doubtless aware, the title to all the land purchased by late Agent Henton for said Indians [loyal

Mdewakanton], is still vested in the United States—being held in trust for them."). To that end, the Department employed an assignment system under which a parcel of land would be assigned to a particular beneficiary who could use and occupy the land as long as he or she wanted; however, if the assignee did not use it for two years, the parcel would be reassigned. *See Wolfchild I*, 62 Fed.Cl. at 528.

Under the assignment system, the Department provided documents called Indian Land Certificates to assignees as evidence of their entitlement to the land. *See Wolfchild I*, 62 Fed.Cl. at 528. The Certificates stated that the assignee "and [his] heirs are entitled to immediate possession of said land, which is to be held in trust, by the Secretary of the Interior, for the exclusive use and benefit of the said Indian, so long as said allottee or his or her heirs occupy and use said lands." Def.'s Mot., Ex. P (Indian Land Certificate).[21] If an assignee abandoned the land for a period of time, usually two years, then the Department of Interior would reassign the land to another beneficiary; any sale, transfer, or encumbrance of the land other than to the United States was void. *Wolfchild I*, 62 Fed.Cl. at 529. "Although not guaranteed under the assignment system, in practice an assignee's land would pass directly to his children upon his death." *Id.* Other relatives, however, were required to follow procedures established by the Bureau of Indian Affairs to receive an assignment. *Id.*

*Evolution of the Three Communities*

In 1934, the Indian Reorganization Act ("Reorganization Act") fundamentally altered the way in which the federal government

---

26. Stat. at 349.

20. This provision was contained in the original version of the bill but was elided pursuant to an amendment proposed by Senator Cockrell who declared it a "remarkable provision." 21 CONG. REC. 7,586 (1890). Senator Dawes responded to Senator Cockrell by observing that "[t]his whole paragraph [the entire text of the 1890 appropriation to the loyal Mdewakanton] is [not] of the ordinary course of an Indian appropriation bill." *Id.* Senator Cockrell responded: "Or any other appropriation bill, is it not?" *Id.*

21. In accord with the representation in the Indian Land Certificates that the land was "held in

trust ... by the Secretary of the Interior" for the assignee and his heirs, Congress amended a bill that allowed the Secretary of Interior to sell an unfarmable parcel of 1886 lands to include a requirement that the loyal Mdewakanton had to consent to the sale. *See Wolfchild I*, 62 Fed.Cl. at 528–29; Act of Feb. 25, 1901, ch. 474, 31 Stat. 805, 806. In the course of debating that amendment, Senator Pettigrew remarked that "[the 1886 lands] were not an Indian reservation. These Indians own the homes, and they have a right there greater than that of reservation Indians. The land was purchased for their benefit, and the title is in them subject to a provision by which they can not convey it." *Wolfchild I*, 62 Fed.Cl. at 529 (citing 34 CONG. REC. 2,523 (1901)).

dealt with Indians and Indian tribes. *See* Act of June 18, 1934, ch. 576, 48 Stat. 984 (also known as the Wheeler–Howard Act) (codified as amended at 25 U.S.C. §§ 461–79). The Reorganization Act permitted "[a]ny Indian tribe, or tribes, residing on the same reservation . . . to organize for its common welfare." *Id.*, § 16, 48 Stat. at 987. Pursuant to the Act, the Mdewakanton and others formed three communities: the Shakopee Mdewakanton Sioux Community, the Prairie Island Indian Community, and the Lower Sioux Indian Community. *See Wolfchild I*, 62 Fed.Cl. at 529. Although loyal Mdewakanton resided in the three communities, the three communities were and are not exclusively comprised of descendants of the loyal Mdewakanton, and "many of the descendants of the 1886 Mdewakantons are not enrolled members of any of the three communities." *Wolfchild VI*, 559 F.3d at 1235. The membership of these communities thus is not defined in terms of indigenous relationships; [22] rather, the communities exercise discretion over who attains or keeps their membership. *See Wolfchild I*, 62 Fed. Cl. at 530; *see, e.g.*, Def.'s Mot., Ex. E, art. III (Constitution and Bylaws of the Lower Sioux Indian Community in Minnesota). As a result, "a lineal descendant of a loyal Mdewakanton might be denied admission to, or removed from, membership in a community even if the descendant lived on 1886 land encompassed by the community boundary." *Wolfchild I*, 62 Fed.Cl. at 530.

As a consequence of the fact that the communities were not equivalent to the loyal Mdewakanton, the communities did not have a collective claim to the 1886 lands. In 1978, a Field Solicitor for the Department of Interior addressed this issue: "[N]one of the three Community governments, organized under the [Reorganization Act] . . . has any right, title or interest in these lands. The land is held for the benefit of a specific class of people and their descendants." Joint App. ("J.A.") 00399–400 (Letter from Mariana R. Shulstad, Field Solicitor, to Edwin L. Dem-

ery, Area Dir. for Minneapolis Area Office of the Bureau of Indian Affairs (Nov. 8, 1978) ("Shulstad 1978 Letter")).

Nonetheless, after the passage of the Reorganization Act, the BIA consulted with the communities before granting assignments to 1886 lands. *See Wolfchild I*, 62 Fed.Cl. at 529–30. Although the Field Solicitor for the Department noted that the communities' recommendations were "a courtesy only" and not "a legal necessity, since the communities have no decision making authority concerning use of these lands[,]" the communities were provided an opportunity to influence the assignment of 1886 lands. J.A. 00400 (Shulstad 1978 Letter). Additionally, prior to the establishment of the three communities, the Department's policy was that any sand and gravel deposits located on the 1886 lands were the government's property and were not subject to sale by the assignees. *See* Def.'s Mot., Ex. D (Letter from J.W. Balmer, Superintendent of the Pipestone Indian School to Earl Pendleton) (Nov. 22, 1930). After the passage of the Reorganization Act, however, the BIA adopted the view of the Lower Sioux Indian Community that sand and gravel on the 1886 lands within the reservation constituted a community resource and was not the government's property. *See* Def.'s Mot. at 8.

*Funds Derived from the 1886 Lands*

Eventually, money derived from 1886 lands began to be held in Treasury accounts. On June 13, 1944, Congress enacted a statute authorizing the Secretary to transfer approximately 110.24 acres of 1886 lands in Wabasha County to the Upper Mississippi River Wild Life and Fish Refuge ("the Wabasha Land Transfer"). *See* An Act to Add Certain Lands to the Upper Mississippi Wild Life and Fish Refuge, Pub.L. No. 78–335, ch. 243, 58 Stat. 274. The parcels had been acquired pursuant to the 1888 and 1889 Appropriations Acts "for Indian use, but [were] no longer [being] used by Indians." *Id.*, § 2, 58 Stat. at 274.

---

22. Groups organized pursuant to and recognized by the Reorganization Act are not required to "correspond exactly to any tribe or band." Felix Cohen, On the Drafting of Tribal Constitutions 5 (David E. Wilkins ed., Univ. of Oklahoma Press

2006) (1934). Accordingly, "[a]ll the Indians of a given reservation may organize as a unit if they so desire, regardless of past tribal affiliations." *Id.*

The Secretary of the Interior drafted a bill to authorize the land transfer and proposed it to Congress. *See* S.Rep. No. 78–809, at 1 (1944). In his proposal, the Secretary noted that "[t]hese lands cannot be acquired or transferred in the usual manner as their use has been fixed by Congress ... [i]n these circumstances it is recommended that the proposed legislation be placed before the Senate for appropriate action." *Id.* at 2. In the course of considering the Secretary's bill, Senator Mundt remarked, "I understand that it is a matter of transferring the title so that it can be used by the refuge." 90 Cong. Rec. 5,325 (1944). The Act provided as follows:

> In order to carry out ... [the transfer of the land], the sum of $1,261.20 ... is hereby made available for transfer on the books of the Treasury of the United States to the credit of the Mdewakanton and Wahpakoota Bands of Sioux Indians pursuant to the provisions of the Act of May 17, 1926 (44 Stat. 560) ... and shall be subject to disbursement under the direction of the Secretary of the Interior for the benefit of the Mdewakanton and Wahpakoota Bands of Sioux Indians. Where groups of such Indians are organized as tribes under the [Reorganization Act], the Secretary of the Interior may set apart and disburse for their benefit and upon their request a proportionate part of said sum, based on the number of Indians so organized.

Pub.L. No. 78–335, § 2, 58 Stat. 274.[23] The 1886 lands at Wabasha were transferred, and on October 6, 1944, $1,261.20 was credited to the United States Treasury Account 147436, "Proceeds of Labor, Mdewakanton and Wahpakoota Bands of Sioux Indians, Minnesota." *See* Def.'s Mot. at 8, Ex. A (Letter from F.G. Hutchinson, Acting Chief, Branch of Realty, to E.M. Pryse, Area Director, Minneapolis, Minn. (Feb. 24, 1955)), Ex. B (Letter from C.B. Emery, Chief, Branch of Budget and Finance, to D.C. Foster, Area Director, Minneapolis, Minn. (June 8, 1951)).

Although the 1944 Act provided the funds to the Mdewakanton and Wahpakoota generally, not the loyal Mdewakanton specifically, the Act notably allowed funds from the Wabasha Land Transfer to be disbursed to tribes organized under the Reorganization Act only in proportion to the number of Mdewakanton and Wahpakoota contained within those tribes. *See* Pub.L. No. 78–335, § 2, 58 Stat. 274. The importance of the restriction contained in the last sentence was reiterated by the Chief of Budget and Finance for BIA, C.B. Emery, in a letter dated June 8, 1951, to the Area Director of BIA for Minneapolis, D.C. Foster, in response to Mr. Foster's inquiry as to the status of the Wabasha Land Transfer funds. *See* Def.'s Mot., Ex. B (In regards to the Wabasha Land Transfer funds, "[t]he last sentence of the Act of June 13, 1944 should be particularly noted.").[24]

Money was also derived from the 1886 lands by the Department's policy of leasing or licensing 1886 lands for fair market value where no eligible 1886 Mdewakanton was available for the land assignment. *See* *Wolfchild I*, 62 Fed.Cl. at 530. The Department sometimes licensed the unused parcels to non-Indians for a fixed compensation to be paid to a third party. *See, e.g.,* Def.'s Mot., Ex. R (License Agreement (Apr. 22, 1916)) (granting license to non-Indian in consideration of $25.00 per annum payment to Pipestone Indian School, Pipestone, Minn.). The Department also deposited some leasing funds derived from the 1886 lands in various Treasury accounts. *See* Def.'s Mot., Ex. C (Accountant's Report, Income to Mdewakanton Sioux Lands, Minneapolis Area Office, Minneapolis Minn. (Field work for report completed Feb. 5, 1975)) ("1975 Report").

In 1974, the Acting Associate Solicitor for Indian Affairs in the Department, Duard R. Barnes, wrote a detailed opinion explaining the Department's interpretation of the status of the 1886 lands and the funds derived from the land. J.A. 00392–97 (Mem. to Comm'r of

---

23. The Act also provided that the $1,261.20 "when so transferred, shall operate as a full, complete, and perfect extinguishment of all their right, title, and interest in and to the lands above described." Pub.L. No. 78–335, § 2, 58 Stat. 274.

24. The 1944 Act also made the Wabasha Land Transfer funds subject to the restrictions contained in the Act of May 17, 1926, ch. 309, 44 Stat. 560. *See* Pub.L. No. 78–335, § 2, 58 Stat. 274. The effect of that statute is discussed *infra*, at 333 n. 42.

Indian Affairs (Mar. 19, 1974)) ("Barnes 1974 Mem."). The opinion stated that legal title was taken in the United States' name, and tenancies at will or defeasible tenancies were granted to the 1886 Mdewakantons. J.A. 00394. The memorandum concluded that the 1886 lands were "held in trust by the United States with the Secretary possessing a special power of appointment among members of a definite 'class." *Id.* at 00396. The opinion also noted that whereas lease income from the 1886 lands had been "expended through local tribal governments ... for the benefit of reservation communities in which members of the beneficiary class reside or with which they are affiliated[,]" in the future "[p]roceeds from the leases should be kept separate and may be expended for the benefit of the class." *Id.* at 00394, 00397. The letter ended by proposing that the BIA "undertake to ascertain whether some legislative disposition of beneficial title to these lands consistent with the present situation is current and can be recommended to the Congress." *Id.* at 00397. Pursuant to the 1974 opinion letter, the BIA began to deposit lease income in suspense accounts, *see* Def.'s Mot., Ex. C, and ordered that all income from the 1886 lands be identified and maintained in a separate account. *Id.*, Ex. F (Mem. from Milton C. Boyd, Chief, Office of Audit, BIA, to Minneapolis Area Director (Mar. 21, 1975)).

In 1975, the BIA completed a report documenting all funds derived from the 1886 lands. *See* Def.'s Mot., Ex. C. The 1975 Report found no evidence of any income derived from the 1886 lands prior to 1950 with the exception of the Wabasha Land Transfer. *Id.*[25] The BIA accountants found a total of $61,725.22 in funds derived from the 1886 lands, including the $1,261.20 in Wabasha–Land–Transfer funds. The Accounts were

divided into three "Proceeds of Labor" Treasury accounts,[26] and four Individual Indian Money ("IIM") accounts. *Id.*[27] Of the remaining $60,464.02, $58,784.96 was deposited in four Lower Sioux Treasury and IIM accounts, and $1,679.06 was deposited in two Prairie Island Treasury and IIM accounts. *Id.* As is evident from the accounting described above, the majority of the income derived from the 1886 lands was allocated to accounts belonging to the Lower Sioux, and no money accounted for in the 1975 Report was attributed to the Shakopee Mdewakanton Sioux. *See id.* The entire $61,725.22 was subsequently placed in Treasury Account 147436 "Proceeds of Labor, Mdewakanton and Wahpakoota" and its associated interest account, 147936, thus, in the words of the BIA, "restor[ing] these funds to the proper accounts." *See id.*

On June 27, 1975, BIA officials met with representatives of the three communities to address the disbursement of the money gathered in Treasury Account 147436 and its associated interest account. *See* Def.'s Mot. at 10. The parties agreed that the three communities "would submit resolutions requesting distribution of the ... funds" and "requesting a Congressional directive as to the 1886 lands." *Id.* The three communities submitted their proposals to the BIA, *see id.*, and by September 1980, the three communities had agreed that the funds should be divided equally and disbursed to the communities, and that any money earned after January 1, 1978 would be paid to the community whose reservation encompassed the 1886 lands from which the funds were derived. *See id.*, Ex. I (Mem. to Area Director of Minneapolis Area Office from Richard L. McLaughlin, BIA (Sept. 16, 1980)).

---

25. The 1975 Report did not provide an accounting of any income disbursed to the assignees or to the Pipestone Indian School.

26. The "Proceeds of Labor" Treasury Accounts were: Account 147158, "Proceeds of Labor, Lower Sioux Indian Community," Account 147043, "Proceeds of Labor, Prairie Island Indian Community," and Account 147436, "Proceeds of Labor, Mdewakanton and Wahpakoota." *See id.*

27. An IIM account is "an interest bearing account for trust funds held by the Secretary that belong to a person who has an interest in trust assets. These accounts are under the control and management of the Secretary. There are three types of IIM accounts: unrestricted, restricted, and estate accounts." 25 C.F.R. § 115.002. The Report does not specify in which types of IIM accounts the funds were placed. *See* Def.'s Mot., Ex. C.

About the same time that some BIA officials were consulting the three communities as to the funds derived from the 1886 lands, other BIA officials realized that the three communities did not have a claim to the funds. In a response dated Nov. 6, 1975 to an inquiry by Minnesota Representative Richard Nolan regarding the 1886 lands and funds derived from the lands, the Acting Area Director for the Minnesota Field Office of the BIA stated that "the funds appropriated are to be used only for the benefit of a certain class of people identified by special census of that time [the 1886 Mdewakanton] [and] [t]he current Sioux Communities do not represent the special class of people referred to even though some of their members may qualify in the special class mentioned in the actions taken in 1888, 1889, and 1890." J.A. 02548 ("Area Director's 1975 Mem."). In a subsequent memorandum dated June 3, 1976, to the Commissioner of Indian Affairs, the Office of the Area Director reiterated that the funds obtained by virtue of the 1886 lands could not be distributed to the three communities without legislative action. He stated,

[W]e should not attempt to distribute such funds on the strength of the resolutions from the three communities at this time ... The land was originally purchased for the Mdewakanton Sioux residing in Minnesota on May 20, 1886, and their descendants ... A very small portion of the descendants reside on the three Minnesota Sioux Communities today. A question arises as to whether all descendants would be entitled to the income similar to an Indian Claims Commission judgment award distributed to descendants....

One suggestion to resolve this matter would be to incorporate the disposition of the funds with legislation converting the

title. Another suggestion would be to develop a descendancy roll similar to a claim distribution, however, this would only dispose of funds accumulating up to the date of the payment and would have to be repeated in the future, or until title to the land is changed. We would appreciate your advice and authority for the disposition of subject funds.

J.A. 01115–16 ("Area Director's 1976 Mem.").

Nonetheless, on January 9, 1981, the BIA disbursed $37,835.88 to the Shakopee Mdewakanton, $36,210.01 coming from Treasury Account 147436 and $1,625.87 coming from the associated interest account 147936. *See* Def.'s Mot., Ex. K (Public Voucher (Dec. 30, 1980)). On March 3, 1981, the BIA disbursed $37,835.88 to the Lower Sioux, $27,601.78 coming from Treasury Account 147436 and $10,234.10 coming from a Lower Sioux "Proceeds of Labor" and interest account. *See id.,* Ex. L (Public Voucher (Feb. 23, 1981)). And on April 21, 1981, the BIA disbursed the final $37,835.88 to the Prairie Island community, $25,450.48 coming from accounts 147436 and 147936 and $12,385.40 from a Prairie Island "Proceeds of Labor" and interest account. *See id.,* Ex. M (Public Voucher (Apr. 21, 1981)).[28] The BIA made additional disbursements from Treasury Account 147436 in 1981 and 1982, with the Shakopee Mdewakanton receiving $6,429.71, the Lower Sioux receiving $5,115.85, and the Prairie Island receiving $6,429.71. *See* Def.'s Mot. at 11; *id.,* Ex. N (Public Voucher (Mar. 22, 1983)).

*Treatment of the 1886 Lands under the 1980 Act*

After the passage of the Reorganization Act, "additional lands were acquired in trust for the benefit of" the three communities. *See* H.R.Rep. No. 96–1409, at 2 (1980). As a

---

28. The "Proceeds of Labor" accounts from which disbursements were made to the Lower Sioux and Prairie Island Communities are the same accounts that the 1975 Report identified as containing money derived from the 1886 lands. *See* Def.'s Mot., Ex. C. Pursuant to that report, all money related to the 1886 lands then found in those accounts was transferred to Treasury Account 147436 and its associated interest account 147936. *Id.* However, it would appear from the source of the 1980 disbursements that subsequent to the 1975 transfer of $61,725.22, funds

derived from the 1886 lands were once again placed in the "Proceeds of Labor" Treasury Accounts belonging to the Lower Sioux and the Prairie Island Communities. The BIA's decision to resume placing monies derived from the 1886 lands in accounts other than Account 147436 and its associated interest account 147936 is perplexing given the BIA's acknowledgement, in its 1975 Report, that transferring the funds to accounts 147436 and 147936 "restore[d] these funds to the proper accounts." *Id.*

result, the three communities had "two classes of members: all members of the community who were entitled to the benefits of the tribal lands acquired under the Reorganization Act and members who were descendants of the 1886 Mdewakanton and who had exclusive rights to the benefits of the 1886 lands." *Id.* The property interests possessed by the two classes of members of the three communities were interspersed and resulted in "a checkerboard pattern of land used that severely diminishe[d] the effectiveness of overall land management programs and community development." *See id.* at 6. In a lame-duck session following the 1980 elections, Congress statutorily addressed the disparate property interests of the members of the three communities in December 1980, approximately one month after the communities and the BIA signed the agreement for the disbursement of the funds to the communities. *See* Act of Dec. 19, 1980, Pub.L. No. 96–557, 94 Stat. 3262.

The 1980 Act provided that the 1886 lands, which "were acquired and are now held by the United States for the use or benefit of certain Mdewakanton Sioux Indians" under the Appropriations Acts, would henceforth be "held by the United States ... in trust for" the three communities. 94 Stat. 3262.[29] The Act also contained a savings clause providing that the Act would not "alter" any rights then existing under "any contract, lease, or assignment entered into or issued prior to enactment of" the Act. *Id.* "Thus, all of the individuals then holding assignments to the 1886 lands retained their rights to use the land unaffected by the 1980 legislation." *Wolfchild VI,* 559 F.3d at 1235.

The United States continued to "oversee assignments that had been made before 1980 and were covered by Section 3 of the 1980 Act[,]" but no new assignments were made by the Department after the passage of the 1980 Act. Def.'s Mot. at 6–7. Upon the death of an assignee of the 1886 lands, the assignee's parcel of land was apparently shifted to the control of the community that possessed an interest in the surrounding land pursuant to the 1980 Act. *See id.* at 7 (citing *Gitchel v. Minneapolis Area Director,* 28 IBIA 46 (1995)). The three communities also assumed the responsibility of "managing ... and issuing new assignments" for those 1886 lands not assigned to loyal Mdewakanton prior to the passage of the 1980 Act. *See* Def.'s Mot. at 6 (citing *Smith v. Haliburton,* 1982 U.S. Dist. Lexis 14243 *4–*5 (D.Minn. Aug. 23, 1982)).

Most importantly for the court's present purpose, the 1980 Act did not address the disposition of the funds that were derived from the 1886 lands then held by Treasury. *See* 94 Stat. 3262; *Wolfchild VI,* 559 F.3d at 1259 n. 14. Despite the silence of the 1980 Act as to the funds, the Department acted on the presumption that the funds derived from the 1886 lands "could be turned over to the communities without notice to the 1886 beneficiaries." *Wolfchild I,* 62 Fed.Cl. at 533. As described above, the disbursement of the funds was agreed prior to the passage of the 1980 Act, and the funds were given to the

---

29. The Act provided, in material part:

[A]ll right, title, and interest of the United States in those lands (including any structures or other improvement of the United States on such lands) which were acquired and are now held by the United States for the use or benefit of certain Mdewakanton Sioux Indians under ... [the Appropriations Acts], are hereby declared to hereafter be held by the United States—,

(1) with respect to the some 258.25 acres of such lands located within Scott County, Minnesota, in trust for the Shakopee Mdewakanton Sioux Community of Minnesota;

(2) with respect to the some 572.5 acres of such lands located within Redwood County, Minnesota, in trust for the Lower Sioux Indian Community of Minnesota; and

(3) with respect to the some 120 acres of such lands located in Goodhue County, Minnesota, in

trust for the Prairie Island Indian Community of Minnesota.

Sec. 2. The Secretary of the Interior shall cause a notice to be published in the Federal Register describing the lands transferred by section 1 of this Act. The lands so transferred are hereby declared to be a part of the reservations of the respective Indian communities for which they are held in trust by the United States.

Sec. 3. Nothing in this Act shall (1) alter, or require the alteration, of any rights under any contract, lease, or assignment entered into or issued prior to enactment of this Act, or (2) restrict the authorities of the Secretary of the Interior under or with respect to any such contract, lease, or assignment.

94 Stat. 3262.

three communities beginning approximately one month after the passage of the 1980 Act.

## STANDARDS FOR DECISION

### Motion to Amend

[2, 3] "The court should freely give leave [to amend pleadings] when justice so requires." Rule 15(a)(2) of the Rules of the Court of Federal Claims ("RCFC"). The decision to grant or deny amendment of a complaint or answer is within the discretion of the trial court, but "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1403 (Fed.Cir.1989) (Under Rule 15(a), "discretion should be exercised liberally to permit such amendments."). Absent a reason, such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment[, or] futility of amendment[,]" the motion to amend should be granted. *Foman*, 371 U.S. at 182, 83 S.Ct. 227; *Mitsui Foods, Inc.*, 867 F.2d at 1403–04; *see also Henry E. and Nancy Horton Bartels Trust ex rel. Cornell Univ. v. United States*, 88 Fed.Cl. 105, 111 (2009), *aff'd*, 617 F.3d 1357 (Fed.Cir.2010).

### Motion to Dismiss

[4–6] "Jurisdiction must be established as a threshold matter before the court may proceed with the merits of this or any other action." *OTI Am., Inc. v. United States*, 68 Fed.Cl. 108, 113 (2005) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). Plaintiffs bear the burden of establishing the court's subject matter jurisdiction over their claim. *See McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). In undertaking an analysis of subject matter jurisdiction, the court must accept as true the facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiffs. *See*

*Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir.1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds as noted in Francis v. Giacomelli*, 588 F.3d 186, 192 n. 1 (4th Cir.2009)); *Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1568–69 (Fed.Cir.1993).

[7–9] Jurisdiction over a claim against the United States requires a waiver of sovereign immunity combined with a cause of action falling within the terms of that waiver. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (citing *United States v. Mitchell*, 445 U.S. 535, 538–39, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) ("*Mitchell I*"); *United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("*Mitchell II*")). Such a waiver must be "unequivocally expressed." *Mitchell I*, 445 U.S. 535 at 538, 100 S.Ct. 1349 (quoting *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)). The government has consented to suit through the Indian Tucker Act, 28 U.S.C. § 1505, which provides:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

Claims that would "otherwise be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group" include those founded upon the Tucker Act, 28 U.S.C. § 1491(a)(1), which waives immunity for claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliq-

uidated damages in cases not sounding in tort."

[10, 11] Although serving as a waiver of sovereign immunity, the Indian Tucker Act does not itself "create[ ] a substantive right enforceable against the Government by a claim for money damages." *White Mountain Apache,* 537 U.S. at 472, 123 S.Ct. 1126. As with the Tucker Act, a plaintiff grounding its claim on the Indian Tucker Act must demonstrate that some other source of law creates a money-mandating right or duty that falls within the ambit of the waiver of sovereign immunity. *See United States v. Navajo Nation,* — U.S. —, —, 129 S.Ct. 1547, 1551–52, 173 L.Ed.2d 429 (2009). "The other source of law need not *explicitly* provide that the right or duty it creates is enforceable through a suit for damages, but it triggers liability only if it can be fairly interpreted as mandating compensation by the Federal Government." *Id.* at 1552 (internal quotations omitted).

[12, 13] "This 'fair interpretation' rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity." *White Mountain Apache,* 537 U.S. at 472, 123 S.Ct. 1126; *see also Mitchell II,* 463 U.S. at 218–19, 103 S.Ct. 2961 ("Because the Tucker Act supplies a waiver of immunity for claims of this nature, the separate statutes and regulations need not provide a second waiver of sovereign immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity."). Accordingly, "[i]t is enough . . . that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages." *White Mountain Apache,* 537 U.S. at 473, 123 S.Ct. 1126; *see Adair v. United States,* 497 F.3d 1244, 1250 (Fed.Cir.2007) ("Tucker Act jurisdiction requires merely that the statute be fairly interpreted or reasonably amenable to the interpretation that it mandates a right of recovery in damages.") (citations and internal quotations omitted). "[A] fair inference will do." *White Mountain Apache,* 537 U.S. at 473, 123 S.Ct. 1126. If the court determines that the source of law upon which plaintiffs rely is not money-mandating, the court must dismiss the claim for

lack of subject matter jurisdiction under Rule 12(b)(1). *Adair,* 497 F.3d at 1251.

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* — U.S. —, —, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A court ruling on a 12(b)(6) motion to dismiss must not only "accept as true the complaint's undisputed factual allegations[,]" it must also "construe them in a light most favorable to the plaintiff." *Cambridge v. United States,* 558 F.3d 1331, 1335 (Fed.Cir.2009) (citing *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991)).

[14] A claim is facially plausible when the plaintiff pleads facts such that "the court [may] draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). The plaintiff need not show that it is probable that it will succeed on the merits of the case, but it must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949. In the context of claims arising under the Tucker Act or the Indian Tucker Act, the standard applied under RCFC 12(b)(6) means that if "the court concludes that the facts as pled do not fit within the scope of a statute that is money-mandating, the court shall dismiss the claim on the merits under Rule 12(b)(6) for failing to state a claim upon which relief can be granted." *Adair,* 497 F.3d at 1251; *see Greenlee Cnty. Ariz. v. United States,* 487 F.3d 871, 876–77 (Fed.Cir.2007).

*Motion for Summary Judgment*

A grant of summary judgment is warranted when the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Whether a fact is material will, of course, depend upon the substantive law of the case. *Id.* A genuine dispute is one that "may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

The party moving for summary judgment bears the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Consequently, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). If the moving party carries its burden of establishing that there is no genuine issue of material fact, the nonmoving party "may not rely merely on allegations or denials in its own pleadings; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." RCFC 56(e)(2); *see Long Island Sav. Bank, FSB v. United States,* 503 F.3d 1234, 1244 (Fed.Cir.2007) ("Once the moving party has

satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence."). Where an examination of the record, "taken as a whole," could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## ANALYSIS

Legally, this case is just as tangled and convoluted as the historical record of events.

### A. *Amendment of Complaints*

Plaintiffs request leave of the court to amend their complaints to state counts asserting their right to the funds derived from the 1886 lands based upon the statutory use restrictions contained in the Appropriations Acts. *See* Pls.' Mot. to Am. Compl. ("Pls.' Mot. to Am."); Pls.' Sixth Am. Compl. ("Sixth Am. Compl."). Plaintiffs' proposed amendments rest on the same operative facts as those addressed in their prior complaints; the recasted claims simply reflect the basis on which the Federal Circuit decided *Wolfch-ild VI* and the remand ordered by that decision. *See* 559 F.3d at 1259 n. 14.[30] The government will not suffer prejudice as a result of these amendments as it has long had notice of plaintiffs' demand for relief based upon the terms of the Appropriations Acts and of the factual history surrounding this case. *See Foman,* 371 U.S. at 182, 83

---

30. Included in plaintiffs' proposed sixth amended complaint are other alleged counts that: (1) assert that the statutory use restrictions created a duty on the part of the government to collect lease and other revenue from the three communities and distribute gaming proceeds to the plaintiffs under the Indian Gaming Regulatory Act, Pub. Law No. 100-497, 102 Stat. 2467 (1988) (codified as amended at 18 U.S.C. § 1166 and 25 U.S.C. §§ 2701–21) ("Indian Gaming Act"), Sixth Am. Compl. ¶¶ 83–98; (2) aver that the Department's adoption of a so-called "recognition test" for determining the identity of the loyal Mdewakanton violated the statutory use restrictions, Sixth Am. Compl. ¶¶ 99–106; and

(3) ask the court to issue an order setting aside provisions in the three communities' constitutions, ordinances, resolutions, censuses, rolls, and tribal revenue-allocation plans "which are repugnant to the [s]tatutory [u]se [r]estriction[s]" and remanding the matter to the Department of Interior pursuant to 28 U.S.C. § 1491(a)(2), Sixth Am. Compl. ¶ 116. The court will not parse the individual paragraphs of plaintiffs' amended complaint in ruling on plaintiffs' motion to amend; rather, the merits of plaintiffs' particular claims will be addressed *infra,* after the court determines whether the motions to amend should be granted as a general matter.

S.Ct. 227; *Mitsui Foods, Inc.*, 867 F.2d at 1403–04.[31]

The government asserts, however, that such amendments would be "futile" and plaintiffs' claims also would be barred by the statute of limitations. *See* Def.'s Opp'n at 5, 15; Def.'s Mot. at 30–36. The plaintiffs respond that amendment is necessary in light of the Federal Circuit's remand order and that this court's prior ruling regarding the statute of limitations in *Wolfchild I*, 62 Fed. Cl. at 547–49, largely dispenses with the government's present statute-of-limitations argument. *See* Pls.' Reply to Def.'s Opp'n to Pls.' Mot. to Am. ("Pls.' Reply") at 4–7, 14–17.

### 1. *Futility.*

[15, 16] Where an amendment would be futile, a court should disallow the plaintiffs' motion to modify its complaint. *See Foman*, 371 U.S. at 182, 83 S.Ct. 227; *Mitsui Foods, Inc.*, 867 F.2d at 1403–04. In assessing the "futility" of an amendment, the court should apply "the same standard of legal sufficiency as [it] applies under Rule 12(b)(6)." *Merck & Co., Inc. v. Apotex, Inc.*, 287 Fed.Appx. 884, 888 (Fed.Cir.2008) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir.1997)); *see also Taylor Consultants, Inc. v. United States*, 90 Fed.Cl. 531, 546 (2009) (same). "Thus, an amendment to add a [ ]claim is futile if the amendment fails to state a claim upon which relief can be granted." *Merck*, 287 Fed.Appx. at 888.

[17] The government argues that an amendment to plaintiffs' complaint would be "futile" because "the Federal Circuit did not recognize a viable claim for statutory use restriction[s] in its opinion holding that [p]laintiffs could not assert a claim for breach of trust" and that such a claim would be "directly contrary to the Federal Circuit's findings and cannot be a basis for a lawsuit against the United States." Def.'s Opp'n at 6, 9.[32] The government additionally asserts that "[t]o the extent that a[ny] statutory use restriction[s] w[ere] created by the Appropriations Acts, any interest [p]laintiffs may have had in the ... funds w[ere] terminated by the 1980 Act." *Id.* at 14. Plaintiffs counter that the Federal Circuit's statement that "the Appropriations Acts are best interpreted as merely appropriating funds subject to ... statutory use restriction[s], and not creating a trust relationship[,]" *Wolfchild VI*, 559 F.3d at 1240, must be read to mean that the Court of Appeals recognized that plaintiffs had a viable claim predicated on the statutory use restrictions and that such recognition is "the law of the case." Pls.' Reply at 4–7.[33]

[18] Both parties misapprehend the Federal Circuit's opinion. The Federal Circuit indeed held that the Appropriations Acts were subject to statutory use restrictions, *see Wolfchild VI*, 559 F.3d at 1240, but it quite explicitly abstained from addressing the merits of any claim that plaintiffs would have under such restrictions. The court stated:

its analysis of the government's motion to dismiss for lack of subject matter jurisdiction.

---

31. The government denigrates the plaintiffs' basis for the amendment by contending that it relies on "the appellate court's passing comments" regarding the Appropriations Acts. Def.'s Opp'n to Pl.'s Reply to Am. Compls. ("Def.'s Opp'n") at 9. Yet, that disparagement ignores the remand order. The Federal Circuit remanded the case to this court address, to the extent necessary, the funds derived from the 1886 lands, *see Wolfchild VI*, 559 F.3d at 1259 n. 14; in these circumstances, justice would require that the plaintiffs be given leave to amend their complaints to take account of the Federal Circuit's remand. *See* RCFC 15(a)(2).

32. In its opposition to plaintiffs' motion to amend, the government alleges that the amendment is futile also because the court lacks subject matter jurisdiction over the case. Def.'s Opp'n at 11–14. The court addresses this argument in

33. The "law of the case" doctrine provides that when a case has been once decided by a superior court and remanded to the lower court, whatever was before the superior court and disposed of by its decree, is considered finally settled. The lower court is bound by the decree as the law of the case, and must carry it into execution, according to the mandate. *See In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255, 16 S.Ct. 291, 40 L.Ed. 414 (1895); *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed.Cir.1995) (The law of the case doctrine "prevent[s] the relitigation of issues that have been decided and ... ensure[s] that trial courts follow the decision of appellate courts.") (citation omitted); *see also Banks v. United States*, 76 Fed.Cl. 686, 689–90 (2007) (describing the law of the case doctrine).

The parties devote some attention to the question whether it was lawful for the Interior Department, following the 1980 Act, to transfer to the three communities approximately $60,000 in funds that had been collected as proceeds from the sale, use, or leasing of certain of the 1886 lands, given that the 1980 Act was silent as to the disposition of those funds. *See Wolfchild I*, 62 Fed.Cl. at 549–50. *That issue does not affect our analysis of the two certified questions, however, and we leave that issue to be addressed, to the extent necessary, in further proceedings before the trial court.*

*Wolfchild VI*, 559 F.3d at 1259 n. 14 (emphasis added). The Federal Circuit's ruling was thus limited to its answer to the two questions certified for interlocutory appeal—namely, that the Appropriations Acts did not create the loyal Mdewakanton and that any trust so created in land would have been terminated by the 1980 Act. *See id.* at 1255, 1260.[34] On the one hand, recognition that the Appropriations Acts were subject to statutory use restrictions cannot be construed to mean that it concluded that plaintiffs have a meritorious claim based on those restrictions. On the other hand, neither can the Federal Circuit's ruling be read to foreclose the possibility that the statutory use restrictions, which it recognized, could serve as the basis for a legitimate claim by the plaintiffs.

[19] Thus, there is no "law of the case" as to the merits of plaintiffs' statutory-use-restrictions claim and as to the accompanying question of whether it was lawful for the Department to disburse the funds at issue to the communities. Accordingly, the court may, and, indeed, must—given the parties' contentions—examine the merits of plaintiffs' claims under the Federal Circuit's remand order. *See Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1382 (Fed.Cir.1999) ("[W]hile a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues.") (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168, 59 S.Ct. 777, 83 L.Ed. 1184 (1939)); *see also Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 951 (Fed.Cir.1997) ("Upon return of its mandate, the district court cannot give relief beyond the scope of th[e] mandate, but it may act on 'matters left open by the mandate.'") (quotation omitted).

[20] Plaintiffs' proposed amendments could have legal viability. The statutory use restrictions reflect mandatory terms of the Appropriations Acts and may be sufficient to provide a "fair inference" that the government had a money-mandating duty to the loyal Mdewakanton and their lineal descendants that was contravened when the Department disbursed the funds held in Treasury trust accounts to the three communities. As the Federal Circuit has observed: "The court has found Congress provided such damage remedies where the statutory text leaves the government no discretion over payment of claimed funds." *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed.Cir.2005); *see also Hopi Tribe v. United States*, 55 Fed.Cl. 81, 86–87 (2002) ("If the language and effect of the statute is mandatory, then the court possesses jurisdiction.") (quoting *Lewis v. United States*, 32 Fed.Cl. 59, 64 (1994)). Further, plaintiffs' claims find support in *Reuben Quick Bear v. Leupp*, 210 U.S. 50, 28 S.Ct. 690, 52 L.Ed. 954 (1908). Under *Quick Bear*, a court should trace the historical origins of the funds at issue and determine whether the funds can be characterized as mere gratuitous appropriations or whether the funds are in reality, or have been treated as though they are, "Indians' money." *See id.* at 77–82, 28 S.Ct. 690.

[21] Any claim plaintiffs may have based on statutory use restrictions to pre-1980 funds is also unaffected by the 1980 Act.[35]

34. The Federal Circuit's conclusions as to these two issues certainly constitute "the law of the case." The court accordingly cannot revisit these matters.

