Nos. 2012-5035, -5036, -5043

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

SHELDON PETERS WOLFCHILD, ERNIE PETERS LONGWALKER,
SCOTT ADOLPHSON, MORRIS J. PENDLETON,
BARBARA FEEZOR BUTTES, WINIFRED ST. PIERRE FEEZOR,
AUTUMN WEAVER, ARIES BLUESTONE WEAVER,
ELIJAH BLUESTONE WEAVER, RUBY MINKEL,
LAVONNE A. SWENSON, WILLIS SWENSON, AARON SWENSON,
BEVERLY M. SCOTT, LILLIAN WILSON, MONIQUE WILSON,
SANDRA COLUMBUS GESHICK, CHERYL K. LORUSSO,
JENNIFER K. LORUSSO, CASSANDRA SHEVCHUK,
JASON SHEVCHUK, JAMES PAUL WILSON, EVA GRACE WILSON,
BENITA M. JOHNSON, and KEVIN LORUSSO,
Plaintiffs-Cross Appellants,

and

ANITA D. WHIPPLE et al., Descendants of Lucy Trudell,
BONNIE RAE LOWE, et al., Descendants of Joseph Graham, et al.,
LENOR ANN SCHEFFLER BLAESER et al., Descendants of John Moose,
and MARY BETH LAFFERTY, et al.,
Plaintiffs,
(caption continued on the inside cover page)

Appeals from the United States Court of Federal Claims in
consolidated case Nos. 03-CV-2684 and 01-CV-0568, Judge Charles F. Lettow

**CORRECTED APPELLEE/CROSS-APPELLANT PLAINTIFF-
INTERVENORS' PRINCIPAL AND RESPONSE BRIEF**

November 29, 2012

Gary J. Montana
Montana & Associates
N12923 N. Prairie Road
Osseo, WI 54758
(715) 597-6464
*Attorney for Appellee-
Cross Appellant Julia
Dumarce Group*

Robin L. Zephier
Abourezek & Zephier
2020 W. Omaha Street
Rapid City, SD 57709
(605) 342-0097
*Attorney for Appellee-
Cross Appellant
Harley Zephier, Sr.*

R. Deryl Edwards, Jr.
R. Deryl Edwards
606 South Pearl St.
Joplin, MO 64801
(417) 624-1962
*Attorney for
Appellee-Cross Appellant
Victoria R. Vadnais*

FILED
U.S. COURT OF APPEALS
THE FEDERAL CIRCUIT

1 4 20

JAN HORBAL
CLERK

and

COURSOLLE    DESCENDANTS    and    ROCQUE    AND    TAYLOR
DESCENDANTS et al.,

Plaintiffs,

and

DEBORAH L. SAUL, LAURA VASSAR, et al., LYDIA FERRIS et al.,
DANIEL M. TRUDELL, et al., and ROBERT LEE TAYLOR et al.,
and DAWN HENRY,

Plaintiffs,

and

RAYMOND CERMAK, SR. (acting individually and
under power of attorney for Stanley F. Cermak, Sr.),
MICHAEL STEPHENS, et al., JESSE CERMAK, et al.,
DENISE HENDERSON, DELORES KLINGBERG,
SALLY ELLA ALKIRE, PIERRE ARNOLD, JR.,
GETRUDE GODOY et al.,

Plaintiffs,

and

JOHN DOES 1-30, WINONA C. THOMAS ENYARD, and
KITTO, et al,

Plaintiffs,

and

FRANCINE GARREAU, et al.,

Plaintiffs,

and

FRANCIS ELAINE FELIX,

Plaintiff,

and

KE ZEPHIER, et al.,

Plaintiffs,

and

LOWER SIOUX INDIAN COMMUNITY,

Plaintiff,

and

PHILIP W. MORGAN,

Plaintiff,

and

REBECCA ELIZABETH FELIX,

Plaintiff,

ii

and

VERA A. ROONEY, et al.,

Plaintiffs,

and

DANNY LEE MOZAK,

Plaintiff-Cross Appellant,

and

DAWN BURLEY, et al.,

Plaintiff-Cross Appellants,

and

HARLEY ZEPHIER, SR.

Plaintiff-Cross Appellant,

and

JOHN DOES 1-433,

Plaintiffs-Cross Appellants,

and

JULIA DUMARCE, et al.,

Plaintiff-Cross Appellants,

and

RAYMOND COURNOYER, SR., et al., JERRY ROBINETTE, et al.,
SANDRA KIMBELL, et al., CHARLENE WANNA, et al., and LESLIE
LEE FRENCH, et al.,

Plaintiff-Cross Appellants,

and

KRISTINE ABRAHAMSON,

Plaintiff-Cross Appellant,

and

VICTORIA ROBERTSON VADNAIS,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST

TABLE OF AUTHORITIES ......................................................viii

**APPELLEE PLAINTIFF-INTERVENORS' RESPONSE TO THE APPELLANT UNITED STATES' PRINCIPAL BRIEF:**

RESPONSIVE STATEMENT OF FACTS .....................................1

SUMMARY OF THE ARGUMENT ...........................................11

RESPONSIVE STANDARD OF APPELLATE REVIEW ...................13

ARGUMENT ...................................................................14

I.   THE APPELLEE PLAINTIFF INTERVENOR CROSS-APPELLANTS JOIN IN THE BRIEF OF THE APPELLEE WOLFCHILD PLAINTIFFS EXCEPT WHERE NOTED OTHERWISE .............................................................14

II.  THE CFC CORRECTLY FOUND THAT THE 1888-1890 APPROPRIATION ACTS ARE "MONEY MANDATING" AS THEY CAN BE FAIRLY INTERPRETED AS MANDATING COMPENSATION BY THE GOVERNMENT FOR THE PLAINTIFFS' CLAIM ...................................................14

     A.   The Plaintiffs' Non-Frivolous Claim That The Appropriation Acts May Be Interpreted As "Money Mandating" Satisfies The Jurisdictional Requirement ....................................14

     B.   The Appropriations Acts May Be Fairly Interpreted Or Reasonably Amenable To The Interpretation That The Acts Mandate A Right Of Recovery In Damages .....................16

III.   THE CFC DID NOT ERR IN HOLDING THE INDIAN TRUST
       ACCOUNTING STATUTE DISPLACES THE STATUTE OF
       LIMITATIONS OVER THE PLAINTIFFS' STATUTORY USE
       CLAIMS, AS THE GOVERNMENT'S ERRONEOUS PAYMENTS
       OF TRUST FUNDS TO INELIGIBLE BENEFICIARIES NOT
       DIRECTLY RELATED TO THE "1886 LANDS" CONSTITUTE
       COGNIZABLE CLAIMS OF "LOSS" AND "MISMANAGEMENT"
       OF "TRUST FUNDS" UNDER THE STATUTE ......................18

       A.   The Defendant's Argument That This Court's *Wolfchild VI*
            Opinion, Rejecting A Trust Relationship In The "1886 Lands,"
            Should Also Be Applied To The Government's Erroneous
            Payment Of Treasury Trust Fund Accounts Established As A
            Result Of Separate Congressional Action And By Subsequent
            Leasing Of The Lands Improperly Extends And Enlarges This
            Court's Holding ...............................................19

       B.   An ITAS Accounting Was Reasonably Required ..............21

PLAINTIFF-INTERVENOR CROSS APPELLANTS'
PRINCIPAL BRIEF: ..........................................................23

STATEMENT OF JURISDICTION ....................................23

STATEMENT OF THE ISSUES .........................................24

STATEMENT OF THE CASE .............................................25

STATEMENT OF THE FACTS ...........................................27

I.    PROCEDURAL FACTS ..............................................27

II.   CROSS APPEAL FACTUAL STATEMENTS .....................30

      *The 1851 and 1858 Treaties of Traverse Des Sioux* ..................30

      *The February and March 1863 Congressional Acts* ..................33

SUMMARY OF THE ARGUMENT .............................................38

STANDARD OF REVIEW ...................................................39

ARGUMENT ...............................................................39

I.    THE CFC ERRED IN INTERPRETING THE FEBRUARY 16, 1863 ACT AS FAILING TO DEMONSTRATE THAT THE LEGISLATION IMPOSED A "SPECIFIC MONEY-MAKING DUTY" AND FURTHER FAILED TO "ESTABLISH A TRUST RELATIONSHIP OR IMPOSE FIDUCIARY DUTIES UPON THE GOVERNMENT" ..............................................39

      A.    THE CFC DID NOT ERR IN FINDING THIS COURT "MISREAD" THE MARCH 1863 ACT IN *WOLFCHILD VI* AS "SUPERSEDING" THE FEBRUARY 1863 ACT, THUS THE FORMER ACT REMAINS VIABLE AS A MATTER OF LAW ....................................................39

      B.    IN *WOLFCHILD VIII*, THE CFC ERRED IN INTERPRETING THE FEBRUARY 1863 ACT AS A MERELY "MONEY-AUTHORIZING" STATUTE, RATHER THAN A "MONEY-MANDATING" STATUTE ..............41

      C.    THE CFC AND THIS COURT EACH CLEARLY ERRED IN CONCLUDING, IN *WOLFCHILD VI AND VII*, THAT THE "SECRETARY DID NOT EXERCISE THE AUTHORITY GRANTED" BY THE FEBRUARY 1863 ACT AS, BY ITS OWN ADMISSION, THE DEPARTMENT OF INTERIOR TOOK SIGNIFICANT "ACTION" IN 1865 TO SET ASIDE TWELVE SECTIONS OF LAND FOR THE INTENDED BENEFICIARIES OF THE FEBRUARY 1863 ACT ..........50

      D.    THE CFC ERRED IN CONCLUDING THAT THE FEBRUARY 1863 ACT DOES NOT "ESTABLISH A TRUST RELATIONSHIP OR IMPOSE FIDUCIARY DUTIES UPON THE GOVERNMENT" .............................................58

E.    THE STATUTE OF LIMITATIONS IS INAPPLICABLE  ...66

II.    THE CFC ERRED IN ITS FAILURE TO FIND AN ACTIONABLE
VIOLATION OF THE 1851 AND 1858 TREATIES WHEN THE
CFC FOUND THE FAILURE TO FULLY IMPLEMENT § 9 OF
THE FEBRUARY 16, 1863 ACT PROVIDED NO VIABLE MEANS
FOR THE PLAINTIFFS TO RECOVER TRUST BENEFITS FROM
THE ACT  ..............................................................................69

CONCLUSION  ..................................................................74

PROOF OF SERVICE  .........................................................79

CERTIFICATE OF COMPLIANCE  ...........................................81

ADDENDUM:

Act of Feb. 16, 1863, 12 Stat. 652

Act of Mar. 3, 1863, 12 Stat. 819

Treaty with the Sioux – Mdewakanton and Wahpakoota Bands, 1851

Treaty with the Sioux – Mdewakanton and Wahpakoota Bands, 1858

March 17, 1865 letter from Secretary Usher to Commissioner Dole

March 23, 1865 letter from Commissioner Dole to Rev. Hinman

# TABLE OF AUTHORITIES

## U.S. CONSTITUTION:

Art. II, sec. 2, cl. 2 ......................................................................70

## CASES:

*Adair v. United States*, 497 F.3d 1244 (Fed. Cir. 2007) ...................15

*Bank of Am. v. Doumani*, 495 F.3d 1366 (Fed. Cir. 2007) ...................13

*Banks v. Garrett*, 901 F.2d 1084 (Fed. Cir. 1990) ..............................16

*Bennett County, South Dakota v. U.S.*, 394 F.2d 3 (8th Cir. 1968) ...........73

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n,* 400 F.3d 1352
    (Fed. Cir. 2005) ....................................................................41

*Choate v. Trapp*, 224 U.S. 665 (1912) ...........................................73

*City of El Centro v. United States*, 922 F.2d 816 (Fed. Cir. 1990) ...........13

*Doe v. United States*, 463 F.3d 1314 (Fed. Cir. 2006) .........................29

*Fellows v. Blacksmith*, 60 U.S. 366 (1856) .....................................70

*Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005)
    (en banc) ....................................................................15, 45

*French v. Edwards*, 80 U.S. 506 (1871) .........................................46

*Friedman v. United States*, 310 F.2d 381 (Ct. Cl. 1962) ......................66

*Gollehon Farming v. United States*, 207 F.3d 1373 (Fed. Cir.
    2000) ...............................................................................16

*Greenlee County v. United States*, 487 F.3d 871 (Fed. Cir. 2007) ...........15

*Hankins Constr. Co. v. United States*, 838 F.2d 1194 (Fed. Cir. 1988) ....13

*Heckler v. Community Health Servs.*, 467 U.S. 51 (1984) ....................49

*Jones v. United States*, 9 Cl. Ct. 292 (1985) ............................68

*Kane v. United States*, 43 F.3d 1446 (Fed. Cir. 1994) ........................13

*Kolovrat v Oregon*, 366 U.S. 187 (1961) ............................72

*Manchester Band of Pomo Indians, Inc. v. United States*, 363 F.Supp. 1238
  (N.D. Cal. 1973) ............................68

*Mass. Bay Transport. Auth. v. United States*, 254 F.3d 1367
  (Fed. Cir. 2001) ............................12

*Medawakanton and Wahpakoota Bands of Sioux Indians v. United States*,
  57 Ct. Cl. 357 (1922) ....................30, 31, 32, 33, 71

*Menominee Tribe v. U.S.*, 391 U.S. 404 (1968) ......................69, 70, 73

*Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Engineers*,
  619 F.3d 1289 (11th Cir. 2010) ............................41

*Mitchell v. United States*, 445 U.S. 535 (1980) ("*Mitchell I*") ...............48

*National Ass'n of Homebuilders v. Defenders of Wildlife*, 551 U.S. 644
  (2007) ............................41

*Navajo Nation v. United States*, 631 F.3d 1268 (Fed. Cir. 2011) .........13, 59

*Navajo Tribe of Indians v. United States*, 624 F.2d 981 (Ct. Cl. 1980) ......59

*Red Canyon Sheep Co. v. Ickes*, 98 F.2d 308 (D.C. Cir. 1938) .............43

*Russell v. United States*, 37 Ct. Cl. 113 (1902) ............................68

*Salazar v. Ramah Navajo Chapter et. al.*, 132 S. Ct. 2181
  (June 18, 2012) ............................73

*Samish v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005)) ...........45

*Seminole Nation v. United States*, 316 U.S. 286 (1942) .......................58

*Shoshone Tribe v. United States*, 299 U.S. 476 (1937) ........................70

*Shoshone Indian Tribe v. United States*, 364 F.3d 1339
    (Fed. Cir. 2004) ...................................................................21, 22

*Supervisors v. United States*, 71 U.S. 435 (1866) ..............................47

*United States v. Dion*, 476 U.S. 734, 740 (1986) ................................70

*United States v. Mitchell*, 463 U.S. 206 (1983)
    ("*Mitchell II*") ......................................29, 42, 58, 59, 60, 63, 65

*United States v. Navajo Nation*, 537 U.S. 488 (2003) ........................59

*United States v. Taylor*, 104 U.S. 216 (1881) ...................................68

*United States v. Testan*, 424 U.S. 392, 400 (1976) ............................49

*United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948) .................13, 51

*United States v. White Mt. Apache Tribe*, 537 U.S. 465 (2003) ............14

*United States v. Winans*, 198 U.S. 371 (1905) .................................70

*United States v. Winstar Corporation, et. al*, 518 U.S. 839 (1996) .........73

*United States Sugar Equalization Board v. P.De Ronde & Co.*,
    7 F.2d 981 (3rd Cir. 1925) ...................................................43

*Wayne v. United States*, 26 Ct. Cl. 274 (1891) .................................68

*White Mt. Apache Tribe v. United States*, 249 F.3d 1364
    (Fed. Cir. 2001) ...............................................................15, 29

*Wolfchild v. United States*, 62 Fed. Cl. 521 (2004)
    (*Wolfchild I*) .....................................................................2, 29

*Wolfchild v. United States*, 68 Fed. Cl. 779 (2005)
    (*Wolfchild II*) ...............................................................1, 2, 4, 5, 24

*Wolfchild v. United States*, 72 Fed. Cl. 511 (2006)
    ("*Wolfchild III*") ...........................................................4, 5

*Wolfchild v. United States*, 77 Fed. Cl. 22 (2007) ("*Wolfchild IV*") ..........6

*Wolfchild v. United States*, 559 F.3d 1228 (2009) ("*Wolfchild
    VI*") ........................1, 3, 11, 19, 21, 27, 28, 34, 39, 40, 49, 50, 51

*Wolfchild v. United States*, 96 Fed. Cl. 302 (2010) ("*Wolfchild VII*") ...3, 6,
10, 12, 14, 15, 16, 17, 18, 20, 22, 27, 28, 29, 31, 32, 33, 34, 40, 41, 42, 43,
50

*Wolfchild v. United States*, 101 Fed. Cl. 54 (2011) ("*Wolfchild
    VIII*") ..............................1, 5, 6, 23, 27, 29, 38, 41, 43, 45, 46, 65

## STATUTES:

28 U.S.C. § 1291 ...............................................................24
28 U.S.C. § 1491 ...............................................11, 15, 23, 27
28 U.S.C. § 1505 ...............................................11, 15, 23, 27
28 U.S.C. § 2501 ...............................................33, 66, 67, 68
28 U.S.C. § 2507 ...............................................3
Act of February 16, 1863, ch. 37, 12 Stat. 652 .......23, 26, 27, 28, 29, 38,
40, 41, 42, 43, 45, 47, 50, 51, 54, 57, 58, 60, 64, 69, 72, 74
Act of March 3, 1885, 23 Stat. 375 ..................................7, 28, 38, 41
Act of June 29, 1888, chap. 503, 25 Stat. 217, 228-29 .........1, 3, 5, 10, 71
Act of March 2, 1889, chap. 412, 25 Stat. 980, 992-93 ..........1, 3, 5, 10, 71
Act of August 19, 1890, chap 807, 26 Stat. 336, 349 .........1, 3, 5, 8, 10, 71
Pub. L. No. 78-335, § 2, 58 Stat. 274 ..........................................29
Pub. L. No. 108-108, 117 Stat. 1241, 1263 (Nov. 10, 2003) .........12, 20, 68
Pub. L. No. 109-54, 119 Stat. 499, 519 (Aug. 2, 2005) ......................26

## RULES & REGULATIONS:

25 C.F.R. § 115.002 ...........................................................68
Fed. R. App 4(a)(1)(B) .........................................................24

Fed. R. App. Proc. 28(a) ...................................................1, 23
Fed. R. App. Proc. 28(b) ..........................................................1
Fed. R. App. Proc. 28(d) .........................................................14
Fed. R. App. Proc. 28(i) ..........................................................14
Fed. R. App. Proc. 28.1 ....................................................14, 23
Fed. Cir. R. 28(a)) ...................................................................23
Fed. Cir. R. 28(b) .....................................................................1
Fed. Cir. R. 47.5 .......................................................................1
RCFC 20(a) ...............................................................................5
RCFC 52.2(a) ............................................................................1

**TREATIES:**

Treaty of April 30, 1803 ...................................................30, 31

Treaty of Sept. 29, 1837, arts. I-II, 7 Stat. 538 ("1837 Treaty") .............31

Treaty of Aug. 5, 1851, arts. I-II, 10 Stat. 954
        ("1851 Treaty") ...........................31, 32, 42, 52, 58, 61, 62, 69, 71

Treaty of June 19, 1858, arts. I-III, 12 Stat. 1031
        ("1858 Treaty") ...............................33, 42, 52, 58, 61, 62, 69, 71

*Treaty between the United States and the Mdewakanton and*
*Wahpakoota Bands of Dakota or Sioux Tribe of Indians,* Articles III
and IV, March 31, 1859, 12 Stat.1031 ...........................................72

**OTHER SOURCES:**

CONG. GLOBE, 37th CONG., 3D SESS. 511, 528 (1863) ..........28, 43, 72

CONG. GLOBE, SESS. Feb. 26, 1889, p. 2366 ...............................72

Roy W. Meyer, *History of the Santee Sioux: United States Indian*
*Policy on Trial,* (University of Nebraska Press
1967) ...............................................7, 8, 34, 35, 36, 37, 51, 54, 55, 56

Restatement (Second) of Torts § 894(1) .......................................49

Restatement (Second) of Trusts § 2 ....................................60, 61, 62

Restatement (Second) of Trusts § 219 ……………………………...21, 22

Sutherland, *Statutes and Statutory Construction*, 7th Ed. (2010) ……..46, 47

*Treaty Between the United States of America and the French Republic, April 30, 1803 in Treaties and Other International Acts of the United States of America,* v.2 (Hunter Miller ed.) (1931) ..………………………30

Form 9

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Wolfchild et al.       v. United States

No. 2012-5035, -5036, -5043

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Appellee/Cross-Appellant Plaintiff Intervenors certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Victoria Robertson Vadnais et al.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

R. Deryl Edwards, R. Deryl Edwards, Jr.

11-29-12
_____
Date

_R Deryl Edwards_
_____
Signature of counsel

_Royce Deryl Edwards_
_____
Printed name of counsel

Please Note: All questions must be answered
cc: counsel of record

**APPELLEE PLAINTIFF-INTERVENORS' RESPONSE TO THE APPELLANT UNITED STATES' PRINCIPAL BRIEF[1]:**

**RESPONSIVE STATEMENT OF FACTS**

*Pursuant to Fed. R. App. Proc. 28(b) and Fed. Cir. R. 28(b).*

The Government's opening brief refers to the Appellee/Cross-Appellants generically as "alleged descendants of the '1886 Mdewakantons.'"[2] In a footnote, the Government defines the term "1886 Mdewakantons," borrowing from this Court's definition of "the Mdewakantons who were statutorily eligible for benefits under the [1888-1890] Acts."[3] In its brief, the Government now takes the position that the Department of Interior (DOI) "identified a total of 264 individuals" to distribute benefits under the Acts.  U.S. Br. at 21.[4]

Similarly, in the Brief of the "Wolfchild" Appellees/Cross-Appellants, they identify themselves as the "1886 Mdewakanton Group."  Br. at 2.  This plaintiffs' group is self-defined as "the group which lineally descends from

---

[1] The United States' Statement of Related Cases (U.S. Br. at 1) adequately sets forth the information required by Fed. Cir. Rules 28(a)(4) and 47.5.  The Statement will not be replicated in this brief.

