

**Nos. 2012-5035, -5036, -5043 (consolidated)**


FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

DEC 27 2011

JAN HORBALY
CLERK

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

SHELDON PETERS WOLFCHILD, ERNIE PETERS LONGWALKER,
SCOTT ADOLPHSON, MORRIS J. PENDLETON,
BARBARA FEEZOR BUTTES, WINIFRED ST. PIERRE FEEZOR,
AUTUMN WEAVER, ARIES BLUESTONE WEAVER,
ELIJAH BLUESTONE WEAVER, RUBY MINKEL, LAVONNE A. SWENSON,
WILLIS SWENSON, AARON SWENSON, BEVERLY M. SCOTT,
LILLIAN WILSON, MONIQUE WILSON, SANDRA COLUMBUS GESHICK,
CHERYL K. LORUSSO, JENNIFER K. LORUSSO,
CASSANDRA SHEVCHUK, JASON SHEVCHUK,
JAMES PAUL WILSON, EVA GRACE WILSON,
BENITA M. JOHNSON, and KEVIN LORUSSO,

Plaintiffs-Cross Appellants,

and

ANITA D. WHIPPLE et al., Descendants of Lucy Trudell,
BONNIE RAE LOWE, et al., Desecendants of Joseph Graham, et al.,
LENOR ANN SCHEFFLER BLAESER et al., Descendants of John Moose,
and MARY BETH LAFFERTY, et al.,

Plaintiffs,

(caption continued on following page)

Appeals from the United States Court of Federal Claims in
Consolidated Case Nos. 03-CV-2684 and 01-CV-0568, Judge Charles F. Lettow

**UNITED STATES' ANSWERING BRIEF AS CROSS-APPELLEE
AND REPLY BRIEF AS APPELLANT**

JOHN L. SMELTZER
AARON AVILA
JODY SCHWARZ
*Attorneys, U.S. Dept. of Justice*
*Environment & Natural*
  *Resources Division*
*(202) 305-0343*
john.smeltzer@usdoj.gov

IGNACIA S. MORENO
*Assistant Attorney General*
*Environment & Natural*
  *Resources Division*
*U.S. Department of Justice*
*Post Office Box 7415*
*Washington, D.C 20044*

and

COURSOLLE DESCENDANTS and ROCQUE AND TAYLOR
DESCENDANTS,

Plaintiffs,

and

DEBORAH L. SAUL, LAURA VASSAR, et al., LYDIA FERRIS et al.,
DANIEL M TRUDELL, et al., and ROBERT LEE TAYLOR, et al.,
and DAWN HENRY,

Plaintiffs,

and

RAYMOND CERMAK, SR., (acting individually and
under a power of attorney for Stanley F. Cermak, Sr.),
MICHAEL STEPHENS, et al., JESSE CERMAK, et al., DENISE HENDERSON,
DELORES KLINGBERG, SALLY ELLA ALKIRE,
PIERRE ARNOLD, JR., GETRUDE GODOY et al.,

Plaintiffs,

and

JOHN DOES 1-30, WINONA C. THOMAS ENYARD, and
ELIZABETH T. WALKER,

Plaintiff,

and,

FRANCIE GARREAU, et al.,

Plaintiff,

and

FRANCIS ELAINE FELIX,

Plaintiff,

and

JOHN DOES 1-433,

Plaintiff,

and

KE ZEPHIER, et al.,

Plaintiff,

and

LOWER SIOUX INDIAN COMMUNITY,

Plaintiff,

and

PHILIP W. MORGAN,

Plaintiff,

and

REBECCA ELIZABETH FELIX,

Plaintiff,

and

VERA A. ROONEY, et al.,

Plaintiff,

and

DANNY LEE MOZAK,

Plaintiff-Cross Appellant,

and

DAWN BURLEY, et al.,

Plaintiff-Cross Appellant,

and

HARLEY ZEPHIER, SR.,

Plaintiff-Cross Appellant,

and

JULIA DUMARCE, et al.,

Plaintiff-Cross Appellant,

and

RAYMOND COURNOYER, SR., et al., JERRY ROBINETTE, et al.,
SANDRA KIMBELL, et al., CHARLENE WANNA, et al.,
and LESLIE LEE FRENCH, et al.,

Plaintiff-Cross Appellants,

and

KRISTINE ABRAHAMSON,

Plaintiff-Cross-Appellant,

v.

UNITED STATES,

Defendant-Appellant.

# **TABLE OF CONTENTS**

STATEMENT OF JURISDICTION (CROSS-APPEAL)..........................................1

STATEMENT OF THE ISSUES (CROSS-APPEAL) .............................................2

STATEMENT OF THE CASE (CROSS-APPEAL) ................................................3

    A.    Background.................................................................................3

    B.    Judgment of "Use Restriction" Claims .................................8

    C.    Denial of Other Proposed Claims..........................................8

        1.    *1863 Acts* ......................................................................8

        2.    *Indian Non-Intercourse Act* ........................................9

        3.    *Fifth Amendment Taking Clause*............................... 12

SUPPLEMENTAL STATEMENT OF FACTS (CROSS-APPEAL) .................... 13

    A.    Abrogation of Treaty Rights and Disposition of Treaty Lands.......... 13

    B.    Authority to Aid Loyal Sioux.............................................. 14

    C.    Aborted Efforts to Provide Lands under the 1863 Acts..................... 16

SUMMARY OF ARGUMENT ............................................................................ 18

    A.    Reply on United States' Appeal ........................................... 18

    B.    Response to Cross-Appeals .................................................. 20

        1.    *Plaintiffs' Cross-Appeal*........................................... 20

        2.    *Intervenor-Plaintiffs' Cross-Appeal* ........................ 21

STANDARD OF REVIEW (CROSS-APPEAL) ................................................. 22

i

REPLY ARGUMENT (UNITED STATES' APPEAL) ........................................ 23

I. CLAIMAINTS CANNOT STATE A CLAIM UNDER THE
   1888-1890 ACTS ................................................................................. 23

   A. The 1888-1890 Acts Plainly Impose No Duties With
      Respect to Revenues from the 1886 Lands or the 1886
      Descendants ................................................................................. 23

   B. "Context" Does Not Supply Otherwise Missing Statutory
      Duties ............................................................................................. 27

      1. *The 1888-1890 Acts Did Not Create Reservations
         for the 1886 Mdewakantons* ................................................... 28

      2. *No Specific Duties Can Be Inferred by Reference
         to the Annulled Treaties* ......................................................... 30

   D. A "Non-Frivolous" Allegation of Tucker-Act Jurisdiction
      Is Insufficient to Support the CFC's Tucker-Act
      Judgment ....................................................................................... 33

II. THE USE RESTRICTION CLAIMS ARE TIME BARRED ...................... 35

   A. This Use-Restriction Claims are Not Breach of Trust
      Claims ............................................................................................. 36

   B. The Use-Restriction Claims Are Not "Loss" or
      "Mismanagement" Claims ............................................................. 38

RESPONSE ARGUMENT ON CROSS-APPEALS ............................................. 41

I. THE CFC CORRECTLY DISMISSED PLAINTIFFS' CLAIMS .............. 41

   A. Plaintiffs' "Statutory Land Claim" Is Not Viable ............................. 42

      1. *The INIA Does Not Provide the Basis for a Tucker
         Act Claim* ................................................................................... 42

ii

        2.    *Plaintiffs Do Not Allege an INIA Violation* .............................. 44

        3.    *Any Claim As to the 7,680 Acres is Time-Barred* ................... 47

    B.    Plaintiffs' "Statutory Funds Claim" Is Not Viable.............................. 48

II.  THE CFC CORRECTLY DISMISSED INTERVENOR-
PLAINTIFFS CLAIMS UNDER THE 1863 ACTS ..................................... 50

    A.    By Its Plaint Terms, The February 1863 Act Did Not
Mandate Land Grants ......................................................................... 51

    B.    The 1863 Acts Must Be Read Together ............................................. 53

    C.    Actions By DOI Under the 1863 Acts Do Not
Demonstrate a Mandatory Duty ......................................................... 55

III.  THE INTERVENOR-PLAINTIFFS DID NOT PLEAD AND
CONNONT STATE A TREATY-BASED CLAIM .................................. 57

CONCLUSION ................................................................................................. 60

STATUTORY ADDENDUM: 1863 Acts

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**

*Adair v. United States*, 497 F.3d 1244 (Fed. Cir. 2007) .......................................... 34

*American Indians Residing on Maricopa-Ak Chin Reservation v. United States*, 667 F.2d 980 (Ct. Cl. 1981) .................................................. 37

*Brown v. United States*, 195 F.3d 1334 (Fed. Cir. 1999)......................................... 22

*Central Pines Land Co., L.L.C. v. United States*, 697 F.3d 1360 (Fed. Cir. 2012) .................................................... 22

*Choate v. Trapp*, 224 U.S. 665 (1912)...................................................................... 58

*Cloer v. Secretary of Health and Human Services*, 654 F.3d 1322 (Fed. Cir. 2011) .................................................... 52

*Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99 (1960)......................................................... 43

*Ferreiro v. United States*, 501 F.3d 1349 (Fed. Cir. 2007) ...................................... 33

*Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005)................................... 33, 34

*Frederick v. Shinseki*, 684 F.3d 1263 (Fed. Cir. 2012)......................................... 51

*Garcia v. United States*, 469 U.S. 70 (1984) ........................................................... 52

*Gollehon Farming v. United States*, 207 F.3d 1373 (Fed. Cir. 2000) .............. 33, 35

*In re Staats*, 671 F.3d 1350 (Fed. Cir. 2012) .......................................................... 33

*Ingrum v. United States*, 560 F.3d 1311 (Fed. Cir. 2009) ....................................... 40

*NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005)................ 57

iv

*Oneida County, N.Y. v. Oneida Indian Nation of New York State,*
470 U.S. 226 (1985) ..................................................................... 10

*San Carlos Apache Tribe v. United States,*
639 F.3d 1346 (Fed. Cir. 2011) ............................................. 39, 40

*Sanofi-Aventis v. Apotex Inc.,* 659 F.3d 1171 (Fed. Cir. 2011) ............................. 22

*Seldovia Native Ass'n, Inc. v. United States,* 144 F.3d 769 (Fed. Cir. 1998) ......... 59

*Shoshone Indian Tribe of Wind River Reservation, Wyo. v.*
*United States,* 672 F.3d 1021 (Fed. Cir. 2012) .......................... 10, 40, 44, 59

*Shoshone Indian Tribe v. United States,*
364 F.3d 1339 (Fed. Cir. 2004) ...................................... 38, 39, 59

*South Dakota v. Bourland,* 508 U.S. 679 (1993) .................................... 58

*United States v. Mitchell,* 445 U.S. 535 (1980) ("*Mitchell I*") ............................. 25

*United States v. Mitchell,* 463 U.S. 206 (1983) ("*Mitchell II*") ...................... 26, 57

*United States v. Navajo Nation,* 556 U.S. 287 (2009) .......................... 24, 27, 28, 43

*United States v. White Mountain Apache Tribe,* 537 U.S. 465 (2003) ................... 26

*Wolfchild v. United States,* 559 F.3d 1228 (Fed. Cir. 2009)
("*Wolfchild VI*") ................................................................ *passim*

*Wolfchild v. United States,* 101 Fed. Cl. 54 (2011)
("*Wolfchild VIII*") ............................................... 6-8, 9, 11-12, 17,
31, 41, 45, 47, 51, 57

*Wolfchild v. United States,* 96 Fed. Cl. 302 (2010)
("*Wolfchild VII*") ...................................................... 7, 8, 13, 30, 32,
37, 38, 41, 42, 48

*Wolfchild v. United States,* 77 Fed. Cl. 22 (2007) ............................... 3, 6
("*Wolfchild IV*")

v

## STATUTUES

Act of February 16, 1863, 12 Stat. 642.................................................................8
Act of February 16, 1863, Ch. 37, 12 Stat. 652 .................................................... 58
Act of February 16, 1863, Ch. 37, § 1, 12 Stat. 652 ............................ 13, 45, 46, 52
Act of February 16, 1863, Ch. 37, §§ 2-8, 12 Stat. 652-54 ................................... 14
Act of February 16, 1863, Ch. 37, § 9, 12 Stat. 654 ................. 15, 45, 46, 50, 52- 55
Act of March 3, 1963, 12 Stat. 819.......................................................................8
Act of March 3, 1863, Ch. 119, 12 Stat. 819-820...................................... 14, 46, 47
Act of March 3, 1863, Ch. 119, § 1-3, 12 Stat. 819.......................................... 14, 52
Act of March 3, 1863, Ch. 119, § 4, 12 Stat. 819 ...............14-16, 45, 50, 53- 54, 56
Act of February 9, 1865, Ch. 9, § 2, 13 Stat. 427 ............................................. 16, 17
Act of June 29, 1888, Ch. 503, 25 Stat. 217, 228-29........................................ 26, 29
Act of March 2, 1889, Ch. 412, 25 Stat. 992-993...................................... 24, 26, 29
Act of August 19, 1890, Ch. 807, 26 Stat. 349 ............................................. 24, 29
Act of August 19, 1890, Ch. 807, 26 Stat. 336 ...................................................... 26

Pub. L. No 96-557, § 1, 94 Stat. 3262 (Dec. 19, 1980) ...................................... 4, 49
Pub. L. No. 108-108, 117 Stat. 1241 (Nov. 10, 2003)
        ("Indian Tribal Accounting Statute") ...................................................... 36, 39

