Nos. 2012-5035, -5036, -5043

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

SHELDON PETERS WOLFCHILD, ERNIE PETERS LONGWALKER,
SCOTT ADOLPHSON, MORRIS J. PENDLETON,
BARBARA FEEZOR BUTTES, WINIFRED ST. PIERRE FEEZOR,
AUTUMN WEAVER, ARIES BLUESTONE WEAVER,
ELIJAH BLUESTONE WEAVER, RUBY MINKEL,
LAVONNE A. SWENSON, WILLIS SWENSON, AARON SWENSON,
BEVERLY M. SCOTT, LILLIAN WILSON, MONIQUE WILSON,
SANDRA COLUMBUS GESHICK, CHERYL K. LORUSSO,
JENNIFER K. LORUSSO, CASSANDRA SHEVCHUK,
JASON SHEVCHUK, JAMES PAUL WILSON, EVA GRACE WILSON,
BENITA M. JOHNSON, and KEVIN LORUSSO,

Plaintiffs-Cross Appellants,

and

ANITA D. WHIPPLE et al., Descendants of Lucy Trudell,
BONNIE RAE LOWE, et al., Descendants of Joseph Graham, et al.,
LENOR ANN SCHEFFLER BLAESER et al., Descendants of John Moose,
and MARY BETH LAFFERTY, et al.,

Plaintiffs,

(caption continued on the following page)

Appeals from the United States Court of Federal Claims in
consolidated case Nos. 03-CV-2684 and 01-CV-0568, Judge Charles F. Lettow

**APPELLEE PLAINTIFF-INTERVENORS' REPLY BRIEF**

January 4, 2013

Gary J. Montana
Montana & Associates
N12923 N. Prairie Road
Osseo, WI 54758
(715) 597-6464
*Attorney for Appellee-
Cross Appellant Julia
Dumarce Group*

Robin L. Zephier
Abourezek & Zephier
2020 W. Omaha Street
Rapid City, SD 57709
(605) 342-0097
*Attorney for Appellee-
Cross Appellant
Harley Zephier, Sr.*
and

R. Deryl Edwards
606 South Pearl St.
Joplin, MO 64801
(417) 624-8099
*Attorney for
Appellee-Cross Appellant
Victoria Robertson
Vadnais*

COURSOLLE DESCENDANTS and ROCQUE AND TAYLOR
DESCENDANTS et al.,

Plaintiffs,

and

DEBORAH L. SAUL, LAURA VASSAR, et al., LYDIA FERRIS et al.,
DANIEL M. TRUDELL, et al., and ROBERT LEE TAYLOR et al.,
and DAWN HENRY,

Plaintiffs,

and

RAYMOND CERMAK, SR. (acting individually and
under power of attorney for Stanley F. Cermak, Sr.),
MICHAEL STEPHENS, et al., JESSE CERMAK, et al.,
DENISE HENDERSON, DELORES KLINGBERG,
SALLY ELLA ALKIRE, PIERRE ARNOLD, JR.,
GETRUDE GODOY et al.,

Plaintiffs,

and

JOHN DOES 1-30, WINONA C. THOMAS ENYARD, and
KITTO, et al,

Plaintiffs,

and

FRANCINE GARREAU, et al.,

Plaintiffs,

and

FRANCIS ELAINE FELIX,

Plaintiff,

and

KE ZEPHIER, et al.,

Plaintiffs,

and

LOWER SIOUX INDIAN COMMUNITY,

Plaintiff,

and

PHILLIP W. MORGAN,

Plaintiff,

and

REBECCA ELIZABETH FELIX,

Plaintiff,

and

VERA A. ROONEY, et al.,

Plaintiffs,

and

DANNY LEE MOZAK,

Plaintiff-Cross Appellant,

and

DAWN BURLEY, et al.,

Plaintiff-Cross Appellant,

and

HARLEY ZEPHIER, SR.

Plaintiff-Cross Appellant,

and

JOHN DOES 1-433,

Plaintiffs,

and

JULIA DUMARCE, et al.,

Plaintiff-Cross Appellant,

and

RAYMOND COURNOYER, SR., et al., JERRY ROBINETTE, et al., SANDRA KIMBELL, et al., CHARLENE WANNA, et al., and LESLIE LEE FRENCH, et al.,

Plaintiff-Cross Appellants,

and

KRISTINE ABRAHAMSON,

Plaintiff-Cross Appellant,

and

VICTORIA ROBERTSON VADNAIS,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................................1

ARGUMENT ....................................................................6

I.    THE PLAINTIFF-INTERVENORS JOIN IN THE REPLY OF
      THE PLAINTIFFS, IN RELEVANT PART .....................6

II.   THE UNITED STATES COMMITTED STATUTORY USE
      AND TRUST VIOLATIONS AGAINST THE PLAINTIFFS
      AND PLAINTIFF-INTERVENORS ARISING OUT OF THE
      SECRETARY'S SETTING APART TWELVE SECTIONS OF
      MINNESOTA LAND FOR THE LOYAL SIOUX IN 1865 BY
      FAILING TO COMPLY WITH HIS STATUTORY AND
      TRUST-RELATED DUTIES PURSUANT TO THE
      FEBRUARY 16, 1863 ACT ......................................7

      A.   The March 3, 1863 Act Is Irrelevant to Plaintiff-
           Intervenors' Statutory Use and Trust Violation Claims
           under the February 16, 1863 Act ...........................7

      B.   The Government Now Admits That It "Identified,"
           Designated" and "Set Aside" Twelve Sections of
           Minnesota Land for the Loyal Sioux .....................11

      C.   The Impact of The Government's Admission That It
           "Set Apart" Twelve Sections of Minnesota Land For the
           Loyal Sioux Is Far Reaching in Scope and
           Detrimentally Impacts Its Litigation Positions ..........14

           1.   The February 1863 Act mandated land grants to
                the loyal Sioux ........................................14

           2.   The February and March 1863 Acts Should Not
                Be "Read Together" ...................................18

i

III.   THE PLAINTIFF-INTERVENORS PROPERLY
       PRESENTED A COGNIZABLE TREATY-BASED
       CLAIM ……………………………………...……………………20

CONCLUSION ……………………………………………………..31

PROOF OF SERVICE ………………………………………………34

CERTIFICATE OF COMPLIANCE ……………………………….36

ADDENDUM:

February 16, 1863 Act

March 3, 1863 Act

Anne Kaplan and Marilyn Ziebarth, *Making Minnesota Territory: 1849-1858*, 1999 Minnesota Historical Society Press, page 7 (Map)

1859 Map of Sioux Reserve – Bureau of Indian Affairs

1861 Map of the Ceded Part of the Dakota Territory

Map of Sections 5, 6, 7, 8, and 9, Township 112, Range 34, Renville and Redwood Counties, Minnesota

## TABLE OF AUTHORITIES

CASES:

*Bennett County, South Dakota v. United States*, 394 F.2d 8
(8th Cir. 1968) ....…………………………………………..………25

*Braun, Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 821
(Fed. Cir. 1992) …………………………………………………..8

*Elk v. United States,* 87 Fed.Cl. 70 (2009) ....…………………..28, 29

*Choate v. Trapp*, 224 U.S. 665 (1912) …………………………..25, 26

*Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984) ……8

*Fellows v. Blacksmith*, 60 U.S. 366, 372 (1856) ....…………………24

*Jones vs. Meehan*, 175 U.S. 1 (1899) .………………………………24

*Kolovrat v Oregon*, 366 U.S. 187 (1961) ……………………………22

*Mdewakanton & Wahpakoota Bands of Sioux Indians v. United States,*
*States,* 57 Ct.Cl 357, 359-61 (1922) .…………………………..21

*Menominee Tribe v. U.S.*, 391 U.S. 404 (1968) ….....……………23, 25, 26

*Minnesota v. Mile Lacs Band of Chippewa Indians,* 562 U.S. 172, 200
(1999) ....………………………………………………………29

