Case Nos. 2012-5035, -5036, -5043 (consolidated)
CORRECTED

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

SHELDON PETERS WOLFCHILD, ERNIE PETERS LONGWALKER, SCOTT
ADOLPHSON, MORRIS J. PENDLETON, BARBARA FEEZOR BUTTES,
WINIFRED ST. PIERRE FEEZOR, AUTUMN WEAVER, ARIES BLUESTONE
WEAVER, ELIJAH BLUESTONE WEAVER, RUBY MINKEL, LAVONNE A.
SWENSON, WILLIS SWENSON, AARON SWENSON, BEVERLY M. SCOTT,
LILLIAN WILSON, MONIQUE WILSON, SANDRA COLUMBUS GESHICK,
CHERYL K. LORUSSO, JENNIFER K. LORUSSO, CASSANDRA
SHEVCHUK, JASON SHEVCHUK, JAMES PAUL WILSON, EVA GRACE
WILSON, BENITA M. JOHNSON, and KEVIN LORUSSO,

Plaintiffs-Cross Appellants,

(caption continued on following pages)

Appeal from the United States Court of Federal Claims in
Consolidated Case Nos. 03-CV-2684 and 01-CV-0568, Judge Charles F. Lettow

**BRIEF OF AMICI CURIAE SHAKOPEE MDEWAKANTON SIOUX
COMMUNITY, PRAIRIE ISLAND INDIAN COMMUNITY, AND LOWER
SIOUX INDIAN COMMUNITY IN SUPPORT OF THE UNITED STATES'
ANSWERING AND REPLY BRIEF**

Philip Baker-Shenk (D.C. Bar No. 386662)
Holland & Knight LLP
800 – 17th Street, N.W., Ste. 1100
Washington, D.C.  20006
Telephone:  202-457-7031
Facsimile:  202-955-5564

Attorney for the Shakopee Mdewakanton
Sioux Community, Prairie Island Indian
Community, and Lower Sioux Indian
Community

February 19, 2013

(caption continued from preceding page)

and

ANITA D. WHIPPLE et al., Descendants of Lucy Trudell,
BONNIE RAE LOWE, et al., Descendants of Joseph Graham, et al.,
LENOR ANN SCHEFFLER BLAESER, et al., Descendants of John Moose, and
MARY BETH LAFFERTY, et al.,

Plaintiffs,

and

COURSOLLE DESCENDANTS and ROCQUE AND TAYLOR
DESCENDANTS,

Plaintiffs,

and

DEBORAH L. SAUL, LAURA VASSAR, et al., LYDIA FERRIS et al.,
DANIEL M. TRUDELL, et al., and ROBERT LEE TAYLOR, et al.,

and DAWN HENRY,

Plaintiffs,

and

VERA A. ROONEY, et al.,

Plaintiff,

and

DANNY LEE MOZAK,

Plaintiff-Cross Appellant,

and

DAWN BURLEY, et al.,

Plaintiff-Cross Appellant,

and

(caption continued from preceding page)

HARLEY ZEPHIER, SR.,

Plaintiff-Cross Appellant,

and

JULIA DUMARCE, et al.,

Plaintiff-Cross Appellant,

and

RAYMOND COURNOYER, SR., et al., JERRY ROBINETTE, et al.,
SANDRA KIMBELL, et al., CHARLENE W. ANNA, et al.,
and LESLIE LEE FRENCH, et al.,

Plaintiff-Cross Appellants,

and

KRISTINE ABRAHAMSON,

Plaintiff-Cross- Appellant,

v.

UNITED STATES,

Defendant-Appellant.

## CERTIFICATE OF INTEREST

The amici parties to this brief are the Shakopee Mdewakanton Sioux Community, the Prairie Island Indian Community, and the Lower Sioux Indian Community (collectively, the "Mdewakanton Tribes" or "Tribes"). The Mdewakanton Tribes are federally recognized Indian tribes.

The law firms and attorneys who appeared on behalf of the Mdewakanton Tribes in the court below are the same attorneys listed on this motion.

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES AND STATEMENT OF JURISDICTION ............................................................................................. vii

STATEMENT OF IDENTITY OF AMICI CURIAE ............................................. 1

INTRODUCTION ................................................................................................. 2

LEGAL ISSUE ADDRESSED BY THE AMICI ...................................................... 4

STATEMENT OF THE CASE .............................................................................. 4

FACTS RELEVANT TO ARGUMENT OF AMICI ............................................... 5

I.    THE THREE MDEWAKANTON TRIBES ARE THE MODERN DAY SUCCESSORS TO THE HISTORIC MDEWAKANTON INDIANS IN MINNESOTA ......................................... 5

II.   THE GENESIS OF THE FROZEN FUNDS IN THE 1944 ACT .................. 8

III.  THE DEPARTMENT'S CONSIDERATION OF THE DISTRIBUTION OF THE FROZEN FUNDS AND PASSAGE OF THE 1980 ACT .................................................................................... 10

SUMMARY OF ARGUMENT ............................................................................ 14

ARGUMENT ...................................................................................................... 16

I.    THE PLAINTIFFS ADMIT THEY ARE NOT AN IDENTIFIABLE GROUP OF INDIANS AND THEY HAVE NO ROLE IN THE MDEWAKANTON TRIBES' EXCLUSIVE CONTROL OF TRIBAL MEMBERSHIP AND RESERVATION RESOURCES .................................................... 16

      A.    The Plaintiffs Are Not An Identifiable Group Of Indians .................. 16

      B.    Plaintiffs' Unsupported Allegations Regarding The Mdewakanton Tribes' Membership And Federal Recognition Are Nonjusticiable ....................................... 19

II.    THE DEPARTMENT'S DECISION TO DISTRIBUTE THE
       FROZEN FUNDS TO THE MDEWAKANTON TRIBES
       WAS A CORRECT AND A REASONABLE EXERCISE OF
       AGENCY DISCRETION ............................................................................ 20

       A.    Chevron Deference Is Appropriate .................................................... 21

       B.    The Department's Distribution Decision Was The Result
             Of Careful Consideration And Informed Judgment ........................... 24

CONCLUSION ..................................................................................................... 29

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

Apodaca v. Silvas,
    19 F.3d 1015 (5th Cir. 1994) ............................................................... 19

Barnhart v. Walton,
    535 U.S. 212 (2002) ................................................................... 23, 28

Chevron U.S.A., Inc. v. NRDC, Inc.,
    467 U.S. 837 (1984) ............................................................... passim

In re Sac & Fox Tribe,
    340 F.3d 749 (8th Cir. 2003) ............................................................. 20

Martinez v. Southern Ute Tribe,
    249 F.2d 915 (10th Cir. 1957) .......................................................... 19

N. Colo. Water Conservancy Dist. v. United States,
    88 Fed. Cl. 636 (Fed. Cl. 2009) ....................................................... 22

NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,
    513 U.S. 251 (1995) ........................................................................ 23

Nero v. Cherokee Nation of Oklahoma,
    892 F.2d 1457 (10th Cir. 1989) ...................................................... 20

Odow v. United States,
    51 Fed. Cl. 425 (Fed. Cl. 2001) ....................................................... 21

Ordinance 59 Ass'n. v. United States DOI Sec'y,
    163 F.3d 1150 (10th Cir. 1998) ...................................................... 19

Red Lake Band of Chippewa Indians v. Barlow,
    834 F.2d 1393 (8th Cir. 1987) .................................................... 27, 28