35. In support of its argument that the 1980 Act terminated any interest plaintiffs may have had in the funds, the government quotes the Federal Circuit's opinion in *Wolfchild VI* noting that "[t]he fact that the savings clause was regarded as necessary to protect the current assignees is a clear indication that the drafters viewed the Act as otherwise terminating any equitable interests of the 1886 Mdewakantons." Def.'s Opp'n at 15. The government fails to quote, however, the last three words of that sentence, which read: "*in*

When interpreting a statute, the court must look first to the statutory language. *See Strategic Hous. Fin. Corp. of Travis Cnty. v. United States*, 608 F.3d 1317, 1323 (Fed.Cir. 2010) (citing *Jimenez v. Quarterman*, 555 U.S. 113, ——, 129 S.Ct. 681, 685, 172 L.Ed.2d 475 (2009); *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004)); *see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). In this instance, however, the statute contains no text pertaining to the disposition of the funds. *See* 94 Stat. 3262; *Wolfchild VI*, 559 F.3d at 1259 n. 14 ("[T]he 1980 Act was silent as to the disposition of th[e] funds.").

[22, 23] The Department simply presumed that it could distribute the funds to the three communities on the basis of the 1980 Act, and memorialized that view in a letter from the Field Solicitor to the Area Director. J.A. 00878–80 (Letter from Elmer T. Nitzschke to Edwin Demery (Feb. 6, 1981) ("Nitzschke 1981 Letter")); *see Wolfchild I*, 62 Fed.Cl. at 532–33. Where the text of statute does not address a particular issue, an agency's interpretation of the statute as contained in informal opinion letters or otherwise not embodied in regulations is "entitled to respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), "but only to the extent that those interpretations have the 'power to persuade.'" *Christensen v. Harris Cnty.*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161); *id.* ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference.") (referring to *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81

L.Ed.2d 694 (1984)); *see also United States v. Mead Corp.*, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ("Interpretive choices" of agencies may be entitled to *Skidmore* deference).

[24] In applying the "limited deference" of *Skidmore*, the court considers "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161; *see Mead*, 533 U.S. at 228, 121 S.Ct. 2164 (same); *see also Cathedral Candle*, 400 F.3d at 1366 (Under *Skidmore*, the court should "defer to an agency interpretation of the statute that it administers if the agency has conducted a careful analysis of the statutory issue, if the agency's position has been consistent and reflects agency-wide policy, and if the agency's position constitutes a reasonable conclusion as to the proper construction of the statute, even if we might not have adopted that construction without the benefit of the agency's analysis.").

[25] The court also considers the extent to which the agency's interpretation relies upon its "specialized experience and broader investigations and information." *Mead*, 533 U.S. at 234, 121 S.Ct. 2164 (quoting *Skidmore*, 323 U.S. at 139, 65 S.Ct. 161); *see also Cathedral Candle*, 400 F.3d at 1367 (applying *Skidmore* deference, taking into account the International Trade Commission's "specialized expertise" and broader access to information in ruling on Commission's exclusion of plaintiffs from the list of potential affected domestic producers under the Byrd Amendment, 19 U.S.C. § 1675c); *Rubie's Costume Co. v. United States*, 337 F.3d 1350, 1356–60 (Fed.Cir.2003) (considering the United States Customs Service's "specialized experience" and "expertise" in classifying goods in ruling on Customs Service's tariff classification for certain imported textile costumes).

The majority of the Field Solicitor's letter is devoted to interpreting the 1980 Act as it

*those lands." Wolfchild VI*, 559 F.3d at 1259 (emphasis added). Selective quotation such as

this does little to aid the government's case.

applied to the 1886 lands, *see* J.A. 00878–80 (Nitzschke 1981 Letter); however, in the final paragraph, the Field Solicitor addresses the funds:

> One further matter for consideration is the accumulated revenues currently held by the Bureau identifiable to the lands in question. It is my understanding that the apportioned share belonging to or identified for the Shakoppee Community has already been turned over to that group. Similar action should be taken as to the other two communities claiming an interest in these monies. As to how the respective communities can utilize these funds, it is interesting to note, as pointed out in the Secretary's letter to OMB that the cost of acquiring the land in question was offset against the recovery by the Mdewakanton and Wahpakoot[a] Bands of S[i]ou[ ]x Indians against the United States (57 Court of Claims 357 (1932 [—*sic*—57 Ct. Cl. 357 [ (1922) ] )) the beneficiaries of which included many individuals other than those for whom such land was held by the United States. In light of this bit of information it may be that tribal use of these impounded funds may include other than those persons previously identified as eligible Mdewakantons for purposes of occupying the land in question.

J.A. 00879 (Nitzschke 1981 Letter).

This singular paragraph appears to constitute the entirety of the "analysis" the Department devoted to considering the applicability of the 1980 Act to the funds.[36] The letter shows that the Department did not engage in a thorough consideration of the issue. In fact, it did not consider the issue at all; it simply assumed, without deliberation or analysis, that the Act applied.[37]

The Field Solicitor's opinion regarding the disposition of the funds also was issued after

one third of the funds had already been distributed to the Shakoppee Community. J.A. 00879 (Nitzschke 1981 Letter) ("It is my understanding that the apportioned share belonging to or identified for the Shakopee Community has already been turned over to that group."); Def.'s Mot., Ex. K (Public Voucher (Dec. 30, 1980)) (documenting distribution of $37,835.88 to the Shakopee Mdewakanton). Thus, the Department's "consideration" of the issue, to the extent that the Field Solicitor's letter can be deemed as such, only factored into the agency's action after the distributions had begun.

Consequently, the court cannot conclude that the Department engaged in the sort of thoughtful analysis of the fund-disposition issue that warrants *Skidmore* deference. *See, e.g., Federal Nat'l Mortg. Ass'n v. United States*, 379 F.3d 1303, 1308–10 (Fed.Cir.2004) (concluding that Internal Revenue Service's interpretation of a statute was not entitled to *Skidmore* deference where it "set[ ] forth no reasoning in support of its conclusion" and was "unaccompanied by any supporting rationale," but allowing an agency interpretation to stand based upon the ground that a waiver of sovereign immunity must be strictly construed.).

Furthermore, the action by the Department after adoption of the 1980 Act was directly contrary to its conclusions respecting the status and proper ownership of the funds prior to 1980. *See supra*, at 320–22 (addressing BIA's positions from 1975–1980). This *volte face* by the Department as to the fundamental question of who was entitled to the pre-1980 funds disfavors deferring to the Department's actions after the 1980 Act was adopted. *See Cathedral Candle Co.*, 400 F.3d at 1367 (indicating that where the agency's current position is "inconsistent with

---

36. The only additional contemporaneous document in the record that touches on the issue of income from the 1886 lands is a letter from the Acting Area Director of the BIA dated January 15, 1981 to the Chairman, Community Council, Lower Sioux Community. J.A. 00876 (Letter from David Granum to Leon Columbus). In that letter, the Director simply states that "income derived from the[ ] [1886] lands *in the future* will be utilized as other income from tribal land." *Id.* The letter does not include any opinion on the

status of the income or funds derived from the 1886 lands prior to the 1980 Act. *Id.*

37. The Field Solicitor's citation of the fact that the 1922 judgment in the *Medawakanton* case reflected an offset for funds provided by the Appropriations Acts was inapposite. The judgment in that case did not modify, and could not have modified, the statutory terms of the Appropriations Acts.

positions the [agency] . . . has previously taken," it may counsel against *Skidmore* deference) (citing *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212–13, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)). In short, although the Department certainly possesses "specialized experience" in dealing with Native American matters, the Nitzschke 1981 Letter did not draw on any expertise or specialized information to interpret the scope of the 1980 Act.

[26] Finally, the agency's position does not constitute "a reasonable conclusion as to the proper construction of the statute." *Cathedral Candle Co.,* 400 F.3d at 1366. At every possible point, the 1980 Act specifies that it only applied to the 1886 lands. The name of the Act is "An Act to provide that *certain land* of the United States shall be held by the United States in trust for certain communities of the Mdewakanton Sioux in Minnesota." 94 Stat. 3262 (emphasis added). Although the title of a statute cannot limit the plain meaning of the text, "statutory titles and section headings 'are tools available for the resolution of a doubt about the meaning of statute.' " *Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.,* 554 U.S. 33, 47, 128 S.Ct. 2326, 171 L.Ed.2d 203 (2008) (quoting *Porter v. Nussle,* 534 U.S. 516, 528, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). The 1980 Act states that "all right, title, and interest of the United States in *those lands (including any structures or other improvements of the United States on such lands)* . . . are hereby declared to hereafter be held by the United States [in trust for the three communities]." 1980 Act, § 1, 94 Stat. 3262 (emphasis added). It then describes the lands in detail down to the hundredths of an acre. *See id.* § 2. It finally requires the Secretary to publish notice in the Federal Register describing the lands being transferred and recites the so-called "savings clause" preserving any prior contract, lease, or assignment interests in the land. *Id.* §§ 2, 3.

Notably, the sponsor of the legislation in the House, Representative Richard Nolan of Minnesota, was aware of the funds' existence. *See* J.A. 02547–49 (Area Director's 1975

Mem.). In introducing the bill, Rep. Nolan defined its scope as "legislation which will change the legal status of *tracts of land* in Minnesota presently held by the United States for exclusive use by the descendants of the Mdewakanton Sioux who resided there on May 20, 1886." 26 CONG. REC. 8,897 (emphasis added). Rep. Nolan did not mention the funds in his introductory statement, *see id.* at 8,897 to 8,898, nor were the funds mentioned in any of the other legislative history materials surrounding the 1980 Act. The specific choice not to include a provision for disposition of the funds could not have been attributable to inadvertence particularly in light of the suggestion in the Area Director's 1976 Memorandum that the disposition of the funds needed to be included "with legislation converting the title" to enable the Department to distribute the funds to the three communities. *See* J.A. 01116 (Area Director's 1976 Mem.). Instead, this is yet another instance where "[t]he best evidence of congressional intent is the plain meaning of the statutory language at the time Congress enacted the statute." *Strategic Hous. Fin. Corp. of Travis Cnty.,* 608 F.3d at 1323.

The silence of the 1980 Act as to the pre–1980 funds, particularly in light of the detailed nature of the statute and the legislative history, cannot be read to terminate any interest plaintiffs may have in those funds. The 1980 Act also did not constitute a repeal, "implied or otherwise," of the Appropriations Acts. *Wolfchild VI,* 559 F.3d at 1258 n. 13. Thus, the court will not defer to the Department's actions disposing of the pre–1980 funds after passage of the 1980 Act, and it instead concludes that the 1980 Act does not affect plaintiffs' claims in those funds.[38]

#### 2. *Statute of limitations.*

[27–29] Generally, suits against the United States filed in this court must be filed within six years after accrual of the cause of action. 28 U.S.C. § 2501. Because this statute of limitations circumscribes the scope of the government's waiver of sovereign immunity, it is "jurisdictional" in nature and must be construed strictly. *See John R. Sand &*

---

38. However, as explained *infra,* the 1980 Act does affect plaintiffs' claim that they are entitled

to funds derived from the 1886 lands after the passage of the 1980 Act.

*Gravel Co. v. United States,* 552 U.S. 130, 133–34, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008); *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1576–77 (Fed. Cir.1988). The court may not consider whether a case warrants equitable tolling, *see John R. Sand & Gravel Co.,* 552 U.S. at 133–34, 128 S.Ct. 750, or imply exceptions to the limitations period. *See Hopland Band of Pomo Indians,* 855 F.2d at 1577. However, in this instance Congress has acted by statute to toll the limitations period.

In a series of appropriations acts for the Department of the Interior beginning in 1990, Congress began enacting "provisions which suspend accrual of the statute of limitations for certain tribal trust claims." *Shoshone Indian Tribe of the Wind River Reservation, Wyo. v. United States,* 93 Fed.Cl. 449, 459 (2010).[39] At the time of the plaintiffs' filing of their initial complaint in this case, the version of that provision, referred to as "the Indian Trust Accounting Statute" or "ITAS," provided:

[N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

Pub.L. No. 108–108, 117 Stat. 1241, 1263 (Nov. 10, 2003). The Federal Circuit has held that the Indian Trust Accounting Stat-

ute displaces the six-year general statute of limitations for claims falling within its terms, and that it postpones the beginning of the limitations period until an accounting has been provided to the affected beneficiary. *Shoshone Indian Tribe of Wind River Reservation v. United States,* 364 F.3d 1339, 1346–47 (Fed.Cir.2004).[40]

The government argues that the Indian Trust Accounting Statute or "Appropriations Rider," as it calls the provision, does not apply to plaintiffs' claims because those claims are "based upon funds and lands which were not held in trust by the United States for [p]laintiffs." Def.'s Mot. at 35; *see also* Def.'s Opp'n at 16–17. The government also argues that the plaintiffs assert "mis-management-styled claims" not cognizable under the ITAS. Def.'s Mot. at 36. Plaintiffs respond that the Department's placement of funds derived from the 1886 lands into Treasury trust fund accounts places their claims squarely within the ambit of the ITAS. Pls.' Reply at 14–17; *see also* Pls.' Cross. Mot. at 47–48.

[30] The government is mistaken in its view that the Federal Circuit's ruling regarding plaintiffs' trust claim dispenses with the statute-of-limitations issue. While the monies at issue were derived from lands said to be held under use restrictions and not in trust for the loyal Mdewakanton, *see Wolfchild VI,* 559 F.3d at 1255, it does not follow that funds stemming from those lands could not have been held in trust by the government.[41]

---

39. A version of the 1990 provision has been adopted each year since, with minor changes. *See Shoshone,* 93 Fed.Cl. at 459 n. 9.

40. In *Shoshone,* the Federal Circuit was interpreting a prior version of the Indian Trust Accounting Statute, Pub.L. No. 108–7, 117 Stat. 11 (Feb. 20, 2003), which nonetheless was identical to the one applicable to this case. *See* 364 F.3d at 1344.

41. Where the government holds any Indian money, there is a strong presumption that those funds are held in trust. *See, e.g., Loudner v. United States,* 108 F.3d 896, 900 (8th Cir.1997) ("[T]here is a presumption that absent explicit language to the contrary, *all funds* held by the United States for Indian tribes are held in trust." (quoting *Rogers v. United States,* 697 F.2d 886,

890 (9th Cir.1983) (emphasis added))); *Moose v. United States,* 674 F.2d 1277, 1281 (9th Cir.1982) ("[W]here the United States holds funds for Indian tribes, a trust relationship exists unless there is explicit language to the contrary."); *American Indians Residing on Maricopa–Ak Chin Reservation v. United States,* 667 F.2d 980, 1002 (Ct.Cl. 1981) ("Where the [g]overnment takes on or has control and supervision over tribal money or property, the normal relationship is fiduciary unless Congress expressly has provided otherwise. Defendant must account for all Indian money that is in its hands, both that classified as Indian Money Proceeds of Labor and deposited in the United States Treasury and that called Individual Indian Moneys and held outside the Treasury."). "This 'trust relationship extends not only to Indian Tribes as governmental units, but to tribal members living collectively or individually, on or

The Department of Interior has adopted guidelines that govern the management by the BIA of "Trust Funds for Tribes and Individual Indians." *See* 25 C.F.R. Chapter I, Part 115. Those guidelines define "trust funds" as "money derived from the sale or use of trust lands, *restricted fee lands,* or trust resources and *any other money that the Secretary must accept into trust.*" 25 C.F.R. § 115.002 (emphasis added). The monies at issue ostensibly would fit under the heading of money derived from "restricted fee lands." However, that term has been defined in the Department's regulations as having a restrictive meaning pertinent to allottees only. *Id.* ("Restricted fee land(s) means the land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary because of limitations contained in the conveyance instrument pursuant to federal law.") The Federal Circuit's ruling that the Appropriations Act did not vest any form of title to the 1886 lands in the loyal Mdewakanton as a group or in the individual assignees forecloses classifying the funds at issue as money derived from "trust lands" or "restricted fee lands."

Nevertheless, "trust funds" are also defined as embracing "any other money that the Secretary must accept into trust." 25 C.F.R. § 115.002. At the time of the 1975 Report by the BIA, the funds at issue were held in three Indian Money "Proceeds of Labor" Treasury Accounts (Account 147158, "Proceeds of Labor, Lower Sioux Indian Commu-

nity," Account 147043, "Proceeds of Labor, Prairie Island Indian Community," and Account 147436, "Proceeds of Labor, Mdewakanton and Wahpakoota.")[42] and four IIM accounts. *See* Def.'s Mot., Ex. C. Pursuant to the 1975 Report, all of the funds were placed in Treasury Account 147436 "Proceeds of Labor, Mdewakanton and Wahpakoota" and its associated interest account, 147936. *See id.*

Proceeds-of-Labor accounts are statutorily classified as "trust funds" accounts. *See* Permanent Appropriation Repeal Act of 1934, ch. 756, § 20, 48 Stat. 1224, 1233 (codified as amended at 31 U.S.C. § 1321(a)(20) (2004)) (classifying "Indian moneys, proceeds of labor, agencies, schools, and so forth" as "trust funds"); *see also Short v. United States,* 50 F.3d 994, 998 (Fed.Cir.1995) (subjecting Proceeds-of-Labor accounts to the statutory requirements applicable to "trust funds" and funds "held in trust" by the United States); *Red Lake Band of Chippewa Indians v. Barlow,* 834 F.2d 1393, 1395 n. 4 (8th Cir.1987) ("The Secretary apparently maintains four general trust accounts in the name of the Red Lake Band. The one of primary concern here is the 'Proceeds-of-Labor' account.").

That Proceeds-of-Labor accounts are "trust fund" accounts finds further support in the numbers designated for the accounts. In *Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States,* 69 Fed.Cl. 639, 653 (2006), the court examined the Treasury

---

off the reservation.'" *Loudner,* 108 F.3d at 901 (quoting *Little Earth of United Tribes, Inc. v. Department of Housing and Urban Dev.,* 675 F.Supp. 497, 535 (D.Minn.1987), *amended,* 691 F.Supp. 1215 (D.Minn.1988), *aff'd,* 878 F.2d 236 (8th Cir.1989)); *cf. Morton v. Ruiz,* 415 U.S. 199, 236, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) ("The overriding duty of our Federal Government to deal fairly with Indians wherever located [on or off reservation] has been recognized by this Court on many occasions.").

42. Proceeds-of-Labor accounts were created consequent upon adoption of the Act of March 3, 1883, ch. 141, 22 Stat. 582, 590, which provided, in pertinent part: "[T]he proceeds of all pasturage sales of timber, coal, or other product of any Indian reservation ... and not the result of the labor of any member of such tribe, shall be covered into the Treasury for the benefit of such

tribe." In 1887, Congress authorized the Secretary of the Interior to use the money deposited into these accounts "for the benefit of several tribes on whose account said money was covered in, in such way and for such purposes as in his discretion he may think best." Act of March 2, 1887, ch. 320, 24 Stat. 449, 463. The 1883 and 1887 acts were later amended in 1926 to provide that "all miscellaneous revenues derived from Indian reservations, agencies, and schools which are not required by existing law to be otherwise disposed of, shall be covered into the Treasury ... under the caption 'Indian moneys, proceeds of labor.'" Act of May 17, 1926, ch. 309, § 1, 44 Stat. 560 (now codified as 25 U.S.C. § 155). The 1926 Act also authorized the Secretary to expend the funds "for the benefit of the Indian tribes, agencies, and schools on whose behalf they are collected." *Id.* In 1982, Congress abolished the use of Proceeds-of-Labor funds effective September 30, 1982. *See* 25 U.S.C. § 155b.

accounting system used "to account for trust and other moneys received by the United States government." Under that system, "all appropriated moneys and funds collected by the various departments of government are assigned account numbers that indicate the class of receipt or appropriation." *Id.* Treasury funds are given "master symbols" to designate the type of funds within the account. *Id.* (quoting *King v. United States,* 107 Ct.Cl. 223, 234–35, 68 F.Supp. 206 (1946)).[43] Master symbols 0001 to 5999 designate "General Funds," and master symbols 6000 to 6999 designate "Special Funds." *Id.* (quoting *King,* 107 Ct.Cl. at 234–35, 68 F.Supp. 206). "Master symbols 7000 to 9999 designate 'Trust Funds,' which represent moneys received by the United States for the purposes specified in and for disbursement in accordance with the terms of the arrangements under which they are accepted." *Id.* at 653 (quoting *King,* 107 Ct.Cl. at 234–37, 68 F.Supp. 206)

The full account numbers assigned by Treasury to accounts that held the funds at issue were account nos. 14x7158, 14x7043, and 14x7436, with all of the funds ultimately being deposited in account 14x7436. *See* Def.'s Mot., Ex. C (1975 Report). "The numerical code '14' [placed before each account number] identifies the Department of Interior, while the letter 'x' denotes that the appropriation is ongoing and without a fiscal year limitation under the authority of the [Permanent Appropriation Repeal] Act[, codified as amended at 31 U.S.C. § 1321]." *Chippewa,* 69 Fed.Cl. at 653 (citing *King,* 107 Ct.Cl. at 236, 68 F.Supp. 206). The actual accounts numbers of 7158, 7043, and 7436 thus fall within the range reserved for trust funds only.[44]

Similarly, according to the Department of Interior's guidelines, an IIM account is "an interest bearing account *for trust funds held by the Secretary* that belong to a person who has an *interest in trust assets."* 25 C.F.R. § 115.002 (emphasis added). IIM accounts are "under the control and management of the Secretary." *Id.* As mentioned previously, there are three types of IIM accounts: unrestricted, restricted, and estate accounts, *id.,* but it is not readily apparent which type of IIM accounts held the funds at issue. Regardless, under the Department's own regulations, IIM accounts are trust fund accounts. *See also American Indians Residing on Maricopa–Ak Chin Reservation,* 667 F.2d at 1002 ("IIM funds are recognized as trust funds.").

[31] The funds derived from the 1886 lands and placed in Proceeds–of–Labor and IIM accounts thus fall under the heading of "any other money that the Secretary must accept into trust." 25 C.F.R. § 115.002. Nonetheless, the conclusion that the funds derived from the 1886 lands were held "in trust" and come within the reach of the Indian Trust Accounting Statute does not end the court's inquiry as to the applicability of the ITAS. The ITAS requires that plaintiffs' claims not only concern "trust funds" but also that those claims fit within the scope of "losses to or mismanagement of" such trust funds. 117 Stat. at 1263.

The government argues that "any rights here [p]laintiffs assert to the [1886 monies] . . . on the basis of funds mismanagement-styled claims should be rejected for the same reasons th[e] [c]ourt rejected [p]laintiffs' breach of contract claim." Def.'s Mot. at 36. This contention appears to involve two separate arguments, *viz.,* (1) that the court's reasoning expressed in its conclusion that the Indian Trust Accounting Statute was inapplicable to plaintiffs' breach of contract claims is germane to the present question, and (2) that the court should dismiss the plaintiffs' arguments because they are mismanagement-style claims of the type rejected in *Shoshone,* 364 F.3d 1339.

---

43. The *King* decision is set out in full only in the Court of Claims reporter and on Lexis Nexis. A portion of the decision is also reported at 68 F.Supp. 206, and that portion is available on-line via Westlaw, but neither the report in the Federal Supplement nor in Westlaw on-line reproduces the portion of the *King* decision quoted and cited in *Chippewa* and relevant here.

44. *King's* recitation of the Treasury accounting system, which cited to general regulations of the Comptroller General promulgated in 1928 and amended in 1936, comports with regulations in effect during the time period in which the funds at issue were being deposited into the Treasury. *See* General Regulations No. 84–2d Revision, 30 Comp. Gen. 541, 543 (Nov. 20, 1950).

In *Wolfchild I*, the court concluded that the Indian Trust Accounting Statute did not apply to plaintiffs' breach of contract claims because the ITAS only applies to "trust mismanagement and to specific kinds of losses[,]" not claims based on a breach of contract. 62 Fed.Cl. at 548. That reasoning, however, is inapposite regarding claims respecting the funds. Because the funds at issue were held "in trust" specifically by statute, the ITAS applies by its express terms.

The government's second argument recalls a contention that it made, and lost, in *Shoshone*. In *Shoshone*, the government argued that the ITAS would only encompass "mismanagement or loss of tribal funds that were actually collected and deposited into the tribal trusts by the [g]overnment." 364 F.3d at 1349. The Federal Circuit rejected "the [g]overnment's narrow reading of the [ITAS]" and accepted that some losses to trust funds could occur prior to collection. *Id.* at 1349–50.[45]

The plaintiffs assert a loss to and mismanagement of the funds derived from the 1886 lands caused by the government's disbursal of such funds to the three communities, and not to eligible Mdewakanton. *See* Pls.' Cross-Mot. at 47–48. Those funds were in the government's possession and deposited into trust funds by the government. The Federal Circuit has held that losses to trust funds within the government's possession fall under the ITAS, *see Shoshone*, 364 F.3d at 1349–50, and indeed, it is difficult to imagine what type of claim would fall under "losses to or mismanagement of trust funds" if the disbursement of the entire funds at issue to the wrong beneficiaries is not included.

It is also evident that plaintiffs' claims concern trust funds, not, as the government argues, trust assets. The funds may have been derived from various leases and licenses in and for the 1886 lands, but the issue at hand is the government's payment of the funds to the three communities. Plaintiffs' claims are thus distinguishable from claims

the Federal Circuit and this court have concluded are not within the reach of ITAS because they concern trust assets. *See, e.g., Shoshone*, 364 F.3d at 1350 (claim concerned "mineral trust assets"); *Simmons v. United States*, 71 Fed.Cl. 188, 192–93 (2006) (claim concerned lumber harvested from plaintiff's land).

Accordingly, the court finds that the Indian Trust Accounting Statute is applicable to plaintiffs' claim that the government mismanaged and caused a loss to the monies derived from the 1886 lands, such monies being held in trust for the plaintiffs. The government does not assert as there any evidence before the court that the plaintiffs have been provided with an accounting of the funds. *See* 117 Stat. at 1263; *Shoshone*, 364 F.3d at 1347 ("The clear intent of the [ITAS] is that the statute of limitations will not begin to run on a tribe's claims until an accounting is completed."). Consequently, the ITAS resuscitates and preserves plaintiffs' claims, thereby displacing the general six-year statute of limitations, 28 U.S.C. § 2501.

### 3. *Plaintiff–Intervenors' motion to amend.*

The Julia DeMarce Group and the Harley D. Zephier Group of Plaintiff–Intervenors have filed motions and proposed complaints containing an additional count, which alleges that the government violated its obligation to set aside land under the Act of Feb. 16, 1863 § 7, 12 Stat. 652, 654. The government opposes the motion arguing that the Federal Circuit's conclusion that the second Act of 1863, 12 Stat. 819, superseded the first Act of 1863 means that plaintiff-intervenors cannot base a claim on the first Act of 1863. Def.'s Opp'n at 18. The government also alleges that this claim would be barred by the statute of limitations as "[p]laintiffs were on notice of their claim six years before filing their complaints, even as early as 1888, when the first of the Appropriations Acts were passed and the land designated under this

---

**45.** In a related view, the Federal Circuit opined in *Shoshone* that claims pertaining to losses to trust *assets*, rather than trust *funds*, are outside the scope of the ITAS. *See* 364 F.3d at 1350; *id.* at 1351 (noting that the Federal Circuit's interpretation of "losses ... to trust funds" limited that phrase to "accounts receivable due and owing to the Tribes"); *see also Rosales v. United States*, 89 Fed.Cl. 565, 580 (2009) (summarizing *Shoshone*).

particular statute was not acquired for the benefit of the loyal Mdewakanton." *Id.* at 18–19. Notwithstanding these arguments by the government, the salient threshold question realistically is whether the first Act of 1863 can be read as giving rise to a money-mandating duty under controlling precedent—a question that neither party has addressed. The court will grant intervenor-plaintiffs' motion to amend such that this threshold issue might be addressed.

**B.** *Motion to Dismiss and Competing Motion for Partial Summary Judgment*

1. *Entitlement to the funds obtained from the 1886 lands prior to the adoption of the 1980 Act.*

[32] The government makes an overarching argument that the statutory mandates contained in the Appropriations Acts are essentially immaterial to plaintiffs' potential entitlement to the funds at issue. Specifically, the government argues that "the *only* thing 'restricted' by the statutory use restriction[s] is what the Secretary can do with the money appropriated—here, money appropriated in 1888, 1889, and 1890[,]" and that "[i]t is plainly impossible to violate such ... restriction[s] once those funds have been expended." Def.'s Reply at 13–14. The court expressed some skepticism of that argument at the hearing held on the present motions, *see* Hr'g Tr. 30:10–30:19 (Oct. 22, 2010), and will now address the merits of the government's position in full.

[33] "Every agency decision must be anchored in the language of one or more statutes the agency is charged to implement." 1 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE 155 (5th ed. 2010). This fundamental precept of administrative law—that an agency may only act pursuant to and within the scope of a statutory delegation of authority granted by Congress—is embodied in the Administrative Procedure Act and judicial review of congressional delegations of power to administrative agencies. *See* 5 U.S.C. § 706(2)(c) (A "reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."); *see,*

*e.g., Federal Commc'n Comm'n v. Fox Television Stations, Inc.,* — U.S. —, —, 129 S.Ct. 1800, 1823, 173 L.Ed.2d 738 (2009) (Kennedy, J., concurring); *Whitman v. American Trucking Ass'ns.,* 531 U.S. 457, 472–73, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001); *Mistretta v. United States,* 488 U.S. 361, 371–73, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on unrelated grounds by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

[34] Moreover, "[u]nder the Appropriations Clause of the Constitution, funds from the Treasury cannot be used for purposes other than those permitted by the appropriating statute." *Marathon Oil Co. v. United States,* 374 F.3d 1123, 1133 (Fed.Cir.2004) (citing *Office of Pers. Mgmt. v. Richmond,* 496 U.S. 414, 424, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) ("Money may be paid out [of the Federal Treasury] only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by a statute.")); *see also Reeside v. Walker,* 52 U.S. 272, 291, 11 How. 272, 13 L.Ed. 693 (1850) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of anything not thus previously sanctioned."). Of course, the funds at issue were derived from the 1886 lands, which were properly purchased with appropriated funds; nonetheless, this basic principle regarding the expenditure of appropriations reinforces the conclusion that the Secretary was required to deal with the monies in a way that comported with the original appropriating statute.

The 1974 opinion letter from the Solicitor's office at the Department, which "sets forth the most definitive statement of the Department's position as to the legal status of the 1886 lands[,]" *Wolfchild VI,* 559 F.3d at 1248, explicitly makes the point that the Department must comply with the statutory use restrictions on a continuing basis. *See* J.A. 00392–97 (Barnes 1974 Mem.). That letter began by stating the Department's long-standing interpretation that the Appropriations Acts' benefits, including the 1886 lands,

were to extend only to the loyal Mdewakanton and their lineal descendants. *Id.* at 00392. Because the benefits of the Acts could only be enjoyed by eligible Mdewakanton, the letter noted the predicament that unassigned lands might remain "idle and unproductive of income which might be used for the benefit of the Indians," as they could not be assigned to individuals who did not qualify as lineal descendants. *Id.* at 00393. The letter then analyzed whether the Secretary might find some source of authority under which it could lease the lands to non-eligible individuals. *Id.* at 00394.

After determining that the 1886 lands could not be classified as "tribal lands" susceptible to leasing under 25 U.S.C. § 15, the letter looked to the Appropriations Acts as a possible source of the Secretary's leasing authority. J.A. 00395. As noted in the recitation of facts, the letter concluded that "[t]he lands are held in trust by the United States with the Secretary possessing a special power of appointment among members of a definite class." J.A. 00396. Relying on the determination that the Appropriations Acts conferred the powers of a trustee on the Secretary, the letter concluded that "the Secretary *in the exercise of powers of an ordinary trustee, in light of broad discretionary powers conferred by statute,* [and] in these unique circumstances may grant leasehold interests in the lands acquired under authority of the above-listed acts of Congress [the Appropriations Acts]." *Id.* at 00396 (emphasis added). The letter then recognized that because the Secretary was acting pursuant to authority conferred by the Appropriations Acts, the funds derived from the 1886 lands were equally subject to the restrictions contained in those statutes. It stated: "*Proceeds from the leases should be kept separate and may be expended for the benefit of the class* in such manner as the Secretary deems best consistent with his powers under the trust." J.A. 00397 (emphasis added).

In the 1978 letter from the Field Solicitor of the Department to the Area Director of the BIA, this understanding of the restrictions on the Secretary's power to lease the 1886 lands was reiterated. J.A. 00399–401

46. As part of its argument that the court lacks

(Shulstad 1978 Letter). In that letter, the Field Solicitor repeated the conclusion set out in the 1974 memorandum that the 1886 lands "could be leased, under certain specified circumstances, to non-Indians or to non-eligible Indians, *provided that fair rent payments are made in order to provide income for the benefit of eligible Mdewakantons.*" J.A. 00400 (emphasis added); *see* J.A. 00401 ("The rental would have to be paid to the Bureau of Indian Affairs for the benefit of Mdewakanton Sioux.").

Thus, when the Secretary leased the 1886 lands to non-eligible individuals and obtained money as a result, he plainly did so under authority conferred by the Appropriations Acts. Because the Secretary acted in these endeavors pursuant to a congressional delegation of power granted in the Appropriations Acts, he was statutorily required to handle the funds derived from the 1886 lands in a manner that accorded with the congressional mandates contained in those Acts—including the requirements that the benefits of the Appropriations Acts be distributed to the loyal Mdewakanton and families thereof and that such benefits be conferred in as equal an amount as practicable. *See Lincoln v. Vigil,* 508 U.S. 182, 193, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) ("Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes."). The question remains, however, whether the requirements contained in the Appropriations Acts may be read as creating a money-mandating duty such that the Secretary's contravention of them may allow a damages remedy for the lineal descendants of the loyal Mdewakanton.

(a.) *Jurisdiction.*

[35] The government challenges the court's jurisdiction, arguing that the Appropriations Acts and subsequent Department actions do not create the money-mandating duty that plaintiffs must establish as a basis for their claims under the Indian Tucker Act, 28 U.S.C. § 1505.[46] *See* Def.'s Mot. at 18–25.

subject matter jurisdiction, the government con-

Plaintiffs assert that the Appropriations Acts created a money-mandating duty on the part of the government for the benefit of the 1886 Mdewakanton and their lineal descendants, and that the government is liable in damages for its disbursement of the funds to the three communities. *See* Pls.' Cross-Mot. at 26–29, 33–43.

The Indian Tucker Act was adopted in 1946 to avoid the need for Indians to present special jurisdictional bills to Congress. *See Mitchell II*, 463 U.S. at 214, 103 S.Ct. 2961. Where the plaintiffs are a "tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska," the Indian Tucker Act provides the court with the same juridical power it would have respecting traditional Tucker Act claims. 28 U.S.C. § 1505. The loyal Mdewakanton are an "identifiable group of American Indians" within the meaning of the Act, *see Wolfchild I*, 62 Fed.Cl. at 539–40,[47] and their claims are premised on laws of the United States, namely the Appropriations Acts. Thus, plaintiffs' claims fall within the terms of the Indian Tucker Act. As explained above, however, the source of law upon which plaintiffs rely must "be fairly interpreted or reasonably amenable to the interpretation that it mandates a right of recovery in damages." *Adair*, 497 F.3d at 1250 (quoting *White Mountain Apache*, 537 U.S. at 472–73, 123 S.Ct. 1126) (internal quotations omitted).

[36]  "[W]here the statutory text leaves the government no discretion over payment of claimed funds[,]" Congress has provided a money-mandating source for jurisdiction in this court. *Samish*, 419 F.3d at 1364; *see*

*Hopi Tribe*, 55 Fed.Cl. at 86–87.  In this regard, the Federal Circuit has "repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating." *Greenlee Cnty.*, 487 F.3d at 877 (quoting *Agwiak v. United States*, 347 F.3d 1375, 1380 (Fed.Cir.2003)). "But Tucker Act jurisdiction is not limited to such narrow statutory entitlements[;]  [c]ertain discretionary schemes also support claims within the Court of Federal Claims['] jurisdiction." *Samish*, 419 F.3d at 1364.

[37, 38]  For example, the use of the word "may" in a statute leads to the presumption that the government has discretion over the payment of funds and does not owe a money-mandating duty to a plaintiff. *See Doe v. United States*, 463 F.3d 1314, 1324 (Fed.Cir. 2006). Yet, "this presumption of discretion may be rebutted by 'the intent of Congress and other inferences that [the court] may rationally draw from the structure and purpose of the statute at hand.'" *Id.* (quoting *McBryde v. United States*, 299 F.3d 1357, 1362 (Fed.Cir.2002)); *see, e.g., Doe v. United States*, 100 F.3d 1576, 1579–82 (Fed.Cir.1996) (concluding that moiety statute, 19 U.S.C. § 1619(a), which provided that the Secretary of Treasury "may award and pay" to an informant a reward, was money-mandating in light of legislative history and prior interpretation of statute). Thus, "a statute is not wholly discretionary, even if it uses the word 'may' when an analysis of congressional intent or the structure and purpose of the statute reveal one of the following: (1) the statute has 'clear standards for paying' money to recipients, (2) the statute specifies 'precise amounts' to be paid, or (3) the statute

---

tends also that any claim plaintiffs may have in the funds derived from the 1886 lands was extinguished by the 1980 Act and that such a claim would be barred by the statute of limitations as well. Def.'s Mot. at 25–26; 30–35. In granting plaintiffs' motion to amend, the court concluded that the 1980 Act does not affect a wholesale termination of plaintiffs' interest in the funds and the statute of limitations has been tolled. *See supra*, at 327–31. The court's conclusion as to these issues in its motion-to-amend analysis dispenses with these same arguments as presented in the government's motion to dismiss. *But see infra*, at 345–46 (reaching the opposite conclusion respecting funds derived from the Wabasha Land Transfer). Accordingly, the court rejects

the government's arguments on these points and will not repeat its reasoning here.

47. In *Wolfchild I*, the government argued that lineal descendants of the loyal Mdewakanton do not have a right to sue under the Indian Tucker Act because they are not a tribe or otherwise identifiable group. *See* 62 Fed.Cl. at 539. The court rejected this argument, noting that the 1886 census and the Department's own dealings with the lineal descendants demonstrated that the plaintiffs are an identifiable group. *See id.* The government does not resuscitate this objection to plaintiffs' claim in the motions currently before the court.

compels payment once certain conditions precedent are met." *Doe,* 463 F.3d at 1324 (citing *Samish,* 419 F.3d at 1364–65); *see also District of Columbia v. United States,* 67 Fed.Cl. 292, 305 (2005) ("Even statutory language such as 'may award and pay' has been found to be money-mandating, when the legislative intent and context of the statute indicate that the applicant is entitled to payment from the United States if certain conditions have been met." (*citing Doe,* 100 F.3d at 1580–82)).