[2] U.S. Corr. Br. at 7; all future references shall be to the "U.S. Br."

[3] Citing this Court's opinion, *Wolfchild v. United States*, 559 F.3d 1228, 1234 (2009) ("*Wolfchild VI*"); Act of June 29, 1888, chap. 503, 25 Stat. 217, 228-29, Act of March 2, 1889, chap. 412, 25 Stat. 980, 992-93, Act of August 19, 1890, chap 807, 26 Stat. 336, 349.

[4] The trial court has deferred the determination of eligibility throughout these proceedings.  See *Wolfchild II*, 68 Fed. Cl. 779, 787, n. 10; *Wolfchild v. United States*, 101 Fed. Cl. 54, 122 (2011) ("*Wolfchild VIII*").

1

the 1886 censuses (McLeod and Henton censuses, "the 1886 censuses") of

loyal Mdewakanton relative to the 1862 Uprising." *Id.* The "Wolfchild"

plaintiffs assert that the Department of Interior, in the implementation of the

1863 Acts and the 1888-1890 Appropriations Acts, exclusively used the

1886 censuses to "purchase private land and set[] the lands apart for the

1886 Mdewakanton Group." Br. at 30. This plaintiffs' subgroup also argues

that "[t]he CFC found that Interior's distribution of these funds beginning in

1981 to the subgroup communities was a breach of Interior's statutory duties

to the *1886 Mdewakanton Group*." Br. at 45. (Emphasis added).

The following facts are intended to be responsive to those positions

pursuant to Fed. R. App. Proc. 28(b) and Fed. Cir. R. 28(b).

In *Wolfchild VI*, this Court observed that the trial court's opinions

"contain[ed] a thorough canvass of the complex factual and legal

background of this case."[5] *Id.*, 559 F.3d at 1232. This Court proceeded to

admittedly "borrow heavily from the trial court's analysis of the facts and the

governing legal principles." *Id.* The *Wolfchild I* and *II* opinions the Court

"heavily" relied upon by this Court, however, did not address the factual and

legal arguments of the Plaintiff-Intervenors, which mirror the Government's

---

[5] Citing *Wolfchild v. United States*, 62 Fed. Cl. 521, 526-35 (2004)
(*Wolfchild I*); *Wolfchild v. United States*, 68 Fed. Cl. 779, 782-83, 785-94
(2005) (*Wolfchild II*).

2

earlier litigation position that "the rolls [1886/1889 census] may not be either sufficient to establish eligibility for any possible damages awarded nor the exclusive means of demonstrating eligibility."[6] Furthermore, none of the nine *Wolfchild* published opinions from this Court and the CFC ever recognized the "Wolfchild" plaintiffs, much less the Plaintiff-Intervenors in this appeal, as the "1886 Mdewakanton Group."

Both this Court and the trial court have analyzed the text of the respective Appropriations Acts.[7] Notably, this Court observed that, although the Acts "used slightly different language, the operative provisions were largely similar." *Wolfchild VI*, 559 F.3d at 1233. One of the differences was the 1890 Act's use of the phrase "full and mixed blood" loyal Mdewakantons as being the statutory beneficiaries. *Id.* at 1234. The previous 1888 Act made provisions for only the "full blood" Mdewakanton and the 1889 Act included the full-blood's families.[8] *Id.*

In a 2005 CFC brief, the United States argued that a proposed notice to potential plaintiffs under the "Call Statute", 28 U.S.C. § 2507, was

---

[6] See Defendant's Response to Plaintiff's Proposed Notice to Potential Plaintiffs, Doc. # 75, p. 5, § II. B.3. (May 6, 2005).

[7] *Wolfchild VI*, 559 F.3d at 1233-1234; *Wolfchild VII*, 96 Fed. Cl. 302, 316-318 (2010).

[8] The 1888 Act made provisions for the "full blood" Mdewakanton. The 1889 Act provisioned for the "full blood" Mdewakanton and their "families."

deficient in that the notice should "accurately indicate all individuals mentioned in the Appropriations Acts," as the beneficiaries to the "1890 Act also includes individuals who are 'mixed-blood.'"[9] The Government challenged the language of the notice which confined beneficiaries of the Acts to "direct lineal descendants of people on the May 20, 1886 census" – the same definition used by the Wolfchild Plaintiffs now in their brief.[10] *Id.*

The United States' 2005 brief stated several reasons underlying its objections why "the rolls [1886/1889 census] may not be either sufficient to establish eligibility for any possible damages awarded or the exclusive means of demonstrating eligibility."[11] First, the Government argued, in part, that the "rolls identified by the [Wolfchild] Plaintiffs – the 1886 roll by William McLeod and an 1889 roll by Robert Henton - do not cover all individuals who might have been eligible..."[12] The Government then stated its "understanding that neither roll includes mixed-bloods who were included in the 1890 Act," but identified "one later [non-census] document" identifying "some" mixed-blood members.[13] The United States cited

[9] Defendant's Response to Plaintiff's Proposed Notice to Potential Plaintiffs, Doc. # 75, p. 5, § II. B.3. (May 6, 2005).
[10] Wolfchild Corrected Brief, p. 2; ("the group which lineally descends from the 1886 censuses of loyal Mdewakanton relative to the 1862 Uprising."
[11] *Id.* (emphasis added).
[12] *Id.*
[13] *Id.*

4

correspondence from "Robert Henton and others also indicates that some individuals who were not on the rolls should be eligible."[14]  The Government commented that it "believes that these later eligibility determinations are not reflected in the rolls to which Plaintiffs refer."[15]

In *Wolfchild v. United States*, 68 Fed. Cl. 779, 786-87 (2005) ("*Wolfchild II*"), the Government argued that the 1888,[16] 1889,[17] and 1890[18] Appropriation Acts (the "Acts") provide a "changing and indefinite description of the beneficiary group." *Id.*, at 787, n. 10.  The trial court attributed to the Government's "understanding that neither [the 1886 nor the 1889] roll includes the mixed bloods who were included in the 1890 Act." *Id.*

In *Wolfchild v. United States*, 72 Fed. Cl. 511 (2006) ("*Wolfchild III*"), the trial court, in holding permissive joinder of additional lineal descendants of the loyal Mdewakanton was "proper" under either the Indian Tucker Act or *RCFC 20(a)*, observed the following:

> Some of these groups of individuals base their claims upon the census of loyal Mdewakanton conducted by U.S. Special Agent Walter McLeod between May 20, 1886 and September 2, 1886...Others seek to establish their status as lineal

[14] *Id.*
[15] *Id.*
[16] Act of June 29, 1888, chap. 503, 25 Stat. 217, 228-29.
[17] Act of March 2, 1889, chap. 412, 25 Stat. 980, 992-93.
[18] Act of August 19, 1890, chap 807, 26 Stat. 336, 349.

> descendants based upon different forms of proof. Some groups
> of applicants for intervention contain individuals from both
> categories...

*Id.*, 72 Fed. Cl. at 518-19. The trial court concluded that, "those groups of

applicants for intervention that assert means of proving descendancy

different from the 1886 and 1889 censuses all make good-faith, non-

frivolous claims that they are beneficiaries... under the criteria specified in

the Appropriation Acts." *Id.* at 520. Neither this Court nor the CFC ever

specifically addressed an eligibility issue under the Acts or issued any

appealable findings regarding standards of eligibility for the Acts.

Ultimately, the trial court identified the "Wolfchild Plaintiffs" as a

group comprising "about 7500 persons, and 41 separate groups totaling

about 13,250 people were granted leave to intervene as plaintiffs."

*Wolfchild v. United States*, 96 Fed. Cl. 302, 310 (2010), n. 1 ("*Wolfchild*

*VII*").[19] In rendering its judgment, the trial court partially granted the

"Plaintiffs' and plaintiff-intervenors' motions for summary judgment."

*Wolfchild VIII*, 101 Fed. Cl. at 121. There is no mention of any "1886

Mdewakanton Group" in any judgment or decision of this Court or the CFC.

---

[19] Citing *Wolfchild v. United States*, 77 Fed. Cl. 22, 31-35 (2007)
("*Wolfchild IV*").

The historical record, both before and after the Acts, illuminates the issue of Mdewakanton mixed-blood participation in Congressional appropriations for the loyal Mdewakanton in Minnesota.

Special Agent McLeod, the author of the 1886 census and himself a half-blood Mdewakanton, objected to allowing mixed-bloods to participate in Congressional appropriations.[20]  McLeod stated that allowing the mixed-bloods to participate would not leave enough "to buy a spelling book" for the full-bloods.[21]  McLeod ultimately became a mixed-blood Mdewakanton claimant to the 1890 Act - a situation that troubled agent Robert Henton in 1892.[22]  McLeod's mixed-blood claim was made to Henton in June, 1892,[23] causing Henton to complain in a letter to the Commissioner of Indian Affairs that McLeod was making an 1890 Act mixed-blood claim, although he was "worth at least $100,000."[24]  Walter McLeod's name was not on either his 1886 census or the Henton 1889 census.

---

[20] (The Combined Appendix, hereinafter designated with the letters "CA");
(CA5006, CA5012) See October 20, 1888 letter (CA2560-2573), p. 7.
[21] *Id.*, Mr. Henton was agent McLeod's successor.
[22] (CA5020) Letter from Henton to Comm'r of Indian Affairs, June 3, 1892.
[23] *Id.*
[24] *Id.*

The same anti-mixed-blood sentiment was shared by *Henton*. Myers observed that Henton "was always opposed to permitting the mixed-bloods to share" with the full-bloods.[25]

The Government's approach to mixed-blood Mdewakanton enrollment after the 1890 Act, however, emphasized inclusiveness in benefits. The 1890 Act expressly required the Secretary of Interior to assure that,

> ...all of said money which is to be expended for lands, cattle, horses, implements, seeds, food, or clothing shall be so expended that each of the Indians in this paragraph mentioned shall receive, as nearly as practicable an equal amount in value of this appropriation...

26 Stat. at 349.

In the summer of 1892, Henton told the Commissioner of Indian Affairs that "[s]ince I submitted my last estimate ...a great many mixed bloods have made application and been enrolled."[26] He even suggested to the government that he "be allowed to use my own judgment in regard to

---

[25] Myers, *History of the Santee Sioux*, pp. 286-287.

[26] (CA2628, CA5021) July 13, 1892 letter from Henton to the Commissioner of Indian Affairs; see also (CA5023) January 11, 1892 letter from Henton to the Comm'r of Indian Affairs telling the Government that he "overlooked" a Mdewakanton in taking his last census.

equalizing the [1890 Appropriation Act] funds [between the full and mixed-bloods] which was approved by your office."[27]

In January 1898, Henton wrote to the Commissioner of Indian Affairs referring to the Government's "present system of enrolling any and all persons submitting proof of being Mdewakanton Sioux blood."[28] Henton's last census, in June 1898, showed 198 full-bloods and 722 mixed bloods were sharing the appropriations – compared to the 264 Mdewakantons listed in his first censuses.[29]

The Government has continued this policy of inclusiveness for mixed-blood Mdewakanton. The Government has allowed non-1886/1889 census Mdewakantons to receive Indian Land Certificates. The Indian Land Certificate contains a certification that the individual "has been established as an eligible Mdewakanton Sioux Indian by reason of being a descendant of a Mdewakanton Sioux Indian who resided in Minnesota on May 20, 1886...and who had severed his tribal relations."[30]

In 1971, the United States Assistant Solicitor was asked "what [Mdewakanton] roll or rolls should receive the official approval of the

---

[27] *Id.*

[28] (CA5026) January 13, 1898, Henton to Comm'r of Indian Affairs.

[29] *Id.*; see also Myers, *Id.* at 287.

[30] (CA5030); Indian Land Certificate.

United States."[31]    On August 17, 1971, the Department restated its policy that the following documents were recognized as establishing eligibility for 1888-1890 Appropriation Acts benefits: (1) the McLeod 1886 census;[32] (2) the Henton 1889 census;[33] (3) the McLaughlin 1917 roll (as long as used with other qualifying documents);[34] and (4) "other rolls or materials if their contents sufficiently prove that the named individual is a descendant of an 1886 Mdewakanton resident of Minnesota."[35]

On March 17, 1974, the Acting Associate Solicitor wrote to the Commissioner of Indian Affairs concerning the "granting of leasehold interests in lands purchased for the benefit of a class of Mdewakanton Sioux." The Solicitor, referring to the August 17, 1971 "Gurshuny" policy memorandum, in a footnote stated, "[t]he conclusion of that opinion with respect to the manner in which members of the beneficiary class are determined have not been questioned and are not herein reconsidered." *Id.*

---

[31] (CA2967-2972) August 17, 1971, Department of Interior Memorandum, Acting Assistant Solicitor, William A. Gurshuny to the Field Solicitor of Twin Cities, Minnesota.

[32] *Id.* at p. 2.

[33] *Id.*

[34] *Id.* at p. 3.

[35] *Id.*; In the Assistant Solicitor's "Conclusion," he further states, "we are of the opinion that any other information or records submitted by an individual who claims to trace back to an 1886 Mdewakanton, which sufficiently proves his claim, may be used..." *Id.* at 5.

## SUMMARY OF THE ARGUMENT

The Court of Federal Claims ("CFC") did not commit reversible error in granting the collective Plaintiffs and Plaintiff Intervenors' cross-motions for summary judgment on the issue of the United States' "statutory use" violations. *Wolfchild VII*, 96 Fed. Cl. 302, 352 (2010). While the Plaintiff Intervenors have joined in with the Wolfchild Plaintiffs' Response Brief, in relevant part, the Plaintiff-Intervenors separately submit that the Government's arguments advocating reversal are insufficient as a matter of law.

In its opening brief, the United States fails to contest any significant factual findings of the Court of Claims in *Wolfchild VII-IX*. As a consequence, the CFC's factual findings in these opinions should not be disturbed by the Government's appeal. In any case, the Defendant has failed to prove any of the CFC's factual findings are clearly erroneous.

Rather than attack the CFC's factual findings, the Government's opening brief unsuccessfully attempts to initially challenge the trial court's jurisdiction. The CFC possessed plenary jurisdiction over the statutory-use claims of the Plaintiffs. The Plaintiffs asserted non-frivolous claims that the 1888-1890 Appropriations Acts (the "Appropriation Acts" or the "Acts") may be reasonably interpreted as containing a money-mandating duty. The

Government's arguments confuse the CFC's jurisdiction under the Tucker Act, 28 U.S.C. § 1491, and Indian Tucker Act, 28 U.S.C. § 1505, with the separate issue of whether the Plaintiffs have a stated a "proper claim" based upon the Acts or otherwise pled their use-restriction claim properly.

Substantively, however, the Appropriations Acts may be fairly interpreted or reasonably amenable to the interpretation that the Acts mandate a right of recovery in damages.   The CFC correctly found Congress' intended purpose in passing the Appropriations Acts was "not merely 'money-authorizing" legislation." *Wolfchild VII*, 96 Fed. Cl. at 341. The Government's erroneous payment of loyal Mdewakanton 1886 land proceeds to an improper beneficiary was a violation of the Defendant's duties arising under the Appropriations Acts.

The Government appeals to the "simple logic" which summarily concludes that a formal accounting should not be required where the "United States has openly repudiated an alleged trust."  However, the Defendant's arguments do not explain how an "open" trust repudiation effectively imports notice of the repudiation to the intended beneficiaries, much less establishes Plaintiffs' actual knowledge of the Government's mismanagement of the special account deposits.

The Appellee/Cross-Appellant Plaintiff-Intervenors request oral argument.

## STANDARD OF APPELLATE REVIEW

Whether the Court of Federal Claims possesses jurisdiction over a claim is a question of law that is subject to de novo review. *Navajo Nation v. United States*, 631 F.3d 1268, 1272 (Fed. Cir. 2011). In reviewing judgments of the Court of Federal Claims, the Federal Circuit reviews conclusions of law regarding statutory interpretation without deference. *Bank of Am. v. Doumani*, 495 F.3d 1366, 1371 (Fed. Cir. 2007).[36] This court reviews factual findings by the Court of Federal Claims under the "clearly erroneous" standard. *Id.*[37] "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948).

---

[36] Citing *Kane v. United States*, 43 F.3d 1446, 1448 (Fed. Cir. 1994).
[37] Citing *City of El Centro v. United States*, 922 F.2d 816, 819 (Fed. Cir. 1990); *Hankins Constr. Co. v. United States*, 838 F.2d 1194, 1195 (Fed. Cir. 1988).

## RESPONSE ARGUMENT

### I. THE APPELLEE PLAINTIFF INTERVENOR CROSS-APPELLANTS JOIN IN THE BRIEF OF THE APPELLEE WOLFCHILD PLAINTIFFS IN RELEVANT PART

The Appellee Plaintiff-Intervenor Cross-Appellants (hereinafter the "Plaintiff-Intervenors"), pursuant to Fed. R. App. Proc. 28(d)), join in the parts of the brief of the Appellee Wolfchild Plaintiffs (hereinafter "Wolfchild Plaintiffs" or "Plaintiffs") directly responding to the United States' Opening Brief  Fed. R. App. Proc. 28(i).[38]  Plaintiff-Intervenors do not join any argument in the Wolfchild corrected brief concerning the "1886 Mdewakanton Group" specifically as an exclusive beneficiary group, tribe or band.

### II. THE CFC CORRECTLY FOUND THAT THE 1888-1890 APPROPRIATION ACTS ARE "MONEY MANDATING" AS THEY CAN BE FAIRLY INTERPRETED AS MANDATING COMPENSATION BY THE GOVERNMENT FOR THE PLAINTIFFS' CLAIM

#### A. The Plaintiffs' Non-Frivolous Claim That The Appropriation Acts May Be Interpreted As "Money Mandating" Satisfies The Jurisdictional Requirement

The United States makes the argument that, although the Department of Interior "reasonably interpreted  the 1888 – 1890 acts as authorizing use of 1886 lands for the support of descendents of the 1886 Mdewakantons,

---

[38] The above statement of facts are provided pursuant to FRAP Rule 28.1(c)(2).  The Plaintiff-Intervenors will provide a separate statement of facts for the cross appeal later in this Brief.

those Acts cannot be construed as mandating the payment of land revenues to descendants." U.S. Br. at 37. It further argues that the 1888-1890 Acts did not mandate "disbursements of land revenues at any particular time, to any particular descendent, or in any particular amount." *Id.* at 39. The Government also challenges the CFC's inferring of a money-mandating duty from the so-called "equal value proviso" of the 1889 and 1890 Acts. *Id.* at 39-40.

The Government's arguments confuse the CFC's jurisdiction under the Tucker Act, 28 U.S.C. § 1491, and Indian Tucker Act, 28 U.S.C. § 1505, with the separate issue of whether the Plaintiffs have a stated a "proper claim" based upon the Acts or otherwise pled their use-restriction claim properly. *Adair v. United States*, 497 F.3d 1244, 1250 (Fed. Cir. 2007).[39] It is submitted that the essence of the Government's present jurisdictional arguments were previously rejected by the Supreme Court,[40] and this Court.[41]

This Court has traditionally used a two-step process to determine whether a source of substantive law creating the right to money damages is

---

[39] (citing *White Mt. Apache Tribe v. United States*, 249 F.3d 1364, 1383 (Fed. Cir. 2001) (internal quotations omitted), aff'd, *White Mt.*, 537 U.S. 465, 468 (2003); *Wolfchild VII*, 96 Fed. Cl. at 338).

[40] *White Mountain, Id.*, 537 U.S. at 472.

[41] *Greenlee County v. United States*, 487 F.3d 871, 875 (Fed. Cir. 2007); *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc).

"money-mandating." *Gollehon Farming v. United States*, 207 F.3d 1373,

1378-80 (Fed. Cir. 2000).[42] The first step of the process, which also satisfies

"the jurisdictional requirement that a money-mandating statute...is before

the court, [requires] the plaintiff 'make a non-frivolous allegation that the

statute...may be interpreted as money mandating.'" The second step

becomes necessary only "if the issue of jurisdiction is later pressed and it is

decided that the statute...is not money-mandating." *Id.*, 207 F.3d at 1379.

The CFC found that Plaintiffs non-frivolously asserted that the

"Appropriations Acts created a money-mandating duty on the part of the

Government, and ...the government is liable in damages for its disbursement

of the funds to the three communities." *Wolfchild VII*, 96 Fed. Cl. at 338.

The Government's jurisdictional arguments are without merit.

## B.    The Appropriations Acts May Be Fairly Interpreted Or Reasonably Amenable To The Interpretation That The Acts Mandate A Right Of Recovery In Damages

Proceeding to the merits of the "money-mandating" issue, the

Government argues that the Appropriations Act could not form the basis of a

money-mandating duty because the "present case involves claims by a

different class of persons (alleged *descendants* of the 1886 Mdewakantons)

to a different set of funds (revenues derived from the lands purchased under

---

[42] (citing *Banks v. Garrett*, 901 F.2d 1084, 1087-88 (Fed. Cir. 1990)).

the 1888-1890 Acts)." U.S. Br. at 37. Admitting certain duties under the Acts, U.S. Br. at 38-39, the Defendant nevertheless asserts that "DOI's implied authority to generate and expend land revenues for the 'support' of families of the 1886 Mdewakantons was not a mandate requiring any expenditures, much less a mandate to make monetary payments to any and all descendants." *Id.*

The CFC found that "Congress' purpose in passing the Appropriations Acts reveals that the provisions of the Acts are not merely "money-authorizing" legislation." *Wolfchild VII, Id.* at 341. The trial court concluded, rather, that it was Congress' intent that the Acts "serve as substitutes for the obligations the government took upon itself in its prior treaties with the Sioux" and further Congressional intent that the "funds be expended only for the benefit of the loyal Mdewakanton, thereby serving as "binding obligations" upon the Government. *Id.,* 96 Fed. Cl. at 341-42. The Defendant does not directly address this part of the CFC's ruling.

The CFC, after closely examining the Appropriations Acts and the Department's subsequent actions interpreting the Acts regarding the "different class" of lineal descendants to the loyal Mdewakanton, dismissed the Government's argument that the Acts fail to create any duties to the these descendants as carrying "little or no persuasive weight." *Wolfchild*

17

*VII, Id.*, 96 Fed. Cl. at 345.  The Government provides no contrary analysis

of the CFC's conclusions, wherein the trial court carefully reviewed the

language of the Acts and the DOI's subsequent policies to hold that the Acts

included the "lineal descendants of the loyal Mdewakanton, such that

plaintiffs may base their claims on the statutory use restrictions contained in

the Appropriations Acts." *Id.*  The CFC did not commit reversible error in

these findings.