25 U.S.C. § 177 (Indian Non-Intercourse Act)....................................... 6, 10, 43, 44
25 U.S.C. § 476(a)..................................................................................................... 29
25 U.S.C. § 479 ......................................................................................................... 29

28 U.S.C. § 1291 .........................................................................................................1
28 U.S.C. § 1505 (Indian Tucker Act)............................................................... 23, 42
28 U.S.C. § 1491 (Tucker Act) ......................................................................... 23, 42

## RULES & REGULATIONS

RCFC 12(b)(1) ............................................................................................. 33, 35, 36
RCFC 12(b)(6) ..................................................................................................... 34
RCFC 54(b)..................................................................................................................1
RCFC 59.....................................................................................................................1

vii

## LEGISLATIVE HISTORY

19 Cong. Rec. 2,976-77 (1888).................................................................. 32
21 Cong. Rec. 7,589 (1890) ...................................................................... 32
Cong. Globe, 37th Cong., 3d Sess., 511 (1863)........................................ 51

## MISCELLANEOUS

Roy W. Meyer, History of the Santee Sioux, 261
    (U. Nebraska Press 1967) ............................................... 16-17, 47, 53

## STATEMENT OF JURISDICTION (CROSS-APPEAL)

As previously explained (*U.S. Br.*[1] at 2-5), the Court of Federal Claims

("CFC") invoked RCFC 54(b) to direct a final monetary judgment against the

Defendant United States for alleged violations of statutory "use restrictions"

allegedly imposed under Acts of 1888-1890. *See* A89-92. This Court has

jurisdiction over the United States' appeal from that certified final judgment. 28

U.S.C. § 1291. In contrast, the CFC did not explicitly direct final judgment on

additional claims that the CFC decided in favor of the United States and are now

the subject of the Plaintiffs and Intervenor-Plaintiffs' cross-appeals. *See* A92

(judgment). Nonetheless, this Court should treat the CFC's certified final

judgment as implicitly including dismissal of those additional claims. As

explained (*U.S. Br.* at 4-5, 16-18), the CFC withheld final judgment in this case not

because there are liability claims yet to be resolved, but for purposes of retaining

jurisdiction over the United States' distribution of the monetary judgment and to

hear motions for attorneys fees and costs. A98. Resolution of such post-judgment

matters ordinarily should not delay the entry of final judgment for appeal purposes.

*See* RCFC 59.

---

[1] Citations to "*U.S. Br.*" are to the <u>*Corrected* Opening Brief for the United States as *Appellant*</u> filed on June 5, 2011 (*nunc pro tunc* May 25, 2011).

1

## STATEMENT OF THE ISSUES (CROSS-APPEAL)

The issues in the United States' appeal are set out in the United States' Opening Brief. *U.S. Br.* at 6. The issues in the Plaintiffs' cross-appeal are:

1.  Whether the CFC correctly granted summary judgment against Plaintiffs on claims asserted under the Indian Non-Intercourse Act (25 U.S.C. § 177); and

2.  Assuming, *arguendo*, that the CFC correctly granted judgment in favor of the descendants of the "1886 Mdewakantons" on claims to revenues derived from lands purchased under the 1888-1890 Acts (an issue in the United States' appeal), whether the CFC correctly limited such judgment to revenues derived *before* the 1980 Act, which declared the subject lands to be held in trust for three Minnesota Sioux Communities (and not the descendants of the 1886 Mdewakantons).

The issues in the Intervenor-Plaintiffs' cross-appeal are:

1.  Whether the CFC correctly determined that an Act of February 1863 – which authorized the Secretary of the Interior to provide lands to certain loyal Sioux (whom Intervenor-Plaintiffs allege to be the predecessors to the 1886 Mdewakantons) – did not create a specific

2

fiduciary duty or other "money-mandating" obligation in favor of the loyal Sioux or their descendants; and

2.  Whether the CFC correctly determined (to the extent the issue was ever raised) that the Claimants cannot state a viable claim for breach of the 1851 and 1858 Treaties, which were abrogated by the Act of February 1863.

## STATEMENT OF THE CASE (CROSS-APPEAL)

### A.   Background

Plaintiffs and Intervenor-Plaintiffs (collectively, the "Claimants") are over 20,000 individuals, each of whom claims to be a descendant of at least one Indian who was eligible to receive material assistance under the terms of appropriations acts enacted in 1888, 1889, and 1890 (the "1888-1890 Acts"). *See Wolfchild v. United States*, 77 Fed. Cl. 22, 34-35 (2007) ("*Wolfchild IV*") (A208-209); *U.S. Br.* at 7, n. 3, 10-13. Because the 1888-1890 Acts limited benefits, in part, to Indians residing in or engaged in removing to Minnesota as of 1886, the statutorily eligible class is referred to as the "1886 Mdewakantons." *See Wolfchild v. United States*, 559 F.3d 1228, 1234 (Fed. Cir. 2009) ("*Wolfchild VI*").  For purposes of this brief, the descendants of the 1886 Mdewakantons are referred to as the "1886 descendants."

3

Under the 1888-1890 Acts, the Department of the Interior ("DOI")
purchased, among other material goods, certain tracts of land – the "1886 lands" –
for use and occupancy by designated individual 1886 Mdewakantons. *U.S. Br.* at
23-24. DOI retained title to these lands and assigned specific parcels to named
individuals *via* "Indian land certificates." *Id.* As a matter of policy and practice,
when an original assignee died or abandoned a tract of 1886 land, DOI would
reassign the subject parcel to a lineal descendant of the original assignee or other
individual from the class of 1886 Mdewakantons and their descendants, whom
DOI determined to be "most equitably entitled to . . . temporary use and
occupancy" of the subject tract. *Wolfchild VI*, 559 F.3d at 1247 (A244). DOI did
not assume any legal obligation to the 1886 descendants as a group.

In 1980, Congress enacted a statute (the "1980 Act") declaring that all
"right, title, and interest of the United States" in the 1886 lands[2] would
"[t]hereafter be held . . . in trust" for three federally-recognized tribal communities
that had organized on and around the 1886 lands: the Shakopee Mdewakanton
Sioux Community, the Lower Sioux Indian Community, and the Prairie Island
Indian Community. Pub. L. No 96-557, § 1, 94 Stat. 3262 ( Dec. 19, 1980); *see*

---

[2]Excluding certain lands in Wabasha County transferred to conservation use in
1944. *U.S. Br.* at 24, 26.

4

*also U.S. Br.* at 25-26. The three Communities have since controlled the 1886 lands and revenues derived from the lands (including gaming revenues).

The Plaintiffs (Sheldon Peters Wolfchild, *et al.*) initiated this action in 2003, alleging that Congress intended the 1886 lands to be held in trust for the 1886 Mdewakantons and their descendants as a group, and that DOI officials breached the United States' trust obligation by failing to maintain the lands and land revenues for 1886 Mdewakanton group. *U.S. Br.* at 10-11. In a 2009 decision on interlocutory appeal, this Court held: (1) that the 1888-1890 Acts did not create a trust in favor of the 1886 Mdewakantons and their descendants; and (2) that the 1980 Act terminated any such trust, if it ever existed. *Wolfchild VI*, 559 F.3d at 1255, 1260 (A252, 257).

In the wake of this Court's ruling in *Wolfchild VI*, the Plaintiffs and Intervenor-Plaintiffs variously moved to amend their complaints to add four new claims (or sets of claims) that either did not rely on a trust theory or did not exclusively rely on the 1888-1890 Acts. *See U.S. Br.* at 13-14. The new claims alleged:

- that DOI officials violated "use restrictions" in the 1888-1890 Acts, even if the statutes imposed no trust duties, A383-405, A466-488;

- that DOI officials violated trust duties or other obligations by failing to convey or assign lands to "loyal" Sioux under Acts of February and March 1863 ("1863 Acts"), A407-409, A450-455, A489-493;

- that DOI officials violated the Indian Non-Intercourse Act (25 U.S.C. § 177) by disposing, at public sale, lands allegedly set aside for loyal Sioux in the 1863 Acts, A493-499; and

- that DOI officials caused an uncompensated "taking" in violation of the Fifth Amendment by disposing, at public sale, lands allegedly set aside for the loyal Sioux in the 1863 Acts. A410-422.[3]

The present appeal and cross-appeals involve the CFC's disposition of these proposed additional claims.

---

[3] The citations herein are to motions to amend and proposed amended complaints separately filed by: (1) the original Plaintiffs Sheldon Peters Wolfchild *et. al.*, *see* A459-61; (2) Intervenor-Plaintiffs "Robertson/Vadnais lineal descendants," *see* A347-48; and (3) Intervenor Plaintiffs Julia Dumarce, *et al.*. A432-458. Numerous other plaintiff groups also intervened and moved to amend after this Court's ruling in *Wolfchild VI*. *See Wolfchild IV*, 77 Fed. Cl. at 34-35 & n. 19 (A208-209) (chart of intervenor-plaintiffs); *see also* A604-609 (docket entry nos. 932-938, 943-950, 952-956, 959-960, 972, 976, 986). The pleadings cited herein are representative of all proposed claims brought to and resolved by the CFC. *See Wolfchild v. United States*, 101 F.3d Cl. 54, 64-76 (2011) ("*Wolfchild VIII*") (A62-74).

**B.    Judgment on "Use Restriction" Claims**

The CFC permitted the Plaintiffs and Intervenor-Plaintiffs to add the use-restriction claims. *U.S. Br.* at 7-8, 13-17. These claims relate to approximately $60,000 in land revenues derived from the 1886 lands before 1980, which revenues were held by DOI in various trust accounts at the time of the 1980 Act. *Id.* at 7-8, 27-28. After Congress enacted the 1980 Act, DOI distributed the pre-Act revenues to the three Sioux communities named in the Act. *Id.* Upon motions for partial summary judgment, the CFC determined that DOI had been "statutorily mandated" – under the 1888-1890 Acts – to disburse the 1886 land revenues to the 1886 descendants (and not the three Communities). *Wolfchild v. United States,* 96 Fed. Cl. 302, 336-353 (2010) ("*Wolfchild VII*") (A35-51). The CFC further held that the statute of limitations did not bar the Claimants' action for damages relating to the alleged unlawful disbursement of land revenues because the so-called "Indian Trust Accounting Statute" ("ITAS") applied and permitted the claim. *Id.* at 331-335 (A30-34). The CFC subsequently entered judgment against the United States in the amount of $673,944, the stipulated present value of the funds allegedly unlawfully disbursed. *Wolfchild v. United States,* 101 Fed. Cl. 54, 91-92 (2011) ("*Wolfchld VIII*") (A89); A92.

7

## C.    Denial of Other Proposed Claims

The CFC disallowed the other proposed amendments for "futility," holding

that the claims would not survive motions to dismiss for failure to state a claim if

the amendments were allowed.[4] *Wolfchild VIII*, 101 Fed. Cl. at 64-76 (A62-74).

The CFC reasoned as follows.

### 1.    1863 Acts

Congress enacted the 1863 Acts, in the wake of the 1862 Sioux rebellion, to

annul treaties that had established a Sioux reservation in south central Minnesota

and to open the former reservation lands to settlement and sale under public-land

laws. *See U.S. Br.* at 19-20 (citing Act of Feb. 16, 1863, 12 Stat 642; Act of Mar 3,

1963, 12 Stat. 819); *see also* pp. 13-16, *infra*.  In so doing, Congress authorized the

Secretary to set aside, from the former reservation lands, up to 80 acres of public

land for each "meritorious" individual Indian who had had aided settlers during the

rebellion. Act of Mar 3, 1963, 12 Stat. 819.  As previously explained (*U.S. Br.* at

19-20), the Secretary did not exercise this authority, due to opposition from

settlers. *See Wolfchild VI*, 559 F.3d at 1232 (A229); *see also* pp. 16-17, *infra*.

---

[4] The CFC also dismissed one added claim it had allowed *via* an earlier
amendment. *See Wolfchild VII*, 96 Fed. Cl. at 335-36 (A34-35); *Wolfchild VIII*,
101 Fed. Cl. at 76 (A74).

8

In their proposed amended complaints, the Plaintiffs and Intervenor-Plaintiffs alleged that federal officials, in failing to exercise their authority under the 1863 Acts, breached a statutory obligation and/or trust duty to provide lands to the "loyal" or "friendly" Sioux (*i.e.*, those Indians, who, in the terms of the 1863 Acts, had "exerted" themselves in "rescuing" settlers from "massacre.") A407-409, A450-455, A489-493; *see also Wolfchild VIII*, 101 Fed. Cl. at 69-70 (A67-69) (describing claims). Plaintiffs and Intervenor-Plaintiffs – who claim to be lineal descendants of the 1886 Mdewakantons (*i.e.*, persons eligible to receive benefits under the 1888-1890 Acts) – alleged or implied that their ancestors were also entitled to land under the 1863 Acts. *Id.*

The United States opposed the proposed amendments, arguing that the 1863 Acts did not impose any trust obligation or other money-mandating duty enforceable under the Tucker Act and that the claims were barred by the statute of limitations. *See Wolfchild VIII*, 101 Fed. Cl. at 70 (A68). The CFC addressed only the former argument, holding that that the text of the 1863 Acts was "patently discretionary" and could not be interpreted as imposing a mandatory duty or specific fiduciary obligation. *Id.* at 72-73 (A70-71).