*Pigeon River Co. v. Charles W. Cox, Ltd.*, 291 U.S. 138 (1934) …………25

*Salazar v. Ramah Navajo Chap.*, 132 S.Ct. 2181 (June 18, 2012) ………..27

*Samish v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005) …………14

*Shoshone Tribe v. U.S.*, 299 U.S. 476, 497 (1937) …………………………24

*Squire v. Capoeman*, 351 U.S. 1 (1956) …………………………………25

*Trulee v. Washing*, 315 U.S. 681 (1942) …………………………………24

iii

*United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) (*"Navajo III"*) ..17

*United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980) ..........24, 28

*United States v. Winans*, 198 U.S. 371 (1905) ...............................23

*United States v. Winstar*, 518 U.S. 839 (1996) ...............................27

*Washington v. Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U.S. 658, 675-76 (1979) ...............................................29

*Winters v. United States*, 207 U.S. 564, (1908) ...............................24

*Wolfchild v. United States,* (*"Wolfchild I"*), 62 Fed. Cl. 521 (2004) .....20, 21

*Wolfchild v. United States,* (*"Wolfchild VI"*), 559 F.3d 1228 (Fed. Cir. 2009) ...................................1, 3, 4, 5, 6, 11, 15, 20, 21

*Wolfchild v. United States,* 96 Fed. Cl. 302 (2010) (*"Wolfchild VII"*) ...10, 15

*Wolfchild v. United States*, 101 Fed. Cl. 54 (2011) (*"Wolfchild VIII"*) ...........................................................15

*Worcester v. Georgia*, 31 U.S. 515 (1832) .......................................24

## STATUTES:

U.S. Const. Art. II, sec. 2, cl. 2 ...............................................23

Act of Feb. 16, 1863, § 9, 12 Stat. 652, 654 .................1, 3, 6, 10, 16, 20

Act of March 3, 1863, ch. 119, § 4, 12 Stat. 81...............................8, 10

28 U.S.C. § 1491 ...............................................................17

28 U.S.C. § 1505 ...............................................................17

Treaty of 1851 ...............................................................22, 26

Treaty of 1858 ...............................................................22, 26

## RULES AND REGULATIONS:

Fed. R. App. Proc. 28(i) ...........................................................6

RCFC 56(a) ...............................................................10

## SECONDARY SOURCES:

Anne R. Kaplan and Marilyn Zeibarth, *Making Minnesota Territory:*
    *1849-1858*, 1999 Minnesota Historical Society, p. 7 (map) ............8

Map of Ceded Part of Dakota Territory 1861 ....................................8

Map – Sioux Reserve – Bureau of Indian Affairs ................................8

Map of Sections 5, 6, 7, 8, and 9, Township 112, Range 34, Renville and
Redwood Counties, Minnesota ....................................................8

October 1, 2012 *"Preliminary Plan for the Distribution of Judgment Funds*
    *to the Loyal Mdewakanton,"* 77 Fed. Reg. 59963-67 ....................5

Roy W. Meyers, *History of the Santee Sioux* (University of Nebraska
    Press 1967) ..............................................................3

Form 9

FORM 9.  Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Wolfchild et al.,                          v. United States

No. 2012-5035, -5036, -5043

### CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Appellee Plaintiff-Intervenor  certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Victoria Robertson Vadnais

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

n/a

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

R. Deryl Edwards

1-4-13
Date

Signature of counsel

R Deryl L Edwards
Printed name of counsel

Please Note: All questions must be answered
cc: counsel of record

124

## SUMMARY OF ARGUMENT

The United States' Answering and Reply Brief exhibits a continuing pattern of shifting litigation positions from those it took earlier in this case. In the government's April 20, 2011 summary judgment briefing, it argued that "*before* the [12 sections of Minnesota] land had been set aside," the military, through General Sibley, "forbid settlement on the old reservation."[1] In yet another CFC brief, the Government argued that, although "Congress authorized the Secretary of the Interior to set apart, for any individual Sioux who "exerted himself in rescuing the whites . . . ," up to 80 acres from the "public lands" to be held for said Indian and his heirs "forever,"[2] the Secretary was "effectively blocked...from exercising this authority" by "area settlers."[3]

Confronted with the historical record, now the Defendant admits that the Secretary of Interior exercised his authority in the February 1863 Act in that he "identified 12 sections of the reservation for the loyal Sioux,"[4] and "preliminarily designated for assignment [12 sections] to loyal Sioux.[5]

---

[1] U.S. Memorandum in Support of its Motion to Dismiss, p. 8 (Doc. 1037-1); (emphasis provided).

[2] Act of Feb. 16, 1863, § 9, 12 Stat. 652, 654.

[3] U.S. Corrected Opening Brief at 20 (hereinafter "U.S. Br."), citing *Wolfchild VI*, 559 F.3d at 1232 (A229).

[4] U.S. Answering and Reply Brief (hereinafter "U.S. Reply Br."), p. 45

[5] *Id*. at 46.

Further, the United States admitted that the Secretary "immediately" withdrew a portion of the former reservation for the loyal Sioux in 1865, "authorized" Rev. Hinman to designate twelve sections of Minnesota land, "direct[ed]" local land officers to reserve the designated sections, and subsequently ordered the "twelve sections of land...*restored* to public land sales and sold."[6]   The government characterized these aforementioned actions as "DOI preliminarily set[ting] aside for loyal Sioux...12 sections of land (or 7,680 acres)." U.S. Reply Br. at 41.  The Government's various synonyms for the act of setting apart land under the February 1863 Act aside, in 1865 the United States affirmatively "set apart" twelve specific sections of Minnesota land for the loyal Sioux under the February 1863 Act.

The historical record likewise compelled the Government to concede that it was not the "area settlers" that "blocked" their authority.  As a preliminary matter, the Secretary of Interior was never "blocked" by the Supreme Court, Congress or the President from following through on the requirements of the February 1863 Act – to this day. In 1865, there was no settler uprising or protest bringing about the Secretary's statutory use violation of the law.  Instead, it was the action of the United States military, by the order of General Pope, ratified by Lt. General Ulysses S. Grant,

---

[6] U.S. Reply Br., pp. 16-17; (emphasis provided).

which blocked the settlement of the former reservation on the unfounded fear of "recommencement of quarrels, bickerings, stealing and outrage" by both the whites and loyal Sioux alike.[7]  In sustaining Pope's order, Grant observed from his "own experience" that the loyal Sioux were "little trouble," but the trouble came from the "encroachments & influence of bad whites."[8]

The government's belated admissions dramatically affect its arguments against the theories of liability presented by the Plaintiffs and Plaintiff-Intervenors.  First, the admission that the Secretary of Interior exercised his authority to "set apart" lands in severalty for the loyal Sioux, triggered other mandatory parts of section 9 of the February 1863 Act.  The "land so set apart" was declared exempt from "tax, forfeiture, or sale."[9] Furthermore, the designated land "shall not be aliened or devised," except by the President of the United States.  *Id.*  The land was expressly to be held as

---

[7] U.S. Reply Br. at 17; Letter from Gen. Pope to U.S. Grant; LS, DNA, RG 94, Letters Received, 2602M 1865; see also *Wolfchild v. United States*, 559 F. 3d 1228, 1232-33 (*Wolfchild VI*) (citing H.R. Exec. Doc. No. 39-126, at 10 (1865); H.R. Exec. Doc. No. 50-61, at 2 (1889).

[8] Telegram sent from Lt. General U.S. Grant, May 17, 1865, National Archives, DNA, RG 107, O.R. I, xlviii, part 2, 480; Roy W. Myers, *History of the Santee Sioux*, p. 263.

[9] Act of Feb. 16, 1863, § 9, 12 Stat. 652, 654.

an "inheritance to said Indians and their heirs forever."[10]  *Id.*  The fact that

the Secretary never allocated parcels to the loyal Sioux because of a military

order does not dilute the fact that the land was admittedly set apart for them

under the February 1863 Act, thereby triggering the further statutory

protections afforded them under the law.  The Secretary's failure to follow

through with the requirements of the February 1863 Act, constitutes a use

violation of the law.