Samish Indian Nation v. United States,
    419 F.3d 1355 (Fed. Cir. 2005) ..................................................... 19

Skidmore v. Swift & Co.,
    323 U.S. 134 (1944) ............................................................. 22, 24, 28

iii

Smith v. Babbitt,
    100 F.3d 556 (8th Cir. 1996) ............................................................... 19

Tee-Hit-Ton Indians v. United States,
    128 Ct. Cl. 82 (1954)........................................................................ 18

Udall v. Tallman,
    380 U.S. 1 (1965) ............................................................................. 28

United States v. Mead Corp.,
    533 U.S. 218 (2001) .................................................................... 21, 23

Wolfchild v. United States,
    62 Fed. Cl. 521 (Fed. Cl. 2004) ("Wolfchild I"). ................................... 5

Wolfchild v. United States,
    559 F.3d 1228 (Fed. Cir. 2009) ("Wolfchild VI")...................... passim

Wolfchild v. United States,
    96 Fed. Cl. 302 (Fed. Cl. 2010) ("Wolfchild VII")..................... passim

Wolfchild v. United States,
    101 Fed. Cl. 54 (Fed. Cl. 2011) ("Wolfchild VIII")........................... 16

Zuber v. Allen,
    396 U.S. 168 (1969) ........................................................................ 28

**FEDERAL STATUTES**

25 U.S.C. § 155 .......................................................................... passim

28 U.S.C. § 2501 ................................................................................. 4

Act of June 29, 1888, Chapter 503, 25 Stat. 217 ...................................... 3

Act of Mar. 2, 1889, Chapter 412, 25 Stat. 980 ....................................... 3

Act of Aug. 19, 1890, Chapter 807, 26 Stat. 336 ..................................... 3

Act of June 13, 1944, Pub. L. No. 78-335, 58 Stat. 274 ........................... 5

    In general ...............................................................................8-9, 25

Act of December 19, 1980, Pub. L. No. 96-557, 94 Stat. 3262 ................. 2

In general ........................................................................................ passim

Administrative Procedure Act, 5 U.S.C. §§ 551-59, 701-706 ................................ 19

Federally Recognized Indian Tribe List Act, Pub. L. 103-454, 108 Stat. 4791 ...... 20

Indian Gaming Regulatory Act, 25 U.S.C. § 2710, et seq. ...................................... 1

Indian Reorganization Act of 1934, 25 U.S.C. § 461, et seq. ................................... 1

In general ........................................................................................ 5, 8

Indian Tucker Act, 28 U.S.C. § 1505 ................................................. 3, 18

Pub. L. No. 92-555, 86 Stat. 1168 (Oct. 25, 1972) ................................... 6

Tucker Act, 28 U.S.C. § 1491 ................................................................. 3

**REGULATIONS**

25 C.F.R. § 115.002. ........................................................................... 27

47 Fed. Reg. 34,050 (Aug. 5, 1982) ..................................................... 13

77 Fed. Reg. 47,873 (Aug. 10, 2012) ..................................................... 1

**TREATIES**

Treaty of Sept. 23, 1805 ....................................................................... 6

Treaty of July 15, 1830, 7 Stat. 328 ..................................................... 6

Treaty of Sept. 29, 1837, 7 Stat. 538 ..................................................... 6

Treaty of Aug. 5, 1851, 10 Stat. 954 ..................................................... 6

**OTHER AUTHORITIES**

H.R. 7147 ......................................................................................... 5, 13

H.R. Rep. No. 92-1369 (1971) ............................................................. 7

H.R. Rep. No. 96-1409 (1979) ........................................................ 5, 12, 13

H. R. Rep. No. 99-298 (1985) ............................................................. 7

S. Rep. No. 91-1339 (1970) ........................................................................ 6

S. Rep. No. 96-1047 (1980) ................................................................. 12, 13

S. Rep. No. 99-115 (1985)......................................................................... 7

## STATEMENT OF RELATED CASES
## AND STATEMENT OF JURISDICTION

The Mdewakanton Tribes adopt the Statement of Related Cases and the

Statement of Jurisdiction of the United States.

## STATEMENT OF IDENTITY OF AMICI CURIAE

The Amici Curiae filing this brief in support of the United States are the Shakopee Mdewakanton Sioux Community, the Prairie Island Indian Community, and the Lower Sioux Indian Community (collectively, the "Mdewakanton Tribes" or "Tribes").[1] The Mdewakanton Tribes are federally recognized Indian tribes organized pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 461, et seq. ("IRA"). See 77 Fed. Reg. 47,873 (Aug. 10, 2012) (list of recognized tribes).

The Mdewakanton Tribes have a vital interest in this matter. Contrary to Plaintiffs' arguments, the Mdewakanton Tribes are solely entitled to govern their reservations, and obtain every revenue-producing benefit from them, including gaming-related revenues under the Indian Gaming Regulatory Act, 25 U.S.C. § 2710, et seq. The Mdewakanton Tribes were the proper recipients of the so-called "frozen funds" held by the United States in a Bureau of Indian Affairs ("BIA") Proceeds of Labor account.

The governments of the Mdewakanton Tribes have authorized this amicus filing in support of the United States' Answering and Reply Brief responding to Plaintiffs/Cross-Appellants' cross-appeal and seeking reversal of the Court of

---

[1] Other than the Mdewakanton Tribes and their counsel, no party's counsel authored this brief in whole or in part and no party or party's counsel or other person contributed money intended to fund preparing or submitting this brief.

Federal Claims' judgment on the "use restriction" claims, affirmance of the Court

of Federal Claims' dismissal of all other claims, and remand for entry of final

judgment in favor of the United States on all claims.

## INTRODUCTION

This action is brought by some 20,000 alleged lineal descendants of the few

hundred Mdewakanton Indians present in, or moving to, Minnesota in 1886. The

vast majority of the Plaintiffs are not members of the three Mdewakanton Tribes.[2]

The genesis of this appeal involves a novel "statutory use restriction"

monetary claim to a principal amount of approximately $60,000, which was frozen

in BIA accounts from 1975 to 1981 while the agency determined to whom it

should be distributed. See Wolfchild v. United States, 559 F.3d 1228, 1240 (Fed.

Cir. 2009) ("Wolfchild VI"). These funds were properly distributed by the United

States to the Mdewakanton Tribes in the years immediately following the passage

of the Act of December 19, 1980, Pub. L. No. 96-557, 94 Stat. 3262 ("1980 Act").

Plaintiffs and the Court of Federal Claims ("CFC") rely heavily on this

Court's solitary reference to the phrase "statutory use restriction," which it used to

---

[2] The Plaintiffs concede that, "virtually all the members of the Shakopee and
Prairie Island Communities have refused to join the lawsuit despite the Court [of
Federal Claims] issuing notice to potential plaintiffs." Plaintiffs' Motions for
Court to Issue Summonses to Communities and Their Members Pursuant to 41
U.S.C.A. 114(b) and for Partial Summary Judgment Based on United States'
Breaches of Fiduciary Duties," (Docket No. 102), Mar. 3, 2006, at p. 30.

distinguish the Appropriations Acts of 1888, 1889, and 1890[3] from a law that carried trust obligations. See Wolfchild VI, 559 F.3d at 1240. Implausibly, the Plaintiffs treated this phrase as an invitation to take a second crack at creating duties synonymous with trust duties. On remand, under the guise of a statutory use restriction, Plaintiffs asserted claims to the Tribes' land base and gaming revenues, and sought to challenge or set aside the Tribes' federal recognition, provisions in the Tribes' Constitutions, and Resolutions and Ordinances on tribal membership. See Wolfchild Sixth Amended Complaint ("Sixth Am. Compl.") (Docket No. 736-1), July 9, 2010 at ¶¶ 73, 94-97, 103-105, 113-116.