To determine whether the Appropriations Acts created a mandatory form of benefits for plaintiffs, the court must first look to the text of the Acts. *See Samish,* 419 F.3d at 1365 ("The objective in interpreting [a statute] is to give effect to congressional intent. To determine [c]ongressional intent the court begins with the language of the statutes at issue." (citations omitted)). All of the Appropriations Acts provided that the money appropriated was "to be expended by the Secretary of the Interior." 25 Stat. at 229; 25 Stat. at 992; 26 Stat. at 349. In this respect, Congress used the word "shall." For example, the 1889 Act provided that the unspent funds "*shall* ... be used and expended for the purposes for which the same amount was appropriated and for the benefit of the above-named Indians." 25 Stat. at 992 (emphasis added). The 1889 and 1890 Acts provided "all of said money ... *shall* be so expended that each of the [loyal Mdewakanton] ... *shall* receive[ ]" an equal amount as practicable, and the 1889 Act made that provision applicable to the 1888 Act. 25 Stat. at 992–93; 26 Stat. at 349 (emphasis added). Both Acts also stated that, as far as practicable, lands for the loyal Mdewakanton "*shall* be purchased in such locality as each Indian desires." 25 Stat. at 993; 26 Stat. at 349 (emphasis added). The 1890 Act additionally provided that a certain sum of the money "*shall* be expended for the Prairie Island settlement." 26 Stat. at 349 (emphasis added).

The language of the Appropriations Acts exceeds the wholly discretionary language that may render a statute merely "money-authorizing," not "money-mandating." *See, e.g., Perri v. United States,* 340 F.3d 1337,

1341 (Fed.Cir.2003) (Section 524 of Title 28 is a "money-authorizing statute, not a money-mandating one" where the statute merely established the Department of Justice Assets Forfeiture Fund and dictated that funds for the payment of certain awards "shall be available to the Attorney General."); *Hopi Tribe,* 55 Fed.Cl. at 87–92 (concluding that a statutory provision was not money-mandating where the pertinent provision stated "[t]he Secretary of Interior was authorized" to pay the legal fees of certain tribes). Consistent use of the word "shall" throughout the statute favors the finding that the Appropriations Acts are money-mandating. *See, e.g., Doe,* 463 F.3d at 1325; *Greenlee Cnty.,* 487 F.3d at 877; *Agwiak,* 347 F.3d at 1380.

The pertinent historical antecedents to the Appropriations Acts also have an important bearing on whether they are money mandating. *See Samish,* 419 F.3d at 1365 ("To fully understand the meaning of a statute ... the court looks 'not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.'" (quoting *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990))). Notably, the Supreme Court's analytical position in *Quick Bear,* 210 U.S. 50, 28 S.Ct. 690, serves as an appropriate guide in this respect. In *Quick Bear,* the Supreme Court emphasized that when facing questions regarding appropriations to Indians, the inquiry is largely an historical one. The Supreme Court addressed in *Quick Bear* the question of whether funds appropriated to fulfill treaty obligations and income on Indian trust funds could be expended for the support of sectarian schools on an Indian reservation in the face of a statute disallowing Congress from appropriating funds for education in sectarian schools. *Id.* at 50–53, 28 S.Ct. 690. The Court distinguished between gratuitous appropriations "relate[d] to public moneys belonging to the government" and "moneys which belong to the Indians and which is administered for them by the government." *Id.* at 66, 28 S.Ct. 690. Noting that these two classes of appropriations are "essentially different in character[,]" the Court stated that money appropriated pursuant to a treaty and listed under the heading of "Fulfilling Treaty Stipulations with, and

Support of, Indian Tribes" "is not public money in this sense [but rather] [i]t is the Indians' money, or, at least, is dealt with by the government as if it belonged to them, as morally it does." *Id.* at 80, 28 S.Ct. 690. Similarly, "trust fund[s,] [which] ha[ve] been set aside for the Indians ... and require[ ] no annual appropriation[,] [are] distributed in accordance with the discretion of the Secretary of the Interior, but really belong to the Indians." *Id.* at 80–81, 28 S.Ct. 690. Both types of funds, the Court concluded, are "moneys belonging really to the Indians [constituting] ... the price of land ceded by the Indians to the government." *Id.* at 81, 28 S.Ct. 690. Thus, they are "not gratuitous appropriations of public moneys, but the payment ... of a treaty debt in instal[l]ments." *Id.*[48]

In this case, the historical antecedents to the Appropriations Acts are similarly informative to understanding the language used in the Acts.

### (b.) *Purpose of the Appropriations Acts.*

To recapitulate the more detailed recitations in the statement of facts, the loyal Mdewakanton did not breach the 1851 and 1858 treaties that bound the Sioux to maintain peaceful relations with the settlers. A breach by other Sioux of those treaties served as the fundamental predicate for Congress' voiding of the United States' treaties with the Sioux and terminating all annuities to them. Congress did not except the loyal Mdewakanton from those measures, but, instead, afforded a different set of rights to the loyal Mdewakanton in the two 1863 Acts and subsequently, in the Appropriations Acts. In every practical sense then, the appropriated funds constituted replacements for the annuities and other benefits the loyal Mdewakan-

ton had received under prior treaties in exchange for their concession of land. *See Quick Bear,* 210 U.S. at 80–81, 28 S.Ct. 690 (distinguishing "gratuitous appropriations of public moneys" from "the payment ... of a treaty debt in installments [which are the] price of land ceded by the Indians to the government").

This interpretation is bolstered by the fact that all three of the Appropriations Acts were placed under the heading of "Fulfilling Treaty Stipulations with and Support of Indian Tribes," rather than the more general "Miscellaneous" or "Miscellaneous Supports" heading. *See* 25 Stat. at 219; 25 Stat. at 982; 26 Stat. at 338; *see also Quick Bear,* 210 U.S. at 80, 28 S.Ct. 690 (noting that the funds the Court classified as the "Indians' money" and not "gratuitous appropriations" were listed under the heading of "Fulfilling Treaty Stipulations with, and Support of, Indian Tribes"). While the placement of the funds under that heading "does not support the contention that the Appropriations Acts constituted a conveyance of trust property." *Wolfchild VI,* 559 F.3d at 1240, it supports the fact that Congress regarded the Appropriations Acts as substitute payments for the annuities that would have been received under the Sioux treaties.

The legislative history of the Appropriations Acts also reveals that the Acts were viewed as a substitution for the treaty benefits of which the loyal Mdewakanton had been deprived. Senator MacDonald, the sponsor of the 1888 Appropriation, described his purpose in proposing the Act:

[A] few of ... [the Sioux] remained friendly to the whites and became their trusted allies and defenders, and ... a number of them did valuable service in protecting our people and their property, and in saving

---

48. *Quick Bear's* distinction between "gratuitous appropriations" and money more properly characterized as "belong[ing] to" the Indians has continued to serve as a reference point for courts facing similar questions of the government's obligations in relation to Indian monies. *See, e.g., Lincoln,* 508 U.S. at 194–95, 113 S.Ct. 2024 (citing *Quick Bear* as "distinguishing between money appropriated to fulfill treaty obligations, to which [a] trust relationship attaches, and 'gratuitous appropriations'"); *Sac and Fox Tribe of Indians of Okla. v. Apex Const. Co.,* 757 F.2d 221,

222–23 (10th Cir.1985) (noting in *Quick Bear* that "[t]he Supreme Court recognized the distinction between tribal funds and public monies"); *Scholder v. United States,* 428 F.2d 1123, 1129 (9th Cir.1970) (relying on *Quick Bear's* distinction between "gratuitous appropriations" and "treaty or tribal funds"); *Samish Indian Nation v. United States,* 90 Fed.Cl. 122, 148 (2009) (citing *Quick Bear* as making a distinction between "gratuitous appropriations" and "moneys which belong to the Indians and which is administered for them by the government").

many lives.... They have ever since had claims upon not only our gratitude but that of the nation at large, which ought long ago to have been recognized and partially, at least, compensated for their invaluable services ... I am almost ashamed to say it, but the fact is that no exception [to the Act of Feb. 16, 1863] was made, even in favor of these friendly Indians.

19 Cong. Rec. 2,976–77 (1888). In the course of passing the 1890 Act, Senator Davis similarly stated:

> When the [1868] treaty was made it was made with the Indian nation that was at war with the United States, and not with [the loyal Mdewakanton] ... and by reason of which severance all rights had fallen, so that they had no rights and interests in this country, and they were confiscated in common with all the annuities of the hostiles, and that worked a great injustice for which they have never been repaid.

21 Cong. Rec. 7,589 (1890).[49]

Additionally, the Department's own implementation of the Acts and its treatment of the funds at issue is persuasive in ascertaining the purpose of the Appropriations Acts. *See Mead,* 533 U.S. at 227, 121 S.Ct. 2164 ("[T]he well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." (quoting *Bragdon v. Abbott,* 524 U.S. 624, 642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (internal quotations omitted))). With the exception of its unsupported decision to disburse the funds pursuant to the 1980 Act, *see* J.A. 00878–80 (Nitzschke 1981 Letter), time and again the Department reiterated its opinion that the appropriated

funds, land, and leasing funds at issue were being held for the benefit of eligible Mdewakanton only. *See, e.g.,* J.A. 00397 (Barnes 1974 Mem.) ("Proceeds from the leases should be kept separate and may be expended for the benefit of the class."); J.A. 02548 (Area Director's 1975 Mem.) (concluding that the funds derived from the 1886 lands could not be distributed to the three communities because "the funds appropriated are to be used only for the benefit of a certain class of people identified by special census of that time [the 1886 Mdewakanton]."); J.A. 01115–16 (Area Director's 1976 Mem.) (reiterating that only lineal descendants of loyal Mdewakanton were entitled to the funds derived from the 1886 lands); J.A. 00400 (Shulstad 1978 Letter) ("[F]air rent payments [must be] made in order to provide income for the benefit of eligible Mdewakantons."). These recitations were found in reasoned opinions that demonstrate the type of careful deliberation that can guide the court in determining the persuasive weight that should be accorded to agency interpretations of statutes. *See Cathedral Candle Co.,* 400 F.3d at 1366.

In sum, Congress' purpose in passing the Appropriations Acts reveals that the provisions in the Acts are not merely "money-authorizing" legislation, as the government argues. Rather, Congress intended the Appropriations Acts to serve as substitutes for the obligations the government took upon itself in its prior treaties with the Sioux in consideration of the conveyance of Sioux rights to land and resources. Congress likewise intended that the restrictions in Acts, including the provision that the funds be expended only for the benefit of the loyal Mdewakanton, serve as binding obligations

---

49. In debating the terms of the 1890 Act, Senator Davis summarized the circumstances that generated the Appropriations Acts:

> Now, in regard to the act of February, 1863, what was it? The whole frontier of Minnesota had been swept with fire and massacre. The situation in that part of the country was not then fully understood and it was not known here to its full extent, nor was the extent of the service which these people had performed toward the Government fully known ... [W]hen the law of 1863 was passed Congress did not stop to consider what the relations of this fragment of the band of Medawakantons had

> been to the white people; and accordingly, without discrimination, without any saving of rights, Congress annulled all the rights of all the Medawakantons to their share of annuity moneys. There was an instance where, if the relations of those people had been adequately known at that time, those rights would have been preserved. That they were not preserved is due partly to the effect of insufficient knowledge on the subject, but more largely to the fact that there was a spirit abroad then which demanded confiscation and annulment of all Indian rights of property.

> 21 Cong. Rec. 7,590–91.

on the part of the Secretary.[50] For ninety years, the Department recognized this obligation and treated the funds as belonging to eligible Mdewakanton, including the lineal descendants, by collecting income from rents and licenses from non-eligible lessees and licensees of the 1886 lands and holding such monies separately in trust accounts for the benefit of the Mdewakanton. The Department's administration of the monies obtained from the 1886 lands distinguishes them from "gratuitous appropriations," and aligns the monies with funds "which belong to the Indians and *which [are] administered for them by the government.*" *Quick Bear,* 210 U.S. at 77, 28 S.Ct. 690 (emphasis added). In sum, the factual record illustrates that the funds at issue were "dealt with by the government as if it belonged to" the loyal Mdewakanton, "as morally it does." *Id.* at 80, 28 S.Ct. 690.

(c.) *Structure of the Appropriations Acts.*

Despite the differences between the three statutes, collectively the Appropriation Acts essentially contained five defining elements. First, each of the Acts stated that the appropriated funds were "to be expended" by the Secretary, and, at all other points, the Acts provided that the Secretary "shall" expend the funds according to the various restrictions set out in them. Although this language did not definitively render the Appropriations Acts money-mandating, the obligatory language used throughout the Acts favors finding that a money-mandating duty was created as a result of the Acts.

Second, the Appropriations Acts also all included the mandate that the money be spent for the benefit of a particular and identifiable class of beneficiaries—the loyal Mdewakanton. *See* 25 Stat. at 228–29; 25 Stat. at 992–93; 26 Stat. at 349; *Wolfchild VI,* 559 F.3d at 1243 (In granting land as-

signments to the loyal Mdewakanton and their lineal descendants, "the Secretary held the property for the use and benefit of individuals selected from *a defined class.*") (emphasis added). As the Federal Circuit recognized, "Congress intended the 1886 Mdewakantons to be the specific beneficiaries of the Appropriations Acts." *Wolfchild VI,* 559 F.3d at 1243; *id.* ("The Secretary of the Interior considered himself bound by the terms of the statutes to reserve the usage of the 1886 lands for members of the particular beneficiary class (the 264 individuals determined by a contemporaneous Interior Department census to constitute the 1886 Mdewakantons).")". Because the Acts were intended to compensate the loyal Mdewakanton for the deprivation of their annuities and land under the first 1863 Act, they fit within the general characterization of money-mandating statutes as those that seek to "compensate a particular class of persons for past injuries or labors." *Bowen v. Massachusetts,* 487 U.S. 879, 907 n. 42, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); *see also Black v. United States,* 56 Fed.Cl. 19, 22 (2003) (For a statute to be money-mandating, it must "compensate a particular class of persons for past injuries or labors."); *Kennedy Heights Apartments, Ltd. I v. United States,* 48 Fed.Cl. 574, 579 (2001) ("In order to be found money-mandating, a statute must 'compensate a particular class of persons for past injuries or labors.'" (quoting *Bowen,* 487 U.S. at 907 n. 42, 108 S.Ct. 2722)).

Third, the Appropriations Acts also included detailed directions requiring the Secretary to put the funds to particular uses, including purchases of agricultural stock and equipment and land. *See* 25 Stat. at 228–29; 25 Stat. at 992–93; 26 Stat. at 349. Fourth, the Acts required that the Secretary expend the money in a way that ensured each loyal

---

50. As noted, Congress was aware at the time of the passage of the Acts that the Sioux had entered new treaties with the government under which they were provided with land and annuities, while the loyal Mdewakanton, who had severed tribal relations, were left destitute. *See supra* at 340–41 & n. 49 (quoting statements of Sen. Davis). The Appropriations Acts sought to compensate the latter group. Allowing the Sec-

retary to distribute the funds to the three communities in lieu of the lineal descendants of the loyal Mdewakanton would defeat Congress' intent to provide for the loyal Mdewakanton and their families, who suffered precisely because they lacked tribal relations. *See Hopi Tribe,* 55 Fed.Cl. at 91 (considering whether interpreting the Navajo-Hopi Settlement Act of 1974 as failing to give rise to a money-mandating duty

Mdewakanton would receive as close to an equal amount as practicable. *Id.* Fifth, the Acts contained no time restrictions on the expenditure of the funds, and, in fact, the 1888 and 1889 Acts were both subject to the provision that any money appropriated not expended within the applicable fiscal year would be carried over to the following years and expended for the benefit of the loyal Mdewakanton. *Id.* These requirements that the funds be expended for particular uses and for a narrowly defined class of beneficiaries distinguish the Acts from lump-sum appropriations, the expenditure of which is committed to agency discretion. *See Samish,* 419 F.3d at 1366 (noting that the Supreme Court, in *Lincoln,* 508 U.S. 182, 113 S.Ct. 2024, determined that "the Snyder Act[, 25 U.S.C. §§ 2, 13,] does not provide a damage remedy because it does not require the expenditure of general appropriations, on specific programs, for particular classes of Native Americans"); *Samish,* 90 Fed.Cl. at 139–40, 146–47 (concluding that various annual lump-sum appropriations to the Department of Interior that did not specify to whom or for what specific purposes the funds should be paid were not money-mandating).

(d.) *The lineal descendants' entitlement.*

[39] Nonetheless, under the government's view, whatever restrictions are contained in the Appropriations Acts cannot be read to benefit the lineal descendants of the loyal Mdewakanton. *See* Def.'s Opp'n at 12–13. This is so, the government argues, because "Congress did not include lineal descendants as a beneficiary of the acts and its use of the word 'family' did not create any vested ownership rights in the purchased land." *Id.* at 12 (citing *Wolfchild VI,* 559 F.3d at 1242). In regards to the inclusion of the loyal Mdewakantons' "family" or "families" as beneficiaries under the Appropriations Acts, the Federal Circuit concluded that "the references to the Mdewakantons' families was not directed at creating rights of

would "interfere with or defeat congressional intent").

51. The 1888 Appropriation did not include the provision that the funds were to be expended for the families of the loyal Mdewakanton. *See* 25 Stat. at 228–29. Because the appropriated funds

inheritance in the properties purchased, but instead was simply part of the directive to the Secretary as to the scope of his discretion in spending the appropriated funds." *Wolfchild VI,* 559 F.3d at 1242. While the language "makes clear that the authorization for expenditures extended to cover the needs of the families of the beneficiaries, not simply the needs of the beneficiaries themselves, [i]t does not speak to the nature of the interest created in any real property purchased with the funds." *Id.* Contrary to the government's argument, the Federal Circuit's conclusion that the lineal descendants did not obtain an inheritable property interest in the 1886 lands does not answer the question of whether the Secretary violated a money-mandating duty by distributing the funds derived from those lands to groups of individuals not intended to qualify as beneficiaries of the Appropriations Acts to the prejudice of the individuals who would have qualified as beneficiaries.

The Appropriations Acts authorized the Secretary to expend the funds for the benefit of two classes of individuals: the loyal Mdewakanton and families of the loyal Mdewakanton. *See* 25 Stat. at 992–93; 26 Stat. at 349.[51] Contemporaneous sources demonstrate that at the time the Appropriations Acts were passed, the term "family" was understood to have both narrow and broad meanings. In the narrowest sense, a "family" was understood to include "a father, mother, and children." BLACK'S LAW DICTIONARY 477 (1891) ("BLACK'S"); BOUVIER, A LAW DICTIONARY 645 (15th ed. 1883) ("BOUVIER") ("Family" encompasses "[f]ather, mother, and children."). "Family" was also understood to include "all the relations who descend from a common ancestor, or who spring from a common root." BLACK'S 477; *see also* BOUVIER 645 ("Family" means "[a]ll the relations who descend from a common ancestor or who spring from a common root."); 5 OXFORD ENGLISH DICTIONARY 707 (2d. ed. 1989) (citing contemporaneous exam-

were ultimately utilized in the same assignment system and the Department did not distinguish between the 1888 Appropriation and the subsequent Acts in its legal opinions or in its administration of the funds, the court will not treat the funds traceable to the 1888 Appropriation differently.

ples of usage and defining "family" as including "[t]hose descended or claiming descent from a common ancestor: a house, kindred, lineage" and "a people or group of peoples assumed to be descended from a common stock"). The legislative history does not reveal whether Congress contemplated the narrow or broad understanding of "family" when it passed the Appropriations Acts. Interpretive guidance, however, can be derived from the Federal Circuit's opinion and from the Department's interpretations of the Acts.

In describing the Secretary's decision to assign lands to lineal descendants of the loyal Mdewakanton, the Federal Circuit stated:

> The Interior Department recognized, of course, that Congress intended the 1886 Mdewakantons to be the specific beneficiaries of the Appropriations Acts. The Secretary of the Interior accordingly sought to ensure that the funds appropriated under the Act would be spent for those individuals. With respect to funds that were used to purchase land (as opposed to personal property that was rapidly consumed), *the Secretary adopted a policy designed to promote Congress's intent by assigning the land to individuals from within the group of 1886 Mdewakantons and subsequently to individuals from within the class of the descendants of those Mdewakantons.*

559 F.3d at 1243 (emphasis added). Thus, under the Federal Circuit's interpretation of the Appropriations Acts, the Secretary was "promot[ing] Congress's intent by assigning the land to" lineal descendants of the loyal Mdewakanton. *Id.*

The Department's consistent practice over a ninety-year period of granting land assignments to lineal descendants and numerous internal memoranda of the Department reinforce this view. A 1933 memorandum from the Assistant Solicitor made the point when it stated: "Under present law, the land which is the basis of these communities was land purchased for the Mdewakanton Sioux residing in Minnesota on May 20, 1886 *and their descendants. It has been and can be assigned only to such persons.*" J.A. 00587–88. (Mem. from Charlotte T. Westwood to Joe Jennings, Indian Reorganization (Undated, written sometime after Nov. 27, 1933)) (em-

phasis added). A 1950 memorandum prepared by the Area Land Officer for the Department once again stated the Department's interpretation of the lineal descendants' entitlement to the 1886 lands. *See* J.A. 00373–74 (Mem. by Rex. H. Barnes (July 24, 1950)) ("Barnes 1950 Mem."). That opinion stated that:

> In view of the provisions of the [Appropriations] Acts . . . [the 1886 lands] may be assigned only to members of the Mdewakanton Band of Sioux Indians residing in Minnesota, and such assignee must have been a resident of Minnesota on May 20, 1886, or be a legal descen[d]ant of such resident Indian.

J.A. 00374. In a 1969 memorandum from the Area Director of the BIA in Minneapolis to the Field Solicitor, the 1950 memorandum's interpretation of the Appropriations Acts was researched and endorsed once more. J.A. 00382 (Mem. from Daniel S. Boos (Mar. 17, 1969)) ("Based on independent research I have concluded that these remarks [the statements in the Barnes 1950 memorandum regarding the lineal descendants' entitlement] are correct.").

A 1970 memorandum from the Assistant Solicitor for Indian Legal Activities reiterated the Department's interpretation of the Appropriations Acts. J.A. 00386–87 (Mem. from Charles M. Soller to the Field Solicitor, Minneapolis, Minn. (Dec. 4, 1970)) ("Soller 1970 Mem."). That memorandum stressed:

> [T]he land in question remains available only for the use of qualified Mdewakanton Sioux Indians. If it appears desirable to use the land by assigning it to or for the benefit or other Indians, we suggest that Congress should be asked to permit such action by affirmative legislation. We know of no means of accomplishing this by administrative action, particularly over any objections of eligible Mdewakanton Sioux Indians.

J.A. 00386.

A 1971 memorandum from the Acting Associate Solicitor of Indian Affairs restated the Department's interpretation that the Appropriations Acts entitled lineal descendants of the loyal Mdewakanton to its benefits.

J.A. 00344–49 (Mem. from William A. Gersbury to the Field Solicitor for the Department, Twin Cities, Minn. (Aug. 19, 1971)) ("Gersbury 1971 Mem."). In response to the Field Solicitor's inquiry as to the Shakopee Mdewakanton Sioux Community's potential entitlement to the 1886 lands, the opinion cited the text of the Appropriations Acts that stated that the appropriated funds were for the benefit of the loyal Mdewakanton. J.A. 00344. It followed the citation by stating that "*only descendants of Mdewakantons who resided in Minnesota on May, 20, 1886, are eligible for land assignments at Shakopee.*" *Id.* (emphasis added). Later, the memorandum reiterated that, as of 1971, lineal descendants were the only group entitled to the 1886 lands:

[A]ny assignee who cannot meet the basic requirement for issuance of an assignment (that he is a legal descendant of a Mdewakanton Sioux resident of Minnesota on May 20, 1886) has no right to continued possession of the property, even if, the assignment was presumably valid when issued. *The wording in the aforementioned Acts of Congress* [the Appropriations Acts] *compels us to this conclusion.*

J.A. 00347 (emphasis added) (internal parenthetical included in original). The letter ended by repeating the conclusion in the Soller 1970 memorandum that congressional action would be required to allow anyone other than lineal descendants of the loyal Mdewakanton to benefit from the land. J.A. 00348–49.

The lineal descendants' entitlement to the benefits of the Appropriations Acts was stated once again in a 1978 letter from the Field Solicitor to the Area Director of the BIA. J.A. 00399–00401 (Shulstad 1978 Letter). That letter noted that "[t]he land is held for the benefit of a specific class of people and their descendants." J.A. 00400.

[40] The above memoranda, particularly the detailed analysis contained in the Gersbury 1971 memorandum, manifestly demonstrates that the Department did not view its assignment of lands to the lineal descendants as a matter of administrative grace; rather, it considered itself "compel[led]" by the terms of the Appropriations Acts to do so. J.A. 00347 (Gersbury 1971 Mem.). In light of the Department's decades-long interpretation that the Acts' benefits, including the leasing funds, extended to lineal descendants and only lineal descendants of the loyal Mdewakanton, the government's argument that "the Appropriations Acts cannot be interpreted as creating any duties as to the descendants of the loyal Mdewakanton" carries little or no persuasive weight. Although the Appropriations Acts do not specify how broadly "family" was to be interpreted, in light of the aforementioned facts, the court is persuaded that inclusion of the term "family" and "families" encompassed "lineal descendants" of the loyal Mdewakanton, such that plaintiffs may base their claims on the statutory use restrictions contained in the Appropriations Acts.[52]

(e.) *The Secretary's discretion.*

The government also argues that "[i]nsofar Congress has left to the Secretary's sole judgment the determination of the manner for providing assistance to the loyal Mdewakanton, the Secretary's distribution [of funds from the Treasury accounts] was permissible and the [c]ourt lacks jurisdiction to otherwise review his decision." Def.'s Mot. at 29 (*citing Milk Train, Inc. v. Veneman,* 310 F.3d 747 (D.C.Cir.2002)). For this proposition, the government relies on the fact that the Acts granted the Secretary the discretion to implement the Acts' mandates "in such manner as in his judgment he may deem best."

---

52. The court's conclusion is bolstered by the long-standing canon of statutory interpretation that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985); *see Bryan v. Itasca Cnty., Minn.,* 426 U.S. 373, 392, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) ("[I]n construing ... admittedly ambiguous statute[s] ... [the court] must be guided by that eminently sound and vital canon ... that statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians.") (internal quotations and citations omitted); *Shoshone,* 364 F.3d at 1352 (noting that the principle articulated in *Blackfeet* supported the court's interpretation that the government was obligated under 25 U.S.C. § 612 to credit prejudgment interest to plaintiffs); *Doyon, Ltd. v. United States,* 214 F.3d 1309, 1314 (Fed. Cir.2000) (noting the *Blackfeet* principle).

*Id.* Besides this general argument, the government particularly avers that "[t]o the extent the funds in the account were traceable to the Wabasha land transfer[,] the Secretary's distribution was permissible because such distribution was left to his discretion and [p]laintiffs have no vested or beneficial interest in the funds." *Id.* The court will first address the government's specific argument regarding the Wabasha–Land–Transfer funds.

[41] The 1944 Act authorizing the transfer of the 1886 Wabasha lands to the Upper Mississippi River Wild Life and Fish Refuge provided that:

> The sum of $1,261.20 . . . is hereby made available for transfer on the books of the Treasury . . . to the credit of the Medawakanton and Wahpakoota Bands of Sioux . . . and shall be subject to disbursement under the direction of the Secretary of the Interior for the benefit of the Medawakanton and Wahpakoota Bands of Sioux Indians. Where groups of such Indians are organized as tribes under the [Reorganization Act], the Secretary of the Interior may set apart and disburse for their benefit and upon their request a proportionate part of said sum, based on the number of Indians so organized.

1944 Act, § 2, 58 Stat. 274. Subsequently, $1,261.20 was transferred to Treasury account 147436 "Proceeds of Labor, the Mdewakanton and Wahpakoota Bands of Sioux Indians." Def.'s Mot. at 8. That money was later distributed to the three communities when the Department disbursed the entirety of the funds derived from the 1886 lands. *Id.* at 10–11.

Under the terms of the 1944 Act, payment was made not to the loyal Mdewakanton or their descendants, *see Wolfchild VI,* 559 F.3d at 1251; rather, the funds were allocated to be paid for the benefit of the Mdewakanton and Wahpakoota Bands generally. Plaintiffs' entitlement to the funds derived from the 1886 lands in Wabasha, which would have been based on the restrictions contained in the Appropriations Acts, was consequently terminated upon passage of the 1944 Act. *See id.,* 559 F.3d at 1257–58 (noting that Congress had the power to change the identity of

the class of individuals entitled to the 1886 lands). Additionally, when the Secretary distributed the Wabasha–Land–Transfer funds to the three communities, he acted pursuant to authority derived from the 1944 Act, which explicitly allowed him to disburse the funds to tribes organized under the Reorganization Act. *See* 1944 Act, § 2, 58 Stat. 274.

Accordingly, although the rest of the funds at issue remained controlled by the terms of the Appropriations Acts and unaffected by the 1980 Act, the 1944 Act provided that the Wabasha–Land–Transfer funds be paid to a broader set of beneficiaries and conferred upon the Secretary supplemental authority to distribute those funds, thus freeing the disbursement of the Wabasha funds from the statutory restrictions of the Appropriations Acts. Consequently, the government's motion to dismiss as to these specific funds is granted.

[42] Respecting the Secretary's discretion as to the remaining pre–1980 funds, the Appropriations Acts provided that the Secretary could use his "judgment" in administering the benefits of the Appropriations Acts. *See* 25 Stat. at 228–29 ("For the support of [eligible Mdewakanton] . . . twenty thousand dollars, to be expended by the Secretary of the Interior in the purchase, in such manner as in his judgment he may deem best, of agricultural implements, cattle, horses and lands"); 25 Stat. at 992–93 ("For the support of [eligible Mdewakanton] . . . twelve thousand dollars, to be expended by the Secretary of the Interior as follows: ten thousand dollars in the purchase, as in his judgment he may think best, of such lands, agricultural implements, seeds, cattle, horses, food or clothing as may be deemed best in the case of each [eligible Mdewakanton] or family thereof."); 26 Stat. at 349 ("For the support of [eligible Mdewakanton] . . . eight thousand dollars, to be expended by the Secretary of the Interior, as in his judgment he may think best, for such lands, agricultural implements, buildings, seeds, cattle, horses, food, or clothing as may be deemed best in the case of each [eligible Mdewakanton] or families thereof.").

The clause granting discretion to the Secretary did not modify or abrogate the Appropriations Acts' other restrictions but rather simply allowed the Secretary to determine in what precise manner to implement the acts. That grant of restricted discretion can hardly be read to have provided the Secretary with the authority to override the specific mandates contained in the Acts. As the Federal Circuit noted, "[t]he language of the Appropriations Acts ... makes clear that the references to the Mdewakantons' families[,]" while not creating rights of inheritance in the 1886 lands, constituted *"part of the directive to the Secretary as to the scope of his discretion in spending the appropriated funds." Wolfchild VI,* 559 F.3d at 1242 (emphasis added). And as the extensive memoranda cited above demonstrate, the government's current interpretation directly contradicts the Department's long-standing position that the Department was statutorily bound to administer the funds for the benefit of the loyal Mdewakanton and their lineal descendants. *See also Wolfchild VI,* 559 F.3d at 1248 ("To be sure, the Interior Department has consistently recognized that in the original legislation Congress intended for the appropriated funds to be expended for the benefit of the 1886 Mdewakantons.").

[43] The government's interpretation of the breadth of the Secretary's discretion would render meaningless the provisions of the Appropriations Acts dictating that the funds were to benefit the eligible Mdewakanton only and that the funds were to be distributed as equally as possible. Such an interpretation would contravene the " 'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' " *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (quoting *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)); *see Astoria Fed. Sav. and Loan Ass'n v. Solimino,* 501 U.S. 104, 112, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) (courts must "construe statutes, where possible, so as to avoid rendering superfluous any parts thereof."); *Inhabitants of Montclair Tp. v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883) ("It is the duty of the court to give effect, if possible, to every clause and word of a statute."); *Shoshone,* 364 F.3d at 1349 ("Accepted rules of statutory construction suggest that we should attribute meaning to all of the words in [a statute] if possible." (citation omitted)); *Splane v. West,* 216 F.3d 1058, 1068 (Fed.Cir.2000) ("We must construe a statute, if at all possible, to give effect and meaning to all its terms." (citation omitted)). In this instance, the court need not strain to interpret the Appropriations Acts in a way that gives legal effect to all its terms. The terms of the Acts make explicit that although Congress provided discretion to the Secretary to determine what particular items to purchase for beneficiaries of the Acts, depending on what he "deemed best" in each case, the Acts did not provide the Secretary with such broad discretion so as to negate the specific statutory restrictions.

The government's citation to *Milk Train,* 310 F.3d 747, provides no added support for its position. In that case, Secretary of Agriculture had placed a 26,000 [hundredweight ("cwt") ] per dairy operation cap on what could be considered "eligible production" for purposes of determining how much money a producer could receive in subsidies created for the Department to administer pursuant to its 2000 Appropriations Act, Pub.L. No. 106–78, § 805, 113 Stat. 1135, 1179 (1999). *See* 310 F.3d at 748–49. The 2000 Appropriations Act provided that the appropriated funds were to be used "to provide assistance directly to ... dairy producers, in a manner determined appropriate by the Secretary." *Id.* at 751. The D.C. Circuit concluded that the district court lacked jurisdiction to review the plaintiffs' challenge to the cap because "Congress has left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy farmers." *Id.* In so finding, the court noted that the statute provided "no relevant statutory reference point for the court other than the decisionmaker's own views of what is an appropriate manner of distribution to compensate for 1999 losses." *Id.* (citation and internal quotation omitted).

This is not, however, a case where the court lacks any "meaningful standard[s]

against which to judge the agency's exercise of discretion." *Milk Train*, 310 F.3d at 751 (quoting *Lincoln*, 508 U.S. at 191, 113 S.Ct. 2024). To the contrary, the Acts provide quite straightforward standards by which to judge the Secretary's conduct. While the Secretary was entitled to exercise discretion as to the exact manner of implementation, he was at all times bound by the explicit mandates that the Acts' benefits extend to eligible Mdewakanton only and that they be distributed in as equal amounts as practicable.[53] Accordingly, the Secretary was empowered and required to distribute the funds to the group of statutorily authorized beneficiaries under the Acts—the lineal descendants of the loyal Mdewakanton.

[44] Fairly interpreted, in light of the historical record and ninety years of the Department's own legal opinions and actions, the Appropriations Acts are reasonably amenable to the reading that they created a money-mandating duty on the part of the government to the lineal descendants of the loyal Mdewakanton.[54] Although the Secretary had significant discretion under the Appropriations Acts, in disbursing the leasing funds at issue, he was statutorily mandated to provide those funds to the lineal descendants of the loyal Mdewakanton. Plaintiffs fall within the class of plaintiffs entitled to recover under the Appropriations Acts as they are lineal descendants of the 1886 Mde-

wakanton.[55] over plaintiffs' claims; the government's motion to dismiss on this ground is accordingly denied. Because plaintiffs assert that they were displaced from receiving any portion of the funds derived from the 1886 lands as a result of the Secretary's distribution of the funds to the three communities, their particular claims fall within the scope of the Appropriations Acts and likewise survive the government's motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Adair*, 497 F.3d at 1251.

2. *Money obtained from the 1886 lands after adoption of the 1980 Act.*

[45] Plaintiffs argue that "[a]fter the 1980 Act, under the [s]tatutory [u]se [r]estriction[s], the Department of the Interior should have continued to collect revenues from . . . [the three communities'] enterprises and leases" for eventual disbursement to the lineal descendants. Sixth Am. Compl. ¶ 83. In support of this proposition, plaintiffs also rely upon the Reorganization Act, 48 Stat. 984, and the Indian Gaming Act, Pub.L. No. 100–497, 102 Stat. 2467 (1988). Sixth Am. Compl. ¶¶ 74, 88–98. The government responds that the 1980 Act terminated any interest plaintiffs would have had in such funds and that neither the Reorganization Act nor the Indian Gaming Act provides additional support for plaintiffs' claim. Def.'s Reply at 18–19; Def.'s Mot. at 25–26.[56]

---

53. The decision in *Milk Train* would be a more instructive precedent if, for example, the court there had been reviewing the Secretary's decision to distribute the appropriated funds to grain producers, as opposed to dairy producers, in the face of statutory language mandating that the appropriated funds were to be used for the assistance of dairy producers.

54. The government argues that because the Acts do not provide a certain sum of money be paid to the loyal Mdewakanton, the Acts cannot be reasonably interpreted as giving rise to a money-mandating duty. However, a statute can be money-mandating without stating a precise amount to be paid. *See Doe*, 463 F.3d at 1324 ("[A] statute is not wholly discretionary, even if it uses the word 'may' when an analysis of congressional intent or the structure and purpose of the statute reveal *one of the following:* (1) the statute has 'clear standards for paying' money to recipients, (2) the statute specifies 'precise amounts' to be paid, *or* (3) the statute compels payment once certain conditions precedent are met.")

(emphasis added). As described above, the Acts contain "clear standards for paying" the money to the lineal descendants of the loyal Mdewakanton.

55. Plaintiffs and various intervening plaintiffs have submitted to the court thousands of pages of genealogical records demonstrating that most are lineal descendants of loyal Mdewakanton. *See* Pls.' Genealogy Affs., *e.g.,* Loretta Stensland Family Tree (establishing that numerous plaintiffs are lineal descendants of Mary Pay Pay (Pepe)); J.A. 00242 (May 20, 1886 census) (listing Mary Pepe as a loyal Mdewakanton).