## III.   THE CFC DID NOT ERR IN HOLDING THE INDIAN TRUST ACCOUNTING STATUTE DISPLACES THE STATUTE OF LIMITATIONS OVER THE PLAINTIFFS' STATUTORY USE CLAIMS, AS THE GOVERNMENT'S ERRONEOUS PAYMENTS OF TRUST FUNDS TO INELIGIBLE BENEFICIARIES NOT DIRECTLY RELATED TO THE "1886 LANDS" CONSTITUTE COGNIZABLE CLAIMS OF "LOSS" AND "MISMANAGEMENT" OF "TRUST FUNDS" UNDER THE STATUTE

The United States argues that the Indian Trust Accounting Statute

("ITAS")[43] "does not apply."  U.S. Br. at 47.  The Government asserts that

the "Claimant's use restriction claims do not involve 'trust funds.'"  Br. at

---

[43] The 2003 enactment stated that:

> [N]otwithstanding any other provision of law, the statute of
> limitations shall not commence to run on any
> claim…concerning losses to or mismanagement of trust funds,
> until the affected tribe or individual Indian has been furnished
> with an accounting of such funds from which the beneficiary
> can determine whether there has been a loss.

*Id.*, U.S. Br. at 47.

48. The Defendant further argues that ITAS does not apply in that "an

accounting was not reasonably required to provide notice of the claims." Br.

at 51-52. These arguments are unavailing.

> **A.    The Defendant's Argument That This Court's *Wolfchild VI*
> Opinion, Rejecting A Trust Relationship In The "1886
> Lands," Should Also Be Applied To The Government's
> Erroneous Payment Of Treasury Trust Fund Accounts
> Established As A Result Of Separate Congressional Action
> And By Subsequent Leasing Of The Lands Improperly
> Extends And Enlarges This Court's Holding**

The Government maintains that this Court's negative answer to the

first certified question in *Wolfchild VI* - whether a "trust was created ...as a

consequence of the 1888, 1889 and 1890 Appropriations Acts...which trust

included land, improvements to land and *monies* as the corpus"[44] – should be

extended to the Plaintiffs' use restriction claim. Neither this Court nor the

CFC's opinions support such an extrapolation.

There is nothing in the *Wolfchild VI* opinion which the Government

points out as supporting their non-trust fund argument – other than the text

of the certified question itself. See U.S. Br. at 48-51. The Government's

argument seeking to extend the *Wolfchild VI* holding beyond the "1886

land" is not supported by this Court's opinion.

---

[44] (Emphasis added by the Defendant; U.S. Br. at 48); *Wolfchild VI*, 559
F.3d at 1237.

The Government next argues that the CFC improperly applied an "interpretive presumption" confined to the Appropriation Acts. U.S. Br. at 49. The Government argument, however, fails to make a logical connection between the Congressional appropriations in the 1888-1890 Acts which were used to purchase the 1886 lands in the first instance and the monies derived from the subsequent Congressional sale of unused 1886 lands and the Department's "policy" of collecting leasing revenues from the 1886 lands.[45]

The Defendant baldly claims, without any case authorities, that "absent a statutory duty or delegated authority to create a binding trust, the mere deposit the funds into an Indian trust account by federal officials cannot create an Indian 'trust fund.'" U.S. Br. at 49. It does not attempt to distinguish any of the three cases cited by the CFC for the "proposition that when the government holds any Indian money, the funds are presumed to be held in trust."[46] Id. Furthermore, the United States fails to address the CFC's finding that "Proceeds-of-Labor accounts are statutorily classified as 'trust funds' accounts,'"[47] or otherwise address the trial court's authorities.

---

[45] "It is also evident that plaintiffs' claims concern trust funds, not, as the government argues, trust assets." (Citations omitted) *Wolfchild VII*, 96 Fed. Cl. at 335.

[46] *Id.*, 96 Fed. Cl. at 332, n. 41.

[47] See *Wolfchild VII*, 96 Fed. Cl. at 333-334.

---

## B.    An ITAS Accounting Was Reasonably Required

The Government asserts further that ITAS does not apply because "an accounting was not reasonably required to provide notice of the claims." U.S. Br. at 51-52.  The Defendant argues abstractly that ITAS should not apply "where the alleged trust has long since ceased to exist as a result of federal action completely repudiating the notion of any trust obligation." U.S. Br. at 53.

The Government bases its argument upon the unsupported assertion that the "simple logic" of a formal accounting should not be required where the "United States has openly repudiated an alleged trust."  However, it does not explain how an "open" trust repudiation effectively imports notice to the intended beneficiaries.   This Court in *Shoshone Indian Tribe v. United States*, 364 F.3d 1339 (Fed. Cir. 2004) clearly stated that a breach of trust cause of action "accrues when the trustee 'repudiates' the trust *and* the beneficiary has knowledge of that repudiation."[48]  *Id.* at 1348. One of the authorities cited by this Court in *Shoshone* included Restatement (Second) of Trusts § 219, which notably provides that the "beneficiary is not barred merely by the lapse of time from enforcing the trust...[unless] the trustee repudiates the trust to the knowledge of the beneficiary." Section 219,

---

[48] Citations omitted; (emphasis added).

Comment c. further explains that a beneficiary will not be barred "for a breach of trust of which the beneficiary did not know and had no reason to know."

The Defendant's position appears to be based upon the argument that their breach of trust in wrongfully paying the monies over to an improper beneficiary should have imparted notice of the breach to the Plaintiffs. The Defendant has produced no evidence in this record to show Plaintiffs' actual knowledge of the United States' open repudiation of the trust accounts or that the Plaintiffs had a "reason to know" of their breach.

The CFC found that the Government "does not assert nor is there any evidence before the court that the Plaintiffs have been provided with an accounting." *Wolfchild VII*, 96 Fed. Cl. at 335. This failure of proof contradicts the Defendant's argument. A formal accounting is required by ITAS to meaningfully impart notice of the United States' breach of its trust duty over the Treasury accounts. This Court observed in *Shoshone* that, "the statute of limitations will not begin to run on a...claim[] until an accounting has been completed." 364 F.3d at 1347. The same principal applies to the current appeal. The CFC should be upheld on the ITAS-related issues.

## PLAINTIFF-INTERVENOR CROSS APPELLANTS'

## PRINCIPAL BRIEF:

### STATEMENT OF JURISDICTION

The Government's opening brief, for the most part, accurately states the basis of this Court's jurisdiction for its appeal. Thus, many of the jurisdictional statements made by the United States equally apply to the Plaintiff-Intervenors' cross-appeal. See U.S. Brief at 2-5. Pursuant to Fed. R. App. Proc. 28(a)(4) and 28.1 and Fed. Cir. R. 28(a)(5), respectively, the Plaintiff-Intervenors present further support for this Court's jurisdiction as follows:

The Plaintiff-Intervenors' claims, in addition to the so-called "use restriction" violations at issue in the Government's appeal, *Id.* at 2, further invoked the jurisdiction of the Court of Federal Claims ("CFC") under the Tucker Act (28 U.S.C. § 1491) and the Indian Tucker Act (28 U.S.C. § 1505) for claims arising out breaches of the 1837, 1851 and 1858 treaties between the Government and the Minnesota Sioux and statutory use violations involving a February 16, 1863 Congressional Act.[49] In *Wolfchild VIII*, the CFC denied the Plaintiff-Intervenor's claims under the February 1863 Act. 101 Fed. Cl. 54, 91 (2011). In this same decision, the CFC

---

[49] Act of February 16, 1863, ch. 37, 12 Stat. 652; see Addendum.

certified that there was "no just reason for delay," and the court directed the clerk to enter final judgment as to the use-restriction claims, but retained jurisdiction on other claims.

The Plaintiff-Intervenors timely filed a notice of cross-appeal on December 27, 2011. (CA504). Fed. R. App. 4(a)(1)(B). This Court has jurisdiction over the certified final judgment on the use-restriction claim, as well as the treaty and February 1863 Act claims, under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**Viability of the February 1863 Act.** In February 1863, Congress enacted a law providing eighty acres of land to the loyal Mdewakanton Indians who acted to save white settlers during the 1862 uprising. This Court has held that the March 1863 Congressional act "superseded" the February 1863 Act. The CFC subsequently held this Court "misread[] the second enactment," and found that the February 1863 Act "remained valid." Did the trial court commit reversible error in concluding the February 1863 Act was viable notwithstanding the passage of the March 1863 Act?

**Money-Mandating Nature of the February 1863 Act.** The February 1863 Act "authorized" the Secretary of Interior to "set apart ['donations'] of the public lands" eighty acres for those loyal Mdewakanton who "exerted themselves" in rescuing white settlers as an "inheritance to said Indians and their heirs forever." In March 1865, the Secretary took specific action to set apart twelve sections of public lands in Minnesota and further authorized purchase of farm implements and seeds. Did the February 16, 1863 Act and subsequent actions of the Government create a money-mandating, continuing obligation upon the United States, which it violated?

**Fiduciary Duty Issue - February 1863 Act.** The CFC held that a statute can create a "fiduciary duty [upon the Government] which can also give rise to a claim for damages within the Tucker Act or Indian Tucker Act." The CFC held that the "entirely discretionary" February 1863 Act did not create a fiduciary duty notwithstanding the Government's actions in 1865 to set

apart land twelve sections of land for the loyal Mdewakantons. Did the CFC err in concluding that the February 1863 Act and subsequent actions of the Government failed to create a fiduciary duty upon the United States?

**1851 and 1858 Minnesota Sioux Treaties.** By the Act of February 16, 1863, Congress declared the treaties of 1851 and 1858 annulled and confiscated lands and annuities of the Minnesota Sioux. These actions rendered "poverty-stricken and homeless" the loyal Sioux who assisted the settlers during the uprising. The CFC held the Act provided the loyal Sioux no viable means to recover treaty benefits. Did the CFC err in failing to find an actionable violation of the 1851 and 1858 treaties because of the failure to fully implement § 9 of the Act?

## STATEMENT OF THE CASE

The Plaintiff-Intervenors, while asserting this Court should affirm that part of the CFC's judgment awarding $673,944 to the "Plaintiffs' and plaintiff-intervenors," appeal the CFC's granting summary judgment for the Government on the Plaintiff-Intervenors' statutory use violations of February 1863 Act and treaty claims.

The CFC committed reversible error in granting summary judgment to the United States concerning the Plaintiff-Intervenors' claim for benefits under the February 1863 congressional Act. The Act, rewarding loyal Mdewakantons who "exerted themselves" in rescuing white settlers from the 1862 Uprising, provided an inheritable, beneficial interest in 80 acres of land in Minnesota.

The CFC should be affirmed in its finding that the March 1863 Act did not supersede the February 1863 Act, as held by this Court in *Wolfchild VI*.

The CFC materially erred in its statutory interpretation of the February 16, 1863 Act as failing to impose a "specific money-making duty." Instead, the court characterized the Act as merely "money-authorizing" legislation. The text of the Act, its legislative history, and the affirmative, direct actions of the Department of Interior to "set apart" twelve sections of land under the Act compels the reversal of the CFC's actions granting summary judgment to the Government.

The Department of Interior took specific actions to implement the provisions of the February 1863 Act, contrary to the findings of the CFC and this Court. The Government partitioned twelve sections of land in Minnesota, by metes and bounds legal descriptions, located primarily in the area where the Mdewakantons lived prior to 1862 Uprising. It instructed its agents to hold the sections back from impending sale and advised Mdewakanton missionaries to relocate the loyal Indians to the property. These actions fixed the Government's liability to the loyal Mdewakantons under the February 1863 Act.

The direct actions of the Department of Interior over the twelve sections of land set apart under the February 1863 Act for the loyal Mdewakantons created an ongoing trust relationship. The Government's subsequent actions and inaction breached the trust relationship with the loyal Mdewakanton beneficiaries, thereby entitling them to damages. The CFC erred in failing to find a fiduciary relationship was created and, subsequently, breached by the Defendant.

The CFC committed reversible error in its failure to find actionable violations by the Government concerning the abrogation of treaty rights and obligations after the uprising. The 1862 Uprising motivated the United States to abrogate prior treaties in violation of the express terms of the treaties and the Government's fiduciary duties associated with Mdewakantons.

## STATEMENT OF FACTS-CROSS APPEAL

### I.    PROCEDURAL FACTS

Subsequent to this Court's 2009 decision in *Wolfchild VI*,[50] the CFC handed down two additional decisions, *Wolfchild VII* and *Wolfchild VIII*, relevant to the Plaintiff-Intervenors' cross appeal. These subsequent

---

[50] 559 F.3d 1228 (Fed. Cir. 2009).

decisions, and this Courts' opinion in *Wolfchild VI*, are the focus of the Plaintiff-Intervenors' cross appeal.

This Court, in *Wolfchild VI*, held that the February 1863 Act "authorized the Secretary of the Interior to set aside parcels of 80 acres of public land for any individual among the Minnesota Sioux 'who exerted himself in rescuing the whites' during the 1862 revolt.'"[51] However, this Court further held that, by a Congressional act passed two weeks later in March 1863, the February 1863 Act was "superseded...with another statute dealing with the same authorization." *Id.* This Court observed that, "[t]he Secretary never exercised the authority granted by the 1863 legislation, and no lands were provided to the loyal Mdewakantons at that time." *Id.*

The CFC, in *Wolfchild VII*, concluded that this Court "misread[] the second enactment," in finding that the March 1863 Act "superseded" the February 1863 Act.[52] The trial court, citing legislative history,[53] noted that "[t]his history demonstrates that Congress was not 'superseding' the first Act of 1863 by the second Act of 1863; to the contrary, it passed the second act with the specific understanding that the first Act of 1863 remained valid." *Id.*

---

[51] *Id.* at 1232 (citing Act of Feb. 16, 1863, § 9, 12 Stat. at 654).
[52] *Wolfchild VII*, 96 Fed. Cl. at 314.
[53] *Id.*, (citing CONG. GLOBE, 37th CONG., 3D SESS. 528 (1863)).

Based, in part, upon its ruling that the February 1863 Act remained viable after the passage of the March 1863 Act, the trial court granted the Plaintiff-Intervenors' motion for leave to amend their complaints to add claims arising out of the February 1863 Act.  The court identified "the salient threshold question realistically is whether the first Act of 1863 can be read as giving rise to a money-mandating duty under controlling precedent."

In *Wolfchild VIII*, the CFC rejected Plaintiffs-Intervenors' February 1863 claims; citing the absence of a money-mandating duty as the "plain terms of the 1863 Acts do not "compel[] payment once certain conditions are met."[54]  *Id.*, 101 Fed. Cl. at 71.   It further concluded that, "there is nothing within the legislative history or the structure of the statutes that demonstrates a congressional intent clearly and expressly contrary to the patently discretionary terms ultimately adopted in the text of the Acts."  *Id.*, at 73.  The court likewise rejected the Plaintiff-Intervenors' assertion that a "trust relationship was created under the...1863 Acts."  *Id.*  Distinguishing *Mitchell II*[55] and *White Mountain Apache*,[56] the court held that "the 1863 Acts are directory propositions to the Secretary which did not and do not impose upon the Secretary any specific fiduciary obligations that would

---

[54] Citing *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006).

[55] *United States v. Mitchell*, 463 U.S. 206 (1983) ("*Mitchell II*")).

[56] *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003).

create a trust relationship between the friendly Sioux and the government."
*Id.*, at 73.

## II.   CROSS APPEAL FACTUAL STATEMENTS

The Plaintiff Intervenors will briefly state only those facts explicitly germane to the scope of their appellate points.

*The 1851 and 1858 Treaties of Traverse Des Sioux*

Historically, the Minnesota Sioux, consisting of the Mdewakanton, Wahpakoota, Sisseton, and Wahpeton Bands, lived along the Mississippi River, stretching from the Territory of Dakota to the Big Sioux River.[57] The Minnesota Sioux were known to the Government as the "Sioux of the Mississippi." *Id.*, 57 Ct. Cl. at 360. Originally, these Sioux were all Mdewakantons, but they later split into four bands, known as the Mdewakanton and the Wahpakoota (together comprising the "lower bands"), and the Sisseton and the Wahpeton (known as the "upper bands" or "Santee Sioux"). *Id.*

The 1803 Louisiana Purchase never included the sovereign interests of the Sioux, nor the Mdewakanton Sioux.[58] Article VI of the Treaty stated

---

[57] *See Medawakanton and Wahpakoota Bands of Sioux Indians v. United States*, 57 Ct. Cl. 357, 359 (1922).
[58] *See Treaty Between the United States of America and the French Republic, April 30, 1803 in Treaties and Other International Acts of the United States of America*, v.2 (Hunter Miller ed.) (1931).

that "[t]he United States promise to execute such treaties and articles as may

have been agreed between Spain and the tribes and nations of Indians until

by mutual consent of the United States and the said tribes or nations other

suitable articles shall have been agreed upon." *Id.*

The Mdewakantons' aboriginal lands existed in the Minnesota and

Dakota Territories. *Medawakanton*, *Id.*, 57 Ct. Cl. at 359-360. The United

States' original dealings with the Mdewakanton and its individual Dakota

Indians were exclusively through the treaties such as those in 1825, 1831,

1837, 1851, 1858 and 1868.   See *Id.*, at 360-62, 364-65.

On September 29, 1837, the leaders of the Mdewakanton band of

Sioux Indians entered a treaty with the United States by which they ceded

"to the United States all their land, east of the Mississippi River, and all their

islands in said river[,]" in consideration of the United States' investment of

$300,000 for the benefit of the Sioux.[59] Pursuant to the treaty, the United

States obligated itself to pay an annuity to the Sioux at a rate of not less than

five percent interest, "such annuity to be paid 'forever.'"[60]

In 1851, the Mdewakanton and Wahpakoota bands entered another

treaty with the United States under which they ceded "all  their lands and all

---

[59] *Wolfchild VII*, 96 Fed. Cl. at 312 (citing Treaty of Sept. 29, 1837, arts. I-II,
7 Stat. 538 ("1837 Treaty")).

[60] 1837 Treaty, *Id.*, art. II, 7 Stat. at 538.

their right, title and claim to any lands whatever, in the Territory of Minnesota, or in the State of Iowa[,]" and bound themselves to "perpetual" peace and friendship with the United States.[61] The treaty provided that the federal government "would provide to the bands, among other compensation, a trust fund of $1,160,000, with interest set at five percent, to be paid annually for a period of fifty years."[62]

The 1851 treaties purported to create a reservation for the Minnesota Sioux to run along the Minnesota River.[63] Ultimately, during ratification of the 1851 Treaty, the Sioux were removed to the reservation delineated in the treaty. *Medawakanton, Id.,* at 360. The Senate, however, struck out the treaty article establishing the reservation and, instead, paid the Sioux for the land they were to receive and added the amount to the trust funds created by treaties. *Id.* Although the Senate authorized the President to set aside "another reservation outside the limits of the ceded land," the President never established an alternative reservation for the Sioux. *See Id.* at 362. However, the Sioux "continued to live on the land originally intended to serve as their reservation under the 1851 treaties." *See Id.*

---

[61] *Wolfchild VII, Id.,* (citing Treaty of Aug. 5, 1851, arts. I-II, 10 Stat. 954 ("1851 Treaty")).

[62] See 1851 Treaty, *Id.,* art. IV, ¶ 2, 10 Stat. at 954; (the Sisseton and Wahpeton signed a similar treaty on July 23, 1851).

[63] *Wolfchild VII,* 96 Fed. Cl. at 312 (citing *Medawakanton,* 57 Ct. Cl. at 361).

"In 1858, the United States entered into another treaty with the Sioux under which the Mdewakanton and Wahpakoota bands 'agreed to cede that part of their reservation lying on the north side of the Minnesota River' in exchange for compensation, including money and goods, the exact amount of which would be determined by the Senate at a later time."[64]  The treaty "created a new reservation for the Sioux;" comprised of land already occupied by the bands along the Minnesota River in south-central Minnesota.[65]  "By entering the treaty, the Mdewakanton and Wahpakoota bands of the Sioux Indians pledged "to preserve friendly relations with the citizens [of the United States], and to commit no injuries or depredations on their persons or property."[66]  The Sisseton and Wahpeton bands entered into a similar treaty the same year.[67]

*The February and March 1863 Congressional Acts*

The Court of Federal Claims, except where noted, adequately detailed the 1862 uprising, the legislative history underlying the February and March 1863 Acts and the subsequent events related to these events.  Furthermore, the Defendant has restated a majority of the facts in their brief.  See U.S. Br.

---

[64] *Wolfchild VII, Id.,* (citing *Medawakanton*, 57 Ct. Cl. at 365-66; Treaty of June 19, 1858, arts. I-III, 12 Stat. 1031 ("1858 Treaty").
[65] *Id.*
[66] *Id.,* at 312-313.
[67] *Id.,* at 313, n. 9.

at pp. 7-28.    Consequently, the Plaintiff-Intervenors would seek to incorporate those facts in *Wolfchild VII* and *VIII*, respectively, herein that are left out of the Government's Statement of Facts, rather than reassert them again in their present brief.  Any facts which bear particular emphasis in the appeal will be stated below.

In *Wolfchild VI*, this Court found that the "Secretary never exercised the authority granted by the 1863 legislation, and no lands were provided to the loyal Mdewakantons at that time, apparently because of opposition by white settlers to allowing even the loyal Sioux to settle in the state."  559 F.3d at 1232.[68]    However, this Court, in making the observation that the Secretary "never exercised the authority granted by the 1863 legislation," did not have an opportunity to analyze the following facts below.

On March 15, 1865, Reverend Samuel D. Hinman, the protégé of Bishop Whipple who was absent abroad at the time, was in Washington and wrote to Commissioner of Indian Affairs Dole "asking that twelve sections of land be withdrawn from pre-emption and sale until each deserving head of family had received the allotment promised in 1863."[69]  Two days later,

---

[68] Citing H.R. Exec. Doc. No. 39-126, at 10 (1865); H.R. Exec. Doc. No. 50-61, at 2 (1889).