### 2.    *Indian Non-Intercourse Act*

In the Indian Non-Intercourse Act of 1793 (which amended an earlier statute of 1790), Congress declared that "no purchase or grant of lands, or of any title or

claim thereto, from any Indians or nation or tribe of Indians . . . shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the constitution." *Oneida County, N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 232 (1985) (quoting 1 Stat. 330, § 8 (1793)); *see also* 25 U.S.C. § 177.[5]  Under this Act, any conveyance of land or interest in land from an Indian tribe is void, unless "made in accordance with a federal treaty or statute." *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States*, 672 F.3d 1021, 1037-39 (Fed. Cir. 2012).

In their proposed amended complaint, the Plaintiffs alleged: (a) that the 1863 Acts set aside an unspecified 21,120 acres of land for the 1886 Mdewakantons (or loyal Sioux) as a group,[6] A498 (¶¶ 160, 164); or, alternatively, (b) that preliminary actions by DOI officials under the 1863 Acts set aside a specific 12 sections of land for the 1886 Mdewakantons (or loyal Sioux). A494 (¶ 143).  As already noted, the Secretary of the Interior ultimately did not convey or assign any of the

---

[5] The Act presently states that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177.

[6] As previously explained (*U.S. Br.* at 21), federal censuses taken in 1886 and 1889 identified a total of 264 Mdewakantons in Minnesota.  *Id.*  Plaintiffs used this number (264 times 80) as a basis for alleging (A489 (¶ 160)) that the 1863 Acts (enacted 25 years earlier) granted the loyal Sioux a total of 21,120 acres.

12 sections or any other former reservation lands under the 1863 Acts. *See*

*Wolfchild VI*, 559 F.3d at 1232 (A229). Instead, federal officials allowed the

former reservation lands to be sold under homestead and public-land laws. *See*

*Wolfchild VIII*, 101 Fed. Cl. at 66, 74 (A64, 72). Plaintiffs alleged that the

"government sale" of the "21,120 acres" of alleged tribal land – including the

specified 12 sections of alleged tribal land – constituted a violation of the Indian

Non-Intercourse Act. A494 (¶¶ 143-144), A498-99 (¶164).

The United States opposed the proposed amendment, arguing, *inter alia*:

(a) that the subject lands had never been conveyed to Indians, (b) that the 1886

Mdewakantons (alleged beneficiaries also of the 1863 Acts) were not a tribe for

purposes of the Non-Intercourse Act; (c) that the Non-Intercourse Act provides no

basis for a Tucker-Act claim against the United States; and (d) that the claims were

barred by the statute of limitations. The CFC addressed only whether the 1886

Mdewakantons and/or the "'friendly Sioux' identified in the 1863 Acts were a

'tribe.'" *Wolfchild VIII*, 101 Fed. Cl. at 65-69 & n. 14 (A63-67). Although the

CFC determined that the 1886 Mdewakantons and their descendants were and are

an "identifiable group of Indians" for purposes of the Indian Tucker Act, *id.* at 67;

*see also U.S. Br.* at 16-17, the CFC held that the 1886 Mdewakantons and

"friendly Sioux" were not "tribes" for purposes of the Non-Intercourse Act, but

11

instead were collections of individuals. *Wolfchild VIII*, 101 Fed. Cl. at 67-69 & n. 14 (A63-67).

### 3.    *Fifth Amendment Takings Clause*

Echoing the Plaintiffs' claim under the Indian Non-Intercourse Act (A493-499), Intervenor-Plaintiffs Robertson-Vadnais Group alleged, in their proposed amended complaint (A410-422), that the 1863 Acts "granted the loyal Mdewakantons rights of permanent occupancy of lands in Minnesota," A415 (¶213), that DOI officials took steps under the 1863 Acts to set aside 12 sections of land for loyal Mdewakantons, A415-419 (¶¶ 213-220), but that DOI officials ultimately failed to convey the "designated property" to the loyal Mdewakantons," instead "convey[ing]" the land to "white settlers and land speculators." A419 (¶221). The Robertson-Vadnais Plaintiffs alleged that these actions constituted the taking of "cognizable property interests" and that the government's subsequent "withholding" of 80-acre tracts from the descendants of loyal Mdewakantons amounted to a "'continuous' taking." A421 (¶ 226).

The United States opposed the proposed amendment, arguing, *inter alia*, that the 1863 Acts conveyed no property interests and that the statute of limitations had long since run on the alleged taking. *See Wolfchild VIII*, 101 Fed. Cl. at 73 (A71). The CFC addressed the latter claim only, holding that the alleged takings occurred at the point the subject property was sold (sometime between 1871 and 1895) and

12

that the "continuing claims" doctrine did not apply to toll the statute of limitations. *Id.* at 74-76 (A72-74).

## SUPPLEMENTAL STATEMENT OF FACTS (CROSS-APPEAL)

### A.    Abrogation of Treaty Rights and Disposition of Treaty Lands

In a series of treaties in 1851 and 1858, the Minnesota Sioux – comprised of the Mdewakanton, Wahpakoota, Sisseton, and Wahpeton Bands (hereinafter, the "Minnesota bands") – ceded their aboriginal lands to the United States in exchange for a reservation in south central Minnesota and substantial annuities and other financial commitments. *Wolfchild VII*, 96 Fed. Cl. at 311-313 (A10-12). In the wake of the Sioux rebellion of 1862, during which over 500 settlers were killed, Congress enacted two statutes for the principal purpose of abrogating the treaty rights of the Minnesota bands and removing the Sioux from Minnesota. *Id.* at 313 (A12).

The first statute, enacted in February 1863, declared all prior treaties with any one or more of the Minnesota Bands to be "abrogated and annulled," and declared all "lands and rights of occupancy within the State of Minnesota" and "all annuities and claims" of the bands to be "forfeited" to the United States. Act of Feb. 16, 1863, ch. 37, § 1, 12 Stat. 652. The Act also contained provisions to allow former treaty funds – *i.e.*, funds that otherwise would have been due to the bands

13

under the treaties – to be used to make reparations to Minnesota settlers who suffered damages in the rebellion. *Id.*, §§ 2-8, 12 Stat. 652-54.

The second statute, enacted in March 1863, provided for the relocation of the Minnesota bands away from Minnesota and the disposition of lands within the former reservation. Act of Mar. 3, 1863, ch. 119, 12 Stat. 819-820. The Act "authorized and directed" the President to "set apart," for the Minnesota bands, "a tract of unoccupied land outside of the limits of any state," sufficient in size to provide each "willing" band member "80 acres of good agricultural lands." *Id.*, § 1, 12 Stat. 819. As for the former reservation lands in Minnesota, the Act provided for the survey, subdivision, and appraisal of such lands, *id.* § 2, and declared that such lands "shall be open to preemption, entry, and settlement in the same manner as other public lands" "after the [required] survey," and that any lands "not . . . settled upon" may be sold "as other public lands are sold" for not less than appraised value. *Id.*, § 3. The Act stated that the "money arising from said sale shall be invested by the Secretary of the Interior for the benefit of [the Minnesota bands] in their new homes." *Id.*, § 4.

## B.    Authority to Aid Loyal Sioux

At the same time that Congress abrogated the treaty rights of the Minnesota Bands and provided for the disposition of treaty lands, Congress made special provisions for individual Sioux who had aided settlers during the 1862 rebellion

14

(hereinafter, the "loyal Sioux"). Specifically, in Section 9 of the February 1863 Act, Congress "authorized" the Secretary of the Interior to "set apart of the public lands, not otherwise appropriated, eighty acres in severalty to each individual of the [Minnesota Bands] who exerted himself in rescuing the whites from the late massacre of said Indians." Act of Feb. 16, 1863, Ch. 37, § 9, 12 Stat. 654. The Act provided that such lands "shall not be subject to any tax, forfeiture, or sale," "shall not be aliened or devised except by the consent of the President," and "shall be an inheritance to said Indians and their heirs forever." *Id.* Congress authorized these land grants to individual loyal Sioux before making the provisions in the March 1863 Act (*supra*), for the relocation of the Minnesota Bands as a whole and the opening of former reservation lands to the public. Accordingly, the reference in the February 1863 Act to "public lands, not otherwise appropriated" presumably was to public lands outside of the former reservation.

In Section 4 of the March 1863 Act, Congress provided for the first time that loyal Sioux lawfully could be located on former reservation lands. Act of March 3, 1963, Ch. 119, § 4, 12 Stat. 819. Specifically, the Act stated that "it shall be lawful for [the] Secretary to locate any meritorious individual Indian of [the Minnesota Bands], who exerted himself to save the lives of the whites in the late massacre, upon said [former reservation] lands on which the improvements are situated, assigning the same to him to the extent of eighty acres to be held by such tenure as

15

is or may be provided by law." *Id.* The Act further stated that "no more than eighty acres shall be awarded to any one Indian, under this or any other act." *Id.*

### C.    Aborted Efforts to Provide Lands under the 1863 Acts

Following the enactment of the 1863 Acts, missionaries working with homeless loyal Sioux lobbied for funding to help settle the loyal Sioux on former reservation lands. *See* Roy W. Meyer, *History of the Santee Sioux*, 261 (U. Nebraska Press 1967). In February 1865, Congress appropriated $7,500 to be used, *inter alia*, to "make provisions for [the] welfare" of Indians who shall "appear specially entitled thereto, for their friendly, extraordinary, and gallant services in rescuing white settlers from massacre." Act of Feb. 9, 1865, Ch. 9, § 2, 13 Stat. 427; *see also U.S. Br.* at 20. In March 1865, after such funding was secured, the Rev. Samuel D. Hinman wrote William P. Dole, then Commissioner of Indian Affairs, asking that twelve sections of land (7,680 acres) be withdrawn from preemption and sale, per the March 1863 Act, until allotments could be made for meritorious Sioux. Meyer at 262.

Two days later, on March 17, 1865, the Secretary of the Interior wrote Commissioner Dole, noting the need to "immediately withdraw" a portion of the reservation for such allotments. Meyer at 262; *see also Intervenor-Plaintiffs' Brief* (Addendum) (March 17, 1865 letter from Secretary Usher to Commissioner Dole). In his letter, the Secretary authorized the Rev. Hinman to designate twelve

16

sections, and stated that he would direct local land officers to reserve the designated sections, once notified of Hinman's selection. *Id.* Hinman thereafter identified 12 sections on the south bank of the Minnesota River in the vicinity of the former (pre-rebellion) Indian agency. Meyer at 262.

In April 1865, Hinman's efforts were abruptly halted. Responding to widespread public sentiment opposing any Indian settlement in Minnesota, General John Pope, who was responsible for military actions against rebel Indians, forbade settlement on the former reservation without orders from Pope or higher authorities. *Id.* President Ulysses S. Grant sustained Pope's decision. *Id.* at 263. A later attempt in 1869 to settle loyal Sioux on former reservation lands was also unsuccessful. *Wolfchild VIII*, 101 Fed. Cl. at 66, n. 11 (A64). The twelve sections of land were restored to public land sales and sold, sometime between 1871 and 1895. *Id.* at 74 (A72). Ultimately, DOI never made any formal conveyance or assignment of land to individual loyal Sioux under the 1863 Acts.

17

## SUMMARY OF ARGUMENT

### A.    Reply on United States' Appeal

The United States opening brief demonstrates that the CFC's judgment on the use-restriction claims under the 1888-1890 Acts must be reversed for two reasons: (1) the 1888-1890 Acts imposed no money-mandating duty in favor of the Claimants on which a Tucker-Act or Indian-Tucker-Act claim can be based; and (2) the claims accrued between 1981 and 1983 and are time barred.  The Claimants have no substantial response on either point.

Indeed, Plaintiffs do not even attempt to defend the CFC's interpretation of the 1888-1890 Acts and do not address the application of the statute-of-limitations to the use-restriction claim *per se*.  Instead, Plaintiffs proceed directly to their cross-appeal (*Pl. Br.* at 47-65) and assert the right to a greater judgment on a broader theory of liability (dependent on the INIA and the 1863 Acts), which the CFC correctly rejected.  While the Intervenor-Plaintiffs do attempt to defend the CFC's interpretation of the 1888-1890 Acts  (*Int.-Pl. Br.* at 14-18), they mistakenly assume that alleging a "non-frivolous" claim under the Indian Tucker Act suffices for defending a final judgment and that that the CFC's "findings" on questions of Congressional intent are entitled to deference.

At bottom, neither the Plaintiffs nor the Intervenor-Plaintiffs provide a text-based defense of the CFC's interpretation of the 1888-1890 Acts because there is

18

none. The 1888-1890 Acts appropriated funds to be expended for the one-time purchase of land and/or chattels for individual Indians. The 1888-1890 Acts did not anticipate future land revenues, contained no provisions for the disbursement of any such revenues, and conferred no benefits upon descendants. Even if the Acts could be interpreted as imposing "restrictions" on the use of the later-derived revenues, the 1888-1890 Acts cannot be seen as mandating any particular disbursement or entitling 1886 descendants, individually or as a group, to any particular share of the revenues.