The government's recognition that the Secretary of Interior

affirmatively acted to set apart land for the loyal Sioux has further caused

the United States to assert in its brief, for the first time in this case, that the

February and March 1863 Acts should be "read together."[11]  As part of this

newly minted argument, the government claims that the "relevant question is

not whether the February and March 1863 Acts 'co-exist,' but how."  *Id.*

Since this Court held that the March 1863 Act "superseded" the February

1863 Act,[12] the Defendant has been satisfied to ignore the former Act

altogether.  Now, because the government has been compelled by the

historical record to admit that the Secretary set aside twelve sections of

---

[10] *Wolfchild VI*, 559 F.3d at 1232.  This Court noted that this "language
clearly would have created an inheritable beneficial interest in the recipients
of any land conveyed under the statute."  *Id.* at 1241.
[11] U.S. Reply Br. at 53-55.
[12] *Wolfchild VI*, 559 F.3d at 1241.

Minnesota land for the loyal Sioux, the United States impermissibly attempts to salvage its case by forging a new litigation position in this appeal.

The government's admissions also support the argument that a trust relationship was created and breached by the Defendant's actions – apart from its liability for wrongfully disbursing the trust account proceeds to a third party. In *Wolfchild VI*, this Court found there was no trust relationship by the United States because the Appropriations Acts do not evidence "an intention on Congress's part to create a legal relationship between the Secretary of Interior and the 1886 Mdewakantons."[13]

In the February 16, 1863 Act, quite the opposite is true. In this Court's words, in the Act, the Secretary of Interior "was assigned particular duties as trustee." *Id.* The statute gave the Secretary responsibility, as trustee, to locate the lands, to set apart the lands, to determine the eligibility of individuals who "exerted himself in rescuing whites" from the 1862 uprising,[14] and otherwise in the exercise of "complete control (as necessarily they must) over the…disposition of public land to individual Indians."[15]

---

[13] *Wolfchild VI*, 559 F.3d at 1238.
[14] A task they are currently undertaking. See October 1, 2012 "*Preliminary Plan for the Distribution of Judgment Funds to the Loyal Mdewakanton.*" 77 Fed. Reg. 59963-67.
[15] U.S. Reply Br. at 57.

The loyal Mdewakanton were given "enforceable rights as trust

beneficiaries."[16]  The land, once set apart by the Secretary, became an

"inheritance…forever"[17] for the loyal Mdewakanton, free from tax,

forfeiture, sale or alienation except by presidential action.  The

government's failure to protect the land so set apart by the Secretary of the

Interior breached an enforceable trust relationship between the loyal Sioux

and the government.

## ARGUMENT

## I.    THE PLAINTIFF-INTERVENORS JOIN IN THE REPLY OF THE PLAINTIFFS, IN RELEVANT PART

The Appellee Plaintiff-Intervenors Cross-Appellants (herewith

"Plaintiff-Intervenors") join in the Reply brief of the Appellee Wolfchild

Plaintiffs Cross-Appellants (hereinafter "Plaintiffs") replying to the United

States' Answering Brief, in relevant part.  Fed. R. App. Proc. 28(i).  The

Plaintiff-Intervenors do not join in any Plaintiffs' claim that the 1888, 1889

and 1890 Appropriations Acts benefits are exclusively confined to 264

individuals on the 1886 McLeod and the 1889 Henton federal censuses as

contrary to federal law, Department of Interior practice and policy.

---

[16] *Wolfchild VI*, 559 F.3d at 1238; see also the government's argument that
the "mandate implicit within the February 1863 Act must have been
contingent on the assent of the intended beneficiaries."  U.S. Rely Br. at 54.
[17] Act of Feb. 16, 1863, § 9, 12 Stat. 652, 654.

II.   THE UNITED STATES COMMITTED STATUTORY USE AND
TRUST VIOLATIONS AGAINST THE PLAINTIFFS AND
PLAINTIFF-INTERVENORS ARISING OUT OF THE
SECRETARY'S SETTING APART TWELVE SECTIONS OF
MINNESOTA LAND FOR THE LOYAL SIOUX IN 1865 BY
FAILING TO COMPLY WITH HIS STATUTORY AND TRUST-
RELATED DUTIES PURSUANT TO THE FEBRUARY 16, 1863 ACT

A.   The March 3, 1863 Act Is Irrelevant to Plaintiff-
Intervenors' Statutory Use and Trust Violation Claims
under the February 16, 1863 Act

As a preliminary matter, the government argues, for the first time in

the case and this appeal, that the February and March 1863 Acts should

"read together."[18] The government asserts that the Plaintiff-Intervenors "fail

to acknowledge the implication of the two Acts when read together." For

reasons below, the March 1863 Act is irrelevant to the Plaintiff-Intervenors'

cross-appeal and their claims that the government committed statutory use

and trust-related violations under the February 1863 Act as a matter of law.[19]

---

[18] U.S. Reply Br. at 53-55; compare the government's CFC argument that
the February 1863 statute was "superseded by another statute two weeks
later." Doc. 778 (August 9, 2010) U.S. Opposition to Motions to Amend, p.
18; citing this Court in *Wolfchild VI.*

[19] Contrary to the government's unsupported argument that the "'Group B'
Intervenor-Plaintiffs...do not allege that DOI breached an obligation by
failing to purchase lands or chattels for their ancestors from the 1888-1890
appropriations," U.S. Reply Br. at 24-25, n. 8, they have consistently joined
the Plaintiffs in the claims and legal theories presented to the CFC and in
this appeal, except where noted. See Appellee Plaintiff-Intervenor Principal
Br. at 14.

The government's argument that the two acts must be read together

fails because it is being raised for the first time on appeal.[20]  Substantively,

the argument fails as well.  The language of the March 1863 Act renders it

irrelevant.  The March Act, unlike February 1863 Act, sets apart 80 acre

tracts on "unoccupied land outside of the limits of any state."  The

government attempts to argue that the March 1863 Act[21] allowed

"'meritorious individual[s]' on former reservation lands."[22]  Even if this

position were factual, the government's position is undermined in that the

twelve sections of Minnesota land set apart for the loyal Sioux were not

solely confined within the former reservation.[23]  The post-1858 Treaty Sioux

reservation was located entirely south of the Minnesota River.[24]

Not all of the twelve sections of land set apart by the Secretary were

located in the former reservation confiscated by the government in the

February 1863 Act, but some were located north of the Minnesota River in

---

[20] "it is well settled that issues and legal theories not asserted at the district
court level ordinarily will not be heard on appeal."  *Columbia v. Air Florida,
Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984); *Braun, Inc. v. Dynamics Corp.
of America*, 975 F.2d 815, 821 (Fed. Cir. 1992).
[21] Act of March 3, 1863, ch. 119, § 4, 12 Stat. 819.
[22] U.S. Reply Br. at 50.
[23] Anne Kaplan and Marilyn Ziebarth, *Making Minnesota Territory: 1849-
1858*, 1999 Minnesota Historical Society Press, page 7; Map in Addendum.
[24] Map – Sioux Reserve – Bureau of Indian Affairs; see also Map of Ceded
Part of Dakota Territory 1861; Maps in Addendum.

Renville County and Sibley County, Minnesota.[25]  At the time the February

16, 1863 Act became law, the 1851 and 1858 treaties between the

government and the Sioux ceded substantial portions of land in southern

Minnesota to the federal government.[26]  The remaining "1858" reservation

lands were located entirely south of the Minnesota River.[27]  Portions of

sections 5, 6, 8 and 9, Township 112, Range 34, part of the land set apart by

the Secretary, were located both on the south and north sides of the

Minnesota River in Renville and Redwood County, Minnesota.