The CFC properly turned aside these new claims. See generally Wolfchild v. United States, 96 Fed. Cl. 302 (Fed. Cl. 2010) ("Wolfchild VII"). However, the CFC erred on the issue which initiated the remand, the early-1980s disbursement to the three Mdewakanton Tribes of the $60,000 in frozen funds (with interest) generated from the lands known as "1886 lands," purchased by the Department of the Interior ("Department") with the appropriations from 1888 – 1890.

The Mdewakanton Tribes fully agree with the Government's arguments that the Appropriations Acts created no money-mandating duty, precluding Tucker Act, 28 U.S.C. § 1491, or Indian Tucker Act, 28 U.S.C. § 1505, jurisdiction, and that

---

[3] See Act of June 29, 1888, Ch. 503, 25 Stat. 217; Act of Mar. 2, 1889, Ch. 412, 25 Stat. 980; Act of Aug. 19, 1890, Ch. 807, 26 Stat. 336.

the statute of limitations in 28 U.S.C. § 2501 independently bars Plaintiffs' claims to the frozen funds. However, should this Court reach the merits of the Department's decision to distribute the frozen funds to the Mdewakanton Tribes, that decision was a permissible and correct interpretation of the Department's authority under the 1980 Act and other applicable law.

## LEGAL ISSUE ADDRESSED BY THE AMICI

The Plaintiffs' disparaging and extra-record allegations pertaining to the Mdewakanton Tribes' recognition and membership cannot entitle them to share in the frozen funds or any other reservation revenues. If the Court reaches the merits, the Department's decision to distribute the frozen funds to the three Mdewakanton Tribes was correct as they are the federally recognized successors to the historic Mdewakanton Indians in Minnesota. The Department was not obligated under any law to distribute the frozen funds to unknown, individual descendants. Certainly, the Department's decision to distribute the frozen funds to the Mdewakanton Tribes is entitled to deference as a permissible exercise of agency discretion.

## STATEMENT OF THE CASE

The Mdewakanton Tribes adopt the United States' Statement of the Case.

4

## FACTS RELEVANT TO ARGUMENT OF AMICI

I.    **THE THREE MDEWAKANTON TRIBES ARE THE MODERN DAY SUCCESSORS TO THE HISTORIC MDEWAKANTON INDIANS IN MINNESOTA**

The Mdewakanton in Minnesota took advantage of the IRA to undertake a government-to-government relationship with the United States and reorganize as three tribes—the Prairie Island Indian Community and the Lower Sioux Indian Community organized in 1936, and the Shakopee Mdewakanton Sioux Community organized in 1969. See Wolfchild v. United States, 62 Fed. Cl. 521, 529 (Fed. Cl. 2004) ("Wolfchild I").

Congress has repeatedly identified the Mdewakanton Tribes as the successors to the historical Mdewakanton Indians. Twice this has been done in connection with the 1886 lands themselves, in 1944 and in 1980. In 1944, Congress passed legislation entitling the Mdewakanton Tribes to benefit from the sale of a portion of the 1886 lands. See Act of June 13, 1944, Pub. L. No. 78-335, 58 Stat. 274 ("1944 Act"). See also the 1980 Act's legislative history, H.R. Rep. No. 96-1409 (1979) at 2 ("H.R. 7147 provides that the title of the United States to certain lands held for the benefit of certain Mdewakanton Sioux or their

descendants will be held in trust for the three existing tribal entities of the Mdewakanton Sioux.") (CA 1078, 1079).[4]

In other legislative contexts, Congress has identified the Mdewakanton Tribes as among the successors to the historic bands of Minnesota Sioux Indians. In 1972 Congress enacted legislation to enable distribution of Indian Claims Commission judgments concerning treaty-based claims asserted by the Mdewakanton and Wahpakoota Tribes against the United States. These tribes had claims for compensation for lands taken from them by the United States following the treaty of Sept. 23, 1805 (never ratified), the treaty of July 15, 1830, 7 Stat. 328, the treaty of Sept. 29, 1837, 7 Stat. 538, and the treaty of Aug. 5, 1851, 10 Stat. 954. See Pub. L. No. 92-555, 86 Stat. 1168 (Oct. 25, 1972); see also S. Rep. No. 91-1339 (1970) at 5 (detail on judgments). The legislative history identifies the successor tribes to the Mdewakanton and Wahpakoota Bands:

> [T]he following modern entities, respectively, cited in the bills, form successor tribes. Successors to the combined Mdewakanton-Wahpakoota (known as Lower Council Sioux):
>
> > The Santee Sioux Tribe of Nebraska . . ., The Flandreau Santee Sioux Tribe of South Dakota . . ., **the Lower Sioux, Prairie Island, and Shakopee Sioux Communities of Minnesota.**

---

[4] "CA" refers to the Cross-Appeal Joint Appendix proposed by Plaintiffs. "A" refers to the Joint Appendix proposed by the Government.

Nov. 4, 1971, Dept. of the Interior report to the Comm. on Interior and Insular

Affairs, attached to H.R. Rep. No. 92-1369 (1971) at 7 (emphasis added).

When enacting additional distribution legislation in 1985, Congress again

named the Mdewakanton Tribes as successors to the Mdewakanton Band:

> The Santee Sioux Tribe, Flandreau Santee Sioux Tribe, **Lower Sioux Indian Community, Prairie Island Community and Shakopee Mdewakanton Sioux Community** are the successors to the historical Mdewakanton Sioux . . . . These tribes and communities are full beneficiaries of the Mdewakanton and Wahpekute awards . . . .

S. Rep. No. 99-115 (1985) at 4 (emphasis added). See also H. R. Rep. No. 99-298

(1985) at 1 (containing nearly identical language).[5]

Demographic data confirms the tight bond between the historic

Mdewakanton Indians in Minnesota and the Mdewakanton Tribes. In 1979, prior

to distributing the frozen funds, the BIA conducted a population study of the

Tribes' members. This study found that at least 90% of the members of each of the

three Mdewakanton Tribes were descended from the 1886 Mdewakanton Indians

in Minnesota. See "Portfolio of Information Relative to Special Sioux Lands in

Minnesota Known as 1886 Mdewakanton Lands or Old Assignment Lands"

---

[5] The Santee Sioux Tribe, in Nebraska, and the Flandreau Santee Sioux Tribe, in South Dakota, have no 1886 lands within their reservations.

7

(CA 1618-1871, at 1737-38).  See also Wolfchild VI, 559 F.3d at 1235 n.2 (citing 1979 Report). [6]

## II.   THE GENESIS OF THE FROZEN FUNDS IN THE 1944 ACT

The accounts referred to as the "frozen funds" were first opened by the Department in 1944 to hold proceeds from the sale of certain 1886 lands in Wabasha County, Minnesota.  See Letter from F.G. Hutchinson to E.M. Pryse, February 24, 1955 (CA 2884; A 262).  The 1944 Act directed the sale of a parcel of land purchased with Appropriations Acts funds to the U.S. Fish & Wildlife Service for $1,261.20.  The statute specified that the money from the sale must be credited to "the Mdewakanton and Wahpakoota Bands" (not to individual Indian descendants), "as a full, complete, and perfect extinguishment of all their right, title, and interest in and to" such lands.  Id.  The 1944 Act expressly provided that "[w]here groups of such Indians are organized as tribes under the [IRA]," such tribes were entitled to share in the proceeds generated by the sale.  Id.  The Wabasha County lands sold under the 1944 Act were not at the time assigned to any particular Indians.  See id. (noting that the parcels to be transferred had been acquired "for Indian use, but are no longer used by Indians").  However, the Department did not immediately pay the $1,261.20 to the Mdewakanton Tribes.