56. The government responds by arguing also that neither the Indian Gaming Act nor the Reorganization Act are independently money-mandating statutes. *See* Def.'s Reply at 7–11. The court does not read plaintiffs' complaint to assert that either statute independently gives rise to a money-mandating duty to the lineal descendants; rather plaintiffs argue that the statutory use restrictions contained in the Appropriations Acts

The 1980 Act did not terminate plaintiffs' entitlement to funds collected prior to the passage of the Act because the terms of the 1980 legislation dealt only with the 1886 lands, and because such funds were collected and disbursed pursuant to authority derived by the Secretary from the Appropriations Acts. However, after the passage of the 1980 Act, the 1886 lands were and are now held by the United States in trust for the three communities. *See Wolfchild VI*, 559 F.3d at 1255. Consequently, the three communities, not the plaintiffs, would be entitled to any income derived from those lands because the communities have become the trust beneficiaries. *See, e.g.,* 1 GEORGE GLEASON BOGERT, GEORGE TAYLOR BOGERT, AND AMY MORRIS HESS, THE LAW OF TRUSTS AND TRUSTEES § 1, at 11 (3d ed. 2000) ("A trustee holds trust property 'for the benefit of' the beneficiary. Advantages usually come to the beneficiary.... How the benefits are to come to the beneficiary is unimportant. The important trust concept is the beneficiary's right to obtain them."). Although the 1980 Act did not did not affect a blanket repeal of the Appropriations Acts, *see Wolfchild VI*, 559 F.3d at 1258 n. 13, the 1980 Act's "long-term disposition of the property purchased pursuant to the Appropriations Acts," *id.,* renders the statutory use restrictions contained in the Appropriations Acts inapplicable to any funds derived from those lands after such conversion was had. The government could not both abide by the mandate that only eligible Mdewakanton receive the Acts' benefits and perform its duties as trustee for the three communities by ensuring that the beneficiaries receive the benefits of the trust corpus. Thus, while funds derived prior to 1980 remain subject to the terms of the Appropriations Acts, the terms of the 1980 Act prevent the application of the statutory use restrictions to the 1886 lands and funds derived from those lands subsequent to the passage of the 1980 Act.

Nonetheless, plaintiffs argue that the Reorganization Act "made the Secretary of the Interior's duties perpetual until Congress directed otherwise." Sixth Am. Compl. ¶ 74.

should have controlled the government's administration of those statutes. *See* Sixth Am. Compl.

Specifically, plaintiffs argue that the restrictions contained in the Appropriations Acts were extended by the Reorganization Act by virtue of the following provision: "The existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are extended and continued until otherwise directed by Congress." 25 U.S.C. § 462 (quoted at Sixth Am. Compl. ¶ 74). The historical note to Section 462 indicates that the Section was applicable "to all Indian tribes, all lands held in trust by the United States for Indians, and all lands owned by Indians that are subject to a restriction imposed by the United States on alienation of the rights of Indians in the lands." The government asserts that 25 U.S.C. § 462 is consequently inapplicable to the 1886 lands because such lands were neither held in trust nor was title held by the assignees in restricted fee. *See* Def.'s Reply at 8–9.

The Federal Circuit definitively held that the 1886 lands were not held in trust by the United States and that the eligible Mdewakanton did not hold title to the land. *See Wolfchild VI*, 559 F.3d at 1255 ("[W]e conclude that, as of the time of the 1980 Act, all indications were that neither Congress nor the Department of the Interior had conveyed any vested ownership rights in the 1886 lands, legal or equitable, to anyone."). Accordingly, 25 U.S.C. § 462 does not apply to the 1886 lands. What is more, however, 25 U.S.C. § 462 provides that the periods of trust or restriction on alienation extend "until otherwise directed by Congress." As noted, Congress disposed of any interest plaintiffs had in the 1886 lands by adopting the 1980 Act, thus explicitly excluding the 1886 lands from the scope of 25 U.S.C. § 462.

Likewise, the Indian Gaming Act does not salvage plaintiffs' claim as to funds, including gaming revenue, derived from the 1886 lands after the passage of the 1980 Act. Plaintiffs argue that the Department's administration of the Indian Gaming Act was subject to the restrictions contained in the Appropriations Acts. They also contend that in approving tribal ordinances, revenue allocation plans,

¶ 73–98.

constitutions, and other documents pertinent to tribal gaming under the Indian Gaming Act that did not "provide [that] distributions of revenue from economic enterprises created as a result of the [Indian Gaming Act] [would] exclusively and equally benefit [all] the ... 1886 Mdewakanton lineal descendants," the government contravened those restrictions. Sixth Am. Compl. ¶ 97. The Indian Gaming Act was adopted on October 17, 1988, 102 Stat. 2467; hence, any governmental approval of the three communities' tribal or gaming documents occurred after the passage of the 1980 Act. As noted, the 1980 Act rendered the restrictions contained in the Appropriations Acts inapplicable to the 1886 lands or to any funds derived from those lands subsequent to the passage of the 1980 Act. Thus, even if, in the absence of the 1980 Act, the government would have been theoretically bound to abide by the restrictions in its approval of the aforementioned documents, the 1980 Act eliminated those potential constraints on the government's actions.[57]

Accordingly, the government's motion to dismiss for lack of subject matter jurisdiction is granted respecting plaintiffs' claims that they are entitled to funds, gaming and otherwise, traceable to the 1886 lands after the passage of the 1980 Act.

3. *The method of identifying lineal descendants for purposes of the Appropriations Acts.*

[46] Plaintiffs claim that the manner in which the government determined who constituted lineal descendants of the loyal Mdewakanton "result[ed] in the exclusion of certain 1886 Mdewakanton lineal descendants from the distribution of revenue" derived

from the 1886 lands. Sixth Am. Compl. ¶ 104. As detailed in the recitation of facts, the Appropriations Acts defined its beneficiary class in terms of presence in Minnesota as of May 20, 1886, which in turn was determined by the McLeod and Henton listings (the 1886 census). The historical record before the court indicates that the Department followed the Acts' mandates in preparing the listings and granting land assignments to individuals listed on the 1886 census and their lineal descendants. *See Wolfchild I*, 62 Fed.Cl. at 529 (describing the Department's land assignment system).

Whether this manner of ascertaining the lineal descendants resulted in the exclusion of some individuals who may have otherwise qualified is not an issue properly before this court. "It is ... well established that Congress can, within constitutional limits, determine the terms and conditions under which an appropriation may be used." 1 U.S. Gen. Accountability Office, Office of the General Counsel, Principles of Federal Appropriations Law (3d ed.2004), 2004 WL 5661322 ("GAO Redbook"); *id.* ("Congress can decree, either in the appropriation itself or by separate statutory provisions, what will be required to make the appropriation 'legally available' for any expenditure."); *see also State of Okla. v. Schweiker*, 655 F.2d 401, 406 (D.C.Cir.1981) (noting Congress's broad discretion to set the terms of appropriations and listing cases to that effect). Congress was accordingly free to define the beneficiary class of the Appropriations Acts as it deemed appropriate.[58] The government's motion to dismiss this claim is accordingly granted.

4. *Review of community governing documents.*

[47] In count V of plaintiffs' proposed sixth amended complaint, plaintiffs ask the

---

57. In ruling that the 1980 Act terminated any potential support for plaintiffs' claims that may have been found in the Indian Gaming Act and the Reorganization Act, the court does not mean to indicate that plaintiffs' claims would have been viable but for the 1980 Act. Because "tribal recognition remains a political question," *Samish*, 419 F.3d at 1373, and plaintiffs' claims as to the Reorganization Act and the Indian Gaming Act are essentially grounded in the contention that the government erred in approving tribal constitutions and various documents that did not comport with the Acts' restrictions, there is a

distinct possibility that plaintiffs' claims would have been nonjusticiable, at least in this court which does not have juridical power under the federal-question jurisdictional statute, 28 U.S.C. § 1331, or the Administrative Procedure Act.

58. As noted previously, the court's finding that the appropriated funds conceptually served as a substitute for terminated treaty payments does not mean that Congress was in reality legally obligated to appropriate funds to particular persons among the loyal Mdewakanton.

court to issue an order setting aside provisions in the three communities' constitutions, ordinances, resolutions, censuses, rolls, and tribal revenue allocation plans "which are repugnant to the [s]tatutory [u]se [r]estriction[s]" and remanding the matter to the Department of Interior with directions to cause the governing documents to be modified. Sixth Am. Compl. ¶ 116. The government asserts that the court does not have jurisdiction over that claim and, alternatively, that such a claim would be barred by the statute of limitations. Def.'s Opp'n at 17.

[48] For purposes of the Indian Tucker Act, this court's power to order equitable relief is delineated in 28 U.S.C. § 1491(a)(2). That provision states that "[t]o provide an entire remedy and to complete the relief afforded by the [money] judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records." Section 1491(a)(2) plainly does not convey the power to afford the equitable relief plaintiffs seek. See Flowers v. United States, 80 Fed.Cl. 201, 221–22 (2008), aff'd, 321 Fed.Appx. 928 (Fed. Cir.2008) (noting that 28 U.S.C. § 1491(a)(2) "enables the court to grant equitable relief under limited circumstances"). While "limited equitable relief sometimes is available in Tucker Act suits ... that equitable relief must be 'an incident of and collateral to' a money judgment." James v. Caldera, 159 F.3d 573, 580 (Fed.Cir.1998) (quoting 28 U.S.C. § 1491(a)(2)); id. ("Stated another way, the Court of Federal Claims has no power [under Section 1491(a)] to grant affirmative non-monetary relief unless it is tied and subordinate to a money judgment." (internal quotation omitted)). Any money judgment the court issues in this case would not be directly tied to the tribal governing documents plaintiffs seek to set aside; thus, an order requiring their alteration or modification could not be characterized as "an incident of and collateral to" a money judgment. Accordingly, defendant's motion to dismiss as it relates to count V is granted.

### 5. Breach-of-trust and breach-of-contract claims.

Plaintiffs include counts relating to claims of trust mismanagement, breach of contract, the separately-pled claims of minors in the amended complaint, but they note that such claims have been dismissed or otherwise subsumed into count IV. Sixth Am. Compl. ¶¶ 8–10. The breach-of-contract claims and separately pled claims of minors were addressed and rejected in a prior opinion of this court, and the breach-of-trust claims were denied in the Federal Circuit's opinion. See Wolfchild VI, 559 F.3d at 1255, 1260 (disposing of plaintiffs' trust claims); Wolfchild I, 62 Fed. Cl. at 547–49 (dismissing plaintiffs' breach-of-contract claim and the separately-pled claims of minor plaintiffs). Accordingly, the court grants the government's motion to dismiss plaintiffs' count I (trust mismanagement), count II (breach of contract), and count III (separately-pled claims of minor plaintiffs).

### 6. Partial summary judgment.

As the preceding analysis shows, as lineal descendants of the 1886 Mdewakanton, plaintiffs were entitled to the funds derived from leasing and licensing the 1886 lands prior to the passage of the 1980 Act. The Indian Trust Accounting Statute serves to toll the accrual of the statute of limitations as to this claim, and the 1980 Act did not affect plaintiffs' entitlement to the leasing and licensing funds generated and obtained prior to the passage of the 1980 Act. The undisputed facts demonstrate that the government disbursed the funds to the three communities rather than to the lineal descendants, thereby contravening the provisions of the Appropriations Acts that dictated that only eligible Mdewakanton could receive the benefits of the Acts and that such benefits be conferred in as equal an amount as practicable. Consequently, the government is liable in damages in the amount of these funds. Based upon the text of the Acts and the extensive historical record, which was largely uncontroverted by the parties, the court can ascertain "no genuine issue as to any material facts." RCFC 56(c)(1); see Matsushita, 475 U.S. at 586–87, 106 S.Ct. 1348. Nor has the government come forward with specific facts dem-

onstrating a genuine issue for trial. *See* RCFC 56(e)(2). Accordingly, plaintiffs' motion for summary judgment as to its entitlement to the funds derived from leasing and licensing the 1886 lands prior to the passage of the 1980 Act is granted. As explained *supra*, the Wabasha–Land–Transfer funds are excluded from this grant.

### CONCLUSION

For the reasons stated, the court grants in part and denies in part the government's motions to dismiss this action. The government's motion to dismiss as it relates to plaintiffs' entitlement to the Wabasha–Land–Transfer funds and any revenue derived from the 1886 lands after the passage of the 1980 Act is granted. The government's motion to dismiss as it relates to plaintiffs' entitlement to funds derived from leasing and licensing the 1886 lands prior to the passage of the 1980 Act is denied. Accordingly, the court also denies the governments' motion respecting plaintiffs' claim for attorneys' fees. The court grants in full the government's motion to dismiss plaintiffs' count I (trust mismanagement), count II (breach of contract), count III (separately-pled claims of minor plaintiffs), and count V (community governing documents).

The court grants plaintiffs' cross-motion for partial summary judgment that: (1) with the exception of the Wabasha–Land–Transfer funds, the Secretary was bound to distribute funds derived from leasing and licensing the 1886 lands prior to the passage of the 1980 Act to the lineal descendants of the loyal Mdewakanton, (2) the 1980 Act did not extinguish plaintiffs' claims as to those particular funds, and (3) the Secretary's disbursal of those funds to the three communities in lieu of the lineal descendants as a group entitles plaintiffs to damages in the amount of the distributed funds. The court otherwise denies the plaintiffs' motion for partial summary judgment.

Plaintiffs' motion for leave to file a Sixth Amended Complaint is granted, and the court will deem that complaint filed as of July 9, 2010, the date on which the court received plaintiffs' motion. Intervening

plaintiffs' motions for leave to file their amended complaints are likewise granted.

The parties are requested to file a joint status report on or before January 19, 2011, addressing a means of, and arrangements for, entering a final judgment in this litigation. A status conference will be held January 21, 2011 at the National Courts Building in Washington, D.C., commencing at 10:00 a.m., EST.

It is so ORDERED.



Maria Sandra FERNANDEZ DE IGLESIAS, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 08–464C.

United States Court of Federal Claims.

Dec. 22, 2010.

**Background:** Landlord filed action under Contract Disputes Act (CDA) against United States, as tenant of residence in Juárez, Chihuahua, Mexico, demanding compensation for amount of time of hold over. United States moved for summary judgment.

**Holdings:** The Court of Federal Claims, Futey, J., held that:

(1) Mexican statute that gave right to landlord to increase rent on leased premises if tenant requested extension of lease did not apply to landlord's claim;

(2) use general principles, due to lack of directly applicable Mexican statute, was not warranted;

(3) factual issue existed as to whether single ten percent increase in monthly rent was appropriate for unilateral extension of lease by United States;

modifications issued pursuant to an "Options clause," as here, are ."signed only by the contracting officer." FAR 43.103(b). The regulations say nothing about requiring a contractor's consent to exercise an option. Modification 34 thus created a binding extension of Teamstaff's FSS contract without the signature and return of the document by Teamstaff's President. The Court does not need to consider the circumstances under which Teamstaff may have signed the document.

At various stages, Top Echelon included other grounds in support of its protest, but the major issues it raised are discussed above. The Court considered all of Top Echelon's arguments, and the failure to address each and every contention in this opinion should not be read to suggest that any argument was overlooked. None of Top Echelon's arguments would have altered the VA's selection of Teamstaff for the Dallas CMOP facility.

### Conclusion

Based upon the foregoing, the Court DISMISSES Seaborn's protest for lack of standing, DENIES Top Echelon's motion for judgment on the administrative record, and GRANTS Defendant's and Teamstaff's motions for judgment on the administrative record. The motions of Top Echelon and Teamstaff to supplement the administrative record are GRANTED IN PART and DENIED IN PART, as indicated in Section C above.

On or before October 6, 2011, counsel for the parties shall carefully review this opinion for competition-sensitive, proprietary, confidential, or other protected information, and submit to the Court any proposed redactions before the opinion is released for publication.

IT IS SO ORDERED.



Sheldon Peters WOLFCHILD,
et al., Plaintiffs,

v.

UNITED STATES, Defendant.

Nos. 03–2684L, 01–568L.

United States Court of Federal Claims.

Aug. 5, 2011.

As Corrected Aug. 18, 2011.

**Background:** Lineal descendants of Mdewakanton Sioux who were loyal to United States during 1862 Sioux uprising in Minnesota sued United States for, inter alia, breach of fiduciary duty based upon government's management of property originally provided for benefit of loyal Mdewakanton. Following partial summary judgment, 96 Fed.Cl. 302, descendants moved to amend complaint, government moved for dismissal, and parties cross-moved for summary judgment.

**Holdings:** The Court of Federal Claims, Lettow, J., held that:

(1) descendants were not "tribe" within meaning of Non-Intercourse Act;

(2) historic land-grant acts did not impose specific money-mandating duty upon government;

(3) historic land-grant acts did not impose specific fiduciary duty upon government;

(4) descendants' Fifth Amendment takings claims were time-barred;

(5) Indian Judgment Distribution Act was applicable to claims; and

(6) government erred in shifting burden concerning identification and proof of descent to descendants.

Motions granted in part and denied in part.

**1. Indians ⊜197**

Although not guaranteed under assignment system, in practice, Indian assignee's land passes directly to his children upon his death.

**2. Federal Courts ⊜1111**

So long as underlying facts or circumstances relied upon by Court of Federal Claims plaintiff may be proper subject of relief, he ought to be afforded opportunity to test his claim on merits. RCFC, Rule 15(a)(2), 28 U.S.C.A.

**3. Federal Courts ⊜1111**

Although Court of Federal Claims ought to exercise liberally its discretion to grant leave to amend, undue delay, bad faith or dilatory motive on part of movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to opposing party by virtue of allowance of amendment, or futility of amendment may justify denial of a motion for leave to amend. RCFC, Rule 15(a)(2), 28 U.S.C.A.

**4. Federal Courts ⊜1111**

Motion to amend may be deemed futile by Court of Federal Claims if claim added by amendment would not withstand motion to dismiss. RCFC, Rule 15(a)(2), 28 U.S.C.A.

**5. Federal Courts ⊜1111**

When party in Court of Federal Claims faces possibility of being denied leave to amend on ground of futility, that party must demonstrate that its pleading states claim on which relief could be granted, and it must proffer sufficient facts supporting amended pleading that claim could survive dispositive pretrial motion. RCFC, Rule 15(a)(2), 28 U.S.C.A.

**6. Federal Courts ⊜1071**

Jurisdiction is threshold issue, and Court of Federal Claims must satisfy itself that it has jurisdiction to hear and decide case before proceeding to merits.

**7. Federal Courts ⊜1111**

When considering jurisdictional dispute, Court of Federal Claims draws all reasonable inferences in favor of plaintiff, and accepts as true undisputed allegations in complaint.

**8. Federal Courts ⊜1113**

Plaintiff will not defeat jurisdictional challenge in Court of Federal Claims by relying merely on allegations in complaint, but must instead bring forth relevant, competent proof to establish jurisdiction.

**9. Federal Courts ⊜1113**

Court of Federal Claims plaintiff bears burden of establishing by preponderance of evidence court's subject matter jurisdiction over its claim.

**10. Federal Courts ⊜1113**

In establishing predicate jurisdictional facts, Court of Federal Claims is not restricted to face of pleadings, but may review evidence extrinsic to pleadings, including affidavits and deposition testimony.

**11. Indians ⊜120, 174**

Non-Intercourse Act bars land conveyances by Indians to non-Indians unless made or ratified by Congress. 25 U.S.C.A. § 177.

**12. Indians ⊜120, 174**

Purpose of Non-Intercourse Act is to prevent unfair, improvident, or improper disposition by Indians of lands owned or possessed by them to other parties, except United States, without consent of Congress and to enable government, acting as parens patriae for Indians, to vacate any disposition of their lands made without its consent. 25 U.S.C.A. § 177.

**13. Federal Courts ⊜1110**

"Prudential standing" inquiry looks to whether constitutional or statutory provision on which claim rests properly can be understood as granting persons in plaintiff's position right to judicial relief.

    See publication Words and Phrases for other judicial constructions and definitions.

**14. Federal Courts ⊜1110**

Prudential standing inquiry asks whether interest sought to be protected by complainant is arguably within zone of interests to be protected or regulated by statute or constitutional guarantee in question.

**15. Indians ⊜120, 237**

To establish standing under Non-Intercourse Act, plaintiffs are required to demonstrate that they represent entities that: (1) were tribes at time land was alienated, and

(2) remain tribes at time of suit. 25 U.S.C.A. § 177.

**16. Federal Courts ⚬1110**

Prudential standing doctrine represents type of threshold question may be resolved before addressing jurisdiction.

**17. Indians ⚬120, 237**

**United States ⚬105**

Lineal descendants of "loyal" Mdewakanton Sioux were not "tribe" within meaning of Non-Intercourse Act, for purposes of standing to maintain claim seeking remuneration for lands allegedly granted by United States government following 1862 uprising; although descendants' birth certificates demonstrated shared anthropological or geographical connections through familial unions, they did not show that descendants constituted united community, existing and living under one leadership or government and inhabiting particular territory. 25 U.S.C.A. § 177.

See publication Words and Phrases for other judicial constructions and definitions.

**18. United States ⚬125(3, 7)**

United States, as sovereign, is immune from suit save as it consents to be sued, and terms of its consent to be sued in any court define that court's jurisdiction to entertain suit.

**19. Federal Courts ⚬1072**

**United States ⚬127(1)**

Indian Tucker Act provides jurisdictional platform for suit, but does not itself create substantive right enforceable against government by claim for money damages. 28 U.S.C.A. § 1505.

**20. United States ⚬125(5)**

Plaintiff grounding its claim in Indian Tucker Act must demonstrate that some other source of law creates money-mandating right or duty that falls within ambit of waiver of sovereign immunity. 28 U.S.C.A. § 1505.

**21. United States ⚬125(5)**

Where plaintiff alleges that statute provides right or duty that falls within waiver of sovereign immunity, for purposes of jurisdiction under Indian Tucker Act, statute must be fairly interpreted or reasonably amenable to interpretation that it mandates right of recovery in damages. 28 U.S.C.A. § 1505.

**22. Federal Courts ⚬1072**

If court determines that statute upon which plaintiff relies does not impose upon government duty which gives rise to claim for money damages, court lacks subject matter jurisdiction over claim under Indian Tucker Act. 28 U.S.C.A. § 1505.

**23. Federal Courts ⚬1081**

Historic non-implemented Congressional acts providing for grant of lands to "loyal" Mdewakanton Sioux following 1862 uprising did not impose specific money-mandating duty upon government, for purposes of court's jurisdiction under Indian Tucker Act as to action brought by lineal descendants of Sioux, seeking remuneration for lands; plain language of acts revealed that legislation only permitted, not mandated, government to provide lands to individual qualified Sioux. 28 U.S.C.A. § 1505.

**24. Federal Courts ⚬1072**

While discretionary terms may trigger presumption that statute is not money-mandating, for purposes of Indian Tucker Act jurisdiction, presumption can be overcome by intent of Congress and other inferences that court may rationally draw from structure and purpose of statute at hand. 28 U.S.C.A. § 1505.

**25. United States ⚬105**

Statute, or confluence of statutes and regulations, can create fiduciary duty on part of government which can give rise to claim for damages under Indian Tucker Act. 28 U.S.C.A. § 1505.

**26. Federal Courts ⚬1081**

Full fiduciary obligations are applicable to Indian Tucker Act jurisdictional requirements only if plaintiff identifies specific rights-creating or duty-imposing statutory or regulatory prescription, and if that prescription bears hallmarks of conventional fiduciary relationship. 28 U.S.C.A. § 1505.

**27. Federal Courts ⬢1081**

Historic non-implemented Congressional acts providing for grant of lands to "loyal" Mdewakanton Sioux following 1862 uprising did not impose specific fiduciary duty upon government, for purposes of court's jurisdiction under Indian Tucker Act as to action brought by lineal descendants of Sioux, seeking remuneration for lands; acts were directory propositions which did not impose any specific fiduciary obligations that would create trust relationship between Sioux and government. 28 U.S.C.A. § 1505.

**28. Federal Courts ⬢1106**

Limitations period applicable to Indian Tucker Act claims is not subject to equitable tolling or implied exceptions. 28 U.S.C.A. §§ 1505, 2501.

**29. Federal Courts ⬢1107**

Fifth Amendment takings claim accrues when all events have occurred which fix liability of government and entitle claimant to institute action. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 2501.

**30. Federal Courts ⬢1107**

In context of Fifth Amendment, key date for accrual purposes is date on which plaintiff's land has been clearly and permanently taken. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 2501.

**31. Federal Courts ⬢1107**

Proper focus, for accrual under statute of limitations purposes in Fifth Amendment takings action, is upon time of government's acts, not upon time at which consequences of acts became most painful. U.S.C.A. Const. Amend. 5; 28 U.S.C.A. § 2501.

**32. Federal Courts ⬢1107**

Fifth Amendment takings claim only accrues if claimant knew or should have known that claim existed. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 2501.

**33. Federal Courts ⬢1107**

Fifth Amendment takings claims brought by lineal descendants of "loyal" Mdewakanton Sioux, seeking remuneration for lands allegedly granted by United States government following 1862 uprising, accrued

under Indian Tucker Act during year in which United States allegedly began to fail to provide lands under non-implemented Congressional acts providing for grants. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. §§ 1505, 2501.

**34. Federal Courts ⬢1107**

"Continuing claims doctrine" applies where plaintiff's claim is inherently susceptible to being broken down into series of independent and distinct events or wrongs, each having its own associated damages.

See publication Words and Phrases for other judicial constructions and definitions.

**35. Federal Courts ⬢1107**

Continuing claims doctrine does not apply where single governmental action causes series of deleterious effects, even though those effects may extend long after initial governmental breach.

**36. Federal Courts ⬢1107**

Continuing claims doctrine was inapplicable to time-barred Fifth Amendment takings claims brought by lineal descendants of "loyal" Mdewakanton Sioux, seeking remuneration for lands allegedly granted by United States government following 1862 uprising; purported takings were accomplished during 1800s, and did not renew or replicate each day or with each physical incursion upon lands at issue. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 2501.

**37. United States ⬢105**

Indian Trust Accounting Statute does not apply as to claims centering on parcels of land not subject to trust relationships or governmental fiduciary duties. Department of The Interior And Related Agencies Appropriations Act, 2004, § 1, 43 U.S.C.A. § 1735 note.

**38. Federal Courts ⬢1106**

Statute of limitations applicable to claims under Indian Tucker Act treats children as if they were legally unable to file suit, and allows filing within three years after child reaches majority status. 25 U.S.C.A. § 177; 28 U.S.C.A. § 2501.

**39. Statutes ⚖190, 208, 217.4**

Where text of statute does not furnish definitive answer as to interpretation of terms, reference to context, legislative history, and canons of statutory construction is warranted.

**40. Statutes ⚖223.2(1.1)**

"In pari materia" canon of statutory construction dictates that statutes addressing same subject matter generally should be read as if they were one law.

> See publication Words and Phrases for other judicial constructions and definitions.

**41. United States ⚖105**

Indian Judgment Distribution Act was applicable to claims brought by lineal descendants of "loyal" Mdewakanton Sioux, seeking remuneration for lands allegedly granted by United States government following 1862 uprising, since descendants constituted identifiable "group" of American Indians for purposes of statute; term did not limit statutory scope to judgments pertaining to singular Indian entities, as opposed to judgments in favor of grouped individuals. Distribution of Judgment Act, § 1(a), 25 U.S.C.A. § 1401(a); 25 C.F.R. § 87.1(g).

> See publication Words and Phrases for other judicial constructions and definitions.

**42. United States ⚖105**

Indian Judgment Distribution Act was applicable to claims brought by lineal descendants of "loyal" Mdewakanton Sioux, seeking remuneration for lands allegedly granted by United States government following 1862 uprising, since remuneration pertained to "funds appropriated in satisfaction of judgment"; no separate Congressional appropriation was necessary to trigger application of Distribution Act, since exclusive statutory mechanism already existed for funding of potential judgments. Distribution of Judgment Act, § 1(a), 25 U.S.C.A. § 1401(a); 28 U.S.C.A. § 2517; 31 U.S.C.A. § 1304.

> See publication Words and Phrases for other judicial constructions and definitions.

**43. United States ⚖105**

United States government erred in shifting burden concerning identification and proof of descent to lineal descendants of "loyal" Mdewakanton Sioux who sued government, seeking remuneration for lands allegedly granted by United States government following 1862 uprising; pursuant to Indian Judgment Distribution Act, government was obligated to undertake historical research to determine appropriate templates by which to adjudicate claimant eligibility. Distribution of Judgment Act, § 1(a), 25 U.S.C.A. § 1401(a); 25 C.F.R. § 87.3.

West Codenotes

Recognized as Unconstitutional
    25 U.S.C.A. § 1402(a)
    25 U.S.C.A. § 1404

---

Erick G. Kaardal, Mohrman & Kaardal, P.A., Minneapolis, MN, for Wolfchild plaintiffs. With him on the briefs were William F. Mohrman, Mohrman & Kaardal, P.A., Minneapolis, MN.

Jody H. Schwarz and Stephen Finn, Trial Attorneys, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With them on the briefs were Ignacia S. Moreno, Assistant Attorney General, and Sam Costello, Daniel Steele, and J. Nathanael Watson, Trial Attorneys, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C. Of counsel were Kenneth Dalton and James Porter, Office of the Solicitor, Department of the Interior, Washington, D.C.

Jack E. Pierce, Pierce Law Firm, PA, Minneapolis, MN, for the Cermak plaintiffs and for the Stephens, R. Cermak, J. Cermak, Henderson, Klingberg, Alkire, Arnold, and Godoy groups of intervening plaintiffs.

Kelly H. Stricherz, Vermillion, SD, for the Mozak group of intervening plaintiffs.

Garrett J. Horn, Horn Law Office, Yankton, SD, for the Saul, Trudell, Taylor, Ferris,

Henry, and Vassar groups of intervening plaintiffs.

Creighton A. Thurman, Yankton, SD, for the Cournoyer, Robinette, Kimbell, French, and Wanna groups of intervening plaintiffs.

Elizabeth T. Walker, Walker Associates, Alexandria, VA, for the anonymous Walker, the Enyard, and the Kitto groups of intervening plaintiffs.

Robin L. Zephier, Abourezk & Zephier, PC, Rapid City, SD, for the Zephier group of intervening plaintiffs.

Larry Leventhal, St. Paul, MN, for the Burley group of intervening plaintiffs.

Wood R. Foster, Jr., Siegel, Brill, Greupner, Duffy & Foster, PA, Minneapolis, MN, for the Lafferty, Blaeser, Whipple, and Lowe groups of intervening plaintiffs.

Bernard J. Rooney, Amherst, WI, for the Rooney group of intervening plaintiffs.

Scott A. Johnson & Todd M. Johnson, Johnson Law Group, Minnetonka, MN, for the Rocque group of intervening plaintiffs, the Descendants of Joseph Coursolle group of intervening plaintiffs.

James L. Blair, Renaud, Cook, Drury, Mesaros, PA, Phoenix, AZ, for the anonymous Blair group of intervening plaintiffs. With him on the briefs was Barry P. Hogan, Renaud Cook Drury Mesaros, PA, Phoenix, AZ.

Gary J. Montana, Montana & Associates, Osseo, WI, for the Julia DuMarce group of intervening plaintiffs.

Nicole L. Emerson, Lynn, Jackson, Shultz & Lebrun, PC, Sioux Falls, SD, for the Garreau group of intervening plaintiffs.

Douglas Kettering, Kettering Law Office, Yankton, SD, for the Ke Zephier group of intervening plaintiffs.

Randy V. Thompson, Nolan, MacGregor, Thompson & Leighton, St. Paul, MN, for the Abrahamson group of intervening plaintiffs.

Frances Felix, pro se, Minneapolis, MN, for herself and members of her immediate family as intervening plaintiffs.

Royce Deryl Edwards, Jr., Joplin, MO, for the Robertson–Vadnais group of intervening plaintiffs.

Rory King, Bantz, Gosch & Cremer, LLC, Aberdeen, SD, for the Marvel Jean DuMarce group and the Youngbear group.

Brian L. Radke, Radke Law Office, P.C., Sioux Falls, SD, for the Schroder group of intervening plaintiffs.

## OPINION AND ORDER

LETTOW, Judge.

On December 21, 2010, the court issued the seventh opinion in this long-pending litigation involving approximately 20,750 persons of Indian descent. *Wolfchild v. United States,* 96 Fed.Cl. 302, 310 (2010) ("*Wolfchild VII* "). In that decision, the court held that plaintiffs are entitled to certain funds derived from leasing and licensing lands that had been secured and reserved for eligible Indians pursuant to Appropriations Acts passed in 1888, 1889, and 1890. *Id.* at 352. The parties have since stipulated to the amount of funds at issue as of January 1, 2011. The case is now before the court on pending cross-motions for summary judgment respecting persons who qualify as proper claimants to those funds, and on the related matter of whether the Indian Tribal Judgment Funds Use or Distribution Act, 25 U.S.C. §§ 1401–1408, applies to any judgment entered in this case. In addition, since the court's opinion of December 21 was rendered, plaintiffs and plaintiff-intervenors have filed numerous motions to amend complaints and motions for summary judgment on a variety of additional substantive claims.

## FACTS[1]

As of 1862, the Minnesota Sioux consisted of four bands known as the Mdewakanton, the Wahpakoota (together comprising the "lower bands"), the Sisseton, and the Wahpeton (comprising the "upper bands"). *Wolfchild VII,* 96 Fed.Cl. at 311–12. At that time, the relationship between the Minnesota Sioux and the United States was defined and

---

1. A brief recitation of the relevant facts is provided in this decision. A detailed account of the historical background of this case can be found in this court's prior opinions, including especially its most recent opinion, *Wolfchild VII,* 96 Fed.Cl. 302.

governed by a series of treaties, which provided generally for the supply of land and funds to the Sioux. *Id.* at 312–13. In August of 1862, individuals from each of the four bands revolted against the United States, killing settlers, destroying and damaging property, and breaching the treaties then held with the United States. *Id.* at 313. As a consequence, the United States annulled its treaties with the Sioux, which had the effect of, among other things, voiding the annuities that had been granted to the Sioux under those treaties. *Id.* Additionally, the United States confiscated the Sioux lands of Minnesota and later directed that the Sioux be removed to tracts of land outside the limits of the then-existing states. *Id.* These steps were accomplished by two legislative actions taken by Congress and signed by President Lincoln in 1863: the Act of February 16, 1863, ch. 37, 12 Stat. 652, and the Act of March 3, 1863, ch. 119, 12 Stat. 819 (together, "the 1863 Acts"). *Id.*

Some of the Sioux, however, remained loyal to the United States during the uprising by either not participating in the revolt or acting affirmatively to save the settlers. *Wolfchild VII*, 96 Fed.Cl. at 313. By their actions, those Sioux severed their tribal relationships. Although Congress voided all treaties with the Sioux, in the 1863 Acts it recognized the loyalty—and ensuing hardship—of those "friendly Sioux." *Id.* at 313–14. In Section 9 of the Act of February 16, 1863, Congress authorized the Department of the Interior to assign up to eighty acres of public land to each friendly Sioux:

> [T]he Secretary of the Interior is hereby authorized to set apart of the public lands, not otherwise appropriated, eighty acres in severalty to each individual of the before-named bands [the Sisseton, Wahpeton, Mdewakanton, and Wahpakoota of the Dakota or Sioux Indians] who exerted himself in rescuing the whites from the late massacre [by] said Indians. The land so set apart ... shall not be aliened or devised, except by the consent of the President of

the United States, but shall be an inheritance to said Indians and their heirs forever.

Act of February 16, 1863, ch. 37, § 9, 12 Stat. at 654.

Two weeks after enacting this statute, Congress passed a second act providing for the friendly Sioux. The second Act of 1863 supplemented the first Act in important respects. Section 1 provided that the President was "authorized ... and directed to assign to and set apart" "outside of the limits of any state" eighty acres of "good agricultural lands" for all of the Sioux, regardless of loyalty. Act of March 3, 1863, ch. 119, § 1, 12 Stat. at 819. This grant of land "appeared to be an attempt to address the fact that the first Act of 1863 confiscated all Sioux land, leaving the Sioux with no direction as to where they might make a new home." *Wolfchild VII*, 96 Fed.Cl. at 314. In Section 4 of the second 1863 Act, Congress provided for the friendly Sioux specifically:

> [I]t shall be lawful for [the] Secretary [of the Interior] to locate any meritorious individual Indian of [the four] bands, who exerted himself in saving the lives of the whites in the late massacre, upon [the former Sioux reservation lands] on which the improvements are situated, assigning the same to him to the extent of eighty acres, to be held by such tenure as is or may be provided by law ... [provided] [t]hat no more than eighty acres shall be awarded to any one Indian, under this or any other act.

Act of March 3, 1863, ch. 119, § 4, 12 Stat. at 819.[2] Ultimately, no lands were provided to the friendly Sioux pursuant to the 1863 Acts; however, neither act has been repealed. *Wolfchild VII*, 96 Fed.Cl. at 315.

After additional failed legislative attempts to provide for the friendly Sioux, in 1888, 1889, and 1890, Congress enacted Appropriations Acts which provided funds to the Secretary of the Interior with an accompanying mandate to purchase for those friendly Sioux

---

2. The relationship between the two Acts of 1863 was a point of dispute resolved in the court's prior opinion. *See Wolfchild VII*, 96 Fed.Cl. at 314–15. Ultimately, the court concluded that the text and legislative history of the Acts demonstrated that the second Act of 1863 did not supersede the first Act; rather, the two had distinguishable scopes and were complementary in their application. *See id.*

who belonged to the Mdewakanton band specifically ("loyal Mdewakanton") land, agricultural implements, and livestock. *See Wolfchild VII*, 96 Fed.Cl. at 315–18; Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349; Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992–93; Act of June 29, 1888, ch. 503, 25 Stat. 217, 228–29. Unlike the prior unsuccessful Acts of 1863, under the 1888, 1889, and 1890 Appropriations Acts, land and other goods were purchased for the loyal Mdewakanton. *Wolfchild VII*, 96 Fed.Cl. at 318. The land ("1886 lands") was conveyed to eligible Mdewakanton under an assignment system, pursuant to which title was retained in the United States' name, preventing alienation and sale to others. *Id.*

[1] The text delineating the beneficiary class in each Appropriation Act varied in minute respects, but the essential thrust of the Acts was Congress' desire that loyal Mdewakanton would be identified as those Mdewakanton who had severed their tribal relations and who had either remained in, or were removing to, Minnesota as of May 20, 1886.[3] To determine the persons who would be considered "loyal" Mdewakanton under Congress' definition and thus would receive the benefits of the Appropriations Acts, the Department of Interior relied upon two censuses: the McLeod listing and the Henton listing. *Wolfchild VII*, 96 Fed.Cl. at 316. The McLeod listing was generated in 1886 by U.S. Special Agent Walter McLeod and listed all of the full-blood Mdewakantons remaining in Minnesota at the time. *Id.* Under the Secretary's direction, on January 2, 1889, a supplementary census was taken by Robert B. Henton, Special Agent for the Bureau of Indian Affairs ("BIA"), of the Mdewakanton

living in Minnesota since May 20, 1886. *Id.* That listing included some mixed bloods. Together, these listings were used to distribute the benefits of the Appropriations Acts to those persons whose names appeared on the lists, and subsequently, to lineal descendants of those listed persons. *Id.*[4]

Eventually, funds were generated by and derived from the 1886 lands, which monies were placed in Treasury trust fund accounts. *Wolfchild VII*, 96 Fed.Cl. at 319–21. Some of these funds were obtained from a transfer of a portion of the 1886 lands by the United States to the Upper Mississippi River Wild Life and Fish Refuge ("the Wabasha Land Transfer"). *Id.* at 319–20. The remaining portion of the money, however, stemmed from Interior's policy of leasing or licensing 1886 lands for fair market value where no eligible Mdewakanton or lineal descendant was available for a land assignment. *Id.* at 320. In 1975, the BIA performed a detailed accounting of all funds derived from the 1886 lands then held by the Treasury. *Id.* at 321.