[69] Myers, p. 262.

the Secretary of the Interior issued an administrative order dated March 17, 1865, stating the following, in part:

> "Under provisions of section 9 of the act of Congress approved Feby. 16[th] and section 4 of the act approved March 3, 1863, this Department has authority to locate individual Indians of the Sioux tribe who remained true to the Government and exerted themselves to save the lives of the Whites during the massacre of 1862 upon lands within the late Sioux reservation assigning 80 acres to each. In order to do this hereafter, it is necessary immediately to withdraw from sale a portion of the Reservation, and I do not deem twelve sections of land too great a quantity.

> Revd. S. D. Hinman Missionary will therefore be authorized to designate twelve sections in a reasonably compact body and I will direct the local land officers to reserve the same from settlement or sale as soon as they are notified of Mr. Hinman's selection..."[70]

Reverend Hinman responded to the Secretary of Interior's letter dated March 17, 1865,[71] the same day while in Washington, designating the following twelve sections of land in the State of Minnesota:

> Secs [Sections] 1, 2, 3, 11 & 12 T[township] 112, NR[North Range] 35
> fl. sec. 35 T 113, NR 35
> Secs 7, 8, & 9, T 112, NR 34
> F Secs 5 & 6 T 112, R 34

---

[70] (CA5035); March 17, 1865 letter from Secretary Usher to Commissioner of Indian Affairs Dole.

[71] Myers, *Id.*; (CA5037) March 23, 1865 letter from Comm'r Dole to Rev. Hinman.

Fl Sec 31 T 113, R 31

These lands were primarily located on the south bank of the Minnesota River, in the vicinity of the old agency.[72]

Commissioner of Indian Affairs Dole wrote a letter dated March 23, 1865 to Rev. Hinman regarding the "friendly Sioux Indians." Dole advised Hinman that "[t]he decision of the Secy [Secretary] of the Interior already in your hands will be sufficient to authorize you to proceed to collect and establish the friendly Sioux upon the lands designated by you in your letter of the 17[th] March."[73] Commissioner Dole further advised Rev. Hinman that, "Supt. Thompson [Clark W. Thompson] has been authorized to expend a sum not exceeding eight hundred dollars for plowing lands and for the purchase of farming tools and seed for the Indians in question." *Id.*

On March 23, 1865, Reverend Hinman wrote to Bishop Whipple about the events that had happened in the last week while he was in Washington. He advised "through hard work and opportunity, [I] succeeded in getting upwards of 10,000 acres of land set apart for Taopi & friendly Sioux located at Redwood...[t]he Indians are to have 80 acres each – i.e. heads of families – in fee simple and unalienable."[74] He also related that

---

[72] Myers, *Id.*; see the following paragraph.
[73] (CA5037); see also Myers, *Id.*
[74] (CA2400-2401, CA5038); March 23, 1865 letter from Hinman to Whipple

"Clark Thompson, Supt. has agreed to furnish seed and plow the land for me." *Id.*

Based upon the authority granted him by the Secretary, Rev. Hinman "collected at Faribault [Minnesota] as many Indians as he could preparatory to establishing them on their lands."[75] However, Hinman's efforts were "abruptly halted" when General Sibley wrote Hinman in April, 1865 advising him that "General John Pope [was] forbidding any settlement of Indians on the old reservation without further orders from Pope or from higher authority."[76] Ultimately, General Ulysses S. Grant "finally sustained Pope's action in forbidding Hinman to proceed further with the plan."[77]

By letter dated April 20, 1866, from D.N. Cooley, Commissioner of Indian Affairs to Secretary of Interior James Harlan, Commissioner Cooley addressed the actions taken by the Office of Indian Affairs regarding the "friendly Sioux remaining in Minnesota" under the February 1863 Act.[78] Cooley commented that it was "noticeable that Congress has, by several

---

[75] Myers, *Id.*

[76] Myers, *Id.*

[77] Myers, p. 263.

[78] (CA2423-2437) Report of the Secretary of the Interior, No. 102, Department of the Interior – Office of Indian Affairs, dated April 20, 1866 from D.N. Cooley, Commissioner of Indian Affairs, to Hon. James Harlan, Secretary of the Interior, pp. 225-228; see also February 20, 1868 letter from Commissioner of Indian Affairs Taylor to Secretary of Interior Browning. (CA2494-2497).

enactments, made attempts to provide for them by donations of lands and money," *Id.* The Commissioner further noted that, "[a]ction was taken by the department, about one year ago, to select for them eighty acres of land each upon the old reservation." *Id.*

## SUMMARY OF THE ARGUMENT

In *Wolfchild VIII*, the CFC erroneously interpreted the February 16, 1863 Act[79] and events surrounding its implementation in several respects. As a preliminary matter, however, the Plaintiff-Intervenors agree with the trial court's position that this Court "misread" the effect of a March 1863 Act upon the February 1863 Act.[80] The CFC held that the latter Act did not "supersede" the former 1863 Act.

The CFC erred in concluding that the February 1863 Act was not a "money-mandating" statute. The trial court further erred in finding that the statute did not create a fiduciary relationship and in finding the Department's subsequent actions failed to otherwise impose fiduciary duties upon the Government. The court, as well as this Court, clearly committed error in making the factual finding that the Secretary of Interior "did not exercise the authority granted" by the February 1863 Act.

---

[79] Act of February 16, 1863, ch. 37, 12 Stat. 652.
[80] Act of March 3, 1863, ch. 119, 12 Stat. 819; See Addendum.

Finally, the CFC committed error in failing to find that the loyal Sioux did not have a cause of action for breach of the 1851 and 1858 treaties. The self-executing treaty provisions of the Treaties of 1851 and 1858 allowed any individual Sioux Indian to assert their own property and privacy interests, as well as their constitutional and the treaty rights to preserve and protect their rights.

## STANDARD OF REVIEW

The Plaintiff-Intervenors incorporate by reference the standard of review previously provided in the Response section, *supra* at p. 13, as though more fully set forth herein.

## ARGUMENT

**I.    THE CFC ERRED IN INTERPRETING THE FEBRUARY 16, 1863 ACT AS FAILING TO DEMONSTRATE THAT THE LEGISLATION IMPOSED A "SPECIFIC MONEY-MAKING DUTY" AND FURTHER FAILED TO "ESTABLISH A TRUST RELATIONSHIP OR IMPOSE FIDUCIARY DUTIES UPON THE GOVERNMENT"**

    **A.    THE CFC DID NOT ERR IN FINDING THIS COURT "MISREAD" THE MARCH 1863 ACT IN *WOLFCHILD VI* AS "SUPERSEDING" THE FEBRUARY 1863 ACT, THUS THE FORMER ACT REMAINS VIABLE AS A MATTER OF LAW**

In *Wolfchild VI*, this Court analyzed a February 1863 statute passed after the 1862 uprising in Minnesota, which "annulled" previous Mdewakanton treaties that had established a reservation and provided

annuities to the Minnesota Sioux. 559 F.3d at 1232. This Court observed that, in addition to broad nullification of the treaties, the Act "authorized the Secretary of the Interior to set aside 80 acres of public land for any individual among the Minnesota Sioux "who exerted himself in rescuing the whites" during the 1862 uprising. *Id.* The opinion further concluded that the language of the February 1863 Act, "clearly would have created an inheritable beneficial interest in the recipients of any land conveyed under the statute." *Id.*, 559 F.3d at 1241.

This Court interpreted a March 3, 1863 statute, dealing with "the same authorization," *Id.*, at 1232, as superseding the February 1863 Act. *Id.* In *Wolfchild VII*, the CFC observed that the Federal Circuit "misread[]" the impact of the March 1863 Act upon the February 1863 Act. 96 Fed. Cl. at 314. The trial court concluded that the legislative history "demonstrates that the Congress was not 'superseding' the first Act of 1863 by the second Act of 1863; to the contrary, it passed the second act with the specific understanding that the first Act of 1863 remained valid." *Id.* Under the CFC's interpretation, the Secretary of Interior was "entitled to provide relief to the loyal Sioux under either act." *Id.*

It is urged that, in light of the CFC's findings, this Court should not continue to find an implied repeal of the February 16, 1863 Act by the

40

March 3, 1863 Act. The CFC's finding that the amendment to the second act evidenced that "the two acts of 1863 were intended to co-exist" should not be disturbed on these appeals. *Id.* at 314-15. Finally, the authorities cited by the trial court,[81] which appear to minimally require an express contradiction or material conflict between the two statutes in order to effect an implied repeal, counsel against finding the latter 1863 statute effectively repealed the February 1863 law.

Based upon CFC's reasoning and authorities on the issue, as well as the fact that the Government has not appealed this ruling, the Plaintiff-Intervenors maintain that this Court should uphold the trial court's rulings that "Congress was not 'superseding' the first Act of 1863 by the second Act of 1863."

### B. IN *WOLFCHILD VIII*, THE CFC ERRED IN INTERPRETING THE FEBRUARY 1863 ACT AS A MERELY "MONEY-AUTHORIZING" STATUTE, RATHER THAN A "MONEY-MANDATING" STATUTE

In *Wolfchild VIII*, the CFC found "nothing within the legislative history or the structure of the statutes that demonstrates a congressional intent clearly and expressly contrary to the patently discretionary terms

---

[81] *Id.*, at 315; See *National Ass'n of Homebuilders v. Defenders of Wildlife*, 551 U.S. 644, 662-63 (2007), *Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Engineers*, 619 F.3d 1289, 1299 (11th Cir. 2010), and *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1265 (Fed. Cir. 2005).

ultimately adopted in the text of the [1863] Acts." 101 Fed. Cl. at 72. The

Plaintiff-Intervenors submit that the trial court committed reversible error in

its interpretation of the February 1863 Act, wherein it concluded that the Act

was merely a "money-authorizing" statute, rather than a "money-mandating"

statute.

The Supreme Court, in *Mitchell II*, observed that, for claims against

the United States "'founded either upon the Constitution, or any Act of

Congress, or any regulation of an executive department,'...a court must

inquire whether the source of substantive law can fairly be interpreted as

mandating compensation by the Federal Government for the damages

sustained." 463 U.S. at 218. The text of the February 1863 Act, its

legislative history and the Department of Interior's subsequent actions and

its orders, all lead to the conclusion that the first 1863 Act mandates

compensation by the United States for the damages sustained by the loyal

Sioux and their lineal descendants.

As a preliminary matter, the CFC's *Wolfchild VIII* opinion only

minimally addresses the fact that Congress' legislative action in February

1863, first and foremost, was punitive in nature; viewing their actions of

annulling the treaties, stopping the annuities, confiscating the 1851 and 1858

treaty lands held by the Sioux and placing the reservations lands in the hands

of the Department of Interior for ultimate disposition. Act of February 16, 1863, §§ 1-8. At the same time, however, the same Senators approving the punitive measures, likewise recognized the actions of the loyal Sioux, and discussed how to "take care of these friendly Indians."[82] *Id.*, at § 9. The main purpose of the Act was to levy punishment upon the Sioux involved in the uprising, but also to provide a permanent reward for those Sioux "exerting themselves" to protect the settlers.

Senator Fessenden noted that the Committee of Indian Affairs was proposing to "*direct* the Secretary of Interior to set apart" public land for the loyal Sioux. *Id.* at 71-72. (Emphasis added).[83] Senator Harlan, later becoming the Secretary of Interior, reiterated the Committee's opinion that the loyal Sioux "ought to be rewarded, ought to be distinguished from other Indians." *Id.* How would giving the Secretary the discretion to decide *whether* to give the loyal Sioux *any* land, distinguish them from "other Indians?" The Committee of Indian Affairs correctly characterized the

---

[82] *Wolfchild VIII*, 101 Fed. Cl. at 71 (quoting Senator Fessenden's comment in Cong. Globe, 37th Cong., 3d Sess. 511 (1863)).
[83] Compare the legislative history in *United States Sugar Equalization Board v. P.De Ronde & Co.*, 7 F.2d 981, 985 (3rd Cir. 1925) where Senate and House Committee's purpose of the law at issue using the word "authorized" was to "direct" conduct of an administrative body, and not as "discretionary" act; see also *Red Canyon Sheep Co. v. Ickes*, 98 F.2d 308, 314-15 (D.C. Cir. 1938) (Use of the word "authorized" in statute involving Secretary of Interior, was mandatory, entitling livestock owners to grazing permits).

43

intended context of the February 1863 Act as one of mandating conduct, not permitting discretion, as erroneously concluded by the CFC in *Wolfchild VIII*.

The CFC discounted the legislative history of the 1863 Acts, asserting that Senator Fessenden's statement,[84] "did not speak to the force of the direction to the Secretary of Interior." *Id*. Plaintiff-Intervenors disagree with the trial court's interpretation of the Senator's comments. As stated, the Indian Affairs Committee's desired to take care of the "friendly Indians." Senator Fessenden represented that the Committee wanted to "direct" the Secretary's action – not give him discretion. Vesting discretion in the Secretary, to decide whether to give land to the loyal Sioux, would not "take care" of those Indians who risked their lives to protect white settlers.

The CFC failed to analyze the absence of Congressional action, and that of the standing Committee on Indian Affairs, expressly delegating only discretionary powers to the Secretary in setting apart the land in the first instance. Nowhere in the eventual February 1863 Act debates are there any discussions granting the Secretary the discretion to "set apart" the land. As stated, the Committee of Indian Affairs, the best suited legislative body armed with intimate knowledge of the loyal Sioux and their critical role in

---

[84] *Id.*, at 71-72.

saving whites from slaughter, did not propose discretion, but sought to "direct" the Secretary's action in setting apart land.    Arguably, the only discretion reasonably delegated to the Secretary was what "public lands" would be utilized and what loyal Sioux would qualify as beneficiaries of the Act.    With this important backdrop, the text of the February 1863 Act becomes more clear.

In *Wolfchild VIII*, the trial court acknowledged that this Court has approved as money-mandating "certain discretionary [statutory] schemes [as] also support[ing] claims within the Court of Federal Claims' jurisdiction."[85]    Yet, the CFC concluded that the "plain terms of the 1863 Acts do not compel[] payment once certain conditions are met."    *Id.*    The Secretary of Interior did not have discretion under the February 1863 Act to distribute the land to qualifying loyal Sioux – it was a mandatory obligation. It is "the statute, not the Government official, that provides for the payment."[86]

The CFC examined the language of the February 1863 Act, concluding that "the legislation only permits – not mandates – the Secretary

---

[85] *Wolfchild VIII*, 101 Fed. Cl. at 71, (citing *Samish v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005)).
[86] *Fisher v. United States*, 402 F.3d 1167, 1175 (Fed. Cir. 2005) (en banc).

to provide lands" to the loyal Sioux.[87] The trial court misinterpreted the February 1863 Act, when examined in the context of the entire Act. The trial court failed to apply the correct test to the "mandatory-permissive" issue. Essentially, if the violation is serious enough to materially affect the rights, powers and privileges claimed pursuant to the statute, the law is mandatory.[88] The Plaintiff-Intervenors argue that the Government committed statutory use violations by failing to follow through on the Secretary's March 17, 1865 order to set aside of land - those violations being serious enough to materially affect the loyal Sioux's "rights, powers and privileges claimed" pursuant to the February 1863 Act. The CFC committed reversible error in finding the Acts directory.

There are several other statutory construction principles which operate to seriously challenge the CFC's conclusions of law in *Wolfchild VIII*. Where a statute grants authority to do a thing and prescribes the manner of doing it, the rule is clear that the provision as to the manner of doing the thing is mandatory, even though the doing of it in the first place is

---

[87] *Id.*

[88] Sutherland, *Statutes and Statutory Construction*, 7th Ed. (2010), Vol. 3, § 57:1, pp. 3-5; see also *French v. Edwards*, 80 U.S. 506, 511 (1871) ("But when the [statutory] requisitions prescribed are intended for the protection of the citizen, and to prevent a sacrifice of his property, and by a disregard of which his rights might be and generally would be injuriously affected, they are not directory but mandatory.")

discretionary.[89] A distinction is made in cases between statutes conferring

new rights and those which merely create new remedies. A statute granting

a new right is mandatory.[90] Applying this principle, this Court should

necessarily find that the Department of Interior had a mandatory duty to

issue 80 acre parcels to friendly Sioux who exerted themselves to rescue

whites. The February 1863 Act created new rights in the friendly Sioux,

thus creating a mandatory duty upon the Government.

A final tenet of statutory construction holds that, where a statute

provides for the performance of acts or the exercise of power or authority by

public officers protecting private rights or in the public interest, they are

mandatory.[91] This is true whether the statute is phrased in imperative or

permissive terms. The February 1863 Act empowered the Department of

Interior with authority to protect the property rights of the friendly Sioux

who had been granted 80 acre parcels. The statute mandated that the eligible

Sioux would receive the parcels, in a place chosen by the Department. The

---

[89] Sutherland, *Id.*, at Chapter 57:10 (p. 52-53) (applying the statutory construction principle of "expression unius exclusion alterius est").
[90] *Id.* at 57:18, p. 71.
[91] *Supervisors v. United States*, 71 U.S. 435, 446-47 (1866) ("where power is given to public officers, in the language of the act before us, or in equivalent language -- whenever the public interest or individual rights call for its exercise -- the language used, though permissive in form, is in fact peremptory...It is placed with the depositary to meet the demands of right, and to prevent the failure of justice"); see also Sutherland, *Id.* at 57:14, p. 60.

CFC erred in concluding that the February 1863 Act was "patently

discretionary."

Finally, the February 1863 Act, the Department of Interiors' March

1863 written orders, and other sources of law supplied a money-mandating

source of jurisdiction.[92] The actions of the Department of Interior in March

1865 evidence that the Government did not interpret the February 1863 Act

as discretionary, but as a mandatory act. In fact, during this time period, the

Secretary of Interior took affirmative acts and made representations

detrimentally relied upon by the Sioux and their representatives. The

Secretary and the Commissioner of Indian Affairs made several written

representations and orders to Rev. Hinman, going as far as advising him to

gather the loyal Sioux for placement upon the twelve sections of land "set

apart" by the Secretary.[93]

Once the Secretary "set apart" and approved the acreage for the

beneficiaries, the express terms of the first 1863 Act created a vested,

inheritable property interest. The Secretary's failure to provide the land

represented caused a cognizable loss of the loyal Sioux's statutory rights

under the Act. Certainly, history evidences that the loyal Sioux were

---

[92] See *Mitchell v. United States*, 445 U.S. 535 (1980) ("*Mitchell I*").
[93] A listing of the Secretary's actions are collected in the following section
of this brief.

materially prejudiced, particularly because they were deprived of something to which they were entitled as a matter of right – if nothing else by the written affirmative representations and orders by the Secretary, the Commissioner and the Department of Interior. At a constitutional minimum, fairness would justify application of regulatory estoppel upon the Government from denying their conduct and interpretation created an entitlement to the benefits of the February 1863 Act.[94]

In summary, the first 1863 Act, contrary to the CFC's conclusion, is a money-mandating act. The Act "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained."[95] Consequently, the Government must answer for the damages caused by their continuing statutory violations, which continue to deprive the loyal Sioux and their lineal descendants of the express benefits of the Act.

---

[94] See *Heckler v. Community Health Servs.*, 467 U.S. 51, 60-61 (1984) ("the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government."); see also Restatement (Second) of Torts § 894(1).
[95] *United States* v. *Testan*, 424 U.S. 392, 400 (1976).

C.    THE CFC AND THIS COURT EACH CLEARLY ERRED
IN CONCLUDING, IN *WOLFCHILD VI AND VII*, THAT
THE "SECRETARY DID NOT EXERCISE THE
AUTHORITY GRANTED" BY THE FEBRUARY 1863
ACT AS, BY ITS OWN ADMISSION, THE
DEPARTMENT OF INTERIOR TOOK SIGNIFICANT
"ACTION" IN 1865 TO SET ASIDE TWELVE SECTIONS
OF LAND FOR THE INTENDED BENEFICIARIES OF
THE FEBRUARY 1863 ACT

The Plaintiff-Intervenors assert that the this Court, in *Wolfchild VI*,

and the CFC, in *Wolfchild VII*, each committed clear error in summarily

concluding that "[t]he Secretary [of Interior] never exercised the authority

granted by the 1863 legislation."[96] The relevant inquiry should rather be

whether the Secretary affirmatively acted to "set apart" public lands under

the February 1863 Act, § 9. In 1865, the Secretary set apart twelve sections

of land for the loyal Mdewakanton, thereby making the public land "so set

apart" not subject to "tax, forfeiture, or sale" or otherwise allowed to be

"aliened or devised, except by the consent of the President of the United

States." *Id.*

The Federal Circuit's standard of review provides that factual findings

are reviewed under the "clearly erroneous" standard. In order to meet this

standard, the evidence must leave this Court with the "definite and firm

---

[96] 559 F.3d at 1232; compare *Wolfchild VII*, 96 Fed. Cl. at 315 ("The
Secretary did not exercise the authority granted by either 1863 Act..."),
(citing *Wolfchild VI*, 559 F.3d at 1232).

conviction that a mistake has been committed."[97]  The Plaintiff-Intervenors submit that the evidence leads to the inescapable conclusion that the Secretary of Interior, in fact, exercised the authority granted him under the February 16, 1863 Act; thereby meeting the *U.S. Gypsum* standard.

In the underlying CFC case, the trial court rejected the proffered written evidence that the Secretary did exercise the authority granted him under the February 16, 1863 Act.  The Government argued that the "Secretary of the Interior never exercised the authority vested in him by the 1863 Acts."[98]  The CFC and this Court agreed with the Government's position.  However, the evidence is clear and convincing that in March 1865, the Secretary of Interior, the Bureau of Indian Affairs and the Department acted consciously, with the express purpose of setting aside twelve sections of land for the loyal Sioux.

Without question, the biggest advocates for the loyal Mdewakantons in Minnesota during the time period after the 1862 uprising were Episcopal missionaries, Bishop Henry B. Whipple and Reverend Samuel D. Hinman.[99]

---

[97] *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

[98] Doc. # 1037-1, pp. 7-8;

[99] Roy W. Meyer, *History of the Santee Sioux*, p. 138 (commenting that Bishop Whipple was "perhaps the most respected churchman in the state"); see also *Wolfchild VI*, 559 F.3d at 1233 (citing Myer's work).

Bishop Whipple and Rev. Hinman both worked closely with loyal Mdewakantons.