As for the statute of limitations, the so-called Indian Trust Accounting Statute ("ITAS") requires an "accounting" for claim accrual only for claims concerning a "loss to or mismanagement of trust funds." Because ITAS broadens the United States' waiver of sovereign immunity, it must be strictly construed in favor of the sovereign. Neither the Plaintiffs nor the Intervenor-Plaintiffs acknowledge this interpretive rule or its implications. Claimants rely on the fact that Interior held the revenues in trust accounts, but this fact is irrelevant to the use-restriction claim. At bottom, the use-restriction claim is not a trust claim, but a claim that the land revenues were the equivalent of appropriations and that DOI violated statutory use restrictions on the use of the "appropriations." In ITAS, Congress did not unequivocally extend the United States' waiver of sovereign immunity with respect to claims concerning the misuse of appropriations.

19

**B.    Response to Cross-Appeals**

    *1.    Plaintiffs' Cross-Appeal*

Plaintiffs seek to pursue two claims disallowed by the CFC: a "statutory land claim" and a "statutory funds claim." The former claim relates to the 12 sections (7,680 acres) of former reservation land that the Secretary of the Interior identified and preliminarily set aside under the 1863 Acts, but ultimately never assigned to individual loyal Sioux. Plaintiffs contend that that the Secretary violated a trust obligation, under the INIA, by failing to complete the assignments.

This claim fails for at least three reasons. First, the INIA imposes no obligations on federal officials; it simply declares that conveyances of land or land interests from Indian tribes are void absent Congressional approval. Second, Plaintiffs' allegations do not even implicate the INIA. The INIA applies to conveyances *from* an Indian tribe, while Plaintiffs allege a failure to convey lands *to* individual Indians. Third, any complaint regarding the 7,680 acres is time-barred. Plaintiffs allege that the claim for failure to convey 7,680 acres did not accrue until all former reservation lands (approximately 500,000 acres) were sold, which according to Plaintiffs, did not occur until 2002. But the 7,680 acres were a specifically-identified 12 sections of land and the supposed "last remaining parcel" was only 4.80 acres in size, facts that wholly undermine Plaintiffs' argument.

Plaintiffs' "statutory funds claim" is also meritless. Even if Claimants were entitled to judgment on the use-restriction claim, the district court did not err in limiting the judgment to revenues derived before 1980. In the 1980 Act, Congress unambiguously declared the 1886 lands to be held in trust for the three Communities. In *Wolfchild VI*, this Court held that the 1886 lands were never held as a reservation for the 1886 Mdewakantons and that the 1980 Act abrogated any preexisting trust.

### 2.    Intervenor-Plaintiffs' Cross Appeal

Intervenor-Plaintiffs seek to pursue one claim disallowed by the CFC: a claim under the February 1863 Act. Intervenor-Plaintiffs allege that the February 1863 Act was not superseded by the March 1863 Act, that the United States assumed a trust duty to the loyal Sioux under the February 1863 Act when the Secretary of the Interior preliminarily set aside the 12 sections of land, and that the United States breached the trust by not managing the lands for the loyal Sioux and their descendants. This claim also fails for multiple reasons. First, the February 1863 Act merely "authorized" conveyances to the loyal Sioux; it imposed no mandate. Second, the March 1863 Act alone referenced the former reservation lands and unambiguously provided broad discretionary authority. Specifically, the March 1863 Act merely made it "lawful" for the Secretary to "locate" loyal Sioux on the former reservation lands, and authorized the Secretary to make land

21

assignments for any tenure allowed by law. Thus, even if the Secretary's designation of the 12 sections of land was an implicit assignment, it was not an assignment vesting an inalienable inheritance that can be claimed by Intervenor-Plaintiffs.

Intervenor-Plaintiffs also assert claims under the 1851 and 1858 treaties, but these claims were never presented to the CFC and are waived. In any event, Intervenor-Plaintiffs' contention that they possess surviving treaty rights cannot be reconciled with the plain terms of the February 1863 Act annulling all such rights.

## STANDARD OF REVIEW (CROSS-APPEAL)

A denial of leave to amend, when based on a legal interpretation, is reviewed *de novo*. *See Sanofi-Aventis v. Apotex Inc.*, 659 F.3d 1171, 1182 (Fed. Cir. 2011). The presence of subject-matter jurisdiction is a legal question reviewed *de novo*, *Central Pines Land Co., L.L.C. v. United States*, 697 F.3d 1360, 1363 (Fed. Cir. 2012), as is the application of the statute of limitations. *Brown v. United States*, 195 F.3d 1334, 1337 (Fed. Cir. 1999).

22

## REPLY ARGUMENT (UNITED STATES' APPEAL)

The United States demonstrated in its opening brief that the CFC's judgment on the use-restriction claims must be reversed for two reasons. First, the relevant statutes (the 1888-1890 Acts) did not impose any "money-mandating" obligations on federal officials with respect to the disposition of the subject land revenues on which a Tucker Act claim can be stated. *U.S. Br.* at 32-46. Second, the Claimants' cause of action for the alleged unlawful disbursement of the land revenues accrued, at the latest, in 1981 and 1982 and are time barred. *Id.* at 46-54. Plaintiffs and Intervenor-Plaintiffs fail to rebut either point.[7]

## I.    CLAIMAINTS CANNOT STATE A CLAIM UNDER THE 1888-1890 ACTS

### A.    The 1888-1890 Acts Plainly Impose No Duties With Respect to Revenues from the 1886 Lands or the 1886 Descendants

To state a viable claim under the Tucker Act (28 U.S.C. § 1491) or Indian Tucker Act (28 U.S.C. § 1505), a plaintiff must: (1) identify a "substantive source of law" that places "specific fiduciary or other duties" on federal officials and

---

[7] The United States' opening brief also demonstrated that the CFC erred when determining that Congress repealed part of the Indian Tribal Judgment Fund Use or Distribution Act ("Tribal Judgment Act"), an issue that requires resolution only if the CFC's judgment is affirmed. *See U.S. Br.* at 9, 54-60. The Intervenor-Plaintiffs do not attempt to defend the CFC's Tribal Judgment Act ruling and the Plaintiffs' perfunctory (two-paragraph) defense (*Pl. Br.* at 70-71) raises no new points warranting a reply.

(2) show that the source of law "can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of [the identified] duties." *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) (internal quotations and citations omitted). Claimants cannot make either showing as to the 1888-1890 Acts and the distribution of revenues from 1886 lands.

As previously explained, the 1888-1890 Acts appropriated funds to be used for the one-time purchase of land or chattels for individual Indians then residing in Minnesota and now known as the 1886 Mdewakantons. *See U.S. Br.* at 37-45. Like all appropriations statutes, the 1888-1890 Acts contained restrictions on the use of the appropriated funds, including a requirement – in the 1889 and 1890 Acts – that, "as far as practicable," the funds were to be used to provide each eligible Indian with "an equal amount in value of [the appropriated funds]." Act of Mar. 2, 1889, Ch. 412, 25 Stat. 992-993; Act of Aug. 19, 1890, Ch. 807, 26 Stat. 349. Claimants identify no authority, however, for the proposition that a money-mandating duty can be inferred from language that merely restricts the expenditure of appropriations. Nor do Claimants contend that DOI officials violated any use restriction imposed under the 1888-1890 Acts when expending the appropriations.[8]

---

[8] DOI used an 1886 census (as supplemented in 1889) to determine eligibility for benefits under the 1888-1890 Acts. *Wolfchild VI*, 559 F.3d at 1234, 1243 (A231, 240); *U.S. Br.* at 21. Some of the Intervenor-Plaintiffs in this case – designated as

24

Rather, Claimants contend that, many generations after the expenditure of

the appropriated funds, DOI breached an obligation to the 1886 descendants with

respect to revenues derived from lands purchased with the appropriated funds.

Claimants first predicated their claims on a trust theory, *i.e.*, the theory that all

lands purchased under the 1888-1890 Acts were held in trust for the 1886

Mdewakantons as a group. If DOI had an ongoing duty to hold and manage the

1886 lands as trust assets for the Mdewakantons as a group, revenues derived from

the lands arguably would be trust assets, and the alleged improper disbursement of

these revenues[9] arguably might give rise to a breach of trust claim by the 1886

descendants, even though the 1888-1890 Acts say nothing about land revenues or

the descendants.[10] Given the importance of the trust theory for inferring any duty

---

the "Group B" Intervenor-Plaintiffs – claim to be lineal descendants of Indians
who were eligible to receive benefits under the 1888-1890 Acts, but who were not
among the 264 persons named in the censuses. *See U.S. Br.* at 12-13. Although
the Group B Intervenor-Plaintiffs seek to share in the CFC's judgment rendered on
behalf of the 1886 descendants, *see Int.-Pl. Br.* at 1-10, they do not allege that DOI
breached an obligation by failing to purchase lands or chattels for their ancestors
from the 1888-1890 appropriations.

[9]The United States does not concede that the disbursement of the land revenues to
the three Sioux Communities was contrary to the terms of the 1888-1890 Acts. *See
U.S. Br.* at 45.

[10] Statutes establishing trust lands without imposing fiduciary duties on federal
officials do not give rise to Indian Tucker Act claims. *United States v. Mitchell*,
445 U.S. 535, 542-46 (1980) ("*Mitchell I*"). However, where statutes establish

25

in relation to the 1886 descendants, this Court permitted interlocutory appeal on two questions relating to the existence of any trust duty. *Wolfchild VI*, 559 F.3d at 1237 (A234). This Court held that the 1888-1890 Acts did not create any trust in favor of the 1886 Mdewakantons or their descendants and that any trust that might have been created was abrogated by the 1980 Act. *Id.* at 1255, 1260 (A252, 257).

These rulings should have ended the case. The 1888-1890 Acts are utterly silent as to descendants and land revenues. *See* Act of June 29, 1888, ch. 503, 25 Stat. 217, 228-29; Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992-93; Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349. While authorizing land purchases for individual Indians, the 1888-1890 Acts contain: (a) no direction on the title or interest to be conveyed to the original land recipients, (b) no direction on the use or disposal of 1886 lands upon the death of an original assignee or abandonment of an assigned tract, (c) no direction on the use of unoccupied 1886 lands to derive revenue; and (d) no direction on the disposition of revenues so derived. *Id.* Absent a duty to manage the 1886 lands in perpetuity as trust assets for the 1886

---

specific trusts and give federal officials pervasive control over the management of trust resources, a cause of action for breach of trust can be inferred. *United States v. Mitchell*, 463 U.S. 206, 224-228 (1983) ("*Mitchell II*"); *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 474-79 (2003).

Mdewakantons as a group, there was no plausible basis for a claim to land revenues by the 1886 descendants.

To be sure, as previously explained (*U.S. Br.* at 37-39), DOI officials interpreted the 1888-1890 Acts as giving them authority to retain title (on behalf of the United States) to lands purchased for individual 1886 Mdewakantons, to reassign these 1886 lands to selected 1886 descendants upon the death of or abandonment by the original assignee, and to use unoccupied 1886 lands to generate revenue. *See generally Wolfchild VI*, 559 F.3d at 1246-49 (A243-46). The discretionary authority to assist select individual 1886 descendants, however, is a far cry from a specific duty, much less a "money mandating" duty on behalf of the 1886 Mdewakantons as a group. Because the 1888-1890 Acts contain no specific duties with respect to land revenues and/or the 1886 descendants, the CFC erred in finding jurisdiction over, and granting judgment on, Claimants' Indian Tucker Act claims. *Navajo*, 556 U.S. at 302. Plaintiffs and Intervenor-Plaintiffs have not shown otherwise.

**B.** **"Context" Does Not Supply Otherwise Missing Statutory Duties**

Instead of attempting a text-based defense of the CFC's interpretation of the 1888-1890 Acts, Plaintiffs and Intervenor-Plaintiffs make irrelevant and unpersuasive arguments regarding the context of the Acts.

27

*1.　　The 1888-1890 Acts Did Not Create Reservations for the 1886
Mdewakantons*

Plaintiffs contend (*Pl. Br.* at [80-82]) that the 1888-1890 Acts must be

construed in the context of events that occurred decades after their enactment, *viz.*,

the purported fact that DOI "by 1935 had set apart . . . three reservations for the

1886 Mdewakantons" from lands purchased under the 1888-1890 Acts. Plaintiffs

suppose (*id.*) that, because DOI established reservations (allegedly) for the 1886

Mdewakantons as a group on lands purchased under the 1888-1890 Acts, the terms

of those Acts – and especially the "equal value requirement" – fairly can be

interpreted as requiring land revenues to be used for all group members, inclusive

of lineal descendants.[11]

This argument is constructed on a false predicate: *viz.*, that DOI established

reservations for the 1886 Mdewakantons. After Congress enacted the Indian

Reorganization Act of 1934 ("IRA"), the Mdewakanton Sioux then residing in

separate communities on three distinct blocks of land purchased under the 1888-

_____

[11] Plaintiffs also repeat the unfounded assertion that the equal value proviso would
be "superfluous as it relates to the 1886 Mdewakanton beneficiary class created by
the [1888-1890 Acts]," if not read to "require that the 1886 [descendants] be
treated equally regarding funds deriving from the reservations [1886 lands]." As
explained (*U.S. Br.* at 44-45), the equal value proviso, which appeared only in the
1889 and 1890 Acts, applied to the original appropriations. The refusal to apply
the equal value proviso in a later context to which it cannot plausibly be applied
(*id.* at 41-44) does not render it superfluous as to its intended purpose.