The importance of the majority of the land being set apart as being

outside of the reservation in Minnesota is clear.  The March 1863 Act did

not allow access to non-reservation *Minnesota* land – only the February

1863 Act permitted the Secretary to set apart non-reservation Minnesota

public land for the loyal Sioux.  At best, a material issue of disputed fact has

arisen, thereby preventing the CFC from granting a summary judgment on

this important issue.  RCFC 56(a).

---

[25] Map – Sections 5, 6, 7, 8, 9, Township 112, Range 34 Renville County,
Minnesota (top section of map) and Redwood County, Minnesota (bottom
section of map) divided by the Minnesota River; Map in Addendum; Section
31, Township 113, Range 31 is located in Sibley County, Minnesota north of
the Minnesota River and the 1858 reservation.

[26] See Kaplan and Zeibarth color map in Addendum.

[27] See map inserts in Addendum.

9

There are other distinctions in the two Acts that support the irrelevancy of the March 1863 Act in these statutory use and trust claims. Some of the distinctions between the February and March Acts were addressed by the CFC in *Wolfchild VII*.[28] The February Act allowed the 80 acre tracts to come from "public lands," including those on the former reservation in Minnesota and otherwise within the state. As stated, the March 1863 Act, at best, allowed repopulation of the former Minnesota reservation, but did not permit the Secretary to set apart non-reservation Minnesota land.[29]   Furthermore, the statute "directed" the President – not the Secretary of Interior - to set apart land for the four bands of Indians. The loyal Sioux's legal interest in the land under the February Act was "in severalty...an inheritance...forever,"[30] while the March Act only provided "such tenure as is or may be provided by law."[31] Finally, the February Act, created a fiduciary relationship between the Secretary and the loyal Sioux, particularly when the Secretary acted to "set apart" the land for distribution and bore the responsibility to determine who "exerted" themselves in the

---

[28] 96 Fed. Cl. 302, 314-15 (2010).
[29] While the March 1863 Act emphasizes that land was to be set apart on "unoccupied land outside the limits of any state," § 1, 80 acre tracts were available to "meritorious" individuals "upon lands on which the improvements are situated." § 4.
[30] Act of Feb. 16, 1863, § 9.
[31] Act of March 3, 1863, § 4.

1862 uprising. Based upon these material differences and the new argument

raised by the Government, the March Act is irrelevant to the Plaintiffs'

claims.

**B.**    **The Government Now Admits That It "Identified," "Designated" and "Set Aside" Twelve Sections of Minnesota Land for the Loyal Sioux**

Earlier in this case, the United States convinced the CFC and this

Court to hold that the "Secretary never exercised the authority granted by"

the February 1863 Act.[32] Subsequent to this Court's finding on the issue, the

government thus confidently argued to the CFC that "*before* the [12 sections

of Minnesota] land had been set aside," the military, through General Sibley,

"forbid settlement on the old reservation."[33] In the government's opening

brief to this Court, it asserted that the Secretary was "effectively

blocked...from exercising [any] authority" by "area settlers."[34] However,

the documentary evidence of events in March 1865 and thereafter, submitted

in the Plaintiff-Appellees' cross-appeal principal brief,[35] has caused the

---

[32] *Wolfchild VI*, 559 F.3d at 1232.

[33] U.S. Memorandum in Support of its Motion to Dismiss, p. 8 (Doc. 1037-1; April 20, 2011); (emphasis provided).

[34] U.S. Corrected Opening Brief at 20 (hereinafter "U.S. Br."), citing *Wolfchild VI*, 559 F.3d at 1232 (A229).

[35] Appellee Plaintiff-Intervenor Cross-Appellants' Principal and Response Brief, pp. 33-38; Addendum (March 17, 1865 letter from Secretary Usher to Commissioner Dole; March 23, 1865 letter from Commissioner Dole to Rev. Hinman).

government to now admit that the Secretary of Interior "set apart" twelve sections of land in Minnesota for the loyal Sioux. These actions were the result of the February 1863 Act.

The United States' response to the Plaintiff-Intervenors' cross-appeal displays a variety of characterizations for the Secretary's actions in March 1865. The government's brief admitted that the Secretary of Interior exercised his authority in the February 1863 Act in that he "*identified* 12 sections of the reservation for the loyal Sioux,"[36] and "preliminarily *designated for assignment* [12 sections of land] to loyal Sioux."[37] The government's brief characterized the February 1863 Act as providing "land grants to individual loyal Sioux."[38]

More specifically, the United States' brief admitted that the Secretary "immediately" withdrew a portion of the former reservation for the loyal Sioux in 1865, "authorized" Rev. Hinman to designate twelve sections of Minnesota land, "direct[ed]" local land officers to reserve the designated sections, and subsequently ordered the "twelve sections of land...*restored* to public land sales and sold."[39] The government characterized these

---

[36] U.S. Answering and Reply Brief (hereinafter "U.S. Reply Br."), p. 45
[37] *Id.* at 46.
[38] U.S. Reply Brief at 15.
[39] U.S. Reply Br., pp. 16-17; (emphasis provided).

aforementioned actions as "DOI preliminarily set[ting] aside for loyal

Sioux…12 sections of land (or 7,680 acres)." U.S. Reply Br. at 41.

It was the same historical record that prompted the government to

concede that the Secretary of Interior's failure to actually assign 80 acre

parcels in severalty to the loyal Sioux was by a military order from General

Pope – not due to "area settlers."[40]  Thus, the Secretary's actions in March

1865 "set apart" twelve sections of Minnesota land to the loyal Sioux under

the February 1863 Act.  General Pope's order, sustained by then Lt. General

Ulysses S. Grant over two months later on May 17, 1865,[41] should have

compelled the Secretary to make the land assignments to the loyal Sioux

elsewhere, which were triggered by the language of the February 1863 Act

and the actions and representations of the Secretary in March 1865.  Instead,

the Secretary took no further action.

    **C.**    **The Impact of The Government's Admission That It "Set Apart" Twelve Sections of Minnesota Land For the Loyal Sioux Is Far Reaching in Scope and Detrimentally Impacts Its Litigation Positions**

The United States essentially glosses over the Plaintiff-Intervenors'

arguments that the CFC erred in interpreting the February 1863 Act as

merely a "money-authorizing" statute, rather than a "money-mandating"

---

[40] *Id.*, at 20.
[41] Telegram sent (2 p.m.), DNA, RG 107, O.R. I, xlviii, 480.

statute.[42]   The Government's response asserted three reasons why the CFC

correctly dismissed the Plaintiff-Intervenor's February 1863 Act claims:

(1) the February 1863 did not mandate land grants; (2) the February and

March 1863 Acts "must be read together;" and (3) the Department of

Interior's actions failed to demonstrate a "mandatory duty."[43]    The

admissions of the government that it "set apart" twelve sections of

Minnesota land effectively neutralize these arguments.

    *1.    The February 1863 Act mandated land grants to the loyal*
            *Sioux*

The government asserts that, in relevant part, the February 1863 Act

"did not reserve lands for the loyal Sioux or expressly direct the Secretary to

reserve lands" for them.[44]    Although the Defendant dismisses the legislative

history of the Act which was intended to "direct" the Secretary to provide

land to the loyal Sioux,[45] it totally ignores the CFC's observation that this

Court has approved as money-mandating "certain discretionary [statutory]

schemes [as] also support[ing] claims within the Court of Federal Claims'

---

[42] Plaintiff-Intervenor Principal Br., at 41-49.

[43] U.S. Reply Br., at 50-56.

[44] U.S. Reply Br. at 50.