---

[6] Plaintiffs concede the authoritativeness of this study.  See Brief of [Wolfchild] Appellees/Cross-Appellants ("Wolfchild App. Br.") (Nov. 13, 2012) at 19 n.92, 40.

In 1968, payment in the amount of $1,217.14 from the sale of the Wabasha County parcel was made to the Prairie Island Indian Community (the original sum having been augmented by interest in the intervening years). See Accountant's Report, Income to Mdewakanton Sioux Lands, Minneapolis Area Office, Field Work Complete February 5, 1975, at 4 (CA 2990-95 at 2992-93; A 267-72 at 269-70) ("1975 Audit Report"). Although payment was not made to the Lower Sioux Indian Community at that time, the BIA expressed the intent to distribute funds from the 1944 Act to both Tribes. See Letter from C. LeBeau to N. Campbell, June 6, 1966 (CA 2904); Letter from P. Krause to G. Robertson, Aug. 2, 1968 (CA 2911-13). The remaining funds from the 1944 land sale were finally distributed in 1981-83 along with the rest of the frozen funds (A 311-31).

In addition to the 1944 Act funds, additional funds were generated from the 1886 lands. In 1975, the BIA directed that "all income from the 1886 lands be identified and set aside in a separate account until such time as certain legal questions are settled." See Letter from M. Boyd to Minneapolis Area Director dated March 21, 1975 (CA 2996; A 290). In accordance with this direction, accountants at the BIA prepared the 1975 Audit Report. The report found a total of $61,725.22 of income from 1886 lands in seven separate Treasury Accounts and Individual Indian Money Accounts. Id. at 2 (CA 2991; A 268). The 1975 Audit Report did not include income derived from 1886 lands that was subject to

9

distribution to individual assignees.  Rather, it focused only on income that had

accumulated without being attributable to any individual assignee.  Id.

The money identified in the 1975 Audit Report was transferred to Treasury

Account 147436 and Treasury Account 147936 (the account for interest on

147436).  Id. at 5 (CA 2994; A 271).  These were the accounts that held the

proceeds from the 1944 sale of the Wabasha County parcel of 1886 lands.  They

were designated "Proceeds of Labor" accounts because they held "miscellaneous

funds derived from Indian reservations."  See 25 U.S.C. § 155.  Such funds could

be "expended in the discretion of the Secretary of the Interior, for the benefit of the

Indian tribes . . .on whose behalf they are collected."  Id.

## III.  THE DEPARTMENT'S CONSIDERATION OF THE DISTRIBUTION OF THE FROZEN FUNDS AND PASSAGE OF THE 1980 ACT

Throughout the 1970s and early 1980s, the Department deliberated

internally and with the representatives and members of the Mdewakanton Tribes

over how to distribute the frozen funds.  On June 27, 1975, the BIA held a meeting

with members from the three Tribes, who voiced varying opinions on how the

frozen funds should be distributed.  See BIA Meeting Minutes (A 292-295) at 2.

Although the BIA sought input from tribal members, the agency made clear that it

would decide how to distribute the funds.  Id. at 3, 4 (A 294, 295).

The Mdewakanton Tribes, through their member-elected councils, adopted

resolutions that expressed how each Tribe wished to see the money distributed, and

10

these resolutions were presented to the Department. There were some differences in the positions taken by the three Tribes. The Prairie Island and Lower Sioux Communities requested that funds identified as accruing from lands located in their communities remain with the respective communities. The Shakopee Community requested that the money be equally divided among the three Mdewakanton Tribes. See Resolutions #1A-24/3/76 (SMSC), No. 33 (PIIC), and No. 27-'76 (LSIC) (A 700-704). In 1980, Prairie Island tribal members who descended from Mdewakanton Indians present in Minnesota in 1886 urged the BIA to "protect" funds accruing from the 1886 lands. Pet. of Prairie Island Sioux Descendants of 1886 Lands, Dec. 16, 1980 (A 705). Their request shows that the descendants were aware that the BIA would determine the disposition of the frozen funds.

The Department had received a plethora of views from the individuals and governments most directly connected to the frozen funds, and had to use its discretion to decide how to distribute the money. That decision was made after passage of the 1980 Act, in which Congress firmly stated that the 1886 lands and revenues there from would henceforth belong to the Mdewakanton Tribes.

In 1976, Congressman Richard Nolan of Minnesota first introduced legislation to place the 1886 lands in trust for the three Mdewakanton Tribes. The Department supported this outcome and made its view known to Congress that money from the lands should follow the land, and be provided to the Tribes:

11

> Each community wants a greater role in management of this property
> and *putting it in trust for them would clarify issues over the rights to
> monetary proceeds or income (from leasing, rights of way, sale of
> gravel and timber, etc.)*, and give each Community Council a more
> direct responsibility in the self determinate aspects of the usage of the
> Mdewakanton Sioux property.

Memorandum dated Dec. 17, 1976, from G. Goodwin, Office of the [BIA] Area

Director, to the Acting Director, Office of Trust Responsibilities at 3 (CA 3026-29

at 3028) (emphasis added). The Department also made Rep. Nolan aware of the

existence of the frozen funds, though the record does not reveal any response from

him. See Letter from R. McLaughlin, [BIA] Area Realty Officer, to Rep. Nolan,

Nov. 6, 1975, at 2 (CA 3009-11 at CA 3010).

In 1978, Congressional field hearings were held on the proposed legislation

to put the 1886 lands into trust for the Mdewakanton Tribes. All tribal members

were given notice of the opportunity to testify on the bill. See Mem. from K. Aho,

Consultant to All Members of the Three Communities, Jan. 10, 1978 (A 707).[7]

The Department played a key role in drafting the 1980 Act. It provided

Congress with an amended bill "in the nature of a substitute" to the bill originally

introduced by Rep. Nolan. H.R. Rep. No. 96-1409 (1979) at 4 (CA 1078-84 at

1081); S. Rep. No. 96-1047 (1980) at 4 (CA 1086-92 at 1089). The Department

---

[7] It was against this backdrop of pending legislation (Rep. Nolan first introduced
his bill in 1976) that the BIA funded the 1979 population study of the
Mdewakanton Tribes. The BIA study was intended to provide background to
policymakers determining the future course of the 1886 lands (CA 1618-1871).

informed Congress that the bill would transfer the 1886 lands to the three

Mdewakanton Tribes:

> The effect of H.R. 7147 would be to change the legal status of the
> ownership of the lands involved, which are now held by the United
> States under the Acts described above for the use of those
> Mdewakanton Sioux Indian individuals who resided in (or were
> enroute to) the State of Minnesota on May 20, 1886, and for their
> descendants. *Under the bill, as noted above, all right, title, and
> interest in such lands would be declared instead to be held by the
> United States in trust for three Minnesota Sioux tribal communities.*

H.R. Rep. No. 96-1409 at 5 (CA 1082) (emphasis added). Word for word, this

portion of the Department's interpretation is adopted by the Senate Report. S. Rep.