Around the same time, Congress altered significantly the status of the 1886 lands. In 1980, Congress provided that the 1886 lands which "were acquired and are now held by the United States for the use or benefit of certain Mdewakanton Sioux Indians," would henceforth be "held by the United States . . . in trust for" three Indian communities—the Shakopee Mdewakanton Sioux Community, the lower Sioux Community, and the Prairie Indian Community—which had formed in the vicinity of the several 1886 land purchases. Act of 1980, Pub.L. No. 96–557, 94 Stat. 3262 ("1980 Act"). That legislation, however, did not address the funds derived from the 1886

---

3. *See* Act of Aug. 19, 1890, 26 Stat. at 349 (defining the beneficiary class as "full and mixed blood Indians in Minnesota heretofore belonging to the M[de]wakanton band of Sioux Indians, who have resided in said State since the twentieth day of May, eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein, and have severed their tribal relations"); Act of Mar. 2, 1889, 25 Stat. at 992 (defining the beneficiary class as "full-blood Indians, in Minnesota heretofore belonging to the M[de]wakanton band of Sioux Indians, who have resided in said State since the twentieth day of May eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein,

and have severed their tribal relations"); Act of June 29, 1888, 25 Stat. at 228 (defining the beneficiary class as "full-blood Indians in Minnesota, belonging to the M[de]wakanton band of Sioux Indians, who have resided in said State since the twentieth day of May, A.D. eighteen hundred and eighty-six, and severed their tribal relations").

4. "Although not guaranteed under the assignment system, in practice, an assignee's land would pass directly to his children upon his death." *Wolfchild v. United States*, 62 Fed.Cl. 521, 529 (2004) ("*Wolfchild I* ").

lands then being held by the Treasury. Nevertheless, in 1981 and 1982 those funds were distributed to the three communities. *Wolfchild VII*, 96 Fed.Cl. at 323–24.[5]

## PROCEDURAL HISTORY

Plaintiffs aver that they are lineal descendants of the loyal Mdewakanton. *See Wolfchild I*, 62 Fed.Cl. at 524. They filed their complaint in this case on November 18, 2003, and since that time the number of plaintiffs has grown to approximately 20,750 persons.[6]

On October 27, 2004, the court granted partial summary judgment for plaintiffs, holding that a trust for the benefit of the loyal Mdewakanton and their lineal descendants was created by the Appropriations Acts. *See Wolfchild I*, 62 Fed.Cl. at 555.[7] Approximately two and one half years after that decision, the government interposed a motion to certify the court's decisions in *Wolfchild I*, *Wolfchild II*, and *Wolfchild III* for interlocutory appeal under 28 U.S.C. § 1292(d). *See Wolfchild v. United States*, 78 Fed.Cl. 472 (2007) ("*Wolfchild V*"). The court granted the government's motion in part and certified the questions of whether the Appropriations Acts created a trust for the loyal Mdewakanton and their lineal descendants, and whether, if the Acts created such a trust, Congress terminated that trust with the 1980 Act. *Id.* at 485. The Federal Circuit granted interlocutory appeal of those two questions, and reversed this court's conclusions in both respects. *See Wolfchild v. United States*, 559 F.3d 1228, 1231 (Fed.Cir.

2009) ("*Wolfchild VI*"), *cert. denied*, — U.S. ——, 130 S.Ct. 2090, 176 L.Ed.2d 755 (2010).

The court of appeals concluded that the Appropriations Acts did not create a trust for the benefit of the loyal Mdewakanton nor did they vest title, legal or otherwise, in that group, notwithstanding the language and usage reflected in the land assignments and certain historical legal memoranda. *Wolfchild VI*, 559 F.3d at 1240–41, 1249. It concluded instead that "the Appropriations Acts are best interpreted as merely appropriating funds subject to a statutory use restriction." *Id.* at 1240. The court determined as well that the 1980 Act extinguished any trust that would have been created by the Appropriations Acts. *Id.* at 1259–60. The Federal Circuit remanded the case to this court to address one outstanding question: "whether it was lawful for the Interior Department, following the 1980 Act, to transfer to the three communities approximately $60,000 in funds that had been collected as proceeds from the sale, use, or leasing of certain of the 1886 lands, given that the 1980 Act was silent as to the disposition of those funds." *Id.* at 1259 n. 14.

On December 21, 2010, in *Wolfchild VII*, this court granted partial summary judgment to plaintiffs respecting entitlement to those funds derived from the 1886 lands and held in trust accounts prior to 1981 and 1982. 96 Fed.Cl. at 352. After rejecting both statute-of-limitations and jurisdictional challenges, the court concluded that the government acted without authority and in contravention of the Appropriations Acts when it distributed the funds to the three communities as op-

---

5. A detailed description of the historical genesis of the three communities and the role they played in the events of this case is provided in the court's immediately prior opinion. *See Wolfchild VII*, 96 Fed.Cl. at 318–19. In brief, the communities are organized as independent entities under the Indian Reorganization Act, Act of June 18, 1934, ch. 576, 48 Stat. 984 (also known as the Wheeler–Howard Act) (codified as amended at 25 U.S.C. §§ 461–79). *Id.* "Although [some] loyal Mdewakanton [and their descendants] resided in the three communities, the three communities were [not] and are not exclusively comprised of descendants of the loyal Mdewakanton, and many of the descendants of the 1886 Mdewakantons are not enrolled members of any of the three communities." *Wolfchild VII*,

96 Fed.Cl. at 319 (internal quotation marks omitted).

6. Plaintiffs number about 7,500 persons, and 41 separate groups totaling about 13,250 people were granted leave to intervene as plaintiffs. *See Wolfchild v. United States*, 77 Fed.Cl. 22, 31–35 (2007) ("*Wolfchild IV*").

7. The government's motion for reconsideration of this decision was denied in *Wolfchild v. United States*, 68 Fed.Cl. 779 (2005) ("*Wolfchild II*"). The court addressed procedural issues in *Wolfchild v. United States*, 72 Fed.Cl. 511 (2006) ("*Wolfchild III*"), and *Wolfchild IV*, 77 Fed.Cl. 22.

posed to the lineal descendants of the loyal Mdewakanton. *See id.* at 331–48. The court concluded that plaintiffs' entitlement did not extend, however, to funds traceable to the Wabasha Land Transfer. *See id.* at 346. This was so because the 1944 Act dictating the transfer of those lands "provided that the ... funds be paid to a broader set of beneficiaries and conferred upon the Secretary supplemental authority to distribute those funds, thus freeing the disbursement of the Wabasha funds from the statutory restrictions of the Appropriations Acts." *Id.*

The court determined as well that the 1980 Act did not terminate plaintiffs' entitlement to the funds accrued before that law took effect because "the 1980 legislation dealt only with the 1886 lands, and because such funds were collected and [were to be] disbursed pursuant to authority derived by the Secretary from the Appropriations Acts." *Wolfchild VII*, 96 Fed.Cl. at 349. However, because the 1980 Act created a trust for the three communities, with the 1886 lands constituting the trust corpus, the court concluded that after 1980, but not before, "the three communities, not the plaintiffs, would be entitled to any income derived from those lands because the communities have become the trust beneficiaries." *Id.* In sum, the court held that "as lineal descendants of the 1886 Mdewakanton, plaintiffs were entitled to the funds derived from leasing and licensing [of] the 1886 lands prior to the passage of the 1980 Act," excluding those funds traceable to the Wabasha Land Transfer. *Wolfchild VII*, 96 Fed.Cl. at 351.

In that same opinion, the court addressed motions to amend complaints filed by the Julia DuMarce Group and the Harley D. Zephier Group of plaintiff-intervenors. *Wolfchild VII*, 96 Fed.Cl. at 335–36. Those motions sought to add claims based upon the Act of February 16, 1863. The court granted leave to amend such that the parties could address "the salient threshold question ... [of] whether the first Act of 1863 can be read as giving rise to a money-mandating duty under controlling precedent," a question which, at that time, none of the parties had addressed. *Id.* at 336.

Following a status conference held January 21, 2011, the parties and the court identified the three remaining issues that were required to be resolved before the court could enter final judgment in this case. Those issues were: (1) the amount of money involved in the claim delineated in the *Wolfchild VII* opinion, (2) the persons who qualified as proper claimants in this case, and (3) the role, if any, of the 1863 Acts. *See* Scheduling Order, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. Jan. 21, 2011), ECF No. 843. On March 7, 2011, the parties stipulated that the funds to which plaintiffs are entitled pursuant to the court's opinion in *Wolfchild VII,* brought forward to January 1, 2011, are in the amount of $673,944.00. *See* Stipulation as to 1886 Funds, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. filed Apr. 1, 2011), ECF No. 1030. The latter two issues involving eligible claimants and the role of the 1863 Acts remain, however, a source of significant dispute in this case.

Plaintiffs and many plaintiff-intervenors have filed motions to amend their respective complaints to incorporate claims based upon both Acts of 1863 and claims grounded in the Indian Non–Intercourse Act, 25 U.S.C. § 177 ("Non–Intercourse Act"). Plaintiffs have also filed a motion for summary judgment on the issue of claimant eligibility as to the stipulated funds, in which motion plaintiff-intervenors have also joined. Attendant to the issue of claimant eligibility, plaintiffs and plaintiff-intervenors have submitted extensive materials relating to their respective genealogies.

The government opposes plaintiffs' and plaintiff-intervenors' proposed amendments, arguing that such amendments would be futile. Def.'s Mem. in Support of Its Motion to Dismiss ("Def.'s Mem.") at 21. The government additionally has filed a motion to dismiss or, in the alternative, a cross-motion for summary judgment, as well as a motion to defer consideration of eligibility under Rule 56(f) of the Rules of the Court of Federal Claims ("RCFC"), which rule has recently been revised to become Rule 56(d). Among other things, the government has requested that the court defer consideration of the facts submitted by plaintiffs concerning their re-

spective genealogies until the court resolves the outstanding issues of generic entitlement. A hearing was held on the pending motions on May 13, 2011.

After full briefing of the dispositive motions had been completed and the hearing was held, the government raised an entirely new and significant issue of law in a joint status report filed May 27, 2011. In that report, the government contended that the Indian Tribal Judgment Fund Use or Distribution Act, Pub.L. No. 93–134, § 1, 87 Stat. 466 (1973) (codified as amended at 25 U.S.C. §§ 1401–08) ("Indian Judgment Distribution Act"), applies to any distribution of funds that may occur as a result of a final judgment in this case. On June 3, 2011, the court requested that the parties file supplemental briefs addressing the potential applicability of the Indian Judgment Distribution Act to this case, and those briefs have been filed. The pending motions accordingly are ready for disposition.

## I. MOTIONS TO AMEND COMPLAINTS

### A. Applicable Criteria

[2, 3]  Under RCFC 15(a)(2), "[t]he court should freely give leave [to amend pleadings] when justice so requires." So long as "the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1403–04 (Fed.Cir.1989). Although a court ought to exercise liberally its discretion to grant leave to amend, " 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment,' may justify the denial of a motion for leave to amend." *Mitsui Foods*, 867 F.2d at 1403–04 (quoting *Foman*, 371 U.S. at 182, 83 S.Ct. 227); *see also Henry E. & Nancy Horton Bartels Trust ex rel. Cornell Univ. v. United States*, 88 Fed.Cl. 105, 111 (2009), *aff'd*, 617 F.3d 1357 (Fed.Cir.2010). Where one of

these adverse factors exists, denial of the request for leave to amend is appropriate. *See Te–Moak Bands of W. Shoshone Indians of Nev. v. United States*, 948 F.2d 1258, 1261 (Fed.Cir.1991) (affirming Claims Court's denial of motion to amend pleadings based on undue delay and failure to cure in an earlier-allowed amendment); *Mitsui Foods*, 867 F.2d at 1403–04 (Court of International Trade's denial of motion to amend justified upon "apparent futility"); *Rockwell Automation, Inc. v. United States*, 70 Fed.Cl. 114, 122–24 (2006) (denial of motion to amend pleadings due to decade-long delay and prior opportunities to seek amendment).

[4, 5]  Regarding futility, "[a] motion to amend may be deemed futile if a claim added by the amendment would not withstand a motion to dismiss." *Shoshone Indian Tribe of the Wind River Reservation, Wyo. v. United States*, 71 Fed.Cl. 172, 176 (2006) (citing *Slovacek v. United States*, 40 Fed.Cl. 828, 834 (1998)). In this regard, "[w]hen a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted, and it must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion." *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1354–55 (Fed.Cir.2006); *see also Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1333 (Fed.Cir.2000) ("[Plaintiff] has not made a colorable argument of possible success.... Futility was apparent, and is adequate grounds for the denial of leave to amend."); *Webster v. United States*, 74 Fed.Cl. 439, 444 (2006) (denying motion to amend where proposed claims were based upon statute that did not provide a predicate for jurisdiction).

[6–8]  At this juncture, the court must consider also the standard governing jurisdictional challenges, as those objections form the basis of the government's futility arguments. " 'Jurisdiction is a threshold issue and a court must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits.' " *Ultra–Precision Mfg. Ltd. v. Ford Motor Co.*, 338 F.3d 1353,

1356 (Fed.Cir.2003) (quoting *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1241 (Fed.Cir.2002)); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). When considering a jurisdictional dispute, the court draws all reasonable inferences in favor of the plaintiff and accepts as true the undisputed allegations in the complaint. *De Maio v. United States*, 93 Fed.Cl. 205, 209 (2010) (citing *Hamlet v. United States*, 873 F.2d 1414, 1415–16 (Fed.Cir.1989)). Nonetheless, a plaintiff will not defeat a jurisdictional challenge by "rely[ing] merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction." *Murphy v. United States*, 69 Fed. Cl. 593, 600 (2006).

[9, 10] Ultimately, it is the plaintiff who bears the burden of establishing by a preponderance of the evidence the court's subject matter jurisdiction over its claim. *See McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed.Cir.2010). "In establishing the predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony." *Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed.Cir.1993) (citing *Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exchange Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988)).

### B. *Amendments Based on the Indian Non–Intercourse Act*

[11, 12] The Indian Non–Intercourse Act provides, in relevant part:

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, *from any Indian nation or tribe of Indians*, shall be of any validity in law

or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177 (emphasis added).[8] The Non–Intercourse Act "bars conveyances by Indians to non-Indians unless made or ratified by Congress." *Seneca Nation of Indians v. New York*, 382 F.3d 245, 248 (2nd Cir.2004); *see also Catawba Indian Tribe of S. Car. v. United States*, 982 F.2d 1564, 1566 (Fed.Cir.1993) (Under the Non–Intercourse Act, "transfers of title to Native American lands [a]re prohibited unless [made] pursuant to a treaty approved by the United States."). Its purpose is to "prevent unfair, improvident, or improper disposition by Indians of lands owned or possessed by them to other parties, except the United States, without the consent of Congress and to enable the [g]overnment, acting as *parens patriae* for the Indians, to vacate any disposition of their lands made without its consent." *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960).

Plaintiffs contend that they have a viable claim under the Non–Intercourse Act on two grounds. First, plaintiffs aver that because Interior has "never fulfilled its obligations to set aside a land base for the friendly Sioux from the former Sioux reservation," it has contravened the Non–Intercourse Act. Pls.' Mot. for Summ. Judgment ("Pls.' Mot.") at 17. Plaintiffs' second claim under the Non–Intercourse Act is less succinctly stated and reflects historical facts upon which the parties do not agree.

The parties concur that in 1865 Reverend Samuel D. Hinman identified twelve sections of land in Minnesota to set aside for the friendly Sioux pursuant to the 1863 Acts. *See* Def.'s Mem. at 8; Pls.' Mot. at 9.[9] Plaintiffs contend those twelve sections of land were identified at the request of the Secretary and were set aside for the friendly Sioux, but no transfers, assignments, nor allotments to individual Sioux were made due to hostility

---

8. The current version of the Non–Intercourse Act was enacted as Section 12 of the Trade and Intercourse Act of 1834, ch. 161, 4 Stat. 730. *See Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 242 n. 9, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985).

9. Reverend Hinman was a protégé of Bishop Henry B. Whipple, a man who had lobbied for benefits for the friendly Sioux after the uprising. Pls.' Mot. at 9.

from white settlers in the area of those sections. Pls.' Mot. at 9; *see also* Pls.' Resp. at 1–2. Two years later, the twelve sections of land, along with all former Sioux reservation lands, were conveyed through public sale pursuant to a proclamation by President Andrew Johnson. Pls.' Mot. at 9. Plaintiffs aver that the twelve sections of land, once set aside, "remained their tribal, aboriginal lands." *Id.* at 23. They argue that the public sale of those twelve sections constituted a violation of the Non–Intercourse Act. *Id.* at 24.[10]

The government contends that although the Secretary approved Reverend Hinman's identification of the twelve sections as putative set asides for the loyal Sioux, those twelve sections were never actually set aside and no land grants under the 1863 Acts were ever made. Def.'s Mem. at 8.[11] It argues that the identification of land for future possible grants to the friendly Sioux is thus an insufficient basis for plaintiffs' claims because plaintiffs never obtained any vested interests in those lands. *Id.* at 51. The government responds as well that the Non–Intercourse Act does not apply to actions taken by the United States, that plaintiffs and plaintiff-intervenors are not a "tribe" within the meaning of the Act, that the twelve sections of land were not tribal lands, and that the Non–Intercourse Act is not a money-mandating statute upon which to base a claim in this court. Def.'s Mem. at 44–53. Additionally, the government asserts that any claims grounded in the 1863 Acts are barred by the statute of limitations. *Id.* at 35. The factual disputes over the twelve sections of land need not be resolved because plaintiffs' claim based upon the Non–Intercourse Act fails for other reasons.

[13, 14] In every case brought in federal court, the plaintiff must establish its standing to bring suit. *See Elk Grove Unified Sch.*

*Dist. v. Newdow*, 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). The Supreme Court's "standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–62 [112 S.Ct. 2130, 119 L.Ed.2d 351] (1992); and prudential standing, which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.' " *Elk Grove*, 542 U.S. at 11–12, 124 S.Ct. 2301 (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Prudential standing looks to whether "the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see also McKinney v. United States Dep't of Treasury*, 799 F.2d 1544, 1549–51 (Fed.Cir.1986). In other words, it asks "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *see also Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

[15] As made explicit by the text of the statute, a fundamental requisite to maintaining a claim based upon the Non–Intercourse Act is that the claimants constitute an Indian tribe (or nation). *See* 25 U.S.C. § 177 ("from any *Indian nation or tribe of Indians*") (emphasis added); *Seneca Nation*, 382 F.3d at 258 ("In order to establish a violation of the Non–Intercourse Act, [plaintiffs] are required to establish that: (1) *they are an Indian tribe* . . . .") (emphasis added); *Gold-*

---

10. In related vein, plaintiffs contend that the public sale of the lands breached the first Act of 1863 because that Act dictated that once the Secretary set aside the public lands for the friendly Sioux, the consent of the President was required to alienate or devise such land. Pls.' Mot. at 23. This argument fails under plaintiffs' own version of events because the sale of such land was premised upon a proclamation by President Johnson authorizing the sale of all former

Sioux reservation land, of which the twelve sections were a part.

11. The parties concur that sometime between 1868 and 1869, a further attempt to set aside land under the 1863 Acts was made but ultimately those lands were never set aside. Pls.' Mot. at 9–10; Def.'s Mem. 8–9.

*en Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 56 (2d Cir.1994) (same); *Mashpee Tribe v. Secretary of Interior,* 820 F.2d 480, 482 (1st Cir.1987) (same). Specifically, plaintiffs are required to demonstrate that they "represent entities that (1) were tribes at the time the land was alienated and (2) remain tribes at the time of suit." *Mashpee Tribe,* 820 F.2d at 482.

This element is required not only for substantive relief under the statute, but it is also a firmly-established requisite for standing to bring a claim under the Non–Intercourse Act. *See San Xavier Dev. Auth. v. Charles,* 237 F.3d 1149, 1152 (9th Cir.2001) ("Only Indian tribes may bring § 177 actions, and 'individual Indians do not even have standing to contest a transfer of tribal lands on the ground that the transfer violated that statute.'" (quoting *United States v. Dann,* 873 F.2d 1189, 1195 (9th Cir.1989))); *Epps v. Andrus,* 611 F.2d 915, 918 (1st Cir.1979) ("As the courts have stated repeatedly, claims on the part of individual Indians or their representative are not cognizable in federal courts under the Indian Trade and Non–Intercourse Act.... In short, since plaintiffs are not suing as a tribe, they do not have standing to bring this claim ...."). (citations omitted), *overruled on other grounds, James v. Watt,* 716 F.2d 71, 74 (1st Cir.1983); *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 581 (1st Cir.1979) ("Plaintiff must prove that it meets the definition of 'tribe of Indians' as that phrase is used in the Non[-I]ntercourse Act both in order to establish any right to recovery and to establish standing to bring this suit."); *Nahno–Lopez v. Houser,* 627 F.Supp.2d 1269, 1277 (W.D.Okla.2009) ("Only tribes have standing to bring claims under [the Non–Intercourse Act]; individual Indians do not have standing under this Act."), *aff'd,* 625 F.3d 1279 (10th Cir.2010); *State of N.J. v. City of Wildwood,* 22 F.Supp.2d 395, 404 (D.N.J.1998) ("Only the Tribe has standing to vindicate its rights under the Non–Intercourse Act...."); *Canadian St. Regis Band of Mohawk Indians v. State of N.Y.,* 573 F.Supp. 1530, 1534–37 (N.D.N.Y.1983) (discussing in detail tribal status as an element of standing under the Non–Intercourse Act).

[16] Just as Article III standing is a "threshold jurisdictional issue," *Southern Calif. Fed. Sav. & Loan Ass'n v. United States,* 422 F.3d 1319, 1328 (Fed.Cir.2005), the "prudential standing doctrine[] represents the sort of 'threshold question' ... [that] may be resolved before addressing jurisdiction." *Tenet v. Doe,* 544 U.S. 1, 6 n. 4, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005); *see also Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 584–85, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) ("While *Steele* [*Steel*] *Co.* reasoned that subject matter jurisdiction necessarily precedes a ruling on the merits, the same principle does not dictate a sequencing of jurisdictional issues.... It is hardly novel for a federal court to choose among threshold grounds for denying relief to a case on the merits."); *Warth,* 422 U.S. at 517–18, 95 S.Ct. 2197 ("The rules of standing, whether as aspects of the Art[icle] III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of courts, are *threshold determinants of the propriety of judicial intervention.*") (emphasis added); *The Wilderness Soc. v. Kane Cnty., Utah,* 632 F.3d 1162, 1168 (10th Cir.2011) (en banc) ("Because [plaintiff] lacks prudential standing, we proceed directly to that issue without deciding whether [plaintiff] has constitutional standing or whether the case is moot.").

This case has proceeded for the past eight years on the foundational finding by this court that plaintiffs are not a tribe but that they could bring a suit under the Indian Tucker Act because they are an identifiable group of American Indians residing with the territorial limits of the United States. In its first opinion in this case, the court stated unequivocally: "The lineal descendants are unable to sue as a tribe because they necessarily had to sever their tribal relations prior to 1886 to qualify as beneficiaries of the 1888, 1889, and 1890 Acts, but they were and still remain an identifiable group of American Indians." *Wolfchild I,* 62 Fed.Cl. at 540; *see also Wolfchild VII,* 96 Fed.Cl. at 338 ("The loyal Mdewakanton are an 'identifiable group of American Indians' within the meaning of the [Indian Tucker] Act."). Indeed, in their most recent filing, plaintiffs go even further and avow that "the [c]ourt's forthcoming final

judgment will be *in favor of individuals—not in favor of a group.*" Pls.' Supplemental Br. at 2 (emphasis added).

Notwithstanding the long-established conclusions of this court and plaintiffs' own representations, plaintiffs contend that the Appropriations Acts' identification of loyal Mdewakanton as statutory beneficiaries recognized that group as a "tribe." Pls.' Mot. at 25. They further represent that the loyal Mdewakanton are "a federally[-]recognized group of Indians as a result of the 1886 enrollment and supplement." Pls.' Resp. and Reply at 14. Plaintiffs assert additionally that "the 'friendly Sioux' identified in the 1863 Acts were ... a 'tribe' for the purposes of the Non[-]Intercourse Act," and that because plaintiffs are the beneficiaries of the Appropriations Acts, plaintiffs are the successors in interest to any claims the friendly Sioux would have under the Non-Intercourse Act. Pls.' Mot. at 21, 27–28.

The Non-Intercourse Act does not provide a definition of the term "tribe." In *United States v. Candelaria*, 271 U.S. 432, 442, 46 S.Ct. 561, 70 L.Ed. 1023 (1926), however, the Supreme Court interpreted "tribe" for purposes of the Non-Intercourse Act as being "'a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular, though sometimes ill-defined, territory.'" (quoting *Montoya v. United States*, 180 U.S. 261, 266, 21 S.Ct. 358, 45 L.Ed. 521 (1901)) (the "*Montoya/Candelaria* definition"); *see also Golden Hill*, 39 F.3d at 59 (adopting and applying the *Montoya/Candelaria* definition);[12] *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 377 n. 8 (1st Cir.1975) (same); *Narragansett Tribe of Indians v. Southern R.I. Land Dev. Corp.*, 418 F.Supp. 798, 807 n. 8 (D.R.I.1976) (same). Although a group of Indians may constitute a "tribe" for the purposes of the Non-Intercourse Act without being a tribe formally recognized by the federal government, *Golden Hill*, 39 F.3d at 59, courts have looked as well to the BIA regulations governing federal recognition for fur-

ther guidance on the meaning of "tribe" within the Non-Intercourse Act. *See id.* (noting that BIA regulations require that: "(a) they have been identified since 1900 as 'American Indian' or 'aboriginal' on a substantially continuous basis, (b) a predominant portion of their group comprises a distinct community and has existed as such from historical times to the present, and, (c) they have maintained tribal political influence or authority over its members as an autonomous entity throughout history until the present"). Importantly, "[t]he *Montoya/Candelaria* definition and the BIA criteria both have anthropological, political, geographical and cultural bases and *require, at a minimum, a community with a political structure.*" *Id.* (emphasis added).

[17] There has been no evidence put forth that plaintiffs are a tribe within the meaning of this definition. The sole documents upon which plaintiffs rely to establish their status are the birth certificates which have been submitted in support of plaintiffs' eligibility as claimants under the Appropriations Acts. *See* Pls.' Resp. and Reply at 16 ("Plaintiffs' birth certificates collected by anthropologist Dr. Barbara Buttes[ ] indicate anthropological, political, [and] geographical ... ties."). While those birth certificates demonstrate, as an incidental matter, that individual loyal Mdewakanton and their descendants share anthropological or geographical connections through familial unions, they are insufficient to show that plaintiffs constituted in the past or constitute now a united community, existing and living under one leadership or government and inhabiting a particular territory. Indeed, plaintiffs do not even allege those pertinent facts to be true; their claim is based upon severance, not continuation, of tribal ties.

Reference to a case in which a group of non-federally-recognized Indians was deemed a "tribe" in accord with the *Montoya/Candelaria* definition is instructive. In *New York v. Shinnecock Indian Nation*, 400 F.Supp.2d 486 (E.D.N.Y.2005), New York sued to enjoin

---

12. Notably, in *Golden Hill*, the Second Circuit remanded the matter to the district court on the basis of the primary jurisdiction doctrine, concluding that a stay of plaintiff's action was appropriate to allow the Department of the Interior to rule on plaintiff's pending petition for tribal recognition. 39 F.3d at 58–61.

the construction and operation of a gaming casino by the Shinnecock. In determining whether the Shinnecock constituted a "tribe" and were thus entitled to invoke its sovereign immunity against such suit, the court employed the *Montoya/Candelaria* definition and concluded that the Shinnecock were a tribe. The court's determination was based upon, among other things, that: (1) the Shinnecock had been recognized as a tribe by New York for more than 200 years; (2) the tribe had offices and was located on a reservation, (3) tribal officials were the plaintiffs and were suing in their official capacity, and (4) the tribe had selected or elected tribal leaders in every year from 1792 through 2004. *Id.* at 487–90.[13]

Plaintiffs' reliance on the formation of the Minnesota Mdewakanton Dakota Oyate ("Mdewakanton Oyate") is unavailing. Plaintiffs established the Mdewakanton Oyate on March 26, 2004, subsequent to the initiation of this lawsuit. Pls.' Mot. and Br. Regarding Notice to Lineal Descendants at 8, *Wolfchild v. United States*, No. 03–2684 (Fed.Cl. filed March 21, 2005). That association was formed as "a Minnesota non-profit corporation … for the purpose of organizing the trust beneficiaries for business purposes." *Id.* At a minimum, existence of the Mdewakanton Oyate fails to satisfy the requirement under the Non–Intercourse Act that plaintiffs constitute a tribe at the time of the allegedly unlawful sale of land and at the time of the initiation of suit. *See Mashpee Tribe*, 820 F.2d at 482; *see also Abraxis*

*Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed.Cir.2010) ("A court may exercise jurisdiction only if a plaintiff has standing to sue *on the date it files suit.*" (citing *Keene Corp. v. United States*, 508 U.S. 200, 207, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993); *Minneapolis & St. Louis R.R. v. Peoria & Perkin Union Ry. Co.*, 270 U.S. 580, 586, 46 S.Ct. 402, 70 L.Ed. 743 (1926))). What is more, the Mdewakanton Oyate has never been and is not now a plaintiff in this lawsuit. *See* Wolfchild Pls.' Objections & Admissions to United States' Proposed Findings of Uncontroverted Fact at 2, *Wolfchild v. United States*, No. 03–2684 (Fed.Cl. filed May 4, 2011), ECF No. 1047.

In sum, the court concludes that plaintiffs are not a "tribe" within the meaning of the Non–Intercourse Act. Plaintiffs thus lack standing to bring a suit grounded in that Act.[14]

C. *Amendments Based upon the 1863 Acts*

Plaintiffs seek to amend their complaints to allege that plaintiffs are statutorily entitled to the benefits of the 1863 Acts, and that the 1863 Acts created a "fiduciary (trust) relationship" between the government and plaintiffs under which the government was required "to provide land to the group of 'friendly Sioux' as statutory beneficiaries." Pls.' Proposed Seventh Am. Compl. ¶¶ 117, 119. This proposed amendment would echo the amendments previously made to the complaints of the Julia DuMarce and Harley Zephier groups of intervening plaintiffs. *See Wolfchild VII*, 96 Fed.Cl. at 335–36. Other

---

13. In support of their contentions, plaintiffs cite to *Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 388 F.Supp. 649 (D.Me.1975), *aff'd*, 528 F.2d 370, and *Narragansett Tribe*, 418 F.Supp. 798, in which, according to plaintiffs, the court recognized as a "tribe" under the Non–Intercourse Act similarly placed "landless Indian groups [that had] enrolled people into their purported tribe via genealogical qualification per birth certificates and similar documents." Pls.' Mot. at 27. Yet, those cases did nothing of the sort. In *Passamaquoddy*, "it [wa]s stipulated that the Passamaquoddies are a 'tribe of Indians,' " 388 F.Supp. at 656, and in *Narragansett Tribe*, that issue was explicitly reserved for trial, 418 F.Supp. at 807 n. 8, 808. And far from being "landless Indian groups" that were then enrolling members via birth certificates, the named plaintiff in *Passamaquoddy* was "the official governing body of the Passamaquoddy Tribe,

a tribe of Indians residing on two reservations in the State of Maine … [that] since at least 1776 … have constituted and continue to constitute a tribe of Indians in the racial and cultural sense." 388 F.Supp. at 651–52.

14. Plaintiffs' argument that the "friendly Sioux" identified in the 1863 Acts were a "tribe" and that plaintiffs have inherited those claims, Pls.' Mot. at 21, 22–28, is equally unavailing. No evidence before the court shows that the "friendly Sioux" constituted either in 1863 or now a distinct "tribe," and Congress' reference in the 1863 Acts to "each *individual* of the [four Bands of Sioux Indians] who exerted himself in rescuing the whites," *see, e.g.*, Act of Feb. 16, 1863, ch. 37, § 9, 12 Stat. at 654, demonstrates that Congress recognized in the 1863 Acts *individual Sioux Indians*—not a separate tribal entity.

groups of intervening plaintiffs now join plaintiffs in moving for comparable amendments. *See, e.g.,* Taylor Group's Proposed Third Am. Compl. ¶¶ 117–138, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. filed March 21, 2011), ECF No. 947. The government contends that plaintiffs' requests must be denied because the 1863 Acts are not money-mandating statutes upon which jurisdiction in this court can be founded nor do they impose fiduciary duties on the government. *See* Def.'s Mem. at 24–28. The government argues also that any such claims are barred by the statute of limitations. *Id.* at 35–39.

### 1. *Money-mandating duty.*

[18] It is axiomatic that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued ..., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) ("*Mitchell I*"). Congress has consented to suit by way of the Indian Tucker Act, 28 U.S.C. § 1505, which provides:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band, or group.

[19–22] The Indian Tucker Act provides a jurisdictional platform for suit but does not itself "create[ ] a substantive right enforceable against the [g]overnment by a claim for money damages." *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003). As with the Tucker Act, a plaintiff grounding its claim in the Indian Tucker Act must demonstrate that some other source of law creates a money-mandating right or duty that falls

within the ambit of the waiver of sovereign immunity. *See United States v. Navajo Nation,* 556 U.S. 287, 288-90, 129 S.Ct. 1547, 1551–52, 173 L.Ed.2d 429 (2009) ("*Navajo II*"); *see also Fisher v. United States,* 402 F.3d 1167, 1172 (Fed.Cir.2005) (en banc). Where plaintiff alleges that a statute provides such a right or duty, "the statute [must] be 'fairly interpreted' or 'reasonably amen[ ]able' to the interpretation that it 'mandates a right of recovery in damages.'" *Adair v. United States,* 497 F.3d 1244, 1250 (Fed.Cir.2007) (quoting *White Mountain Apache,* 537 U.S. at 472–73, 123 S.Ct. 1126). If the court determines that the statute upon which plaintiff relies does not impose upon the government a duty which gives rise to a claim for money damages, then the court lacks subject matter jurisdiction over the claim. *Adair,* 497 F.3d at 1251 (citing *Fisher,* 402 F.3d at 1173); *see also Greenlee Cnty., Ariz. v. United States,* 487 F.3d 871, 876 (Fed.Cir.2007); *Perri v. United States,* 340 F.3d 1337, 1340–41 (Fed.Cir.2003).

To determine whether the two Acts of 1863 provide the money-mandating duty needed to invoke this court's jurisdiction, the court must look first to the text of the Acts. *See Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999); *see also Sursely v. Peake,* 551 F.3d 1351, 1355 (Fed.Cir.2009). "[W]here the statutory text leaves the government no discretion over payment of claimed funds," Congress has provided a money-mandating source of law for jurisdiction in this court. *Samish Indian Nation v. United States,* 419 F.3d 1355, 1364 (Fed.Cir.2005). Where, however, the statute "gives the government complete discretion over the decision whether or not to pay an individual or group," the statute is not money-mandating. *Doe v. United States,* 463 F.3d 1314, 1324 (Fed.Cir.2006); *see also Hopi Tribe v. United States,* 55 Fed.Cl. 81, 86–87 (2002); *Lewis v. United States,* 32 Fed.Cl. 59, 63 (1994). In this regard, a distinction lies between those statutes which employ mandatory language such as "shall" and those that use permissive language such as "may" or similar terms. *Compare Greenlee Cnty.,* 487 F.3d at 877 (Payment in Lieu of Taxes Act, 31 U.S.C. §§ 6901–07, was money-mandating where

pertinent provision stated that Secretary of Interior "shall make a payment" to the local government), *and Agwiak v. United States*, 347 F.3d 1375, 1380 (Fed.Cir.2003) (5 U.S.C. § 5942(a) was money-mandating where it provided that employees were "entitled" to certain pay and such funds "shall be paid under regulations prescribed by the President"), *with Perri*, 340 F.3d at 1341 (Fed.Cir. 2003) (28 U.S.C. § 542 was "money-authorizing statute, not a money-mandating one," where statute established the Department of Justice Assets Forfeiture Fund and provided that funds for the payment of certain awards "shall be available to the Attorney General"); *and Hopi Tribe*, 55 Fed.Cl. at 87–92 (25 U.S.C. § 640d–7(e) was not money-mandating where the pertinent provision stated "[t]he Secretary of Interior is authorized" to pay the legal fees of certain tribes). ·

[23]   The first Act of 1863 provided that the Secretary was "authorized" to set apart eighty acres of land to any friendly Sioux. Act of Feb. 16, 1863, § 9, 12 Stat. at 654. The statutory sentence which follows governs the disposition of such lands once they are set apart for an individual Indian. *Id.* Similarly, the relevant language of the second Act of 1863 stated that "[i]t shall be lawful for the Secretary" to assign to the individual friendly Sioux eighty acres of land. Act of March 3, 1963 § 4, 12 Stat. at 819. The plain language of the Acts reveals that the legislation only permits—not mandates—the Secretary to provide the lands to individual qualified Sioux. Merely "authorizing" or, in even more discretionary terms, making it "lawful" for the Secretary to commit certain lands to friendly Sioux is identical to or even more permissive in character than the legislation at issue in *Perri* and *Hopi Tribe*. Plaintiffs contend, however, that even if the statutory text is facially discretionary, that presumption is rebutted by the legislative history and the structure of the Acts. *See* Pls.' Mot. at 35–36; Pls.' Resp. and Reply at 22–25, 28.