In March 1865, Reverend Hinman was in Washington, D.C., and, on behalf of the loyal Sioux, penned a March 15, 1865 letter to Commissioner of Indian Affairs Dole, where he asked the "that twelve sections of land be withdrawn from pre-emption and sale until each deserving head of family had received the allotment promised in 1863."[100]

Two days later, the Secretary of the Interior responded to Reverend Hinman's request by a letter dated March 17, 1865 to Commissioner Dole.[101]  The Secretary, referring to specific sections of the February and March 1863 Acts, stated the "Department has authority to locate individual Indians of the Sioux tribe who remained true to the Government and exerted themselves to save the lives of Whites during the massacre of 1862."  More specifically, the Secretary represented apparent authority to "assign[] eighty acres to each" Indian under the 1863 Acts "within the late Sioux reservation."  The "late Sioux reservation" referred to by the Secretary was the reservation resulting from the 1851 and 1858 treaties,[102] which were

---

[100] Myers, p. 262.

[101] (CA5035); March 17, 1865 letter from Secretary Usher to Commissioner Dole.

[102] The 1851 treaty did not ultimately result in creation of a reservation, but the subsequent 1858 treaty "created a new reservation for the Sioux."

annulled by the February 1863 Act and the former reservation land confiscated by the Government.

The Secretary of Interior, after reviewing the scope of his authority under the 1863 Acts in the March 17 letter, then advised Commissioner Dole that "in order to do this…it is necessary *immediately* to withdraw from sale a portion of the Reservation."[103]  Thus, the Secretary of Interior recognized that three things must take place to grant Rev. Hinman's request for twelve sections of land for the loyal Sioux under the 1863 Acts.  First, he recognized the immediate need to withdraw from public sale twelve sections of land for compliance with the 1863 Acts.  Second, the Secretary realized that someone needed to specifically designate the twelve sections of land within the "late Reservation."  Finally, the Secretary noted that he must have the metes and bounds description of the proposed reservation land for the purposes of awarding the eighty acre parcels to qualifying Sioux Indians.

It is noteworthy that, in the Secretary's March 17, 1865 letter, he confirmed that he did not deem Rev. Hinman's request for "twelve sections of land too great a quantity" for use in complying with the 1863 Acts.  Immediately thereafter, the Secretary exercised his authority under the February 1863 Act, by the order that the "Revd. S. D. Hinman Missionary

---

[103] (Emphasis added); Secretary of Interior's March 17, 1865 letter to Comm'r Dole.

will therefore be authorized to designate twelve sections in a reasonably compact body." The Secretary further represented that, upon receipt of Hinman's designation, he would "direct the local land officers to reserve the same from settlement or sale as soon as they are notified of Mr. Hinman's selection..."[104]

Rev. Hinman promptly identified, by return letter the same day – March 17, 1865 - twelve sections of Minnesota land by metes and bounds descriptions.[105] These lands were generally located on the south bank of the Minnesota River, in the vicinity of the old agency.[106]

Subsequent to the Secretary's receipt of Rev. Hinman's authorized designation of twelve sections of land on March 17, 1865, Commissioner Dole recounted the Secretary's authority under "section 9 of the act of Congress approved Feby. [February] 16th...1863" and authorized Rev. Hinman "to gather and establish the Indians on these lands."[107] The Secretary also authorized that Superintendent Clark W. Thompson should

---

[104] (CA5035); As late as 1868, the Commissioner of Indian Affairs, N.G. Taylor, advised Secretary of Interior Browning of the "[t]he Sioux lands...which were reserved by order of the Secretary of the Interior of March 17, 1865, for the use of friendly Sioux..."

[105] (CA5035); March 17, 1865 letter; see also (CA2400-2401); March 23, 1865 letter from Dole to Hinman;
[106] Myers, *Id.*
[107] Myers, *Id.*

"spend $800 to buy farm implements and seeds and to have lands plowed for the Indians."[108]

A year later, D.N. Cooley, Commissioner of Indian Affairs wrote a report date April 26, 1866 to the Secretary of Interior James Harlan.   In the report, Commissioner Cooley addressed the actions taken by the Office of Indian Affairs regarding the "friendly Sioux remaining in Minnesota" under the February 1863 Act.[109]   Cooley characterized the first 1863 Act as a "donation[] of lands and money," *Id.*  His report noted that, *"[a]ction was taken by the department, about one year ago*, to select for them eighty acres of land each upon the old reservation." *Id.* (emphasis added). As late as 1868, the Department of Interior recognized "Sioux lands...which were reserved by order of the Secretary of the Interior of March 17, 1865, for the use of certain friendly Sioux."   Consequently, Plaintiff-Intervenors view the Secretary's actions in March 1865 as the fully exercising his authority to "set apart...eighty acres in severalty" for the loyal Sioux, triggering the beneficiaries' rights under the statute.

History evidences that, subsequent to the Secretary's actions in March 1865, Rev. Hinman "collected at Faribault [Minnesota] as many Indians as

---

[108] *Id.*

[109] (CA2423-2437); Report of the Secretary of the Interior - dated April 20, 1866 from D.N. Cooley, Commissioner of Indian Affairs, to Hon. James Harlan, Secretary of the Interior, pp. 225-228.

he could preparatory to establishing them on their lands."[110]   However, Hinman's efforts were "abruptly halted" when General Sibley wrote Hinman in April, 1865 advising him that "General John Pope [was] forbidding any settlement of Indians on the old reservation without further orders from Pope or from higher authority,"[111] a position ultimately upheld and made permanent by the order of General Ulysses S. Grant."[112]

It is noteworthy that the Secretary's March 1865 exercise of his authority under the February 1863 Act setting apart twelve sections of land in Minnesota was, in fact, completed by the Department of Interior.  There was no Presidential executive order or other proclamation that expressly authorized the alienation or other taking of the lands that were set up for the loyal Sioux at the time of the Secretary's March 17, 1865 "action."  Once the Department's administrative authority was exercised, the "land so set apart...shall be an inheritance to said Indians and their heirs forever."  The unambiguous language of the February 1863 Act is clear.

The Plaintiff-Intervenors allege that the Secretary of Interior (or his designees) executed his authority to "set apart" eighty acres of the former

---

[110] Myers, *Id.*
[111] Myers, *Id.*
[112] Myers, p. 263

reservation in compliance with the Act of February 16, 1863 by the

following actions:

> a.    Consented to "set apart" twelve sections of land in Minnesota for the loyal Sioux;
> b.    Reaffirmed his authority under the February 1863 Act "to locate individual Indians of the Sioux tribe who remained true to the Government and exerted themselves to save the lives of Whites during the massacre of 1862;"
> c.    Confirmed his statutory authority to "assign[] eighty acres to each" Indian under the 1863 Acts "within the late Sioux reservation;"
> d.    Provided Rev. Hinman with a copy of his March 17, 1865 letter to Commissioner Dole;
> e.    Authorized Rev. Hinman to use the March 17 letter as authority to act for the Government regarding the loyal Sioux, which Hinman significantly acted upon;
> f.    Authorized Rev. Hinman to designate twelve sections of former reservation land in Minnesota for the loyal Sioux;
> g.    Consented to the metes and bounds legal descriptions of twelve sections of land specifically identified by Hinman;
> h.    Set apart the twelve sections and ordered the immediate withdrawal from public sale of the twelve sections of land identified by Hinman;
> i.    Authorized Rev. Hinman "to gather and establish the Indians" on the designated lands; and,
> j.    Authorized Superintendent Clark W. Thompson to "expend...eight hundred dollars for plowing [set apart] land and for the purchase of farming tools and seed for the Indians."

This Court should hold that this Court and the CFC each committed

clear error in finding that the "Secretary did not exercise the authority

granted" by the February 1863 Act. The Act authorized the Secretary of

Interior to "set apart" lands for the loyal Mdewakanton – the Secretary

exercised that authority by specifically designating twelve sections of land

upon the former reservation. The Secretary took several "actions," ordering that the property be withdrawn from public sale. The evidence arguably should leave this Court with the "definite and firm conviction that a mistake has been committed." The failure of the United States to grant the loyal Sioux and their lineal descendants the lands set apart by the Secretary of Interior in 1865 constitutes a continuing statutory use violation as the "land so set apart" was statutorily intended to "be an inheritance to said Indians and their heirs forever."

**D.    THE CFC ERRED IN CONCLUDING THAT THE FEBRUARY 1863 ACT DOES NOT "ESTABLISH A TRUST RELATIONSHIP OR IMPOSE FIDICIARY DUTIES UPON THE GOVERNMENT"**

The United States possessed a trust relationship and otherwise had fiduciary duties with the loyal Sioux directly arising from the Government's overly broad annulling of the 1851 and 1858 treaties. In March 1865, the Government likewise took affirmative actions, setting apart twelve sections of land pursuant to the February 16, 1863 Act, thereby creating a trust relationship and unmistakable fiduciary duties.

There is an "undisputed . . . general trust relationship between the United States and the Indian people."[113] The Supreme Court has previously emphasized "the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people."[114] This legal principle has "long dominated the Government's dealings with Indians." *Id.* (citations omitted).

A specific trust relationship may be created in the language of statutory or regulatory provisions. *Id.* at 224. Furthermore, "a fiduciary relationship necessarily arises when the Government assumes such elaborate control over...property belonging to Indians." *Id.* at 225. Furthermore, "[where] the Federal Government takes on or has control or supervision over tribal monies or properties, a fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." *Id.* at 225[115]

---

[113] *United States v. Mitchell*, 463 U.S. 206, 225 (1983) ("*Mitchell II*"); *see also United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) (quoting the same language from *Mitchell*).
[114] *Mitchell II, Id.*, 463 U.S. at 225, (citing *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942)).
[115] Citing *Navajo Tribe of Indians v. United States*, 624 F.2d 981, 987 (Ct. Cl. 1980).

Restatement (Second) of Trusts § 2 provides that a trust creates a fiduciary relationship with respect to property, thereby subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, as arising "as a result of a manifestation of an intention to create it."[116] If the intent to create the trust is manifested, then formation of the trust involves three elements, namely, (1) a trustee, who holds the trust property and is subject to equitable duties to deal with it for the benefit of another; (2) a beneficiary, to whom the trustee owes equitable duties to deal with the trust property for his benefit; (3) trust property, which is held by the trustee for the beneficiary. *Id.*, Comment (h).

The Plaintiff-Intervenors argue that a specific trust and other fiduciary duties were created in three ways: (1) by the language of the Act of February 16, 1863; (2) by the Government's control over the former reservation land confiscated in the 1863 Acts; and (3) the Federal Government's assumption of control and supervision over designated loyal Sioux property created a cognizable fiduciary relationship regarding the twelve sections of land set aside by the Secretary of the Interior on March 17, 1863, "even though nothing [was] said expressly in the [February 16,

---

[116] "The phrase 'manifestation of intention' means the external expression of intention as distinguished from undisclosed intention." *Restatement of Trusts* § 2, Comment g.

1863 Act] about a trust fund, or a trust or fiduciary connection." *Mitchell II*, 463 U.S. at 225.

In this appeal, the three elements of a trust in Restatement (Second) § 2 were present in the language of the February 1863 Act and by the Government's assumption of control and supervision of the twelve sections of property designated by the Secretary of Interior. The United States was trustee of the designated property from the Act. As such, the Government is "subject to equitable duties to deal with the [property] for the benefit" of the loyal Sioux. *Restatement (Second) of Trusts* § 2, Comment h.

The loyal Sioux "who remained true to the Government and exerted themselves to save the lives of Whites during the massacre of 1862" are the intended beneficiaries of the trust property as well as the fiduciary duties assumed by the United States.

Finally, the "trust property," at a bare minimum, consisted of the twelve sections of former Minnesota reservation land that the Secretary of Interior expressly designated for distribution in March 1865.[117] See *Id.* The Secretary, by his March 17, 1865 order, evidenced the trust nature of the relationship and the attendant fiduciary duties.

---

[117] (CA5035); Secretary Usher March 17, 1865 letter to Commissioner of Indian Affairs.

The United States, by its assumption of control and supervision over the former 1851 and, in particular, the 1858 reservation property it confiscated by the first 1863 Act, possessed trustee authority over the property.    As discussed, *supra*, the Secretary of Interior advised Commissioner Dole, in a letter dated March 17, 1865 that the Department had authority to "assign[] eighty acres to each" Indian under the 1863 Acts "within the late Sioux reservation."   This written acknowledgement, the Secretary's subsequent orders and his actions each constituted an "external expression of intention" by the Government to serve as trustee and imposed fiduciary duties upon the United States to the loyal Sioux.[118]   Even though the Government wrested the former reservation land from even the loyal Sioux by the first 1863 Act, the Department had the ability to reassign it back to them – which it did by its actions in March 1865 – in compliance with the requirements of the first 1863 Act.

The Plaintiff-Intervenors addressed the language of the February 1863 Act previously in the money-mandating nature of the legislation.   It is asserted that this first Act of 1863 was the Government's measured response to the 1862 uprising.   Although the first 1863 Act took away the 1851 and 1858 treaty lands - at the same time the Secretary of Interior interpreted the

---

[118] *Restatement (Second) of Trusts*, § 2, Comment g.

Act as giving him authority to "assign[] eighty acres to each" Indian under the 1863 Acts "within the late Sioux reservation." Thus, the language of the February 1863 Act, as interpreted by the Department of Interior, necessarily impressed inherent "trust" authority upon the Secretary to reallocate land from the Minnesota Sioux to the loyal Sioux. Obviously, Secretary Usher felt that the 1863 Acts provided him the full authority to set apart the lands to the loyal Sioux, without the need to secure another act of Congress.

The Government further created a fiduciary relationship by its "elaborate control over…property belonging to Indians." *Mitchell II, Id.* at 225. By confiscating the former treaty reservation land, the United States asserted ultimate control over the reservation property. It appears the United States had opened up the property for public sale as the Secretary told Commissioner Dole that, in order to comply with Rev. Hinman's request for twelve sections of land, "it is necessary *immediately* to withdraw from sale a portion of the Reservation."[119] He made the unusual request to have Rev. Hinman designate the sections – which Hinman immediately did and

---

[119] (Emphasis added); Secretary of Interior's March 17, 1865 letter to Comm'r Dole.

notified the Secretary.[120]   At all times, the Secretary asserted complete control over the property as required by the February 1863 Act.

The March 17, 1865 letter from Secretary Usher to Commissioner Dole clearly showed the Department's exertion of control over the former reservation land in three separate ways.   First, the Secretary of Interior exerted control over the twelve sections of land, whether or not specifically designated, by withdrawing the sections from public sale.   Second, control was further exerted in the Secretary's order to the "local land officers to reserve the same from settlement or sale as soon as they" were notified of Rev. Hinman's selection.[121]   Third, control was exerted over the land after Hinman's designation of the specific twelve sections of land and by the Secretary's further order to expend monies for farming implements and plowing of the land.   These indicia of the Department's control over the property, for the time period, were elaborate in nature for the time period. No administrative regulations were needed or required – the March 17, 1865 exchange between Secretary Usher and Commissioner Dole was sufficiently

---

[120] See *Id.*, including Hinman's signed designation of twelve sections of former Minnesota treaty land which was delivered to the Department.

[121] See March 17, 1865 letter from Sec. Usher to Comm'r Dole.

detailed in itself. The Department's control created a fiduciary relationship as a matter of law.

The Plaintiff-Intervenors finally argue that the Federal Government's assumption of control and supervision over designated loyal Sioux property created a cognizable trust and/or fiduciary relationship regarding the twelve sections of land set aside by the Secretary of the Interior "even though nothing [was] said expressly in the [February 16, 1863 Act] about a trust fund, or a trust or fiduciary connection." *Mitchell II*, 463 U.S. at 225.

The CFC erroneously concluded that the "1863 Acts do not establish a trust relationship or impose fiduciary duties upon the government." *Wolfchild VIII*, 101 Fed. Cl. at 73. The trial court's rationale for concluding the absence of a trust relationship or any Government fiduciary duties was its erroneous characterization of the 1863 Acts as "entirely discretionary statutes - which were never implemented." *Id.* The Court misread the February 1863 Act and, further, failed to appreciate and analyze the "actions" taken by the Secretary in implementing the first act.

Apart from the interpretation of the first 1863 act, the CFC failed to consider and analyze the above-detailed actions of the Secretary of Interior, the Commissioner of Indian Affairs and the Department as an administrative body for the benefit of the loyal Sioux in March 1865. These actions created

fiduciary duties upon the Department – which exist to the current day. The Secretary did indeed set apart twelve specific sections of land in the former treaty reservation lands by the Secretary's order of March 17, 1865. In doing so, the Secretary exercised his authority under the February 1863 Act. In 1868, Commissioner of Indian Affairs Taylor, reflecting back to the Secretary's 1865 actions setting aside lands, reminded current Secretary of Interior Browning that, "[t]hat Sioux lands, *with the exception of certain Sections…which were reserved by order of the Secretary of the Interior of March 17, 1865*, for the use of certain friendly Sioux…are now open for sale…" (Emphasis added). The CFC's failure to analyze the affirmative actions taken in March 1865 by the Department of Interior under a trust or fiduciary duty analysis, requires reversal as a matter of law.

### E.  THE STATUTE OF LIMITATIONS IS INAPPLICABLE

The Plaintiff-Intervenors anticipate the Government will assert that their claims to damages will be barred by the general statute of limitations, 28 U.S.C. § 2501. There are three separate reasons why the statute of limitations are inapplicable to these claims.

Federal courts recognize a principle involving cases where "Congress has deliberately given an administrative body the function of deciding all or part of the claimant's entitlement." *Friedman v. United States*, 310 F.2d

381, 386-87 (Ct. Cl. 1962). In that type of case, "the claim does not accrue until the executive body has acted or declines to act." *Id*. The statute of limitation does not begin to run until the agency has rendered or refused its determination." *Id*.

In this appeal, the Secretary of Interior was required to make two determinations. First, the Secretary had to decide *where* he would place the loyal Sioux – a task which he accomplished. However, no actual land was eventually given to the loyal Sioux by military - not Department of Interior - fiat. Further, the Secretary had to determine *who* the beneficiaries were under the first 1863 statute – a task the Department of Interior continues during this appeal and serves as a Government appellate issue in this Court – over a hundred years later. Consequently, the Plaintiff-Intervenors' claims do not run until the Department of Interior acts or refuses to act. Viewing that neither event has occurred since the passage of the February 1863 Act, the claims do not ripen, and 28 U.S.C. § 2501 does not begin to run until the Department "has rendered or refused its determination."

The statute, 28 U.S.C. § 2501, never begins to run where a trust relationship exists between the United States and the Plaintiff-Intervenors. The general rule is that the statute "does not run against a beneficiary in favor of a trustee until the trust is repudiated and the fiduciary relationship is

terminated." *Jones v. United States*, 9 Cl. Ct. 292, 295 (1985).[122] At the very least, the Government's actions and representations regarding the Secretary of Interior's setting aside of twelve sections of land on former reservation land pursuant to the Act of February 16, 1863, created a trust and/or fiduciary duties to the loyal Sioux. The United States has never repudiated the trust, as they continue to deny a trust or fiduciary duties ever existed. Consequently, the trust relationship and the Government's fiduciary duties created by the first 1863 Act still exist, thereby preventing the running of the limitations statute, 28 U.S.C. § 2501.

The Indian Trust Accounting Statute, Pub. L. No. 108-108, 117 Stat. 1241, 1263 (November 10, 2003 (ITAS) displaces the Government's ITAS defense. The statute provides, in relevant part, that the statue of limitations, 28 U.S.C. § 2501 "shall not commence to run on any claim...concerning losses to or mismanagement of trust funds, until the affected...individual Indian has been furnished an accounting..."

The term "trust funds" is defined as meaning "money derived from sale or use of trust lands, restricted fee lands or trust resources." 25 C.F.R.

---

[122] Quoting *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F. Supp. 1238, 1249 (N.D. Cal. 1973); citing *United States v. Taylor,* 104 U.S. 216 (1881); *Russell v. United States,* 37 Ct. Cl. 113 (1902); *Wayne v. United States,* 26 Ct. Cl. 274 (1891)).

§ 115.002. "Trust lands" is defined as "any tract or interest therein, the United States holds in trust for the benefit of…an individual Indian." *Id.*

At worst, the United States sold the land set apart by the Secretary of Interior in March 1865, twelve sections of which the proceeds and interest should have been held in trust for the loyal Sioux pursuant to the February 1863 Act. This would consist of "losses to or mismanagement of trust funds," qualifying for ITAS tolling, as no accounting has ever been provided to any of the loyal Sioux individuals. Otherwise, the United States must answer in damages for the continued holding of the loyal Sioux property, for which no accounting has ever been provided, thereby invoking ITAS tolling.

The statute of limitations does not operate to bar the Plaintiff-Intervenor claims pursuant to the February 1863 Act.

**II.    THE CFC ERRED IN ITS FAILURE TO FIND AN ACTIONABLE VIOLATION OF THE 1851 AND 1858 TREATIES WHEN THE CFC FOUND THE FAILURE TO FULLY IMPLEMENT § 9 OF THE FEBRUARY 16, 1863 ACT PROVIDED NO VIABLE MEANS FOR THE PLAINTIFFS TO RECOVER TRUST BENEFITS FROM THE ACT**

The CFC committed error in failing to find an actionable violation of the 1851 and 1858 treaties with the Minnesota Sioux, in that the loyal Sioux did not breach the treaties. The Court further erred in holding the Secretary's failure to fully implement § 9 of the Act of February 16, 1863

provided no viable means for the loyal Sioux to recover trust benefits from the Act.

A treaty is a contract between sovereign nations.[123] The Supreme Court has expressly held that an Indian treaty is "not a grant of rights to the Indians, but a grant of rights from them."[124]   Any right not expressly extinguished by a treaty or federal statute is reserved to the tribe.[125] A "treaty, after being executed and ratified by the proper authorities of the government, becomes the supreme law of the land, and the courts can no more go behind it for the purpose of annulling its effect and operation, then they can go behind an Act of Congress."[126] A sovereign to sovereign treaty cannot be abrogated by implication, nor by solely executive order or executive act.[127]

The Fifth Amendment to the Constitution states the Congress may not deprive anyone of "private property...without just compensation".  The Supreme Court has held that Indian treaty rights are a form of private property protected by the Just Compensation Clause.[128]  Consequently,

---

[123] U.S. Const. Art. II, sec. 2, cl. 2.

[124] *United States v. Winans*, 198 U.S. 371 (1905).

[125] *Menominee Tribe v. U.S.*, 391 U.S. 404 (1968).