28

1890 Acts sought to organize and obtain official recognition from the United States. *See U.S. Br.* at 24-25. The IRA permits any "Indian tribe" to adopt a constitution and bylaws to be approved by the Secretary of the Interior, 25 U.S.C. § 476(a), and defines "Indian tribe" broadly to include, in addition to already-organized tribes, bands, and pueblos, "the Indians residing on one reservation." *Id.*, § 479. Because the 1888-1890 Acts authorized land purchases for individual Indians who had "severed their tribal relations," *see* Act of June 19, 1888, Ch. 503, 25 Stat. 217, Act of Mar. 2, 1889, Ch. 412, 25 Stat. 992, Act of Aug. 19, 1890, Ch. 807, 26 Stat. 349, DOI officials determined that the Indians residing on the 1886 lands could not organize as an extant tribe. A2833, 2835. But DOI officials also determined that the three Indian communities each could organize as "Indians residing on one reservation." A2836-2837.

Contrary to Plaintiffs' argument (*Pl. Br.* at 82), this determination did not somehow "set apart" the 1886 lands as "three reservations for the 1886 Mdewakantons" as a group. Rather, DOI simply determined that Indians then residing on 1886 lands could organize under the IRA, on the theory that the three blocks of land assigned to individual Indians (to be augmented by additional land purchases for the existing Communities) each constituted a "reservation" within the meaning of the IRA. A2836-37. DOI did not purport to make any determination as to non-resident 1886 descendants or all 1886 descendants as a

29

group. And DOI expressly acknowledged that the resident communities included Indians who were not descendants of 1886 Mdewakantons and who were ineligible for formal assignment of 1886 lands.[12]  A2836-2837.

In short, as this Court already determined in *Wolfchild VI*, the 1888-1890 Acts "did not create a reservation for the 1886 Mdewakantons," 559 F.3d at 1254 (A251), and DOI has never interpreted the Acts as requiring the 1886 lands to be held for the 1886 descendants as a whole. *Id.* at 1249 (A246). Rather, DOI's "consistent position," "throughout the period between the enactment of the Appropriations Act and the passage of the 1980 Act" was that "the 1886 lands were meant to be held in small plots for a small number of individual Mdewakanton living on or near the lands, *not collectively for the entire class of Mdewakanon descendants, wherever they might be found.*" *Id.*

2.  *No Specific Duties Can Be Inferred by Reference to the Annulled Treaties*

For their part, the Intervenor-Plaintiffs argue (*Int.-Pl. Br.* at 16-18) that the 1888-1890 Acts must be construed in relation to earlier events, *viz.,* the "prior treaties with the Sioux," for which the 1888-1890 Acts were intended (allegedly) to

---

[12] DOI developed a policy of limiting 1886 land assignments to persons who were within the original beneficiary class and their lineal descendants. *See Wolfchild VI,* 559 F.3d. at 1243-44 (A240-241).

serve as "substitutes." It is true that the CFC so found.[13] *See Wolfchild VII*, 96 Fed. Cl. 340-42 (A39-41). In particular, noting that the "loyal Mdewakanton did not breach the 1851 and 1858 treaties," the CFC found that the "rights" provided in the 1863 Acts[14] and the funds later appropriated in the 1888-1890 Acts "constituted replacements for the annuities and other benefits" previously provided by treaty. *Id.* at 340 (A39). Based on the notion that the 1888-1890 Acts were intended to replace treaty provisions, the CFC concluded that the Acts should be interpreted as imposing "binding obligations" as opposed to mere "gratuitous appropriations." *Id.* at 341-342 (A40-41).

This interpretation cannot be squared with this Court's decision in *Wolfchild VI*. The CFC relied, *inter alia*, on the fact that the appropriations for the 1886 Mdewakantons appeared within statutory enactments labeled "Fulfilling Treaty Stipulations with and Support of Indian Tribes" as opposed to sections labeled "Miscellaneous" or "Miscellaneous Supports." *Wolfchild VII*, 96 Fed. Cl. at 341-42 (citing 25 Stat. at 219, 25 Stat. at 982, 25 Stat. at 338). Addressing the very

---

[13] It is not true, as Intervenor-Plaintiffs' assert (*Int.-Pl. Br.* at 17), that the United States did not address this part of the CFC's ruling. *See U.S. Br.* at 44 (addressing CFC finding that appropriations were intended "substitutes" for treaty benefits).

[14] As explained (pp. 51-55, *infra*), the 1863 Acts authorized the Secretary of the Interior to set aside lands for loyal Sioux, but did not mandate such action. The CFC itself subsequently determined that the 1863 Acts were "patently discretionary." *Wolfchild VIII*, 101 Fed. Cl. at 72-73 (A70-71).

31

same text and argument, this Court observed that the 1888-1890 Acts were "not enacted pursuant to any treaty with the Mdewakantons, and therefore *cannot fairly be characterized as payment . . . of a treaty debt*." *Wolfchild VI*, 559 F.3d at 1240 (A237) (emphasis added) (internal citations and quotations omitted). This Court further noted that all three of the 1888-1890 Acts appropriated funds "for the support of" the 1886 Mdewakantons, "language [not] typically used in clauses directed at fulfilling treaty obligations." *Id.*

Moreover, even if the CFC correctly construed the 1888-1890 Acts as imposing "binding obligations" (for whatever reason), it does not follow that the Acts imposed binding obligations with respect to 1886 land revenues and the 1886 descendants as a group. The CFC also relied on comments from individual senators expressing "gratitude" to the valuable service of the loyal Sioux, *Wolfchild VII*, 96 Fed. Cl. at 340-341 (A39-40) (citing 19 Cong. Rec. 2,976-77 (1888) (comments of Senator MacDonald)) and regret for the fact that the United States had not made exception to the treaty nullification or provided earlier compensation to the loyal Sioux. *Id.* (citing 19 Cong. Rec. 2,976-77 (1888) (comments of Senator MacDonald) and 21 Cong. Rec. 7,589 (1890) (comments of Senator Davis)). But such statements of legislative motivation cannot trump the language actually used by Congress when making provisions for the 1886 Mdewakantons. The relevant text says nothing of ongoing duties, much less

32

continuing obligations to descendants many generations removed from the 1886 Mdewakantons.

At bottom, contrary to the Intervenor-Plaintiffs' suggestion (*Int.-Pl. Br.* at 16-18), the CFC's "findings" regarding the 1888-1890 Acts are unsupported and not entitled to deference from this Court. Issues of statutory construction are matters of law subject to *de novo* review. *In re Staats*, 671 F.3d 1350, 1353 (Fed. Cir. 2012). Likewise, "a trial court's determination regarding the money-mandating character of [a] statute . . . is subject to appellate review as a question of law." *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005); *see also Ferreiro v. United States*, 501 F.3d 1349, 1352 (Fed. Cir. 2007). The CFC's interpretation of the 1888-1890 Acts is legally erroneous and cannot stand.

## D.    A "Non-Frivolous" Allegation of Tucker-Act Jurisdiction Is Insufficient to Support the CFC's Tucker-Act Judgment

There is also no merit to the Intervenor-Plaintiffs' assertion (*Int.-Pl. Br.* at 14-16) that they only needed to make a "non-frivolous" allegation that the 1888-1890 Acts were "money-mandating." The Intervenor-Plaintiffs rely (*id.*) on this Court's decision in *Gollehon Farming v. United States*, 207 F.3d 1373, 1378-80 (Fed. Cir. 2000), which drew a distinction between the threshold showing needed to establish Tucker-Act jurisdiction (and avoid dismissal under RCFC 12(b)(1)) versus the more robust showing needed to state a Tucker-Act claim (and avoid

33

dismissal under RCFC 12(b)(6)). This Court determined that the former step could

be satisfied by a "non-frivolous allegation that the statute or regulation may be

interpreted as money-mandating." *Id.* Citing this ruling, the Intervenor Plaintiff s

argue (*Int.-Pl. Br.* at 15-16) that they made a non-frivolous assertion that 1888-

1890 Acts created a money-mandating duty and that the trial court's finding on this

point should stand.

But *Gollehon Farming* was overruled by this Court sitting *en banc*. *See*

*Fisher*, 402 F.3d at 1171-1173 & n. 3. In *Fisher*, this Court held that the "money-

mandating" determination is a "single step" to be undertaken at the "outset" of a

case, and that such decision shall be "determinative both as to the question of the

court's jurisdiction and thereafter as to the question of whether, on the merits,

plaintiff has a money-mandating source on which to base his cause of action." *Id.*

at 1173. This Court subsequently clarified that whether a plaintiff has pled

sufficient facts to state a cause of action under a statute determined to be money-

mandating is a separate inquiry from whether the statute is money-mandating.

*Adair v. United States*, 497 F.3d 1244, 1250 (Fed. Cir. 2007). Nonetheless, there is

no lower bar (*e.g.*, a "non-frivolous" allegation) that will satisfy the Tucker Act for

jurisdictional purposes. *Fisher*, 402 F.3d at 1173.

More importantly, even if there were a lower bar for Tucker-Act

*jurisdiction*, that lower bar obviously would be of no relevance here. The present

34

appeal is not an appeal from a jurisdictional dismissal under RCFC 12(b)(1), but an appeal from a final judgment in the Intervenor-Plaintiffs' favor. To defend that judgment, the Intervenor-Plaintiffs (and Plaintiffs) must do more than establish Tucker Act jurisdiction; they must establish the absence of disputed facts and entitlement to judgment as a matter of law. A "non-frivolous" allegation of a money-mandating duty is not, and never was, sufficient to support a Tucker-Act judgment. *See Gollehon Farming*, 207 F.3d at 1380 (affirming dismissal of Tucker Act complaint for failure to state claim, after finding Tucker Act jurisdiction).

## II.    THE USE RESTRICTION CLAIMS ARE TIME BARRED

The United States' opening brief also explained that the use restriction claims – even if somehow within the Tucker Act or Indian Tucker Act – are time barred because not brought within six years of the alleged unlawful distribution of the subject land revenues (which occurred in 1981 and 1982), *U.S. Br.* at 46-47, and because the so-called "Indian Trust Accounting Statute" ("ITAS") does not prevent the running of the statute of limitations as to the alleged unlawful distribution of the subject land revenues. *U.S. Br.* at 47-54. In their responses, Plaintiffs and Intervenor-Plaintiffs do not dispute that the use-restriction claims

35

would be untimely without ITAS, but continue to assert that ITAS voided any timeliness concern in this case.[15]

The United States' opening brief explained that ITAS does not apply for two reasons: (1) because the subject land revenues were not held in a "trust fund" within the meaning of the statute, *id.* at 47-51; and (2) because ITAS applies only where an accounting is reasonably required to provide notice of "mismanagement or loss" from a trust fund, and not where (as here) there is a wholesale liquidation of alleged trust assets. *Id.* at 51-54. Plaintiffs and Intervenor-Plaintiffs have failed to rebut either point.

## A.    This Use-Restriction Claims are Not Breach of Trust Claims

In ITAS, Congress declared that the statute of limitations "shall not commence to run" on claims "concerning losses to or mismanagement of trust funds." *See* Pub. L. No. 108-108, 117 Stat. 1241, 1263 (Nov. 10, 2003). This statute cannot apply to prevent the statute of limitations from running against the Claimants' use-restriction claims – claims that DOI officials unlawfully distributed certain 1886 land revenues – unless those claims involved a breach of trust duties. In *Wolfchild VI*, this Court held that the 1888-1890 Acts did not create "a trust for

---

[15] While Plaintiffs make multiple statute-of-limitations arguments (*Pl. Br.* at 65-70), those arguments conflate the use-restriction claims (at issue in the government's appeal) with the claims in Plaintiffs' cross-appeal. Only Plaintiffs ITAS argument (*id.* at 69-70) is relevant to the use-restriction claim.

the benefit of the 1886 Mdewakantons and their descendants." 559 F.3d at 1255.

To be sure, in so holding, this Court did not expressly address the land revenues.

But revenues derived from the 1886 lands cannot be "trust funds" under the 1888-1890 Acts if the lands themselves were never held in trust and if the Acts did not create any trust.[16]

Plaintiffs argue (*Pl. Br.* at 69-70) that the need for a "trust duty" is an "attempted gloss" on the text of ITAS and (by negative implication) that there can be a "mismanagement of trust funds" in cases where there are no trust duties. Plaintiffs reason (apparently) that the text of ITAS is satisfied by a showing that the subject revenues were deposited and held in trust accounts. The Intervenor-Plaintiffs likewise rely (*Int.-Pl. Br.* at 20) on the CFC's "finding" that "Proceeds-of-Labor accounts are statutorily classified as 'trust fund' accounts.'" As already explained (*U.S. Br.* at 48-51), these arguments are illogical and contrary to the bedrock principle that waivers of sovereign immunity – including the waiver

---

[16]Contrary to Intervenor-Plaintiffs's contention (*Int.-Pl. Br.* at 20), the United States did distinguish the cases cited by the CFC for the 'proposition that when the government holds any Indian money, the funds are presumed to be held in trust.'" *See Int.-Pl. Br.* at 20 (citing *Wolfchild VII*, 96 Fed. Cl. at 332, n. 41 (A31)). As explained (*U.S. Br.* at 49), that interpretive presumption applies equally to money and property. *See American Indians Residing on Maricopa-Ak Chin Reservation v. United States*, 667 F.2d 980, 1002 (Ct. Cl. 1981). Where, as here, this Court determined that the 1886 lands were not held in trust, the CFC cannot logically presume that Congress intended the land revenues to be held in trust.

expressed in ITAS – must be strictly construed in favor of the sovereign. *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1346 (Fed. Cir. 2004).