[45] *Id.* at 51; addressing the Plaintiff-Intervenors' arguments on the legislative history, see Appellee Plaintiff-Intervenors' Principal Br. at pp. 41-45.

jurisdiction."[46]  The United States likewise failed to address other statutory construction principles identified by the Plaintiff-Intervenors which evidenced the CFC's reversible error in failing to find a money-mandating duty under the February 1863 Act.[47]

The Plaintiff-Intervenors have articulated two legal theories as supporting their claims that the February 1863 Act mandated land grants to the loyal Sioux in Minnesota. First, the express language of the Act, its legislative history and the Secretary's subsequent actions compel the conclusion that the CFC erred in granting summary judgment, in that Congress intended to impose a duty upon the Secretary to "set apart" land for the loyal Sioux who "exerted [themselves] in rescuing whites" from the 1862 massacre as an "inheritable beneficial interest."[48]

The government asserts that, in the February 1863 Act, "Congress did not utilize any language suggestive of a mandate."[49]  However, as discussed below, the February 1863 Act, in addition to the use of the word

---

[46] *Wolfchild VIII*, 101 Fed. Cl. at 71, (citing *Samish v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005).

[47] Plaintiff-Intervenor Principal Br. at 45-47 (Where a statute grants authority to do an act and prescribes the manner of doing the act – a mandatory duty results, particularly where the statute confers new rights; also where a statute provides for the performance of acts or exercise of power by public officers protecting private rights or in the public interest, a mandatory duty arises.)

[48] *Wolfchild VI*, 559 F.3d at 1241; *Wolfchild VII*, 96 Fed. Cl. at 314.

[49] U.S. Reply Br. at 52.

"authorized" in the first sentence, utilizes the word "shall" three times in the second sentence of the two-sentence structure of section 9.

The government has belatedly recognized that, in March 1865, the Secretary set apart twelve sections of Minnesota land for the loyal Sioux, both lying in former reservation and non-reservation Minnesota public property. These actions met the provisions of the first sentence of the February 1863 Act, § 9. As a consequence of the Secretary's actions, the second sentence expressly contains further mandatory duties upon the Secretary, arising under the statute and the government's fiduciary relationship with the loyal Sioux.

The second theory of liability concerns the actions of the Secretary, in fact, setting aside twelve sections of land in and around the former Minnesota reservation in 1865, so triggering mandatory provisions of the February Act which provided that the "land so set apart *shall* not be subject of any tax, forfeiture, or sale, by process of law, and *shall* not be aliened or devised...but *shall* be an inheritance...forever.[50] Once the Secretary "set apart" lands for the loyal Sioux, statutory and common law fiduciary duties were triggered as a matter of law.

---

[50] February 1863 Act, § 9; (emphasis provided).

The Plaintiff-Intervenors have established a cognizable claim for relief against the United States under both 28 U.S.C. § 1491 and 28 U.S.C. § 1505, respectively. The evidence shows that they have proven that a relevant "substantive source of law…establishes specific fiduciary or other duties" on the government, and that such source of law "can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of [such] duties."[51]

The February 1863 Act is the requisite source of law which establishes specific statutory and fiduciary duties upon the government. At a minimum, when the Secretary "set apart" the twelve sections of Minnesota land for the loyal Sioux, the government was compelled by the statute to protect the land from separation from its intended beneficiaries. Its failure to do so constitutes a breach of its statutory and attendant fiduciary duties. The CFC erred as a matter of law when it held the February 1863 Act could not be "fairly interpreted as mandating compensation for damages sustained as a result" of the government's breach.

### 2. The February and March 1863 Acts Should Not Be "Read Together"

While the Plaintiff-Intervenors have previously analyzed the two 1863 statutes and concluded that the March 1863 Act is irrelevant to the cross-

---

[51] *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) ("*Navajo III*").

appeal,[52] the government's argument that land grants contemplated under the February Act "is not the equivalent of a right to land within the former Minnesota reservation" is misplaced.

The government makes this argument in an attempt to assuage the detrimental impact of their admission that the Secretary "set apart" twelve sections of land for the loyal Sioux in 1865. Essentially, the Defendant's fall-back position, asserts that when the statutes are "read together," the loyal Sioux are merely given a life estate at best - a claim barred by the statute of limitations.[53]

The government's position is contrary to the clear language of the two statutes and based upon an erroneous premise. The "reservation land" issue addressed in the Defendant's brief is the classic "red herring."[54]    As discussed previously, while Congress did not specify what "public lands, not otherwise appropriated" could be set apart by the Secretary under the auspices of § 9 of the February 1863 Act, it did not specify the former reservation in Minnesota – or any reservation for that matter. It only provided for "public lands."

---

[52] Section II, A., supra.

[53] U.S. Reply Br. at 53-4. (Government's argument that 'if the 1863 Acts required the Secretary to convey life estates, the statutory mandate would have expired with the loyal Sioux.")

[54] U.S. Reply Br. at 54.

Somewhat incredibly, the government asserts that subsequent to the March 1863 Act, "no individual Sioux could have demanded a right to be located on former reservation lands."[55] But such a demand was made and the Secretary set apart twelve sections of Minnesota land containing both former reservation and non-reservation land. The fact that the March 1865 actions of the Secretary set apart, in part, non-reservation land in Minnesota clearly excludes the application of the March 1863 Act, which limited its provisions to "unoccupied land outside of the state"[56] or, for the loyal Sioux, to "lands on which the [reservation] improvements are situated."[57] The Secretary obviously concluded that the Department of Interior had authority, in relevant part, under "section 9 of the act of Congress approved Feby. 16[th]" to "locate individual Indians of the Sioux tribe who remained true to the Government and exerted themselves to save the lives of Whites during the massacre of 1862."[58]

---

[55] *Id.*
[56] February 1863 Act, § 9.
[57] March 1863 Act, §§ 2, 4.
[58] March 17, 1865 letter from Secretary Usher to Commisioner of Indian Affairs Dole. (CA5035; Addendum – Principal Brief)

## III.    THE PLAINTIFF-INTERVENORS PROPERLY PRESENTED A COGNIZABLE TREATY-BASED CLAIM

The Government asserts that the Plaintiff-Intervenors did not plead or state a treaty based claim.[59] However, this is incorrect.[60]

After defeating the Sioux in 1862, the United States annulled its treaties with them, which had the effect of, among other things, voiding the annuities that had been granted and were then being paid to the Sioux as part of the terms of the 1837 and 1851 treaties and eliminating any possibility of compensation under the 1858 treaty.[61]  The United States also confiscated the Sioux lands in Minnesota, *Id.*

Some of the Sioux, however, had been loyal to the United States during the uprising by either not participating in the revolt or affirmatively acting to save the settlers.[62] Nonetheless, Congress acted with a broad brush, declaring the Sioux's treaties void and annuities and allocation of land forfeited and failing to except from that termination the loyal Mdewakanton band of Sioux, whose annuity was valued at approximately $1,000,000. *See id.* at 527.   Those Sioux who observed their pledge under the 1851 and 1858

---

[59] U.S. Reply Br. 57.

[60] See Doc. 930-1, Dumarce Fourth Amended 53, Complaint ¶¶ 1, 9, 10, 20, 30-38, 40-42, 45-50, 54-56, 60, 64-67; Doc. 1082, ¶¶ 37-39, 47-48, 68-81, 96, 98, 101, 111, 134-142.

[61] *See* Act of Feb. 16, 1863, ch. 37, 12 Stat. 652; Doc. 836, p. 7.

[62] *See Wolfchild I*, 62 Fed. Cl. at 526.

20

treaties to maintain peaceful relations with the citizens of the United States were rendered "poverty-stricken and homeless."[63]  Notwithstanding the broad termination of the Sioux treaties, Congress did attempt to provide for the loyal Mdewakanton by including a specific provision for them in the Act of February 16, 1863.

With the treaty cession to the United States in 1851, the trust responsibilities of the United States and its agents to the Mdewakanton Dakota Sioux bands, was clearly established in the form of rights, remedies, payments and annuities granted to the bands, and to the individual members of said bands.[64]  The 1851 and 1858 treaty provisions recognize a "self-executing" right of the *individuals,* not just the band/tribe, that allows a protected individual within the Mdewakanton band, the clear right recognized by Congress, to pursue individual rights, remedies and privileges, associated with the life, liberty and property as protected by said Treaty.  The self-executing treaty provisions of the Treaties of 1851 and 1858, allowed for any individual Mdewakanton Indian to assert their own property and privacy interests and to use the (later) due process clause of the

---

[63] *Wolfchild VI*, 559 F.3d at 1232.
[64] *See Mdewakanton & Wahpakoota Bands of Sioux Indians v. United States, States,* 57 Ct.Cl 357, 359-61 (1922).