No. 96-1047 at 5 (CA 1090).

Furthermore, as required by the 1980 Act, the Department subsequently

published notice in the Federal Register describing in detail the land being

transferred to each of the three Tribes pursuant to the Act. 47 Fed. Reg. 34,050

(Aug. 5, 1982). When such notice was published and the 1886 land was

transferred to the three Mdewakanton Tribes, no one objected.

Soon after passage of the 1980 Act, and after several years of study and

information gathering, the Department distributed the frozen funds in roughly

equal shares to the three Mdewakanton Tribes. On January 9, 1981, the BIA

disbursed $37,835.88 to the Shakopee Mdewakanton Sioux Community. See

Public Voucher, Dec. 30, 1980 (A 311). Identical amounts were distributed to

Prairie Island and Lower Sioux, and smaller amounts to each Tribe in 1983. See

13

Public Voucher, Feb. 23, 1981; Public Voucher, Apr. 21, 1981; 1983 Resolutions

and authorizations for disbursement (A 314-31).[8]

## SUMMARY OF ARGUMENT

On remand to the CFC, Plaintiffs focused much of their attention on federal

recognition and tribal membership issues—principally attacking the Mdewakanton

Tribes. Such issues, as this Court has previously held, are nonjusticiable.

The Plaintiffs admit they are not an identifiable group of Indians, nor are

they an Indian tribe. They are an inchoate group of individuals with no lawful

claim to the frozen funds or any other revenue generated from the Mdewakanton

Tribes' reservations.

Following the passage of the 1980 Act, the Department decided to distribute

the frozen funds to the three Mdewakanton Tribes. This decision was correct and a

reasonable exercise of agency discretion under existing law at the time – the 1980

Act and 25 U.S.C. § 155 – and did not contravene the Appropriations Acts. First,

the Department had conducted a detailed population study in 1979 and determined

that over 90% of the members of the three Mdewakanton Tribes were lineal

---

[8] In their amicus brief filed with this Court when the case was last on appeal, Amici Shakopee Mdewakanton Sioux Community and Prairie Island Indian Community stated that they had been unable to ascertain the final disposition of the frozen funds. See Amicus Brief dated April 18, 2008, Appeal No. 2008-5018 (Docket No. 90) at 18 n.10. In the years since, the Mdewakanton Tribes were able to locate Department records at Ft. Snelling showing the disposition of the funds.

descendants of the 1886 Mdewakanton in Minnesota. Second, pursuant to 25

U.S.C. § 155, the Department possessed statutory discretion to distribute the frozen

funds as it did, and nothing in the Appropriations Acts compelled distribution to

every individual lineal descendant. Third, given that the 1980 Act declared all

right, title, and interest in the 1886 lands to be held in trust for the three

Mdewakanton Tribes, it logically follows that the proceeds from such lands not

attributable to any individual should be distributed to the Mdewakanton Tribes.

Although the CFC found that the 1980 Act was silent with respect to the

distribution of the frozen funds, it erred when it failed to defer to the reasonable

interpretation of the agency charged with carrying out that Act, pursuant to

Chevron U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837 (1984). The Department had

studied the issue and exercised its discretion to disburse the funds "for the benefit

of the Indian tribes . . . on whose behalf they [were] collected." 25 U.S.C. § 155.

The Department's role in drafting the 1980 Act, along with its careful

consideration of the issue of distributing the funds and its discretionary authority

under 28 U.S.C. § 155, compels deference to the agency's decision.

15

## ARGUMENT

**I.    THE PLAINTIFFS ADMIT THEY ARE NOT AN IDENTIFIABLE GROUP OF INDIANS AND THEY HAVE NO ROLE IN THE MDEWAKANTON TRIBES' EXCLUSIVE CONTROL OF TRIBAL MEMBERSHIP AND RESERVATION RESOURCES**

Plaintiffs' efforts to assert any cohesiveness beyond simple joining together on the caption of this lawsuit are futile.  Plaintiffs cannot displace the Mdewakanton Tribes from their reservations, nor usurp the Tribes' exclusive control of their reservations and the economic benefits that flow there from.

### A.    The Plaintiffs Are Not An Identifiable Group Of Indians

Plaintiffs recently informed the CFC that "the court's forthcoming final judgment will be *in favor of individuals – not in favor of a group.*"  Wolfchild v. United States, 101 Fed. Cl. 54, 67-68 (Fed. Cl. 2011) ("Wolfchild VIII") (emphasis in original).  Contrary to the conclusion of the CFC, Plaintiffs are not an identifiable group of Indians able to sue under the Indian Tucker Act.  Id. at 67.

Plaintiffs are certainly not a federally recognized Indian tribe, nor do they live in a common location or act politically as a group.  When this lawsuit began, Plaintiffs alleged that individuals were to come from "four classes of plaintiffs": one Shakopee member; a few Prairie Island members; several Lower Sioux members; and scores of non-members who are allegedly lineal descendants.  Hearing of June 24, 2004, Tr. at 47 – 49 (Attorney Erick Kaardal) (A 712-14).

The fourth category is by far the largest and they were found when the lead Plaintiffs' attorney "went on a tour of the Sioux Reservation[s] in South Dakota and six states and two nations."  Hrg. of June 10, 2005, Tr. at 112 (Attorney Erick Kaardal) (A 719).  Thus, counsel pulled clients from "many of the reservations." Id. at 113.  According to the Wolfchild Plaintiffs, they "have had about 40 public meetings at over 20 different locations with prospective lineal descendants on or in the vicinity of 19 Sioux reservations in six states and two nations.

| Sioux Reservations | Meeting Locations |
| --- | --- |
| Lower Sioux | Lower Sioux Res., Minnesota |
| Shakopee | Mendota, Minnesota |
| Prairie Island | Mendota, Minnesota |
| Upper Sioux | Upper Sioux Res., Minnesota |
| Santee | Santee Res., Nebraska and Sioux City, Iowa |
| Sisseton | Sisseton Res., South Dakota |
| Crow Creek | Crow Creek Res., South Dakota |
| Flandreau | Flandreau Res., South Dakota |
| Yankton | Yankton Res., South Dakota |
| Rosebud | Rosebud Res., South Dakota |
| Pine Ridge | Pine Ridge Res., South Dakota |
| Lower Brule | Lower Brule Res., South Dakota |
| Cheyenne River | Cheyenne River Res., S. Dakota |
| Standing Rock | Standing Rock Res., S. Dakota |
| Ft. Peck | Ft. Peck Res., Montana |
| Spirit Lake | Spirit Lake Res., North Dakota |
| Sioux Valley Reserve | Sioux Valley Res., Manitoba |
| Bird Tail Reserve | Sioux Valley Res., Manitoba |
| Pipestone Reserve | Sioux Valley Res., Manitoba" |

Plaintiffs' Motions and Brief Regarding Notice to Lineal Descendants and
Requiring United States to Provide a List of Known Lineal Descendants (Docket
No. 63), Mar. 19, 2005, at p. 13.