[24]   The Federal Circuit has indeed acknowledged that "[c]ertain discretionary [statutory] schemes also support claims within the Court of Federal Claims' jurisdiction." *Samish*, 419 F.3d at 1364. While discretionary terms may trigger the presumption that

the statute is not money-mandating, that presumption can be overcome by " 'the intent of Congress and other inferences that [the court] may rationally draw from the structure and purpose of the statute at hand.' " *Doe*, 463 F.3d at 1324 (quoting *McBryde v. United States*, 299 F.3d 1357, 1362 (Fed.Cir. 2002)); *see also Doe v. United States*, 100 F.3d 1576, 1579–82 (Fed.Cir.1996). In this regard, the Federal Circuit has stated: "[A] statute is not wholly discretionary, even if it uses the word 'may' when an analysis of congressional intent or the structure and purpose of the statute reveal one of the following: (1) the statute has 'clear standards for paying' money to recipients, (2) the statute specifies 'precise amounts' to be paid, or (3) the statute compels payment once certain conditions precedent are met." *Doe*, 463 F.3d at 1324 (citing *Samish*, 419 F.3d at 1364–65).

Plaintiffs contend that the language of the 1863 Acts meets these requirements because the 1863 Acts specifically delineate the class of persons to whom the Secretary could grant the land, specify the precise amount of land (eighty acres), and require the Secretary to make that acreage available for each individual Indian who met the criterion of having exerted themselves to save the settlers during the revolt. Pls.' Resp. and Reply at 25. Plaintiffs' proffered analysis nonetheless fails to address the circumstance that the plain terms of the 1863 Acts do not "compel[ ] payment once certain conditions are met." *Doe*, 463 F.3d at 1324. The strongly discretionary language of the Acts constitutes an impediment to plaintiffs' claims.

Plaintiffs argue also that the legislative history espouses a mandatory intent contrary to the discretionary language of the statute. Pls.' Resp. and Reply at 28. In this vein, plaintiffs point to two statements made by Senators prior to the passage of the first Act of 1863. The first statement, by Senator Fessenden, provides:

I have referred to the last section of the bill simply to show in what way the committee [of Indian Affairs] propose[s] to take care of these friendly Indians. They propose to direct the Secretary of the Inte-

rior to set apart for each of them one hundred and sixty acres of the public land....

Cong. Globe, 37th Cong., 3d Sess. 511 (1863). The second statement, by Senator Harlan, reads:

I think the provision is well enough as it is. I think we should reward Indians, who, under the circumstances that surrounded this case, exerted themselves to protect white inhabitants. This was the opinion of the committee. This was the opinion of the committee—or of several members of the committee, I know—that they ought to be rewarded, ought to be distinguished from other Indians.... [15]

Cong. Globe, 37th Cong., 3d Sess. 514 (1863); see Pls.' Mot. at 28.

The first sentence of Senator Fessenden's statement establishes that the purpose of the pertinent section of the first Act of 1863 was indeed to care for the friendly Sioux but does not speak to the force of the direction to the Secretary of the Interior. His further observation that the relevant section "propose[s] to direct the Secretary" could touch on that issue, but it does not explicitly do so, and even if it did, one remark by one Senator is inadequate to overcome the unambiguous, plainly discretionary terms ultimately passed by the entire Congress. Senator Harlan's statement is even more equivocal, illuminating only his personal opinion that the Indians "ought to be rewarded" (emphasis added), but providing no evidence that Congress believed it was enacting a mandate rather than an authorization and direction to the Secretary to provide for the friendly Sioux. In this vein, the legislative history merely repeats the discretionary language of the statute. See New England Tank Indus. of N.H. v. United States, 861 F.2d 685, 694 (Fed.Cir. 1988) ("Will" and "will not" are "mandatory terms" as contrasted to "directory terms" such as "should."); Cybertech Grp., Inc. v. United States, 48 Fed.Cl. 638, 649 (2001) ("[I]n everyday discourse, 'shall' is used to denote an affirmative command or obligation

whereas 'should,' by contrast, is used to denote a request or suggestion.").

In short, there is nothing within the legislative history or the structure of the statutes that demonstrates a congressional intent clearly and expressly contrary to the patently discretionary terms ultimately adopted in the text of the Acts. The court thus concludes that the 1863 Acts cannot be read as imposing a specific money-mandating duty upon the government.

### 2. Fiduciary duty.

Apart from plaintiffs' contention that the 1863 Acts impose upon the Secretary a money-mandating duty to provide eighty acres of land to plaintiffs, plaintiffs argue also that a "trust relationship [was] created under the ... 1863 Acts ... [which] continues to this day." Pls.' Mot. at 18. The government responds that "[t]he United States has no [f]iduciary [d]uty to [p]laintiffs because the 1863 Acts did not create a [t]rust." Def.'s Mem. at 28.

[25, 26] A statute, or confluence of statutes and regulations, can create a "fiduciary duty [on the part of the government which] can also give rise to a claim for damages within the Tucker Act or Indian Tucker Act." Samish, 419 F.3d at 1367 (citing White Mountain Apache, 537 U.S. at 473–74, 123 S.Ct. 1126; United States v. Mitchell, 463 U.S. 206, 224–26, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("Mitchell II")). Recently, in United States v. Jicarilla Apache Nation, the Supreme Court explained further that "[i]n some cases, Congress establishe[s] only a limited trust relationship to serve a narrow purpose." — U.S. —, —, 131 S.Ct. 2313, 2324–25, 180 L.Ed.2d 187 (2011) (citing Mitchell I, 445 U.S. at 544, 100 S.Ct. 1349; United States v. Navajo Nation, 537 U.S. 488, 507–08, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003) ("Navajo I")). In other circumstances, Congress can establish full fiduciary obligations on the part of the government. Jicarilla Apache, 131 S.Ct. at 2325 (citing Mitchell II, 463 U.S. at 226, 103 S.Ct. 2961; White Mountain Apache, 537 U.S. at 475,

---

15.  Senator Harlan's statement was made in response to another Senator's suggestion that the acreage of the potential land grants be reduced

from one hundred sixty acres, as provided in the bill then under consideration, to forty acres. Cong. Globe, 37th Cong., 3d Sess. 513–14 (1863).

123 S.Ct. 1126). Full fiduciary obligations, however, are applicable only "*[i]f* a plaintiff identifies ... a [specific rights-creating or duty-imposing statutory or regulatory prescription], and *if* that prescription bears the hallmarks of a 'conventional fiduciary relationship.'" *Navajo II*, 129 S.Ct. at 1558 (internal quotation omitted).[16]

Thus, in *Mitchell II*, a fiduciary relationship was found where the Secretary held a "pervasive role in the sales of timber from Indian lands ... [since] 1910," and numerous, detailed pieces of legislation had been passed and extensive regulations promulgated that governed the Secretary's duty to manage and protect the timber lands and imposed upon the Secretary "full responsibility to manage Indian resources and land for the benefit of the Indians." 463 U.S. at 219–24, 103 S.Ct. 2961. Similarly, in *White Mountain Apache*, the Secretary was required by law to hold the plaintiffs' property "in trust" and the government "ha[d] not merely exercised daily supervision but ha[d] enjoyed daily occupation, and so ha[d] obtained control at least as plenary as its authority over the timber in *Mitchell II*." 537 U.S. at 475, 123 S.Ct. 1126.

[27]   In this case, plaintiffs aver that two entirely discretionary statutes—which were never implemented—established a trust relationship between plaintiffs and the government. Far from the type of specific duty-imposing prescriptions and ongoing fiduciary relations present in *Mitchell II* and *White Mountain Apache*, the 1863 Acts are directory propositions to the Secretary which did not and do not impose upon the Secretary any specific fiduciary obligations that would create a trust relationship between the friendly Sioux and the government.

In sum, the court finds that the 1863 Acts do not establish a trust relationship or impose fiduciary duties upon the government.[17]

### D.   *Amendment Based upon an Alleged Taking*

The Robertson–Vadnais Group of plaintiff-intervenors seeks leave to amend its complaint to allege a taking in contravention of the Fifth Amendment. First, they contend that "the United States effected a 5th Amendment 'taking' by failing to provide 'eighty acres in severalty to each individual [Mdewakanton] ... who exerted himself in rescuing the whites' from the 1862 [u]prising" pursuant to the first Act of 1863. Robertson–Vadnais Seventh Amend. Compl. ¶ 225 (ECF No. 929). Second, they allege that the United States effected a taking of their property interest in the twelve sections of land identified in 1865 through the public sale of that land in 1867. Robertson–Vadnais Mem. in Support of Partial Summ. J. ("Robertson–Vadnais Mem.") at 33 (ECF No. 1001). The government responds that any such alleged takings claims "first accrued more than six years before [plaintiff-intervenors] filed their complaint and the claim is thus [time-]barred." Def.'s Mem. at 54. Additionally, the government avers that the plaintiff-intervenors do not "possess [a] compensable property interest arising from the February 1863 Act," and that the government's failure to provide land cannot form the basis of a legally cognizable takings claim. *Id.* at 58.

[28]   Fifth Amendment takings claims are within the jurisdiction of this court under the Tucker Act, 28 U.S.C. § 1491, *Boling v. United States*, 220 F.3d 1365, 1370 (Fed.Cir. 2000), and thus also under the Indian Tucker Act. However, suits against the United States brought in this court under these Acts

---

16.   In *Navajo II*, the Court explained in more detail the requisites a plaintiff must satisfy to establish jurisdiction under the Indian Tucker Act. First, the plaintiff "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the [g]overnment has failed faithfully to perform those duties." 129 S.Ct. at 1552 (internal quotation marks and citation omitted). If the plaintiff overcomes that first hurdle, "the court must then determine whether the relevant source of substantive law can fairly be interpreted as mandat-

ing compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s]." *Id.* (internal quotation marks and citation omitted).

17.   For these reasons, the court finds unpersuasive the DuMarce Group of plaintiff-intervenors' contention that the 1863 Acts serve as enabling acts which create a trust relationship in conjunction with the Appropriations Acts. DuMarce Fourth Amend. Compl. ¶ 42 (ECF No. 930).

must be filed within six years after accrual of the cause of action. 28 U.S.C. § 2501. Because this statute of limitations circumscribes the scope of the government's waiver of sovereign immunity, it is "jurisdictional" in nature. *See John R. Sand & Gravel Co. v. United States,* 552 U.S. 130, 133–34, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008); *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1576–77 (Fed.Cir.1988). Accordingly, the limitations period is not subject to equitable tolling or implied exceptions. *See John R. Sand,* 552 U.S. at 133–34, 128 S.Ct. 750. Plaintiff-intervenors must meet this jurisdictional burden by demonstrating by a preponderance of the evidence that their claim was timely filed. *See Taylor v. United States,* 303 F.3d 1357, 1359 (Fed.Cir.2002).

[29–32] "A claim accrues 'when all the events have occurred which fix the liability of the [g]overnment and entitle the claimant to institute an action.'" *Goodrich v. United States,* 434 F.3d 1329, 1333 (Fed.Cir.2006) (quoting *Hopland Band,* 855 F.2d at 1577). In the context of the Fifth Amendment, "the key date for accrual purposes is the date on which the plaintiff's land has been clearly and permanently taken." *Boling,* 220 F.3d at 1370; *Goodrich,* 434 F.3d at 1333 (A Fifth Amendment claim accrues "'when th[e] taking action occurs.'" (quoting *Alliance of Descendants of Tex. Land Grants v. United States,* 37 F.3d 1478, 1481 (Fed.Cir.1994))). In this regard, the "proper focus, for statute of limitations purposes, 'is upon the time of the [government's] acts, not upon the time at which the consequences of the acts became most painful.'" *Fallini v. United States,* 56 F.3d 1378, 1383 (Fed.Cir.1995) (quoting *Delaware State Coll. v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). However, "the claim only accrues if the claimant 'knew or should have known' that the claim existed." *Goodrich,* 434 F.3d at 1333 (quoting *Kinsey v. United States,* 852 F.2d 556, 557 n. * (Fed.Cir.1988)).

[33] Plaintiff-intervenors' contention based upon the government's failure to provide land matured in 1867—the year in which plaintiff-intervenors contend the United States began to fail to provide lands under the Act. Robertson–Vadnais Mem. at 34 ("The United States, *since the 1867 original taking,* continues to hold the Mdewakanton 'inheritable beneficial interest,' constituting a continuing taking, by withholding Plaintiff[-Intervenors'] cognizable property interests under the February 1863 Act without just cause of reason.") (emphasis added).

Likewise, plaintiff-intervenors' second takings claim, based upon the twelve sections of land, accrued in 1867. It was in that year that the land was authorized to be publicly sold by President Johnson's proclamation. *See, e.g., Alliance of Descendants,* 37 F.3d at 1482 (takings claim, which alleged taking of a cause of action for land, accrued with passage of treaty releasing United States from all claims regarding such land). At the very latest, the takings claim would have accrued upon the government's actual sale of the land and issuance of land patents to the buyers of the twelve sections of land. *See Voisin v. United States,* 80 Fed.Cl. 164, 170–71 (2008) (government's issuance of land patents for plaintiffs' land and subsequent sale of land pursuant to legislation marked date of accrual of takings claim). Plaintiffs have provided evidence that those sales took place between 1871 and 1895. *See* Pls.' Mem. at 9 n. 31 (citing Pls.' App. 287–330 (Redwood and Renville City Land Patents, 1871–95)).

Thus, in 1867, or, construed most generously, by 1895, plaintiff-intervenors' alleged property interests in a land expectancy under the 1863 Acts had been taken. *See Fallini,* 56 F.3d at 1380 ("The question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue."). Accordingly, the filing of the complaint in this case on November 18, 2003, falls far outside of the six-year statute of limitations.

Nevertheless, plaintiff-intervenors "join in the Wolfchild [p]laintiffs' . . . arguments in support of their claim that the . . . statute of limitations . . . is inapplicable." Robertson–Vadnais Mem. at 37.[18] Plaintiffs' statute-of-

---

18. Plaintiff-intervenors state also that the takings

claim is not untimely under 28 U.S.C. § 2415

limitations arguments rely on: (1) the continuing claims doctrine; (2) the Indian Trust Accounting Statute, Pub.L. No. 108–108, 117 Stat. 1241, 1263 (2003); and (3) the provision of 28 U.S.C. § 2501 allowing for the tolling of the limitations period for persons under legal disability. Pls.' Mem. at 36–39.

[34, 35] The continuing claims doctrine applies "where a plaintiff's claim is 'inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages.'" *Tamerlane, Ltd. v. United States,* 550 F.3d 1135, 1145 (Fed.Cir.2008) (quoting *Brown Park Estates–Fairfield Dev. Co. v. United States,* 127 F.3d 1449, 1456 (Fed.Cir. 1997)). The doctrine does not apply, however, where "a single governmental action causes a series of deleterious effects, even though those effects may extend long after the initial governmental breach." *Boling,* 220 F.3d at 1373.

[36] Plaintiff-intervenors' takings claims do not fall within the ambit of the continuing claims doctrine. The purported takings were accomplished by governmental action—and, in plaintiff-intervenors' view, inaction—during the Nineteenth Century. Those alleged takings do not renew or replicate each day or with each physical incursion upon the twelve sections of land. *See, e.g., Boling,* 220 F.3d at 1373–74 (taking accrued on date erosion from waterway substantially encroached on plaintiffs' property and claims did not renew with each quantum of erosion damage to plaintiffs' property); *Fallini,* 56 F.3d at 1382–83 (taking via legislation that prevented plaintiffs from disallowing wild horses and burros to drink plaintiffs' water did not renew with "every drink by every wild horse"); *Voisin,* 80 Fed.Cl. at 172, 176–77 (refusing to apply continuing claims doctrine, in similar circumstances, where plaintiffs alleged that the United States' "continued and repeated refusal to recognize [plaintiffs] as the rightful owners of [the disputed parcel] should be considered a continuing wrong").

because "[p]laintiff-intervenors] did not receive any notice or opportunity to be heard pursuant to th[at] statute." Robertson-Vadnais Mem. at 37. Section 2415 provides the statute of limita-

[37] Nor does the Indian Trust Accounting Statute assist plaintiff-intervenors. The version of that statute in place at the time of the filing of plaintiffs' initial complaint provided:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

117 Stat. at 1263. In *Shoshone Indian Tribe of the Wind River Reservation v. United States,* 364 F.3d 1339, 1348–50 (Fed.Cir. 2004), the Federal Circuit emphasized that the Indian Trust Accounting Statute applies only to trust funds and does not toll claims for breach of fiduciary duties regarding trust assets. *See also Rosales v. United States,* 89 Fed.Cl. 565, 580 (2009) (Indian Trust Accounting Statute did not apply to claims of breach of fiduciary duty where plaintiffs claimed they were rightful beneficial owners of parcels of land held in trust by government for Indian tribe); *Simmons v. United States,* 71 Fed.Cl. 188, 193 (2006) (Indian Trust Accounting Statute did not apply to a claim for breach of fiduciary duty for government mismanagement of timber assets). Plaintiff-intervenors' reliance on the Indian Trust Accounting Statute is thus unavailing. Their claims center on parcels of land—not on trust *funds*—and the court has already found that the 1863 Acts did not create a trust relationship or impose upon the government fiduciary duties; thus, there is nothing held in trust under the 1863 Acts to which the Indian Trust Accounting Statute could apply.

[38] Plaintiff-intervenors' final contention, that the claims should be tolled for minors, is dealt with much in the same way it was first rejected by this court in *Wolfchild I.* As the court noted, the pertinent statute of

tions for actions for money damages brought by the United States and has no bearing on this case.

limitations, 28 U.S.C. § 2501, "treats children as if they were legally unable to file suit and allows filing within three years after a child reaches majority status." 62 Fed.Cl. at 549. Eighteen years is the age of majority in Minnesota. *See* Minn.Stat. § 645.451. The alleged takings in this case accrued in the Nineteenth Century. The minors' takings claims are thus time-barred as well.

### E. *Synopsis*

In sum, the court concludes that plaintiffs lack standing to bring a claim based upon the Non–Intercourse Act because they are not a "tribe" within the meaning of the Act. Plaintiffs also lack any claim grounded in the 1863 Acts because those Acts do not impose a money-mandating duty upon the government nor do they create specific fiduciary obligations giving rise to a trust relationship between plaintiffs and the government. The Robertson–Vadnais Group of plaintiff-intervenors' takings claim fails because it falls outside this court's statute of limitations.

These defects of the proposed amendments are jurisdictional in nature; the particular claims at issue would not withstand a motion to dismiss. Accordingly, plaintiffs and plaintiff-intervenors' motions to amend must be denied in relevant part for futility. *See Kemin Foods*, 464 F.3d at 1354–55; *Webster*, 74 Fed.Cl. at 444; *Shoshone Indian Tribe*, 71 Fed.Cl. at 176. In other respects the proposed amendments are allowed. The government's motion to dismiss claims based upon the 1863 Acts is granted as to the Julia DuMarce Group and the Harley Zephier Group of plaintiff-intervenors, which groups were granted leave to amend their complaints to include claims based upon the 1863 Acts in the court's opinion in *Wolfchild VII*. *See* 96 Fed.Cl. at 335–36.

## II. MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO DEFER CONSIDERATION PURSUANT TO RULE 56(f)

The question of claimant eligibility has permeated this case from its inception. While identification of proper plaintiffs is

expected to be a source of some contention in a case of this nature, the government's erratic positions as to this issue have exacerbated the matter.

At a status conference held on January 21, 2011, the parties agreed on a schedule for a final resolution of this case, which schedule included, among other things, the requirement that plaintiffs and plaintiff-intervenors submit documentation in support of their motions for summary judgment regarding claimant eligibility. *See* Scheduling Order, *Wolfchild v. United States*, No. 03–2684 (Fed.Cl. Jan. 21, 2011), ECF No. 843. As contemplated by the parties' discussions during the status conference and pursuant to that schedule, plaintiffs and plaintiff-intervenors have filed proposed findings of uncontroverted facts and motions for summary judgment regarding the determination of eligible claimants and have submitted attendant to those motions almost 150,000 pages of documentary exhibits. *See* Def.'s Rule 56(d) Mot. at 3. Plaintiffs rely on these documents and a declaration submitted by Dr. Barbara Buttes to contend that they have satisfied the preponderance-of-the-evidence standard for eligibility and that "[t]here are no disputed material facts" precluding summary judgment in their favor. Pls.' Mot. at 32–33; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (party moving for summary judgment must demonstrate the absence of any genuine issue of material fact); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (A material fact is one "that might affect the outcome of the suit under the governing law," and a genuine dispute is one that "may reasonably be resolved in favor of either party.").

In response to plaintiffs' motions, the government filed a motion to defer consideration under RCFC 56(d).[19] Rule 56(d) provides that "[i]f a nonmovant [for summary judgment] shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may ... allow time to obtain affidavits or

---

19. Prior to the court's amendments to the Rules of the Court of Federal Claims which became effective on July 15, 2011, similar language appeared in RCFC 56(f). The government's motion was filed prior to July 15, 2011, and refers to RCFC 56(f).

declarations or to take discovery." RCFC 56(d)(2); *see also Brubaker Amusement Co. v. United States,* 304 F.3d 1349, 1361 (Fed. Cir.2002). Such a motion must articulate "with particularity, what facts the movant hopes to obtain by discovery and how these facts will raise a genuine issue of fact." *Exigent Tech., Inc. v. Atrana Solutions, Inc.,* 442 F.3d 1301, 1310 (Fed.Cir.2006).

In its motion under Rule 56(d), the government resurrected its contention, which position was rejected by this court in *Wolfchild I,* that "[p]laintiffs are not a group of identifiable Indians." Def.'s Rule 56(d) Mot. at 1; *id.* at 5 ("This lawsuit is not in the name of an Indian Tribe or an identifiable group of Indians."). Concurrently, the government requested that the "[c]ourt determine that [the government] need not respond to [p]laintiffs' [p]roposed [f]indings of [u]ncontroverted [f]act until such time as the eligibility criteria for any claimants are established and [the government] has had time to conduct any additional and necessary discovery related to those criteria." *Id.* at 9. As cause for its motion, the government stated that "the [c]ourt has not yet defined the requirements and standards it intends to use to evaluate the [p]laintiffs' individual eligibility for any disbursement," *id.* at 1, and it "specifically aver[red] that it await[ed] the adjudication and a determination of which criteria define an eligible claimant." *Id.* at 8. It thus represented that "[a]ny additional factual discovery would directly relate to the eligibility criteria set forth by the [c]ourt." *Id.*[20] In tension with these arguments, however, it contended that "[d]etermination of which individual [p]laintiffs or [i]ntervening-[p]laintiffs are eligible to participate in any distribution of funds as a result of the [c]ourt['s] December 21, 2010[ ] [o]rder ... is not necessary for the entry of final judgment." *Id.* at 2 (citation omitted). Then, in its reply to plaintiffs' response in opposition to the 56(d) motion, the government again averred that "[t]he United States seeks relief pursuant to RCFC 56[ (d) ] because it *requires addition-*

*al time to determine which individual plaintiffs or intervening plaintiffs are eligible to participate in any distribution of funds as a result of the [c]ourt's December 21, 2010[ ] [o]rder.*" Def.'s Rule 56(d) Reply at 1 (emphasis added).

In a Joint Status Report filed May 27, 2011, however, the government retreated entirely from its Rule 56(d) motion and, indeed, from nearly all of its prior positions regarding the appropriate procedure to determine claimant eligibility. In that report, the government asserted for the first time that the Indian Judgment Distribution Act, 25 U.S.C. §§ 1401–1408, applies here because the court has determined that the plaintiffs are an identifiable group of American Indians, and "[c]onsistent with that finding, the [g]overnment believes that [p]laintiffs are, therefore, also a 'group' under the [Distribution Act]." Joint Status Report at 10, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. filed May 27, 2011), ECF No. 1076 ("Joint Status Report"). The government "request[ed] that the [c]ourt define those who may share in any award premised on the Appropriations Acts," and asked the court to "find the McLeod and Henton census rolls to be comprehensively and exclusively correct, such that a [plaintiff] must prove by a preponderance that they descend from a person ... on those rolls." *Id.* at 8, 9; *see also* Def.'s Mot. at 61 ("The McLeod and Henton censuses were created for the purpose of identifying those Indians entitled to the benefits of the Appropriations Acts, and this [c]ourt should accept them as correct and dispositive."). It claimed, however, that any distribution following such a determination by the court "must be accomplished according to the requirements of the [Distribution Act]." Joint Status Report at 10.

At that point, the court requested that the parties submit supplemental briefs addressing the following three questions:

1) Does Chapter 16 of Title 25 of the United States Code, 25 U.S.C. §§ 1401–

---

20. In its Rule 56(d) motion, the government also urged the court to defer consideration of plaintiffs' and intervening-plaintiffs' claims of eligibility as to the 1863 Acts until the court determines "whether the 1863 Acts give rise to a money-

mandating duty." Def.'s Rule 56(d) Mot. at 7. The court's determination that plaintiff and plaintiff-intervenors lack any viable claim grounded in the 1863 Acts renders moot this portion of the government's motion.

08, apply to a money judgment that is entered and subject to payment under 28 U.S.C. § 2517 and 31 U.S.C. § 1304?

2) If Chapter 16 of Title 26 does not apply to such a money judgment, can and should a distribution plan nonetheless follow and reflect the plan provisions set out in Chapter 16?

3) If Chapter 16 of Title 25 does apply to such a money judgment, what is the court's role in ensuring that the distribution plan accords with the judgment that is entered?

Order of June 3, 2011, ECF No. 1083.[21]

In response to the court's request for supplemental briefing, the government undertook a further *volte face* in its supplemental brief filed on June 17, 2011. Although the government reiterated its contention that the Distribution Act applies to any judgment that may be issued in this case, it altered once more its position as to this court's proper role in determining claimant eligibility. The government avers now that "even asking this [c]ourt to make a determination about the import or extent of certain census rolls is inappropriate" because "[t]o do so would operate to summarily exclude certain classes of potential participants before they could be heard in the exclusive forum and [pursuant

to] processes provided by Congress to resolve such issues under the Act." Def.'s Supplemental Br. at 16. The court accordingly turns to the Indian Judgment Tribal Fund Use or Distribution Act before proceeding to address the eligible-claimant cross-motions.

A.  *The Indian Judgment Tribal Fund Use or Distribution Act*

Enacted on October 19, 1973, the Indian Judgment Tribal Fund Use or Distribution Act, Pub.L. No. 93–134, 87 Stat. 466, 466–68 (codified as amended at 25 U.S.C. §§ 1401–08) provides, in relevant part:

> Within one year after appropriation of funds to pay a judgment of the Indian Claims Commission or the United States Court of Federal Claims to any Indian tribe, the Secretary of the Interior shall prepare and submit to Congress a plan for the use and distribution of the funds. Such plan shall include identification of the present-day beneficiaries, a formula for the division of the funds among two or more beneficiary entities if such is warranted, and a proposal for the use or distribution of the funds.

25 U.S.C. § 1402(a).[22] The impetus for the Act was described in the House Report attendant to the legislation:

---

21. The manner and means of paying judgments of this court are provided by 28 U.S.C. § 2517, which states in pertinent part:

(a) Except as provided by chapter 71 of title 41, every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefore, on presentation to the Secretary of the Treasury of a certification of the judgment by the clerk and chief judge of the court.

28 U.S.C. § 2517(a). In turn, appropriations to pay such judgments are provided via 31 U.S.C. § 1304, which states:

(a) Necessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when—

(1) payment is not otherwise provided for;
(2) payment is certified by the Secretary of the Treasury; and
(3) the judgment, award, or settlement is payable—
(A) under section 2414, 2517, 2672, or 2677 of title 28;
(B) under section 3723 of this title;

(C) under a decision of a board of contract appeals; or
(D) in excess of an amount payable from the appropriations of an agency for a meritorious claim under section 2733 or 2734 of title 10, section 715 of title 32, or section 20113 of title 51.

31 U.S.C. § 1304(a) (emphasis added).

22. The Act sets forth detailed guidelines for preparation of a distribution plan. It delineates factors the Secretary must consider in formulating the plan, mandates that the Secretary provide a hearing of record after public notice to the affected tribe or group, and requires Interior to make its "legal, financial, and other expertise ... fully available in an advisory capacity to the [affected] Indian Tribe [or group] ... to assist [in] develop[ing] and communicat[ing] to the Secretary ... its own suggested plan for the distribution and use of such funds." 25 U.S.C. §§ 1403(a), (b).

As addressed in detail, *infra*, at 89–91, a previously-existing requirement, codified at 25 U.S.C. §§ 1402(a), 1404, that the Secretary submit such a distribution plan to Congress for its review and potential disapproval has been superseded by subsequent law.

Funds appropriated to satisfy judgments of the Indian Claims Commission or the Court of Claims on behalf of Indian plaintiffs are deposited in the United States Treasury to the credit of the plaintiff tribe. Prior to 1960, under an opinion of the Interior Solicitor, these funds were distributed by the Secretary of the Interior without further Congressional action.

Since 1960, each Interior Department Appropriation Act has included the following proviso:

*Provided further,* That nothing contained in this paragraph or in any other provision of law shall be construed to authorize the expenditure of funds derived from appropriations in satisfaction of awards of the Indian Claims Commission or the Court of Claims, ... until after legislation has been enacted that sets forth the purposes for which said funds will be used....

H.R.Rep. No. 93–377, at 4 (1973), 1973 U.S.C.C.A.N. 2311, 2313. The requirement of further legislative action to approve a distribution was "impos[ing] a severe burden upon the time and efforts of Members of the Committee on Interior and Insular affairs" and distracting its attention from other issues. *Id.* at 4–5. Additionally, the process of enacting legislation for each distribution of funds "caused long delays, in some cases, over several years after judgments [had] been awarded until their distribution." S.Rep. No. 93–167, at 2 (1973). The purpose of the Distribution Act was to ameliorate this situation by "provid[ing] for the use or distribution of Indian judgment funds appropriated in satisfaction of awards of the Indian Claims Commission and the Court of Claims without further legislation." H.R.Rep. No. 93–377, at 3, 1973 U.S.C.C.A.N. 2311 at 2312.

Subsection 1401(a) of Title 25 defines the scope of the Indian Judgment Distribution Act and is the focal point of the court's inquiry. It provides:

Notwithstanding any other law, all use or distribution of funds appropriated in satisfaction of a judgment of the Indian Claims Commission or the United States Court of Federal Claims in favor of any Indian tribe, band, group, pueblo, or com-

munity (hereinafter referred to as "Indian tribe") ... shall be made pursuant to the provisions of this chapter.

25 U.S.C. § 1401(a). Plaintiffs and plaintiff-intervenors object to application of the Indian Judgment Distribution Act to this case. They contend that the Act "only applies if the party plaintiff is an entity and not specifically[-]named individuals." Pls.' Supplemental Br. at 2–3. Because plaintiffs and plaintiffs-intervenors are named individuals, they argue the Act does not encompass this case. *Id.; see also* Pl.-Intervenors' Supplemental Br. at 6–7. Plaintiffs also aver that the Act "does not apply until Congress has actually appropriated funds to pay a [Court of Federal Claims] judgment separate and apart from funding via 28 U.S.C. § 2517 and 31 U.S.C. § 1304." Pls.' Supplemental Br. at 4. Plaintiffs thus urge that "because no separate, specific appropriation has been enacted satisfying a ... judgment in ... [p]laintiffs' favor," the Act does not apply. *Id.*

The government argues that the Act applies because the court has already determined that "[p]laintiffs [in this case] constitute an 'identifiable group of Indians' for purposes of exercising jurisdiction under 28 U.S.C. § 1505." Joint Status Report at 10 (quoting *Wolfchild I,* 62 Fed.Cl. at 539; *see also* Def.'s Supplemental Br. at 1. It contends also that the Act applies to any money judgment issued from this court, whether that judgment is satisfied pursuant 28 U.S.C. § 2517 and 31 U.S.C. § 1304 or by a separate appropriation from Congress. Def.'s Supplemental Br. at 7.

*1. An Indian "group."*

As noted, the court has determined and reaffirmed multiple times that plaintiffs are "an identifiable group of American Indians." *Wolfchild I,* 62 Fed.Cl. at 540; *see also id.* at 540 ("[P]laintiffs bring their claims specifically and solely as members of a group."); *Wolfchild VII,* 96 Fed.Cl. at 338 ("The loyal Mdewakanton are an 'identifiable group of American Indians' within the meaning of the [Indian Tucker] Act."). Plaintiffs contend, however, that the court's classification of plaintiffs under the Indian Tucker Act does not mean that plaintiffs are a "group" within

the meaning of the Indian Judgment Distribution Act because the latter "does not ... mention the Indian Tucker Act" and because "group" as used in the Distribution Act encompasses only singular Indian entities, not judgments in favor of named individuals. Pls.' Supplemental Br. at 2–3.

The Indian Judgment Distribution Act does not define the term "group." The regulations implementing the Act provide, however, that *"Indian tribe or group means any* Indian tribe, nation, band, pueblo, community or *identifiable group of Indians,* or Alaska Native entity." 25 C.F.R. § 87.1(g) (emphasis added). Subsection (g) of this regulation indisputably encompasses the plaintiffs in this case. Importantly, the Department of the Interior's interpretation of the Distribution Act reflected in this regulation is amply supported by the statutory regime and history governing Indian claims in this court.

[39, 40] Where, as here, the text of a statute does not furnish a definitive answer, reference to context, legislative history, and canons of statutory construction is warranted. *See Bull v. United States,* 479 F.3d 1365, 1376 (Fed.Cir.2007); *Timex V.I. v. United States,* 157 F.3d 879, 882 (Fed.Cir.1998). Of particular relevance in this case, the *in pari materia* canon of construction dictates that "statutes addressing the same subject matter generally should be read as if they were one law." *Wachovia Bank v. Schmidt,* 546 U.S. 303, 315–16, 126 S.Ct. 941, 163 L.Ed.2d 797 (2006) (quoting *Erlenbaugh v. United States,* 409 U.S. 239, 243, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972)) (internal quotation marks omitted); *see also Strategic Housing Fin. Corp. of Travis Cnty. v. United States,* 608 F.3d 1317, 1330 (Fed.Cir.2010) ("Under [the *in pari materia* ] canon, courts should interpret statutes with similar language that generally address the same subject matter together, as if they were one law.") (internal quotation marks omitted).

[41] Although the Indian Tucker Act is a jurisdictional grant to the Court of Federal Claims, and the Distribution Act governs the administration of certain judgments from the Court of Federal Claims (and, formerly, the Indian Claims Commission), the relationship between the two statutes favors application of the *in pari materia* canon. As described below, presently, the Indian Tucker Act serves as the only jurisdictional avenue by which a judgment falling within the terms of the Distribution Act may be created. In this context, the court finds it improbable that Congress intended "group" as used in the Distribution Act to have a meaning entirely exclusive of the term "identifiable group" in the Indian Tucker Act.

The court is persuaded as well by the parallel structure of the jurisdictional grant to the Indian Claims Commission. The Indian Tucker Act, passed in its original form in 1949, adopted language nearly identical to that used in the grant of jurisdiction to the Indian Claims Commission, created three years earlier. *Compare* Act of May 24, 1949, ch. 139, § 89(a), 63 Stat. 89, 102 (codified as amended at 28 U.S.C. § 1505) (granting jurisdiction to the Court of Claims over claims against the United States accruing after August 13, 1946 "in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska"), *with* Indian Claims Commission Act, Act of Aug. 13, 1946, § 2, 60 Stat. 1049, 1050 (granting jurisdiction to the Claims Commission over claims against the United States by "any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska"). Early on, the Court of Claims recognized that there was a distinction between the term "tribe" and "group" under the Indian Claims Commission Act. *See McGhee v. Creek Nation,* 122 Ct.Cl. 380 (1952). In this regard, the Court of Claims stated:

> To identify is to establish the identity of, and if a group presenting a claim under the Act is capable of being identified as a group of Indians consisting of the descendants of members of the tribes or bands which existed at the time the claim arose, the jurisdictional requirements of the status, in our opinion, have been met. It would ... be a strained and unwarranted interpretation of the Act to say that Congress intended by the term 'identifiable group' that the group making the claim must be identical, as a distinct entity, with

the tribe or band existing at the time the claim arose. Such interpretation would make the term 'identifiable group' mean nothing more than a recognized tribe or band.

*Id.* at 391–92; *see also Thompson v. United States,* 122 Ct.Cl. 348, 360 (1952) ("Congress intended to enlarge [beyond 'recognized tribes or bands'] the category of groups of Indians entitled to present claims for hearing and determination when it added the words 'or other identifiable groups,' not theretofore customarily used.").

The court's reading of the language within the Indian Claims Commission Act naturally carried over into the Indian Tucker Act as well, *see Tee–Hit–Ton Indians v. United States,* 120 F.Supp. 202, 204 (Ct.Cl.1954), *aff'd,* 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955),[23] and persists to the present day, *see Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States,* 69 Fed.Cl. 639, 670–71 (2006). In 1976, the Indian Claims Commission was abolished, at which point Congress instructed the Commission to "transfer [all cases] to the Court of Claims" and granted jurisdiction to the Court of Claims over those cases previously heard by the Commission. *See* Pub.L. No. 94–465, § 23, 90 Stat. 1990 (1976).

Thus, when the Indian Judgment Distribution Act was enacted in 1973, the only judgments that could have potentially fallen within the scope of the Distribution Act would have been those from the Court of Claims or the Indian Claims Commission in favor of a "tribe, band, or other identifiable group of American Indians," with the latter phrase carrying the precise meaning it does today, that is, an aggregation of identifiable American Indians but not necessarily a singular entity. The Distribution Act encompasses judgments in favor of "any Indian tribe, band, group, pueblo, or community." 25 U.S.C. § 1401(a). It would be strange indeed if the term "group" as used in that Act included only singular Indian entities besides those known as tribes and bands, when the

two jurisdictional statutes which could produce judgments within the scope of the Distribution Act encompassed only judgments in favor of "identifiable group[s] of American Indians," besides those known as tribes and bands. 28 U.S.C. § 1505; 60 Stat. at 1050. The only reading of the Distribution Act which does not logically necessitate finding that an "identifiable group" under the Indian Tucker Act qualifies as a "group" under the Distribution Act is one which gives the term "group" as used in the Distribution Act a technical meaning amounting essentially to a federally-recognized entity; yet, pertinent regulations governing Indian recognition defy such a reading.

The Department of the Interior's regulations governing federal acknowledgement of Indian associations define an "Indian group or group" as "any Indian or Alaska Native aggregation within the continental United States that the Secretary of the Interior does not acknowledge to be an Indian tribe." 25 C.F.R. § 83.1. The regulations explicitly distinguish such a "group" from federally-acknowledged aggregations of Indians, which may be recognized as "tribes, organized bands, pueblos, Alaska Native villages, or communities." 25 C.F.R. § 83.3(b). The Department of the Interior's regulations thus show that to the extent the term Indian "group" may have a particular meaning within the legislative or regulatory context, the term does not equate to a recognized, singular Indian entity but rather encompasses aggregations of Indians.