[126] *Fellows v. Blacksmith*, 60 U.S. 366, 372 (1856).

[127] *United States v. Dion*, 476 U.S. 734, 740 (1986).

[128] *Shoshone Tribe v. U.S.*, 299 U.S. 476, 497 (1937); *Menominee, Id.*, p. 413.

Indians must receive compensation whenever Congress abrogates their treaty rights.

The Minnesota Sioux's aboriginal lands existed in the Minnesota and Dakota Territories. Only through the treaties of 1825, 1831, 1837, 1851, 1858 and 1868, have the United States and its agents dealt with the Sioux and its individual Dakota Indians.

The Sioux treaties from 1825 through 1868, along with individual potentate rights heirs of the Sioux chiefs and lineal descendants, necessarily included individual rights, remedies and property interests as set forth in the Sioux treaties. The Plaintiff-Intervenors claim to be lineal decedents of individual loyal Mdewakantons referenced in the February 16, 1863 Act and the Appropriations Acts of 1888, 1889 and 1890.

With the treaty cession to the United States in 1851, the trust responsibilities of the United States and its agents to the Mdewakanton Dakota Sioux bands were clearly established in the form of rights, remedies, payments and annuities granted to the bands, and to the individual members of said bands.[129]

The 1851 and 1858 treaty provisions recognized a "self-executing" right of the *individuals,* not just the band/tribe, that allows a protected

---

[129] See *Mdewakanton & Wahpakoota Bands of Sioux Indians v. United States*, 57 Ct. Cl. 357, 359-61 (1922).

individual within the Mdewakanton band, the right recognized by Congress, to pursue individual rights, remedies and privileges, associated with the life, liberty and property as protected by said Treaty.[130]  The self-executing treaty provisions of the Treaties of 1851 and 1858, allowed for any individual Mdewakanton Sioux Indian to assert their own property and privacy interests and to use the (later) due process clause of the U.S. Constitution and the treaty rights to preserve and protect said rights.[131]  The sweeping move to wipe out all existing treaty rights did not succeed.

The February 16, 1863 Act was enacted as an obvious consequence of 1962 uprising and Congress' recognition and intent, that by abrogating all former treaties with the Minnesota Sioux, that the loyal Sioux may choose to demand their aboriginal treaty lands back from the United States.  Senator McDonald, during a debate in 1889, noted that loyal Sioux suffered, in the February 1863 Act from "no discrimination in the act of forfeiture, and thereby excluded from the benefit of the treaty."  He went on to comment that "we have not complied with their treaty rights."[132]

---

[130] *Treaty between the United States and the Mdewakanton and Wahpakoota Bands of Dakota or Sioux Tribe of Indians,* Articles III and IV, March 31, 1859, 12 Stat.1031.

[131] *See Kolovrat v Oregon,* 366 U.S. 187 (1961) (recognizing a self-executing treaty right for lineal heirs).

[132] Cong. Globe, Sess. Feb. 26, 1889, p. 2366; see also Cong. Globe, Sess. January 1863, p. 517.

Congress cannot, consistent with due process, abrogate a treaty without compensation or destroy rights which have previously been acquired under the treaty. Thus, rights that have vested are not subject to being extinguished.[133] Abrogation of a treaty must be narrowly construed, with any abrogation doing prejudice to the Indian signatories being disfavored.[134]

Explicit and direct statutory language is necessary to effect an abrogation to treaty rights.[135] In *Menominee*, despite the apparent directive to strip the Menominee Tribe and its reservation of Indian identity, the Supreme Court held that the language was not sufficiently direct to evidence Congressional intention that the members of the Menominee Tribe were to become subject to Wisconsin's game laws. Thus, if the relatively specific language of the Termination Act was inadequate to demonstrate Congressional intent to abrogate the Menominee Treaty, certainly sale of treaty designated land cannot be seen to have abrogated the responsibilities of the federal government under the 1851 and 1858 treaties with Bands of the Sioux Nation.

---

[133] *Choate v. Trapp*, 224 U.S. 665 (1912).
[134] *Bennett County, South Dakota v. U.S.*, 394 F.2d, 3, 11-12 (8th Cir. 1968).
[135] *Menominee, Id.*

Even apart from treaty protection, promises by the United States to Tribes must be honored and are not modified through "agencies' shifting priorities and competing obligation."[136]

When the United States sold the 10,000 acres of the 1863 Act land to private purchasers, the treaty obligations were again violated by the Government. The trial court was presented the argument that this sale of the acreage in this manner also violated the trust responsibility that the United States had toward these loyal Sioux Indians, and that the trust obligation recognized in the 1863 Act, Sec. 9, remains unfulfilled to this day. The 80 acre parcels have never been provided, nor has there ever been a formal accounting of these lost treaty rights to those lands, by the government. Therefore, the trial court erred in finding that any statute of limitations expired in 1876.[137]

## CONCLUSION

WHEREFORE, the Plaintiff-Intervenors request this Court take the following actions: (1) affirm the Court of Federal Claims' ruling regarding the Government's "statutory use" violations under the 1888, 1889 and 1890

---

[136] *United States v. Winstar Corporation, et. al*, 518 U.S. 839 (1996). See also, *Salazar v. Ramah Navajo Chapter et. al.*, 132 S. Ct. 2181 (June 18, 2012).
[137] Doc. # 1093, p. 16-23.

Appropriations Acts and otherwise deny the relief sought in the United States' Opening Brief; (2) affirm the CFC's ruling that the March 1863 Act did not "supersede" the February 1863 Act; (3) reverse the CFC's ruling that the February 1863 Act did not create a money-mandating obligation upon the United States; (4) reverse this Court's finding that "[t]he Secretary [of Interior] never exercised the authority granted by the [February 16,] 1863 legislation;" (5) reverse the CFC's ruling that the February 1863 Act was "entirely discretionary" and the subsequent actions of the Government did not create a fiduciary duty upon the Defendant, and (5) reverse the CFC's ruling that there was no actionable violation of the 1851 and 1858 treaties inuring to the loyal Sioux because of the failure to implement § 9 of the February 1863 Act. The Plaintiff-Intervenors request this relief based upon the foregoing and for such other and further reasons as this Court deems just, proper and equitable.

Respectfully Submitted,

R. Deryl Edwards
R. Deryl Edwards, Jr
606 S. Pearl
Joplin, MO 64801-2582
(417) 624-1962 (Telephone)
(417) 624-1965 (Facsimile)
rde417@hotmail.com
ATTORNEYS FOR THE
ROBERTSON LINEAL
DESCENDANTS

s/ Gary J. Montana
Gary J. Montana
Montana & Associates
N. 12923 N. Prairie Rd.
Osseo, WI 54758
Telephone No. 715.597.6464
ATTORNEY JULIA DUMARCE GROUP

s/ Robin L. Zephier
Robin L. Zephier
ABOUREZK & ZEPHIER, P.C.
P.O. Box 9460
Rapid City, SD 57709
(605) 342-0097
ATTORNEY FOR ZEPHIER PLAINTIFFS

s/ Barry Hogan
Barry Hogan
Attorney, CPCU
RENAUD COOK DRURY
MESAROS, PA
One North Central, Suite 900
Phoenix, Arizona 85004-4417
RENAUD JOHN DOES a/k/a
John Does 1-433

76

s/ Randy V. Thompson
Randy V. Thompson, #122506
Robert J. Leighton, Jr., #220735
5001 American Blvd. West, Suite 595
Bloomington, MN 55437
Telephone:   952-405-7171
Fax:              952-224-0647
ATTORNEYS FOR
PLAINTIFF/INTERVENORS
ABRAHAMSON GROUP

s/ Kelly Hope Stricherz
Kelly Hope Stricherz
213 Forest Ave
PO Box 187
Vermillion, SD 57069
605.624.3333
ATTORNEY FOR INTERVENORS'
MOZAK GROUP

s/ Scott A. Johnson
Scott A. Johnson (#124606)
Todd M. Johnson (# 52061)
JOHNSON LAW GROUP, LLC
10580 Wayzata Blvd., Suite 250
Minnetonka, MN 55305
ATTORNEYS FOR THE FELIX,
COURSOULLE, PRESCOTT AND
TAYLOR GROUPS OF PLAINTIFFS

s/ Jack Pierce
Jack E. Pierce
Bernick Lifson, P.A.
5500 Wayzata Blvd.,
Suite 1200
Minneapolis, MN 55416
(763) 546-1200
Fax: (763) 546-1003
Email: jpierce@bernicklifson.com
ATTORNEY FOR THE GODOY ET AL.
INTERVENOR APPELLEES/CROSS-
APPELLANTS

s/ Larry B. Leventhal
Larry B. Leventhal
Larry Leventhal & Associates
319 Ramsey Street
St. Paul, MN 55102
(612) 333-5747
Fax: (612) 344-1126
Email: lleven6001@aol.com
ATTORNEY FOR THE INTERVENOR
BURLEY PLAINTIFFS

s/ Creighton Thurman
Creighton A. Thurman
Creighton A. Thurman, Attorney at Law
P.O. Box 897
Yankton, SD 57078
(605) 260-0623
Fax: (605) 260-0624
Email: thurmanlaw@iw.net
ATTORNEY FOR THE COURNOYER,
ROBINETTE, KIMBELL AND WANNA
ET AL. INTERVENOR PLAINTIFFS

## PROOF OF SERVICE

I hereby certify that two copies of the foregoing Appellee-Cross Appellants Principal and Response Brief have been served by United States mail or provided by electronic transmittal, this 29th day of November, 2012, upon the following counsel of record:

John L. Smelzer, Attorney
U.S. Department of Justice
ENRD Appellate Section
PHB Mailroom 2121
601 D. Street, N.W.
Washington DC  20026

Jody Schwarz, Attorney
U.S. Department of Justice
General Litigation Section
ENRD
601 D. Street, N.W.
Washington DC  20026

Kelly Stricherz, Esq.
PO Box 187
Vermillion, SD  57069

Garrett Horn, Esq.
PO Box 886
Yankton, SD  57078

Creighton A. Thurman, Esq.
PO Box 897
Yankton, SD  57078

Robin L. Zephier, Esq.
PO  Box 9460
Rapid City,  SD  57709

Elizabeth Walker, Esq.
Walker Law LLC
429 North Saint Asaph Street
Alexandria, VA 22314

Larry B. Leventhal
Larry Leventhal & Associates
319 Ramsey Street
St. Paul, MN  55102

Wood Foster, Esq.
Siegel, Brill, Greupner, Duffy & Foster
1300 Washington Square
100 Washington Avenue South
Minneapolis, MN  55401

Nicole Nachtigal Emerson, Esq.
Lynn, Jackson, Schultz, & Lebrun
PO Box 2700
141 North Main Ave Suite 900
Sioux Falls SD  57101-3020

Douglas R. Kettering
Kettering Law Office
714 Douglas Ave.
Yankton, SD 57078

Barry P. Hogan
Renaud, Cook, et al.
1 North Central Avenue, Suite 900
Phoenix, AZ 85004

Gary J. Montana, Esq.
12923 N. Prairie Rd.
Osseo, WI 54758

Phillip W. Morgan, Esq.
758 7th St
Britton, SD 57430

Brian L. Radke, Esq.
Radke Law Office, PC
3500 S. 1st Ave. Circle, Suite 201
Sioux Falls, SD 57105

Sam Killinger, Esq.
522 4th St. Suite #300
Sioux City IA 51101

Eric G. Kaardal
Mohrman & Kaardal, P.A.
33 South Sixth St., Suite 4100
Minneapolis, MN 55402

Scott A. Johnson, Esq.
Johnson Law Group, LLP
10580 Wayzata Boulevard, Suite 250
Minnetonka, MN 55305

Randy V. Thompson, Esq.
5001 American Blvd. West
Ste. 595
Bloomington, MN 55437

Jack Pierce
6040 Earle Brown Dr., Suite 420
Minneapolis, MN 55430

Bernard Rooney, Esq.
84 Park Avenue
Larchmont, NY 10538

Lawrence H. Crosby, Esq.
2277 Highway 36W
Suite 234E
St. Paul, MN 55113-3808

Francis Elaine Felix
826-21st Avenue SE
Minneapolis, MN 55414

Phillip Baker-Shenk
Holland & Knight, LLP.
2099 Pennsylvania Ave. NW Suite 100
Washington DC 20006


s/ R. Deryl Edwards
R. Deryl Edwards
R. Deryl Edwards, Jr.
November 29, 2012

## CERTIFICATE OF COMPLIANCE
### (Nos. 2012-5035, -5036, -5043)

I certify that:

1.      Pursuant to Fed. R. App. P. 32(a)(7)(C), that the attached Appellee-Cross Appellant Principal and Response Brief is:

Proportionally spaced, has a typeface of 14 points or more in Times New Roman font and contains 16,500 words (exclusive of the table of contents, table of authorities, addenda, and certificates of counsel).

Date:  November 29, 2012                    s/ R. Deryl Edwards

                                                     R. Deryl Edwards
                                                     R. Deryl Edwards, Jr.

# ADDENDUM

# ADDENDUM

## TABLE OF CONTENTS

Act of Feb. 16, 1863, 12 Stat. 652

Act of Mar. 3, 1863, 12 Stat. 819

Treaty with the Sioux – Mdewakanton and Wahpakoota Bands, 1851

Treaty with the Sioux – Mdewakanton and Wahpakoota Bands, 1858

March 17, 1865 letter from Secretary Usher to Commissioner Dole

March 23, 1865 letter from Commissioner Dole to Rev. Hindman

# TREATY WITH THE SIOUX—MDEWAKANTON AND WAHPAKOOTA BANDS, 1851.

*Articles of a treaty made and concluded at Mendota, in the Territory of Minnesota, on the fifth day of August, eighteen hundred and fifty-one, between the United States of America, by Luke Lea, Commissioner of Indian Affairs, and Alexander Ramsey, governor and ex-officio superintendent of Indian affairs in said Territory, commissioners duly appointed for that purpose, and the Med-ay-wa-kan-toan and Wah-pay-koo-tay bands of Dakota and Sioux Indians.*

Aug. 5, 1851.

10 Stats., 954.
Proclamation Fe 24, 1853.

ARTICLE 1. The peace and friendship existing between the United States and the Med-ay-wa-kan-toan and Wah-pay-koo-tay bands of Dakota or Sioux Indians shall be perpetual.

ARTICLE 2. The said Med-ay-wa-kan-toan and Wah-pay-koo-tay bands of Indians do hereby cede and relinquish all their lands and all their right, title and claim to any lands whatever, in the Territory of Minnesota, or in the State of Iowa.

ARTICLE 3. [Stricken out.]

ARTICLE 4. In further and full consideration of said cession and relinquishment, the United States agree to pay to said Indians the sum of one million four hundred and ten thousand dollars, ($1,410,000,) at the several times, in the manner and for the purposes following, to wit:

1st. To the chiefs of the said bands, to enable them to settle their affairs and comply with their present just engagements; and in consideration of their removing themselves to the country set apart for them as above, (which they agree to do within one year after the ratification of this treaty, without further cost or expense to the United States,) and in consideration of their subsisting themselves the first year after their removal, (which they agree to do without further cost or expense on the part of the United States,) the sum of two hundred and twenty thousand dollars ($220,000.) *Provided*, That said sum shall be paid, one-half to the chiefs of the Med-ay-wa-kan-toan band, and one-half to the chief and headmen of the Wah-pay-koo-tay band, in such manner as they, hereafter, in open council, shall respectively request, and as soon after the removal of said Indians to the home set apart for them as the necessary appropriations therefor shall be made by Congress.

2d. To be laid out, under the direction of the President, for the establishment of manual-labor schools; the erection of mills and blacksmith shops, opening farms, fencing and breaking land, and for such other beneficial objects as may be deemed most conducive to the prosperity and happiness of said Indians, thirty thousand dollars ($30,000.)

The balance of said sum of one million four hundred and ten thousand dollars, ($1,410,000,) to wit: one million, one hundred and sixty thousand dollars ($1,160,000) to remain in trust with the United States, and five per cent. interest thereon to be paid annually to said Indians for the period of fifty years, commencing on the first day of July, eighteen hundred and fifty-two (1852,) which shall be in full payment of said balance, principal and interest; said payments to be made and applied, under the direction of the President as follows, to wit:

3d. For a general agricultural improvement and civilization fund, the sum of twelve thousand dollars, ($12,000.)

4th. For educational purposes, the sum of six thousand dollars, ($6,000.)

5th. For the purchase of goods and provisions, the sum of ten thousand dollars, ($10,000.)

6th. For money annuity, the sum of thirty thousand dollars, ($30,000.)

*[Marginal notes:]* Peace and friendship. Cession of lands in Minnesota and Iowa. Payment for said cession.

**The annuity provided in treaty to be paid in money.**

ARTICLE 5. The entire annuity, provided for in the first section of the second article of the treaty of September twenty-ninth, eighteen hundred and thirty-seven, (1837,) including an unexpended balance that may be in the Treasury on the first of July, eighteen hundred and fifty-two, (1852,) shall thereafter be paid in money.

**Spirituous liquors.**

ARTICLE 6. The laws of the United States prohibiting the introduction and sale of spirituous liquors in the Indian country shall be in full force and effect throughout the territory hereby ceded and lying in Minnesota until otherwise directed by Congress or the President of the United States.

**Rules and regulations.**

ARTICLE 7. Rules and regulations to protect the rights of persons and property among the Indian parties to this Treaty, and adapted to their condition and wants, may be prescribed and enforced in such manner as the President or the Congress of the United States, from time to time, shall direct.

In witness whereof, the said Luke Lea and Alexander Ramsey, Commissioners on the part of the United States and the undersigned Chiefs and Headmen of the Med-ay-wa-kan-toan and Wah-pay-koo-tay bands of Dakota or Sioux Indians, have hereunto set their hands, at Mendota, in the Territory of Minnesota, this fifth day of August, Anno Domini, one thousand eight hundred and fifty-one.

L. Lea.
Alex. Ramsey.

Med-ay-wa-kan-toans.

Chief       Ta-oya-te-duta, (his scarlet people, or "Little Crow,")
Headmen  Wa-kan-o-zhan, (Sacred Light, or Medicine Bottle,)
            Tee-tchay, (Top of the Lodge or "Jim," or "Old Thad,")
            Ta-tchan-h'pee-sa-pa, (His "Black Tomahawk,")
            Ma-ka-na-ho-toan-ma-nee, (At whose tread the earth resounds,)
            H'-da-ee-yan-kay, (he runs rattling,)
            Too-kan-a-hena-ma-nee, (Walker on the Medicine Boulders or Stones,)
            Wa-m'dee-doo-ta, (Scarlet War Eagle,)
            Na-ghee-yoo-shkan, (He moves the Ghosts or Shadows,)
            Shoank'-a-ska, ("White Dog,")
            Hoo-sa-nee-ghee, (one leg yellow or orange colored,)
            Wa-keen-yan-wash-tay, ("Good Thunder,")
Chief       Wa-pa-sha, (The Standard, or "Red Leaf,")
Headmen  Wa-kan-hendee-o-ta, (Many Lightnings,)
            Tchan-h'pee-yoo-ka, (He has a war club,)
            Heen-han-doo-ta, (Red Owl,)
            Ma ka-ka-ee-day, (He sets the Earth on fire,)
            Ee-a-hee-herday, (He bursts out speaking,)
Chief       Wa-koo-tay, (The "Shooter,")
Headmen  Ma-h'pee-ya-ma za, (Metal cloud,)
            Ta-ma-za-ho-wash-tay, (his good iron voice,)
            Ma-ka ta-na-zheen, (He stands on the earth,)

            Ee-wan-kam-ee-na-zhan, (He stands above,)
            Wa-kan-ta-pay-ta, (The Spirit's Fire,)
            Na-ghee-mee-tcha-keetay, (He kills the Ghosts,)
            Een-yan-sha-sha, (Red Stones,)
            Ee-day-wa-kan, (Sacred Blaze,)
            Ta-sag-yay-ma-za, (His metal Staff,)
Chief       Ma-h'pee mee-tchash-tay, (man of the sky,)
Headmen  Wee-tchan-h'pee, (The Star,)
            Ta-tay-na-zhee-na, (Little standing Wind,)
Headmen  Hoak-shee-dan-doo-ta, (Scarlet Boy,)
            Am-pay-sho-ta, (Smoky Day,)
            Ha-ha-ka-ma-za, (Metal Elk,)
            Ta-tay-h'moo-he-ya-ya, ("Whistling Wind,")
            Wa-pa-ma-nee, (He strikes walking,)
            Ma-h'pee-ya-wa-kan, (Sacred Cloud,)
            Ta-tchan-h'pee-ma-za, (His Iron War Club,)
Chief       Ma-za-ho-ta, (Gray Metal,)
Headmen  Wa-soo-mee-tchaeb-ta-shnee, (Wicked or "Bad Hail,")
            Oan-ketay-hee-dan, (Little Water-God or "Little Whale,")
            Tcha-noon-pay-sa, (The Smoker,)
            Ta-tay-to-kay-tcha, (Other wind,)
            Ka-ho, (The Rambler about,)
Chief       Ta-tchan-koo-wash-tay, (Good Road,)
Headmen  Ta-tay-o-wo-teen-ma-nee, (Roaring Wind that walks,)
            O-yay-tchan-ma-nee, (Track Maker,)

Chief  Ta-shoork-ay, (His Dog,)
      Sha-k'pay, ("Six,")
Headmen A-no-ghee-ma-sheen, (He that
      stands on both sides,)
      Hoo-ya-pa, (Eagle Head,)
      Ta-tay-mee-na, (Round Wind,)
      Ka-t'pan-t'pan-oo, (He comes
      pounding to pieces,)
      Ma-h'pee-ya-henda-keen-yan,
      (Walking across a cloud,)
      Wa-pee-ghee, (The orange red
      speckled cloud,)
      Ma-za-wa-menoo-ha, (Gourd
      shell metal medicine rattle,)
Chief  Hay-ee-tcha-h'moo-ma-nee,
      (Horn whistling walking,)

Headmen Pay-pay, (Sharp,)
      Ta-wo-ta-way-doo-ta,    (His
      Scarlet Armor,)
      Hay-pee, (Third Son,)
      A-pay-ho-ta, (Grey mane or
      crest,)
      Ho-tan-een, (His voice can be
      heard,)
      Ma-h'pee-ya-shee-tcha, (Bad
      Cloud,)
      Ta-wa-tcheen, (His mind,)
      Han-yay-too-ko-kee-pa-pee,
      (Night which is feared,)

In presence of Thomas Foster, Secretary. Nathaniel McLean, Indian Agent. Alexander Faribault; P. Prescott, G. H. Pond, Interpreters. David Olmstead; W. C. Henderson; Alexis Bailly; Richard Chute; A. Jackson; A. L. Larpenteur; W. H. Randall, Sr.; A. S. H. White; H. L. Dousman; Frederic B. Sibley; Marten McLeod; Geo. H. Faribault.