For purposes of construing ITAS, the relevant issue is not how the government held or tracked the land revenues for accounting purposes, but whether the Claimants' use-restrictions claims are the type of claims that Congress intended to address when enacting ITAS. The use-restriction claims are predicated on the theory that DOI "was required to deal with the [land revenues] in a way that comported with the original appropriating statute" or, in other words, that the land revenues were the equivalent of restricted appropriations. *Wolfchild VII*, 96 Fed. Cl. at 336 (A35). That DOI deposited these "appropriations" into trust accounts *in lieu* of immediate expenditure/disbursement does not make the alleged improper disbursement of the "appropriations" a breach of trust or alter the nature of the use-restriction claims. Strictly construed, ITAS applies to claims concerning trust funds allegedly mismanaged, not appropriations allegedly misspent. The CFC erred in holding otherwise.

## B.    The Use-Restriction Claims Are Not "Loss" or "Mismanagement" Claims

The CFC also erred in concluding that the wholesale liquidation of the land revenues and repudiation of any trust duty to the descendants of the 1886 Mdewakantons as a group constitutes a "loss to" or "mismanagement of" alleged

38

trust funds for purposes of ITAS. Under ITAS, the "statute of limitations shall not commence to run" on claims "concerning losses to or mismanagement of trust funds" until DOI provides the beneficiary an "accounting . . . from which the beneficiary can determine whether there has been a loss." Pub. L. No. 108-108, 117 Stat. 1241, 1263. Read as a whole, the quoted text conveys Congress's intent to forego the United States' statute-of-limitations defense in cases where there is a "loss to" or "mismanagement of" trust funds and an accounting of those funds is reasonably required to demonstrate a loss. *See U.S. Br.* at 51-53.

An alleged wrongful liquidation of a trust or express repudiation of an alleged trust duty is fundamentally different from a mere "loss to" or "mismanagement of" an acknowledged trust. Among other things, when there is such a repudiation of a trust duty, the alleged rightful beneficiaries do not need an "accounting" to be put on notice of the existence of a cause of action. *See San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1355 (Fed. Cir. 2011). Because Congress did not unequivocally require an accounting in cases concerning the repudiation of trust duties, ITAS cannot be construed to apply to such cases. *See Shoshone Indian Tribe*, 364 F.3d at 1346.

The Plaintiffs and Intervenor-Plaintiffs have no response. The Claimants contend (*Pl. Br.* at 67-70; *Int.-Pl. Br.* at 22) that an accounting was necessary to "meaningfully impart notice" of the alleged breach of trust. But this conflates the

39

question of statutory interpretation with the question of when the use-restriction claims accrued. Because a cause of action under the Indian Tucker Act accrues only when "all the events which fix the government's alleged liability have occurred *and the plaintiff was or should have been aware of their existence*," *San Carlos Apache*, 639 F.3d at 1350 (emphasis added) (citation omitted), constructive notice is always required.[17] ITAS imposes a heightened notice requirement – the need for a formal "accounting" – only in a limited class of cases; *i.e.*, those involving "losses to or mismanagement of trust funds." For reasons stated, this is not such a case.

Thus, contrary to Intervenor-Plaintiffs' assertion (*Int.-Pl. Br.* at 22), the government's failure to provide an accounting is not a failure of proof on the constructive notice question; *i.e.*, whether the claimants were aware or reasonably should have been aware of the alleged unlawful disbursement of the land revenues in 1981 and 1983. The disbursement of the land revenues was in accordance with

---

[17] Contrary to Plaintiffs' argument (*Pl. Br.* at 67-68), "actual knowledge" is not required for accrual of Indian Tucker Act breach-of-trust claims. Under this Court's precedents, a cause of action accrues when there is an express repudiation of a trust or actions sufficient to place a beneficiary on notice of repudiation. *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States*, 672 F.3d 1021, 1030-31 (Fed. Cir. 2012); *see also Ingrum v. United States*, 560 F.3d 1311, 1315 n. 1 (Fed. Cir. 2009) (the accrual of a claim is suspended only when relevant acts are "concealed or inherently unknowable").

40

a distribution plan negotiated with tribal governments and was accomplished

shortly after a legislative enactment (the 1980 Act) that altered the status of the

1886 lands. *Wolfchild VII*, 96 Fed. Cl. at 321-322; *U.S. Br.* at 26-28. Claimants do

not now allege that they lacked *constructive* notice of these events. Nor did the

CFC find any failure to provide to constructive notice. Rather, the CFC

erroneously relied on ITAS. *See Wolfchild VII*, 96 Fed. Cl. at 330-35.

## RESPONSE ARGUMENT ON CROSS-APPEALS

## I.    THE CFC CORRECTLY DISMISSED PLAINTIFFS' CLAIMS

In their appeal, Plaintiffs argue (*Pl. Br.* at 47) that the CFC erred by not

acknowledging the validity of two newly-articulated claims, loosely aligned with

claims asserted below. First, they assert a "statutory land claim" under the Indian

Non-Intercourse Act ("INIA"), alleging that DOI "failed to reserve" for the 1886

Mdewakantons, the 12 sections of land (or 7,680 acres) that DOI preliminarily set

aside for loyal Sioux under the 1863 Acts. *See* pp. 16-17, *supra.* This is similar to

the claim that the CFC dismissed on the grounds that the loyal Sioux (and/or 1886

Mdewakanton) are not a "tribe." *Wolfchild VIII*, 101 Fed. Cl. at 67-69 & n. 14; *see*

*also* pp. 9-12, *supra.*

Second, Plaintiffs assert a "statutory fund claim," alleging that DOI

breached fiduciary obligations to the 1886 Mdewakantons with respect to revenues

41

derived from the 1886 lands. *See Pl. Br.* at 47. This claim is similar to the use-restriction claim on which the CFC (erroneously) granted judgment, with the following differences. The CFC based its judgment on the 1888-1890 Acts alone, did not rely on a trust theory, and limited the judgment to a discrete set of revenues derived prior to the 1980 Act (*i.e.*, before Congress declared the 1886 lands to be held in trust for the three Sioux Communities). *See Wolfchild VII*, 96 Fed. Cl. at 336-352. In contrast, (1) Plaintiffs base their "statutory fund claim" on a mash-up of six statutes: the1888-1890 Acts, the INIA, and 1863 Acts, *Pl. Br.* at 48-59; (2) Plaintiffs assert fiduciary obligations as to the 1886 lands and land revenues, allegedly arising from the INIA, *id.* at 56-59; and (3) Plaintiffs claim entitlement to 1886 land revenues derived both before and after the 1980 Act (including recent revenues from casino operations). *Id.* Neither of Plaintiffs' newly articulated claims – the "statutory land claim" and the "statutory funds claim" – is viable.

A.    **Plaintiffs' "Statutory Land Claim" Is Not Viable**

1.    *The INIA Does Not Provide the Basis for a Tucker Act Claim*

As already explained (pp. 23-24, *supra*), to state a viable claim under the Tucker or Indian Tucker Acts (28 U.S.C. §§ 1491, 1505), a plaintiff must first identify a "substantive source of law" that places "specific fiduciary or other duties" on federal officials. *Navajo Nation*, 556 U.S. at 290. The INIA is not such a source of law. In the INIA, Congress declared that certain types of land

42

transactions – *viz.*, conveyances of land or land interests "from any Indian nation or tribe of Indians" – shall lack "validity in law [and] equity," unless "made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177. This rule of law imposes no affirmative obligation on any federal official. Rather, the INIA serves "to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties," by rendering void and unenforceable any tribal land conveyance not authorized by Congress and "enabl[ing] the Government, acting as *parens patriae* for the Indians, to vacate any disposition of their lands made without [Congress's] consent." *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960).

Nothing in the text or purpose of the INIA suggests that federal officials have an affirmative duty to bring actions to vacate or void a tribe's noncompliant conveyance of a land interest, much less a duty that gives rise to a cause of action for money damages. *See Navajo Nation*, 556 U.S. at 290. Indeed, the Supreme Court has held that the INIA "is not applicable to the sovereign United States." *Tuscarora Indian Nation*, 362 U.S. at 120. This is not to say that an otherwise invalid tribal land conveyance – *i.e.*, a conveyance without Congressional approval – becomes valid if approved by federal officials. In a recent case against the United States, this Court held that certain tribally authorized gas leases were void under the INIA, despite federal approval, because federal officials failed to follow

43

the terms of the 1938 statute that authorized gas leases only if competitively bid. *Shoshone Indian Tribe*, 672 F.3d at 1037-38. This Court did not conclude, however, that the INIA, or the general trustee-ward relationship recognized in the INIA, provide specific duties enforceable *via* an Indian Tucker Act claim. *Id.* at 1039-1041. To the contrary, this Court determined that the complaining tribe would have a viable cause of action only if it could identify some separate statute or regulation establishing a specific duty on federal officials, such as the duty to remove the lessees as trespassers. *Id.*

### 2.    *Plaintiffs Do Not Allege an INIA Violation*

Moreover, the Plaintiffs have not even alleged conduct implicating the INIA. The statute applies to "conveyance[s] of land[] . . . from . . . Indian nations or tribe[s]." 25 U.S.C. § 177. In contrast, Plaintiffs argue (*Pl. Br.* at 48, 66) that DOI officials "failed to reserve" lands for the 1886 Mdewakantons as allegedly required under the 1863 Acts. The failure to reserve land *for* the 1886 Mdewakantons does not involve the conveyance of a land interest *from* the 1886 Mdewakntons. And the 1886 Mdewakantons (even if the intended beneficiaries of the 1863 Acts) are not a tribe.

As explained (*supra*), in February 1863, Congress declared "all [Sioux] lands and rights of occupancy within the State of Minnesota" to be "forfeited to the United States." Act of Feb. 16, 1863, ch. 37, § 1, 12 Stat. 652. In the same Act,

44

Congress authorized DOI to set apart, from the "public lands, not otherwise appropriated," 80-acre tracts "in severalty," for specified "individual" Indians.' *Id.*, § 9, 12 Stat. 654. In March 1863, Congress provided, for the first time, that DOI could "locate" the friendly or "meritorious" Sioux, on 80-acre tracts on the former reservation lands in Minnesota. Act of Mar. 3, 1863, ch. 119, § 4, 12 Stat. 819. DOI then identified 12 sections of the former reservation to be used for loyal Sioux, but ultimately made no individual assignments. *Wolfchild VIII*, 101 Fed. Cl. at 74 (A72). Because Congress annulled all Sioux land rights in the February 1863 Act, the failure of DOI officials to carry through with land assignments made "lawful" in the March 1863 Acts cannot implicate the INIA. As a result of the February 1863 Act, there were no Sioux lands in Minnesota, only former reservation lands that could be assigned to individual Indians.

To be sure, Plaintiffs also contend (*Pl. Br.* at 57) that the 1863 Acts obligated DOI to set aside lands for the loyal Sioux (whom Plaintiffs conflate with the 1886 Mdewakantons). But the allegation that DOI officials failed to assign lands to individual Indians is a distinct claim that does not depend on the pre-existence of Indian tribal lands, does not therefore implicate the INIA, and is lacking in merit for independent reasons. *See* pp. 51-57, *infra*.

Finally, as the CFC correctly determined, neither the loyal Sioux nor the 1886 Mdewakantons were a "tribe." In challenging this holding (*Pl. Br.* at 52-55),

45

Plaintiffs completely disregard the statutory terms that serve to define the two groups. The 1863 Acts unambiguously abrogated all rights claimed by the four Minnesota "bands," Act of Feb. 16, 1863, ch. 37, § 1, 12 Stat. 652, while authorizing DOI to convey or assign lands to "*individual[s]* of the before-named bands," *id.*, § 9, 12 Stat. 654, or "any meritorious *individual* Indian of said bands." Act of Mar. 3, 1863, ch. 119, 12 Stat. 819 (emphasis added). The 1888-1890 Acts likewise authorized expenditures on behalf of Indians "*heretofore* belonging" to the Mdewakanton band, who had "*severed* their tribal relations." *See*, *e.g.*, Act of Mar. 2, 1889, ch. 412, 25 Stat 992-93 (emphasis added). Prior to these enactments, there were no identifiable groups known as the "loyal" or "friendly Sioux" or "1886 Mdewakantons" and the statutes only recognize the specified potential beneficiaries as collections of individual Indians. Thus, the 1883 Acts and 1888-1890 Acts cannot reasonably be read as granting *tribal* land rights protected under the INIA, even if the statutes somehow can be seen as granting land entitlements.

### 3. Any Claim As to the 7,680 Acres is Time-Barred

In addition, any claim based on the alleged unlawful sale of the 7,680 acres is time-barred. There is no dispute that these lands (which DOI had preliminarily designated for assignment to loyal Sioux) were sold at public sale by 1895. *Wolfchild VIII*, 101 Fed. Cl. at 74 (A72). In an attempt to avoid the statute of limitations, Plaintiffs now assert (*Pl. Br.* at 8, 68) that DOI did not finally complete

46

the public sale of former reservation lands – which totaled approximately 500,000 acres – until the sale of a "last remaining parcel" in 2002. Plaintiffs reason that DOI's (alleged) obligation, per the 1863 Acts, to set aside former reservation lands for the loyal Sioux (and their descendants) continued until all former reservations lands were sold and none of these lands remained available to be set apart under the Acts.