21

U.S. Constitution and the treaty rights to preserve and protect said rights.[65]
The loyal Mdewakantons are a recognized group of Indians, however.

The February 16, 1863 Act was intended to avoid the problem of the loyal Sioux asking to have their 1851 and 1858 treaty lands back.[66]   The granting of the 80 acre parcels pursuant to the provision in the February 16, 1863 Act, stated, to "each individual of the before mentioned bands who exerted himself in rescuing whites from the late massacre [by[ said Indians. The lands so set apart . . . shall be an inheritance to said Indians and their heirs forever." This provision was to compensate the loyals and their heirs as a direct consequence of the abrogation of the prior treaties by the United States.  The United States has breached the treaties as no compensation has been paid to the individual beneficiaries of the non-breaching loyal Sioux or their heirs, to the present day.[67]    No accounting has been undertaken or completed.

In 1865, the Secretary of the Interior, pursuant to Section 9 of the 1863 Act, did purchase twelve sections of land, including non-treaty land in Redwood, Renville and Sibley counties in Minnesota.  Approximately 10,000 acres within 12 sections of land was to be used to fulfill the "80 acre

---

[65] *See Kolovrat v Oregon,* 366 U.S. 187 (1961) (recognizing a self-executing treaty right for lineal heirs).
[66] See maps in the Addendum.
[67] See Art. 7 of the 1851 Treaty, and Art. 5 of the 1858 Treaty.

parcels" described in the Act, as direct compensation to the friendly Sioux for the abrogation of their treaty rights. However, in 1870, the Secretary acting on behalf of the United States, released said 10,000 acres for sale through the general land office. This was a violation of the Sioux treaties of 1851 and 1858, because the loyal/friendly Sioux had not breached their part of the treaties, by their actions during the 1862 uprising.

A treaty is a contract between sovereign nations.[68]   The Supreme Court has expressly held that an Indian treaty is "not a grant of rights to the Indians, but a grant of rights from them."[69]   The purpose of an Indian treaty was not to give rights to the Indians but to remove rights they possessed. Thus, Indians have a great many rights, in addition to those described in treaties. In fact, any right not expressly extinguished by a treaty or federal statute is reserved to the tribe.[70]   This fundamental principle of Indian law is known as the "reserved rights" doctrine.

The Fifth Amendment to the Constitution states the Congress may not deprive anyone of "private property...without just compensation". The Supreme Court has held that Indian treaty rights are a form of private

---

[68] U.S. Const. Art. II, sec. 2, cl. 2.
[69] *U.S. v. Winans*, 198 U.S. 371 (1905).
[70] *Menominee Tribe v. U.S.*, 391 U.S. 404 (1968).

property protected by the Just Compensation Clause.[71]  Consequently,

Indians must receive compensation whenever Congress abrogates their

treaty rights.  Realistically, however, a monetary award usually provides

little compensation to people who have lost their homes or sacred lands.[72]

Under the United States Constitution, Article II, Section 2, Clause 2,

Treaties are, along with acts of Congress and the Constitution itself,

considered to be "the supreme law of the land."  As such, "judges in every

state shall be bound thereby." A "treaty, after being executed and ratified by

the proper authorities of the government, becomes the supreme law of the

land, and the courts can no more go behind it for the purpose of annulling its

effect and operation, then they can go behind an Act of Congress."[73]

A cardinal rule in the interpretation of Indian treaties is that they are

to be interpreted in accordance with the meaning understood by the

signatory Indians.[74]  In connection with such interpretation, all ambiguities

are to be resolved in favor of the Indians.[75]

---

[71] *Shoshone Tribe v. U.S.*, 299 U.S. 476, 497 (1937); *Menominee, Id.*, p. 413.
[72] See, *U.S. v. Sioux Nation of Indians*, 448 U.S. 371 (1980).
[73] *Fellows v. Blacksmith*, 60 U.S. 366, 372 (1856).
[74] *Jones vs. Meehan*, 175 U.S. I (1899); *Trulee v. Washing*, 315 U.S. 681 (1942).
[75] *Worcester v. Georgia*, 31 U.S. 515 (1832); *Winters v. United States*, 207 U.S. 564 (1908).

Congress cannot, consistent with due process, abrogate a treaty without compensation or destroy rights which have previously been acquired under the treaty. Thus, rights that have vested are not subject to being extinguished.[76]    Abrogation of a treaty must be narrowly construed, with any abrogation doing prejudice to the Indian signatories being disfavored.[77]

The United States Supreme Court has been very hesitant to find statutory abrogation of Indian treaties. The Court has continually stated that "(T)he intention to abrogate or modify a treaty is not to be lightly imputed to the Congress."[78]

The Act of 1863 does not purport to abrogate the 1837, 1851, and 1858 treaties in all respects. Rather, it directs abrogation to "lands and rights of occupancy within the State of Minnesota" and existing monetary claims ("all annuities and claims heretofore accorded.") Surviving are trust responsibilities, tribal recognition, as well as provisions for assertions of individual rights, privileges and remedies.

In *Menominee, supra,* the Government argued, as it does herein, that abrogation language in a Congressional statute of broad impact should be

---

[76] *Choate v. Trapp*, 224 U.S. 665 (1912).

[77] *Bennett County, South Dakota v. United States*, 394 F.2d 8 (8th Cir. 1968).

[78] *Menominee Tribe of Indian v. United States*, 391 U.S. 404 (1968); *Pigeon River Co. v. Charles W. Cox, Ltd.*, 291 U.S. 138 (1934); *Squire v. Capoeman*, 351 U.S. 1 (1956).

seen as preemptive of all treaty rights. The United States Supreme Court

disagreed, finding that the "termination of federal supervision over the

property and members of the Tribe" and transfer of the title of the property

of the Tribe to a newly created County existing under State law, should not

be interpreted as "a backhanded way of abrogating hunting and fishing

rights" guaranteed by the Wolf River Treaty of 1854. The Menominee

Termination Act of 1954 provided that the laws of the State of Wisconsin

would "apply to the Tribe and members in the same manner as they apply to

other citizens or persons within their jurisdiction". Nevertheless, despite the

Government's argument that the Termination Act stripped the Menominee

of its Reservation and Tribal identity, the Supreme Court held that the

language was not sufficiently specific to evidence a congressional intention

that members of the Menominee Tribe were to forego treaty guarantees and

become subject to Wisconsin Game Laws. Under a similar analysis, the Act

of 1863 cannot be seen as abrogating provisions, apart from those

specifically identified, of preexisting treaties.[79]

Even apart from treaty protection, promises by the United States to

Tribes must be honored and are not modified through "agencies' shifting

---

[79] See also, *Choate v. Trapp,* 224 U.S. 665 (1912).

priorities and competing obligation."[80]    When the United States sold the

10,000 acres of the 1863 Act land to private purchasers, the treaty

obligations were again violated by the Government.  The trial court was

presented the argument that this sale of the 10,000 in this manner also

violated the trust responsibility that the United States had toward these loyal

Sioux Indians, and that the trust obligation recognized in the 1863 Act, Sec.

9, remains unfulfilled to this day.  The 80 acre parcels have never been

provided, nor has there ever been a formal adequate accounting of these lost

treaty rights to those lands, by the government.  Therefore, the trial court

erred in finding that any statute of limitations expired in 1876.  DK 1093, p.

16-23.  Although the CFC always linked the treaty rights to the February 16,

1863 Act, in its decision in Wolfchild VI, the CFC did not even address the

alleged treaty breach by the United States, as to the Loyals.