Plaintiffs do not even agree among themselves as to which categories of
individuals are proper Plaintiffs. Ironically, the Wolfchild Plaintiffs created this
situation by labeling themselves the "loyal Mdewakanton," which spurred the
Group B Plaintiffs to find other sources allegedly linking their ancestors to acts of
loyalty, friendliness, or neutrality during the 1862 Dakota Conflict.[9]

Accordingly, Plaintiffs do not constitute an identifiable group of Indians, but
rather a collection of individuals ranging over six states and two countries. Even
under cases generously reading the Indian Tucker Act to encompass Indians living
within one state as an identifiable group, e.g., Tee-Hit-Ton Indians v. United
States, 128 Ct. Cl. 82, 85-86 (1954), these individual Plaintiffs are too disparate to
be treated as such. Certainly, unlike the Mdewakanton Tribes – and contrary to the

---

[9] Counsel for the DuMarce Plaintiff group informed the CFC that "I think the
loyalty issue is a big issue too because we did do some research into the loyalty
issue, and it appears from Meyer's book which you cite that there are really only
three Indians that were not involved in the uprising, and that was Other Day,
Coursolle and another half breed, so I mean if they had to be loyal, then that
narrows the group dramatically to three people and their descendants." Hrg. of
July 18, 2006, Tr. at 63 (Attorney Gary Montana) (A 725).

bold misstatements in the Wolfchild Plaintiffs' brief, e.g., Wolfchild App. Br.

at 5-6, – Plaintiffs are not and have never been federally recognized as a tribe.

**B.    Plaintiffs' Unsupported Allegations Regarding The Mdewakanton Tribes' Membership And Federal Recognition Are Nonjusticiable**

Contrary to the 1980 Act and this Court's decision in 2009, Plaintiffs

repeatedly argue that the three Mdewakanton Tribes' reservations in Minnesota

"are for the 1886 Mdewakanton group." See, e.g., Wolfchild App. Br. at 5, 38, 44.

Without citing to any evidence, Plaintiffs set forth allegations pertaining to the

Mdewakanton Tribes' supposedly temporary recognition, and attacking their

membership determinations. E.g., Wolfchild App. Br. at 2. Plaintiffs ignore this

Court's determination that, "Congress plainly gave the Court of Federal Claims no

role in the recognition process, and that court has no inherent authority to take part

in it. Moreover, the Court of Federal Claims has no power to review the

Secretary's acknowledgment decisions under the [Administrative Procedure Act]."

Samish Indian Nation v. United States, 419 F.3d 1355, 1373 (Fed. Cir. 2005).[10]  In

---

[10] This Court's holding in Samish is consistent with decades of federal case law on the subject. "[C]ourts have consistently recognized that in absence of express legislation by Congress to the contrary, a tribe has the complete authority to determine all questions of its own membership." Martinez v. Southern Ute Tribe, 249 F.2d 915, 920 (10th Cir. 1957); see also Ordinance 59 Ass'n. v. United States DOI Sec'y, 163 F.3d 1150 (10th Cir. 1998); Smith v. Babbitt, 100 F.3d 556, 559 (8th Cir. 1996) ("there is perhaps no greater intrusion upon tribal sovereignty than for a federal court to interfere with a sovereign tribe's membership determinations."); Apodaca v. Silvas, 19 F.3d 1015, 1016 (5th Cir. 1994) (Indian

(footnote continued)

fact, the record shows that the Mdewakanton Tribes are the successors to the historic Mdewakanton Band.

The assertion by Plaintiffs that the three Mdewakanton Tribes are "temporary subgroup communities" is absurd. See, e.g., Wolfchild App. Br. at 2, 6, 39. It is a phrase that is factually inaccurate and has no legal meaning. Under the Federally Recognized Indian Tribe List Act, Pub. L. 103-454, 108 Stat. 4791, all recognized tribes, however denominated—whether as "tribes," "bands," "communities," or "villages"—have equal sovereign rights. Congress has repeatedly identified the Mdewakanton Tribes as federally recognized sovereigns.

## II.   THE DEPARTMENT'S DECISION TO DISTRIBUTE THE FROZEN FUNDS TO THE MDEWAKANTON TRIBES WAS A CORRECT AND A REASONABLE EXERCISE OF AGENCY DISCRETION

The Mdewakanton Tribes agree with the arguments of the United States that there are no federal statutes imposing a money-mandating duty that would permit Plaintiffs to challenge in the CFC any decision by the Department to disburse the

---

(footnote continued from previous page)

tribes "have the right to control their membership roster, and any federal litigation on that subject would disrupt the conduct of intratribal affairs, an area that the federal government has left to the tribe itself."). Federal court interpretation of tribal membership laws would be particularly inappropriate, because "no right is more integral to a tribe's self-governance than its ability to establish its membership." Nero v. Cherokee Nation of Oklahoma, 892 F.2d 1457, 1463 (10th Cir. 1989). "Jurisdiction to resolve internal tribal disputes, interpret tribal constitutions and laws, and issue tribal membership determinations lies with Indian tribes and not in the district courts." In re Sac & Fox Tribe, 340 F.3d 749, 763 (8th Cir. 2003).

frozen funds. The Mdewakanton Tribes address the CFC's further failure to defer

to the decision of the Department to distribute the frozen funds to the three

Mdewakanton Tribes following the passage of the 1980 Act. The CFC found that

the 1980 Act was silent with respect to the disposition of the frozen funds.

Wolfchild VII, 96 Fed. Cl. at 323 (finding the statute "silen[t] . . . as to the funds");

see also id. at 329 ("the statute contains no text pertaining to the disposition of the

funds"). The CFC acknowledged that the agency had conducted a membership

study in 1979 and consulted with the three tribal communities about the

disbursement of the funds prior to the passage of the 1980 Act. Nevertheless, the

CFC incorrectly held that the agency's decision to disburse the funds equally to the

three Mdewakanton Tribes after the 1980 Act passed was not entitled to deference

under Chevron, or any related doctrine. See id. at 323-24, 329.

## A.    Chevron Deference Is Appropriate

It is well-settled that "[i]f the statute is silent or ambiguous with respect to

the specific issue, the question for the court is whether the agency's answer is

based on a permissible construction of the statute." Chevron, 467 U.S. at 843.

"The well-reasoned views of the agencies implementing a statute constitute a body

of experience and informed judgment to which courts and litigants may properly

resort for guidance." United States v. Mead Corp., 533 U.S. 218, 227 (2001)

(citations and internal quotations omitted). See also Odow v. United States, 51

21

Fed. Cl. 425, 433 (Fed. Cl. 2001) (holding that the CFC defers to an agency's interpretation of a statute it administers as long as the agency's interpretation does not contravene clearly discernible legislative intent); N. Colo. Water Conservancy Dist. v. United States, 88 Fed. Cl. 636, 659-660 (Fed. Cl. 2009) (same).

Ignoring the 1979 BIA population study and the tribal meetings and consultation that had occurred, the CFC found that "[t]he Department simply presumed that it could distribute the funds to the three communities on the basis of the 1980 Act, and memorialized that view in a letter from the Field Solicitor to the Area Director." Wolfchild VII, 96 Fed. Cl. at 329 (citing A 00878-80 (Field Solicitor letter)).[11] The CFC concluded that the Field Solicitor's letter constituted an opinion letter or other informal agency communication not embodied in notice-and-comment regulations, and was therefore not entitled to Chevron deference, but that the Department's determination may be entitled to respect under Skidmore v. Swift & Co., 323 U.S. 134 (1944). See id. However, in applying the Skidmore standards, the CFC found, incorrectly, that the Department did not engage in the type of "thoughtful analysis" that would warrant deference. Id. at 330.