Furthermore, the legislative history of the Indian Judgment Distribution Act disfavors plaintiffs' position. Section 4 of Senate Bill 1016, the legislative predecessor to the Act, provided:

> Within six months after the date of the appropriation of funds by the Congress to pay each Indian judgment, the Secretary of the Interior ... shall prepare and submit to the Congress a recommended plan for the distribution of such funds ... to *the*

---

23. Notably, although the Court of Claims' finding that plaintiffs constituted an "identifiable group" under 28 U.S.C. § 1505 was not a disputed issue on appeal to the Supreme Court, the Supreme Court observed that the claimants in *Tee–Hit–Ton*

were "an identifiable group of American Indians of between 60 and 70 individuals residing in Alaska." *Tee–Hit–Ton,* 348 U.S. at 273, 75 S.Ct. 313.

*Indian tribe, band, group, pueblo, or community in whose favor such judgment is rendered and such funds appropriated.*

*Hearing Before the Subcomm. on Indian Affairs of the Comm. on Interior and Insular Affairs: First Session on S. 1016,* 93d Cong. 5–6 (1973) ("Hearing on S. 1016") (S. 1016, 93d Cong. (1973)) (emphasis added). After Congress solicited the views of the Department of Interior on the proposed legislation, the Assistant Secretary of the Interior objected to the emphasized language, noting that "the beneficiaries of an award are *often individuals,* for example, *the persons listed on a given roll." Id.* at 12, 14 (Letter from John H. Kyl, Assistant Secretary of the Interior, to Sen. Henry Jackson (Apr. 12, 1973)) (emphasis added). The Assistant Secretary recommended the deletion of any language insinuating judgments were rendered or funds appropriated in favor of Indian tribes, bands, groups, pueblos, or communities. *Id.* at 14. Congress obliged, and that portion of Section 4 of Senate Bill 1016, along with similar language, was struck from the bill. *See* 93 Cong. Rec. 33,180 (1973) (statement of Sen. Jackson) ("At the time this measure was considered before the full committee, all of the Department's clarifying amendments were approved...."); 93 Cong. Rec. 16,375–76 (1973) (enacting relevant amendments to S. 1016).

Congress' alteration of the provision of the Distribution Act providing for public hearings of record on a proposed distribution plan is similarly instructive. Section 4(c)(2) of Senate Bill 1016 required the Secretary to "hold a hearing or hearings of record, after appropriate public notice, to obtain the testimony of leaders and members of the Indian tribe, band, group, pueblo, or community and any individual who may receive any portion, or be affected by the distribution, of such funds." Hearing on S. 1016 at 7. Here also, the Assistant Secretary objected, noting that "[b]ecause of the fact that many judgments involve *entities which are comprised solely of individual descendants,* sometimes numbering in the thousands ... to guarantee that all individuals' views be heard in public hearings, as section 4(c)(2) contemplates, would be impossible, even with respect to smaller, organized tribes.... Accordingly, we recom-

mend that the words 'and any individual' ... be deleted." *Id.* at 15. Those words were struck from the bill, and 25 U.S.C. § 1403(a)(2) instead requires the Secretary to hold a public hearing "to obtain the testimony of leaders and members of the Indian tribe which may receive any portion, or be affected by the use of distribution, of such funds."

This series of events demonstrates that Congress understood that the Indian Judgment Distribution Act was to encompass judgments in favor of aggregations of individual Indians, and not just singular entities. And indeed, other provisions of the Indian Judgment Distribution Act make sense only with this understanding of the Act. For example, 25 U.S.C. § 1403(a) requires that the Secretary "prepare a plan which shall best serve the interest of all those entities *and individuals* entitled to receive funds of each Indian judgment." (Emphasis added.) In this same vein, 25 U.S.C. § 1403(b)(2) mandates that the Secretary assure that "the needs and desires of any groups *or individuals* who are in a minority position, but who are also entitled to receive such funds, have been fully ascertained and considered." (emphasis added); *see also* 25 U.S.C. § 1404(2) (requiring the Secretary to submit to Congress "a statement of the extent to which such plan reflects the desire of the Indian tribe *or individuals* which are entitled to such funds") (emphasis added).

Nevertheless, plaintiffs and plaintiff-intervenors rely on *Short v. United States,* 12 Cl.Ct. 36 (1987), in arguing that the Distribution Act does not apply. *See* Pls.' Supplemental Br. at 2. Plaintiffs contend that *Short* "held that 25 [U.S.C.] § 1401 did not apply because the judgment was issued in favor of individual Indian class beneficiaries." Pls.' Supplemental Br. at 3. *Short,* however, is inapposite to the present case.

In contrast to this case, in *Short* the Claims Court found jurisdiction under the Tucker Act, 28 U.S.C. § 1491, not the Indian Tucker Act, 28 U.S.C. § 1505. *See Short,* 12 Cl.Ct. at 40 ("[P]laintiffs are suing as individuals under 28 U.S.C. § 1491 (1982)."). Later, "[i]n 1989, the Claims Court *denied* the

plaintiffs' claim for *group damages* under 28 U.S.C. § 1505." *Short v. United States*, 50 F.3d 994, 997 (Fed.Cir.1995) (emphasis added) (citing Order at 3–10, *Short v. United States*, No. 102–63 (Cl.Ct. July 25, 1989)). The court also refused the government's request to substitute a tribal entity for the individually-named plaintiffs and to apply the Distribution Act to the judgment because "there [was] no functioning ... tribal organization," and "substitution of such a nonfunctioning entity" would impair prompt resolution of the case. *Short v. United States*, 661 F.2d 150, 155 (Ct.Cl.1981).[24]

Although this case bears a similarity to *Short* in that plaintiffs are not suing as part of a federally-recognized entity, the plaintiffs are an identifiable group. At a minimum, the lineal descendants of the loyal Mdewakanton are identifiable under the terms of the Appropriations Acts and the two censuses. *See, e.g., Chippewa Cree Tribe*, 69 Fed.Cl. at 670–74 (holding that beneficiaries of judgment fund constituted an identifiable group where beneficiary class was defined by statute and rolls prepared by the Secretary of Interior); *Peoria Tribe of Indians of Okla. v. United States*, 169 Ct.Cl. 1009, 1012–13 (1965) (finding that identification of two scattered families descended from an Indian nation was sufficient to support Claims Commission's determination that plaintiffs constituted an identifiable group); *Thompson v. United States*, 122 Ct. Cl. 348, 360 (1952) (holding that Indians of California could bring suit as identifiable group despite lack of formal tribal organization). What is more, plaintiffs assert a collective interest in the lands and funds resulting from the Appropriations Acts. *See, e.g., Tee–Hit–Ton Indians*, 120 F.Supp. at 204 (holding that individuals representing the plaintiff clan constituted an identifiable

group where "land ... was claimed by the plaintiff clan as a whole").

For these reasons, the court finds that plaintiffs and plaintiff-intervenors are indeed an "identifiable group" under the Indian Tucker Act, and thus, a "group" within the meaning of the Indian Judgment Distribution Act.

### 2.  *"Funds appropriated in satisfaction of a judgment."*

Plaintiffs aver that the Distribution Act "does not apply until Congress has actually appropriated funds to pay a [Court of Federal Claims] judgment separate and apart from funding via 28 U.S.C. § 2517 and 31 U.S.C. § 1304." Pls.' Supplemental Br. at 4. Plaintiffs contend that "the government's [position] is based on a contingency—that Congress would actually enact, in the future, a specific claims distribution act for the [plaintiffs]." *Id.* The government responds that no separate appropriation is necessary to trigger application of the Distribution Act because 28 U.S.C. § 2517 and 31 U.S.C. § 1304 provide the exclusive statutory mechanism for Congressional funding of this court's judgments. *See* Def.'s Supplemental Br. at 7.

The Indian Judgment Distribution Act applies, "[n]otwithstanding any other law, [to] all use or distribution of funds appropriated in satisfaction of a judgment of the ... United States Court of Federal Claims in favor of any Indian tribe, band, group, pueblo, or community." 25 U.S.C. § 1401(a). In isolation, the statutory text does not make obvious whether the Act applies only to funds specifically appropriated by separate legislation to satisfy Court of Federal Claims' judgments in favor of Indians, or whether it applies to funds derived from the general

---

24. Decisions rendered in the *Short* litigation must be viewed in light of that case's particular and peculiar history. The *Short* litigation spanned nearly forty years, and eventually gave way to Congressional intervention, namely, the 1988 Hoopa-Yurok Settlement Act, 25 U.S.C. §§ 1300i to 1300i–11 (1994). That Act "nullified the *Short* rulings [*Short v. United States*, 486 F.2d 561 (Ct.Cl.1973); *Short v. United States*, 661 F.2d 150 (Ct.Cl.1981); *Short v. United States*, 719 F.2d 1133 (Fed.Cir.1983)], by establishing a new

Hoopa Valley Reservation." *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1372 (Fed.Cir.2000).

Additionally, avoidance of the Distribution Act did not turn out to provide the relatively rapid distribution of judgment funds that the *Short* court expected: a final order directing the entry of judgments was not filed until 1993, thirty years after the initial decision on liability was issued. *See* Final Order Directing Entry of Judgments, *Short v. United States*, No. 63–102 (Fed. Cl. July 29, 1993), ECF No. 3.

appropriation known as the Judgment Fund when those funds satisfy an Indian judgment. Although the text does not furnish a definitive answer, the statutory regime governing appropriations to satisfy judgments of this court and the legislative history of the Distribution Act provide interpretive guidance.

Two statutes govern payment of this court's judgments: 28 U.S.C. § 2517 and 31 U.S.C. § 1304, each quoted *supra*, at 78 n. 21. Prior to 1863, judgments rendered by this court's predecessor, the Court of Claims, were payable only by "specific legislative enactment." *Slattery v. United States*, 635 F.3d 1298, 1301 (Fed.Cir.2011) (en banc). In the Amended Court of Claims Act of 1863, ch. 92, 12 Stat. 765, 766, Congress provided that judgments of the court were to "be paid out of any general appropriation made by law for the payment and satisfaction of private claims." *Slattery*, 635 F.3d at 1302. That provision "removed the need for a special congressional appropriation to pay each individual judgment" and is now codified as amended at 28 U.S.C. § 2517. *Id.* at 1302.

"Following the 1863 enactment, Congress made periodic general appropriations for payment of the judgments of the Court of Claims, initially on an annualized basis, *e.g.,* Act of June 25, 1864, ch. 147, 13 Stat. 145, 148, and then by a standing appropriation that created a Judgment Fund to pay all Court of Claims judgments for which a specific appropriation did not exist, *e.g.,* Supplemental Appropriation Act, 1957, Pub.L. No. 84–814, § 1302, 70 Stat. 678, 694–95 (1956)." *Slattery*, 635 F.3d at 1302–03. Now codified as amended at 31 U.S.C. § 1304, the Judgment Fund statute provides for payments of certain judgments against the United States, including those authorized by 28 U.S.C. § 2517.[25] The Judgment Fund was created "to avoid the need for specific appropriations to pay judgments awarded by the Court of Claims." *Slattery*, 635 F.3d at 1317; *see also*

*Bell BCI Co. v. United States*, 91 Fed.Cl. 664, 668 (2010) ("Congress enacted the Judgment Fund in 1956 to eliminate the need for specific appropriations to satisfy judgments against federal agencies."). It is "a permanent, indefinite appropriation." 31 C.F.R. § 256.1.

[42] Thus, pursuant to 28 U.S.C. § 2517 and 31 U.S.C. § 1304, unless provision for payment of a judgment is supplied by another statute, any final judgment issued by this court is satisfied by payment from the standing appropriation known as the Judgment Fund. *See Doe v. United States*, 16 Cl.Ct. 412, 423 (1989) ("Every final judgment of the United States Claims Court rendered against the United States is to be paid out of the judgment fund."). No additional appropriation by Congress is necessary; once the award is certified by the clerk and the chief judge of this court, it is presented to the Secretary of the Treasury. *See* 28 U.S.C. § 2517(a). Once the Secretary certifies the judgment, 31 U.S.C. § 1304(a)(2), the funds are deemed appropriated, and Treasury is charged with providing the funds to the payee. *See, e.g., United States v. Dann,* 470 U.S. 39, 42, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985) (noting that once Court of Claims' judgment was certified to 31 U.S.C. § 724a (1976 ed., Supp. V), the predecessor statute to 31 U.S.C. § 1304, "this certification automatically appropriated the amount of the award"); *see also* 31 C.F.R. §§ 256.0–.60 (Treasury regulations governing payments from the Judgment Fund); Treasury Financial Manual 6–3100, *Certifying Payments and Recording Corresponding Intragovernmental Receivables in the Federal Government's Judgment Fund* (Apr. 2009) (describing Treasury's process for administering payments under the Judgment Fund).

Notably, relevant judicial precedents also disfavor plaintiffs' position. In *Dann,* 470

---

25. As the Federal Circuit noted in *Slattery*, "[t]he Judgment Fund had been limited to payments up to $100,000, but Congress removed the cap, so that the Fund covers claims of any amount." 635 F.3d at 1303 (citing Supplemental Appropriations Act, 1977, Pub.L. No. 95–26, ch. 14, 91 Stat. 61, 96–97). It is likely that the original language of the Distribution Act in Senate Bill

1016 which spoke more specifically of funds being appropriated in favor of Indians was grounded in the reality that at the time the Distribution Act was passed in 1973, the $100,000 cap on the Judgment Fund would have necessitated a separate appropriation for nearly every Indian judgment.

U.S. 39, 105 S.Ct. 1058, individual plaintiffs alleged, in defense of an action in trespass brought by the United States, that they possessed aboriginal title to a portion of land that had been the subject of litigation before the Indian Claims Commission. 470 U.S. at 43, 105 S.Ct. 1058. The Claims Commission had awarded damages to the Western Shoshone tribe of Indians for the loss of aboriginal title to that land. *Id.* In *Dann*, the government contended that the plaintiffs' aboriginal-title defense was unavailing due to the collateral—estoppel effect of the Claims Commission's judgment. *Id.* The Court of Appeals for the Ninth Circuit rejected that contention, finding that the Claims Commission judgment did not yet have collateral-estoppel effect because "payment" to the Western Shoshone had not then occurred within the meaning of Section 22(a) of the Indian Claims Commission Act, which section dictated that "payment" of any claim before the Commission effected a "full discharge of the United States of all claims and demands touching any of the matters involved in the controversy." *United States v. Dann*, 706 F.2d 919, 924, 925–27 (9th Cir.1983). The court of appeals found dispositive the fact that although funds had been appropriated and credited to an interest-bearing Treasury account in the name of the Western Shoshone, no funds had actually been disbursed to or used for the benefit of the tribe, nor had Congress then passed legislation to provide a distribution plan for the funds. *Id.* at 925–26.[26]

The Supreme Court disagreed, concluding that "payment" occurred within the meaning of Section 22(a) when the judgment in favor of the Western Shoshone was certified pursuant to 31 U.S.C. § 724a (1976 ed., Supp. V), the Judgment Fund predecessor statute to 31 U.S.C. § 1304,[27] and funds to compensate the tribe were placed by the government into an account in the Treasury. *Dann*, 470 U.S. at 44–45, 105 S.Ct. 1058. Importantly for the

present case, the Court stated explicitly that the Indian Judgment Distribution Act applied to the Commission's judgment as affirmed by the Court of Claims, and "[u]nder 25 U.S.C. § 1402(a) and § 1403(a), the Secretary of the Interior [wa]s required, after consulting with the Tribe, to submit to Congress within a specified period of time a plan for the distribution of the fund." *Id.* at 42, 105 S.Ct. 1058. Although 31 U.S.C. § 724a (1976 ed., Supp. V) and 31 U.S.C. § 1304 differ in their details, their effect is the same, and there is nothing within 31 U.S.C. § 1304 that would lead to the conclusion that a judgment certified under its mandates is not subject to the Indian Judgment Distribution Act whereas one certified pursuant to its precursor was subject to the Distribution Act.

The Senate Report on the bill that became the Distribution Act is revealing in this regard, as well. As previously noted, contained within that report is a letter from the Assistant Secretary of the Interior commenting on the Distribution Act. In that letter, the Assistant Secretary objected also to a provision in Senate Bill 1016 that stated: "Within six months after the date of the appropriation of funds by the Congress to pay each Indian judgment, the Secretary of the Interior ... shall prepare and submit to the Congress a recommended plan for the distribution of such funds ... to *the Indian tribe, band, group, pueblo, or community in whose favor such judgment is rendered and such funds appropriated.*" *Hearing on S. 1016* at 5–6 (S. 1016, 93d Cong. § 4 (1973)) (emphasis added). The Secretary observed:

[W]ith the exception of a few very early Indian Claims Commission awards, neither the Indian Claims Commission *nor the Court of Claims specifies the ultimate or present-day beneficiaries of an award. Furthermore, the appropriation acts covering the awards are silent on the subject of beneficiaries. The burden of identify-*

---

26. In the *Western Shoshone* litigation, the Secretary failed timely to submit to Congress a distribution plan, and thus separate legislation for distribution of the funds was required. *Dann*, 706 F.2d at 926. Ultimately, Congress provided a plan for the use and distribution of the Western Shoshone funds. *See* Western Shoshone Claims

Distribution Act, Pub.L. No. 108–270, 118 Stat. 805 (2004).

27. *See United States v. General Elec. Corp.*, 727 F.2d 1567, 1571 (Fed.Cir.1984) ("Title 31 U.S.C. § 724a was reenacted and is now 31 U.S.C. § 1304.").

*ing beneficiaries has fallen on the Secretary of the Interior,* a process that we feel should continue to be followed because of the fact that the identification of beneficiaries often demands intense research in the cultural and political history of the involved group or groups. *This is a task that neither the Indian Claims Commission nor the Court of Claims is equipped to handle.*

*Id.* at 14 (Letter from John H. Kyl, Assistant Secretary of the Interior, to Sen. Henry M. Jackson (Apr. 12, 1973)) (emphasis added). The Assistant Secretary thus recommended the deletion of the quoted language of Section 4 and all similar text. *Id.; see also id.* at 19 (Test. of Mr. Kyl). Congress agreed, and the quoted portion of Section 4 of Senate Bill 1016, along with similar language, was struck from the bill. *See* 93 Cong. Rec. 33,180; 93 Cong. Rec. 16,375–76.

While the Assistant Secretary's objection to Section 4 of Bill 1016 appeared to be based primarily on the fact that judgments in favor of Indians and appropriations to satisfy those judgments did not list individual beneficiaries, the language to which the Secretary objected and which was ultimately struck from the bill actually spoke of funds being appropriated in favor of "the Indian tribe, band, group, pueblo, or community," not individual beneficiaries. Nevertheless, the affirmative elimination of that language is persuasive evidence that application of the Distribution Act is not dependent on a specific appropriation in the name of an Indian entity.[28]

In short, the statutory scheme governing payment of judgments by the Court of Federal Claims and the legislative history of the Indian Judgment Distribution Act convince the court that the Distribution Act applies to this case, regardless of whether the money is automatically appropriated pursuant to the Judgment Fund statute, 31 U.S.C. § 1304, or Congress enacts a specific appropriation to satisfy the judgment. Because the court concludes that the Distribution Act applies here, the court will abstain from identifying the specific individual persons who qualify as lineal descendants of the loyal Mdewakanton. Identification of beneficiaries of the final judgment is within the purview of the Secretary of Interior under the Indian Judgment Distribution Act. *See* 25 U.S.C. §§ 1402(a), 1403. The court will likewise refrain from articulation of what specific criteria claimants must satisfy to prove their status, as all facets of this determination make up the Secretary's responsibilities under the Act. *See id.*[29]

B. *Application of the Indian Judgment Distribution Act to this Case*

1. *Previously incurred costs associated with formulation of a distribution plan.*

Although the court concludes that the Distribution Act applies, it does so reluctantly. As noted, pursuant to the parties' representations at the status conference held on January 21, 2011, and the scheduling order issued on that same date, plaintiffs and plaintiff-intervenors prepared and filed 33 motions and numerous proposed findings of uncontroverted facts alleging that they are lineal de-

28. Notably, the language found in 25 U.S.C. § 1401(a) that defines the scope of the Distribution Act was present in nearly identical form in Section 3 of the original Senate Bill 1016, *see Hearing on S.* 1016 at 5 (S. 1016, 93d Cong. § 3) (1973), but no objection to that text was raised by the Assistant Secretary.

29. The Indian Judgment Distribution Act's delegation to the Secretary of Interior of sole authority to determine proper beneficiaries in Indian judgment cases is in keeping with a line of cases from this court that held, outside the context of the Distribution Act and prior to the lifting of the $100,000 cap on the Judgment Fund, that Congress was responsible for determining individual claimants through Congress' appropriation of

funds to satisfy the Indian judgment. *See, e.g., Turtle Mountain Band of Chippewa Indians v. United States,* 490 F.2d 935, 951 (Ct.Cl.1974); *Cherokee Freedmen & Cherokee Freedmen's Assoc. v. United States,* 195 Ct.Cl. 39, 48 (1971); *Confederated Tribes of Warm Springs Reservation of Or. v. United States,* 177 Ct.Cl. 184, 210 (1966); *Peoria Tribe,* 169 Ct.Cl. at 1011–12; *McGhee,* 122 Ct.Cl. at 396; *see also Chippewa Cree Tribe of Rocky Boy's Reservation v. United States,* 85 Fed. Cl. 646, 657 (2009) ("composition of the particularly entity or group in whose favor an award is made" was "beyond the competence of" the court where Congress had enacted specific legislation creating distribution plans for judgments at issue).

scendants of the loyal Mdewakanton. Attendant to those motions, they have obtained, sorted through, organized, and submitted to the court and the government almost 150,000 pages of material to show individual genealogies that span more than a century. Def.'s Rule 56(d) Mot. at 3. This information includes family trees, family Bibles, newspapers, books, historical accounts, Excel spreadsheets, birth certificates, and death certificates. *Id.; see also* Def.'s Mem. at 62 (recounting plaintiffs' and plaintiff-intervenors' submissions). Indeed, the court can summarize no better than the government the Herculean task plaintiffs and plaintiff-intervenors undertook to prepare this case for a final resolution:

> [I]t took [p]laintiffs years to compile their own records. *See* Declaration Regarding Persons Who Qualify as Proper Claimants in this Case, March 8, 2011, at ¶ 7 (Dkt. 898) ("Since the filing of the instant matter, [plaintiffs' counsel] has endeavored to identify individuals, who through various means but mainly birth certificates and similar authentic records, can prove their lineal descendancy."); Declaration of Barbara Buttes, March 21, 2011, at ¶ 3 (Dkt. 978-2) ("Over the eight years of this lawsuit (2003–2011), Wičaŋpi [Buttes' research firm] has employed many people, full-time and part-time, to conduct the research on 1886 Mdewakanton descendancy.") (Dkt. 978-2). Indeed, merely to identify [p]laintiffs, the lead [p]laintiffs' attorney "went on a tour of the Sioux Reservation[s] in South Dakota and six states and two nations." Transcript, Attorney Erick Kaardal, p. 112 (June 10, 2005).

Def.'s Rule 56(d) Reply at 5.

[43] Plaintiffs' and plaintiff-intervenors' efforts were accomplished at the insistence of the government, which has demanded from the inception of this case that all plaintiffs be individually named and identified as lineal descendants in this case. *See, e.g., Wolfchild IV,* 77 Fed.Cl. at 33 ("The government states that it and other parties to this action are 'entitled to certainty and closure respecting the number and identities of the persons' participating in this suit."); Def.'s Mot. to File Exs. under Seal at 2, *Wolfchild v. Unit-*

ed States, No. 03–2684 (Fed.Cl. filed Sept. 13, 2007) ("Names of minors and their ages are necessary to the determination of whether these individuals have previously been admitted as parties...."); Def.'s Resp. to Mot. to Substitute Legal Counsel at 1, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. filed Feb. 23, 2007), ECF No. 430 ("The United States opposes the motion to the extent that it seeks to add as new plaintiffs any persons who have not already moved for, and been granted, intervention."); Def.'s Opp'n to Pls.' Mot. to Amend Third Amended Compl. at 2, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. filed Feb. 2, 2007), ECF No. 418 ("In a case in which such matters as lineage, tribal affiliation, and severance of tribal relations may play a significant role, it is particularly important for the [d]efendant to know for certain who the [p]laintiffs (and [p]laintiff-[i]ntervenors) are."); Def.'s Opp'n to DuMarce Mot. to Intervene at 2, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. filed Nov. 8, 2006) ("As it has previously noted, the United States is entitled to have certainty and closure respecting the number and identities of the persons who are suing it in this action...."); Def.'s Mot. for Disclosure of Names of John Doe Plaintiff–Intervenors at 1, 4, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. filed Oct. 24, 2006) ("Defendant ... moves ... for an [o]rder directing counsel ... to provide ... the United States with the identities of those John Doe plaintiffs.... Defendant is entitled to know who is suing it ... This is particularly true in light of the fact that all claims in the case rest, in part, on allegations regarding the lineage of the persons who are suing ... No litigant should be forced to defend itself against phantom plaintiffs, nor carry the logistical burden of keeping track of hundreds of 'John Does' who may or may not exist."); Def.'s Opp'n to DuMarce Mot. to Amend First Amended Compl. at 3, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. filed Oct. 23, 2006) ("As it has previously noted, [d]efendant is entitled to have certainty and closure respecting the number and identities of the persons who are suing it in this action...."); Def.'s Opp'n to Rooney Mot. to Amend at 2, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. filed Oct. 10, 2006) (same).

The government's position regarding claimants adopted at the outset and maintained until the very last submissions has driven the course of this litigation and is directly opposed to the terms of the Distribution Act, which contemplate that the government was not entitled to such specific identification at any time prior to a judgment, given that development of a plan under the Distribution Act would follow entry of a judgment.

Not only was the government in error to demand identification of plaintiffs and proofs of descent throughout this case, under the Indian Judgment Distribution Act it is the Secretary of Interior, not plaintiffs' attorneys or the court, who must sort through the thousands of documents, compile the pertinent records, and undertake the historical research to determine the appropriate templates by which to adjudicate claimant eligibility. In short, it is the Department of the Interior that is charged with the task of determining whether each claimant's supporting documentation demonstrates lineal descendancy. The pertinent regulations provide:

(a) *The Secretary shall cause to begin as early as possible the necessary research to determine the identity of the ultimate or present day beneficiaries of judgments. Such research shall be done under the direction of the Commissioner of Indian Affairs.* The affected tribes or groups shall be encouraged to submit pertinent data. *All pertinent data,* including cultural, political and historical material, and records, including membership, census and other roll *shall be considered ....*

(b) *The results of all research shall be provided to the governing bodies of all affected tribes and groups.* The Area Director shall assist the affected tribe or group in arranging for preliminary sessions or meetings of the tribal governing body, or public meetings. *The Area Director shall make a presentation of the results of the research* and shall arrange for expertise of the Bureau of Indian Affairs to be available at these meetings to assist the tribe or

group in developing a use or distribution proposal....

25 C.F.R. § 87.3 (emphasis added). In the Joint Status Report of May 27, 2011, the government provided an illuminating example of the scope of the work required under the Distribution Act. The government explained that in the context of the *Western Shoshone* litigation, *see supra,* at 84–85 & n. 26:

The Bureau received more than 9,000 applications to share in the judgment. The documents to which claimants had to show genealogical connections were census rolls generated from 1885 to 1940. The Bureau started accepting applications in October 2007. The first distribution was made in March 2011; the final distributions have not yet been made. *The Bureau hired a contractor to perform the voluminous research. The Bureau paid the contractor approximately $1.5 million for two years of work. The Bureau elected not to endorse the third year of the contract, assuming direct responsibility for the work to be done. To date, the Bureau has expended about one million dollars above what it paid the contractor.*

The underlying documentation, i.e., census roles, birth certificates, etc. in Western Shoshone[,] is generally more recent, reducing the research by one or possibly two generations. Depending on the criteria to qualify for a distribution in this case, the number of Wolfchild applicants could be twice the size of the Western Shoshone claimant group.

Joint Status Report at 13 (emphasis added).

As demonstrated by the government's recitation of the work required in the Western Shoshone litigation, plaintiffs' and plaintiff-intervenors' assembly of the pertinent records into a readily analyzable format in effect will enable the government to avoid incurring a substantial part of the costs entailed in complying with the Indian Judgment Distribution Act. In light of these circumstances, the government shall reimburse plaintiffs and plaintiff-intervenors for the costs of preparing the materials that plaintiffs and plaintiff-intervenors submitted in support of their claims of eligibility as to the stipulated funds.

The government's unjustified litigation posture has caused plaintiffs to expend resources that properly should have been borne by the government, and the plaintiffs deserve recompense for those efforts. Such reimbursement will also carry out the Department of the Interior's obligation to make financial resources available to the claimant group to aid in "develop[ing] and communicat[ing] to the Secretary . . . its own suggested plan for the distribution and use of [the judgment] funds." 25 U.S.C. § 1403(b).

### 2. Review and approval of a distribution plan.

A final point regarding the administration of this case under the Indian Judgment Distribution Act must be addressed. The government contends that "[i]f the Act applies to any judgment entered in this case, this [c]ourt's role terminates after certification of the judgment to the Secretary of the Treasury and allocation of appropriated funds for the judgment." Def.'s Supplemental Br. at 5; id. at 13 ("The court[']s role in Indian tribal or group judgment actions is limited to rendering judgments and certifying those judgments to the Secretary of the Treasury for payment pursuant to 31 U.S.C. § 1304."). It avers that "[u]nder the Act, the Secretary of the Interior must create and Congress

approves the plan for distribution and use of the appropriated funds." Id. at 6.

The Indian Judgment Distribution Act ostensibly provides that the Secretary must submit to Congress the distribution plan within one year of the appropriation of the funds to satisfy the judgment. See 25 U.S.C. § 1402(a).[30] The distribution plan becomes effective at the end of the sixty-day period beginning on the day the plan is submitted to Congress, unless during that period "a joint resolution is enacted disapproving such plan[ ]." 25 U.S.C. § 1405(a). Upon enactment of a joint resolution, the Secretary must submit to Congress within thirty days proposed legislation authorizing distribution of the funds. 25 U.S.C. § 1405(b).

This aspect of the Indian Judgment Distribution Act reflects an amendment adopted in 1983 to cure a constitutional defect in the original terms of the Act. Initially the Distribution Act incorporated a legislative-veto provision identical in effect to that deemed unconstitutional in *Immigration & Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).[31] See Pub.L. No. 93–134, § 5, 87 Stat. 466, 468 (1973) (Proposed distribution plans submitted to Congress would take effect unless "during such sixty-day period either House adopts a resolution disapproving such plans."). The curing amendment adopted in 1983 was en-

---

30. Amendments to the Distribution Act in 1983 extended the time to one year from one hundred eight days originally provided. See Pub.L. No. 97–458, § 1, 96 Stat. 2512 (Jan. 12, 1983).

31. In *Chadha*, the Supreme Court faced the question of the constitutionality of a one-House veto over executive action. Section 244(a)(1) of the Immigration and Nationality Act permitted the Attorney General to suspend the deportation of an alien if that alien met certain statutory prerequisites. 42 U.S.C. at 923–24. A separate provision of the Act, Section 244(c)(1), granted to Congress the power to override and veto the Attorney General's suspension of deportation via a resolution adopted by either the House of Representatives or the Senate. Id. at 925. The Supreme Court concluded that the legislative veto violated the Presentment Clauses of Article I, Section 7, Clauses 2 and 3, and the Bicameralism requirement of Article I, Sections 1 and 7. The Court determined that Congress' invocation of the veto power granted to it under the Act constituted legislative action because it "alter[ed] the legal rights, duties and relations of persons,

including the Attorney General, Executive Branch officials, and [the alien subject to deportation], all outside the legislative branch." *Chadha*, 462 U.S. at 951–52, 103 S.Ct. 2764. Absent the veto provision in Section 244(c)(2), Congressional overruling of the Attorney General's suspension determination could be achieved, if at all, only through legislation enacted pursuant to Article I. Id. at 953–54, 103 S.Ct. 2764. Because the veto was legislative action, "that action was subject to the standards prescribed in Article I" and could not be exercised outside of the careful process delineated in that part of the Constitution. Id. at 956–57, 103 S.Ct. 2764. Accordingly, the one-House veto was a violation of separation of powers and was thus unconstitutional. Id. at 959, 103 S.Ct. 2764.

Notably, the legislative veto contained within the Indian Judgment Distribution Act was listed in an Appendix to Justice White's dissent in *Chadha* listing then-current legislative vetoes which Justice White believed were invalidated by the majority opinion in *Chadha*, 462 U.S. at 959–60, 1012, 103 S.Ct. 2764.

acted prior to the Supreme Court's decision in *Chadha* but subsequent to the decision of the United States Court of Appeals for the Ninth Circuit in *Chadha v. Immigration & Naturalization Service*, 634 F.2d 408 (9th Cir.1980) (op. by Kennedy, J.), which decision was affirmed by the Supreme Court in due course. The Congressional cure in the form of requiring a joint resolution to be enacted to disapprove a proposed distribution plan satisfied both the Bicameralism and Presentment Clauses of the Constitution.[32]

Although Congress cured a constitutional flaw in the statutory regime for developing and implementing a distribution plan for judgments in certain Indian cases, it introduced another equally significant defect by legislative action taken in 1995. The provisions cited by the government calling for the Secretary to submit a distribution plan to Congress have been repealed. In 1995, Congress enacted the Federal Reports Elimination and Sunset Act of 1995, Pub.L. No. 104–66, 109 Stat. 707. Intended to "alleviate the burden on the Executive Branch [and] to also allow the [g]overnment to focus its energy on more important issues, thereby better utilizing their time," H.R. Rep. No. 104–327 (1995), 1995 WL 683033, at \*23, that Act dictated that certain provisions of law mandating the submission of reports to Congress were void as of the date of enactment or four years thereafter, *id.* at \*25. Among the reporting requirements that were to be eliminated four years after the date of enactment of the law were those mandated by the Distribution Act under Sections 1402(a) and 1404 of Title 25. 109 Stat. at 734–35 (eliminating the reporting requirements listed in H.R. Doc. No. 103–7 (1993)); H.R. Doc. No. 103–7, at 113 (listing reporting requirements under 25 U.S.C. § 1402(a) and § 1404 as among

those being abrogated). Thus, contrary to the government's contentions, the Secretary is no longer required or allowed to submit its proposed distribution plan to Congress.

To say the least, application of a repealed statutory provision will not do. The court is presented with a statute that has been decimated. The question arises whether means of filling the resulting very substantial gap are available. This court has judicial power to remit and remand "appropriate matters" to executive officials, *see* 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."); *Mendoza v. United States*, 87 Fed.Cl. 331, 337–38 (2009) (partially remanding a claim for pay and benefits to the Office of Personnel Management, where that office had statutory authority over aspects of the claim), and the court has inherent power to effectuate its judgments. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) ("[C]ertain implied powers must necessarily result to ... [c]ourts of justice from the nature of their institution.... These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812); *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962))); *Riggs v. Johnson Cnty.*, 73 U.S. (6 Wall.) 166, 187, 18 L.Ed. 768 (1867) ("[T]he rule is universal, that if the power is conferred to render the judgment ..., it also includes the power to issue proper process to

---

32. *See Constitution, Jefferson's Manual, and Rules of the House of Representatives,* H.R. Doc. No. 108–241, 108th Cong., 2d Sess. § 397 (2005) ("A[ ] development of the modern practice is the joint resolution, which is a bill so far as the processes of the Congress in relation to it are concerned. With the exception of joint resolutions proposing amendments to the Constitution, all these resolutions are sent to the President for approval and have the full force of law. They are used for what may be called the incidental, unusual, or inferior purposes of legislating.") (citations omitted); *see also International Brother-*

*hood of Elec. Workers v. Washington Terminal Co.,* 473 F.2d 1156, 1164 (D.C.Cir.1972) ("That a joint resolution was used [by Congress] to accomplish the intended result does not detract from the legislative character of the action.")

Congress made similar changes to other laws to cure the constitutional infirmity identified in *Chadha. See United States v. Amirnazmi,* 645 F.3d 564, 581 n. 26 (3d Cir.2011) (discussing an amendment to the National Emergencies Act to replace a termination of an emergency by "concurrent resolution" of Congress with termination of an emergency by a "joint resolution.").

enforce such judgment or decree."); *see also Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135–38 (2004) (addressing various inherent powers); 28 U.S.C. § 2521(c) ("The United States Court of Federal Claims shall have such assistance in the carrying out of its lawful writ, process, order, rule, decree, or command as is available to a court of the United States."). Exercising those powers offers the best prospect of adhering to the terms of the Distribution Act insofar as it is legally possible to do so. Accordingly, the court will issue a remit, remand, and direction to the Secretary of the Interior to provide a report to the court within the time specified in 25 U.S.C. § 1402, submitting his or her "plan for the use and distribution of the funds" awarded to the lineal descendants of the loyal Mdewakanton, 25 U.S.C. § 1402(a). Upon receipt of the report, the court will entertain potential proceedings to review the report, as provided in RCFC 52.2(f). This disposition will enable the court to take the "necessary steps to insure the[ ] speedy determination" of the case, at least to the extent that any such determination is possible. *Navajo Tribe of Indians v. United States*, 601 F.2d 536, 540 (Ct.Cl.1979).

### C. *Summary Judgment*

Because the court has no direct role in specifying the individual persons entitled to share in a judgment in favor of the descendants of the loyal Mdewakanton as an identifiable group of Indians, and because the amount of the funds to which the descendants are entitled based upon plaintiffs' and intervening plaintiffs' use-restriction claims has been set by stipulation of the parties, there is no genuine dispute of any material fact regarding those claims. As a result, plaintiffs and intervening plaintiffs are granted summary judgment on their use-restriction claims for $673,944, measured as of January 1, 2011.

### III. JUDGMENT UNDER RULE 54(b)

Pursuant to RCFC 54(b), this court is authorized to "direct entry of a final judgment as to one or more, but fewer than all claims," upon the finding that "there is no just reason for delay." RCFC 54(b). In this case there is no reason to delay further the final resolution of the claims regarding the restricted

use funds. The court will enter final judgment as to those claims.

Entry of a judgment under Rule 54(b) will allow the Secretary of the Interior to develop a roll of eligible claimants and prepare a distribution plan. Partial final judgments are expressly authorized under 28 U.S.C. § 2517(b), and 31 U.S.C. § 1304(a)(3)(A) provides for payment from the Judgment Fund of all those judgments payable under Section 2517. Once the judgment is certified and the money automatically appropriated, the Secretary shall begin the work necessary to create a distribution plan in accordance with the Indian Judgment Distribution Act.