To the Indian names are subjoined marks.

----

### SUPPLEMENTAL ARTICLE.

1st. The United States do hereby stipulate to pay the Sioux bands of Indians, parties to this treaty, at the rate of ten cents per acre, for the lands included in the reservation provided for in the third article of the treaty as originally agreed upon in the following words:

*Payment for said cession.*

"ARTICLE 3. In part consideration of the foregoing cession and relinquishment, the United States do hereby set apart for the future occupancy and home of the Dakota Indians, parties to this treaty, to be held by them as Indian lands are held, a tract of country of the average width of ten miles on either side of the Minnesota River, and bounded on the west by the Tchaytam-bay and Yellow Medicine Rivers, and on the east by the Little Rock River and a line running due south from its mouth to the Waraju River; the boundaries of said tract to be marked out by as straight lines as practicable, whenever and in such manner as the President of the United States shall direct: *Provided,* That said tract shall be held and occupied by said bands in common, and that they shall hereafter participate equally and alike, in all the benefits derived from any former treaty between said bands, or either of them, and the United States," which article has been stricken out of the treaty by the Senate. The said payment to be in lieu of said reservation; the amount, when ascertained under instructions from the Department of the Interior, to be added to the trust fund provided for in the fourth article.

*Tract of land to be set apart.*

*To be occupied in common.*

2d. It is further stipulated that the President be authorized, with the assent of the said bands of Indians, parties to this treaty, and as soon after they shall have given their assent to the foregoing article, as may be convenient, to cause to be set apart by appropriate landmarks and boundaries, such tracts of country without the limits of the cession made by the first article of the treaty as may be satisfactory for their future occupancy and home: *Provided,* That the President may, by the consent of these Indians, vary the conditions aforesaid if deemed expedient.

TREATY WITH THE YANKTON SIOUX, 1858.

who may be within the limits of their reservation, whenever required to do so by such officer.

*Tribal annuities to be withheld if intemperance, etc.*

ARTICLE 12. To aid in preventing the evils of intemperance, it is hereby stipulated that if any of the Yanctons shall drink, or procure for others, intoxicating liquor, their proportion of the tribal annuities shall be withheld from them for at least one year; and for a violation of any of the stipulations of this agreement on the part of the Yanctons they shall be liable to have their annuities withheld, in whole or in part, and for such length of time as the President of the United States shall direct.

*Annuities may be withheld to enforce obligations, etc.*

ARTICLE 13. No part of the annuities of the Yanctons shall be taken to pay any debts, claims, or demands against them, except such existing claims and demands as have been herein provided for, and except such as may arise under this agreement, or under the trade and intercourse laws of the United States.

*Release of all demands, etc.*

ARTICLE 14. The said Yanctons do hereby fully acquit and release the United States from all demands against them on the part of said tribe, or any individual thereof, except, the beforementioned right of the Yanctons to receive an annuity under said treaty of Laramie, and except, also, such as are herein stipulated and provided for.

*Indian agent for Yankton.*

ARTICLE 15. For the special benefit of the Yanctons, parties to this agreement, the United States agree to appoint an agent for them, who shall reside on their said reservation, and shall have set apart for his sole use and occupation, at such a point as the Secretary of the Interior may direct, one hundred and sixty acres of land.

*Expenses intended to be borne by United States.*

ARTICLE 16. All the expenses of the making of this agreement, and of surveying the said Yancton reservation, and of surveying and marking said pipe-stone quarry, shall be paid by the United States.

*When to take effect.*

ARTICLE 17. This instrument shall take effect and be obligatory upon the contracting parties whenever ratified by the Senate and the President of the United States.

In testimony whereof, the said Charles E. Mix, commissioner, as aforesaid, and the undersigned chiefs, delegates, and representatives of the said tribe of Yancton Indians, have hereunto set their hands and seals at the place and on the day first above written.

Charles E. Mix, Commissioner. [L. S.]

Pa-la-ne-a-pa-pe, or the Man that was struck by the Ree, his x mark. [L. S.]
Ma-to-sa-be-che-a, or the Smutty Bear, his x mark. [L. S.]
Charles F. Picotte, or Eta-ke-cha. [L. S.]
The-ton-ke-a-yah-ka, or the Crazy Bull, his x mark. [L. S.]
Pse-the-we-kan, or the Jumping Thunder, his x mark. [L. S.]
Ma-ra-ha-ton, or the Iron Horn, his x mark. [L. S.]
Nom-ba-ka-pah, or One that knows two, his x mark. [L. S.]
Ah-ka-na-pah, or the Walking, his x mark. [L. S.]
A-ha-ka-ma-ne, or the Standing Elk, his x mark. [L. S.]

A-ki-tcha-ta-hou-ka, or the Little Elk, [L. S.]
One-too-wee-ta-pa, or the Grebling, [L. S.]
Hawk, his x mark. [L. S.]
Ehawe-cha-cha, or the Owl Man, his x mark. [L. S.]
Pte-an-wa-kan-mu-ga, or the White Medicine Cow that stands, by and duly authorized delegate and representative, Charles F. Picotte.
Ma-ga-a-she-to-ka, or the Little White Swan, by his duly author-ized delegate and representative, Charles F. Picotte.
O-ke-cha-wash-ta, or the Pretty Boy, by his duly authorized delegate and representative, Chas. F. Picotte. [L. S.]

Executed in the presence of—
A. H. Redfield, agent.
J. B. S. Todd.
Theophile Bruguier.
Fd. Schmidt.
John W. Wells.
D. Walker.

E. B. Grayson.
S. J. Johnson.
George P. Mapes.
P. O. Davis.
Zephier Rencontre, his x mark, United States interpreter.

Witness:
J. B. S. Todd.
Paul Dorion, his x mark.
Charles Rulo, his x mark.

Witness:
J. B. S. Todd.

## TREATY WITH THE SIOUX, 1858.

Articles of agreement and convention made and concluded at the city of Washington, on the nineteenth day of June, one thousand eight hundred and fifty-eight, by Charles E. Mix, commissioner on the part of the United States, and the following-named chiefs and headmen of the Mendawkanton and Wahpakoota bands of the Dakota or Sioux tribe of Indians, viz, Wabashaw, Chatanwakoomane, Wakhaytayhe-dan, Shakopee, Wamindeetunka, Mahpeeoke, chaghi, and Hinhanduta, He-nu-ha-kaza, pa-ma-za, Wahpaytunkah, Tachuay-nioui-na, Oyaytaygahtay, Washingmanza, Tashun-kaymazaza, Wahkanhayduta, and Wa-kinyantawa, they being duly authorized and empowered to act for said bands.

*Preamble.*
*June 19, 1858.*
*Parties to treaty.*

ARTICLE 1. It is hereby agreed and stipulated that, as soon as practicable after the ratification of this agreement, so much of that part of the reservation or tract of land now held and possessed by the Mendawkanton and Wahpakoota bands of the Dakota or Sioux Indians, and which is described in the third article of the treaty made with them on the fifth day of August, one thousand eight hundred and fifty-one, which lies south or southwestwardly of the Minnesota River, shall constitute a reservation for said bands, and shall be surveyed, and eighty acres thereof, as near as may be in conformity with the public surveys, be allotted severally to each head of a family; or single person over the age of twenty-one years, in said band of Indians, and which allotments are to include the proper proportion of timbered land, if the same be practicable, for each allotment.

*Lands to be allotted in severalty.*
*Eighty acres of reservation to each individual.*

*Provided, however,* That eighty acres, as near as may be, shall, in like manner as above provided for, be allotted to each of the minors of said bands on his or her attaining their majority, or on becoming heads of families by contracting marriage, if neither of the parties shall have previously received land.

*Further allotment.*

The residue of the said part of said reservation not so allotted, shall be held by said bands in common, and shall be surveyed.

*Residue to be held in common.*

All the necessary expenses of the surveys, and allotments thus provided, for shall be defrayed out of the funds of said bands of Indians in the hands of the Government of the United States.

*Expenses of survey, etc.*

As the members of said bands become capable of managing their business and affairs, the President of the United States may, at his discretion, cause patents to be issued to them, for the tracts of land allotted to them, respectively, in conformity with this article; said tracts to be exempt from levy, taxation, or sale, and be inalienable for ever; nor shall they be sold or alienated otherwise provided for by the legislature of the State in which they are situated with the assent of Congress; nor shall they be sold or alienated in fee, or be in any other manner disposed of except to the United States or to members of said bands.

*Patents to be issued to members.*
*Tracts to be exempt from taxes, etc.*

ARTICLE 2. Whereas by the treaty with the Mendawkanton and Wahpakoota bands of Sioux Indians, concluded at Mendota on the fifth day of August, one thousand eight hundred and fifty-one, said bands retained for their "future occupancy and home," "to be held by them so Indian lands are held, a tract of country of the average width of

*Recitals.*
*Provisions of treaty of Aug. 5, 1851.*

*Amended by Senate.*

ten miles on either side of the Minnesota River," extending from Little Rock River to the Tchetambe and Yellow Medicine Rivers, which land was to "be held by said bands in common."

And whereas the Senate of the United States so amended said treaty as to strike therefrom the provision setting apart said land as a home for said bands, and made provision for the payment to said bands "at the rate of ten cents per acre for the lands included in the" said tract so reserved and set apart for the "occupancy and home" of said bands, and also provided in addition thereto, that there should be "set apart, by appropriate landmarks and boundaries, such tracts of country without the limits of the cession made by the instrumentation of the" said treaty as should "be satisfactory for their future occupancy and home," said Senate amendment providing also "that the President may, with the consent of these Indians, vary the conditions aforesaid, if deemed expedient," all which provisions in said amendment were assented to by said Indians:

And whereas the President so far varied the conditions of said Senate amendment, as to permit said bands to locate for the time being, upon the tract originally reserved by said bands for a home, and in the said "tracts of country without the limits of the cession" made in the said treaty *has* [have] ever been provided for, or offered to, said bands:

*Act of 1854, ch. 101, 10 Stat. 326.*

And whereas by the "act making appropriations for the current and contingent expenses of the Indian Department and for fulfilling treaty stipulations with various Indian tribes," approved July 31, 1854, the President was authorized to confirm to the Sioux of Minnesota forever, the reserve on the Minnesota River now occupied by them, upon such conditions as he may deem just:

*Question of title of the lands to be submitted to the Senate, and freedom in their favor.*

And whereas, although the President has not directly confirmed said reserve to said Indians, they claim that as they were relied to to "such tracts of country as should be satisfactory for their future occupancy and home," as no such country has been provided for, or prescribed to said Indians, it is agreed and stipulated that the Senate for decision whether they have such title; and if they have, what compensation shall be made to them for that part of said reservation or tract of land lying on the north side of the Minnesota River—whether they shall be allowed a specific sum of money therefor, and if so, how much; or whether the same shall be sold for their benefit, they to receive the proceeds of such sale, deducting the necessary expenses incident thereto. Such sale, if decided in favor of by the Senate, shall be made under and according to regulations to be prescribed by the Secretary of the Interior, and in such manner as will secure to them the largest sum it may be practicable to obtain for said land.

ARTICLE 3. It is also agreed that if the Senate shall authorize the land designated in Article two of this agreement to be held for the benefit of the said Mendawakanton bands, or shall prescribe the manner in which said lands or their interest in said trust, provision may be made by which said bands and head-men of said bands may, in their discretion, in open council, authorize to be paid out of the proceeds of said tract, such sum or sums as may be found necessary and proper, not exceeding seventy thousand dollars, to satisfy their just debts and obligations, and to provide goods to be taken by said chiefs and head-men to the said bands upon their return:

*Proviso.*

*Provided, however,* That their said determinations shall be approved by the superintendent of Indian affairs for the northern superintendency for the time being, and the said payments be authorized by the Secretary of the Interior.

*Lands, reclaimed under the first article to be deemed an Indian reservation.*

ARTICLE 4. The lands retained and to be held by the members of the Mendawakanton and Wahpakoota bands of the Dakota or Sioux Indians, under and by virtue of the first article of this agreement, shall, to all intents and purposes whatever, be deemed and held to be—

an Indian reservation; and the laws which have been, or may hereafter be enacted by Congress, to regulate trade and intercourse with the Indian tribes, shall have full force and effect over and within the limits of the same; and no person other than the members of the said bands, to be ascertained and defined under such regulations as the Secretary of the Interior shall prescribe, unless such as may be duly licensed to trade with said bands, or employed for their benefit, or members of the family of such persons, shall be permitted to reside or make any settlement upon any part of said reservation, or the timbered land allotted to individuals, and also this reserved for subsequent distribution as provided in the first article of this agreement, shall be free from all trespass, use, or occupation, except as hereinafter provided.

*The United States may maintain military posts, agencies, schools, etc., on reservation.*

ARTICLE 5. The United States shall have the right to establish and maintain upon said reservation such military posts, agencies, schools, mills, shops, roads, and agricultural or mechanical improvements, as may be deemed necessary, but no greater quantity of land or timber shall be taken and used for said purposes than shall be actually required. And if it in the establishment or maintenance of such posts, agencies, roads or other improvements, the timber or other property of any individual Indian shall be taken, injured, or destroyed, just and adequate compensation shall be made therefor by the United States.

*Compensation to be made for depredations committed thereby by any Indian.*

Roads or highways authorized by competent authority other than the United States, the lines of which shall be through said reservation, shall have the right of way through the same, upon the fair value of such right being paid to the Mendawakanton and Wahpakoota bands by the party or parties authorizing or interested in the same, to be assessed and determined in such manner as the Secretary of the Interior shall direct.

*The bands to preserve friendly relations, etc.*

ARTICLE 6. The Mendawakanton and Wahpakoota bands of Dakota or Sioux Indians acknowledge their dependence on the Government of the United States, and do hereby pledge and bind themselves to preserve friendly relations with the citizens thereof, and to commit no injuries or depredations on their persons or property, nor on those of the members of any other tribe; but, in case of any such injury or depredation, full compensation shall, as far as practicable be made therefor out of their moneys in the hands of the United States; the amount in all cases to be determined by the Secretary of the Interior.

*To pay for depredations.*

They further pledge themselves not to engage in hostilities with the Indians of any other tribe unless in self-defence, but to submit, through their agent, all matters of dispute and difficulty between themselves and other Indians, for the decision of the President of the United States, and to acquiesce in and abide thereby.

*Not to engage in hostilities unless, etc.*

They also agree to deliver to the proper officers all persons belonging to their said bands who may become offenders against the treaties, laws, or regulations of the United States, or the laws of the State of Minnesota, and to assist in discovering, pursuing, and capturing all such offenders whenever required to do so by such officers, through the agent or other proper officer of the Indian Department.

*Bands to surrender offenders.*

ARTICLE 7. To aid in preventing the evils of intemperance, it is hereby stipulated that if any of the members of the said Mendawakanton and Wahpakoota bands of Sioux Indians shall drink, or procure for others, intoxicating liquors, their proportion of the annuities of the said bands shall, at the discretion of the Secretary of the Interior, be withheld from them for the period of at least one year; and for a violation of any of the stipulations of this agreement on the part of any members of said bands, the persons so offending shall be liable to have their annuities withheld and to be subject to such other punishment as the Secretary of the Interior may prescribe.

*Annuities may be withheld from delinquents, etc. for introducing intoxicating liquors.*

ARTICLE 8. Such of the stipulations of former treaties as provided for the payment of particular sums of money to the said Mendawakanton and Wahpakoota bands, or for the application or expenditure

*Secretary of the Interior to have discretion over annuities and annual expenditure.*

784                                        TREATY WITH THE SIOUX, 1858.



of specific amounts for particular objects or purposes, shall be, and
hereby are, so amended and changed as to invest the Secretary of the
Interior with discretionary power in regard to the manner and objects
of the annual expenditure of all such sums or amounts which have
accrued and are now due to said bands, together with the amount the
said bands shall become annually entitled to under and by virtue of
the provisions of this agreement: *Provided,* The said sums or amounts
shall be expended for the benefit of said bands at such time or times
and in such manner as the said Secretary shall deem best calculated to
promote their interests, welfare, and advance in civilization. And it
is further agreed, that such change may be made in the stipulations of
former treaties which provide for the payment of particular sums for
specified purposes, as to permit the chiefs and braves of said bands or
any of the subdivisions of said bands, with the sanction of the Secre-
tary of the Interior, to authorize such payment or expenditures of
their annuities, or any portion thereof, which are to become due here-
after, as may be deemed best for the general interests and welfare of
the said bands or subdivisions thereof.

Senate to decide
whether $10,000 to be
paid to A. J. Camp-
bell.
*Ante,* p. 493.

ARTICLE 9. As the Senate struck from the treaty with the Menda-
wakanton band of Sioux on the twenty-ninth day of September, one
thousand eight hundred and thirty-seven, the ninth clause of the second
article and the whole of the third article of said treaty, which provided
for the payment of four hundred and fifty (450) dollars annually, for
twenty years, to Scott Campbell, and confirmed to the said Scott Camp-
bell a title to five hundred (500) acres of land which he then occupied,
said payment and land being deemed by said Indians to form a part of
the consideration for which they ceded to the United States a certain
tract of land in said treaty specified, which reduction, in the consider-
ation for said land, has never been sanctioned by said Indians, the said
Mendawakantons and Wahpakoota bands now request that provision
be made for the payment of the sum of ten thousand (10,000) dollars
to A. J. Campbell, the son of said Scott Campbell, now deceased, in
full consideration of the money stipulated to be paid and land con-
firmed to said Scott Campbell in the original draft of said treaty
aforesaid; which subject is hereby submitted to the Senate for its
favorable consideration.

United States to pay
expenses of negotia-
tion.

ARTICLE 10. The expenses attending the negotiation of this agree-
ment shall be defrayed by the United States.

In testimony whereof, the said Charles E. Mix, Commissioner, as
aforesaid, and the undersigned chiefs and headmen of the said Men-
dawakanton and Wahpakoota bands, have hereunto set their hands and
seals at the place and on the day first above written.

Charles E. Mix, Commissioner, [L. S.]

Wa-bash-aw, his x mark.          [L. S.]
Che-tan-a-koo-a-mo-nee, (Little
    Crow,) his x mark.          [L. S.]
Wa-su-bi-ya-hi-dan, *his x mark.*  [L. S.]
Sha-ko-pee, (Six,) his x mark.   [L. S.]
Wa-min-dee-ton-kee, (Large War
    Eagle,) his x mark.          [L. S.]
Muz-za-o-jan-jan, (Iron Light,) his
    x mark.                      [L. S.]
Ma-kaw-to, (Blue Earth,) his x
    mark.                        [L. S.]
Hu-shaw-shaw, (Red Legs,) his x
    mark.                        [L. S.]
Hin-hau-du-ta, (Scarlet Owl,) his
    x mark.                      [L. S.]
Ha-raka-muz-za, (Iron Elk,) his x
    mark.                        [L. S.]

Wu-ka-no-jan-jan,    (Medicine
    Light,) his x mark.          [L. S.]
Ta-chunr-pee-muzza, (His Iron
    War Club,) *his x mark.*      [L. S.]
Wa-kin-yan-to-wa, (Owns the
    Thunder,) his x mark.        [L. S.]
Chunr-pi-you-ha, (Has a War
    Club,) his x mark.           [L. S.]
On-kee-ter-hi-dan, (*Little Whale,*)
    his x mark.                  [L. S.]
Wa-mo-u-i-sa, (The Thief,) his x
    mark.                        [L. S.]
Pa-pa, (Sharp,) his x mark.      [L. S.]
Ta-ta-i-bom-du, (Scattering Wind,)
    his x mark.                  [L. S.]

his charge for the use of said register as may be necessary for his accommodation, unless it shall appear to said Secretary that such rooms cannot be so appropriated without interfering with the business of his Department; and in that event the said register shall procure, with the approbation of said Secretary, such rooms, in the city of Washington, as may be necessary for the security of the records and the convenient transaction of the business of said office.

*Repealing clause.* SEC. 3. *And be it further enacted,* That all acts and parts of acts inconsistent with the provisions of this act be, and the same are hereby, repealed.

APPROVED, February 14, 1863.

---

*Feb. 16. 1863.*

CHAP. XXXVI. — *An Act to issue an American Register to the Steamship Karnak.*

*Register to steamship Karnak.*

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is hereby directed to issue an American register to the steamship or vessel known as the Karnak, of the collection district of the port of New York, the same being a British built vessel, but now owned by American citizens.

APPROVED, February 16, 1863.

---

*Feb. 16, 1863.*

CHAP. XXXVII. — *An Act for the Relief of Persons for Damages sustained by reason of Depredations and Injuries by certain Bands of Sioux Indians.*

*Damages by Sioux Indians.*
*Preamble.*

Whereas the United States heretofore became bound by treaty stipulations to the Sisseton, Wahpaton, Medawakanton, and Wa[h]pakoota bands of the Dakota or Sioux Indians to pay large sums of money and annuities, the greater portion of which remains unpaid according to the terms of said treaty stipulations; and whereas during the past year the aforesaid bands of Indians made an unprovoked, aggressive, and most savage war upon the United States, and massacred a large number of men, women, and children within the State of Minnesota, and destroyed and damaged a large amount of property, and thereby have forfeited all just claim to the said moneys and annuities to the United States; and whereas it is just and equitable that the persons whose property has been destroyed or damaged by the said Indians, or destroyed or damaged by the troops of the United States in said war, should be indemnified in whole or in part out of the indebtedness and annuities so forfeited as aforesaid: Therefore —

*Treaties with certain Sioux Indians annulled in part.*

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That all treaties heretofore made and entered into by the Sisseton, Wahpaton, Medawakanton, and Wahpakoota bands of Sioux or Dakota Indians, or any of them, with the United States, are hereby declared to be abrogated and annulled, so far as said treaties or any of them purport to impose any future obligation on the United States, and all lands and rights of occupancy within the State of Minnesota, and all annuities and claims heretofore accorded to said Indians, or any of them, to be forfeited to the United States.