This logic suffers at least three critical flaws. First, even if the last remaining parcel was sold in 2002, this event was not necessary to fix liability for the alleged improper sale of the 7,680 acres, which were specifically identified sections of land that were all sold in public sale by 1895. *Wolfchild VIII*, 101 Fed. Cl. at 74 (A72). Second, the 1863 Acts did not authorize DOI to locate the loyal Sioux on just any part of the former reservation. Rather the March 1863 Act provided that it "shall be lawful" for DOI to locate loyal Sioux "upon said [former reservation] lands *on which the improvements are situated*." Act of Mar. 3, 1863, ch. 119, 12 Stat. 819. The 12 sections chosen by Reverend Hinman (pp.16-17, *supra*) were apparently in the area of the former Indian village. *See* Meyer at 262. In their brief, Plaintiffs neglect to provide any description of the supposedly critical "last remaining parcel" (*Pl. Br.* at 68). Indeed, Plaintiffs did not include any allegation about this sale in their Seventh Amended Complaint. A459-501.

47

Third, based on the citations in Plaintiffs' brief, the supposedly critical 2002 sale of the "last remaining parcel" (*Pl. Br.* at 68) apparently concerned a parcel only 4.80 acres in size. A3615-16; *see also Pl. Br.* at 8, n. 30 (citing A3615-3616).

At bottom, if the government has any liability for not exercising the authority granted in the 1863 Acts (to locate loyal Sioux on former reservation lands) that liability was fixed in the years shortly after the 1863 Acts were enacted, when DOI aborted its plans to assign the 12 sections to individual Indians and instead released those lands for public sale. *See* pp. 16-17, *supra*.

## B.   Plaintiffs' "Statutory Funds Claim" Is Not Viable

Plaintiffs also fail to state a viable claim to land revenues derived from the 1886 lands. For reasons already explained (pp. 23-41, *supra*), the CFC erred in granting judgment for the Plaintiffs on their use-restriction claims (claims to revenues from the 1886 lands). However, even if that judgment stands, the CFC committed no error in limiting the judgment to revenues derived *before* the 1980 Act. *See Wolfchild VII*, 96 Fed. Cl. at 348-350 (A47-49). In the 1980 Act, Congress declared that all "right, title, and interest of the United States" in the 1886 lands is "hereafter" to be held in trust for the three Communities. Act of Dec. 19, 1980, Pub. L. No. 96-557, § 1, 94 Stat. 3262. In *Wolfchild VI*, this Court held that the 1980 Act "terminated any trust created by the [1888-1890] Appropriations Acts." *See* 559 F.3d at 1260 (A257). Given this Court's holding in *Wolfchild VI*,

48

Plaintiffs cannot plausibly claim entitlement, on behalf of the 1886 Mdewakantons, to post-1980-Act land revenues.

To be sure, *Wolfchild VI* did not expressly address Plaintiffs' alleged pre-existing rights under the 1863 Acts and the INIA. Plaintiffs' err, however, in supposing that those statutes are relevant to their land-revenue claims. For example, Plaintiffs assert (*id.* at 57) that the 1980 Act cannot be construed to "terminate" the "government's [alleged] continuing obligations under the 1863 Acts." But even if the government had or has a continuing obligation under the 1863 Acts to convey or assign former reservation lands to the loyal Sioux (*see infra*), this unfulfilled obligation has nothing to do with the status of the 1886 lands, which were purchased and assigned under the 1888-1890 Acts, or to the Plaintiffs' alleged entitlement to revenues from the 1886 lands.[18]

As for the INIA, Plaintiffs contend (*Pl. Br.* at 58-9) that "[p]roof of coverage by the INIA" (*i.e.*, proof that the 1886 Mdewakantons were a "tribe" for INIA purposes) establishes a fiduciary relationship with respect to the alleged "reservations" established under the 1888-1890 Acts. But, as this Court held in *Wolfchild VI*, the 1886 lands did not establish reservations for the 1886

---

[18] This Court rejected the notion that language from the February 1863 Act – which authorized the conveyance of permanent inalienable interests – informs the nature of the land interests conveyed under the 1888-1890 Acts. *Wolfchild VI*, 559 F.3d at 1241-1242 (A238-239).

49

Mdewakantons as a group and were never held in trust for the 1886 Mdewakantons as a group. 559 F.3d at 1254 (A251). Accordingly, the 1886 lands cannot be deemed "tribal" lands for INIA purposes, even if the INIA might be seen to impose mandatory obligations on government officials in other contexts.

## II.    THE CFC CORRECTLY DISMISSED INTERVENOR-PLAINTIFFS' CLAIMS UNDER THE 1863 ACTS

The CFC also correctly dismissed the Intervenor-Plaintiffs' claims under the 1863 Acts. The Acts did not reserve lands for the loyal Sioux or expressly direct the Secretary to reserve lands for the loyal Sioux. Instead, the February 1863 Act "authorized" the Secretary to "set apart" 80-acre parcels for the loyal Sioux from "public lands, not otherwise appropriated," Act of Feb. 16, 1863, ch. 37, § 9, 12 Stat. 654 (emphasis added), while the March 1863 Act provided that "it shall be lawful to locate any [such] meritorious individual[s]" on former reservation lands. Act of Mar. 3, 1863, ch. 119, § 4, 12 Stat. 819. Intervenor-Plaintiffs do not contend that the phrase "shall be lawful" constitutes a mandate. Intervenor-Plaintiffs insist, however, that the February 1893 Act did impose money-mandating obligations (*Int.-Pl. Br.* at 25-27, 41-49) and was not superseded by the March 1893 Act (*id.* at 26, 39-41). These arguments do not withstand scrutiny.

## A.     By Its Plain Terms, The February 1863 Act Did Not Mandate Land Grants

To find a mandate within the February 1863 Act, Intervenor-Plaintiffs rely

(*Int.-Pl. Br.* at 43-45) on two comments from the Act's legislative history: *viz.*, a

comment from Senator Fessenden describing the draft legislation as proposing to

"direct" the Secretary to provide land to "take care" of the loyal Sioux, *see*

*Wolfchild VIII*, 101 Fed. Cl. 71-72 (quoting Cong. Globe, 37th Cong., 3d Sess.,

511 (1863)), and a comment from Senator Harlan expressing the view that the

loyal Sioux "ought to be rewarded" and "distinguished from other Indians . . ." *Id.*

(quoting Cong. Globe, 37th Cong., 3d Sess., 514 (1863)).  Both comments

demonstrate the Senators' intent to aid loyal Sioux and expectation that the

Secretary would endeavor, in good faith, to utilize the statutory authority.

These comments, however, cannot be seen as mandating land grants for the

loyal Sioux, much less monetary compensation for the failure to make such grants.

"Legislative history, no matter how creatively spun, cannot trump the plain and

unambiguous language of [a] statute," *Frederick v. Shinsheki*, 684 F.3d 1263, 1275

(Fed. Cir. 2012), and caution must be exercised before equating the passing

comments of one or a few legislators with the intent of an entire legislative body.

*Cloer v. Secretary of Health and Human Services*, 654 F.3d 1322, 1339 n. 8 (Fed.

Cir. 2011) (citing *Garcia v. United States*, 469 U.S. 70, 75 (1984)).  In the

February 1863 Act, Congress plainly "authorized" the Secretary to set apart public lands for the loyal Sioux, but Congress did not utilize any language suggestive of a mandate. *Cf.* Act of Mar. 3, 1863, ch. 119, § 1, 12 Stat. 819 (stating that "the President is authorized and *hereby directed*" to set apart and assign certain lands to Sioux bands).

Nor can a money-mandating duty be inferred from context. As Intervenor-Plaintiffs acknowledge (*Int.-Pl. Br.* at 42-43), Congress enacted the February 1863 Act in the wake of what Congress described as an "unprovoked, aggressive, and most savage war [by the Sioux] upon the United States." Act of Feb. 16, 1863, ch. 37, § 1, 12 Stat. 652. Although Congress acted, through Section 9 of the February 1863 Act, to mitigate the punitive effect of the legislation on the loyal Sioux (individuals who had exerted themselves in the aid of settlers), Congress made no provision in the February 1863 Act to exempt the loyal Sioux from such effects or to otherwise enable the loyal Sioux to remain in Minnesota on their ancestral lands. Rather, Congress simply empowered the Secretary to set apart parcels from unspecified "public lands, not otherwise appropriated." *Id.*, § 9, 12 Stat. 654.

There is no historical evidence, from the time of the February 1863 Act, that Congress or the Secretary had then located suitable "public lands" for the loyal Sioux or that the loyal Sioux would agree to relocation. Further, there is considerable evidence that public sentiment was hostile to the location of any

Sioux (friendly or otherwise) near white settlements. Meyer, at 259-262. That the Secretary would face considerable obstacles in exercising the authority granted in Section 9 strongly counsels against the suggestion that Congress intended Section 9 to convey entitlements.

### B.    The 1863 Acts Must Be Read Together

In any event, an entitlement to land grants from the "public lands, not otherwise apportioned" (if such entitlement can be found within the February 1863 Act) is not the equivalent of a right to land within the former Minnesota reservation. Congress did not address disposition of former reservation lands until the March 1863 Act. Act of Mar. 3, 1863, ch. 119, § 4, 12 Stat. 819. Further, while the February 1863 Act specified that "public lands" set aside for individual loyal Sioux would be an inalienable "inheritance to said Indians and their heirs forever," Act of Feb. 16, 1863, ch. 37, § 9, 12 Stat. 654, the March 1863 Act did not so provide, but instead stated that the assignment of former reservation lands could be for "such tenure as is or may be provided by law." Act of Mar. 3, 1863, ch. 119, § 4, 12 Stat. 819.

Intervenor-Plaintiffs fail to acknowledge the implication of the two Acts when read together. Intervenor-Plaintiffs' claim to monetary damages for a breach of the 1863 Acts depends upon the allegation that the Secretary was required to set apart lands for the loyal Sioux as an inalienable inheritance. If, for example, the

53

1863 Acts required the Secretary to convey life estates, the statutory mandate would have expired with the loyal Sioux. For this reason (among others), Intervenor-Plaintiffs rely on the February 1863 Act (*Int.-Pl. Br.* at 25-27, 41-49) and insist (*id.* at 26, 39-41) that the February 1863 Act was not superseded by the March 1863 Act.

But the relevant question is not whether the February and March 1863 Acts "co-exist" (*id.* at 41), but how. After the enactment of the March 1863 Act, no individual loyal Sioux could have demanded a right to be located on former reservation lands. The March 1863 Act unambiguously stated that it was merely "lawful" to locate loyal Sioux on former reservation lands. Act of Mar. 3, 1863, ch. 119, § 4, 12 Stat. 819. To the extent the February 1863 Act provided a land entitlement that survived enactment of the March 1863 Act, that entitlement attached solely to non-apportioned "public lands" outside of the former reservation. Act of Feb. 16, 1863, ch. 37, § 9, 12 Stat. 654.

This is fatal to Intervenor-Plaintiffs' claim. As Intervenor-Plaintiffs themselves assert (*Int.-Pl. Br.* at 43), the relevant provisions of the 1863 Acts were intended to "reward" individual loyal Sioux. This means that any mandate implicit within the February 1863 Act must have been contingent on the assent of the intended beneficiaries. By specifying that the land grants were to be inalienable, except by consent of the President, *id.*, Congress evidenced its intent to provide

54

lands for permanent homes and livelihood, not to reward individuals with a convertible asset. To interpret the Act as compelling the Secretary to provide permanent homes where individual beneficiaries did not want to reside would convert the intended reward into a penalty of forced relocation. Thus, to allege a breach of the February 1863 Act – *i.e.*, a breach of the alleged obligation to provide lands on non-apportioned "public lands" outside of the former reservation – the Intervenor-Plaintiffs had to allege some facts indicating that the loyal Sioux desired such assignments. This they have not done.

## C. Actions By DOI Under the 1863 Acts Do Not Demonstrate a Mandatory Duty

Instead, the Intervenor-Plaintiffs only make arguments regarding DOI's aborted efforts to set aside 12 sections for the loyal Sioux on former reservation lands. *See Int.-Pl. Br.* at 50-66. First, Intervenor-Plaintiffs contend (*id.* at 48) that the Secretary's efforts demonstrate that the Secretary viewed his authority under the 1863 Acts as a mandate. This is plainly not the case. In the March 17, 1865 letter on which Intervenor-Plaintiffs rely, (*id.* at 35), the Secretary did cite an "immediate[]" need to "withdraw from [public] sale a portion of the [former] Reservation." However, this need arose from the prospect that the lands otherwise might be sold before the Secretary could exercise his authority to locate loyal Sioux on parts of the former reservation. The Secretary did not reference a

55

statutory obligation, but instead referenced his "authority" under both the February and March 1863 Acts. *Id.*

Second, Intervenor-Plaintiffs argue (*id.* at 58) that because the Secretary "specifically designated twelve sections of land [for the loyal Sioux] upon the former reservation," those lands thereby became an inalienable inheritance of the loyal Sioux under the February 1863 Act. As just explained, the March 1863 authorized the Secretary to assign former-reservation lands to individual loyal Sioux for any "tenure that is or may be provided by law." Act of Mar. 3, 1863, ch. 119, § 4, 12 Stat. 819; *Wolfchild VI*, 559 F.3d at 1232 (A229). Thus, even if DOI's efforts were implicit assignments under the March 1863 Act, such actions cannot be presumed to have conveyed an inalienable and inheritable land interest. Rather, in the absence of any document evidencing the nature of the assignment, the only fair inference is the conveyance of the minimum interest permitted by law.