It is logical to recognize that the congressional acts concerning the

Loyal Sioux subsequent to the 1863 Act were designed to implement the

reserved and self-executing their treaty rights as recognized in Section 9 of

the February 16, 1863 Act.  The Act is self executing as to individual rights,

privileges and remedies for the Loyal Mdewakantons and their heirs.

---

[80] *United States v. Winstar Corporation, et. al*, 518 U.S. 839 (1996).  See
also, *Salazar v. Ramah Navajo Chapter et. al.* 132 S. Ct. 2181 (June 18,
2012).

The self-executing rights to potentate lineal descendancy of the

Mdewakanton Sioux continued to be recognized in the 1868 Treaty of Fort

Laramie.  The Ft. Laramie Treaty of 1868, included Chief Wabasha III, a

direct potentate lineal descendant of Chief Wabasha who signed the 1851

and 1858 treaties as a recognized signatory.  The Fort Laramie Treaty of

1868 also contained self-executing provisions affording rights to assert

individual rights, remedies and privileges to preserve and protect property,

property interests and other personal rights.

Article I of the Fort Laramie Treaty provides:

> If bad men among the whites, or among other people subject to the
> authority of the United States shall commit *any* wrong upon the
> person or property of the Indians, the United States will, upon proof
> made to the agent and forwarded to the Commissioner of Indian
> Affairs at Washington City, proceed at once to cause the offender to
> be arrested and punished according to the law of the United States,
> and also reimburse the injured person for the loss sustained (emphasis
> added). *Id.*

The Fort Laramie Treaty of 1868 postdated the 1863 Act, and is still

good law.[81]  Since Chief Wabasha III was an invited signatory on behalf of

the Mdewakanton/Santee Dakota Sioux, this indicates that Congress

continued to recognize the Mdewakanton Sioux still held individual rights

and interests including potentate lineal descendancy rights.  If the

---

[81] *United States v. Sioux Nation of Indians,* 1448 U.S. 371 (1980); *Elk v.
United States,* 87 Fed.Cl. 70 (2009).

Mdewakantons had no existing self-executing potentate rights after Congress passed Section 1 of the 1863 Act, Chief Wabasha III would not have been invited to sign the 1868 Treaty of Ft. Laramie on their behalf.

It is clear that the individual self-executing rights of the earlier treaties (1837, 1851, and 1858) were existent and preserved, particularly as to the loyals, even following the 1863 Act of Congress. The 1868 Ft. Laramie Treaty recognized the important right of potentate and individual lineal descendancy of the Mdewakanton Sioux. The canons of construction must favor the rights of the individual Indian if any ambiguity exists as to treaty or congressional statute interpretation, as here.[82]

The 1837, 1851 and 1858 Treaties predated the 1934 Indian Reorganization Act, as did the 1868 Fort Laramie Treaty. The individual, self-executing treaty rights continued to exist through lineage and heirship, and survived the passage of later acts of Congress not explicitly abrogating these rights, including the 1934 IRA, and the later acts leading to the formation of the Shakopee Mdewakanton Dakota Sioux Community, the Lower Sioux Indian Community and the Prairie Island Community.[83]

---

[82] *Washington v. Washington State Commercial Passenger Fishing Vessel Assn.,* 443 U.S. 658, 675-76 (1979); *Minnesota v. Mile Lacs Band of Chippewa Indians,* 562 U.S. 172, 200 (1999); *United States v. Dion,* 476 U.S. at 740.

[83] *See Elk v. United States,* 87 Fed.Ct. 70 (2009).

The Government's failure to provide a band with its full treaty land entitlement gives rise to lawful obligations to make up the shortfall and to compensate the Plaintiffs-Intervenors for loss of use. There are three possible bases in law for such a conclusion. The Government's failure to deliver the loyal Sioux' entire land entitlement may be a breach of the terms of the treaty itself. Second, it is arguable that this failure is also a violation of the general trust-like responsibilities that the United States owes the loyals and their heirs in respect of matters concerning Indian title, and is therefore a breach of fiduciary duty. Third, the Government's conduct giving rise to the shortfall may, in certain cases, substantiate a separate cause of action based upon breach of fiduciary duty.

Although it may be said that the relationship between the United States and the loyal Sioux is fiduciary in nature, in the context of treaty land entitlement, the government's primary obligation to the Indians arises not from the fiduciary nature of the relationship, but rather from the fact that the people of the United States, as represented by their government, entered into a solemn treaty relationship with these aboriginal people. The United States as a party to that relationship has an obligation to live up to the terms of the treaty. It is without question that such treaty covenants are of sufficient

importance in modern American society that they stand on their own as *sui generis* obligations independent of the concept of fiduciary obligation for their legitimacy or enforceability. To suggest that the treaties are reliant on the vehicle of fiduciary duty to make them enforceable would fail to accord them the historical and constitutional importance that they have acquired in the United States. The treaties are fundamental in defining the nature of the relationship between the United States and aboriginal people.

## CONCLUSION

WHEREFORE, the Plaintiff-Intervenors request this Court take the actions requested in their Principal Brief, which are restated herein by reference, for the reasons stated in their Principal and Reply briefs and for such other and further reasons as this Court deems just, proper and equitable.

Respectfully Submitted,

R. Deryl Edwards MO # 21875
606 S. Pearl
Joplin, MO 64801-2582
(417) 624-8099 (Telephone)
(417) 624-1965 (Facsimile)
deryled@swbell.net
ATTORNEY FOR THE
ROBERTSON LINEAL
DESCENDANTS

s/ Gary J. Montana
Gary J. Montana
Montana & Associates
N. 12923 N. Prairie Rd.
Osseo, WI 54758
Telephone No. 715.597.6464
ATTORNEY JULIA DUMARCE GROUP

s/ Robin L. Zephier
Robin L. Zephier
ABOUREZK & ZEPHIER, P.C.
P.O. Box 9460
Rapid City, SD 57709
(605) 342-0097
ATTORNEY FOR ZEPHIER PLAINTIFFS

s/ Barry Hogan
Barry Hogan
Attorney, CPCU
RENAUD COOK DRURY
MESAROS, PA
One North Central, Suite 900
Phoenix, Arizona 85004-4417
ATTORNEY FOR
RENAUD JOHN DOES a/k/a
John Does 1-433

s/ Randy V. Thompson
Randy V. Thompson, #122506
Robert J. Leighton, Jr., #220735
5001 American Blvd. West, Suite 595
Bloomington, MN 55437
Telephone:    952-405-7171
Fax:              952-224-0647
ATTORNEYS FOR
PLAINTIFF/INTERVENORS
ABRAHAMSON GROUP

s/ Kelly Hope Stricherz
Kelly Hope Stricherz

213 Forest Ave
PO Box 187
Vermillion, SD 57069
605.624.3333
ATTORNEY FOR INTERVENORS'
MOZAK GROUP

s/ Scott A. Johnson
Scott A. Johnson (#124606)
Todd M. Johnson (# 52061)
JOHNSON LAW GROUP, LLC
10580 Wayzata Blvd., Suite 250
Minnetonka, MN 55305
ATTORNEYS FOR THE FELIX,
COURSOULLE, PRESCOTT AND
TAYLOR GROUPS OF PLAINTIFFS

s/ Jack Pierce
Jack E. Pierce
Bernick Lifson, P.A.
5500 Wayzata Blvd.,
Suite 1200
Minneapolis, MN 55416
(763) 546-1200
Fax: (763) 546-1003
Email: jpierce@bernicklifson.com
ATTORNEY FOR THE GODOY ET AL.
INTERVENOR APPELLEES/CROSS-
APPELLANTS

s/ Larry B. Leventhal
Larry B. Leventhal
Larry Leventhal & Associates
319 Ramsey Street
St. Paul, MN 55102
(612) 333-5747
Fax: (612) 344-1126
Email: lleven6001@aol.com
ATTORNEY FOR THE INTERVENOR
BURLEY PLAINTIFFS

s/ Creighton Thurman
Creighton A. Thurman
Creighton A. Thurman, Attorney at Law
P.O. Box 897
Yankton, SD 57078
(605) 260-0623
Fax: (605) 260-0624
Email: thurmanlaw@iw.net
ATTORNEY FOR THE COURNOYER,
ROBINETTE, KIMBELL AND WANNA
ET AL. INTERVENOR PLAINTIFFS