---

[11] The Field Solicitor concluded, in part, that because the amounts of money used to purchase the 1886 lands were later deducted from the Claims' Commission awards for the Mdewakanton and Wahpakoota tribes, disbursement of the frozen funds to the Mdewakanton Tribes was permissible (A 879).

The CFC should have applied a <u>Chevron</u> analysis to the Department's decision to disburse the frozen funds equally to the three Tribes and deferred to the reasonable judgment of the agency. That decision was a permissible (and correct) construction of the 1980 Act and 25 U.S.C. § 155, and did not contravene the Appropriations Acts.

There is no requirement that regulations need to be promulgated before an agency's interpretation of a statute that it administers is entitled to <u>Chevron</u> deference. The Supreme Court has specifically held that <u>Chevron</u> deference may be appropriate even where notice-and-comment rulemaking has not occurred, or other "such administrative formality was required and none was afforded." <u>Mead Corp.</u>, 533 U.S. at 230-31 (citing <u>NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.</u>, 513 U.S. 251, 256-257, 263 (1995)). The simple fact that an agency determination was not the product of formal rulemaking "does not alone . . . bar the application of <u>Chevron</u>." <u>Id.</u> at 231.

Rather, in determining whether <u>Chevron</u> deference is appropriate a court considers "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." <u>Barnhart v. Walton</u>, 535 U.S. 212, 222 (2002) (citing <u>Mead Corp.</u>). Given the admittedly interstitial nature of the

legal question of disbursing the frozen funds, the Department's extensive

consideration of the issue of the distribution of the money, its 1979 population

study, its public meetings, and its role as principal drafter and implementer of the

1980 Act, <u>Chevron</u> deference is appropriate in this case.

Even if this Court agrees that <u>Chevron</u> deference is not appropriate, the CFC

nevertheless erred in its application of <u>Skidmore</u>, which also requires substantial

deference to an agency decision because agency "rulings, interpretations and

opinions . . . do constitute a body of experience and informed judgment to which

courts and litigants may properly resort for guidance. The weight of such a

judgment in a particular case will depend upon the thoroughness evident in its

consideration, the validity of its reasoning, its consistency with earlier and later

pronouncements, and all those factors which give it power to persuade."

<u>Skidmore</u>, 323 U.S. at 140. The Department's decision is precisely the type that

the Supreme Court determined was entitled to great weight under <u>Skidmore</u>, if not

<u>Chevron</u> deference.

### B.    The Department's Distribution Decision Was The Result Of Careful Consideration And Informed Judgment

The CFC incorrectly concluded that the "singular paragraph" in the Field

Solicitor's 1981 opinion letter constituted the agency's primary consideration for

the distribution of the frozen funds. <u>See</u> <u>Wolfchild VII</u>, 96 Fed. Cl. at 329-31. By

limiting its consideration to this letter (which correctly noted the Mdewakanton

Tribes' entitlement to funds coming from the 1886 lands), the CFC erred.

The 1979 BIA population study and the public hearings the Department held

demonstrate that the decision to distribute the frozen funds to the three

Mdewakanton Tribes was the result of the agency's informed judgment.  See the

discussion supra, at 10 – 14.  The Department's decision was consistent with prior

Congressional direction in the 1944 Act (and indeed implemented that statute in

part, by finally distributing the last of the funds appropriated in 1944).  The 1944

Act authorized the Fish & Wildlife Service to purchase certain 1886 lands for a

refuge and expressly directed that payment be made to Mdewakanton and

Wahpakoota Bands (including the newly reorganized IRA Tribes at Prairie Island

and Lower Sioux), not individual descendents of the Mdewakanton present in

Minnesota in 1886.  58 Stat. 274; see Wolfchild VI, 559 F.3d at 1251 ("[P]ayment

was made to a tribe, not to a group of individuals, and in particular not to the lineal

descendants of the 1886 Mdewakantons.").  In other words, Congress in 1944

provided for distribution of proceeds from the sale of 1886 lands without reference

to lineal descent.

It was permissible, therefore, for the Department to treat the remaining

money held in the frozen funds in the same manner as the proceeds from the sale

of lands authorized in the 1944 Act.  After all, the remaining money had accrued

undistributed from the 1886 lands, just as the proceeds of the 1944 land sale arose from the transfer of some of the 1886 lands to the Fish & Wildlife Service. The agency could reasonably conclude that because Congress directed that income from some of the 1886 lands that was not individually vested should be distributed to the Mdewakanton Tribes, the agency could also distribute all remaining non-vested income from the 1886 lands to the Mdewakanton Tribes.

There was no duty under the Appropriations Acts or any other law for the Department to identify each individual "lineal descendant" and pay them a vanishingly small portion of a relatively modest fund. For years the Department had assigned individual parcels of 1886 land only to relatively few "lineal descendants," and made no attempt to rotate every descendant through an assignment because that would have been economically senseless, if not practically impossible. After enactment of the 1980 Act, the Department made the reasonable and correct decision that unvested money should, like the land, devolve to the three Mdewakanton Tribes under the 1980 Act.

This Court has determined that the Appropriations Acts did not create a trust and that the 1886 lands were not held in trust until the 1980 Act placed them in trust for the Mdewakanton Tribes. Wolfchild VI, 559 F.3d at 1240-41. Proceeds from these federal lands not held in trust cannot be trust assets.

26

The CFC found, by contrast, that because the proceeds from the lands were held in three Indian money "Proceeds of Labor" Treasury Accounts, the funds should be classified as trust accounts, citing in support 25 U.S.C. § 155 and 25 C.F.R. § 115.002 (a definitional regulation which makes no mention of Proceeds of Labor accounts). Wolfchild VII, 96 Fed. Cl. at 333 n.42, 334. 25 U.S.C. § 155 does not help the Plaintiffs or support the CFC's ruling. This 1928 statute reads:

> All miscellaneous revenues derived from Indian reservations, agencies and schools . . . which are not required by existing law to be otherwise disposed of, shall be covered into the Treasury of the United States under the caption "Indian moneys, proceeds of labor," and are hereby made available for expenditure, in the discretion of the Secretary of the Interior, *for the benefit of the Indian tribes* . . . on whose behalf they are collected . . . .

25 U.S.C. § 155 (emphasis added).

While funds held in accounts created under authority of 25 U.S.C. § 155 may be affected with a general trust duty to be used for the tribes on whose behalf they were gathered, individual Plaintiffs cannot bootstrap a <u>monetary</u> claim for their benefit onto funds that were not generated off of trust assets -- at the time the frozen funds were generated, they simply came off U.S.-title land, not assigned to any individual. In fact, 28 U.S.C. § 155 confers on the Secretary precisely the discretion to do with the frozen funds (which were not held for any individual under a contract, lease, or assignment) what he ultimately did—distribute them to the three Mdewakanton Tribes. E.g., <u>Red Lake Band of Chippewa Indians v.</u>

Barlow, 834 F.2d 1393, 1400 (8th Cir. 1987) (funds held in account governed by 25 U.S.C. § 155 are "to be used for the Band's general welfare").

Importantly, because the Department played a significant role in authoring the 1980 Act, its interpretation of its authority under the statute to distribute the frozen funds to the Mdewakanton Tribes is particularly deserving of Chevron deference. The Supreme Court "shows great deference to the interpretation given [a] statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16 (1965). An agency construction "carries most weight when the administrators participated in drafting and directly made known their views to Congress in Committee hearings. In such circumstances, absent any indication that Congress differed with the responsible department, a court should resolve any ambiguity in favor of the administrative construction, if such construction enhances the general purposes and policies underlying the legislation." Zuber v. Allen, 396 U.S. 168, 192-93 (1969) (citations omitted). The Department's distribution decision enhanced the goals of the 1980 Act.