### IV. CONCLUSION

For the reasons stated, the court DENIES plaintiffs' and plaintiff-intervenors' motions to amend their respective complaints to include claims grounded in the Indian Non–Intercourse Act and the 1863 Acts. The Robertson–Vadnais group of plaintiff-intervenors' motion to amend to add a takings claim under the Fifth Amendment is likewise DENIED. The motions to allow the various other proffered amendments to plaintiffs' and plaintiff-intervenors' complaints are GRANTED. The government's motion to dismiss claims grounded in the 1863 Acts is GRANTED as to the Julia DuMarce Group and the Harley Zephier Group of plaintiff-intervenors. The government's motion to dismiss is otherwise DENIED, as is the government's motion to defer consideration under RCFC 56(d).

Plaintiffs' and plaintiff-intervenors' motions for summary judgment are GRANTED IN PART, i.e., they are granted as to the claims based upon the use restrictions in the 1888, 1889, and 1890 Appropriation Acts. The government's cross-motion for summary judgment is DENIED. There being no just reason for delay, and because entry of a final judgment on the use-restriction claims will materially advance the ultimate resolution of this litigation, the court directs entry of final judgment as to the use-restriction claims pursuant to RCFC 54(b). The clerk is directed to enter a final judgment in favor of plaintiffs and plaintiff-intervenors against the United States on the use-restriction claims in

the amount of $673,944, measured as of January 1, 2011. Distribution of the judgment shall be made pursuant to the Indian Tribal Judgment Funds Use or Distribution Act, 25 U.S.C. §§ 1401–07.

To effectuate the Distribution Act given the repeal of the provisions providing for reports to Congress regarding a proposed distribution plan, the matters of developing a roll of eligible claimants and a plan for distribution of the funds awarded shall be and are remitted and remanded to the Secretary of the Interior pursuant to 28 U.S.C. § 1491(a)(2) and RCFC 52.2(a). In carrying forward with his or her responsibilities under the Distribution Act, the Secretary shall provide reimbursement pursuant to 25 U.S.C. § 1403(b) to plaintiffs and intervening plaintiffs for their costs in preparing and submitting to the court and the government, genealogies to establish their status as eligible claimants. In accord with 28 U.S.C. § 1402, the Secretary shall complete preparation of such roll and plan satisfying the criteria specified in 25 U.S.C. § 1403 within one year from the date of this decision and judgment. Upon completion, the Secretary shall submit a report to the court setting out the proposed roll and plan.

Plaintiffs are awarded their costs of suit.

It is so ORDERED.



Sheldon Peters WOLFCHILD, et al., Plaintiffs,

v.

UNITED STATES, Defendant.

Nos. 03–2684L, 01–568L.

United States Court of Federal Claims.

Oct. 25, 2011.

**Background:** Government moved for reconsideration of a partial final judgment of the United States Court of Federal

Claims, 101 Fed.Cl. 54, granting awards, pursuant to the Indian Tribal Judgment Funds Use or Distribution Act, to approximately 20,750 persons of Indian descent on their claims for revenue derived from use of lands reserved for eligible Indians.

**Holding:** The Court of Federal Claims, Lettow, J., held that upon Reports Elimination Act's repeal of Secretary of the Interior's duty under Indian Tribal Judgment Funds Use or Distribution Act to submit to Congress a plan for the use and distribution of the funds to pay a judgment of the Court of Federal Claims to any Indian tribe, Court of Federal Claims regained its general powers of effectuation of its judgments, including by issuing "a remit, remand, and direction to the Secretary of the Interior to provide a report to the court within the time specified in Indian Tribal Judgment Funds Use or Distribution Act".

Motion denied.

1. **Federal Courts** ⟐1121

Motion for reconsideration of a partial final judgment is governed by the rigorous standards of rule governing motions to alter or amend a judgment. RCFC, Rule 59(e), 28 U.S.C.A.

2. **Federal Courts** ⟐1121

An amendment of an interlocutory order, which may be revised at any time before the entry of a judgment, requires a lesser showing than a reconsideration of a final judgment. RCFC, Rule 59(e), 28 U.S.C.A.

3. **Federal Courts** ⟐1121

Reconsideration of a final judgment is appropriate primarily on grounds of (1) an intervening change in the controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice. RCFC, Rule 59(e), 28 U.S.C.A.

4. **United States** ⟐105

Reports Elimination Act repealed Secretary of the Interior's duty under Indian Trib-

# In the United States Court of Federal Claims

Nos. 03-2684 L & 01-568 L

SHELDON PETERS WOLFCHILD, ET AL.,

**JUDGMENT**

v.

THE UNITED STATES

Pursuant to the Published Opinion and Order, filed August 5, 2011, stating that there is no just reason for delay, as provided in Rule 54(b),

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 54(b), that judgment is in favor of plaintiffs and plaintiff-intervenors on the use-restriction claims in the amount of $554,514.00, measured as of January 1, 2011. Distribution of this judgment shall be made pursuant to the Indian Tribal Judgment Funds Use or Distribution Act, 25 U.S.C. §§ 1401-07. Plaintiffs are awarded their costs of suit.

Hazel C. Keahey
Clerk of Court

**August 5, 2011**          By:    s/Lisa L. Reyes

Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $455.00.

# In the United States Court of Federal Claims

### Nos. 03-2684 L and 01-568 L

SHELDON PETERS WOLFCHILD,
et al.

                                                 **CORRECTED JUDGMENT**

    v.

THE UNITED STATES

Pursuant to the court's Order filed August 18, 2011, and the corrected Opinion and Order, attached thereto,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 54(b), that judgment is in favor of plaintiffs and plaintiff-intervenors on the use-restriction claims in the amount of $673,944.00, measured as of January 1, 2011.  Distribution of this judgment shall be made pursuant to the Indian Tribal Judgment Funds Use or Distribution Act, 25 U.S.C. §§ 1401-07. Plaintiffs are awarded their costs of suit.

                                                Hazel C. Keahey
                                                Clerk of Court

**August 22, 2011**           By:     s/ Debra L. Samler

                                                Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $455.00.

the amount of $673,944, measured as of January 1, 2011. Distribution of the judgment shall be made pursuant to the Indian Tribal Judgment Funds Use or Distribution Act, 25 U.S.C. §§ 1401–07.

To effectuate the Distribution Act given the repeal of the provisions providing for reports to Congress regarding a proposed distribution plan, the matters of developing a roll of eligible claimants and a plan for distribution of the funds awarded shall be and are remitted and remanded to the Secretary of the Interior pursuant to 28 U.S.C. § 1491(a)(2) and RCFC 52.2(a). In carrying forward with his or her responsibilities under the Distribution Act, the Secretary shall provide reimbursement pursuant to 25 U.S.C. § 1403(b) to plaintiffs and intervening plaintiffs for their costs in preparing and submitting to the court and the government, genealogies to establish their status as eligible claimants. In accord with 28 U.S.C. § 1402, the Secretary shall complete preparation of such roll and plan satisfying the criteria specified in 25 U.S.C. § 1403 within one year from the date of this decision and judgment. Upon completion, the Secretary shall submit a report to the court setting out the proposed roll and plan.

Plaintiffs are awarded their costs of suit.

It is so ORDERED.



Sheldon Peters WOLFCHILD,
et al., Plaintiffs,

v.

UNITED STATES, Defendant.

Nos. 03–2684L, 01–568L.

United States Court of Federal Claims.

Oct. 25, 2011.

**Background:** Government moved for reconsideration of a partial final judgment of the United States Court of Federal Claims, 101 Fed.Cl. 54, granting awards, pursuant to the Indian Tribal Judgment Funds Use or Distribution Act, to approximately 20,750 persons of Indian descent on their claims for revenue derived from use of lands reserved for eligible Indians.

**Holding:** The Court of Federal Claims, Lettow, J., held that upon Reports Elimination Act's repeal of Secretary of the Interior's duty under Indian Tribal Judgment Funds Use or Distribution Act to submit to Congress a plan for the use and distribution of the funds to pay a judgment of the Court of Federal Claims to any Indian tribe, Court of Federal Claims regained its general powers of effectuation of its judgments, including by issuing "a remit, remand, and direction to the Secretary of the Interior to provide a report to the court within the time specified in Indian Tribal Judgment Funds Use or Distribution Act".

Motion denied.

1. **Federal Courts** ⟐1121
   Motion for reconsideration of a partial final judgment is governed by the rigorous standards of rule governing motions to alter or amend a judgment. RCFC, Rule 59(e), 28 U.S.C.A.

2. **Federal Courts** ⟐1121
   An amendment of an interlocutory order, which may be revised at any time before the entry of a judgment, requires a lesser showing than a reconsideration of a final judgment. RCFC, Rule 59(e), 28 U.S.C.A.

3. **Federal Courts** ⟐1121
   Reconsideration of a final judgment is appropriate primarily on grounds of (1) an intervening change in the controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice. RCFC, Rule 59(e), 28 U.S.C.A.

4. **United States** ⟐105
   Reports Elimination Act repealed Secretary of the Interior's duty under Indian Trib-

al Judgment Funds Use or Distribution Act to submit to Congress a plan for the use and distribution of the funds to pay a judgment of the Court of Federal Claims to any Indian tribe; Reports Elimination Act explicitly terminated the reporting requirements of the Indian Tribal Judgment Funds Use or Distribution Act by including those requirements on the list prepared by the Clerk of the House of Representatives of those reports to be specifically eliminated. Indian Tribal Judgment Funds Use or Distribution Act, § 2(a), 25 U.S.C.A. § 1402(a).

**5. Federal Courts ⊜1119.1**

Court of Federal Claims has inherent juridical power to effectuate its own judgments.

**6. Federal Courts ⊜25**

Congress may alter the means by which courts exercise their power of enforcing judgments.

**7. Federal Courts ⊜1119.1**

Upon Reports Elimination Act's repeal of Secretary of the Interior's duty under Indian Tribal Judgment Funds Use or Distribution Act to submit to Congress a plan for the use and distribution of the funds to pay a judgment of the Court of Federal Claims to any Indian tribe, Court of Federal Claims regained its general powers of effectuation of its judgments, including by issuing a remit, remand, and direction to the Secretary of the Interior to provide a report to the court within the time specified in Indian Tribal Judgment Funds Use or Distribution Act. Indian Tribal Judgment Funds Use or Distribution Act, § 2, 25 U.S.C.A. § 1402.

**8. Federal Courts ⊜3.1**

Congressional acts delegating or limiting the inherent powers of federal courts are strictly construed and require express intent.

**9. Statutes ⊜223.4**

A remedy furnished by a precisely drawn and detailed statute preempts a more general remedy.

**10. Federal Courts ⊜1073.1, 1081**

Court of Federal Claims' general grant of jurisdiction under the Tucker Act and under the Indian Tucker Act, can only be displaced by more specific legislation. 28 U.S.C.A. § 1491.

**11. Common Law ⊜11**

Statutes ⊜239

Common law prevails where statute does not command, and derogations of common law by statute are strictly construed.

Erick G. Kaardal, Mohrman & Kaardal, P.A., Minneapolis, MN, for Wolfchild plaintiffs. With him on the briefs was William F. Mohrman, Mohrman & Kaardal, P.A., Minneapolis, MN.

Stephen Finn, Jody H. Schwarz, Daniel Steele, and J. Nathanael Watson, Trial Attorneys, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. Of counsel were Kenneth Dalton and James Porter, Office of the Solicitor, Department of the Interior, Washington, D.C.

Jack E. Pierce, Pierce Law Firm, PA, Minneapolis, MN, for the Cermak plaintiffs and for the Stephens, R. Cermak, J. Cermak, Henderson, Klingberg, Alkire, Arnold, and Godoy groups of intervening plaintiffs.

Kelly H. Stricherz, Vermillion, SD, for the Mozak group of intervening plaintiffs.

Garrett J. Horn, Horn Law Office, Yankton, SD, for the Saul, Trudell, Taylor, Ferris, Henry, and Vassar groups of intervening plaintiffs.

Creighton A. Thurman, Yankton, SD, for the Cournoyer, Robinette, Kimbell, French, and Wanna groups of intervening plaintiffs.

Elizabeth T. Walker, Walker Associates, Alexandria, VA, for the anonymous Walker, the Enyard, and the Kitto groups of intervening plaintiffs.

Robin L. Zephier, Abourezk & Zephier, PC, Rapid City, SD, for the Zephier group of intervening plaintiffs.

Larry Leventhal, St. Paul, MN, for the Burley group of intervening plaintiffs.

Wood R. Foster, Jr., Siegel, Brill, Greupner, Duffy & Foster, PA, Minneapolis, MN,

for the Lafferty, Blaeser, Whipple, and Lowe groups of intervening plaintiffs.

Bernard J. Rooney, Amherst, WI, for the Rooney group of intervening plaintiffs.

Scott A. Johnson and Todd M. Johnson, Johnson Law Group, Minnetonka, MN, for the Rocque group of intervening plaintiffs and the Descendants of Joseph Coursolle group of intervening plaintiffs.

James L. Blair, Renaud Cook Drury Mesaros, PA, Phoenix, AZ, for the anonymous Blair group of intervening plaintiffs. With him on the briefs was Barry P. Hogan, Renaud Cook Drury Mesaros, PA, Phoenix, AZ.

Gary J. Montana, Montana & Associates, Osseo, WI, for the Julia DuMarce group of intervening plaintiffs.

Nicole N. Emerson, Lynn, Jackson, Shultz & Lebrun, PC, Sioux Falls, SD, for the Garreau group of intervening plaintiffs.

Douglas Kettering, Kettering Law Office, Yankton, SD, for the Ke Zephier group of intervening plaintiffs.

Randy V. Thompson, Nolan, MacGregor, Thompson & Leighton, St. Paul, MN, for the Abrahamson group of intervening plaintiffs.

Frances Felix, pro se, Minneapolis, MN, for herself and members of her immediate family as intervening plaintiffs.

Royce Deryl Edwards, Jr., Joplin, MO, for the Robertson–Vadnais group of intervening plaintiffs.

Rory King, Bantz, Gosch & Cremer, LLC, Aberdeen, SD, for the Marvel Jean·DuMarce group and the Youngbear group of intervening plaintiffs.

Brian L. Radke, Radke Law Office, P.C., Sioux Falls, SD, for the Schroder group of intervening plaintiffs.

## OPINION AND ORDER

LETTOW, Judge.

This longstanding dispute between the United States ("the government") and approximately 20,750 persons of Indian descent (collectively "plaintiffs" or "plaintiffs and plaintiff-intervenors") involves revenue derived from lands reserved for eligible Indians. On August 18, 2011, the court directed entry of a partial final judgment under Rule 54(b) of the Rules of the Court of Federal Claims ("RCFC"), awarding plaintiffs and plaintiff-intervenors $673,944 for their statutory use-restriction claims. *See Wolfchild v. United States*, 101 Fed.Cl. 54, 91 (2011) ("*Wolfchild VIII* "). To effectuate the distribution of those funds pursuant to the Indian Tribal Judgment Funds Use or Distribution Act ("Distribution Act"), 25 U.S.C. §§ 1401–.1408, the court remitted and remanded the task of determining eligible claimants to the Secretary of the Interior (the "Secretary"). *Id.* at 92. The court instructed the Secretary to produce a roll of claimants and plan for distribution, and to submit within one year a report of that proposed roll and plan for the court's review. *Id.* On September 2, 2011, the government filed a motion for reconsideration of the court's decision. At the court's request, plaintiffs and plaintiff-intervenors responded. The motion is ready for disposition.

## STANDARD FOR RECONSIDERATION

[1] The government requests that the court undertake reconsideration using the standards applicable to interlocutory orders. *See* Def.'s Mot. for Reconsideration ("Def.'s Mot.") at 1–2; Pl.-Intervenors' Resp. in Opp'n to Def.'s Mot. at 5–6. In *Wolfchild VIII*, however, the court directed entry of "*final judgment* as to one or more, but fewer than all claims." *Wolfchild VIII*, 101 Fed.Cl. at 91 (quoting RCFC 54(b)) (emphasis added). Hence, the case is no longer in an interlocutory posture as to those claims. Consequently, the motion for reconsideration does not fall under "RCFC 59(a), [but] rather ... under the more rigorous standards of RCFC 59(e)," *Wolfchild v. United States*, 68 Fed.Cl. 779, 784 (2005) ("*Wolfchild II* "), as a "motion to alter or amend a *judgment*," RCFC 59(e) (emphasis added). *See White v. New Hampshire Dep't of Emp't Sec.*, 455 U.S. 445, 451, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982) (post judgment motions related to the merits should be considered under Rule 59(e) of the Rules of Federal Civil Procedure

("Fed. R. Civ. P."));[1] *Maxus Energy Corp. v. United States*, 31 F.3d 1135, 1139 (Fed.Cir. 1994) ("The universal rule is that, regardless of its label, any motion made within ten days[2] of entry of judgment which seeks a substantive change in the judgment will be considered a Fed.[ ]R.[ ]Civ.[ ]P. 59(e) motion." (citing *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1562 (Fed.Cir. 1994))). Thus, the government's recitation of the standards for reconsideration is pro forma at best and insufficient by any measure because it inappropriately merges the standards for reconsideration of final judgments with those for review of interlocutory orders. Meanwhile, plaintiff-intervenors' brief, which argues that this court should evaluate the government's motion as a reconsideration of an interlocutory order, is simply incorrect.[3]

[2] RCFC 54(b) sets out the difference between partial final judgments and interlocutory orders:

> When an action presents more than one claim for relief ... the court may direct entry of a final judgment as to one or more, but fewer than all, claims.... *Otherwise, any order or other decision*, however designated, that adjudicates fewer than all the claims ... *does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment* adjudicating all the claims and all the parties' rights and liabilities.

RCFC 54(b) (emphasis added); *see also Florida Power*, 66 Fed.Cl. at 95 (citing *Exxon Corp. v. United States*, 931 F.2d 874, 877

(Fed.Cir.1991)). An amendment of an interlocutory order—which "may be revised at any time before the entry of a judgment"—requires a lesser showing than a reconsideration of a final judgment. "At an interlocutory stage, the common law provides that the court has power to reconsider its prior decision on *any ground* consonant with application of the law of the case doctrine." *Wolfchild II*, 68 Fed.Cl. at 785 (emphasis added). However, once a final judgment has been entered, a motion to reconsider that judgment "seeks a revision which disturbs or revises legal rights and obligations that were settled by the previous judgment." *Maxus Energy*, 31 F.3d at 1139 (citing *St. Paul Fire & Marine Ins. Co. v. Continental Cas. Co.*, 684 F.2d 691, 693 (10th Cir.1982)). Consequently, "[t]he legal standards for the amendments of final judgments ... are not coextensive with the standards for the review of non-final orders, which may involve matters as mundane as evidentiary rulings [or] extensions of time." *Florida Power*, 66 Fed. Cl. at 95–96; *cf. Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 698 (Fed.Cir.2001) (departure from the law of the case requires a lesser showing than "the more rigorous requirements of *res judicata* ").

[3] For reconsideration of a final judgment under RCFC 59(e), the movant must make "a showing of extraordinary circumstances to justify relief." *Crews v. United States*, 424 Fed.Appx. 937, 940 (Fed.Cir.2011) (citing *Fru-Con Constr. Corp. v. United States*, 44 Fed.Cl. 298, 300 (1999), *aff'd*, 250 F.3d 762 (Fed.Cir.2000) (table)); *cf. Infiniti*

---

1. While Fed.R.Civ.P. 59 and RCFC 59 are not identical, their differences are not material for determining whether a particular motion should be deemed as falling under Rule 59(e) or not. *See* RCFC 59 rules committee's notes (2008 Amendment) ('The language of RCFC 59 has been amended to conform to the general restyling of the [Fed.R.Civ.P.]."); *Florida Power & Light Co. v. United States*, 66 Fed.Cl. 93, 96 (2005) ("In applying RCFC 59, judges of this [c]ourt regularly cite to cases applying [Fed. R.Civ.P.] 59.").

2. Fed.R.Civ.P. 59 formerly required a motion under Rule 59(e) to be filed within ten days The deadline was amended to 28 days in 2009. *See* Fed.R.Civ.P. 59 (advisory committee's notes on 2009 Amendments). Thereafter, the deadline in RCFC 59(e) was changed to 30 days and then 28

days, to correspond with the Fed.R.Civ.P. *See* RCFC 59 rules committee's notes (2010 Amendment); *id.* (2011 Amendment).

3. The court recognizes that the confusion in the standards has occurred in both directions. "On occasion ... judges of this [c]ourt have applied the[ ] stricter standards [of RCFC 59] to nonfinal, interlocutory orders[, which] blurs the distinction between final and interlocutory orders." *Florida Power*, 66 Fed.Cl. at 96. Contrastingly, *Global Computer Enters. v. United States*, 88 Fed. Cl. 466, 468 (2009), posits that both the Court of Federal Claims and the Federal Circuit have "utilized the standards set forth in Rule 59(a) to review Rule 59(e) motions." *See also Strategic Hous. Fin. Corp. v. United States*, 87 Fed.Cl. 183, 185–86 (2009) (same).

*Info. Solutions, LLC v. United States,* 93 Fed.Cl. 699, 705 (2010) (discussing "extraordinary circumstances" in the context of RCFC 60(b)(6)). Thus, reconsideration of a final judgment is appropriate primarily on grounds of "(1) an intervening change in the controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice." *Delaware Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC,* 597 F.3d 1374, 1383 (Fed.Cir. 2010) (applying Eleventh Circuit law regarding Fed.R.Civ.P. 59(e)); *see also Board of Trs. of Bay Med. Ctr. v. Humana Military Healthcare Servs., Inc.,* 447 F.3d 1370, 1377 (Fed.Cir.2006) (same).

## ANALYSIS

The government seeks reconsideration of three aspects of the court's decision. First, the government requests the court to reverse its determination that the Federal Reports Elimination and Sunset Act of 1995, Pub.L. No. 104–66, 109 Stat. 707 ("Reports Elimination Act"), terminated the Secretary's duty to submit distribution plans to Congress under the Distribution Act. *See Wolfchild VIII,* 101 Fed.Cl. at 88-91. Second, the government requests the court to enter judgment on all claims in this action. *See id.* at 91. Third, the government requests the court to reconsider its order remitting and remanding the distribution-plan-formulation task to the Secretary and providing for possible review of the Secretary's action. *See id.*

### A.  The Reports Elimination Act

[4]  The Distribution Act states that "[w]ithin one year after appropriation of funds to pay a judgment of the ... Court of Federal Claims to any Indian tribe, the Secretary of the Interior shall prepare and submit to Congress a plan for the use and distribution of the funds." 25 U.S.C. § 1402(a). However, the Secretary's duty to submit such a plan to Congress was repealed by the plain terms of the Reports Elimination Act. *See Wolfchild VIII,* 101 Fed.Cl. at 90-91. Specifically, the Reports Elimination Act terminated "each provision of law requiring the submittal to Congress ... of any annual, semiannual, or other regular periodic report specified on the list described under

subsection (c)." Reports Elimination Act § 3003(a), 109 Stat. at 734.  Subsection (c) refers to a list prepared by the Clerk of the House of Representatives. *Id.* § 3003(c), 109 Stat. at 735.  Included in that voluminous list of reports to be eliminated is one titled "Manner of payment of a judgment to any Indian tribe [authorized by] 25 U.S.C. 1402(a), 1404." H.R. Doc. No. 103–7, at 113 (1993).  In short, the Reports Elimination Act explicitly terminated the reporting requirements of the Distribution Act by including those requirements on the list prepared by the Clerk of the House of Representatives of those reports to be specifically eliminated. The Reports Elimination Act thus "decimated" the Distribution Act because "the Secretary is no longer required or allowed to submit [a] proposed distribution plan to Congress." *Wolfchild VIII,* 101 Fed.Cl. at 90.

The government nonetheless argues that the Reports Elimination Act does not apply to the Distribution Act, much less decimate it.  As the government would have it, "[t]he language of the Reports Elimination Act did not terminate 'all' reports found in House Document No. 103–7 but only 'any' reports that were 'annual, semiannual, or regular periodic.'" Def.'s Mot. at 4. Contrary to the government's implied argument, however, Distribution Act reports are "regular periodic" reports.  As stated plainly in the House list, the reports were to be submitted "180 days after appropriation of funds." H.R. Doc. No. 103–7, at 113. Such timely submission is not as "ad hoc" as the government suggests, Def.'s Mot. at 5, in contrast to many reports on the list that might be so characterized, *see, e.g.,* H.R. Doc. No. 103–7, at 19 ("[a]t any time"), 62 ("[i]n advance"), 114 ("[n]o time specified"), 162 ("[a]s appropriate"). This understanding is confirmed by reports Congress exempted from the Reports Elimination Act, which otherwise would have been terminated as "annual, semiannual, or regular periodic." *See* Reports Elimination Act § 3003(d)(12), 109 Stat. at 735 (citing 22 U.S.C. § 5858) (exempting report required of the President "[n]ot less than 15 days before obligating any funds" for specified anti-nuclear-proliferation activities, 22 U.S.C. § 5858(a)).

In an alternative effort at partial resuscitation, the government suggests that the court "sever" the Distribution Act language repealed by the Reports Elimination Act and find that "Congress has partially repealed the Distribution Act only to the extent that the Secretary is no longer required to submit distribution plans to Congress under any particular deadlines." Def.'s Mot. at 13. The government's suggestion that somehow the Reports Elimination Act only repealed the Distribution Act's deadlines is without any textual support and meritless.[4] Further, severance is a concept to guide courts when holding part of a statute unconstitutional, as aptly demonstrated by every case cited by the government on the subject. See Def.'s Mot. at 8–9 (citing, *e.g.*, *Free Enter. Fund v. Public Co. Accounting Oversight Bd.,* — U.S. —, —, 130 S.Ct. 3138, 3161–62, 177 L.Ed.2d 706 (2010) (holding tenure provisions contravened the Constitution's separation of powers but were severable from the rest of the Sarbanes–Oxley Act); *New York v. United States,* 505 U.S. 144, 186–87, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (holding take-title provision was beyond Congress' enumerated powers and inconsistent with the Tenth Amendment but was severable from the rest of the Low–Level Radioactive Waste Policy Amendments Act of 1985); *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 684–97, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) (holding legislative-veto provision was unconstitutional but was severable from the rest of the Airline Deregulation Act of 1978)). Here, though, the court is confronted with a legislative repeal, not a constitutional defect. The plain language of that legislative repeal instructs the Secretary no longer to submit distribution plans to Congress, and when "the intent of Congress is clear [from the unambiguous text of a statute], that is the end of the matter." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**B. *Final Judgment***

The government's second request is that the court enter final judgment on all claims in this case. The government avers that "there are no claims left for the [c]ourt to adjudicate," Def.'s Mot. at 15, save claims for costs and attorneys' fees that cannot be determined until after a final judgment has entered, *id.* at 15 n. 2 (citing RCFC 54(d)). This asserted posture of the case is both incorrect and inconsistent with the government's previously expressed legal position. *See* Def.'s Mot. to Stay Pls.' Mots. for Interim Determination of the United States' Liability for Attorney's Fees, ECF No. 880; Order of August 5, 2011 (granting Def.'s Mot. to Stay). At a minimum, issues remain regarding the government's liability for attorneys' fees as well as recompense for plaintiffs' and plaintiff-intervenors' extensive evidentiary submissions that they are lineal descendants of the loyal Mdewakanton Sioux. *See Wolfchild VIII,* 101 Fed.Cl. at 88–90.

**C. *Review of the Distribution Plan***

The government lastly requests the court to reconsider its order remitting and remanding the formulation of a distribution plan to the Secretary and directing the Secretary to submit that plan to the court for review. The government argues that, assuming the Reports Elimination Act did indeed eliminate the Secretary's submission of distribution plans to Congress, it does not follow that oversight of such plans shifts to this court. Instead, the government contends that any review of the Secretary's action would fall to the federal district courts under the Administrative Procedure Act. *See* Def.'s Mot. at 12–14. In contrast, plaintiff and plaintiff-intervenors argue that the court, per its determination in *Wolfchild VIII,* has power to remand the distribution-plan-formulation task to the Secretary and to address any challenges to the resulting report. *See* Pl.'s Resp. to Mot. for Reconsideration at 4–5; *see also* 28 U.S.C. § 1491(a)(2) ("In any

---

4. The government's brief subsequently contends that this court's direction to the Secretary to report on its distribution plan one year from the entry of judgment in *Wolfchild VIII* is inconsistent with the Distribution Act's requirement that such a report be submitted "[w]ithin one year

after appropriation of funds to pay a judgment." 25 U.S.C. § 1402(a); *see* Def.'s Mot. at 18–20. This is an unavailing proposition given the government's assertion that the Distribution Act's deadlines were eliminated.

case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."); 28 U.S.C. § 2521(c) ("The United States Court of Federal Claims shall have such assistance in the carrying out of its lawful writ, process, order, rule, decree, or command as is available to a court of the United States."); RCFC 52.2(f) (governing remand orders).

[5] As the court explained in its earlier opinion, this court has inherent juridical power to effectuate its own judgments. *See Wolfchild VIII,* 101 Fed.Cl. at 90–91 (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *Riggs v. Johnson County,* 73 U.S. (6 Wall.) 166, 187, 18 L.Ed. 768 (1867)). Indeed, it is fundamental that this "court may take action to protect, secure, and enforce a judgment . . . so long as the court had juridical power to issue that judgment." *Infiniti,* 93 Fed.Cl. at 703 (2010) (citing *Peacock v. Thomas,* 516 U.S. 349, 356, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996) ("Without jurisdiction to enforce a judgment entered by a federal court, the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution."); *Riggs,* 73 U.S. at 187 ("[T]he rule is universal, that if the power is conferred to render the judgment or enter the decree, it also includes the power to issue proper process to enforce such judgment or decree." (alteration added)); *Heartland-By-Prods., Inc. v. United States,* 424 F.3d 1244, 1252 (Fed.Cir.2005) ("Federal courts hold the inherent power to enforce their prior judgments.")).

[6] It is also fundamental that Congress may alter the means by which courts exercise their power of enforcing judgments. *See Virginia v. West Virginia,* 246 U.S. 565, 600–06, 38 S.Ct. 400, 59 L.Ed. 1272 (1918) (Congress may create "additional process relevant to the enforcement of judicial authority" and "new remedies . . . to meet the exigency occasioned by the judicial duty of enforcing a judgment against a [s]tate," *id.* at 603, 38 S.Ct. 400); *Riggs,* 73 U.S. at 187–88 ("Con-

gress . . . possesses the uncontrolled power to legislate in respect both to the form and effect of executions and other final process to be issued in the [f]ederal courts."); *cf. id.* at 195 ("The Constitution itself becomes a mockery . . . if the [s]tate legislatures may at will annul the judgments of the [f]ederal courts, and the nation is deprived of the means of enforcing its own laws by the instrumentality of its own tribunals. Congress may adopt [s]tate laws for such a purpose directly, or confide the authority to adopt them to the [f]ederal courts, *but their whole efficacy when adopted depends upon the enactments of Congress.*" (emphasis added) (footnote omitted)).

[7] When Congress initially enacted the Distribution Act, it specifically displaced this court as the final arbiter of distributions to effectuate judgments in favor of Indians. Congress subsequently removed itself from this role, however, with the repeal of those effectuation-related provisions by the Reports Elimination Act. That removal did not leave a juridical vacuum, contrary to the government's position. Instead, this court simply resumed its general powers of effectuation of its judgments.

[8] This resumption of powers explains why there is no foundation for the government's suggestion that review of the Secretary's action to establish a distribution plan inheres in a district court under the Administrative Procedure Act. The sort of displacement the government suggests would require specific statutory provisions. First, congressional acts delegating or limiting the inherent powers of federal courts are strictly construed and require express intent. *See Miller v. French,* 530 U.S. 327, 340, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) ("[W]e should not construe a statute to displace courts' traditional equitable authority absent the clearest command or an inescapable inference to the contrary." (quoting *Califano v. Yamasaki,* 442 U.S. 682, 705, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979); *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946)) (internal citations and quotation marks omitted)); *NASCO,* 501 U.S. at 46–48, 111 S.Ct. 2123 (federal statutes and

the Federal Rules of Civil Procedure have not displaced the federal courts' inherent power to sanction bad-faith conduct by litigants, for " 'we do not lightly assume that Congress has intended to depart from established principles' such as the scope of a court's inherent power," *id.* at 47, 111 S.Ct. 2123 (quoting *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982))); *Wingo v. Wedding,* 418 U.S. 461, 470 n. 11, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974) (delegation of federal district court powers to conduct hearings to magistrate judges must be "express and circumscribed with procedural safeguards" and "reference to a master shall be the exception and not the rule"); *Crowell v. Benson,* 285 U.S. 22, 46, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ("[T]he statute contains no express limitation attempting to preclude the court, in proceedings to set aside an order [of the U.S. Employees' Compensation Commission] as not in accordance with law, from making its own examination and determination of facts whenever that is deemed to be necessary to enforce a constitutional right properly asserted. As the statute is to be construed so as to support rather than to defeat it, *no such limitation is to be implied.*" (emphasis added) (citations omitted)); *Procter & Gamble Co. v. Kraft Foods Global, Inc.,* 549 F.3d 842, 848 (Fed.Cir.2008) (Congress would not abrogate a trial court's inherent power to grant a stay "*sub silentio.*").

[9, 10] Second, in comparable fashion, this court's general grant of jurisdiction under the Tucker Act and here, under the Indian Tucker Act, can only be displaced by more specific legislation. *See, e.g., United States v. Fausto,* 484 U.S. 439, 454–55, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (holding that the Tucker Act was displaced by the "comprehensive and integrated review scheme" of the Civil Service Reform Act, *id.* at 454, 108 S.Ct. 668); *St. Vincent's Med. Ctr. v. United States,* 32 F.3d 548, 549–50 (Fed.Cir.1994) (concluding that the Tucker Act was displaced by the comprehensive administrative and district-court review procedures provided by the Medicare Act); *Puget Sound Pow-*

er & Light Co. v. United States, 23 Cl.Ct. 46, 56 (1991) (deciding that the Tucker Act was displaced by the Northwest Power Act), appeal dismissed, 944 F.2d 912 (Fed.Cir.1991) (Table).[5]

[11] Third, and most generally, common law prevails where statute does not command, and derogations of common law by statute are strictly construed. "The Supreme Court has established that 'courts may take it as a given that Congress has legislated with an expectation that the common law principle will apply except when the statutory purpose to the contrary is evident.'" *Avgoustis v. Shinseki,* 639 F.3d 1340, 1342 (Fed.Cir.2011) (quoting *Astoria Fed. Savs. & Loan Ass'n v. Solimino,* 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991)); *see also Rios v. Nicholson,* 490 F.3d 928, 931 (Fed.Cir.2007) ("Statutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles." (alteration in original) (quoting *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952))). *See generally* 3 Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 61:2 (7th ed. 2008).

In sum, the Distribution Act modified this court's powers to oversee its judgments, but the Reports Elimination Act elided that aspect of the Distribution Act. As a consequence, this court regained its general powers to effectuate its judgments, including by issuing "a remit, remand, and direction to the Secretary of the Interior to provide a report to the court within the time specified in 25 U.S.C. § 1402." *Wolfchild VIII,* 101 Fed.Cl. at 91.

## CONCLUSION

For the reasons stated, the government's motion for reconsideration is DENIED.

It is so ORDERED.



---

5. This principle reflects the general rule that "a remedy furnished by a precisely drawn and detailed statute preempts a more general remedy." *Puget Sound,* 23 Cl.Ct. at 56–57 (1991) (citing

*Brown v. General Servs. Admin.,* 425 U.S. 820, 834, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Stonite Prods. Co. v. Melvin Lloyd Co.,* 315 U.S. 561, 566–67, 62 S.Ct. 780, 86 L.Ed. 1026 (1942)).

## CERTIFICATE OF COMPLIANCE
### (Nos. 2012-5035, -5036, -5043)

I certify that:

1.    Pursuant to Fed. R. App. P. 32(a)(7)(C), that the attached answering brief is:

Proportionately spaced, has a typeface of 14 points or more and contains

__13,975__   words (exclusive of the table of contents, table of authorities,

addenda, and certificates of counsel).

*May 25, 2012*                                /s   *John L. Smeltzer*
_____                    _____

Date                                          John L. Smeltzer

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing *Corrected Opening Brief for the United States as Appellant* have been served by United States mail, this 5th

day of June, 2012, upon the following counsel of record:

ERICK G. KAARDAL
Mohrman & Kaardal P.A.
33 South Sixth Street, Suite 4100
Minneapolis, MN 55402

GARRETT J. HORN
Horn Law Office
P.O. Box 886
Yankton, SD 57078

RANDY VERN THOMPSON
Nolan, Thompson & Leighton
5001 American Blvd. West, Suite 595
Bloomington, MN 55437

CREIGHTON A. THURMAN
P.O. Box 897
Yankton, SD 57078

ROBIN L. ZEPHIER
Abourezk & Zephier
P.O. Box 9460
Rapid City, SD 57709

GARY JOHN MONTANA
Montana & Associates
N 12923 North Prairie Road
Osseo, WI 54758

WOOD R. FOSTER, JR.,
Siegel Brill Greupner Duffy
100 Washington Avenue South
Suite 1300
Minneapolis, MN 55401

SCOTT ALLEN JOHNSON
Johnson Law Group
10850 Wayzata Boulevard, Suite 250
Minnetonka, MN 55305

KELLY STRICHERZ
213 Forest Avenue
P.O. Box 187
Vermillion, SD 57069

LARRY B. LEVENTHAL
Larry Leventhal & Associates
319 Ramsey Street,
St. Paul, MN 55102

JACK E. PIERCE
Pierce Law Firm, P.A.
6040 Earle Brown Drive, Suite 420
Minneapolis, MN 55430

ELIZABETH T. WALKER
Walker Associates
429 North St. Asaph Street,
Alexandria, VA 22314

NICOLE NACHTIGAL EMERSON
Lynn, Jackson, Shultz & Lebrun
141 North Main Avenue, Suite 900
P.O. Box 2700
Sioux Falls, SD 57101

JAMES LAWRENCE BLAIR
Renaud Cook Drury Mesaros, PA
1 North Central Avenue
Phelps Dodge Tower - Suite 900
Phoenix, AZ 85004

PHILIP WILLIAM MORGAN
757 7th Street
P.O. Box 901
Britton, SD 57430

REBECCA ELIZABETH FELIX
1160 NW Portland Avenue, No. 2
Bend, OR 97701

BERNARD JOSEPH ROONEY
84 Park Avenue
Larchmont, NY 10538

John L. Smeltzer
*Attorney*
*United States Department of Justice*
*Post Office Box 7415*
*Washington, DC 20044*
*(202) 305-0343*
john.smeltzer@usdoj.gov