*Two thirds of unexpended annuities to be paid to commissioners, and apportioned among survivors of massacres.*

SEC. 2. *And be it further enacted,* That two thirds of the balance remaining unexpended of annuities due and payable to said Indians for the present fiscal year, not exceeding one hundred thousand dollars, and the further sum of one hundred thousand dollars, being two thirds of the annuities becoming due and payable to said Indians during the next fiscal year, is hereby appropriated, and shall be paid from the Treasury of the United States, out of any moneys not otherwise appropriated, to the commissioners hereinafter provided for, to be apportioned by them among the heads of families, or, in case of their decease, among the surviving members of

---

THIRTY-SEVENTH C[

families of the State of Minn[
tions of the Sisseton, Wah[
bands of Sioux or Dakota I[
in the late Indian war in th[
of two hundred dollars to an[
said, and no moneys shall be[
claims which shall be prese[
first day of June next, for th[
shall take and return to the[
tary of the Treasury duplica[

SEC. 3. *And be it further*[
proper distribution of the m[
relief of such families, and[
amount of said damages an[
shall be lawful for the Presi[
the Senate, to appoint three[
shall be a resident of Minne[
scribed by the laws of the Un[
they shall entertain and hea[
oath) of all and every perso[
ans, and by the troops of the[
power to compel the attenda[
oaths to them to testify the[
claimants to be examined an[
by them, as to their said c[
times and places as will giv[
nity of verifying their claim[
that no unjust or fictitious[
any reason to suppose that[
power, and it shall be their[
their knowledge, that the a[
of the witnesses and the exa[
to writing, signed and certi[
petition and all the paper[
commission, be transmitted[
proval, rejection, or modific[
gress. A majority of the[
and shall be competent to d[

SEC. 4. *And be it furth*[
their first session at Saint [
the first day of April ne[
claims must be presented t[
of September next, or the [
commissioners shall make[
relating thereto, on or befo[

SEC. 5. *And be it furt*[
ceive for their services and[
dred dollars each. And t[
to summon witnesses, who[
to be allowed by said comi[
for his services. Witnesse[
shall receive pay for atte[
laws of Minnesota for wit[
ing the expenses of said c[
lars is hereby appropriate[
the United States, or so [
same.

SEC. 6. *And be it fur*[
immediately after the pas[

III. Ch. 34, 36, 37.  1863.

...ay be necessary for his accom-
...ecretary that such rooms cannot
...ith the business of his Depart-
...shall procure, with the appro-
... city of Washington, as may
... and the convenient transaction

...at all acts and parts of acts
...be, and the same are hereby,

*Register to the Steamship Karnak.*

*...f Representatives of the United*
... That the Secretary of the
... American register to the
..., of the collection district of
a British built vessel; but now

*...rsons for Damages sustained by reason*
*...Bands of Sioux Indians.*

...e bound by treaty stipulations
...on, and Wa[h]pakoota bands
...ay large sums of money and
...mains unpaid according to the
...hereas during the past year
... unprovoked, aggressive, and
...es, and massacred a large num-
...in the State of Minnesota, and
...f property, and thereby have
...s and annuities to the United
...uitable that the persons whose
...ed by the said Indians, or de-
...e United States in said war,
...t out of the indebtedness and
...efore —

*...Representatives of the United*
... That all treaties heretofore
...ahpaton, Medawakanton, and
...dians, or any of them, with the
...abrogated and annulled, so far
...ppose any future obligation on
...f occupancy within the State
...ms heretofore accorded to said
...the United States.

...two thirds of the balance re-
...ayable to said Indians for the
...dred thousand dollars, and the
...rs, being two thirds of the annui-
...s during the next fiscal year,
...m the Treasury of the United
...ppropriated, to the commission-
...oned by them among the heads
...ng the surviving members of

---

THIRTY-SEVENTH CONGRESS. Sess. III. Ch. 37. 1863.     653

families of the State of Minnesota who suffered damage by the depreda-
tions of the Sisseton, Wahpaton, Medawakanton, and Wa[h]pakoota
bands of Sioux or Dakota Indians, or by the troops of the United States
in the late Indian war in the State of Minnesota, not exceeding the sum   *Limit in time*
of two hundred dollars to any one family, nor the actual damages afore-   *and amount.*
said, and no moneys shall be paid under this section except upon those
claims which shall be presented to said commissioners on or before the
first day of June next, for the payment of which the said commissioners
shall take and return to the Secretary of the Interior and to the Secre-
tary of the Treasury duplicate vouchers therefor, certified by them.

Sec. 3. *And be it further enacted,* That, for the purpose of making the   *Three commis-*
proper distribution of the moneys hereby appropriated for the present   *sioners to be ap-*
relief of such families, and for the purpose of ascertaining the whole   *pointed.*
amount of said damages and the persons who have suffered the same, it
shall be lawful for the President, by and with the advice and consent of
the Senate, to appoint three commissioners, not more than one of whom
shall be a resident of Minnesota, who shall take an oath in the manner pre-
scribed by the laws of the United States to faithfully discharge their duties ;   *Duties.*
they shall entertain and hear the complaints (in writing, duly verified on
oath) of all and every person aggrieved by the depredations of said Indi-
ans, and by the troops of the United States in said war ; they shall have
power to compel the attendance of witnesses, and to administer the proper
oaths to them to testify the truth ; they shall have power to compel the   *Powers.*
claimants to be examined and cross-examined on oath, to be administered
by them, as to their said claim ; they shall hold their sessions at such   *Sessions.*
times and places as will give the persons complaining the fairest opportu-
nity of verifying their claim with the least expense ; they shall take care
that no unjust or fictitious claim shall be established ; and if they have
any reason to suppose that any such claim is presented, they shall have
power, and it shall be their duty, to procure any countervailing proof, to
their knowledge, that the same may be finally rejected. The testimony   *Testimony.*
of the witnesses and the examination of the complainant shall be reduced
to writing, signed and certified by them, respectively, and shall, with the
petition and all the papers relating to each case, with the finding of the
commission, be transmitted to the Secretary of the Interior for his ap-
proval, rejection, or modification, to be by him laid before the next Con-
gress. A majority of the commission may select their presiding officer,   *Presiding offi-*
and shall be competent to decide all questions arising before them.   *cer.*

Sec. 4. *And be it further enacted,* That said commissioners shall hold   *First session.*
their first session at Saint Peter's, in the State of Minnesota, on or before
the first day of April next, for the hearing of claimants, and that all
claims must be presented to said commissioners on or before the first day   *Limit of exist-*
of September next, or the same shall not be heard by them ; and the said   *ence of commis-*
commissioners shall make and return their finding, and all the papers   *sion.*
relating thereto, on or before the first day of December next.

Sec. 5. *And be it further enacted,* That said commissioners shall re-   *Pay of commis-*
ceive for their services and expenses the sum of two thousand five hun-   *sioners.*
dred dollars each. And they are authorized to depute a proper person
to summon witnesses, who shall be entitled to receive his actual expenses,   *Summoning of*
to be allowed by said commissioners, and the sum of three dollars per day   *witnesses.*
for his services. Witnesses subpœnaed in behalf of the United States
shall receive pay for attendance, not to exceed the fees allowed by the   *Pay.*
laws of Minnesota for witnesses attending justices' courts. And, for pay-   *Contingencies*
ing the expenses of said commission, the further sum of ten thousand dol-   *of commission.*
lars is hereby appropriated out of the said annuities in the Treasury of
the United States, or so much thereof as may be necessary to pay the
same.

Sec. 6. *And be it further enacted,* That the Secretary of the Interior,   *This act to be*
immediately after the passage of this act, shall cause the same to be pub-   *published in four*

newspapers in Minnesota.

lished in four of the newspapers of the State of Minnesota which, in his opinion, will give the most publicity to the same among the people who have suffered by said depredations, and give notice of the first meeting of said commissioners, the expenses to be paid out of the sum appropriated in the next preceding section.

Punishment of perjury.

Sec. 7. *And be it further enacted,* That if the complainant, or any witness testifying before said commissioners, shall be guilty of perjury, upon conviction thereof in the proper court of the United States, he shall suffer the pains and penalties prescribed by the laws of the United States for that offence.

Commissioners may make rules, &c.

Sec. 8. *And be it further enacted,* That the said commissioners may make rules, not inconsistent with this act, prescribing the order and mode of presenting, prosecuting, and proving said claims before them, which rules shall be published in one newspaper in the city of Saint Paul and one in Saint Peter for at least two weeks prior to the first session of said commission, to be held at Saint Peter as directed in the fourth section of this act, and the expenses of such publication shall be paid out of the fund appropriated in the fifth section of this act.

Certain land to be set apart for Indians who aided the whites,

Sec. 9. *And be it further enacted,* That the Secretary of the Interior is hereby authorized to set apart of the public lands, not otherwise appropriated, eighty acres in severalty to each individual of the before-named bands who exerted himself in rescuing the whites from the late massacre

to be free from taxes, &c.

of said Indians. The land so set apart shall not be subject to any tax, forfeiture, or sale, by process of law, and shall not be aliened or devised, except by the consent of the President of the United States, but shall be an inheritance to said Indians and their heirs forever.

Commissioners to give bonds.

Sec. 10. *And be it further enacted,* That said commissioners, before entering upon the discharge of their duties as such, shall give bonds in the usual form to the United States, in the sum of twenty thousand dollars each, with good and sufficient security, to be approved by the Secretary of the Treasury, faithfully to discharge their duties as such, and to account for any money which may come into their hands.

Approved, February 16, 1863.

---

Feb. 20, 1863.

Chap. XLIII. — *An Act making Appropriations for the Construction, Preservation, and Repairs of certain Fortifications and other Works of Defence for the Year ending thirtieth of June, eighteen hundred and sixty-four.*

*Be it enacted by the Senate and House of Representatives of the United*

Appropriations for fortifications.

*States of America in Congress assembled,* That the following sums be, and they are hereby, appropriated, out of any money in the Treasury not otherwise appropriated, for the construction, preservation, and repairs of certain fortifications and other works of defence for the year ending the thirtieth of June, one hundred and sixty-four:

Fort Montgomery.

For Fort Montgomery, outlet of Lake Champlain, New York, one hundred thousand dollars.

Fort Knox.

For Fort Knox, at Narrows of Penobscot River, Maine, one hundred and fifty thousand dollars.

Kennebec River.

For fort at entrance of Kennebec River, Maine, one hundred thousand dollars.

Hog Island Ledge.

For fort on Hog Island Ledge, Portland Harbor, Maine, one hundred and fifty thousand dollars.

Fort Preble.

For new Fort Preble, Portland Harbor, Maine, one hundred and fifty thousand dollars.

Fort Scammel.

For Fort Scammel, Portland Harbor, Maine, one hundred and fifty thousand dollars.

Fort Constitution.

For new Fort Constitution, Portsmouth Harbor, New Hampshire, two hundred thousand dollars.

For new Fort McClary, Po hundred thousand dollars.

For Fort Winthrop and exte Harbor, Massachusetts, fifty tho

For Fort Warren, Boston Ha dollars.

For permanent forts at Pr hundred and fifty thousand dolla

For permanent forts at Ni hundred and fifty thousand dolla

For Fort Adams, Newport F dollars.

For permanent defences at N dred and fifty thousand dollars.

For additional fortifications hundred thousand dollars: P shall not be expended unless site for a navy yard or naval si

For Fort Schuyler, East dollars.

For fort at Willet's Point, hundred and fifty thousand doll

For fort on site of Fort Tor dred thousand dollars.

For casemated battery on S sand dollars.

For new battery near Fort sand dollars.

For fort at Sandy Hook, N dollars.

For Fort Delaware, Delaw

For permanent work, for I thousand dollars.

For Fort Carroll, Baltimor dollars.

For Fort Monroe, Hampto

For Fort Wool, Hampton lars.

For Fort Clinch, entrance and fifty thousand dollars.

For Fort Taylor, Key We

For Fort Jefferson, Garde lars.

For new fort at Tortugas,

For fort at Ship Island, C five thousand dollars.

For Fort Jackson, Missis

For Fort Saint Philip, M lars.

For fort at Fort Point, thousand dollars.

For fort at Alcatraz Isla dred thousand dollars.

For defensive works in dred thousand dollars.

For contingencies of fort ations, seven hundred thous

For tool and siege trains thousand dollars.

Case: 12-5035　Document: 90　Page: 107　Filed: 12/14/2012

constructors, and all the civil estab-
and stations, one hundred and six
four dollars : *Provided,* That here-
it the Washington navy yard shall
the salary of the civil engineer of
three thousand dollars.
ers, and contingencies of the United
housand eight hundred and eighty-

hase of nautical instruments, repairs
truments, and for the purchase of
for backing and binding the same,

atchman, porter, and laborers ; for
to buildings and enclosures ; for
postage, and stationery, and inci-
rs.

mer, Nautical Almanac, twenty-
tollars.

That there shall be paid, out of
ise appropriated, the several certifi-
of the Treasury Department to the
the Congress and Cumberland, and
of April second, eighteen hundred
vide for the equitable settlement of
of the frigate Congress and other

That the second section of the act
rease of the Navy," approved July
cty-one, shall be so construed that
which may be made, of acting as-
are hereby ratified and confirmed as
the return of the vessels in which
til the suppression of the present
ary ; and the rate of compensation
l, is hereby legalized and approved.
That the Secretary of the Navy be,
se in such manner as he shall deem
, the flour required for naval use ;
ked from this flour by special con-

, That every assistant paymaster
llowed a clerk, with the compensa-
ven by law to the clerk of a pay-
*Provided,* That clerks shall not be
masters in vessels having supple-
ting in supply steamers or store-

hat the act to increase and i gulate
ates, approved June first, eighteen
is it respects boatswains, gunners,
y, as to allow to those officers such
as they would be entitled to, had
the dates of their appointments or
ive grades, instead of the date of

CHAP. CXIX. — *An Act for the Removal of the Sisseton, Wahpaton, Medawakanton, and Wahpakoota Bands of Sioux or Dakota Indians, and for the Disposition of their Lands in Minnesota and Dakota.*

March 3, 1863.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the President is authorized and hereby directed to assign to and set apart for the Sisseton, Wahpaton, Medawakanton, and Wahpakoota bands of Sioux Indians a tract of un-occupied land outside of the limits of any state, sufficient in extent to enable him to assign to each member of said bands (who are willing to adopt the pursuit of agriculture) eighty acres of good agricultural lands, the same to be well adapted to agricultural purposes.

*Lands outside the limits of any state to be assigned certain bands of Sioux Indians.*

*Quantity.*

SEC. 2. *And be it further enacted,* That the several tracts of land within the reservations of the said Indians, shall be surveyed, under the direction of the commissioner of the general land-office, into legal subdivisions to conform to the surveys of the other public lands. And the Secretary of the Interior shall cause each legal subdivision of the said lands to be appraised by discreet persons to be appointed by him for that purpose. And in each instance where there are improvements upon any legal subdivision of said lands, the improvements shall be separately appraised. But no portion of the said lands shall be subject to preëmption, settlement, entry, or location, under any act of Congress, unless the party preëmpting, settling upon, or locating any portion of said lands shall pay therefor the full appraised value thereof, including the value of the said improvements, under such regulations as hereinafter provided.

*Reservations of said Indians to be surveyed.*

*Legal subdivisions to be appraised.*

*Improvements.*

*When subject to preëmption.*

SEC. 3. *And be it further enacted,* That after the survey of the said reservations the same shall be open to preëmption, entry, and settlement in the same manner as other public lands : *Provided,* That before any person shall be entitled to enter any portion of the said lands by preëmption or otherwise, previous to their exposure to sale to the highest bidder, at public outcry, he shall become an actual bona fide settler thereon, and shall conform to all the regulations now provided by law in cases of preëmption ; and shall pay, within the term of one year from the date of his settlement, the full appraised value of the land, and the improvements thereon, to the land officers of the district where the said lands are situated. And the portions of the said reservations which may not be settled upon, as aforesaid, may be sold at public auction, as other public lands are sold, after which they shall be subject to sale at private entry, as other public lands of the United States, but no portion thereof shall be sold for a sum less than their appraised value, before the first of January, Anno Domini eighteen hundred and sixty-five, nor for a less price than one dollar and twenty-five cents per acre, until otherwise provided for by law.

*After survey, lands to be open to preëmption, entry, and settlement.*

*Who may preëmpt, &c.*

*What may be sold at public auction.*

SEC. 4. *And be it further enacted,* That the money arising from said sale shall be invested by the Secretary of the Interior for the benefit of said Indians in their new homes, in the establishing them in agricultural pursuits : *Provided,* That it shall be lawful for said Secretary to locate any meritorious individual Indian of said bands, who exerted himself to save the lives of the whites in the late massacre, upon said lands on which the improvements are situated, assigning the same to him to the extent of eighty acres, to be held by such tenure as is or may be provided by law : *And provided, further,* That no more than eighty acres shall be awarded to any one Indian, under this or any other act.

*Proceeds of sales of lands, how to be applied.*

SEC. 5. *And be it further enacted,* That the money to be annually appropriated for the benefit of the said Indians shall be expended in such manner as will, in the judgment of the Secretary of the Interior, best advance the said Indians in agricultural and mechanical pursuits, and enable them to sustain themselves without the aid of the government ; but no portion of said appropriations shall be paid in money to said Indians. And in such expenditure, said Secretary may make reasonable discrimination in favor of the chiefs who shall be found faithful to the Government

*Annual appropriations for these Indians, how to be expended.*

*No part to be paid in money.*

820     THIRTY-SEVENTH CONGRESS. Sess. III. Ch. 119, 120. 1863.

**Discrimination in favor of loyal chiefs.** of the United States, and efficient in maintaining its authority and the peace of the Indians. Said Indians shall be subject to the laws of the **Indians to be subject to laws, and to rules and regulations.** United States, and to the criminal laws of the state or territory in which they may happen to reside. They shall also be subject to such rules and regulations for their government as the Secretary of the Interior may **They cannot make a valid civil contract, &c.** prescribe; but they shall be incapable of making any valid civil contract with any person other than a native member of their tribe, without the consent of the President. The Secretary of the Interior shall also make **Education.** reasonable provision for the education of said Indians, according to their capacity and the means at his command.

APPROVED, March 3, 1863.

March 3, 1863.     Chap. CXX. — *An Act to provide for the Collection of abandoned Property and for the Prevention of Frauds in insurrectionary Districts within the United States.*

**Special agents to receive and collect abandoned or captured property in certain states.** *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That it shall be lawful for the Secretary of the Treasury, from and after the passage of this act, as he shall from time to time see fit, to appoint a special agent or agents to receive and collect all abandoned or captured property in any state or territory, or any portion of any state or territory, of the United States, designated as in insurrection against the lawful Government of the United **Proviso.** States by the proclamation of the President of July first, eighteen hundred and sixty-two: *Provided,* That such property shall not include any kind or description which has been used, or which was intended to be used, for waging or carrying on war against the United States, such as arms, ordnance, ships, steamboats, or other water craft, and the furniture, forage, military supplies, or munitions of war.

**Such property may be appropriated to public use, or sold at public auction in loyal States.** Sec. 2. *And be it further enacted,* That any part of the goods or property received or collected by such agent or agents may be appropriated to public use on due appraisement and certificate thereof, or forwarded to any place of sale within the loyal states, as the public interests may require; and all sales of such property shall be at auction to the highest bidder, and the proceeds thereof shall be paid into the treasury of the United States.

**Bond of special agents.** Sec. 3. *And be it further enacted,* That the Secretary of the Treasury may require the special agents appointed under this act to give a bond, with such securities and in such amount as he shall deem necessary, and to require the increase of said amounts, and the strengthening of said **Books to be kept.** security, as circumstances may demand; and he shall also cause a book or books of account to be kept, showing from whom such property was received, the cost of transportation, and proceeds of the sale thereof. And **Owners of such property may sue for proceeds in court of claims.** any person claiming to have been the owner of any such abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the court **Upon what proof may recover.** of claims; and on proof to the satisfaction of said court of his ownership of said property, of his right to the proceeds thereof, and that he has never given any aid or comfort to the present rebellion, to receive the residue of such proceeds, after the deduction of any purchase-money which may have been paid, together with the expense of transportation and sale of said property, and any other lawful expenses attending the disposition thereof.

**Property coming into loyal states from states in insurrection, except through special agents, to be confiscated.** Sec. 4. *And be it further enacted,* That all property coming into any of the United States not declared in insurrection as aforesaid, from within any of the states declared in insurrection, through or by any other person than any agent duly appointed under the provisions of this act, or under a lawful clearance by the proper officer of the Treasury Department, shall be confiscated to the use of the Government of the United **Proceedings for condemnation and sale.** States. And the proceedings for the condemnation and sale of any such

---

property shall be ins Secretary of the Trea and ninetieth sections ninety-nine, entitled " ports and tonnage." through whom such p States unlawfully, as and on conviction the thousand dollars, or im both, at the discretion feitures accruing unde prescribed by the act seven, or in such m Treasury may prescri

Sec. 5. *And be it j* to further provide for northeastern, and nor proved July fourteen, strued as to allow the pointed at ports which l declared to be in inst the first of July, eight which by law is allowe ordinary compensation may determine.

Sec. 6. *And be it f* officer or private of th or any officer, sailor, o upon the inland waters such abandoned prope in such insurrectionary same over to an agen therefor; and in case h by a court-martial, and reduced to the ranks, o order, with the approva

Sec. 7. *And be it f* act shall apply to any United States.

APPROVED, March 1

Department of the Interior

Washington D.C. March 19th [1865?]

Sir

I have considered your report of the new
reservation or proposed.

Under provisions of section 9 of the act of
Congress approved fifty led and section 4 of the
act approved March 3d 1863. This Department has
authority to locate individual Indians of the Sioux
tribe who remained true to the Government and
exerted themselves to save the lives of the whites du-
ring the massacre of 1862 upon lands within the
late Sioux reservation, assigning 80 acres to each. In
order to do this hereafter it is necessary immediately to
withdraw from sale a portion of the Reservation
and I do not deem twelve sections of land too
great a quantity.

Revd S.D. Hinman, Missionary will
therefore be authorized to designate twelve sections
in a reasonably compact body. and I will direct
the local land officers to reserve the same from
settlement or sale, as soon as they are notified of Mr.

Case 12-5106    Document 90    Page 110    Filed 12/14/2012