Third, Intervenor-Plaintiffs argue (*Brief* at 58-66) that the United States' exercise of "elaborate control" over the twelve sections demonstrates the assumption of a trust obligation to the loyal Sioux and their descendants. The Supreme Court has stated that a "fiduciary relationship necessarily arises when the Government assumes . . . elaborate control over forests and property belonging to Indians." *Mitchell II*, 463 U.S. at 225. However, the Intervenor-Plaintiffs entirely misperceive the import of that ruling. *Mitchell II* stands for the proposition that

where Congress establishes an Indian reservation and enacts statutes giving the

Secretary comprehensive control over the management of the forests on the

reservation, a fiduciary obligation may be inferred. *Id.*, 463 at 209, 225; *see also* n.

12, *supra*. It does not follow that a trust duty arises when federal officials exercise

complete control (as necessarily they must) over the discretionary disposition of

public land to individual Indians.

## III.    THE INTERVENOR-PLAINTIFFS DID NOT PLEAD AND CANNOT STATE A TREATY-BASED CLAIM

In their final argument, Intervenor-Plaintiffs contend (*Int.-Pl. Br.* at 69-71)

that the CFC "erred in failing to find an actionable violation of the 1851 and 1858

treaties." However, the Intervenor-Plaintiffs did not seek to add a treaty claim in

their motions to amend. A382-430; 450-457. Nor did the CFC address a treaty

claim when denying those motions. *Wolfchild*, 101 Fed. Cl. at 69-76 (A67-74).

Accordingly, Intervenor-Plaintiffs' argument is untimely and should be deemed

waived. *See NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1296 (Fed. Cir.

2005).

In any event, the treaty claim is patently without merit. Intervenor-Plaintiffs

assert (*Int.-Pl. Br.* at 71-73) that the 1851 and 1858 treaties contained "self-

executing" individual rights that were not abrogated by the February 1863 Act. Yet

Intervenor-Plaintiffs fail to describe the nature of the alleged surviving rights and

57

how they could have survived the 1863 abrogation. The 1851 and 1858 treaties were government-to-government agreements between the United States and the Minnesota bands as sovereigns, not contracts with individual Indians. The February 1863 Act plainly and unambiguously "abrogated" and "annulled" all prior treaties with the Minnesota bands as to "any future obligation on the United States" and declared "all lands and rights of occupancy within the State of Minnesota, and all annuities and claims heretofore accorded" under the prior treaties to be "forfeited to the United States." Act of Feb. 16, 1863, ch. 37, 12 Stat. 652. Contrary to Intervenor-Plaintiffs' argument (*Int.-Pl. Br.* at 73), these terms are sufficiently "explicit and direct" to overcome the presumption against implied abrogation. *See generally South Dakota v. Bourland*, 508 U.S. 679, 687 (1993).

That Congress possesses "power to abrogate Indians' treaty rights" is also not in doubt. *Id.* The authority cited by Intervenor-Plaintiffs (*Brief* at 73, n. 133) stands only for the unremarkable proposition that Congress cannot, consistent with the Fifth Amendment, take private property held by individual Indians. *See Choate v. Trapp*, 224 U.S. 665, 677 (1912) (Indians are "not excepted from the protection guaranteed by the Constitution" and their "private rights are secured and enforced to the same extent and in the same way as other residents or citizens of the United States.")

58

Moreover, even if the February 1863 Act somehow did take vested private property rights of individual Indians (in addition to abrogating treaty rights), the cause of action for such taking accrued in 1863 when the taking occurred. *See generally Seldovia Native Ass'n, Inc. v. United States*, 144 F.3d 769, 777 (Fed. Cir. 1998) (and cases cited therein). To avoid the obvious time bar, Intervenor-Plaintiffs invoke the language of ITAS (p. 39, *supra*), arguing (*Int. Pl.* at 74) that the government has never provided a "formal adequate accounting of . . . lost treaty rights." But as this Court has made clear, ITAS applies only to claims alleging the mismanagement of trust *funds* and not to claims alleging mismanagement of trust lands or other trust assets. *Shoshone Indian Tribe*, 672 F.3d at 1035 (citing *Shoshone Indian Tribe of Wind River Reservation v. United States*, 364 F.3d 1339, 1350 (Fed. Cir. 2004)).

## CONCLUSION

For the foregoing reasons and the reasons stated in the United States'

opening brief, the CFC's judgment on the "use restriction" claims (under the 1888-

1890 Acts) should be reversed, the CFC's dismissal of all other claims should be

affirmed, and the case should be remanded for the entry of final judgment in favor

of the United State on all claims.

> Respectfully submitted,
>
> IGNACIA S. MORENO
> *Assistant Attorney General*
>
> JOHN L. SMELTZER
> AARON AVILA
> JODY SCHWARZ
> *Attorneys, Department of Justice*
> *Environment & Natural Resources Division*
> *P.O. Box 7415*
> *Washington, DC 20044*
> *(202) 305-0343*
> john.smeltzer@usdoj.gov

December 21, 2012
D.J. No. 90-2-20-11099

## STATUTORY ADDENDUM: 1863 Acts

### Act of Feb. 16, 1863, ch. 37, 12 Stat. 652, 652-654 ("February 1863 Act")

Whereas the United States heretofore became bound by treaty stipulations to the Sisseton, Wahpaton, Medawakanton [*sic.*], and Wa[h]pakoota bands of the Dakota or Sioux Indians to pay large sums of money and annuities * * * and whereas during the past year the aforesaid bands of Indians made an unprovoked, aggressive, and most savage war upon the United States, and massacred a large number of men, women, and children within the State of Minnesota, and destroyed and damaged a large amount of property, and thereby have forfeited all just claims to the said moneys and annuities to the United States; and whereas it is just and equitable that the persons whose property has been destroyed or damaged by the said Indians * * * or * * * by the troops of the United States in said war, should be indemnified in whole or in part out of the indebtedness and annuities so forfeited as aforesaid: Therefore –

*Be it enacted* * * *, That all treaties heretore made and entered into by the Sisseton, Wahpaton, Medewakanton [*sic.*], and Wahpakoota bands of Sioux or Dakota Indians, or any of them, with the United States, are hereby declared to be abrogated and annulled, so far as said treaties or any of them purport to impose any future obligation on the United States, and all lands and rights of occupancy within the State of Minnesota, and all annuities and claims heretofore accorded to said Indians, or any of the them, [are hereby declared] to be forfeited to the United States.

SEC. 2. *And be it further enacted,* That two thirds of the balance remaining unexpended of annuities due and payable to said Indians for the present fiscal year * * * and * * * next fiscal year, is hereby appropriated, and shall be paid from the Treasury of the United States * * * to the commissioners hereinafter provided for, to be apportioned by them among the * * * [653] families of the State of Minnesota who suffered damage by the depredations of the Sisseton, Wahpaton, Medawakanton [*sic.*], and Wa[h]pakoota bands of Sioux or Dakota Indians * * *.

* * *

[654]

SEC. 9. *And be it further enacted*, That the Secretary of the Interior is hereby authorized to set apart of the public lands, not otherwise appropriated, eighty acres in severalty to each individual of the before-named bands who exerted himself in rescuing the whites from the late massacre of said Indians. The land so set apart shall not be subject to any tax, forfeiture, or sale, by process of law, and shall not be aliened or devised, except by the consent of the President of the United States, but shall be an inheritance to said Indians and their heirs forever.

* * *

## Act of Mar. 3, 1863, ch. 119, 12 Stat. 819 ("March 1863 Act")

*Be it enacted* * * *, That the President is authorized and hereby directed to assign and set apart for the Sisseton, Wahpaton, Medawakanton [*sic.*], and Wahpakoota bands of Sioux Indians a tract of unoccupied land outside of the limits of any state, sufficient in extent to enable him to assign to each member of said bands (who are willing to adopt the pursuit of agriculture) eighty acres of good agricultural lands, the same to be well adapted to agricultural purposes.

SEC. 2. *And be it further enacted*, That the several tracts of land within the reservation of the said Indians, shall be surveyed, under the direction of the commissioner of the general land office, into legal subdivisions to conform to the surveys of the other public lands. And the Secretary of the Interior shall cause each legal subdivision of the said lands to be appraised * * * [a]nd in each instance where there are improvements upon any legal subdivision of said lands, the improvements shall be separately appraised. But no portion of the said lands shall be subject to preemption, settlement, or location under the Acts of Congress, unless the party preempting, settling upon, or locating any portion of said lands shall pay therefor the full appraised value thereof, including the value of the said improvements * * *.

SEC. 3. *And be it further enacted*, That after the survey of the said reservations the same shall be open to preemption, entry, and settlement in the same manner as other public lands: *Provided*, That before any person shall be entitled to enter any portion of the said lands by preemption or otherwise * * *, he shall become an actual bona fide settler thereon, * * * and shall pay, within the term of one year from the date of his settlement, the full appraised value of the land * * *. And the portions of the said reservations * * * not settled upon, as aforesaid, may be sold at public auction * * *.

SEC. 4. *And be it further enacted*, That the money arising from said sale shall be invested by the Secretary of the Interior for the benefit of said Indians in their new homes, in the establishing them in agricultural pursuits: *Provided*, That it shall be lawful for said Secretary to locate any meritorious individual Indian of said bands, who exerted himself to save the lives of the whites in the later massacre, upon said lands on which the improvements are situated, assigning the same to him to the extent of eighty acres, to be held by such tenure as is or may be provided by law: *And provided, further*, That no more than eighty acres shall be awarded to any one Indian, under this or any other act.   * * *

## CERTIFICATE OF COMPLIANCE
### (Nos. 2012-5035, -5036, -5043)

I certify that:

1.    Pursuant to Fed. R. App. P. 32(a)(7)(C), that the attached answering and

reply brief is:

Proportionately spaced, has a typeface of 14 points or more and contains

**13,971**    words (exclusive of the table of contents, table of authorities,

addenda, and certificates of counsel).


_Dec. 21, 2012_
Date

John L. Smeltzer

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing *United States' Answering Brief as Cross-Appellee and Reply Brief as Appellant* have been served by United States mail, this 21st day of December, 2012, upon the following counsel of record:

ERICK G. KAARDAL
Mohrman & Kaardal P.A.
33 South Sixth Street, Suite 4100
Minneapolis, MN 55402

R. DERYL EDWARDS
606 South Pearl St.
Joplin, MO 64801

ROBIN L. ZEPHIER
Abourezek & Zephier
2020 W. Omaha Street
Rapid City, SD 57709

GARY JOHN MONTANA
Montana & Associates
N 12923 North Prairie Road
Osseo, WI 54758

BARRY HOGAN
Renaud, Cook, Drury, Mesaros, PA
One North Central, Suite 900
Phoenix, AZ 85004-4417

RANDY VERN THOMPSON
Nolan, Thompson & Leighton
5001 American Blvd. West, Suite 595
Bloomington, MN 55437

KELLY STRICHERZ
213 Forest Avenue
P.O. Box 187
Vermillion, SD 57069

SCOTT ALLEN JOHNSON
Johnson Law Group
10850 Wayzata Boulevard, Suite 250
Minnetonka, MN 55305

JACK E. PIERCE
Pierce Law Firm, P.A.
6040 Earle Brown Drive, Suite 420
Minneapolis, MN 55430

LARRY B. LEVENTHAL
Larry Leventhal & Associates
319 Ramsey Street,
St. Paul, MN 55102

CREIGHTON A. THURMAN
P.O. Box 897
Yankton, SD 57078
WOOD R. FOSTER, JR.,
Siegel Brill Greupner Duffy
100 Washington Avenue South
Suite 1300
Minneapolis, MN 55401

GARRETT J. HORN
Horn Law Office
P.O. Box 886
Yankton, SD 57078

ELIZABETH T. WALKER
Walker Associates
429 North St. Asaph Street,
Alexandria, VA 22314

NICOLE NACHTIGAL EMERSON
Lynn, Jackson, Shultz & Lebrun
141 North Main Avenue, Suite 900
P.O. Box 2700
Sioux Falls, SD 57101

FRANCES ELAINE FELIX
826 21st Avenue, SE
Minneapolis, MN 55414

WOOD R. FOSTER, JR.,
Siegel Brill Greupner Duffy
100 Washington Avenue South, Suite
1300, Minneapolis, MN 55401

JAMES LAWRENCE BLAIR
Renaud Cook Drury Mesaros, PA
1 North Central Avenue
Phelps Dodge Tower - Suite 900
Phoenix, AZ 85004

PHILIP WILLIAM MORGAN
757 7th Street
P.O. Box 901
Britton, SD 57430

REBECCA ELIZABETH FELIX
1160 NW Portland Avenue, No. 2
Bend, OR 97701

BERNARD JOSEPH ROONEY
84 Park Avenue
Larchmont, NY 10538

DOUGLAS R. KETTERING
Kettering Law Office
714 Douglas Ave.
Yankton, SD 57078

John L. Smeltzer
*Attorney*
*United States Department of Justice*
*Post Office Box 7415*
*Washington, DC 20044*
*(202) 305-0343*
john.smeltzer@usdoj.gov