## PROOF OF SERVICE

I hereby certify that two copies of the foregoing Appellee-Cross Appellants

Reply Brief have been served by United States mail or provided by

electronic transmittal, this 4th day of January, 2013, upon the following

counsel of record:

John L. Smelzer, Attorney
U.S. Department of Justice
ENRD Appellate Section
PHB Mailroom 2121
601 D. Street, N.W.
Washington DC 20026

Jody Schwarz, Attorney
U.S. Department of Justice
General Litigation Section
ENRD
601 D. Street, N.W.
Washington DC 20026

Kelly Stricherz, Esq.
PO Box 187
Vermillion, SD 57069

Garrett Horn, Esq.
PO Box 886
Yankton, SD 57078

Creighton A. Thurman, Esq.
PO Box 897
Yankton, SD 57078

Robin L. Zephier, Esq.
PO Box 9460
Rapid City, SD 57709

Elizabeth Walker, Esq.
Walker Law LLC
429 North Saint Asaph Street
Alexandria, VA 22314

Larry B. Leventhal
Larry Leventhal & Associates
319 Ramsey Street
St. Paul, MN 55102

Wood Foster, Esq.
Siegel, Brill, Greupner, Duffy & Foster
1300 Washington Square
100 Washington Avenue South
Minneapolis, MN 55401

Nicole Nachtigal Emerson, Esq.
Lynn, Jackson, Schultz, & Lebrun
PO Box 2700
141 North Main Ave Suite 900
Sioux Falls SD 57101-3020

Douglas R. Kettering
Kettering Law Office
714 Douglas Ave.
Yankton, SD 57078

Scott A. Johnson, Esq.
Johnson Law Group, LLP
10580 Wayzata Boulevard, Suite 250
Minnetonka, MN 55305

Barry P. Hogan
Renaud, Cook, et al.
1 North Central Avenue, Suite 900
Phoenix, AZ 85004

Randy V. Thompson, Esq.
5001 American Blvd. West
Ste. 595
Bloomington, MN 55437

Gary J. Montana, Esq.
12923 N. Prairie Rd.
Osseo, WI 54758

Jack Pierce
6040 Earle Brown Dr., Suite 420
Minneapolis, MN 55430

Phillip W. Morgan, Esq.
758 7th St
Britton, SD 57430

Bernard Rooney, Esq.
84 Park Avenue
Larchmont, NY 10538

Brian L. Radke, Esq.
Radke Law Office, PC
3500 S. 1st Ave. Circle, Suite 201
Sioux Falls, SD 57105

Lawrence H. Crosby, Esq.
2277 Highway 36W
Suite 234E
St. Paul, MN 55113-3808

Sam Killinger, Esq.
522 4th St. Suite #300
Sioux City IA  51101

Eric G. Kaardal
Mohrman & Kaardal, P.A.
33 South Sixth St., Suite 4100
Minneapolis, MN  55402

Francis Elaine Felix
826-21st Avenue SE
Minneapolis, MN  55414

Phillip Baker-Shenk
Holland & Knight, LLP.
2099 Pennsylvania Ave. NW Suite 100
Washington DC  20006


s/ R. Deryl Edwards.
R. Deryl Edwards
January 4, 2013

## CERTIFICATE OF COMPLIANCE
### (Nos. 2012-5035, -5036, -5043)

I certify that:

1.    Pursuant to Fed. R. App. P. 32(a)(7)(C), that the attached Appellee-Cross Appellant Reply Brief is:

Proportionally spaced, has a typeface of 14 points or more in Times New Roman font and contains 6,949 words (exclusive of the table of contents, table of authorities, addenda, and certificates of counsel).

Date: January 4, 2013                    s/ R. Deryl Edwards

                                         R. Deryl Edwards

# ADDENDUM

## TABLE OF CONTENTS

February 16, 1863 Act

March 3, 1863 Act

Anne Kaplan and Marilyn Ziebarth, *Making Minnesota Territory: 1849-1858*, 1999 Minnesota Historical Society Press, page 7 (Map)

1859 Map of Sioux Reserve – Bureau of Indian Affairs

1861 Map of the Ceded Part of the Dakota Territory

Map of Sections 5, 6, 7, 8, and 9, Township 112, Range 34, Renville and Redwood Counties, Minnesota

Act of Feb. 16, 1863, ch. 37, 12 Stat. 652, 652-4 ("February 1863 Act")

SEC. 4. And be it further enacted, That the money arising from said sale shall be invested by the Secretary of the Interior for the benefit of said Indians in their new homes, in the establishing them in agricultural pursuits: Provided, That it shall be lawful for said Secretary to locate any meritorious individual Indian of said bands, who exerted himself to save the lives of the whites in the later massacre, upon said lands on which the improvements are situated, assigning the same to him to the extent of eighty acres, to be held by such tenure as is or may be provided by law: And provided, further, That no more than eighty acres shall be awarded to any one Indian, under this or any other act.
* * *

SEC. 9. And be it further enacted, That the Secretary of the Interior is hereby authorized to set apart of the public lands, not otherwise appropriated, eighty acres in severalty to each individual of the before-named bands who exerted himself in rescuing the whites from the late massacre of said Indians. The land so set apart shall not be subject to any tax, forfeiture, or sale, by process of law, and shall not be aliened or devised, except by the consent of the President of the United States, but shall be an inheritance to said Indians and their heirs forever.
* * *

Act of Mar. 3, 1863, ch. 119, 12 Stat. 819 ("March 1863 Act")
Be it enacted * * *, That the President is authorized and hereby directed to assign and set apart for the Sisseton, Wahpaton, Medawakanton [sic.], and Wahpakoota bands of Sioux Indians a tract of unoccupied land outside of the limits of any state, sufficient in extent to enable him to assign to each member of said bands (who are willing to adopt the pursuit of agriculture) eighty acres of good agricultural lands, the same to be well adapted to agricultural purposes.

SEC. 2. And be it further enacted, That the several tracts of land within the reservation of the said Indians, shall be surveyed, under the direction of the commissioner of the general land office, into legal subdivisions to conform to the surveys of the other public lands. And the Secretary of the Interior shall cause each legal subdivision of the said lands to be appraised * * * [a]nd in each instance where there are improvements upon any legal subdivision of said lands, the improvements shall be separately appraised. But no portion of the said lands shall be subject to preemption, settlement, or location under the Acts of Congress, unless the party preempting, settling upon, or locating any

portion of said lands shall pay therefor the full appraised value thereof, including the value of the said improvements * * *.

SEC. 3. And be it further enacted, That after the survey of the said reservations the same shall be open to preemption, entry, and settlement in the same manner as other public lands: Provided, That before any person shall be entitled to enter any portion of the said lands by preemption or otherwise * * *, he shall become an actual bona fide settler thereon, * * * and shall pay, within the term of one year from the date of his settlement, the full appraised value of the land * * *. And the portions of the said reservations * * * not settled upon, as aforesaid, may be sold at public auction * * *.



INDIAN
LAND
CESSIONS
and
RESERVATIONS
to 1858

1854–89

UNCEDED

UNCEDED

Ojibwe cessions

Ojibwe reservations

Dakota cessions

Dakota reservations

Winnebago
(Ho-Chunk)
reservations

SIOUX RESERVE

HUTTON and SNOW.

SURVEYORS.

1882.

MAP OF THE CEDED PART
OF
DAKOTA TERRITORY
Showing also portions of
MINNESOTA, IOWA & NEBRASKA.

Compiled by B. M. SMITH and A. J. HILL, 1861.

Scale 1,000,000 of Nature

Statute miles to 1 inch.