In determining whether deference is due to an agency interpretation, a court must consider the nature of the legal question, the thoroughness of the agency's consideration, and the agency's experience in addressing the issue over a long period of time. See Barnhart, 535 U.S. at 222; Skidmore, 323 U.S. at 140. Here, the agency's efforts in addressing the 1886 lands and the associated frozen funds

are well-documented over a long period of time. The CFC should have given more credence to those efforts and deferred to the agency's decision, whether under Chevron or Skidmore. Crucially, no other law – not the Appropriations Acts and not 25 U.S.C. § 155 – obligated the Secretary to disburse the frozen funds in equal increments to an unknown number of unidentified "lineal descendants." The CFC should not have substituted its judgment for the reasonable construction of a statute by the agency charged with its implementation.

## CONCLUSION

For the foregoing reasons, the Mdewakanton Tribes support the Answering and Reply Brief of the United States responding to the Plaintiffs/Cross-Appellants' cross-appeal, and seek reversal of the CFC's grant of summary judgment to the Plaintiffs "use restriction" claims regarding disposition of the frozen funds, affirmance of the CFC's dismissal of all other claims, and remand for entry of final judgment in favor of the United States on all claims.

/

/

/

/

/

/

29

Respectfully submitted (initially on December 27, 2012) and AS

CORRECTED on this 19th day of February, 2013.

Philip Baker-Shenk
HOLLAND & KNIGHT LLP
800 – 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 457-7031
Facsimile: (202) 955-5564
philip.baker-shenk@hklaw.com
D.C. Bar No. 386662

Attorney for *(Amici)* Shakopee
Mdewakanton Sioux Community, *(Amici)*
Prairie Island Indian Community and
*(Amici)* Lower Sioux Indian Community

30

**CERTIFICATE OF SERVICE**

I hereby certify that two copies of the foregoing *CORRECTED Brief of*

*Amici Curiae Shakopee Mdewakanton Sioux Community, Prairie Island Indian*

*Community, and Lower Sioux Indian Community in Support of the United*

*States' Answering and Reply Brief,* and accompanying *CORRECTED Motion for*

*Leave to File,* have been served by United States Postal Service mail, first-class

postage prepaid, this 19th day of February, 2013, upon each of the following

counsel of record:

ERICK G. KAARDAL
Mohrman & Kaardal P.A.
33 South Sixth Street, Suite 4100
Minneapolis, MN 55402

R. DERYL EDWARDS
606 South Pearl St.
Joplin, MO 64801

ROBIN L. ZEPHIER
Abourezek & Zephier
2020 W. Omaha Street
Rapid City, SD 57709

GARY JOHN MONTANA
Montana & Associates
N 12923 North Prairie Road
Osseo, WI 54758

BARRY HOGAN
Renaud, Cook, Drury, Mesaros, PA
One North Central, Suite 900
Phoenix, AZ 85004-4417

RANDY VERN THOMPSON
Nolan, Thompson & Leighton
5001 American Blvd. West, Suite 595
Bloomington, MN 55437

KELLY STRICHERZ
213 Forest Avenue
P.O. Box 187
Vermillion, SD 57069

SCOTT ALLEN JOHNSON
Johnson Law Group
10850 Wayzata Boulevard, Suite 250
Minnetonka, MN 55305

JACK E. PIERCE
Pierce Law Firm, P.A.
6040 Earle Brown Drive, Suite 420
Minneapolis, MN 55430

LARRY B. LEVENTHAL
Larry Leventhal & Associates
319 Ramsey Street,
St. Paul, MN 55102

CREIGHTON A. THURMAN
P.O. Box 897
Yankton, SD 57078

WOOD R. FOSTER, JR.,
Siegel Brill Greupner Duffy
100 Washington Avenue South
Suite 1300
Minneapolis, MN 55401

GARRETT J. HORN
Horn Law Office
P.O. Box 886
Yankton, SD 57078

ELIZABETH T. WALKER
Walker Associates
429 North St. Asaph Street,
Alexandria, VA 22314

NICOLE NACHTIGAL EMERSON
Lynn, Jackson, Shultz & Lebrun
141 North Main Avenue, Suite 900
P.O. Box 2700
Sioux Falls, SD 57101

FRANCES ELAINE FELIX
826 21st Avenue, SE
Minneapolis, MN 55414

JAMES LAWRENCE BLAIR
Renaud Cook Drury Mesaros, PA
1 North Central Avenue
Phelps Dodge Tower - Suite 900
Phoenix, AZ 85004

PHILIP WILLIAM MORGAN
757 7th Street
P.O. Box 901
Britton, SD 57430

REBECCA ELIZABETH FELIX
1160 NW Portland Avenue, No. 2
Bend, OR 97701

BERNARD JOSEPH ROONEY
84 Park Avenue
Larchmont, NY 10538

DOUGLAS R. KETTERING
Kettering Law Office
714 Douglas Ave.
Yankton, SD 57078

JOHN L. SMELTZER
United States Department of Justice
Post Office Box 7415
Washington, DC 20044

PHILIP R. MAHOWALD
Attorney for *(Amici)* Prairie Island Indian Community
5636 Sturgeon Lake Road
Welch, MN  55089

JOSEPH F. HALLORAN
JOHN E. JACOBSON
Jacobson Buffalo Magnuson
Anderson & Hogen, P.C.
Attorneys for *(Amici)* Lower Sioux Indian Community
335 Atrium Office Building
1295 Bandana Boulevard
St. Paul, MN 55108

RICHARD A. DUNCAN
Faegre Baker Daniels LLP
Attorneys for *(Amici)* Shakopee Mdewakanton Sioux Community
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901

KURT V. BLUEDOG
GREG S. PAULSON
BlueDog, Paulson & Small, P.L.L.P.
Attorneys for *(Amici)* Shakopee Mdewakanton Sioux Community
Southgate Office Plaza, Suite 500
5001 American Boulevard West
Bloomington, MN  55437

/
/
/
/
/
/

Respectfully submitted,

Philip Baker-Shenk
HOLLAND & KNIGHT LLP
800 – 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 457-7031
Facsimile: (202) 955-5564
philip.baker-shenk@hklaw.com
D.C. Bar No. 386662

Attorney for *(Amici)* Shakopee
Mdewakanton Sioux Community, *(Amici)*
Prairie Island Indian Community and
*(Amici)* Lower Sioux Indian Community

## CERTIFICATE OF COMPLIANCE

On this 19th day of February, 2013, I hereby certify that:

1.    This CORRECTED brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e), in that it contains 6,999 words (less than one-half the maximum length of the principal brief), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.    This CORRECTED brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate

Procedure 32(a)(6), in that it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman, 14 Point Font.

Respectfully submitted,

Philip Baker-Shenk
HOLLAND & KNIGHT LLP
800 – 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 457-7031
Facsimile: (202) 955-5564
philip.baker-shenk@hklaw.com
D.C. Bar No. 386662

Attorney for *(Amici)* Shakopee Mdewakanton Sioux Community, *(Amici)* Prairie Island Indian Community and *(Amici)* Lower Sioux Indian Community